# Exhibit A

# TABLE OF CONTENTS

### CUMULATIVE TABLE OF VIRGINIA ADMINISTRATIVE CODE SECTIONS ADOPTED, AMENDED, OR REPEALED

Cumulative Table ........................................2487

## NOTICES OF INTENDED REGULATORY ACTION

TITLE 2. AGRICULTURE

Department of Agriculture and Consumer Services .........2492

TITLE 4. CONSERVATION AND NATURAL RESOURCES

Department of Mines, Minerals and Energy ...................2492

TITLE 8. EDUCATION

State Board of Education ................................2493

TITLE 9. ENVIRONMENT

Virginia Waste Management Board ................................2493

State Water Control Board ...........................................2494

TITLE 12. HEALTH

Department of Medical Assistance Services...................2495

State Mental Health, Mental Retardation and Substance Abuse Services Board...................................................2495

TITLE 18. PROFESSIONAL AND OCCUPATIONAL REGULATION

Board of Medicine .......................................................2495

Board of Nursing.........................................................2495

Department of Professional and Occupational Regulation ..................................................................................2496

Real Estate Appraiser Board ...........................................2496

TITLE 24. TRANSPORTATION AND MOTOR VEHICLES

Department of Motor Vehicles .........................................2496

## PROPOSED REGULATIONS

TITLE 8. EDUCATION

### DEPARTMENT OF EDUCATION

Standards for State-Funded Remedial Programs. (8 VAC 20-630-10 et seq.) ...............................................2497

TITLE 12. HEALTH

### DEPARTMENT OF MEDICAL ASSISTANCE SERVICES

Recipient Cost Sharing and Similar Charges. .................2500

Administration of Medical Assistance Services (amending 12 VAC 30-20-150 and 12 VAC 30-20-160). ...............2500

TITLE 14. INSURANCE

### STATE CORPORATION COMMISSION

#### Bureau of Insurance

Rules Governing Credit for Reinsurance (amending 14 VAC 5-300-90). .........................................................2504

TITLE 18. PROFESSIONAL AND OCCUPATIONAL REGULATION

### BOARD FOR ARCHITECTS, PROFESSIONAL ENGINEERS, LAND SURVEYORS, CERTIFIED INTERIOR DESIGNERS AND LANDSCAPE ARCHITECTS

Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects Rules and Regulations (amending 18 VAC 10-20-10, 18 VAC 10-20-20, 18 VAC 10-20-30, 18 VAC 10-20-110, 18 VAC 10-20-120, 18 VAC 10-20-130, 18 VAC 10-20-140, 18 VAC 10-20-150, 18 VAC 10-20-160, 18 VAC 10-20-190, 18 VAC 10-20-200, 18 VAC 10-20-210, 18 VAC 10-20-220, 18 VAC 10-20-240, 18 VAC 10-20-250, 18 VAC 10-20-260, 18 VAC 10-20-270, 18 VAC 10-20-300, 18 VAC 10-20-310, 18 VAC 10-20-320, 18 VAC 10-20-340, 18 VAC 10-20-350, 18 VAC 10-20-360, 18 VAC 10-20-370, 18 VAC 10-20-380, 18 VAC 10-20-400, 18 VAC 10-20-420, 18 VAC 10-20-430, 18 VAC 10-20-440, 18 VAC 10-20-450, 18 VAC 10-20-490, 18 VAC 10-20-505, 18 VAC 10-20-530, 18 VAC 10-20-540, 18 VAC 10-20-550, 18 VAC 10-20-560, 18 VAC 10-20-570, 18 VAC 10-20-590, 18 VAC 10-20-600, 18 VAC 10-20-610, 18 VAC 10-20-620, 18 VAC 10-20-640, 18 VAC 10-20-650, 18 VAC 10-20-660, 18 VAC 10-20-680, 18 VAC 10-20-720, 18 VAC 10-20-740, 18 VAC 10-20-750, 18 VAC 10-20-760, and 18 VAC 10-20-780; adding 18 VAC 10-20-55, 18 VAC 10-20-75, and 18 VAC 10-20-295; repealing 18 VAC 10-20-100, 18 VAC 10-20-180, 18 VAC 10-20-290, 18 VAC 10-20-330, 18 VAC 10-20-410, and 18 VAC 10-20-480)................................................2506

### VIRGINIA BOARD FOR ASBESTOS AND LEAD

Virginia Asbestos Licensing Regulations. (18 VAC 15-20-10 et seq.)...................................................................2529

### AUCTIONEERS BOARD

Rules and Regulations of the Virginia Auctioneers Board (amending 18 VAC 25-21-10, 18 VAC 25-21-20, 18 VAC 25-21-30, 18 VAC 25-21-40, 18 VAC 25-21-50, 18 VAC 25-21-60, 18 VAC 25-21-90, 18 VAC 25-21-110, 18 VAC 25-21-180, and 18 VAC 25-21-200; adding 18 VAC 25-21-210 and 18 VAC 25-21-220). ....................................................2563

# Table of Contents

**BOARD FOR CONTRACTORS**

Tradesman Rules and Regulations (amending 18 VAC 50-30-10, 18 VAC 50-30-20, 18 VAC 50-30-40, 18 VAC 50-30-50, 18 VAC 50-30-90, and 18 VAC 50-30-200). .................. 2569

## FINAL REGULATIONS

TITLE 4.  CONSERVATION AND NATURAL RESOURCES

**MARINE RESOURCES COMMISSION**

Pertaining to Crab Catch Limits (amending 4 VAC 20-40-20). .................................................................... 2576

Pertaining to Crabbing (amending 4 VAC 20-270-40). .... 2576

Pertaining to the Taking of Bluefish (amending 4 VAC 20-450-30)............................................................................. 2576

Pertaining to Recreational Gear Licenses (adding 4 VAC 20-670-25)..................................................................... 2577

Pertaining to Scup (Porgy) (amending 4 VAC 20-910-45). .................................................................................. 2577

TITLE 5.  CORPORATIONS

**STATE CORPORATION COMMISSION**

State Corporation Commission Rules of Practice and Procedure (REPEALED).  (5 VAC 5-10-10 et seq.)......... 2577

State Corporation Commission Rules of Practice and Procedure.  (5 VAC 5-20-10 et seq.) ............................... 2577

TITLE 12.  HEALTH

**DEPARTMENT OF MEDICAL ASSISTANCE SERVICES**

Groups Covered and Agencies Responsible for Eligibility Determination (amending 12 VAC 30-30-20). ................. 2587

Groups Covered and Agencies Responsible for Eligibility Determination (amending 12 VAC 30-30-20). ................. 2589

Eligibility Conditions and Requirements (amending 12 VAC 30-40-220)..................................................................... 2589

Eligibility Conditions and Requirements (amending 12 VAC 30-40-220)..................................................................... 2592

Individual and Family Developmental Disabilities Support Waiver. ....................................................................... 2595

Amount, Duration and Scope of Medical and Remedial Care Services (adding 12 VAC 30-50-490). ................. 2595

Methods and Standards for Establishing Payment Rates-- Other Types of Care (amending 12 VAC 30-80-110)... 2595

Waivered Services (adding Part XI: 12 VAC 30-120-700 through 12 VAC 30-120-799). .................................... 2595

Methods and Standards for Establishing Payment Rates-Long Term Care (2000 Nursing Home Payment System) (amending 12 VAC 30-90-20, 12 VAC 30-90-30, 12 VAC 30-90-31, 12 VAC 30-90-33, 12 VAC 30-90-34, 12 VAC 30-90-35, 12 VAC 30-90-36, 12 VAC 30-90-37, 12 VAC 30-90-38, 12 VAC 30-90-39, 12 VAC 30-90-40, 12 VAC 30-90-41, 12 VAC 30-90-50, 12 VAC 30-90-51, 12 VAC 30-90-55, 12 VAC 30-90-60, 12 VAC 30-90-65, 12 VAC 30-90-70, 12 VAC 30-90-80, 12 VAC 30-90-120, 12 VAC 30-90-123, 12 VAC 30-90-160, 12 VAC 30-90-170, 12 VAC 30-90-221, 12 VAC 30-90-240, 12 VAC 30-90-250, 12 VAC 30-90-253, 12 VAC 30-90-264, 12 VAC 30-90-266, 12 VAC 30-90-270, 12 VAC 30-90-272, and 12 VAC 30-90-280; adding 12 VAC 30-90-19, 12 VAC 30-90-29, 12 VAC 30-90-136, and 12 VAC 30-90-165; repealing 12 VAC 30-90-42, 12 VAC 30-90-43, 12 VAC 30-90-130, 12 VAC 30-90-131, 12 VAC 30-90-132, 12 VAC 30-90-133, 12 VAC 30-90-135, and 12 VAC 30-90-260)......................................................................2623

TITLE 18.  PROFESSIONAL AND OCCUPATIONAL LICENSING

**BOARD OF COUNSELING**

Regulations Governing the Practice of Licensed Substance Abuse Treatment Practitioners (amending 18 VAC 115-60-20, 18 VAC 115-60-40, 18 VAC 115-60-50, 18 VAC 115-60-120, and 18 VAC 115-60-150). ...............................................2651

**BOARD OF PSYCHOLOGY**

Regulations Governing the Practice of Psychology (amending 18 VAC 125-20-30, 18 VAC 125-20-120, 18 VAC 125-20-130, and 18 VAC 125-20-160; adding 18 VAC 125-20-121, 18 VAC 125-20-122, and 18 VAC 125-20-123)..........................2652

TITLE 20.  PUBLIC UTILITIES AND TELECOMMUNICATIONS

**STATE CORPORATION COMMISSION**

Rules for Enforcement of the Underground Utility Damage Prevention Act (amending 20 VAC 5-309-10, 20 VAC 5-309-20, 20 VAC 5-309-30, 20 VAC 5-309-40, 20 VAC 5-309-50, and 20 VAC 5-309-70; adding 20 VAC 5-309-15 and 20 VAC 5-309-90 through 20 VAC 5-309-180)............................2654

TITLE 22.  SOCIAL SERVICES

**STATE BOARD OF SOCIAL SERVICES**

Agency Placement Adoptions - Preplacement Services (REPEALED).  (22 VAC 40-230-10 et seq.) ....................2660

Relocation Assistance General Relief Program (REPEALED). (22 VAC 40-480-10 et seq.) ..........................................2661

# Table of Contents

Virginia Child Care Provider Scholarship Program (formerly Child Day Care Scholarship Programs) (amending 22 VAC 40-690-10, 22 VAC 40-690-20, 22 VAC 40-690-30, 22 VAC 40-690-40, and 22 VAC 40-690-60; adding 22 VAC 40-690-15, 22 VAC 40-690-35, 22 VAC 40-690-55, and 22 VAC 40-690-65; repealing 22 VAC 40-690-50 and 22 VAC 40-690-70). .................................................................2661

Community Service Block Grant Guidelines (REPEALED). (22 VAC 40-900-10 et seq.)................................................2671

Community Services Block Grant Program.  (22 VAC 40-901-10 et seq.) ....................................................................2671

TITLE 24.  TRANSPORTATION AND MOTOR VEHICLES

**COMMONWEALTH TRANSPORTATION BOARD**

Certification Procedures for the Disadvantaged Business Enterprise/Women-Owned Business Enterprise (DBE/WBE) Program.  (24 VAC 30-240-10)......................................2671

Adoption of the Federal Manual on Uniform Traffic Control Devices.  (24 VAC 30-561-10)......................................2672

# EMERGENCY REGULATIONS

TITLE 4.  CONSERVATION AND NATURAL RESOURCES

**MARINE RESOURCES COMMISSION**

Pertaining to Black Sea Bass (amending 4 VAC 20-950-45). .................................................................................2673

# GENERAL NOTICES/ERRATA

**DEPARTMENT OF ENVIRONMENTAL QUALITY**

Total Maximum Daily Load (TMDL) for Benthic Impairment .................................................................................2674

Total Maximum Daily Load (TMDL) for Black Creek and Tributaries ...............................................................2674

Total Maximum Daily Load (TMDL) for Fecal Coliform Bacteria on a 8.0-Mile Segment of Four Mile Run ...........2674

Total Maximum Daily Load (TMDL) for Fecal Coliform on a 6.37 Mile Segment of Moore's Creek ............................2675

**BOARD FOR GEOLOGY**

Notice of Periodic Review................................................2675

**DEPARTMENT OF SOCIAL SERVICES**

Periodic Review of Regulations .......................................2675

**VIRGINIA CODE COMMISSION**

Notice to State Agencies .................................................2675

Forms for Filing Material for Publication in *The Virginia Register of Regulations* .................................................2675

ERRATA

**DEPARTMENT OF STATE POLICE**

Motor Vehicle Safety Inspection Rules and Regulations. (19 VAC 30-70-5 et seq.)...............................................2676

# CALENDAR OF EVENTS

EXECUTIVE

Open Meetings and Public Hearings .............................2677

INDEPENDENT

Open Meetings and Public Hearings .............................2691

LEGISLATIVE

Open Meetings and Public Hearings .............................2691

CHRONOLOGICAL LIST

Open Meetings...............................................................2692

Public Hearings.............................................................2694

# CUMULATIVE TABLE OF VIRGINIA ADMINISTRATIVE CODE SECTIONS ADOPTED, AMENDED, OR REPEALED

The table printed below lists regulation sections, by Virginia Administrative Code (VAC) title, that have been amended, added or repealed in the *Virginia Register* since the regulations were originally published or last supplemented in VAC (the Spring 2001 VAC Supplement includes final regulations published through *Virginia Register* Volume 17, Issue 11, dated February 12, 2001). Emergency regulations, if any, are listed, followed by the designation "emer," and errata pertaining to final regulations are listed. Proposed regulations are not listed here. The table lists the sections in numerical order and shows action taken, the volume, issue and page number where the section appeared, and the effective date of the section.

| SECTION NUMBER | ACTION | CITE | EFFECTIVE DATE |
|---|---|---|---|
| **Title 2. Agriculture** | | | |
| 2 VAC 15-20-81 | Amended | 17:14 VA.R. 2179 | 3/1/01 |
| **Title 4. Conservation and Natural Resources** | | | |
| 4 VAC 20-252-70 | Amended | 17:12 VA.R. 2024 | 1/26/01 |
| 4 VAC 20-252-90 | Amended | 17:12 VA.R. 2024 | 1/26/01 |
| 4 VAC 20-252-100 | Amended | 17:12 VA.R. 2024 | 1/26/01 |
| 4 VAC 20-252-110 | Amended | 17:12 VA.R. 2025 | 1/26/01 |
| 4 VAC 20-252-140 | Amended | 17:12 VA.R. 2025 | 1/26/01 |
| 4 VAC 20-270-40 | Amended | 17:14 VA.R. 2179 | 3/1/01 |
| 4 VAC 20-561-10 through 4 VAC 20-561-50 | Added | 17:16 VA.R. 2332 | 8/16/01 |
| 4 VAC 20-620-30 | Amended | 17:14 VA.R. 2180 | 3/1/01 |
| 4 VAC 20-620-50 | Amended | 17:14 VA.R. 2180 | 3/1/01 |
| 4 VAC 20-620-70 | Amended | 17:14 VA.R. 2180 | 3/1/01 |
| 4 VAC 20-751-10 | Amended | 17:16 VA.R. 2333 | 4/1/01 |
| 4 VAC 20-751-20 | Amended | 17:16 VA.R. 2333 | 4/1/01 |
| 4 VAC 20-890-30 | Amended | 17:16 VA.R. 2333 | 4/1/01 |
| 4 VAC 20-910-30 | Amended | 17:14 VA.R. 2181 | 3/1/01 |
| 4 VAC 20-950-30 | Amended | 17:14 VA.R. 2181 | 3/1/01 |
| 4 VAC 20-950-45 | Amended | 17:14 VA.R. 2181 | 3/1/01 |
| 4 VAC 20-950-45 | Amended | 17:16 VA.R. 2334 | 4/1/01 |
| 4 VAC 20-995-20 | Amended | 17:12 VA.R. 2025 | 1/26/01 |
| 4 VAC 20-995-20 | Amended | 17:14 VA.R. 2182 | 3/1/01 |
| **Title 8. Education** | | | |
| 8 VAC 20-110-10 | Amended | 17:12 VA.R. 2026 | 3/28/01 |
| 8 VAC 20-110-20 | Repealed | 17:12 VA.R. 2026 | 3/28/01 |
| 8 VAC 20-110-40 | Amended | 17:12 VA.R. 2026 | 3/28/01 |
| 8 VAC 20-110-50 | Amended | 17:12 VA.R. 2026 | 3/28/01 |
| 8 VAC 20-110-60 | Repealed | 17:12 VA.R. 2026 | 3/28/01 |
| 8 VAC 20-110-70 | Repealed | 17:12 VA.R. 2026 | 3/28/01 |
| 8 VAC 20-110-140 | Repealed | 17:12 VA.R. 2026 | 3/28/01 |
| 8 VAC 20-540-10 et seq. | Repealed | 17:16 VA.R. 2334 | 5/23/01 |
| 8 VAC 20-541-10 through 8 VAC 20-541-60 | Added | 17:16 VA.R. 2335-2342 | 5/23/01 |
| 8 VAC 20-650-10 through 8 VAC 20-650-20 emer | Added | 17:14 VA.R. 2202 | 3/7/01-3/6/02 |
| **Title 9. Environment** | | | |
| 9 VAC 5-50-400 | Amended | 17:15 VA.R. 2248 | 6/1/01 |
| 9 VAC 5-60-60 | Amended | 17:15 VA.R. 2248 | 6/1/01 |
| 9 VAC 5-60-90 | Amended | 17:15 VA.R. 2248 | 6/1/01 |
| 9 VAC 5-60-100 | Amended | 17:15 VA.R. 2249 | 6/1/01 |
| 9 VAC 5-210-10 through 9 VAC 5-210-160 | Added | 17:16 VA.R. 2342-2344 | 7/1/01 |
| 9 VAC 20-15-10 through 9 VAC 20-15-160 | Added | 17:16 VA.R. 2344-2346 | 7/1/01 |
| 9 VAC 20-80-10 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-40 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-60 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-80 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-100 | Amended | 17:16 VA.R. 2349 | 5/23/01 |

# Cumulative Table of VAC Sections Adopted, Amended, or Repealed

| SECTION NUMBER | ACTION | CITE | EFFECTIVE DATE |
|---|---|---|---|
| 9 VAC 20-80-110 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-113 | Added | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-115 | Added | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-120 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-140 through 9 VAC 20-80-290 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-310 through 9 VAC 20-80-340 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-360 through 9 VAC 20-80-380 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-400 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-450 | Added | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-460 | Added | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-470 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-480 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-485 | Added | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-500 through 9 VAC 20-80-560 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-620 through 9 VAC 20-80-650 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-670 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-700 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-730 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 20-80-750 through 9 VAC 20-80-790 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| Appendices 2.1 and 2.2 | Added | 17:16 VA.R. 2349 | 5/23/01 |
| Appendix 4.1 | Repealed | 17:16 VA.R. 2349 | 5/23/01 |
| Appendix 5.1 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| Appendices 5.2 and 5.3 | Repealed | 17:16 VA.R. 2349 | 5/23/01 |
| Appendix 5.5 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| Appendix 5.6 | Added | 17:16 VA.R. 2349 | 5/23/01 |
| Appendices 7.4 and 9.1 | Amended | 17:16 VA.R. 2349 | 5/23/01 |
| 9 VAC 25-15-10 through 9 VAC 25-15-160 | Added | 17:16 VA.R. 2347-2349 | 7/1/01 |
| 9 VAC 25-31-10 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-30 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-50 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-100 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-110 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-120 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-170 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-220 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-280 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-370 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-390 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-31-410 | Amended | 17:13 VA.R. 2076 | 4/11/01 |
| 9 VAC 25-110-10 | Amended | 17:16 VA.R. 2350 | 8/1/01 |
| 9 VAC 25-110-20 | Amended | 17:16 VA.R. 2351 | 8/1/01 |
| 9 VAC 25-110-40 | Repealed | 17:16 VA.R. 2351 | 8/1/01 |
| 9 VAC 25-110-50 | Repealed | 17:16 VA.R. 2351 | 8/1/01 |
| 9 VAC 25-110-60 | Amended | 17:16 VA.R. 2351 | 8/1/01 |
| 9 VAC 25-110-70 | Amended | 17:16 VA.R. 2351 | 8/1/01 |
| 9 VAC 25-110-80 | Amended | 17:16 VA.R. 2353 | 8/1/01 |
| 9 VAC 25-115-10 through 9 VAC 25-115-50 | Amended | 17:16 VA.R. 2367-2380 | 7/24/01 |
| 9 VAC 25-260-50 | Amended | 17:16 VA.R. 2381 | * |
| 9 VAC 25-260-55 | Added | 17:16 VA.R. 2381 | * |
| **Title 11.  Gaming** | | | |
| 11 VAC 10-60 (Forms) | Amended | 17:15 VA.R. 2259 | -- |
| **Title 12.  Health** | | | |
| 12 VAC 30-10-160 | Amended | 17:13 VA.R. 2077 | 4/11/01 |

---

* 30 days after notice in *Virginia Register* of EPA approval

# Cumulative Table of VAC Sections Adopted, Amended, or Repealed

| SECTION NUMBER | ACTION | CITE | EFFECTIVE DATE |
|---|---|---|---|
| 12 VAC 30-20-80 | Amended | 17:13 VA.R. 2077 | 4/11/01 |
| 12 VAC 30-30-10 | Amended | 17:13 VA.R. 2077 | 4/11/01 |
| 12 VAC 30-30-20 | Amended | 17:13 VA.R. 2081 | 4/11/01 |
| 12 VAC 30-30-40 | Amended | 17:13 VA.R. 2082 | 4/11/01 |
| 12 VAC 30-30-50 | Amended | 17:13 VA.R. 2082 | 4/11/01 |
| 12 VAC 30-40-80 | Amended | 17:13 VA.R. 2087 | 4/11/01 |
| 12 VAC 30-40-100 | Amended | 17:13 VA.R. 2083 | 4/11/01 |
| 12 VAC 30-40-240 | Amended | 17:13 VA.R. 2083 | 4/11/01 |
| 12 VAC 30-40-250 | Amended | 17:13 VA.R. 2085 | 4/11/01 |
| 12 VAC 30-40-280 | Amended | 17:13 VA.R. 2085 | 4/11/01 |
| 12 VAC 30-40-290 | Amended | 17:13 VA.R. 2085 | 4/11/01 |
| 12 VAC 30-40-350 | Amended | 17:13 VA.R. 2087 | 4/11/01 |
| 12 VAC 30-50-300 | Amended | 17:12 VA.R. 2026 | 6/1/01** |
| 12 VAC 30-50-530 | Amended | 17:12 VA.R. 2026 | 6/1/01** |
| 12 VAC 30-110-630 | Amended | 17:13 VA.R. 2096 | 4/11/01 |
| 12 VAC 30-110-650 | Amended | 17:13 VA.R. 2096 | 4/11/01 |
| 12 VAC 30-110-660 | Amended | 17:13 VA.R. 2096 | 4/11/01 |
| 12 VAC 30-110-670 | Amended | 17:13 VA.R. 2096 | 4/11/01 |
| 12 VAC 30-110-700 | Amended | 17:13 VA.R. 2097 | 4/11/01 |
| 12 VAC 30-110-710 | Amended | 17:13 VA.R. 2097 | 4/11/01 |
| 12 VAC 30-110-720 | Amended | 17:13 VA.R. 2088 | 4/11/01 |
| 12 VAC 30-110-730 | Amended | 17:13 VA.R. 2090 | 4/11/01 |
| 12 VAC 30-110-740 | Repealed | 17:13 VA.R. 2091 | 4/11/01 |
| 12 VAC 30-110-741 | Added | 17:13 VA.R. 2091 | 4/11/01 |
| 12 VAC 30-110-744 | Added | 17:13 VA.R. 2091 | 4/11/01 |
| 12 VAC 30-110-747 | Added | 17:13 VA.R. 2091 | 4/11/01 |
| 12 VAC 30-110-751 | Added | 17:13 VA.R. 2091 | 4/11/01 |
| 12 VAC 30-110-760 | Amended | 17:13 VA.R. 2091 | 4/11/01 |
| 12 VAC 30-110-780 | Amended | 17:13 VA.R. 2091 | 4/11/01 |
| 12 VAC 30-110-790 | Amended | 17:13 VA.R. 2091 | 4/11/01 |
| 12 VAC 30-110-800 | Amended | 17:13 VA.R. 2091 | 4/11/01 |
| 12 VAC 30-110-810 | Amended | 17:13 VA.R. 2091 | 4/11/01 |
| 12 VAC 30-110-813 | Added | 17:13 VA.R. 2092 | 4/11/01 |
| 12 VAC 30-110-815 | Added | 17:13 VA.R. 2092 | 4/11/01 |
| 12 VAC 30-110-820 | Repealed | 17:13 VA.R. 2092 | 4/11/01 |
| 12 VAC 30-110-830 | Amended | 17:13 VA.R. 2092 | 4/11/01 |
| 12 VAC 30-110-840 | Amended | 17:13 VA.R. 2092 | 4/11/01 |
| 12 VAC 30-110-850 | Amended | 17:13 VA.R. 2092 | 4/11/01 |
| 12 VAC 30-110-853 | Added | 17:13 VA.R. 2092 | 4/11/01 |
| 12 VAC 30-110-856 | Added | 17:13 VA.R. 2093 | 4/11/01 |
| 12 VAC 30-110-860 | Amended | 17:13 VA.R. 2093 | 4/11/01 |
| 12 VAC 30-110-870 | Amended | 17:13 VA.R. 2093 | 4/11/01 |
| 12 VAC 30-110-880 | Amended | 17:13 VA.R. 2093 | 4/11/01 |
| 12 VAC 30-110-890 | Repealed | 17:13 VA.R. 2093 | 4/11/01 |
| 12 VAC 30-110-900 | Amended | 17:13 VA.R. 2093 | 4/11/01 |
| 12 VAC 30-110-910 | Amended | 17:13 VA.R. 2094 | 4/11/01 |
| 12 VAC 30-110-920 | Amended | 17:13 VA.R. 2094 | 4/11/01 |
| 12 VAC 30-110-921 | Added | 17:13 VA.R. 2094 | 4/11/01 |
| 12 VAC 30-110-930 | Amended | 17:13 VA.R. 2094 | 4/11/01 |
| 12 VAC 30-110-940 | Amended | 17:13 VA.R. 2094 | 4/11/01 |
| 12 VAC 30-110-950 | Amended | 17:13 VA.R. 2094 | 4/11/01 |
| 12 VAC 30-110-960 | Amended | 17:13 VA.R. 2095 | 4/11/01 |
| 12 VAC 30-110-970 | Amended | 17:13 VA.R. 2095 | 4/11/01 |

** Effective date changed in 17:17 VA.R. 2443.

# Cumulative Table of VAC Sections Adopted, Amended, or Repealed

| SECTION NUMBER | ACTION | CITE | EFFECTIVE DATE |
|---|---|---|---|
| 12 VAC 30-110-980 | Amended | 17:13 VA.R. 2095 | 4/11/01 |
| 12 VAC 30-110-990 | Amended | 17:13 VA.R. 2095 | 4/11/01 |
| 12 VAC 30-110-1010 | Amended | 17:13 VA.R. 2095 | 4/11/01 |
| 12 VAC 30-110-1011 | Added | 17:13 VA.R. 2095 | 4/11/01 |
| **Title 13.  Housing** | | | |
| 13 VAC 10-180-10 | Amended | 17:17 VA.R. 2444 | 4/9/01 |
| 13 VAC 10-180-40 | Amended | 17:17 VA.R. 2444 | 4/9/01 |
| 13 VAC 10-180-60 | Amended | 17:17 VA.R. 2444 | 4/9/01 |
| 13 VAC 10-180-70 | Amended | 17:17 VA.R. 2452 | 4/9/01 |
| 13 VAC 10-180-90 | Amended | 17:17 VA.R. 2452 | 4/9/01 |
| 13 VAC 10-180-100 | Amended | 17:17 VA.R. 2452 | 4/9/01 |
| **Title 14.  Insurance** | | | |
| 14 VAC 5-300-130 | Amended | 17:16 VA.R. 2382 | 5/1/01 |
| **Title 17.  Libraries and Cultural Resources** | | | |
| 17 VAC 15-20-20 through 17 VAC 15-20-50 | Amended | 17:14 VA.R. 2183 | 5/1/01 |
| 17 VAC 15-20-70 through 17 VAC 15-20-120 | Amended | 17:14 VA.R. 2183 | 5/1/01 |
| 17 VAC 15-20-150 through 17 VAC 15-20-170 | Amended | 17:14 VA.R. 2183 | 5/1/01 |
| 17 VAC 15-30-10 et seq. | Repealed | 17:14 VA.R. 2183 | 5/1/01 |
| 17 VAC 15-40-10 et seq. | Repealed | 17:14 VA.R. 2183 | 5/1/01 |
| 17 VAC 15-50-20 through 17 VAC 15-50-50 | Amended | 17:14 VA.R. 2184 | 5/1/01 |
| 17 VAC 15-50-70 | Amended | 17:14 VA.R. 2184 | 5/1/01 |
| 17 VAC 15-50-90 through 17 VAC 15-50-110 | Amended | 17:14 VA.R. 2184 | 5/1/01 |
| 17 VAC 15-50-130 | Amended | 17:14 VA.R. 2184 | 5/1/01 |
| 17 VAC 15-50-140 | Repealed | 17:14 VA.R. 2184 | 5/1/01 |
| 17 VAC 15-50-150 | Amended | 17:14 VA.R. 2184 | 5/1/01 |
| 17 VAC 15-50-160 | Amended | 17:14 VA.R. 2184 | 5/1/01 |
| **Title 18.  Professional and Occupational Licensing** | | | |
| 18 VAC 5-20-10 et seq. | Repealed | 17:14 VA.R. 2184 | 4/25/01 |
| 18 VAC 5-21-10 through 18 VAC 5-21-170 | Amended | 17:14 VA.R. 2184-2198 | 4/25/01 |
| 18 VAC 30-20-10 | Amended | 17:16 VA.R. 2383 | 5/23/01 |
| 18 VAC 30-20-80 | Amended | 17:16 VA.R. 2383 | 5/23/01 |
| 18 VAC 30-20-160 | Amended | 17:16 VA.R. 2383 | 5/23/01 |
| 18 VAC 30-20-300 | Added | 17:16 VA.R. 2384 | 5/23/01 |
| 18 VAC 30-20-310 | Added | 17:16 VA.R. 2384 | 5/23/01 |
| 18 VAC 30-20-320 | Added | 17:16 VA.R. 2384 | 5/23/01 |
| 18 VAC 85-40-61 | Added | 17:13 VA.R. 2097 | 4/11/01 |
| 18 VAC 85-50-58 | Added | 17:13 VA.R. 2098 | 4/11/01 |
| 18 VAC 85-80-10 | Amended | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-80-70 | Amended | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-80-71 | Added | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-80-72 | Added | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-80-80 | Amended | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-101-150 | Amended | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-101-151 | Added | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-101-152 | Added | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-110-150 | Amended | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-110-155 | Added | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-110-160 | Amended | 17:17 VA.R. 2452 | 6/6/01 |
| 18 VAC 85-120-10 et seq. | Added | 17:17 VA.R. 2453 | 6/6/01 |
| 18 VAC 90-30-50 | Amended | 17:13 VA.R. 2098 | 4/11/01 |
| 18 VAC 90-30-110 | Amended | 17:13 VA.R. 2098 | 4/11/01 |
| 18 VAC 90-40-60 | Amended | 17:13 VA.R. 2098 | 4/11/01 |
| 18 VAC 90-40-70 | Amended | 17:13 VA.R. 2098 | 4/11/01 |
| 18 VAC 105-20-60 | Amended | 17:17 VA.R. 2453 | 6/6/01 |
| 18 VAC 125-20-10 | Amended | 17:12 VA.R. 2026 | 3/28/01 |
| 18 VAC 125-20-30 | Amended | 17:12 VA.R. 2027 | 3/28/01 |

# Cumulative Table of VAC Sections Adopted, Amended, or Repealed

| SECTION NUMBER | ACTION | CITE | EFFECTIVE DATE |
|---|---|---|---|
| 18 VAC 125-20-43 | Added | 17:12 VA.R. 2027 | 3/28/01 |
| 18 VAC 140-20-100 | Amended | 17:14 VA.R. 2198 | 4/25/01 |
| 18 VAC 140-20-105 | Added | 17:14 VA.R. 2198 | 4/25/01 |
| 18 VAC 140-20-106 | Added | 17:14 VA.R. 2199 | 4/25/01 |
| 18 VAC 140-20-110 | Amended | 17:14 VA.R. 2199 | 4/25/01 |
| 18 VAC 140-20-160 | Amended | 17:14 VA.R. 2199 | 4/25/01 |
| **Title 19.  Public Safety** | | | |
| 19 VAC 30-40-30 | Amended | 17:15 VA.R. 2252 | 5/9/01 |
| 19 VAC 30-70-160 | Amended | 17:15 VA.R. 2252 | 5/9/01 |
| 19 VAC 30-70-530 | Amended | 17:15 VA.R. 2255 | 5/9/01 |
| 19 VAC 30-150-5 | Added | 17:15 VA.R. 2257 | 5/9/01 |
| 19 VAC 30-150-10 | Amended | 17:15 VA.R. 2257 | 5/9/01 |
| 19 VAC 30-150-20 | Repealed | 17:15 VA.R. 2257 | 5/9/01 |
| 19 VAC 30-150-30 | Amended | 17:15 VA.R. 2257 | 5/9/01 |
| 19 VAC 30-150-50 | Amended | 17:15 VA.R. 2257 | 5/9/01 |
| 19 VAC 30-160-5 | Added | 17:15 VA.R. 2257 | 5/9/01 |
| 19 VAC 30-160-20 | Repealed | 17:15 VA.R. 2257 | 5/9/01 |
| 19 VAC 30-160-30 | Amended | 17:15 VA.R. 2257 | 5/9/01 |
| 19 VAC 30-160-40 | Amended | 17:15 VA.R. 2257 | 5/9/01 |
| 19 VAC 30-160-45 | Added | 17:15 VA.R. 2257 | 5/9/01 |
| 19 VAC 30-165-10 et seq. | Amended | 17:15 VA.R. 2258 | 5/9/01 |
| **Title 22.  Social Services** | | | |
| 22 VAC 40-130-10 et seq. | Withdrawn | 17:17 VA.R. 2456 | -- |
| 22 VAC 40-730-10 emer | Amended | 17:13 VA.R. 2103 | 4/1/01-3/31/02 |
| 22 VAC 40-730-40 through 22 VAC 40-730-100 emer | Amended | 17:13 VA.R. 2103-2104 | 4/1/01-3/31/02 |
| **Title 24.  Transportation and Motor Vehicles** | | | |
| 24 VAC 30-61-20 | Amended | 17:17 VA.R. 2456 | 6/6/01 |
| 24 VAC 30-61-40 | Amended | 17:17 VA.R. 2456 | 6/6/01 |
| 24 VAC 30-280-10 | Amended | 17:13 VA.R. 2099 | 2/15/01 |
| 24 VAC 30-280-20 through 24 VAC 30-280-70 | Added | 17:13 VA.R. 2099-2102 | 2/15/01 |
| 24 VAC 30-440-10 et seq. | Repealed | 17:14 VA.R. 2200 | 3/6/01 |
| 24 VAC 30-450-10 et seq. | Amended | 17:14 VA.R. 2200 | 3/6/01 |
| 24 VAC 30-460-10 | Repealed | 17:14 VA.R. 2201 | 3/6/01 |

# NOTICES OF INTENDED REGULATORY ACTION

**Symbol Key**
† Indicates entries since last publication of the *Virginia Register*

## TITLE 2.  AGRICULTURE

### DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES

### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the State Board of Agriculture and Consumer Services intends to consider amending regulations entitled: **2 VAC 5-500-10 et seq.  Rules and Regulations Governing the Cooling, Storing, Sampling, and Transporting of Milk or Milk Samples from the Farm to the Processing Plant or Laboratory.**  The purpose of the proposed action is to review the regulation for effectiveness and continued need, including the following: the need to include certain other species of mammals if the milk or dairy products are intended for human consumption; the need for consistency and compliance with the requirements of the Pasteurized Milk Ordinance (PMO) for Grade "A" milk; provision for the cooling, storing, and sampling of milk using alternatives to bulk tanks; the need to eliminate references to fees for milk hauling permits; the need to require permits for each milk pickup tank or milk transport tank used to move milk in Virginia; the need to include recording thermometer specifications consistent with the PMO; the need to require dedicated milk transport tanks to be used to haul any pasteurized milk, milk products, or frozen dessert mixes, when the products will not be repasteurized at the plant where they are packaged; and the need to require the collection of two identical milk samples at each pickup.  The agency invites comment on whether there should be an adviser.  The agency intends to hold a public hearing on the proposed regulation after publication.

Statutory Authority:  §§ 3.1-530.1, 3.1-530.2, 3.1-535, and 3.1-535.1 of the Code of Virginia.

Public comments may be submitted until July 9, 2001.

**Contact:**  John A. Beers, Program Supervisor, Department of Agriculture and Consumer Services, Washington Bldg., 1100 Bank St., Room 505, Richmond, VA 23219, telephone (804) 786-1453 or FAX (804) 371-7792.

VA.R. Doc. No. R01-166; Filed April 16, 2001, 4:17 p.m.

◆ ━━━━━━━━━━━━━━━━ ◆

## TITLE 4.  CONSERVATION AND NATURAL RESOURCES

### DEPARTMENT OF MINES, MINERALS AND ENERGY

### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Department of Mines, Minerals and Energy intends to consider repealing regulations entitled: **4 VAC 25-30-10 et seq.  Minerals Other than Coal Surface Mining Regulations.**  The Department of Mines, Minerals and Energy is proposing to repeal this regulation because the revisions are so extensive, both in text and format, that it is more efficient to repeal the regulation and simultaneously promulgate a new regulation in its place (4 VAC 25-31).  The agency intends to hold a public hearing on the proposed regulation after publication.

Statutory Authority:  §§ 45.1-161.3 and 45.1-180.3 of the Code of Virginia.

Public comments may be submitted until June 11, 2001.

**Contact:**  Conrad Spangler, Director, Mineral Mining, Department of Mines, Minerals and Energy, Fontaine Research Park, 900 Natural Resources Dr., P.O. Box 3727, Charlottesville, VA 22903, telephone (804) 951-6310, FAX (804) 951-6325 or toll-free 1-800-828-1120 (VA Relay Center).

VA.R. Doc. No. R01-167; Filed April 17, 2001, 1:39 p.m.

### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Department of Mines, Minerals and Energy intends to consider promulgating regulations entitled: **4 VAC 25-31-10 et seq.  Reclamation Regulations for Mineral Mining.**  The purpose of the proposed action is to provide for the beneficial development of mineral resources and to minimize the effects of mining on the environment.  The regulation is replacing the Minerals Other than Coal Regulations, 4 VAC 25-30.  The agency intends to hold a public hearing on the proposed regulation after publication.

Statutory Authority:  §§ 45.1-161.3 and 45.1-180.3 of the Code of Virginia.

Public comments may be submitted until June 11, 2001.

**Contact:**  Conrad Spangler, Director, Mineral Mining, Department of Mines, Minerals and Energy, Fontaine Research Park, 900 Natural Resources Dr., P.O. Box 3727, Charlottesville, VA 22903, telephone (804) 951-6310, FAX (804) 951-6325 or toll-free 1-800-828-1120 (VA Relay Center).

# Notices of Intended Regulatory Action

VA.R. Doc. No. R01-165; Filed April 13, 2001, 3:13 p.m.

◆ ━━━━━━━━━━━━━━━ ◆

# TITLE 8. EDUCATION

## STATE BOARD OF EDUCATION

### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the State Board of Education intends to consider amending regulations entitled: **8 VAC 20-30-10 et seq. Regulations Governing Adult High School Programs.** The purpose of this intended regulatory action is twofold. First, adult high school programs at which adults are able to earn a Standard or Advanced Studies Diploma will be required to maintain the same high standards as regular day school programs. Second, the change provides a high standard alternative diploma for adults (the Adult Education Diploma) who are unable to complete the requirements for a Standard or Advanced Studies Diploma. The agency intends to hold a public hearing on the proposed regulations after publication.

Statutory Authority: § 22.1-224 of the Code of Virginia.

Public comments may be submitted until June 6, 2001.

**Contact:** Robert MacGillivray, Adult Education Services, Department of Education, P.O. Box 2120, Richmond, VA 23218, telephone (804) 371-2333 or FAX (804) 225-2524.

VA.R. Doc. No. R01-170; Filed April 18, 2001, 10:52 a.m.

### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the State Board of Education intends to consider amending regulations entitled: **8 VAC 20-70-10 et seq. Regulations Governing Pupil Transportation Including Minimum Standards for School Buses in Virginia.** The purpose of the proposed action is to conform the regulations with statutory changes that have occurred since the regulations were last revised in 1994. In addition, federal standards addressing bus equipment and construction have, in some instances, changed significantly since the regulations were last amended. Consequently, Virginia is unable to permit the use of equipment permitted under federal standards because it is not permitted by the current regulations. Technological and manufacturing advancements that are not addressed in the current regulations have resulted in regulations and manufacturing requirements that are too restrictive and are in conflict with the "state-of-the-art." The 2000 National Standards for School Transportation became available in December 2000. These standards address such issues as school inspections, infants and toddlers, special education and specially equipped school buses. Those standards will be reviewed as a part of the revision process in order to incorporate changes, as appropriate. The agency intends to hold a public hearing on the proposed regulations after publication.

Statutory Authority: §§ 22.1-16, 22.1-176, 22.1-177 and 22.1-178 of the Code of Virginia.

Public comments may be submitted until June 6, 2001.

**Contact:** June Eanes, Director, Support Services, Department of Education, P.O. Box 2120, Richmond, VA 23218, telephone (804) 225-2037 or FAX (804) 225-2524.

VA.R. Doc. No. R01-171; Filed April 18, 2001, 10:52 a.m.

◆ ━━━━━━━━━━━━━━━ ◆

# TITLE 9. ENVIRONMENT

## VIRGINIA WASTE MANAGEMENT BOARD

### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Virginia Waste Management Board intends to consider amending regulations entitled: **9 VAC 20-80-10 et seq. Solid Waste Management Regulations.** The purpose of the proposed action is to incorporate and address statutory changes enacted by the General Assembly since Amendment 2 of the Virginia Solid Waste Management Regulations. These remaining statutes to be addressed in the regulations include at least the following:

1. The disposal capacity guarantee as required by § 10.1-1408.1 B 6.

2. Host community agreements as required by § 10.1-1408.1 B 7.

3. Reporting requirements for locally-owned facilities as required by § 10.1-1408.1 B 8.

4. Director's determinations as required by § 10.1-1408.1 D 1 and 2.

5. Permit condition for capacity guarantee as required by § 10.1-1408 1 P.

In addition, the regulation will be updated to correct any errors or omissions resulting from previous amendments and any outdated material. (See 17:17 VA.R. 2437-2440 May 7, 2001, for more detailed information.)

The department is using the participatory approach to develop a proposal.

The agency intends to hold a public hearing on the proposed amendments after their publication in the Virginia Register.

Statutory Authority: §§ 10.1-1402 and 10.1-1408.1 of the Code of Virginia.

Public comments may be submitted until June 22, 2001.

**Contact:** Michael J. Dieter, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4146.

VA.R. Doc. No. R01-169; Filed April 18, 2001, 9:52 a.m.

# Notices of Intended Regulatory Action

## STATE WATER CONTROL BOARD

### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the State Water Control Board intends to consider amending regulations entitled: **9 VAC 25-180-10 et seq. Virginia Pollutant Discharge Elimination System (VPDES) General Permit Regulation for Discharges of Storm Water from Construction Sites.** The purpose of the proposed action is to amend the existing storm water construction general permit, which expires on June 30, 2004, to add coverage for small construction activity (construction activity disturbing between one and five acres of land). (See 17:16 VA.R. 2302 April 23, 2001, for more detailed information.)

The board is forming a technical advisory committee composed of relevant stakeholders to assist in the development of the general permit. Persons interested in participation on the advisory committee should provide their name, address, telephone number and the name of the organization they represent to the contact person by May 23, 2001.

Following publication of the draft general permit regulation in the Virginia Register, the board will hold at least one public hearing to provide opportunity for public comment.

Statutory Authority: § 62.1-44.15 of the Code of Virginia.

Public comments may be submitted until May 23, 2001.

**Contact:** Burt Tuxford, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4086 or FAX (804) 698-4032.

VA.R. Doc. No. R01-162; Filed April 4, 2001, 10:37 a.m.

### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the State Water Control Board intends to consider amending regulations entitled: **9 VAC 25-194-10 et seq. Virginia Pollutant Discharge Elimination System (VPDES) General Permit for Car Wash Facilities.** The purpose of the proposed action is to reissue the existing general permit that expires on October 15, 2002. This general permit regulation governs the discharge of wastewater from car wash facilities to surface waters. (See 17:16 VA.R. 2302-2303 April 23, 2001, for more detailed information.)

The board will form a technical advisory committee composed of relevant stakeholders to assist in the development of the general permit. Persons interested in participation on the advisory committee should provide their name, address, telephone number and the name of the organization they represent to the contact person by May 23, 2001.

Following publication of the draft general permit regulation in the Virginia Register, the board will hold at least one public hearing to provide opportunity for public comment.

Statutory Authority: § 62.1-44.15 of the Code of Virginia.

Public comments may be submitted until May 23, 2001.

**Contact:** George Cosby, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4067 or FAX (804) 698-4032.

VA.R. Doc. No. R01-161; Filed April 4, 2001, 10:38 a.m.

### Notice of Intended Regulatory Action

### Extension of Public Comment Period

The State Water Control Board is extending the comment period on the Notice of Intended Regulatory Action for the triennial review of **9 VAC 25-260-5 et seq. Water Quality Standards** published in 17:10 VA.R. 1442-1445 January 29, 2001. Comments will be accepted until June 22, 2001.

Anyone wishing to submit written comments for the public comment file may do so by mail or by e-mail to emdaub@deq.state.va.us. Written comments must include the name and address of the commenter. In order to be considered, comments must be received by June 22, 2001. All comments received since January 29, 2001, will be considered by the board in the development of the proposal. Written comments may be submitted to Elleanore Daub, Department of Environmental Quality, 629 East Main Street, Richmond, VA 23219.

VA.R. Doc. No. R01-78; Filed April 4, 2001, 10:41 a.m.

### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the State Water Control Board intends to consider promulgating regulations entitled: **9 VAC 25-750-10 et seq. General VPDES Permit Regulation for Discharges of Storm Water from Small Municipal Separate Storm Sewer Systems.** The purpose of the proposed action is to adopt a VPDES general permit for storm water discharges from small municipal separate storm sewer systems (small MS4s). (See 17:16 VA.R. 2303-2304 April 23, 2001, for more detailed information.)

The board is forming a technical advisory committee composed of relevant stakeholders to assist in the development of the general permit. Persons interested in participation on the advisory committee should provide their name, address, telephone number and the name of the organization they represent to the contact person by May 23, 2001.

Following publication of the draft general permit regulation in the Virginia Register, the board will hold at least one public hearing to provide opportunity for public comment.

Statutory Authority: § 62.1-44.15 of the Code of Virginia.

Public comments may be submitted until May 23, 2001.

**Contact:** Burt Tuxford, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4086 or FAX (804) 698-4032.

VA.R. Doc. No. R01-163; Filed April 4, 2001, 10:37 a.m.

◆ ━━━━━━━━━━━━━━━━ ◆

# Notices of Intended Regulatory Action

## TITLE 12. HEALTH

### DEPARTMENT OF MEDICAL ASSISTANCE SERVICES

#### † Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Department of Medical Assistance Services intends to consider amending regulations entitled: **12 VAC 30-90-10 et seq. Methods and Standards for Establishing Payment Rates for Long-Term Care.** The purpose of the proposed action is to promulgate a new methodology, called Resource Utilization Groups (RUGs), for determining and ranking the level of intensity of medical and nursing services that are needed by residents of nursing facilities. The new RUGs system will replace the PIRS methodology that was promulgated by DMAS in 1990. The agency does not intend to hold a public hearing on the proposed regulation after publication.

Statutory Authority: § 32.1-325 of the Code of Virginia.

Public comments may be submitted until June 20, 2001, to Stan Fields, Director, Division of Cost Settlement, Department of Medical Assistance Services, 600 East Broad Street, Suite 1300, Richmond, VA 23219, telephone (804) 371-8850 or (804) 371-4981.

**Contact:** Victoria P. Simmons, Regulatory Coordinator, Department of Medical Assistance Services, 600 E. Broad St., Suite 1300, Richmond, VA 23219, telephone (804) 371-8850 or (804) 371-4981.

VA.R. Doc. No. R01-176; Filed April 25, 2001, 2:48 p.m.

### STATE MENTAL HEALTH, MENTAL RETARDATION AND SUBSTANCE ABUSE SERVICES BOARD

#### † Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the State Mental Health, Mental Retardation and Substance Abuse Services Board intends to consider amending regulations entitled: **12 VAC 35-190-10 et seq. Regulations Establishing Procedures for Voluntarily Admitting Persons who are Mentally Retarded to State Mental Retardation Facilities.** The purpose of this action is to update the definitions and clarify admissions criteria and process consistent with the current law. The agency intends to hold a public hearing on the proposed regulation after publication.

Statutory Authority: §§ 37.1-10 and 37.1-65.1 of the Code of Virginia.

Public comments may be submitted until June 21, 2001.

**Contact:** Wendy V. Brown, Policy Analyst, Department of Mental Health, Mental Retardation and Substance Abuse Services, Jefferson Bldg., 1220 Bank St., 12th Floor, Richmond, VA 23219, telephone (804) 225-2252 or FAX (804) 371-0092.

VA.R. Doc. No. R01-173; Filed April 23, 2001, 2:47 p.m.

◆ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ◆

## TITLE 18. PROFESSIONAL AND OCCUPATIONAL REGULATION

### BOARD OF MEDICINE

#### † Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Board of Medicine intends to consider amending regulations entitled: **18 VAC 85-80-10 et seq. Regulations Governing the Licensure of Occupational Therapists.** The purpose of the proposed action is to clarify certain provisions of the regulation and to specify the appropriate supervision and delegation of duties to unlicensed persons. The agency intends to hold a public hearing on the proposed regulation after publication.

Statutory Authority: § 54.1-2400 of the Code of Virginia.

Public comments may be submitted until June 20, 2001.

**Contact:** William L. Harp, M.D., Executive Director, Board of Medicine, 6606 W. Broad St., 4th Floor, Richmond, VA 23230-1717, telephone (804) 662-9908 or FAX (804) 662-9943.

VA.R. Doc. No. R01-187; Filed May 2, 2001, 10:44 a.m.

### BOARD OF NURSING

#### † Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Board of Nursing intends to consider amending regulations entitled: **18 VAC 90-50-10 et seq. Regulations Governing the Certification of Massage Therapists.** The purpose of the proposed action is to address concerns about competency of certificate holders, which may include hours of continuing education by providers acceptable to the board. The agency intends to hold a public hearing on the proposed regulation after publication.

Statutory Authority: §§ 54.1-2400 and 54.1-3005 of the Code of Virginia.

Public comments may be submitted until June 20, 2001.

**Contact:** Nancy K. Durrett, R.N., Executive Director, Board of Nursing, 6606 W. Broad St., 4th Floor, Richmond, VA 23230-1717, telephone (804) 662-9909 or FAX (804) 662-9512.

VA.R. Doc. No. R01-188; Filed May 2, 2001, 10:44 a.m.

# Notices of Intended Regulatory Action

## DEPARTMENT OF PROFESSIONAL AND OCCUPATIONAL REGULATION

### † Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Department of Professional and Occupational Regulation intends to consider amending regulations entitled: **18 VAC 120-30-10 et seq. Regulations Governing Polygraph Examiners.** The purpose of the proposed action is to make general clarifying changes to the regulations, propose other changes that may be necessary pursuant to the director's periodic review of the regulation, and make any other changes that may be necessary. The agency intends to hold a public hearing on the proposed regulation after publication.

Statutory Authority: § 54.1-201 and 54.1-1802 of the Code of Virginia.

Public comments may be submitted until June 20, 2001.

**Contact:** Mark N. Courtney, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8514, FAX (804) 367-2475 or (804) 367-9753/TTY ☎

VA.R. Doc. No. R01-178; Filed April 30, 2001, 2:30 p.m.

## REAL ESTATE APPRAISER BOARD

### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Real Estate Appraiser Board intends to consider amending regulations entitled: **18 VAC 130-20-10 et seq. Real Estate Appraiser Board Rules and Regulations.** The purpose of the proposed action is to amend the regulation for clarity and to incorporate changes set forth by the Appraiser Qualifications Board and Appraisal Standards Board of the Appraisal Foundation. The agency intends to hold a public hearing on the proposed regulation after publication.

Statutory Authority: § 54.1-2013 of the Code of Virginia.

Public comments may be submitted until June 7, 2001.

**Contact:** Karen W. O'Neal, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8552, FAX (804) 367-2475 or (804) 367-9753/TTY ☎

VA.R. Doc. No. R01-168; Filed April 17, 2001, 1:31 p.m.

◆ ━━━━━━━━━━━━━━━━━━━━━ ◆

## TITLE 24. TRANSPORTATION AND MOTOR VEHICLES

### DEPARTMENT OF MOTOR VEHICLES

#### Notice of Intended Regulatory Action

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Department of Motor Vehicles intends to consider amending regulations entitled: **24 VAC 20-120-10 et seq. Commercial Driver Training School Regulations.** The purpose of the proposed action is to provide appropriate oversight of the driver training schools that are issued Class B licenses by the Department of Motor Vehicles. A Class B licensed school provides training in the operation of any type of motor vehicle other than commercial motor vehicles as defined in § 46.2-341.4 of the Code of Virginia.

Through this regulation, DMV's oversight activities are intended to ensure that graduates of these schools are adequately prepared to safely and independently operate an automobile on the public roadways. The main goals of the proposed regulation are as follows:

1. Strengthen certain DMV training school standards and develop additional standards to ensure that the instruction provided by Class B driver training schools is uniform and meets the requirements established in state law and the Department of Education's Curriculum Guide for Driver Education in Virginia;

2. Strengthen certain components of DMV's oversight process to ensure that reviews of training documentation are consistent, evaluation of school curricula are expanded, and audits of driver training schools' vehicles are more comprehensive; and

3. Implement additional changes intended to ensure that consistently high quality instruction is provided across the driver training school system and that the learning environment for younger students is safe, secure and peer-oriented.

The agency intends to hold a public hearing on the proposed regulation after publication.

Statutory Authority: §§ 46.2-203 and 46.2-1703 of the Code of Virginia.

Public comments may be submitted until May 25, 2001.

**Contact:** Ronnie Hall, Deputy Director, Department of Motor Vehicles, P.O. Box 27412, Room 301, Richmond, VA 23269-0001, telephone (804) 367-2240, FAX (804) 367-0363, toll-free 1-800-435-5137 or 1-800-272-9268/TTY ☎

VA.R. Doc. No. R01-159; Filed April 3, 2001, 2:44 p.m.

◆ ━━━━━━━━━━━━━━━━━━━━━ ◆

# PROPOSED REGULATIONS

For information concerning Proposed Regulations, see Information Page.

---

**Symbol Key**
Roman type indicates existing text of regulations. *Italic type* indicates proposed new text.
Language which has been stricken indicates proposed text for deletion.

---

## TITLE 8. EDUCATION

### DEPARTMENT OF EDUCATION

Title of Regulation: **8 VAC 20-630-10 et seq. Standards for State-Funded Remedial Programs.**

Statutory Authority: § 22.1-199.2 of the Code of Virginia.

Public Hearing Date: June 20, 2001 - 5:30 p.m.
  Public comments may be submitted until July 20, 2001.
    (See Calendar of Events section
    for additional information)

Agency Contact: Dr. Margaret N. Roberts, Executive Assistant to the Board of Education, Department of Education, James Monroe Building, 101 N. 14th Street, 25th Floor, Richmond, VA 23219, telephone (804) 225-2540.

Basis: Section 22.1-199.2 of the Code of Virginia requires the Board of Education to promulgate all necessary regulations to implement the provisions of this act for programs of remediation by August 1, 2000.

Section 22.1-253.13:1 C Standard 1 of the Code of Virginia requires local school boards to implement programs of remediation for students educationally at risk including, but not limited to, those whose scores are in the bottom national quartile of the Stanford 9, who do not pass the Literacy Passport Test, or who fail to achieve a passing score on any Standards of Learning assessment in grades three, five and eight. This section also requires the Board of Education to establish standards for full funding of state-funded remedial summer school programs that shall include, but not be limited to, the minimum number of hours and an assessment system designed to evaluate program effectiveness.

Purpose: The purpose of this regulation is to (i) establish standards and evaluate state-funded remedial programs and (ii) establish a formula for determining the appropriate level of funding necessary to assist school divisions in providing transportation services to students required to attend state-funded remedial programs. These regulations will assist the department in reporting the effectiveness and efficiency of state-funded remedial programs to the General Assembly.

Substance: Key provisions of the proposed regulations:

  1. Define state-funded remedial programs as Standards of Learning Assessment Remediation, Remedial Summer School, and Standards of Quality Remediation (§ 22.1-253.13:1 of the Code of Virginia);

  2. Define students eligible for state-funded remedial programs as those who meet either (i) the criteria identifying students who are educationally at risk that has been established by the local school board or (ii) the state

criteria identifying students who are educationally at risk as specified in § 22.1-253.13:1 of the Code of Virginia;

  3. Require each local school division to develop a remediation program designed to strengthen and improve the academic achievement of those students who demonstrate substandard performance. Annually, local school divisions shall submit these plans to the department for review and approval (§§ 22.1-253.13:1 and 22.1-199.2 of the Code of Virginia);

  4. Require each local school division to record for each eligible student attending a state-funded remedial program: (i) the state or local criteria used to determine eligibility; (ii) the expected remediation goal for the student in terms of measurable student performance. In the case of failure to pass a Standards of Learning test, the goal will be to pass the test; (iii) the pre- and post-test scores assessing the level of student performance before remediation and at the conclusion of the remedial program. In the case of students in grades 3, 5, 8 and for those taking end-of-course tests in high school, the pre- and post-test instrument will be the appropriate Standards of Learning test; and (iv) whether the student did or did not meet the expected remediation goal (§ 22.1-199.2 of the Code of Virginia);

  5. Require each local school division to evaluate the success of their state-funded remedial programs in terms of the percentage of eligible students meeting their remediation goals and, as required in 8 VAC 20-630-30, the pass rate on Standards of Learning assessments (§§ 22.1-253.13:1 and 22.1-199.2 of the Code of Virginia);

  6. Require that each local school division report to the Department of Education data elements for students enrolled in state-funded remedial programs as specified in § 22.1-199.2 of the Code of Virginia;

  7. Establish standards for state-funded remedial summer school in terms of pupil-teacher ratios, the minimum number of hours, and teacher qualifications (§ 22.1-253.13:1 of the Code of Virginia); and

  8. Establish a funding formula for determining the level of funding necessary to assist school divisions in providing transportation services to students required to attend state-funded remedial programs (§ 22.1-199.2 of the Code of Virginia).

Issues:

Advantages. The General Assembly and Board of Education will have consistent data to assist in assessing the effectiveness and efficiency of state-funded remedial programs.

The General Assembly will have a formula for determining the funding necessary for transportation of students required to attend state-funded remedial programs. This formula will

# Proposed Regulations

provide a system to ensure that each local school division will have equity in providing resources to students who attend state-funded remedial programs.

Establishing individual student records will tailor state-funded remedial programs to meet each student's specific needs and will provide a vital assessment and intervention tool for schools with highly mobile populations.

Disadvantages. There is an increased burden of reporting the required data to the Department of Education.

The establishment of a funding formula for determining the level of funding necessary to assist school divisions in providing transportation for students enrolled in state-funded remedial programs may result in an expectation that funds will be provided.

<u>Department of Planning and Budget's Economic Impact Analysis:</u> The Department of Planning and Budget (DPB) has analyzed the economic impact of this proposed regulation in accordance with § 9-6.14:7.1 G of the Administrative Process Act and Executive Order Number 25 (98). Section 9-6.14:7.1 G requires that such economic impact analyses include, but need not be limited to, the projected number of businesses or other entities to whom the regulation would apply, the identity of any localities and types of businesses or other entities particularly affected, the projected number of persons and employment positions to be affected, the projected costs to affected businesses or entities to implement or comply with the regulation, and the impact on the use and value of private property. The analysis presented below represents DPB's best estimate of these economic impacts.

Summary of the proposed regulation. The Board of Education proposes to institute a maximum pupil-teacher ratio for state-funded remedial programs. Also, the board proposes to require that local school divisions record and report specified data pertaining to their state-funded remedial programs, and to annually evaluate the success of those programs.

Estimated economic impact. The proposed regulations implement a requirement that "the pupil-teacher ratios for state-funded summer remedial programs shall not exceed 18:1." According to the Department of Education (DOE), there is no data available to indicate the current pupil-teacher ratios for state-funded summer remedial programs. Nonetheless, DOE believes that it is likely that at least some local school divisions are not currently meeting the mandated ratio. Thus, it is likely that if the proposed regulations were approved, some school divisions would need to hire additional instructors in order to be in compliance.

The evidence on the effects of lower pupil-teacher ratios is mixed. Some studies find that lower class size does significantly improve students' performance (Grissmer 1999 and Krueger 1999, for example), while others do not (Hanuskek (1996), for example). Overall though, the majority of recent respected studies side with the view that reduced class size does improve students' performance. Further, there is evidence that lower-scoring students, such as remedial students, benefit more from smaller classes than do higher-scoring students (Grissmer 1999). The studies generally compare large class sizes to classes with ratios of 16:1 or smaller. So, it cannot be said whether a reduction of class

size to 18:1 is great enough to significantly improve students' performance.

Since no data is available to indicate current pupil-teacher ratios for state-funded summer remedial programs, an accurate estimate of the costs of the mandated 18:1 ration cannot be determined. In Virginia the average teacher salary is $38,797 a year and a typical contract is for about 200 days.[1] Thus, if a local school division were required to hire one additional teacher to teach a five-day summer remedial course, it can be estimated that that would cost the locality approximately $970.[2,3] Due to the absence of data on current class sizes and clear reliable estimates of the benefits of reducing class size to 18:1, an accurate comparison of the costs and benefits of this proposed amendment cannot be made.

The proposed regulations also include requirements that local school divisions record and report specified data pertaining to their state-funded remedial programs, and to annually evaluate the success of those programs. But the current Appropriations Act includes language that negates these requirements even if the proposed regulations are approved. If future Appropriation Acts do not include negating language, and the proposed recording, reporting and evaluating requirements are implemented, the additional information produced would enable analysts and policy makers to potentially produce better analysis and make better-informed policy decisions. If implemented and not negated by the Appropriations Act, these proposed mandates would require local school divisions to employ several months of one full-time employee's time to set-up spreadsheet files plus obtain initial information, and over the school year, cumulatively employ about one month of one full-time employee's time per school to collect and report data.[4]

Businesses and entities affected. The proposed amendments will affect all 132 school divisions in the Commonwealth.

Localities particularly affected. The proposed amendments will affect all localities within the Commonwealth.

Projected impact on employment. Implementation of the proposed regulations will likely increase the employment of teachers for summer remedial programs. Since no data exists to determine the current pupil-teacher ratios in schools throughout the Commonwealth, no accurate estimate on how many teachers would need to be hired can be made.

As stated earlier, language in the current Appropriations Act negates the proposed recording, reporting, and evaluating requirements. If future Appropriation Acts do not include negating language and the proposed regulations are approved, local school divisions will need to hire additional

---

[1] Source: Department of Education

[2] Calculation: ($38,797 / 200) * 5. It is assumed that no additional costs for health benefits, etc. are incurred since, according to DOE, most additional staff hired will already have year-round health benefits, etc.

[3] Minimum remedial summer school course length estimated to be about five days by the Department of Education.

[4] Source: Kathy Kitchen, Assistant Superintendent of Finance for Chesterfield County Public Schools

# Proposed Regulations

staff or employ current staff more hours to conduct the mandated recording, reporting, and evaluating.

Effects on the use and value of private property. The proposed amendments to the regulations are not likely to significantly affect the use and value of private property.

**References**

Grissmer, D. (1999), "Class Size Effects: Assessing the Evidence, its Policy Implications, and Future Research Agenda," *Educational Evaluation and Policy Analysis*, Summer 1999, Vol. 21, No. 2, pp. 231-248.

Hanushek, E.A. (1996), "School Resources and Student Performance," in G. Burtless (Ed.), *Does Money Matter? The Effect of School Resources on Student Achievement and Adult Success* (pp. 43-73), Washington, DC, The Brookings Institution.

Krueger, A.B. (1999), "Experimental Estimates of Education Production Functions," *Quarterly Journal of Economics*, CXIV, 497-532.

Agency's Response to the Department of Planning and Budget's Economic Impact Analysis: The agency concurs with the economic impact analysis as completed by the Department of Planning and Budget.

Summary:

The proposed amendments institute a maximum pupil-teacher ratio for state-funded remedial programs. Also, the board proposes to require that local school divisions record and report specified data pertaining to their state-funded remedial programs, and to annually evaluate the success of those programs. The proposed amendments also set forth a formula for funding transportation for state-funded remediation outside regular school hours.

CHAPTER 630.
STANDARDS FOR STATE-FUNDED REMEDIAL
PROGRAMS.

**8 VAC 20-630-10. Definitions.**

*The following words and terms when used in this chapter shall have the following meanings, unless the context clearly indicates otherwise:*

*"Eligible students" are those students who meet either (i) the criteria identifying students who are educationally at risk that have been established by the local school board or (ii) the state criteria identifying students who are educationally at risk as specified in § 22.1-253.13:1 of the Code of Virginia.*

*"Regular instructional day" means the length of the school day in which instruction is provided for all children, but excluding before and after school programs for state-funded remedial programs.*

*"Regular school year" means the period of time during which the local school division provides instruction to meet the Standards of Quality, exclusive of summer school, Saturday sessions, or intercession periods.*

*"State-funded remedial programs" are comprised of the following three state-funded programs: (i) Standards of*

*Learning Assessment Remediation, (ii) Remedial Summer School, and (iii) Standards of Quality Remediation.*

**8 VAC 20-630-20. Program development and approval.**

*Each local school division shall develop a remediation program designed to strengthen and improve the academic achievement of those students who demonstrate substandard performance. Annually, local school divisions shall submit these plans to the department for review and approval.*

**8 VAC 20-630-30. Individual student record.**

*Each local school division shall record for each eligible student attending a state-funded remedial program: (i) the state or local criteria used to determine eligibility; (ii) the expected remediation goal for the student in terms of measurable student performance; in the case of failure to pass a Standards of Learning test, the goal will be to pass the test; (iii) the pre- and post-test scores assessing the level of student performance before remediation and at the conclusion of the remedial program; in the case of students in grades 3, 5, 8 and for those taking end-of-course tests in high school, the pre- and post-test instrument will be the appropriate Standards of Learning test; and (iv) whether the student did or did not meet the expected remediation goal.*

**8 VAC 20-630-40. Program evaluation.**

*Annually, each local school division shall evaluate the success of its state-funded remedial programs based on the percentage of students meeting their remediation goals, as measured by locally developed assessment tools and, as required in 8 VAC 20-630-30, the pass rate on the Standards of Learning assessments.*

**8 VAC 20-630-50. Reporting requirements.**

*Annually, each local school division shall collect and report to the Department of Education, on-line or on forms provided by the department, the following data pertaining to eligible students:*

*1. The number of students failing a state-sponsored test required by the Standards of Quality or Standards of Accreditation;*

*2. A demographic profile of students attending state-funded remedial programs;*

*3. The academic status of each student attending state-funded remedial programs;*

*4. The types of instruction offered;*

*5. The length of the program;*

*6. The cost of the program;*

*7. The number of ungraded and disabled students, and those with limited English proficiency; and*

*8. As required, the pass rate on Standards of Learning assessments.*

*The local school division shall utilize this data to make appropriate adjustments in improving the quality of its state-funded remedial programs.*

# Proposed Regulations

**8 VAC 20-630-60. Teacher qualifications and staffing ratios.**

Each local school division implementing a state-funded remedial summer school program shall provide a minimum of 20 hours of instruction per subject, exclusive of field trips, assemblies, recreational activities, lunch or post-program testing time.

For state-funded remedial summer school programs in grades K-5 that offer an integrated curriculum, a minimum of 40 hours of instruction shall be required.

The pupil-teacher ratios for state-funded summer remedial programs shall not exceed 18:1.

Teachers providing instruction in the state-funded remedial programs shall be licensed to teach in Virginia, qualified to teach in their assigned area and trained in remediation techniques.

**8 VAC 20-630-70. Transportation formula.**

Funding for transportation services provided for students who are required to attend state-funded remedial programs outside the regular instructional day shall be based on a per pupil per day cost multiplied by the number of student days the program operates (i.e., the number of instructional days the state-funded remedial programs are offered multiplied by the number of students who attend the state-funded remedial programs). The per pupil per day cost shall be based on the latest prevailing cost data used to fund pupil transportation through the Standards of Quality.

For state-funded remedial programs that operate on days that are in addition to the regular school year, 100% of the per pupil per day cost shall be used in the formula. For state-funded remedial programs that begin before or end after the regular instructional day, 50% of the per pupil per day cost shall be used in the formula. The state share of the payment shall be based on the composite index.

VA.R. Doc. No. R00-151; Filed May 2, 2001, 11:25 a.m.

◆ ━━━━━━━━━━━━━━━━ ◆

# TITLE 12. HEALTH

## DEPARTMENT OF MEDICAL ASSISTANCE SERVICES

<u>Title of Regulation:</u> **Recipient Cost Sharing and Similar Charges.**
**12 VAC 30-20-10 et seq. Administration of Medical Assistance Services (amending 12 VAC 30-20-150 and 12 VAC 30-20-160).**

<u>Statutory Authority:</u> § 32.1-325 of the Code of Virginia.

<u>Public Hearing Date:</u> N/A--Public comments may be submitted until July 21, 2001.
(See Calendar of Events section
for additional information)

<u>Agency Contact:</u> Victoria P. Simmons, Regulatory Coordinator, Department of Medical Assistance Services, 600 E. Broad Street, Suite 1300, Richmond, VA 23219, telephone (804) 786-7959.

<u>Basis:</u> Section 32.1-325 of the Code of Virginia grants to the Board of Medical Assistance Services (BMAS) the authority to administer and amend the Plan for Medical Assistance. Section 32.1-324 of the Code of Virginia grants to the Director of the Department of Medical Assistance Services (DMAS) the authority to administer and amend the Plan for Medical Assistance in lieu of board action pursuant to the board's requirements.

42 CFR 447.50 through 447.59, inclusive, are based on § 1902(a)(14) of the Social Security Act, which permits states to require certain recipients to share some of the costs of Medicaid by imposing upon them payments such as enrollment fees, premiums, deductibles, coinsurance, copayments, or similar cost sharing charges.

<u>Purpose:</u> The purpose of this proposal is to update the prescription copayment amount for brand name drugs from the current $1.00 to $2.00. This regulatory action is not expected to affect the health, safety, or welfare of Medicaid recipients because, pursuant to federal law, they cannot be denied this important prescription drug service if they cannot pay the copayment amount.

<u>Substance:</u> The changes are located in subsection A of both 12 VAC 30-20-150 and 12 VAC 30-20-160 and provide for the differentiation of copayment amounts between generic and brand name drugs. Also, new subsections G and H have been added to both sections to establish a definition of a generic drug.

<u>Issues:</u> The primary advantage of this regulation would be savings to the taxpayer. The direct savings from higher copayments for brand drugs is relatively minor, an estimated $2 million annually. The potential savings, if successful in changing prescribing patterns and reducing unnecessary prescriptions for brand drugs, could be substantially more.

A secondary advantage to Medicaid recipients in this proposed change is in directing them to established pharmaceutical compounds, which have a proven safety record, rather than potentially risking their health, or perhaps lives, with new compounds.

The primary disadvantage is the increased cost for recipients. However, if the pharmacy does not collect the copayment from the recipient, the pharmacy bears the cost because Medicaid payments will not make up the loss to the pharmacy.

Some studies indicate that copayments can result in the reduction in both necessary and unnecessary treatment. That is why federal Medicaid regulations stipulate that only "nominal" copayments are permitted. The agency does not anticipate that a $1.00 differential on the copayment for brand drugs would have any impact on a recipient receiving appropriate treatment. However, both the physician and recipient would have some incentive to try traditional, less expensive therapy first, when appropriate.

# Proposed Regulations

<u>Department of Planning and Budget's Economic Impact Analysis:</u> The Department of Planning and Budget (DPB) has analyzed the economic impact of this proposed regulation in accordance with § 9-6.14:7.1 G of the Administrative Process Act and Executive Order Number 25 (98). Section 9-6.14:7.1 G requires that such economic impact analyses include, but need not be limited to, the projected number of businesses or other entities to whom the regulation would apply, the identity of any localities and types of businesses or other entities particularly affected, the projected number of persons and employment positions to be affected, the projected costs to affected businesses or entities to implement or comply with the regulation, and the impact on the use and value of private property. The analysis presented below represents DPB's best estimate of these economic impacts.

Summary of the proposed regulation. This regulatory action proposes to differentiate the copayment amounts between generic and brand-name drugs and increase the prescription copayment for brand-name drugs from $1.00 to $2.00.

Estimated economic impact. Currently, Virginia charges certain Medicaid beneficiaries a $1.00 copayment for pharmacy services.[1] The proposed regulatory action will differentiate generic products from brand-name products and establish a $2.00 copayment for prescriptions filled with brand-name products.

Increased Costs for Recipients. The primary effect of this change will be to increase out-of-pocket payments made by Medicaid recipients. DMAS estimates that recipients who must make copayments costs will pay an additional $13.00 per year on average annually based on current prescribing patterns. The higher copayment could also potentially increase costs for pharmacy providers. Per federal regulation, pharmacies cannot deny services if the recipients cannot pay the copayments. If the pharmacy is unable to collect the copayment from the recipient, the pharmacy bears the cost because Medicaid payments do not make up the loss to the pharmacy. However, according to the DMAS Pharmacy Liaison Committee, few pharmacists are unable to collect the pharmacy copayments from recipients, therefore any effect on pharmacy providers is expected to be minimal.[2]

Savings for the Medicaid Program. The increased copayments will directly save Medicaid an estimated $2 million per year. Since copayments can lead recipients and providers to be more cost conscious when deciding between appropriate therapies, the proposed increase may reduce some unnecessary use of brand name products and lead to even more substantial savings. There is the potential that, if a less effective drug is used or there is a reduction in necessary treatment, there could be a decrease in the quality of health care provided. However, since the difference in the copayments is small ($1.00), it is unlikely to have any significant impact on a recipient receiving appropriate treatment.

Businesses and entities affected. In FY 1999, there were 378,168 individuals who received pharmacy services.[3] The proposed regulatory change will affect the portion of those recipients who must make copayments. The change could also potentially affect any of the 1,788 enrolled pharmacy providers.

Localities particularly affected. No localities are particularly affected by the proposed change to this regulation.

Projected impact on employment. The proposed change to this regulation is not anticipated to have a significant effect on employment.

Effects on the use and value of private property. The proposed change to this regulation is not anticipated to have a significant effect on the use and value of private property.

<u>Agency's Response to the Department of Planning and Budget's Economic Impact Analysis:</u> The agency concurs with the economic impact analysis prepared by the Department of Planning and Budget regarding the regulations concerning Recipient Cost Sharing: Increase Copayments on Brand Name Drugs.

<u>Summary:</u>

*The proposed amendments increase the amount of the copayment that Medicaid recipients are required to pay when their prescriptions are filled with brand name drugs instead of generics.*

**12 VAC 30-20-150. Copayments and deductibles for categorically needy and QMBs for services other than under 42 CFR 447.53.**

A. The following charges are imposed on the categorically needy and Qualified Medicare Beneficiaries for services other than those provided under 42 CFR 447.53.

| Service* | Type Charge | | | Amount and Basis for Determination |
| --- | --- | --- | --- | --- |
| | Deduct. | Coins. | Copay | |
| Inpatient Hospital | $100.00 | -0- | -0- | State's average daily payment of $594 is used as basis. |
| Outpatient Hospital Clinic | -0- | -0- | $3.00 | State's average payment of $136 is used as basis. |

---

[1] As mandated by federal law, copayments are not imposed on children under the age of 21, recipients in nursing homes, or recipients receiving emergency services, pregnancy-related service or family planning services.

[2] The Pharmacy Liaison Committee is made up of representatives from chain drug stores, independent pharmacies, long-term care pharmacies, manufacturers (PhRMA), and the state pharmaceutical association (Virginia Pharmacists Association).

[3] Annual unduplicated recipients by type of medical service as reported in HCFA-2082 series, DMAS SFY 1999 Statistical Record, page 3-12.

# Proposed Regulations

| | | | | |
|---|---|---|---|---|
| Clinic Visit | -0- | -0- | $1.00 | State's average payment of $29 is used as basis. |
| Physician Office Visit | -0- | -0- | $1.00 | State's average payment of $23 is used as basis. |
| Eye Examination | -0- | -0- | $1.00 | State's payment of $30 is used of basis. |
| Prescriptions *Generic Brand Name* | -0-<br>*-0-* | -0-<br>*-0-* | $1.00<br>*$2.00* | State's average per *generic* script of $18 is used as payment basis. *State's average per brand name script of $70 is used as payment basis.* |
| Home Health Visit | -0- | -0- | $3.00 | State's average payment of $56 is used as basis. |
| Other Physician Services | -0- | -0- | $3.00 | State's average payment of $56 is used as basis. |
| Rehab Therapy Services (PT, OT, Sp/Lang.) | -0- | -0- | $3.00 | State's average payment $78 is used as basis. |

*NOTE: The applicability of copays to emergency services is discussed further in this section.

B. The method used to collect cost sharing charges for categorically needy individuals requires that providers be responsible for collecting the cost sharing charges from individuals.

C. The basis for determining whether an individual is unable to pay the charge, and the means by which such an individual is identified to providers, is described below:

Providers will, based on information available to them, make a determination of the recipient's ability to pay the copayment. In the absence of knowledge or indications to the contrary, providers may accept the recipient's assertion that he or she is unable to pay the required copayment.

Recipients have been notified that inability to meet a copayment at a particular time does not relieve them of that responsibility.

D. The procedures for implementing and enforcing the exclusions from cost sharing contained in 42 CFR 447.53(b) are described below:

The application and exclusion of cost sharing is administered through the program's MMIS. Documentation of the certified computer system delineates, for each type of provider invoice used, protected eligible groups, protected services and applicable eligible groups and services.

Providers have been informed about: copay exclusions; applicable services and amounts; prohibition of service denial if recipient is unable to meet cost-sharing charges.

E. State policy does not provide for cumulative maximums on charges.

F. Emergency Services. No recipient copayment shall be collected for the following services:

1. Services provided in a hospital, clinic, office, or other facility that is equipped to furnish the required care, after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that the absence of immediate medical attention could reasonably be expected to result in:

a. Placing the patient's health in serious jeopardy;

b. Serious impairment to bodily functions; or

c. Serious dysfunction of any bodily organ or part; and

2. All services delivered in emergency rooms.

*G. Definitions. For the purposes of this section, "generic drug" means any multiple source product meeting the criteria set forth in 42 CFR 447.332 and § 1927(e) of the Social Security Act, as amended by OBRA '93. Such generic drug must have a current Federal Upper Limit (FUL) payment level defined by the Health Care Financing Administration.*

*H. "Brand name" means (i) any drug product not meeting the definition of a "generic drug" as defined in subsection G of this section or (ii) any drug product for which the prescriber, through the use of the notation "brand necessary" on the prescription, does not allow substitution.*

**12 VAC 30-20-160. Copayments and deductibles for medically needy and QMBs for services other than under 42 CFR 447.53.**

A. The following charges are imposed on the medically needy and Qualified Medicare Beneficiaries for services other than those provided under 42 CFR 447.53.

## Proposed Regulations

| Service* | Type Charge | | | Amount and Basis for Determination |
|---|---|---|---|---|
| | Deduct. | Coins. | Copay | |
| Inpatient Hospital | $100.00 | -0- | -0- | State's average daily payment of $594 is used as basis. |
| Outpatient Hospital Clinic | -0- | -0- | $3.00 | State's average payment of $136 is used as basis. |
| Clinic Visit | -0- | -0- | $1.00 | State's average payment of $29 is used as basis. |
| Physician Office Visit | -0- | -0- | $1.00 | State's average payment of $23 is used as basis. |
| Eye Examination | -0- | -0- | $1.00 | State's payment of $30 is used as basis. |
| Prescriptions *Generic Brand Name* | -0- *-0-* | -0- *-0-* | $1.00 *$2.00* | State's average per *generic* script of $18 is used as payment basis. *State's average per brand name script of $70 is used as payment basis.* |
| Home Health Visit | -0- | -0- | $3.00 | State's average payment of $56 is used as basis. |
| Other Physician Services | -0- | -0- | $3.00 | State's average payment of $56 is used as basis. |
| Rehab Therapy Services (PT, OT, Sp/Lang.) | -0- | -0- | $3.00 | State's average payment $78 is used as basis. |

*NOTE: The applicability of copays to emergency services is discussed further in this section.

B. The method used to collect cost sharing charges for medically needy individuals requires that providers be responsible for collecting the cost sharing charges from individuals.

C. The basis for determining whether an individual is unable to pay the charge, and the means by which such an individual is identified to providers, is described below:

Providers will, based on information available to them, make a determination of the recipient's ability to pay the copayment. In the absence of knowledge or indications to the contrary, providers may accept the recipient's assertion that he or she is unable to pay the required copayment.

Recipients have been notified that inability to meet a copayment at a particular time does not relieve them of that responsibility.

D. The procedures for implementing and enforcing the exclusions from cost sharing contained in 42 CFR 447.53(b) are described below:

The application and exclusion of cost sharing is administered through the program's MMIS. Documentation of the certified computer system delineates, for each type of provider invoice used, protected eligible groups, protected services and applicable eligible groups and services.

Providers have been informed about: copay exclusions; applicable services and amounts; prohibition of service denial if recipient is unable to meet cost-sharing changes.

E. State policy does not provide for cumulative maximums.

F. Emergency Services. No recipient copayment shall be collected for the following services:

1. Services provided in a hospital, clinic, office, or other facility that is equipped to furnish the required care, after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) that the absence of immediate medical attention could reasonably be expected to result in:

a. Placing the patient's health in serious jeopardy;

b. Serious impairment to bodily functions; or

c. Serious dysfunction of any bodily organ or part; and

2. All services delivered in emergency rooms.

*G. Definitions. For the purposes of this section, "generic drug" means any multiple source product meeting the criteria set forth in 42 CFR 447.332 and § 1927(e) of the Social Security Act, as amended by OBRA '93. Such generic drug must have a current Federal Upper Limit (FUL) payment level defined by the Health Care Financing Administration.*

*H. "Brand name" means (i) any drug product not meeting the definition of a "generic drug" as defined in subsection G of this section or (ii) any drug product for which the prescriber, through the use of the notation "brand necessary" on the prescription, does not allow substitution.*

VA.R. Doc. No. R00-96; Filed May 1, 2001, 4:12 p.m.

# Proposed Regulations

◆ ━━━━━━━━━━━━━━━━ ◆

## TITLE 14.  INSURANCE

### STATE CORPORATION COMMISSION

### Bureau of Insurance

<u>Title of Regulation:</u>  **14 VAC 5-300-10 et seq.  Rules Governing Credit for Reinsurance (amending 14 VAC 5-300-90).**

<u>Statutory Authority:</u>  §§ 12.1-13 and 38.2-223 of the Code of Virginia.

<u>Summary:</u>

*The proposed amendments consist of technical amendments to 14 VAC 5-300-90 to correspond with § 38.2-1316.2 A 4 b of the Code of Virginia, and to more accurately describe the annual certifications to be made available by groups of assuming entities that request credit for reinsurance.*

<u>Agency Contact:</u>  Raquel Pino-Moreno, Bureau of Insurance, State Corporation Commission, 1300 E. Main Street, 6th Floor, Richmond, Virginia 23219; Mailing Address: P.O. Box 1157, Richmond, VA 23218, telephone (804) 371-9499 or e-mail rpinomoreno@scc.state.va.us.

AT RICHMOND, APRIL 27, 2001

COMMONWEALTH OF VIRGINIA

At the relation of the

STATE CORPORATION COMMISSION

CASE NO. INS010084

<u>Ex Parte</u>:  In the matter of
Adopting Revisions to the Rules
Governing Credit for Reinsurance

<u>ORDER TO TAKE NOTICE</u>

WHEREAS, § 12.1-13 of the Code of Virginia provides that the Commission shall have the power to promulgate rules and regulations in the enforcement and administration of all laws within its jurisdiction, and § 38.2-223 of the Code of Virginia provides that the Commission may issue any rules and regulations necessary or appropriate for the administration and enforcement of Title 38.2 of the Code of Virginia;

WHEREAS, the rules and regulations issued by the Commission pursuant to § 38.2-223 of the Code of Virginia are set forth in Title 14 of the Virginia Administrative Code;

WHEREAS, the Bureau of Insurance has submitted to the Commission proposed revisions to Chapter 300 of Title 14 of the Virginia Administrative Code entitled "Rules Governing Credit for Reinsurance," which amend the rule at 14 VAC 5-300-90;

WHEREAS, the proposed revisions reflect technical revisions to correspond with § 38.2-1316.2 A 4 of the Code of Virginia and to describe more accurately the annual certifications expected

of assuming entities; and

WHEREAS, the Commission is of the opinion that the proposed revisions should be considered for adoption with a proposed effective date of August 1, 2001.

THEREFORE, IT IS ORDERED THAT:

(1)  The proposed revisions to the "Rules Governing Credit for Reinsurance," which amend the rule at 14 VAC 5-300-90, be attached hereto and made a part hereof;

(2)  All interested persons who desire to comment in support of or in opposition to, or to request a hearing to oppose the adoption of, the proposed revisions shall file such comments or hearing request on or before June 11, 2001, in writing with the Clerk of the Commission, Document Control Center, P.O. Box 2118, Richmond, Virginia 23218 and shall refer to Case No. INS010084;

(3)  If no written request for a hearing on the proposed revisions is filed on or before June 11, 2001, the Commission, upon consideration of any comments submitted in support of or in opposition to the proposed revisions, may adopt the revisions proposed by the Bureau of Insurance;

(4)  AN ATTESTED COPY hereof, together with a copy of the proposed revisions, shall be sent by the Clerk of the Commission to the Bureau of Insurance in care of Deputy Commissioner Douglas C. Stolte, who forthwith shall give further notice of the proposed adoption of the revisions to the rules by mailing a copy of this Order, together with a draft of the proposed revisions, to all insurers, joint underwriting associations, group self-insurance pools, group self-insurance associations, and reinsurers licensed by or otherwise registered with the Commission, and subject to Article 3.1 of Chapter 13 of Title 38.2 of the Code of Virginia or otherwise authorized by Title 38.2 to reinsure risks; and by forwarding a copy of this Order, together with a draft of the proposed revisions, to the Virginia Registrar of Regulations for appropriate publication in the Virginia Register of Regulations; and

(5)  The Bureau of Insurance shall file with the Clerk of the Commission an affidavit of compliance with the notice requirements of paragraph (4) above.

**14 VAC 5-300-90.  Credit for reinsurance; reinsurers maintaining trust funds.**

A.  Pursuant to § 38.2-1316.2 A 4 or § 38.2-1316.3 A 3 of the Act, the commission shall allow credit for reinsurance ceded to a trusted assuming insurer which, as of the date of the ceding insurer's statutory financial statement:

1.  Maintains a trust fund and trusteed surplus that complies with the provisions of § 38.2-1316.2 A 4 of the Act,

2.  Complies with the requirements set forth ~~below~~ in subsections B, C and D of this section, and

# Proposed Regulations

3. Reports annually to the commission on or before June 1 of each year in which a ceding insurer seeks reserve credit under the Act substantially the same information as that required to be reported on the NAIC annual statement form by licensed insurers, to enable the commission to determine the sufficiency of the trust fund. The accounting shall, among other things, set forth the balance to the trust and list the trust's investments as the preceding year end and shall certify the date of termination of the trust, if so planned, or certify that the trust shall not expire prior to the next following December 31.

B. When credit is taken for reinsurance ceded to any trusteed assuming insurer, the commission may require that the ceding insurer file or cause to be filed~~,~~:

1. A copy of the trust agreement pertaining to the requisite trust funds along with a statement identifying and locating the specific provisions in the agreement which satisfy the form of trust requirements set forth ~~below at~~ *in* subsection E~~.~~ *of this section,*

2. Satisfactory evidence that the requisite trust funds are held in a qualified United States financial institution~~.~~*,*

3. A certified statement and accounting of trusteed surplus executed by a duly authorized officer or representative of the trusteed assuming insurer~~.~~*,*

4. A certified statement from the trustee of the trust listing the assets of the trust~~.~~*, and*

5. A certified English translation for any foreign language documents filed pursuant to the Act or this chapter.

C. When credit is requested for reinsurance ceded to trusteed assuming insurer which is a group *of including incorporated and* individual unincorporated underwriters, the group shall make available to the commission annual certifications of solvency of each underwriter member of the group, prepared by the group's domiciliary regulator and its independent accountant*, or if a certification is unavailable a financial statement, prepared by independent public accountants, of each underwriter member of the group.*

D. When credit is requested for reinsurance ceded to a trusteed assuming insurer which is a group of incorporated insurers under common administration, the group shall:

1. File evidence of its submission to the commission's authority to examine the books and records of any member of the group.

2. Certify that any member examined will bear the expense of any such examination.

3. Make available to the commission *an* annual ~~certifications~~ *certification of each underwriter member's solvency* by the ~~members'~~ *member's* domiciliary ~~regulators~~ *regulator* and ~~their~~ *financial statements prepared by* independent public accountants ~~of the solvency~~ *of each underwriter* member of the group.

4. If requested by the commission, file copies of annual statements for the three-year period preceding the initial request for credit, or other documents satisfactory to the commission, which show that the group has continuously

transacted an insurance business outside the United States for at least three years.

E. Form of Trust. The trust required under § 38.2-1316.2 A 4 of the Act and subdivisions A 2, A 3, B 1, and B 2 of this section shall provide that:

1. Contested claims shall be valid and enforceable out of funds in trust to the extent remaining unsatisfied 30 days after entry of the final order of any court of competent jurisdiction in the United States.

2. Legal title to the assets of the trust shall be vested in the trustee for the benefit of the grantor's United States policyholders and ceding insurers, their assigns and successors in interest.

3. The trust and the assuming insurer shall be subject to examination as determined by the commission.

4. The trust shall remain in effect for as long as the assuming insurer, or any member or former member of a group of insurers, shall have outstanding obligations under reinsurance agreements subject to the trust~~, and~~.

5. No later than February 28 of each year the trustees of the trust (i) shall report to the commission in writing setting forth the balance in the trust and listing the trust's investments at the preceding year end and (ii) shall certify the date of termination of the trust, if so planned, or certify that the trust shall not expire prior to the next December 31.

F. Any amendment to the trust, required under § 38.2-1316.2 A 4 of the Act and subdivisions A 1, A 3, B 1, and B 2 of this section, shall be filed with the commission within 30 days after the effective date of the amendment.

VA.R. Doc. No. R01-179; Filed May 1, 2001, 11:25 a.m.

◆ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ◆

# Proposed Regulations

## TITLE 18.  PROFESSIONAL AND OCCUPATIONAL REGULATION

### BOARD FOR ARCHITECTS, PROFESSIONAL ENGINEERS, LAND SURVEYORS, CERTIFIED INTERIOR DESIGNERS AND LANDSCAPE ARCHITECTS

Title of Regulation: **18 VAC 10-20-10 et seq. Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects Rules and Regulations (amending 18 VAC 10-20-10, 18 VAC 10-20-20, 18 VAC 10-20-30, 18 VAC 10-20-110, 18 VAC 10-20-120, 18 VAC 10-20-130, 18 VAC 10-20-140, 18 VAC 10-20-150, 18 VAC 10-20-160, 18 VAC 10-20-190, 18 VAC 10-20-200, 18 VAC 10-20-210, 18 VAC 10-20-220, 18 VAC 10-20-240, 18 VAC 10-20-250, 18 VAC 10-20-260, 18 VAC 10-20-270, 18 VAC 10-20-300, 18 VAC 10-20-310, 18 VAC 10-20-320, 18 VAC 10-20-340, 18 VAC 10-20-350, 18 VAC 10-20-360, 18 VAC 10-20-370, 18 VAC 10-20-380, 18 VAC 10-20-400, 18 VAC 10-20-420, 18 VAC 10-20-430, 18 VAC 10-20-440, 18 VAC 10-20-450, 18 VAC 10-20-490, 18 VAC 10-20-505, 18 VAC 10-20-530, 18 VAC 10-20-540, 18 VAC 10-20-550, 18 VAC 10-20-560, 18 VAC 10-20-570, 18 VAC 10-20-590, 18 VAC 10-20-600, 18 VAC 10-20-610, 18 VAC 10-20-620, 18 VAC 10-20-640, 18 VAC 10-20-650, 18 VAC 10-20-660, 18 VAC 10-20-680, 18 VAC 10-20-720, 18 VAC 10-20-740, 18 VAC 10-20-750, 18 VAC 10-20-760, and 18 VAC 10-20-780; adding 18 VAC 10-20-55, 18 VAC 10-20-75, and 18 VAC 10-20-295; repealing 18 VAC 10-20-100, 18 VAC 10-20-180, 18 VAC 10-20-290, 18 VAC 10-20-330, 18 VAC 10-20-410, and 18 VAC 10-20-480).**

Statutory Authority: §§ 54.1-201, 54.1-404 and 54.1-411 of the Code of Virginia.

Public Hearing Date: June 6, 2001 - 9 a.m.
  Public comments may be submitted until July 20, 2001.
    (See Calendar of Events section
    for additional information)

Agency Contact: Mark N. Courtney, Assistant Director, Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects, 3600 W. Broad Street, Richmond, VA 23230, telephone (804) 367-8514.

Basis: Section 54.1-201 of the Code of Virginia empowers the regulatory boards to promulgate regulations that are necessary to ensure continued competency, to prevent deceptive or misleading practices by practitioners and to effectively administer the regulatory system administered by the regulatory board.

Section 54.1-404 of the Code of Virginia authorizes the board to promulgate regulations governing its own organization, the professional qualifications of applicants, the requirements necessary for passing examinations, the proper conduct of its examinations, the implementation of exemptions from license requirements, and the proper discharge of its duties.

Section 54.1-411 of the Code of Virginia requires the board to adopt regulations governing the registration of persons,

corporations, partnerships, limited liability companies, sole proprietors and other entities.

Purpose: The regulations are essential to comply with state mandates. The change to permit the use of electronic seals, signatures and dates so that documents may be filed electronically is becoming more of a standard operating procedure in today's world and as well as being a more efficient process as the business world evolves towards e-commerce. The remainder of the changes ensure that the board's intent is clearly reflected in the regulations so that the regulations are as clear as possible. Ensuring that the regulations are as clear as possible will facilitate the regulants complying with the board's requirements, which will better protect the health, safety and welfare of the public.

Substance: The proposed amendments:

1. Reorganize the regulations to include relocation of language for the purpose of clarification;

2. Clarify certain provisions;

3. Conform the regulation with statute;

4. In 18 VAC 10-20-20, change the date for receiving applications from 120 days prior to the scheduled examination to a date established by the board;

5. Simplify the provisions for determining the qualifications of applicants;

6. Update documents incorporated by reference;

7. Add a provision that individuals providing references may not also verify experience;

8. Clarify that NCARB procedures must be followed at the examination site, as they are responsible for administering the examination;

9. Provide that "approved engineering curriculum" includes a graduate engineering curriculum;

10. Amend the self-study requirements;

11. Change the term "professional experience" to "qualifying experience";

12. Increase the limit on the amount of experience that may be gained prior to graduation from 1/4 to 1/2 in 18 VAC 10-20-240;

13. Raise the experience provisions in 18 VAC 10-20-300;

14. Add the word "land" to the word "boundary" throughout 18 VAC 10-20-370 and 18 VAC 10-20-380;

15. Add an accuracy standard for global positioning systems;

16. Include a requirement for adequate curve data;

17. Add the option of noting the registered business on the plat instead of the land surveyor;

18. Add the requirement that the name and address of the land surveyor or the registered business be included on a house location survey to make it consistent with the requirements for a land boundary survey;

## Proposed Regulations

19. Update citations to the Code of Virginia;

20. Clarify the wording regarding the CLARB examination;

21. Change the name of Table II to prepare the regulations for the removal of Table I from the regulations at a later date;

22. Reflect that a professional corporation or professional limited liability company must remain in good standing with the State Corporation Commission;

23. Based on legislation passed by the General Assembly, permit certified interior designers to form professional corporations or professional limited liability companies and require them to register their businesses with the board;

24. Require regulants to notify the board office when they leave as the responsible professional of a professional corporation, business entity other than a professional corporation, or professional limited liability company;

25. Eliminate the requirement that reinstatement applicants (whose licenses or certificates have been expired for five years or more) must meet current entry requirements;

26. Clarify wording to clearly indicate that a regulant is responsible for reporting any violation (including their own) of the board's regulations or statutes;

27. Permit the use of electronic seals, signatures and dates.

Issues: The primary advantage to the public is that the board will be able to permit its regulants to file documents electronically with these changes thereby enhancing e-commerce. Further, the proposed changes will help ensure that the board's regulants will have a clearer set of regulations. The only disadvantage is that one experience requirement for the land surveyor license is being increased as the board inadvertently lowered this requirement too far last time and it is being returned to the original requirement.

Department of Planning and Budget's Economic Impact Analysis: The Department of Planning and Budget (DPB) has analyzed the economic impact of this proposed regulation in accordance with § 9-6.14:7.1 G of the Administrative Process Act and Executive Order Number 25 (98). Section 9-6.14:7.1 G requires that such economic impact analyses include, but need not be limited to, the projected number of businesses or other entities to whom the regulation would apply, the identity of any localities and types of businesses or other entities particularly affected, the projected number of persons and employment positions to be affected, the projected costs to affected businesses or entities to implement or comply with the regulation, and the impact on the use and value of private property. The analysis presented below represents DPB's best estimate of these economic impacts.

Summary of the proposed regulation. The Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers, and Landscape Architects (board) proposes to make several changes to these regulations. Changes that may have a significant impact include: (i) changing the required minimum number of days prior to the date of examination that applications are received from a

specified number to "the date established by the board," (ii) changing the required minimum number of days prior to the date of landscape architect certification examination that applicants register and submit their application fee from 75 days to "a time designated by the board," (iii) requiring that "every applicant applying for licensure or certification shall be able to speak and write English to the satisfaction of the board," (iv) allowing architect's required letters of reference to come from Canada, (v) allowing a greater proportion of a professional engineer's qualifying experience to occur prior to graduation from an engineering curriculum, (vi) increasing the experience requirement for one of the routes to the land surveyor-in-training designation, (vii) changing the frequency of land surveyor licensure examinations from semiannually to "times designated by the board," (viii) establishing an accuracy standard for GPS, (ix) allowing certified interior designers to form professional corporations and professional limited liability companies, (x) requiring that any licensed or certified employee responsible for a professional corporation or professional limited liability company to notify the board in writing of any changes of his employment status within 10 days of such change, and (xi) allowing the use of electronic seals when specified criteria are met.

Estimated economic impact. Under the current regulations, complete applications for licensure, certification and registration must be received in the board's office no later than 120 days prior to the scheduled examination date. The proposed regulations require that applications be received in the board's office by "the date established by the board." The proposed new language would permit the board to require that applications be submitted by greater than 120 days prior to the scheduled examination. This would be costly to potential licensees and certificate holders by delaying the potential advancement of their careers. A potential applicant may have satisfied the requirements to take the exam 120 days prior to the scheduled examination, but not say 150 days ahead of time. This could delay entry into the profession by, for example, six months for an exam given semiannually. The Department of Professional and Occupational Regulation (DPOR) has indicated that the board does not intend to require that applications be received by a date greater than 120 days prior to examination. DPOR has indicated that the board would be willing to change the language of the regulations to indicate that applications shall be received by a date established by the board, which is at most 120 days prior to the scheduled examination. If the language is amended to indicate that applications shall be received by a date established by the board, which is at most 120 days prior to the scheduled examination, then the proposed change would introduce no new costs and may be beneficial for applicants if the time is reduced to less than 120 days.

The current regulations also require that applicants approved to sit for the landscape architect certification examination shall register and submit the required examination fee to the board office no later than 75 days before the next administration of the exam. The proposed regulations require that the registration and exam fee be received in the board office "at a time designated by the board." This proposed new discretion for the board would allow the board to require that applicants register and submit the required exam fee by greater than 75 days prior to the scheduled examination. This could be costly

# Proposed Regulations

to potential certified landscape architects by delaying the potential advancement of their careers. A potential applicant may have satisfied the requirements to take the exam 75 days prior to the scheduled examination, but not say 90 days ahead of time. This could delay entry into the profession. According to DPOR, the board would be willing to change the proposed language to indicate that applicants approved to sit for an examination shall register and submit the required examination fee to be received in the board office by a date established by the board, which is at most 75 days prior to the scheduled examination. If the language is amended to indicate that the due date established by the board will not be greater than 75 days prior to the scheduled examination, then the proposed change would introduce no new costs and may be beneficial for potential certified landscape architects if time is reduced to less than 75 days.

The proposed regulations require that "every applicant applying for licensure or certification shall be able to speak and write English to the satisfaction of the board." Previously this only applied to professional engineers. Now it would apply to all professions addressed within the regulations. This proposed change could be beneficial in that individuals who cannot communicate effectively and accurately in English may be more prone to have misunderstandings and miscommunication with clients, leading to unsatisfactory work. Requiring that applicants have or obtain minimum English skills may help protect the public from some potential unsatisfactory work. On the other hand, individuals that are competent or even very talented in their field, but are not fluent in English, would be prevented from obtaining licensure or certification in Virginia. The proposed change would clearly be costly for such individuals, and possibly potential clients who are aware of their language limitations. Individuals may still do work related to architecture, land surveying, interior design, etc. without licensure or certification, but another licensed or certified person in the appropriate field must be involved in and supervise the work.[1] For example, say a Virginia builder wishes to hire a renowned foreign architect, who does not speak fluent English, to design a building. The foreign architect could work with an architect licensed in Virginia, but not on his own. The licensed architect would be the architect of record.

Applicants for licensure as an architect must submit three letters of reference. The current regulations require that the writers of the reference letters be licensed as architects within the United States. The proposed regulations allow one or more of the writers to be licensed in Canada. This clearly could be beneficial to potential applicants by increasing the pool of licensed architects from whom allowable reference letters could be obtained. Assuming that Canadian architects are as reliable reference letter writers as American architects, the proposed change should not put the public at additional risk. Thus this proposed change should produce a net benefit.

The proposed regulations allow a greater proportion of a professional engineer's qualifying experience to occur prior to graduation from an engineering curriculum. "The board, in its sole discretion, may permit partial credit, not to exceed 1/2 of

that required, for approved qualifying engineering experience obtained prior to graduation from an engineering curriculum." Previously, the regulation read "not to exceed 1/4 of that required." This proposed change would likely produce a net benefit. It allows individuals that have gained significant relevant experience, either during a break from or before engineering courses, to apply more of that experience toward qualifying experience. This change does not appear to put the public at any additional risk of having an incompetent engineer licensed.

Under the proposed regulations, the experience requirement for one of the routes to the land surveyor-in-training designation would be increased. One of the current methods of meeting the education and experience requirement for the land surveyor-in-training designation is for an applicant to have earned at least a four-year bachelor's degree in a field unrelated to surveying and with a specific record of two years of approved land surveying experience. Now, the board is proposing to increase the required number years of approved land surveying experience to three. Clearly, this change creates an additional cost, one additional year of experience, for individuals seeking to obtain the land surveyor-in-training designation through this route. According to DPOR, the board proposes this change because it was brought to their attention that for someone "who has graduated from a surveying curriculum of two years or more," the applicant is required to have four years of approved land surveying experience. In comparison, for someone who has graduated from a curriculum with possibly no surveying, albeit with a four-year degree, to be required to only have two years of experience seems insufficient.

The board proposes to alter regulatory language describing the frequency that examinations for land surveyor licensure are given. The proposed regulations state that "these examinations shall be given at times designated by the board." Previously, the regulations read: "these examinations shall be given semiannually at times designated by the board." The proposed deletion of the word "semiannually" would allow the board to give the exam less often than semiannually. This could be costly to potential licensed land surveyors by delaying the potential advancement of their careers. According to DPOR, the board would be willing to change the proposed language to indicate that the examinations shall be given semiannually, or more frequently, if so designated by the board. If the language is amended to indicate that the exam will be given at least semiannually, then the proposed change would introduce no new costs and may be beneficial for potential land surveyors if the frequency that exams are given is greater than twice a year.

The board also proposes to add accuracy standards for GPS used in land boundary surveying. Since GPS is used for surveying, including minimum accuracy standards is beneficial in guaranteeing the quality of land survey work, if the standards adopted by the board are reasonable. No public comment has been received to indicate otherwise.

The proposed regulations newly allow certified interior designers to form professional corporations and professional limited liability companies. Allowing certified interior designers to form professional corporations and professional limited

---

[1] Source: Department of Professional and Occupational Regulation

# Proposed Regulations

liability companies is, of course, beneficial for interior designers. Interior designers will be able to shield their personal assets from liability, as the certified and licensed individuals for the other professions included in these regulations currently may. On the other hand, citizens and businesses who have legal claims against certified interior designers would see fewer assets to sue for with the advent of interior designer professional corporations and professional limited liability companies. In terms of equity, though, there is no compelling reason why certified interior designers should be denied the same legal protection afforded to other professions.

Also, under the proposed regulations, "for those corporations using the title of certified interior designers and providing the services of architects, professional engineers, or land surveyors, or any combination thereof, the capital stock of the corporation shall be held by individuals in accordance with § 13.1-549 of the Code of Virginia. Section 13.1-549 of the Code of Virginia includes the following: "for those corporations using the title of certified interior designers and providing the services of architects, professional engineers or land surveyors, or any combination thereof, not less than two-thirds of the capital stock of the corporation shall be held by individuals who are duly licensed" as architects, professional engineers or land surveyors, respectively. Similar language exists for professional limited liability companies using the title of certified interior designers and providing the services of architects, professional engineers, or land surveyors, or any combination thereof. Unto itself, this proposed provision seems to unnecessarily restrict interior designers. But according to DPOR, interior designers did not object to this provision being added. Apparently, it was considered a compromise that would allow the addition of the provision permitting interior designers to form corporations.

The board also proposes to require that any licensed or certified employee responsible for a professional corporation or professional limited liability company notify the board in writing of any changes of his employment status within 10 days of such change. This proposed change is designed to decrease the number of occurrences and length of time that firms operate without a responsible professional. This proposed change would likely create a net benefit. The public may experience less exposure to firms operating without a responsible professional, and firms that operate legally should not be negatively affected.

Additionally, the board proposes to allow the use of electronic seals when specified criteria are met. The application of a professional seal indicates that the professional has exercised complete direction and control over the work to which it is affixed. According to DPOR, the U.S. Navy and the Virginia Department of Mines, Minerals, and Energy have requested that electronic seals be permitted to be used in lieu of an original seal. The use of electronic seals would be beneficial in that more business could be conducted electronically, which would increase the speed at which business could be conducted.

Businesses and entities affected[2]. The proposed regulations affect the 5,627 licensed architects, 20,099 licensed professional engineers, 1,205 licensed land surveyors, 473 certified landscape architects, and 356 certified interior designers in the Commonwealth, as well as potential applicants for licensure or certification in those professions. The regulations also affect the 1,900 businesses registered in Virginia to do professional work in these areas, as well as potential new firms.

Localities particularly affected. The proposed amendments potentially affect all localities in Virginia.

Projected impact on employment. The proposed requirement that "every applicant applying for licensure or certification shall be able to speak and write English to the satisfaction of the board" may prevent or delay some individuals from gaining employment in fields covered by these regulations. Allowing certified interior designers to form professional corporations and professional limited liability companies may encourage the expansion or formation of firms, which could increase employment.

Effects on the use and value of private property. Allowing certified interior designers to form professional corporations and professional limited liability companies may increase the value of interior designer firms by allowing them to shield liability. Permitting the use of electronic seals may allow firms to conduct business more quickly and save on costs.

<u>Agency's Response to the Department of Planning and Budget's Economic Impact Analysis:</u> Concur.

<u>Summary:</u>

*The proposed amendments clarify language, consolidate provisions, and modify wording to accord with the Code of Virginia. Substantive changes include (i) requiring a regulant to notify the board when he leaves as the responsible professional of a professional corporation; (ii) permitting for use of electronic seals, signatures and dates; and (iii) adding various requirements and standards regarding land boundary surveying.*

## 18 VAC 10-20-10. Definitions.

As used in this chapter, unless the context requires a different meaning:

*"Board"* means the Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects.

*"Comity"* means the recognition of licenses or certificates issued by other states, the District of Columbia, or any territory or possession of the United States as permitted by § 54.1-103 C of the Code of Virginia.

*"Department"* means the Department of Professional and Occupational Regulation.

*"Direct control and personal supervision"* shall be that degree of supervision by a person overseeing the work of another whereby the supervisor has both control over and detailed

---

[2] Source for data: Department of Professional and Occupational Regulation

# Proposed Regulations

professional knowledge of the work prepared under his supervision.

*"Full time"* means 60% or more of a Virginia licensed or certified individual's gainfully employed time.

*"Good moral character"* shall include, but shall not be limited to, compliance with the standards of practice and conduct as set forth in this chapter.

*"Landscape architect" means an individual who has been certified as a landscape architect pursuant to the provisions of this chapter and is in good standing with the board to practice in the Commonwealth.*

*"Licensed" means an individual holding a valid license issued by the board, which has not been suspended or revoked, and is currently registered with the board to practice in the Commonwealth in accordance with § 54.1-405 of the Code of Virginia.*

*"Place of business"* means any location which offers to practice or practices through licensed or certified professionals the services of architecture, ~~professional~~ engineering, land surveying, *certified* landscape architecture and *certified* interior design. A temporary field office set up for project-specific services is not a place of business.

*"Professional"* means ~~licensed~~ architect, ~~licensed~~ professional engineer, ~~licensed~~ land surveyor, ~~certified~~ landscape architect or certified interior designer.

*"Regulant"* means licensee, certificate holder or registrant.

*"Responsible charge"* means ~~the~~ *there shall be a professional in* direct control and personal supervision of ~~the practice of architecture, professional engineering, land surveying and certified landscape architecture~~ *each professional service offered or practiced. Merely reviewing the work prepared by another person does not constitute direct control and personal supervision.*

**18 VAC 10-20-20. Application requirements.**

A. *All applicants must be of good moral character.*

B. *1.* Fully documented applications with the noted exception *in subdivision 2 of this subsection* shall be submitted by applicants seeking consideration for licensure, certification or registration with the appropriate fee(s) (check or money order only made payable to the Treasurer of Virginia) to be received in the board's office no later than ~~120 days prior to the scheduled examination~~ *the date established by the board.* ~~Applicants for the Fundamentals of Engineering examination enrolled in an ABET accredited curriculum who are within 12 months of completion of degree requirements may submit applications to be received in the board's office no later than 60 days prior to the scheduled examination.~~ The date the completely documented application and fee are received in the board's office shall determine if an application has been received by the deadline set by the board. All applications should be completed according to the instructions contained herein. Applications are not considered complete until all required documents, including but not limited to references, employment verifications and verification of registration are

received by the board. All applications, accompanying materials and references are the property of the board.

*2. Applicants for the Fundamentals of Engineering examination enrolled in an ABET accredited curriculum who are within 12 months of completion of degree requirements may submit applications to be received in the board's office no later than 60 days prior to the scheduled examination.*

~~B.~~ *C.* Applicants shall meet applicable entry requirements at the time application is made.

~~C.~~ *D.* Applicants who have been found ineligible for any reason may request further consideration by submitting in writing evidence of additional qualifications, training or experience. No additional fee will be required provided the requirements for licensure, certification or registration are met within a period of three years from the date the original application is received by the board. After such period, a new application shall be required.

~~D.~~ *E.* The board may make further inquiries and investigations with respect to the qualifications of the applicant and all references, etc., to confirm or amplify information supplied. The board may also require a personal interview with the applicant.

~~E.~~ *F.* Failure of an applicant to comply with a written request from the board for additional evidence or information within 60 days of receiving such notice, except in such instances where the board has determined ineligibility for a clearly specified period of time, may be sufficient and just cause for disapproving the application.

~~F.~~ *G.* Applicants shall be held to the same standards of practice and conduct as set forth in this chapter.

**18 VAC 10-20-30. Determining qualifications of applicants.**

In determining the qualifications of an applicant for a license ~~as an architect~~ *or certificate*, a majority vote of only the ~~architect~~ members of the ~~board~~ *profession involved* shall be required. ~~In determining the qualifications of an applicant for a license as a professional engineer, a majority vote of only the professional engineer members of the board shall be required. In determining the qualifications of an applicant for a license as a land surveyor, a majority vote of only the land surveyor members of the board shall be required. In determining the qualifications of an applicant for certification as a landscape architect, a majority vote of only the certified landscape architect members of the board shall be required, and in determining the qualifications of an applicant for certification as an interior designer, a majority vote of only the certified interior designer members of the board shall be required.~~

*18 VAC 10-20-55. Language and comprehension.*

*Every applicant applying for licensure or certification shall be able to speak and write English to the satisfaction of the board. Applicants from a non-English speaking country or a country wherein the primary language is other than English, who have not graduated from a college or university in the United States, shall submit to the board a TOEFL (Test of*

# Proposed Regulations

*English as a Foreign Language) score report that reflects a score acceptable to the board, and a TSE (Test of Spoken English) score report that reflects a score acceptable to the board. Score reports shall not be over two years old at the time of application.*

### 18 VAC 10-20-75. Conduct at examination.

*Examinees will be given specific instructions as to the conduct of each division of the exam at the exam site. Examinees are required to follow these instructions to assure fair and equal treatment to all examinees during the course of the examination. Evidence of misconduct may result in voided examination scores.*

### 18 VAC 10-20-100. ~~Character.~~ *(Repealed.)*

~~Applicants must be of good moral character.~~

### 18 VAC 10-20-110. Education.

A. All applicants *for original licensure* shall hold a professional degree in architecture where the degree program has been accredited by the National Architectural Accrediting Board (NAAB) not later than two years after graduation.

B. Foreign degrees must be evaluated for equivalency to a NAAB accredited degree. The board reserves the right to reject, for good cause, any evaluation submitted. Any cost of translation and evaluation will be borne by the applicant.

### 18 VAC 10-20-120. Experience.

A. The *successful completion of the* NCARB Intern Development Program (NCARB-IDP) shall be required of all applicants for ~~examination~~ *original licensure.* An applicant shall be enrolled in NCARB-IDP for a period of one year or more prior to submitting an application for ~~examination~~ *original licensure* in Virginia. IDP training requirements shall be in accordance with the National Council of Architectural Registration Boards' Handbook for Interns and Architects, ~~1998-1999~~ *2000-2001* Edition.

B. All applicants must have a minimum of 36 months experience/training prior to submitting an application for examination. Any experience/training of less than 10 consecutive weeks will not be considered in satisfying this requirement.

C. All applicants must have a minimum of 12 months experience/training in architecture as an employee in the office of a licensed architect prior to submitting an application for examination. An organization will be considered to be an office of a licensed architect if:

　1. The architectural practice of the organization in which the applicant works is under the charge of a person practicing as a principal, where a principal is a licensed architect in charge of an organization's architectural practice either alone or with other licensed architects, and the applicant works under the direct supervision of a licensed architect; and

　2. The practice of the organization encompasses the comprehensive practice of architecture, including the categories set forth in the IDP requirements.

D. Exceptions.

1. In the case of any individual certifying to the board that he had accrued sufficient experience/training credits under the requirements existing prior to December 1, 1999, so that 12 or fewer months of experience/training remained to be acquired, then the prior experience/training requirements in subsection E of this section shall continue in effect for such individual;

2. Any applicant who has accrued experience/training prior to December 1, 1999, may verify such experience/training to the best of his ability as if such experience/training had been acquired hereunder, and such verified experience/training shall, when accepted by the board, be considered for purposes of meeting the experience/training requirements of this chapter. Subsection E of this section is only applicable to those individuals specified in this subsection. Table I is only applicable to assist in verifying subdivisions 1 and 2 of this subsection.

E. Applicants to whom the exceptions in subsection D of this section apply shall have three years of diversified training in the essential areas of architectural practice as described in this subsection. Evidence shall be in the form of official records of a structured internship or incorporated in the candidate's application and verified by employers. Experience shall include:

　1. A minimum of 18 months in the area of design and construction documents directly related to the practice of architecture;

　2. A minimum of five months in the area of construction administration directly related to the practice of architecture; and

　3. A minimum of three months in the area of office management directly related to the practice of architecture.

Training credits shall be calculated in accordance with Table I.

F. Applications to whom the exceptions in subsection D of this section apply shall have until January 1, 2001, to complete the experience/training credits existing prior to December 1, 1999, and have their completed application received in the board's office. After January 1, 2001, the exceptions in subsection D of this section will cease.

TABLE I.
REQUIREMENTS FOR ARCHITECTURAL LICENSURE
(APPLICABLE ONLY TO INDIVIDUALS SPECIFIED IN
18 VAC 10-20-120 D).

| EDUCATION AND TRAINING REQUIREMENTS | Education Credits | Training Credits | |
|---|---|---|---|
| | | Credit Allowed | Max. Credit Allowed |
| First professional degree in architecture, where the degree program has been approved by the board not later than two years after graduation. | 5 years | No credit used as an education credit may be used as a training credit. | |

# Proposed Regulations

| | | | |
|---|---|---|---|
| A-1. Diversified experience in architecture as an employee in the offices of licensed architects. | 0 | 100% | no limit |
| A-2. Diversified experience in architecture as a principal practicing in the office of a licensed architect with a verified record of substantial practice. | 0 | 100% | no limit |
| A-3. Diversified experience in architecture as an employee of an organization (other than offices of licensed architects) when the experience is under the direct supervision of a licensed architect. | 0 | 100% | 2 years |
| A-4. Experience directly related to architecture, when under the direct supervision of a licensed architect but not qualifying as diversified experience or when under the direct supervision of a professional engineer. | 0 | 50% | 1 year |
| A-5. Experience, other than A-1, A-2, A-3 or A-4 experience, directly related to on-site building construction operations or experience involving physical analyses of existing buildings. | 0 | 50% | 6 months |
| A-6. Other training experience (see B-2.2). | | | |

EXPLANATION OF REQUIREMENTS

B-1 Training Credits. Training credits shall be subject to the following conditions:

B-1.1 Every applicant must earn at least one year of training credit under A-1 or A-2 and must earn it after earning five years of education credits.

.2 No credit used as an education credit may be used as a training credit.

.3 Organizations will be considered to be 'offices of licensed architects': (a) the architectural practice of the organization in which the applicant works is in the charge of a person practicing as a principal and the applicant works under the direct supervision of a licensed architect and (b) the organization is not engaged in construction and (c) the organization has no affiliate engaged in construction which has a substantial economic impact upon the person or persons in the organization practicing as a principal.

.4 An organization (or an affiliate) is engaged in construction if it customarily engages in either of the following activities:

(a) Providing labor and/or material for all or any significant portion of a construction project, whether on lump sum, cost plus or other basis of compensation.

(b) Agrees to guarantee to an owner the maximum construction cost for all or any significant portion of a construction project.

.5 A person practices as a 'principal' by being a licensed architect and the person in charge of the organization's architectural practice, either alone or with other licensed architects.

.6 In evaluating training credits the board may, prior to licensure, require the applicant to substantiate training experience by comparing this experience to the training requirements as indicated for the Intern-Architect Development Program (IDP).

B-2 General Evaluation Criteria.

B-2.1 To earn full training credits under A-1, A-2, A-3, A-4 and A-5, an applicant must work at least 35 hours per week for a minimum period of 10 consecutive weeks under A-1 or six consecutive months under A-2, A-3, A-4 or A-5. An applicant may earn one-half of the credit specified under A-1 for work of at least 20 hours per week in periods of six or more consecutive months; no credit will be given for part-time work in any category other than A-1.

.2 Other training may be substituted for the requirements outlined above, only insofar as the board considers them to be equivalent to the required qualifications.

.3 In evaluating credits, the board may, prior to licensure, require substantiation of the quality and character of the applicant's experience, notwithstanding the fact that the applicant has complied with the training requirements set forth above.

**18 VAC 10-20-130. References.**

Eligibility for licensure is determined in part by the applicant's demonstrated competence and integrity to engage in the practice of architecture. Applicants shall submit three references with the application, all of whom are licensed architects in a jurisdiction or territory of the United States *or a province of Canada*. These professionals shall have personal knowledge of the applicant's architectural experience and have known the applicant for at least one year. References shall be current for one year. *Individuals who provide references may not also verify experience/training*.

**18 VAC 10-20-140. Examination.**

A. All applicants for original licensure in Virginia are required to pass an NCARB-prepared examination after meeting the education and experience/training requirements as provided in this chapter.

B. The Virginia board is a member board of the National Council of Architectural Registration Boards (NCARB) and as

# Proposed Regulations

such is authorized to make available the NCARB-prepared examination.

C. Grading of the examination shall be in accordance with the national grading procedure administered by NCARB. The board shall utilize the scoring procedures recommended by NCARB.

D. The NCARB-prepared examination will be offered at least once a year at a time designated by the board.

E. The board may approve transfer credits for parts of the NCARB-prepared examination taken in accordance with national standards.

F. Unless otherwise stated, applicants approved to sit for an examination shall register and submit the required examination fee. Applicants not properly registered shall not be allowed into the examination site.

G. ~~Examinees will be given specific instructions as to the conduct of each division of the exam at the exam site. Examinees are required to follow these instructions to assure fair and equal treatment to all examinees during the course of the examination. Evidence of misconduct may result in voided examination scores or other appropriate disciplinary action.~~ *Applicants approved to sit for the examination shall follow NCARB procedures.*

H. Examinees will be advised only of passing or failing the examination. Only the board and its staff shall have access to documentation.

I. Should an applicant not pass the NCARB-prepared examination within three years after being approved, the applicant must reapply. If the applicant has not been taking the examination on a continuous basis during the three-year eligibility period, and the applicant does not reapply within six months of the end of his three-year eligibility period, then the applicant shall meet the entry requirements current at the time of reapplication.

## 18 VAC 10-20-150. License by comity.

A. Any person *who is or has been* licensed in another state, jurisdiction or territory of the United States or province of Canada may be granted a license provided that:

1. The applicant meets all the requirements for licensing in Virginia that were in effect at the time of the original licensure or possesses an NCARB certificate; and

2. The applicant holds a currently active valid license in good standing in another state, jurisdiction or territory of the United States or province of Canada.

If the applicant does not possess an NCARB certificate, or does not meet the requirements for licensure in Virginia that were in effect at the time of original licensure, the applicant shall be required to meet the entry requirements current at the time the completed application for comity is received in the board's office.

B. Applicants licensed in foreign countries other than Canada may be granted a license in Virginia based on an NCARB certificate.

## 18 VAC 10-20-160. Definitions.

The following definitions shall apply in the regulations relating to the licensing of professional engineers:

*"ABET"* means the Accreditation Board for Engineering and Technology.

*"Approved engineering curriculum"* means an *undergraduate* engineering curriculum of four years or more, *or a graduate engineering curriculum,* approved by the board. ABET approved engineering curricula are approved by the board.

*"Approved engineering experience"* means a specific record of acceptable professional experience which the board, in its discretion, judges to be pertinent in acquiring engineering skills, on engineering projects of a grade and character indicating that the applicant may be competent to practice engineering.

*"Approved engineering technology curriculum"* means an ~~ABET approved~~ engineering technology curriculum of four years or more *approved by the board. ABET approved engineering technology curricula of four years or more are approved by the board.*

*"Engineering examination"* means an ~~eight hour written~~ *NCEES* examination in the Fundamentals of Engineering and an ~~eight hour written~~ *NCEES* examination in the Principles and Practice of Engineering where required.

*"Engineer-in-training (EIT)"* means an applicant who has completed any one of several combinations of education, or education and experience, and passed the Fundamentals of Engineering examination.

*"Qualifying engineering experience"* means a specific record of engineering experience which the board, in its discretion, judges to be pertinent in acquiring engineering skills, on engineering projects of a grade and character indicating that the applicant may be competent to practice engineering.

## 18 VAC 10-20-180. ~~Character.~~ *(Repealed.)*

~~Applicants must be of good moral character.~~

## 18 VAC 10-20-190. Requirements for the Fundamentals of Engineering (FE) exam.

In order to be approved to sit for the FE examination, an applicant must satisfy one of the following:

# Proposed Regulations

| EDUCATIONAL REQUIREMENTS | NUMBER OF REQUIRED YEARS OF PROGRESSIVE, QUALIFYING ENGINEERING EXPERIENCE |
|---|---|
| 1. Enrolled in an ABET accredited undergraduate curriculum and within 12 months of completion of degree requirements. Enrolled in an ABET accredited graduate curriculum, or enrolled in a graduate curriculum that is ABET accredited at the undergraduate level at the institution at which the graduate degree is being sought, and within six months of completion of graduate degree requirements. Applications must be accompanied by a certificate of good standing from the dean of the engineering school. | 0 |
| 2. Graduated from an approved engineering or an approved engineering technology curriculum ~~of four years or more~~. | 0 |
| 3. Obtained an undergraduate engineering degree from an institution in a curriculum without ABET accreditation and a graduate level engineering degree from an institution in a curriculum that is ABET accredited at the undergraduate level. | 0 |
| 4. Graduated from a nonapproved engineering curriculum or a related science curriculum of four years or more. | 2 |
| 5. Graduated from a nonapproved engineering technology curriculum or not graduated from an engineering or related science curriculum of four years or more but who, in the judgment of the board, has obtained the equivalent of such graduation ~~as described by self study when compared to the ABET Course Requirements for Engineering Technology Programs~~ *by documented academic course work that meets the requirements of ABET accreditation for the engineering technology curricula.* | 6 |

**18 VAC 10-20-200. Requirements for engineer-in-training (EIT) *designation*.**

An applicant who is qualified to sit for the FE examination under subdivision 1 of 18 VAC 10-20-190 must provide verification of his degree prior to ~~becoming an~~ *receiving the* EIT *designation*. All other applicants who qualify to sit for the FE examination under subdivisions 2 through 5 of 18 VAC 10-20-190 will ~~become an~~ *receive the* EIT *designation* upon achieving a passing examination score. *The EIT designation will remain valid indefinitely.*

**18 VAC 10-20-210. Requirements for the Principles of Engineering (PE) examination.**

In order to be approved to sit for the PE examination, an applicant must satisfy one of the following:

| EDUCATIONAL REQUIREMENTS | EIT REQUIRED? | NUMBER OF REQUIRED YEARS OF PROGRESSIVE, QUALIFYING ENGINEERING EXPERIENCE |
|---|---|---|
| 1. Graduated from an approved engineering curriculum of four years or more. | YES | 4 |
| 2. ~~Been~~ Awarded both an ABET accredited undergraduate engineering degree and a doctorate degree in engineering from an engineering curriculum which is ABET accredited at the undergraduate level. | NO | 4 |
| 3. Graduated from a nonapproved engineering curriculum, a related science curriculum, or an approved engineering technology curriculum, all of which shall be four years or more. | YES | 6 |
| 4. Graduated from a nonapproved engineering technology curriculum of four years or more; or without graduation from an engineering or related science curriculum of four years or more *but who, in the judgment of the board, has obtained the equivalent of such graduation by documented academic course work that meets the requirements of ABET accreditation for the engineering technology curricula.* | YES | 10 |
| 5. Graduated from an engineering, engineering technology or related science curriculum of four years or more. | NO | 20 |

**18 VAC 10-20-220. References.**

A. References for Fundamentals of Engineering examination. Applicants for the Fundamentals of Engineering examination only shall provide one reference from a professional engineer, or from the dean of the engineering school or a departmental

## Proposed Regulations

professor in the school attended by the applicant, or an immediate work supervisor. Any reference provided shall be from a person who has known the applicant for at least one year. *Individuals who provide* references may not also verify professional *qualifying* experience. *References shall be no more than one year old at the time the application is received.*

B. References for Principles and Practice of Engineering examination. To be eligible for admission to *Applicants for the* Principles and Practice of Engineering examination, an applicant must indicate competence and integrity to engage in the engineering profession by submitting three references with the application, all of whom shall be licensed *from* professional engineers *licensed* in a state or territory of the United States. The professional engineers providing the references shall have *each having* personal knowledge of the applicant's engineering experience and shall have *having* known the applicant for at least one year. References shall be no more than one year old at the time the applicant *application* is approved to take the requisite examination *received*. *Individuals who provide* references may not also verify professional *qualifying* experience.

*C. References for comity applicants. Applicants for comity shall submit three references with the application, all of whom are licensed professional engineers in a jurisdiction or territory of the United States. These professionals shall have personal knowledge of the applicant's engineering experience and have known the applicant for at least one year. Individuals who provide references may not also verify qualifying experience. References shall be no more than one year old at the time the application is received.*

**18 VAC 10-20-240.** Training and **Experience.**

Professional *Qualifying* engineering training and experience shall be progressive in complexity and based on a knowledge of engineering mathematics, physical and applied sciences, properties of materials, and fundamental principles of engineering design, provided:

1. In general, experience in sales, drafting, estimating, field surveying, nonengineering military service, and inspection are considered nonqualifying;

2. Engineering experience gained by graduate engineering study or by engineering teaching as an instructor or higher in an institution approved by the board may be deemed professional *qualifying* engineering experience;

3. Engineering experience gained during a board-approved co-op program may be deemed professional *qualifying engineering* experience to a maximum of one year of credit;

4. The board, in its sole discretion, may permit partial credit, not to exceed 1/4 *1/2* of that required, for approved professional *qualifying engineering* experience obtained prior to graduation from an engineering curriculum.

**18 VAC 10-20-250.** Language and comprehension. **(Repealed.)**

Every applicant applying for licensure as a professional engineer shall be able to speak and write English. An applicant from a non-English speaking country or a country wherein the primary language is other than English shall submit to the board a TOEFL (Test of English as a Foreign Language) score report with a minimum score of 560, and a TSE (Test of Spoken English) score report with a minimum score of 255. Score reports shall not be over two years old at the time of application. The requirement of submitting a TOEFL and a TSE report shall not apply if the applicant is a graduate of a U.S. college or university.

**18 VAC 10-20-260. Examinations.**

A. The Virginia board is a member board of the National Council of Examiners for Engineering and Surveying (NCEES) and as such is authorized to administer the NCEES examinations.

B. The Fundamentals of Engineering examination consists of a NCEES exam on the fundamentals of engineering and is given at times designated by the board.

C. The Principles and Practice of Engineering examination consists of a NCEES exam on applied engineering and is given at times designated by the board.

D. Unless otherwise stated, applicants approved to sit for an examination shall register and submit the required examination fee to be received in the board office at a time designated by the board. Applicants not properly registered shall not be allowed into the examination site.

E. A candidate eligible for admission to both parts of the examination must first successfully complete the fundamentals of engineering examination before being admitted to the principles and practice of engineering examination.

F. Examinees will be given specific instructions as to the conduct of each examination at the exam site. Examinees are required to follow these instructions to assure fair and equal treatment to all examinees during the course of the examination. Evidence of misconduct may result in voided examination scores or other appropriate disciplinary action.

G. *F.* Grading of the examinations shall be in accordance with national grading procedures established by NCEES.

Each part of the written examination will have a value of 100. A passing score shall be 70 and above. Candidates will be notified of passing or failing and their actual scores.

H. *G.* Should an applicant not pass an examination within three years after being approved to sit for an examination, the applicant must reapply and meet all current entry requirements.

I. *H.* The Fundamentals of Engineering examination may not be reviewed by the candidates. Examination scores are final and are not subject to change.

Upon written request to the board within 20 days of the mailing of exam results, candidates for the Principles and Practice of Engineering examination will be permitted to review only their own failed examination. Score appeals will only be accepted if the candidate received a score of 65 or above. *Score reviews and appeals shall be accepted in accordance with board policy.*

# Proposed Regulations

**18 VAC 10-20-270. License by comity.**

A person holding a license to engage in the practice of engineering, issued to the applicant by ~~another state,~~ *other states, the District of Columbia, or any* territory or possession of the United States~~, Canada or the District of Columbia,~~ based on requirements that do not conflict with and are at least as ~~vigorous~~ *rigorous* as these regulations and supporting statutes of this board that were in effect at the time of original licensure, may be licensed without further examination. No person shall be so licensed, however, who has not passed an examination in another jurisdiction which ~~is~~ *was* substantially equivalent to that approved by the board *at that time*. If the applicant does not meet the requirements for licensure in Virginia that were in effect at the time of original licensure, the applicant shall be required to meet the entry requirements current at the time the completed application for comity is received in the board's office.

**18 VAC 10-20-290.** ~~Character.~~ *(Repealed.)*

~~Applicants must be of good moral character.~~

***18 VAC 10-20-295. Definitions.***

*"Approved land surveying experience" means diversified training in land surveying under the supervision and direction of a licensed land surveyor or under the supervision and direction of an individual authorized by statute to practice land surveying. This experience shall have been acquired in positions requiring the exercise of independent judgment, initiative and professional skill in the office and field and written verification of such work experience shall be on forms provided by the board. Experience may be gained either prior to or after education is obtained. Notwithstanding the definition of "approved land surveying experience," the requirements set forth in 18 VAC 10-20-310 shall not be waived.*

**18 VAC 10-20-300. Requirements for land surveyor-in-training (LSIT) *designation*.**

The education or experience, or both, and examination requirements for ~~land surveyor in training (~~ *the* LSIT~~)~~ *designation* are as follows:

1. An applicant who has graduated from, or is enrolled in*,* a board-approved surveying or surveying technology curriculum of four years or more approved by the board and is within 12 months of completion of degree requirements is eligible for the Fundamentals of Land Surveying examination. Upon passing such examination, and providing evidence of graduation, the applicant ~~shall be a land surveyor in training if the applicant is otherwise qualified~~ *will receive the LSIT designation.* ~~Applications~~ *For those applicants who are within 12 months of completion of degree requirements, their application* must be accompanied by a certificate of good standing from the dean of the school~~.~~*;*

2. An applicant who has graduated from a curriculum of four years or more related to surveying as approved by the board and with a specific record of one year of approved land surveying experience shall be admitted to *an examination in* the Fundamentals of Land Surveying ~~examination~~. Upon passing such examination, the applicant shall ~~be a land surveyor in training if the applicant is otherwise qualified.~~ *receive the LSIT designation;*

3. An applicant who has earned at least a four-year bachelor's degree in a field unrelated to surveying and with a specific record of ~~two~~ *three* years of approved ~~progressive~~ land surveying experience *that is progressive in complexity. The applicant* shall be admitted to *an examination in* the Fundamentals of Land Surveying ~~examination~~. Upon passing such examination, the applicant shall ~~be a land surveyor in training if the applicant is otherwise qualified.~~ *receive the LSIT designation;*

4. An applicant who has graduated from a surveying curriculum of two years or more approved by the board with a specific record of four years of approved ~~progressive~~ land surveying experience *that is progressive in complexity* shall be admitted to *an examination in* the Fundamentals of Land Surveying ~~examination~~. Upon passing such examination, the applicant shall ~~be a land surveyor in training if the applicant is otherwise qualified.~~ *receive the LSIT designation;*

5. An applicant who has successfully completed a survey apprenticeship program approved by the board with at least 480 hours of surveying related classroom instruction with a specific record of six years of approved ~~progressive~~ land surveying experience *that is progressive in complexity* shall be admitted to *an examination in* the Fundamentals of Land Surveying ~~examination~~. Upon passing such examination, the applicant shall ~~be a land surveyor in training if the applicant is otherwise qualified.~~ *receive the LSIT designation; or*

6. An applicant who has graduated from high school ~~with~~ *and who has* evidence of successful completion of courses in algebra, geometry and trigonometry with a specific record of eight years of approved ~~progressive~~ land surveying experience *that is progressive in complexity* shall be admitted to *an examination in* the Fundamentals of Land Surveying ~~examination~~. Applicants who have accumulated college credits may apply credit hours approved by the board to help meet the experience requirement. One year of experience credit will be given for 40 semester hours of approved college credit. Upon passing such examination, the applicant shall ~~be a land surveyor in training if the applicant is otherwise qualified~~ *receive the LSIT designation.*

**18 VAC 10-20-310. Requirements for a licensed land surveyor.**

~~A land surveyor in training~~ *An LSIT* with a specific record of four years of approved land surveying experience *of which a minimum of three years experience has been progressive in complexity and has been on land surveying projects* under the supervision of a licensed land surveyor shall be admitted to an examination in the Principles and Practice of Land Surveying and ~~a~~ *the* Virginia state *specific* examination. Upon passing such examination, the applicant shall be granted a license to practice land surveying, provided the applicant is otherwise qualified.

# Proposed Regulations

**18 VAC 10-20-320. Requirements for a licensed land surveyor B.**

A. An applicant shall hold a valid license as a land surveyor and present satisfactory evidence of two years of ~~progressive~~ land surveying experience *that is progressive in complexity* in land surveyor B ~~professional~~ land surveying, as defined in § 54.1-408 of the Code of Virginia, under the supervision and direction of a licensed land surveyor B or professional engineer.

B. An applicant shall also present satisfactory evidence of having passed ~~board approved~~ *college level* courses in hydraulics and ~~hydrology~~ *acceptable to the board*.

C. An applicant shall pass an examination as developed by the board. Upon passing such examination, the applicant shall be granted a license as a Land Surveyor B if he is otherwise qualified.

**18 VAC 10-20-340. Experience standards.**

~~A. "Approved land surveying experience" means diversified training in land surveying under the supervision and direction of a licensed land surveyor or under the supervision and direction of an individual authorized by statute to practice land surveying. This experience shall have been acquired in positions requiring the exercise of independent judgment, initiative and professional skill in the office and field. Experience may be gained either prior to or after education is obtained. Notwithstanding the definition of "approved land surveying experience," the requirements set forth in 18 VAC 10-20-310 shall not be waived.~~

~~B.~~ An applicant shall submit written verification from a licensed land surveyor or an individual authorized by statute to practice land surveying of work experience from each employment engagement utilized as land surveying experience on forms provided by the board.

**18 VAC 10-20-350. Examinations; grading; reexamination.**

A. The examination for land surveying under § 54.1-400 of the Code of Virginia shall consist of two parts. Part I shall consist of the Fundamentals of Land Surveying. Part II shall consist of an examination in the Principles and Practice of Land Surveying and a Virginia state *specific* examination. These examinations shall be given ~~semiannually~~ at times designated by the board.

B. The examination for land surveying under § 54.1-408 of the Code of Virginia (Land Surveyor B) shall be given at times designated by the board.

C. Unless otherwise stated, applicants approved to sit for an examination must register and submit the required examination fee to be received in the board office at a time designated by the board. Applicants not properly registered shall not be allowed into the examination site.

D. Candidates shall be notified of passing or failing but shall not be notified of actual scores. Only the board and its staff shall have access to examination papers, scores and answer sheets. Examinations may not be reviewed.

E. ~~Upon payment of a reexamination fee, an applicant may retake parts of the written examination which the applicant~~ ~~may have failed.~~ Should the applicant not pass an examination within three years after being ~~approved~~ *authorized to take the examination*, the applicant must reapply and meet all current entry requirements.

**18 VAC 10-20-360. Licensure by comity.**

~~All applicants for comity, after meeting the requirements of 18 VAC 10-20-40, must also comply with the provisions of 18 VAC 10-20-300 and 18 VAC 10-20-310. However, the applicant may be required to take such examinations as the board deems necessary to determine his qualifications, but in any event, the applicant shall be required to pass a written Virginia state examination. The examination shall include questions on law, procedures and practices pertaining to land surveying in Virginia.~~

*A person holding a current license to engage in the practice of land surveying, issued to the applicant by other states, the District of Columbia, or any territory or possession of the United States based on requirements that do not conflict with and are at least as rigorous as these regulations and supporting statutes of this board that were in effect at the time of original licensure, may be licensed without further examination except for the Virginia state specific examination. No person shall be so licensed, however, who has not passed an examination in another jurisdiction that was substantially equivalent to that approved by the board at that time. If the applicant does not meet the requirements for licensure in Virginia that were in effect at the time of original licensure, the applicant shall be required to meet the entry requirements current at the time the completed application for comity is received in the board's office. All applicants shall be required to pass a written Virginia state specific examination. The examination shall include questions on law, procedures and practices pertaining to land surveying in Virginia.*

**18 VAC 10-20-370. Minimum standards and procedures for land boundary surveying practice.**

*A.* The ~~following~~ minimum standards and procedures *set forth in this section* are to be used for *land* boundary surveys performed in the Commonwealth of Virginia. The application of the professional's seal, signature and date as required by these regulations shall be evidence that the *land* boundary survey is correct to the best of the professional's knowledge and belief, and complies with the minimum standards and procedures.

~~A.~~ *B.* Research procedure. The professional shall search the land records for the proper description of the land to be surveyed and obtain the description of adjoining land as it pertains to the common boundaries. The professional shall have the additional responsibility to utilize any other available data pertinent to the survey being performed from any other source that is known. Evidence found, from all sources, shall be carefully compared with that located and found in the field survey in order to aid in the establishment of the correct boundaries of the land being surveyed. The professional shall clearly note inconsistencies found in the research of common boundaries between the land being surveyed and the adjoining land. It is not the intent of this regulation to require the professional to research the question of title or encumbrances on the land involved.

# Proposed Regulations

B. *C.* Minimum field procedures.

1. Angular measurement. Angle measurements made for traverse or *land* boundary survey lines will be made by using a properly adjusted transit type instrument which allows a direct reading to a minimum accuracy of 30 seconds of arc or metric equivalent. The number of angles turned at a given station or corner will be the number which, in the judgment of the professional, can be used to substantiate the average true angle considering the condition of the instrument being used and the existing field conditions.

2. Linear measurement. Distance measurement for the lines of traverse or lines of the *land* boundary survey shall be made with metal tapes which have been checked and are properly calibrated as to incremental distances, or with properly calibrated electronic distance measuring equipment following instructions and procedures established by the manufacturer of such equipment. All linear measurements shall be reduced to the horizontal plane and other necessary corrections performed before using for computing purposes.

3. Field traverse and *land* boundary closure *and accuracy standards*.

a. The maximum permissible error of closure for a field traverse in connection with a *land* boundary survey located in a rural area shall be one part in 10,000 (1/10,000). The attendant angular closure shall be that which will sustain the one part in 10,000 (1/10,000) maximum error of closure. The maximum permissible error of closure for a traverse in connection with a *land* boundary survey located in an urban area shall be one part in 20,000 (1/20,000). The attendant angular closure shall be that which will sustain the one part in 20,000 (1/20,000) maximum error of closure.

*b. The maximum permissible positional uncertainty based on the 95% confidence level of any independent boundary corner or independent point located on a boundary that has been established by utilizing global positioning systems will not exceed the positional tolerance of 0.26 feet (or 80 mm + 200 ppm) for rural surveys and 0.07 feet (or 20 mm + 50 ppm) for urban surveys.*

4. Monumentation. As a requisite for completion of the work product, each *land* boundary survey of a tract or parcel of land shall be monumented with objects made of permanent material at all corners and changes of direction on the *land* boundary with the exceptions of meanders, such as meanders of streams, tidelands, lakes, swamps and prescriptive road rights-of-way; and each such monument, other than a natural monument, shall, when feasible, be identified by a temporary witness stake (which may be wooden). Where it is not feasible to set actual corners, appropriate reference monuments shall be set, preferably on line, and the location of each shall be shown on the plat or map of the *land* boundary.

All boundaries, both exterior and interior, of the original survey for any division or partition of land shall be monumented in accordance with the provisions of this subdivision, when such monumentation is not regulated by the provisions of a local subdivision ordinance.

C. *D.* Office procedures.

1. Computations. The computation of field work data shall be accomplished by using the mathematical routines that produce closures and mathematical results that can be compared with descriptions and data of record. Such computations shall be used to determine the final *land* boundary of the land involved.

2. Plats and maps. The following information shall be shown on all plats or maps, or both, used to depict the results of the *land* boundary survey:

a. The title of the *land* boundary plat identifying the land surveyed and showing the district and county or city in which the land is located and scale of drawing.

b. The name of owner of record and deed book referenced where the acquisition was recorded.

c. Names of all adjoining owners of record with deed book references, or subdivision lot designations.

d. Names of highways and roads with route number, and widths of right-of-way, or distance to the center of the physical pavement and pavement width, name of railroads, streams adjoining or running through the land, and other prominent or well-known objects or areas which are informative as to the location of the *land* boundary survey including but not limited to a distance to the nearest road intersection, or prominent or well-known object. In cases of remote areas, a scaled position with the latitude and longitude must be provided.

e. Bearings of all property lines and meanders to nearest 10 seconds of arc, or metric equivalent.

*f. Adequate curve data to accomplish mathematical closures.*

f. *g.* Distances of all property lines and meanders to the nearest one hundredth (.01) of a foot or metric equivalent.

g. *h.* Area to the nearest hundredth (.01) of an acre or metric equivalent for rural located surveys.

h. *i.* Area to the nearest square foot or thousandth (0.001) of an acre or metric equivalent for urban located surveys.

i. *j.* North arrow and source of meridian used for the survey.

j. *k.* On interior surveys, a reference bearing and distance to a property corner of an adjoining owner or other prominent object including, but not limited to, intersecting streets or roads.

k. *l.* Tax map designation of parcel number if available.

l. *m.* Description of each monument found and each monument set by the professional.

m. *n.* A statement that the *land* boundary survey shown is based on a current field survey. The application of the

# Proposed Regulations

land surveyor's seal, signature and date shall constitute compliance with all the current standards of a *land* boundary survey as of the date of the application of signature unless otherwise clearly stated in the title of the plat that the plat is to be construed otherwise.

n. *o.* If the land boundaries shown on the plat are the result of a compilation from deed or plats, or both, or based on a survey by others, that fact will be clearly stated and the title of the plat shall clearly depict that the plat does not represent a current *land* boundary survey.

o. *p.* Name and address of the land surveyor *or the registered business*.

3. Metes and bounds description. The professional shall prepare a metes and bounds description in narrative form, if requested by the client or their agent, for completion of any newly performed *land* boundary survey. The description shall reflect all metes and bounds, the area of the property described, all pertinent monumentation, names of record owners or other appropriate identification of all adjoiners, and any other data or information deemed as warranted to properly describe the property. Customarily, the metes and bounds shall be recited in a clockwise direction around the property. For subdivisions, the professional shall prepare a metes and bounds description in narrative form for only the exterior boundaries of the property.

No metes and bounds description shall be required for the verification or resetting of the corners of a lot or other parcel of land in accordance with a previously performed *land* boundary survey, such as a lot in a subdivision where it is unnecessary to revise the record boundaries of the lot.

## 18 VAC 10-20-380. Minimum standards and procedures for surveys determining the location of physical improvements; field procedures; office procedures.

A. The following minimum standards and procedures are to be used for surveys determining the location of physical improvements on any parcel of land or lot containing less than two acres or metric equivalent (sometimes also known as "building location survey," "house location surveys," "physical surveys," etc.) in the Commonwealth of Virginia. The application of the professional's seal, signature and date as required by these regulations shall be evidence that the survey determining the location of physical improvements is correct to the best of the professional's knowledge and belief, and complies with the minimum standards and procedures set forth in this section.

B. The professional shall determine the position of the lot or parcel of land in accordance with the intent of the original survey and shall set or verify permanent monumentation at each corner of the property, consistent with the monumentation provisions of subdivision B *C* 4 of 18 VAC 10-20-370; all such monumentation other than natural monumentation, shall, when feasible, be identified by temporary witness markers (which may be wooden).

When the professional finds discrepancies of sufficient magnitude to warrant, in his opinion, the performance of a land boundary survey (pursuant to the provisions of 18 VAC 10-20-370), he shall so inform the client or the client's agent that such *land* boundary survey is deemed warranted as a requisite to completion of the physical improvements survey.

The location of the following shall be determined in the field:

1. Fences in the near proximity to the *land* boundary lines and other fences which may reflect lines of occupancy or possession.

2. Other physical improvements on the property and all man-made or installed structures, including buildings, stoops, porches, chimneys, visible evidence of underground features (such as manholes, catch basins, telephone pedestals, power transformers, etc.), power lines and poles, and telephone lines and poles.

3. Cemeteries, if known or disclosed in the process of performing the survey; roads or travelways crossing the property which serve other properties; and streams, creeks, and other defined drainage ways.

4. Other visible evidence of physical encroachment on the property.

C. The plat reflecting the work product shall be drawn to scale and shall show the following, unless requested otherwise by the client and so noted on the plat:

1. The bearings and distances for the boundaries and the area of the lot or parcel of land shall be shown in accordance with record data, unless a current, new *land* boundary survey has been performed in conjunction with the physical improvements survey. If needed to produce a closed polygon, the meander lines necessary to verify locations of streams, tidelands, lakes and swamps shall be shown. All bearings shall be shown in a clockwise direction, unless otherwise indicated.

2. North arrow, in accordance with record data.

3. Fences in the near proximity to the *land* boundary lines and other fences which may reflect lines of occupancy or possession.

4. Improvements and other pertinent features on the property as located in the field pursuant to subsection B of this section.

5. Physical encroachment, including fences, across a property line shall be identified and dimensioned with respect to the property line.

6. On parcels where compliance with restriction is in question, provide the closest dimension (to the nearest 0.1 foot) or metric equivalent from the front property line, side property line, and if pertinent, rear property line to the principal walls of each building. Also, all principal building dimensions (to the nearest 0.1 foot) or metric equivalent.

7. Building street address numbers, as displayed on the premises, or so noted if no numbers are displayed.

8. Stoops, decks, porches, chimneys, balconies, floor projections, and other similar type features.

9. Street name(s), as posted or currently identified, and as per record data, if different from posted name.

# Proposed Regulations

10. Distance to nearest intersection, based upon record data. If not available from record data, distance to nearest intersection may be determined from best available data, and so qualified.

11. Building restriction line(s) per restrictive covenants, if shown on the record subdivision plat.

12. The caption or title of the plat shall include the type of survey performed; lot number, block number, section number, and name of subdivision, as appropriate, or if not in a subdivision, the name(s) of the record owner; town or county, or city; date of survey; and scale of drawing.

13. Adjoining property identification.

14. Easements and other encumbrances set forth on the record subdivision plat, and those otherwise known to the professional.

15. A statement as to whether or not a current title report has been furnished to the professional.

16. Professional's seal, signature and date.

*17. Name and address of the land surveyor or registered business.*

D. Notwithstanding the monumentation provisions of subsection B of this section or any other provision of these regulations, a professional, in performing a physical improvements survey, shall not be required to set corner monumentation on any property when corner monumentation is otherwise required to be set pursuant to the provisions of a local subdivision ordinance as mandated by ~~§ 15.1-465~~ *§ 15.2-2240* of the Code of Virginia, or by subdivision A 7 of ~~§ 15.1-466~~ *§ 15.2-2241* of the Code of Virginia, or where the placing of such monumentation is covered by a surety bond, cash escrow, set-aside letter, letter of credit, or other performance guaranty. When monumentation is not required, the surveyor shall clearly note on the plat "no corner markers set" and the reason to include name of guarantors.

~~E. Moreover, notwithstanding the monumentation provisions of subsection B of this section or any other provisions of this chapter, a professional, in performing a physical improvements survey, shall not be required to set corner monumentation on any property (i) when corner monumentation has been set pursuant to the provisions of a local subdivision ordinance as mandated by § 15.1-465 of the Code of Virginia, or by subdivision A 7 of § 15.1-466 of the Code of Virginia or (ii) when the owner or contract purchaser, or a legal agent therefore, agrees in writing when the survey is ordered that such corner monumentation shall not be provided in connection with such physical improvements survey. When corner monumentation is not provided, pursuant to such agreement, the land surveyor shall clearly reference on the plat the existing monumentation utilized to perform the physical improvements survey. The provisions of this subsection shall apply only to property located within the counties of Arlington, Fairfax, King George, Loudoun, Prince William, Spotsylvania, and Stafford; and the cities of Alexandria, Fairfax, Falls Church, Fredericksburg, Manassas and Manassas Park.~~

*E. Notwithstanding anything in this chapter, this chapter shall be construed as to comply in all respects with § 54.1-407 of the Code of Virginia.*

F. In no event may this chapter be interpreted or construed to require the professional to perform work of a lesser quality or quantity than that ~~deemed by the professional to be~~ *which is* prudent or warranted under the existing field conditions and circumstances.

## 18 VAC 10-20-400. Fee schedule.

All fees are nonrefundable and shall not be prorated.

| | |
|---|---|
| Application | $75 |
| Renewal | $75 |
| Out of state proctor | $50 |
| Dishonored checks | $25 |

The examination fee shall consist of the administration expenses of the department resulting from the board's examination procedures and contract charges. Exam service contracts shall be established through competitive negotiation in compliance with the Virginia Public Procurement Act (§ 11-35 et seq. of the Code of Virginia). The current examination shall not exceed a cost of $630 for the entire ~~Landscape Architect Registration~~ *CLARB* Examination ~~(LARE)~~ or $160 per division.

## 18 VAC 10-20-410. ~~Character.~~ *(Repealed.)*

~~Applicants must be of good moral character.~~

## 18 VAC 10-20-420. Requirements for certification.

The education or experience, or both, and examination requirements for certification as a landscape architect are as follows:

1. An applicant who has graduated from an accredited landscape architecture curriculum approved by the *Landscape Architectural Accreditation* Board shall be admitted to a CLARB prepared examination or equivalent *approved by the board*. Upon passing such examination, the applicant shall be certified as a landscape architect, if otherwise qualified~~.~~*; or*

2. An applicant who has obtained eight years of combined education and experience, evaluated in accordance with *the Landscape Architect Equivalency* Table ~~II~~, shall be admitted to a CLARB prepared examination or equivalent *approved by the board*. Upon passing such examination, the applicant shall be certified as a landscape architect, if otherwise qualified.

## 18 VAC 10-20-430. Experience standard.

~~Professional~~ *Qualifying* landscape architectural training and experience shall be progressive in complexity and based on a knowledge of natural, physical and mathematical sciences, and the principles and methodology of landscape architecture.

# Proposed Regulations

**18 VAC 10-20-440. Examination.**

A. All applicants for original certification in Virginia are required to pass the ~~Landscape Architect Registration~~ *CLARB prepared* examination ~~(LARE)~~ or equivalent after meeting the education and experience requirements as provided in these regulations.

B. The Virginia board is a member of the Council of Landscape Architectural Registration Boards (CLARB) and as such is authorized to administer the CLARB examinations.

C. The ~~Landscape Architect Registration~~ *CLARB* examination ~~(LARE)~~ will be offered at least once per year at a time designated by the board.

D. Grading of the examination shall be in accordance with the national grading procedures established by CLARB. The board shall adopt the scoring procedures recommended by CLARB.

E. Unless otherwise stated, applicants approved to sit for an examination shall register and submit the required examination fee to be received in the board office ~~no later than 75 days before the next administration of the examination~~ *at a time designated by the board*. Applicants not properly registered shall not be allowed into the examination site.

~~F. Examinees will be given specific instructions as to the conduct of each section of the exam at the exam site. Examinees are required to follow these instructions to assure fair and equal treatment to all examinees during the course of the examination. Evidence of misconduct may result in voided examination scores or other appropriate action.~~

~~G.~~ *F.* Examinees will be advised only of a passing or failing score and the CLARB minimum passing or failing score. Only the board and its staff shall have access to examination papers, scores and answer sheets.

~~H.~~ *G.* Upon written request to the board within 30 days of receiving examination results, examinees will be permitted to view individually their own performance problems for failed sections only. Examination appeals are permitted in accordance with the CLARB score verification process.

~~I.~~ *H.* Should an applicant not pass an examination within three years after being approved, the applicant must reapply and meet all current entry requirements.

**18 VAC 10-20-450. Certification by comity.**

~~Any applicant who has passed an examination in another jurisdiction of the United States or province of Canada comparable to the examination required by this chapter or who is CLARB certified and who is currently licensed or certified in another jurisdiction of the United States or province of Canada may have the required Virginia examinations waived, provided that all other qualifications are met.~~

*A person holding a current license to engage in the practice of landscape architecture, issued to the applicant by other states, the District of Columbia, or any territory or possession of the United States based on requirements that do not conflict with and are at least as rigorous as these regulations and supporting statutes of this board that were in effect at the time of original licensure, may be licensed without further examination. No person shall be so licensed, however, who has not passed an examination in another jurisdiction that was substantially equivalent to that approved by the board at that time. If the applicant does not meet the requirements for licensure in Virginia that were in effect at the time of original licensure, the applicant shall be required to meet the entry requirements current at the time the completed application for comity is received in the board's office or shall hold a CLARB certificate.*

*LANDSCAPE ARCHITECT EQUIVALENCY* TABLE ~~II~~.
TABLE OF EQUIVALENTS FOR EDUCATION AND EXPERIENCE ~~FOR CERTIFIED LANDSCAPE ARCHITECTS~~.

| DESCRIPTIONS | Education Credits | | | Experience Credits | |
| --- | --- | --- | --- | --- | --- |
| | First 2 Years | Succeeding Years | Max. Credit Allowed | Credit Allowed | Max. Credit Allowed |
| A-1. Credits toward a degree in landscape architecture from an accredited school of landscape architecture. | 100% | 100% | 4 years | | |
| A-2. Degree in landscape architecture or credits toward that degree from a nonaccredited school of landscape architecture. | 100% | 100% | 4 years | | |
| A-3. Degree or credits toward that degree in an allied professional discipline, i.e., architecture, civil engineering, environmental science, approved by the board. | 75% | 100% | 3 years | | |
| A-4. Any other bachelor degree or credits toward that degree. | 50% | 75% | 2 years | | |
| A-5. ~~Diversified~~ *Qualifying* experience in landscape architecture under the direct supervision of a ~~certified~~ landscape architect. | | | | 100% | no limit |
| A-6. ~~Diversified~~ *Qualifying* experience directly related to landscape architecture when under the direct supervision of an architect, ~~civil~~ *professional* engineer, or ~~"credentialed" planner~~ *land surveyor*. | | | | 50% | 4 years |

# Proposed Regulations

EXPLANATION OF REQUIREMENTS

B-1. Education Credits. Education credits shall be subject to the following conditions:

B-1.1. Applicants with a degree specified in A-1 through A-4 will be allowed the credit shown in the Maximum Credit Allowed column, regardless of the length of the degree program.

2. With a passing grade, 32 semester credit hours or 48 quarter hours is considered to be one year. Fractions greater than one-half year will be counted one-half year and smaller fractions will not be counted.

B-2. Experience Credits. Experience credits shall be subject to the following conditions:

B-2.1. Every applicant must earn at least two years of experience credit under category A-5. ~~An applicant who has no education credits must earn at least four years of experience under category A-5.~~

**18 VAC 10-20-480.** ~~Character.~~ *(Repealed.)*

~~Applicants must be of good moral character.~~

**18 VAC 10-20-490. Requirements for certification.**

The education, experience and examination requirements for certification as an interior designer are as follows:

1. The applicant shall hold a four-year degree from an institution accredited by the Foundation for Interior Design Education Research (FIDER) or an equivalent accrediting organization approved by the board, have two years of monitored experience, and have passed the examination for certification as an interior designer.

2. Monitored experience gained under the supervision of a professional engineer shall be ~~discounted at~~ *reduced by* 50% with a maximum credit of six months.

**18 VAC 10-20-505. Certification by comity.**

The board, ~~in lieu of all examinations,~~ may accept satisfactory evidence of licensing or certification in another state or country or the District of Columbia where the qualifications required are equal, in the opinion of the board, to those required by the provisions of this chapter as of the date of application, and in which the applicant is the holder of a license or certificate in good standing. Upon receipt of such satisfactory evidence and provided all other requirements of this chapter are complied with, a certificate shall be issued to ~~such~~ *the* applicant ~~(§ 54.1-415 of the Code of Virginia)~~.

**18 VAC 10-20-530. Application requirements.**

A. All applicants shall have been incorporated in the Commonwealth of Virginia or, if a foreign professional corporation, shall have obtained a certificate of authority to do business in Virginia from the State Corporation Commission in accordance with § 13.1-544.2 of the Code of Virginia. *The corporation shall be in good standing with the State Corporation Commission at the time of application to the board office and at all times when the registration is in effect.*

B. Each application shall include certified true copies of the articles of incorporation, bylaws and charter, and, if a foreign professional corporation, the certificate of authority issued by the State Corporation Commission.

C. Articles of incorporation and bylaws. The following statements are required:

1. The articles of incorporation or bylaws shall specifically state that cumulative voting is prohibited.

2. The bylaws shall state that at least 2/3 of the capital stock must be held by persons duly licensed to render the services of an architect, professional engineer or land surveyor, or duly certified to render the services of a landscape architect *or certified interior designer. For those corporations using the title of certified interior designers and providing the services of architects, professional engineers or land surveyors, or any combination thereof, the capital stock of the corporation shall be held by individuals in accordance with § 13.1-549 of the Code of Virginia.* The remainder of the stock may be issued only to and held by individuals who are employees of the corporation.

3. The bylaws shall state that nonlicensed or noncertified individuals will not have a voice or standing in any matter affecting the practice of the corporation requiring professional expertise or considered professional practice, or both.

D. Board of directors. A corporation may elect to its board of directors not more than 1/3 of its members who are employees of the corporation and are not authorized to render professional services.

At least 2/3 of the board of directors shall be licensed to render the services of ~~architecture~~ *an architect*, professional ~~engineering~~ *engineer* or land ~~surveying~~ *surveyor*, or be *duly* certified to render the services of a landscape ~~architecture~~ *architect or certified interior designer*, or any combination thereof.

At least one director currently licensed or certified in each profession offered or practiced shall devote substantially full time to the business of the corporation to provide effective supervision and control of the final professional product.

E. Joint ownership of stock. Any type of joint ownership of the stock of the corporation is prohibited. Ownership of stock by nonlicensed or noncertified employees shall not entitle those employees to vote in any matter affecting the practice of the professions herein regulated.

F. The name of the business and any assumed, fictitious, trading as, or doing business as names of the firm shall be disclosed on the application.

G. Branch offices. If professional services are offered or rendered in a branch office, a separate branch office designation form shall be completed for each branch office located in Virginia. Persons in responsible charge shall be designated in accordance with this chapter. *At least one currently licensed or certified individual in each profession offered or practiced at each branch office shall devote*

# Proposed Regulations

*substantially full time to the business of the corporation at each branch office to provide effective supervision and control of the final professional product.*

## 18 VAC 10-20-540. Certificates of authority.

Certificates of authority shall be issued by the board. The certificate of authority will permit a corporation to practice only the professions shown on its certificate of authority, architecture, ~~professional~~ engineering, land surveying, *certified* landscape architecture*, certified interior design,* or any combination thereof.

## 18 VAC 10-20-550. Foreign corporations.

In addition to these regulations, the bylaws shall state that the corporation's activities *in Virginia* shall be limited to rendering the services of ~~architecture~~ *architects*, professional ~~engineering~~ *engineers*, land ~~surveying and~~ *surveyors*, landscape ~~architecture~~ *architects and certified interior designers*, or any combination thereof.

The corporation shall provide the name and address of each stockholder of the corporation who will be providing the professional service(s) in Virginia and whether such stockholder is licensed or certified to perform the professional service(s) in Virginia.

## 18 VAC 10-20-560. Amendments and changes.

A. Amendments to charter, articles of incorporation or bylaws. A corporation holding a certificate of authority to practice in one or in any combination of the professions covered in these regulations shall file with the board, within 30 days of its adoption, a certified true copy of any amendment to the articles of incorporation, bylaws or charter.

B. Change in directors or shareholders. In the event there is a change in corporate directors or shareholders, whether the change is temporary or permanent and whether it may be caused by death, resignation or otherwise, the certificate of authority shall be limited to that professional practice permitted by those pertinent licenses or certificates held by the remaining directors and shareholders of the corporation unless an employee of the firm holds the appropriate license or certificate and is competent to render such professional services. In the event that such change results in noncompliance with *the requirements of* this chapter and applicable statutes *relating to ownership of capital stock or composition of the board of directors*, the certificate of authority shall be suspended until such time as the corporation comes into compliance with this chapter. The corporation shall notify the board within 30 days of any such change.

C. Change of name, address and place of business. Any change of name (including assumed names), address, place of business in Virginia, or person(s) in responsible charge of the profession(s) practiced or offered at each place of business shall be reported to the board *by the registered entity* within 30 days of such an occurrence. *In addition, any licensed or certified employee responsible for such practice shall notify the board in writing of any changes of his employment status within 10 days of such change.*

## 18 VAC 10-20-570. Definitions.

The following words and terms when used in this part shall have the following meanings, unless the context clearly indicates otherwise:

*"Manager"* is a person or persons designated by the members of a limited liability company to manage the limited liability company as provided in the articles of organization or an operating agreement, and who is duly licensed or otherwise legally authorized to render one or more of the professional services of ~~architecture~~ *architects*, professional ~~engineering~~ *engineers*, land ~~surveying or~~ *surveyors,* landscape ~~architecture~~ *architects or certified interior designers* in the Commonwealth of Virginia.

*"Member"* means an individual or professional business entity that owns an interest in a limited liability company.

*"Professional limited liability company"* means a limited liability company organized in accordance with Chapter 13 (§ 13.1-1100 et seq.) of Title 13.1 of the Code of Virginia for the sole and specific purpose of rendering one or more of the professional services of ~~architecture~~ *architects*, professional ~~engineering~~ *engineers*, land ~~surveying or~~ *surveyors,* landscape ~~architecture~~ *architects or certified interior designers*.

## 18 VAC 10-20-590. Application requirements.

A. All applicants shall have obtained a certificate of organization in the Commonwealth of Virginia or, if a foreign professional limited liability company, shall have obtained a certificate of registration to do business in Virginia from the State Corporation Commission, in accordance with § 13.1-1105 of the Code of Virginia. *The company shall be in good standing with the State Corporation Commission at the time of application to the board office and at all times when the registration is in effect.*

B. Each application shall include a certified true copy of the certificate of organization or, if a foreign professional limited liability company, a certificate of registration issued by the State Corporation Commission.

C. Each application shall be accompanied by a written affirmative affidavit that attests to the following inclusions to the articles of organization or operating agreement.

1. The articles of organization or operating agreement shall state the specific purpose of the professional limited liability company.

2. The articles of organization or operating agreement shall attest that membership is composed of one or more individuals or professional business entities, and at least 2/3 of the membership interests are held by individuals or professional business entities which are duly licensed*, certified* or registered to render professional services within the Commonwealth of Virginia. *For those professional limited liability companies using the title of certified interior designers and providing the services of architects, professional engineers or land surveyors, or any combination thereof, the membership interests of the professional limited liability company shall be held by individuals in accordance with § 13.1-1111 of the Code of Virginia.* The remaining membership interest may be held

# Proposed Regulations

only by employees of the company whether or not they are licensed, *certified* or otherwise legally authorized to render professional services.

3. The articles of organization or operating agreement shall attest that all members, managers, employees and agents who render professional services of ~~architecture~~ *architects*, professional ~~engineering~~ *engineers*, land ~~surveying or surveyors,~~ landscape ~~architecture~~ *architects, or certified interior designers* are duly licensed *or certified* to provide those services.

4. The person executing the ~~document~~ *affidavit* shall sign it and state beneath his signature his name and the capacity in which he signs. *If the person signing the affidavit is not a manager of the limited liability company, the affidavit shall also state that the individual has been authorized by the members of the limited liability company to execute the affidavit for the benefit of the company.*

D. Unless the articles of organization or an operating agreement provides for management of a professional limited liability company by a manager or managers, management of a limited liability company shall be vested in its members~~, all of which must be duly licensed or otherwise legally authorized to render the professional services within the Commonwealth for which the company was formed~~ *pursuant to § 13.1-1118 of the Code of Virginia.*

*If the articles of organization or an operating agreement provides for management of the professional limited liability company by a manager or managers, the manager or managers must be an individual or professional business entity duly licensed or otherwise legally authorized to render the same professional services within the Commonwealth for which the company was formed.*

E. The name of the business and any assumed, fictitious, trading as, or doing business as names of the firm shall be disclosed on the application.

F. If professional services are offered or rendered in a branch office, a separate branch office designation form shall be completed for each branch office located in Virginia. Persons in responsible charge shall be designated in accordance with this chapter. *At least one currently licensed or certified individual in each profession offered or practiced at each branch office shall devote substantially full time to the business of the professional limited liability company at each branch office to provide effective supervision and control of the final professional product.*

**18 VAC 10-20-600. Certificates of authority.**

A certificate of authority shall be issued by the board. The certificate of authority will permit a professional limited liability company to practice only the professions shown on its certificate of authority, architecture, ~~professional~~ engineering, land surveying, *certified* landscape architecture, *certified interior design,* or any combination thereof.

**18 VAC 10-20-610. Foreign professional limited liability companies.**

~~In addition to the requirements of these regulations,~~ The articles of organization or operating agreement shall state that the professional limited liability company's activities *in Virginia* shall be limited to rendering the professional services of ~~architecture~~ *architects*, professional ~~engineering~~ *engineers*, land ~~surveying and~~ *surveyors,* landscape ~~architecture~~ *architects, and certified interior designers*, or any combination thereof.

The professional limited liability company shall provide the name and address of each manager or member who will be providing the professional service(s) in Virginia and whether such manager or member is licensed or certified to perform the professional service(s) in Virginia.

**18 VAC 10-20-620. Amendments to articles of organization, operating agreements or certificate of organization; change in managers or members; change in name, address and place of business.**

A. A professional limited liability company holding a certificate of authority to practice in one or in any combination of the professions covered in these regulations shall file with the board, within 30 days of its adoption, a certified true copy of any amendment to the articles of organization, operating agreement or certificate of organization.

B. In the event there is a change of professional limited liability company managers or members, whether the change is temporary or permanent and whether it may be caused by death, resignation or otherwise, the certificate of authority shall be automatically modified to be limited to that professional practice permitted by those pertinent licenses or certificates held by the remaining managers or members of the professional limited liability company *unless an employee of the professional limited liability company holds the appropriate license or certificate and is competent to render such professional services.* Unless otherwise provided, in the event that such change results in noncompliance with ~~these regulations~~ *the requirements of this chapter* and applicable statutes *relating to ownership of the membership interests,* the certificate of authority shall be automatically suspended until such time as the professional limited liability company comes into compliance with these regulations. The professional limited liability company shall notify the board within 30 days of any such change.

No member of the professional limited liability company may transfer or sell its membership interest in the company, except to the company, or unless at least 2/3 of the remaining membership interest is held by individuals or professional business entities duly licensed or otherwise authorized to render the professional services of the company.

C. Any change of name (including assumed names), address, place of business in Virginia, registered agent or person(s) in responsible charge of the profession(s) practiced or offered shall be reported *by the registered entity* to the board within 30 days of such an occurrence. *In addition, any licensed or certified employee responsible for such practice shall notify the board in writing of any changes of his employment status within 10 days of such change.*

## Proposed Regulations

**18 VAC 10-20-640. Application requirements.**

A. In accordance with § 54.1-411 of the Code of Virginia, applicants shall register with the board on a form approved by the board.

B. If a partnership, a copy of the partnership agreement shall be included with the application. *The partnership agreement shall state that all professional services of the partnership shall be under the direction and control of a licensed or certified professional.*

C. If a corporation, the application shall include certified true copies of the articles of incorporation, bylaws and charter, and if a foreign corporation, a certificate of authority issued by the State Corporation Commission.

D. If a limited liability company, the application shall include a certified true copy of the certificate of organization issued by the State Corporation Commission, and, if a foreign limited liability company, a certified true copy of the certificate of authority issued by the State Corporation Commission.

E. If professional services are offered or rendered in a branch office, a separate branch office designation form shall be completed for each branch office located in Virginia. Persons in responsible charge shall be designated in accordance with this chapter.

F. The name of the business and any assumed, fictitious, trading as, or doing business as names of the firm shall be disclosed on the application.

**18 VAC 10-20-650. Registration certification.**

The application shall contain an affidavit by an authorized official in the corporation, partnership, sole proprietorship, limited liability company, or other entity unit that the practice of architecture, ~~professional~~ engineering, land surveying ~~or~~, certified landscape architecture *or certified interior design* to be done by that entity shall be under the direct control and personal supervision of the licensed or certified full-time employees *or licensed or certified full-time principals* identified in the application as responsible for the practice. In addition, the licensed or certified employees *or principals* responsible for the practice shall sign their names indicating that they are full-time employees *or principals* and in responsible charge, and that they understand and shall comply with all statutes and regulations of the board.

**18 VAC 10-20-660. Change of status.**

Any changes of status, including but not limited to change in entity, name (including assumed names), address, place of business or persons in responsible charge of the professions practiced or offered at each place of business, shall be reported to the board *by the registered entity* within 30 days of such an occurrence. *In addition, any licensed or certified employee responsible for such practice shall notify the board in writing of any changes of his employment status within 10 days of such change.*

In the event there is a change in the licensed or certified employees in responsible charge, whether the change is temporary or permanent and whether it may be caused by death, resignation or otherwise, the registration shall be automatically modified to be limited to that professional practice permitted by the remaining licensed or certified employees, or shall be automatically suspended until such time as the entity comes into compliance with these regulations.

**18 VAC 10-20-680. Reinstatement.**

A. If the license, certificate or registration has expired for six months or more, but less than five years, the regulant shall be required to submit a new application, which shall be evaluated by the board to determine if the applicant meets the renewal requirements. In addition, a reinstatement fee equal to the regular renewal fee plus $100 shall be required.

B. If the license, certificate or registration has expired for five years or more, the regulant will be required to submit a new application~~, meet current entry requirements,~~ and submit a reinstatement fee equal to the regular renewal fee plus $250. In addition, the board may require ~~the~~ *an individual* applicant to submit to an examination.

C. Board discretion to deny reinstatement. The board may deny reinstatement of a license, certificate or registration for the same reasons as it may refuse initial licensure, certification or registration or discipline a regulant.

D. The date the renewal application and fee are received in the office of the board shall determine whether a license, certificate or registration shall be renewed without late renewal or reinstatement, or shall be subject to reinstatement application procedures.

E. A license, certificate or registration that is reinstated shall be regarded as having been continuously licensed, *certified or registered* without interruption. Therefore, the license, certificate or registration holder who is not ~~already~~ subject to the *licensure for life* provisions of § 54.1-405 of the Code of Virginia shall remain under the disciplinary authority of the board during the entire period and shall be accountable for his activities during the period. A license, certificate or registration that is not reinstated and is not subject to the *licensure for life* provisions of § 54.1-405 of the Code of Virginia shall be regarded as unlicensed, *uncertified or unregistered* from the expiration date forward. Nothing in this chapter shall divest the board of its authority to discipline a license, certificate or registration holder for a violation of the law or regulation during the period of time for which the regulant was licensed, *certified or registered*.

**18 VAC 10-20-720. Solicitation of work *or employment*.**

In the course of soliciting work *or employment*:

1. The ~~professional~~ *regulant* shall not bribe.

2. The ~~professional~~ *regulant* shall not falsify or permit misrepresentation of the ~~professional's~~ *regulant's* work or an associate's academic or professional qualifications, nor shall the ~~professional~~ *regulant* misrepresent the degree of responsibility for prior assignments. Materials used in the solicitation of employment shall not misrepresent facts concerning employers, employees, associates, joint ventures or past accomplishments of any kind.

# Proposed Regulations

**18 VAC 10-20-740. Professional responsibility.**

A. The professional shall not knowingly associate in a business venture with, or permit the use of the professional's name or firm name by any person or firm where there is reason to believe that person or firm is engaging in activity of a fraudulent or dishonest nature or is violating statutes or any of these regulations.

B. A professional who has direct knowledge that ~~another~~ *any* individual, *including himself,* or firm may be violating any of these provisions, or the provisions of Chapters 1 through 4 of Title 54.1 or Chapters 7 and 13 of Title 13.1 of the Code of Virginia, shall immediately inform the secretary of the board in writing and shall cooperate in furnishing any further information or assistance that may be required.

C. The professional shall, upon request or demand, produce to the board, or any of its agents, any plan, document, book, record or copy thereof in his possession concerning a transaction covered by this chapter, and shall cooperate in the investigation of a complaint filed with the board against a licensee or certificate holder.

D. A professional shall not utilize the design, drawings or work of another professional *to, including but not limited to, complete the design, drawings or work or to replicate like design, drawings or work* without the knowledge and written consent of the ~~professional~~ *person* or organization ~~of ownership that originated~~ *that owns* the design, drawings or work. ~~In the event that the professional who generated the original document is no longer employed by the design firm retaining ownership of the original documents or is deceased, another professional who is a partner or officer in the design firm retaining ownership of the original documents may authorize utilization of the original documents by another professional or firm.~~

E. A professional who has received permission to modify or otherwise utilize the ~~design~~ *designs*, drawings or work of another professional pursuant to subsection D of this section may seal that work only after a thorough review of the design, drawings or work to the extent that full responsibility shall be assumed for all design, drawings or work.

F. The information contained in recorded plats or surveys may be utilized by another professional without permission. If modifications are made to the plats or surveys, the professional must conduct a thorough review and verification of the work to the extent that full responsibility ~~may~~ *shall* be assumed for any changes or modifications to the plats or surveys.

**18 VAC 10-20-750. Good standing in other jurisdictions.**

A ~~professional~~ *regulant* licensed ~~or,~~ certified, *or registered* to practice architecture, ~~professional~~ engineering, land surveying, landscape architecture or interior design in other jurisdictions shall be in good standing in every jurisdiction where licensed ~~or,~~ certified, *or registered*, and shall not have had a license ~~or,~~ certificate, *or registration* suspended, revoked or surrendered in connection with a disciplinary action or who has been the subject of discipline in another jurisdiction.

**18 VAC 10-20-760. Use of seal.**

A. The application of a professional seal shall indicate that the professional has exercised complete direction and control over the work to which it is affixed. Therefore, no regulant shall affix a name, seal or certification to a plat, design, specification or other work constituting the practice of the professions regulated which has been prepared by an unlicensed or uncertified person or firm unless such work was performed under the direction and supervision of the regulant while under the regulant's contract or while employed by the same firm as the regulant. If a regulant is unable to seal completed professional work, such work may be sealed by another regulant only after thorough review and verification of the work has been accomplished to the same extent that would have been exercised if the work had been done under the complete direction and control of the regulant affixing the professional seal.

B. A ~~principal or authorized licensed or certified employee~~ *regulant* shall apply a stamp, or *a preprinted or electronic* seal to final and complete original cover sheets of plans, drawings, plats, technical reports and specifications and to each original sheet of plans, drawings or plats, prepared by the regulant or someone under his direct control and personal supervision.

1. All seal imprints on *the cover or first sheet of* final documents shall bear an original signature and date. "Final Documents" are completed documents or copies submitted on a client's behalf for approval by authorities or recordation. In such cases, the cover sheet of the documents or copies shall contain a list of drawings included in the set on which a seal, original signature and date ~~will~~ *shall* be affixed for all regulated disciplines. Every page of the submission, other than the cover, may be reproduced from originals which contain the seal, original signature and date by each discipline responsible for the work. ~~A seal, original signature and date is only required on the cover sheet.~~

*a. An electronic seal, signature and date is permitted to be used in lieu of an original seal, signature and date when the following criteria, and all other requirements of this section, are met:*

*(1) It is a unique identification of the professional;*

*(2) It is verifiable;*

*(3) It is under the professional's direct and sole control;*

*(4) It is linked to the document file in such a manner that changes are readily determined and visually displayed if any data contained in the document file was changed subsequent to the electronic seal, signature and date having been affixed to the document; and*

*(5) Changes to the document after affixing the electronic seal, signature and date shall cause the electronic seal, signature and date to be removed or altered in such a way as to invalidate the electronic seal, signature and date.*

*b. In addition, once the electronic seal, signature and date is applied to the document, the document shall be in*

## Proposed Regulations

*a view-only format if the document is to be electronically transmitted.*

2. Incomplete plans, documents and sketches, whether advance or preliminary copies, shall be so identified *on the plan, document or sketch* and need not be sealed ~~or~~, signed *or dated*.

3. All plans, drawings or plats prepared by the regulant shall bear the regulant's name or firm name, address and project name.

4. The seal of each regulant responsible for each profession shall be used and shall be on ~~the originals, including the document cover sheet,~~ *each document that was prepared under the regulant's direction and* for which that professional is responsible~~, including exempted work, for which licensure or certification is not required, prepared under the regulant's direction~~. *If one of the exemptions found in § 54.1-402 of the Code of Virginia is applicable, a professional licensed or certified by this board shall nevertheless apply his seal to the exempt work.*

5. Application of the seal and signature indicates acceptance of responsibility for work shown thereon.

6. The seal shall conform in detail and size to the design illustrated below and shall be two inches in diameter. The designs below may not be shown to scale:





*The number referred to is the *last* six-digit number as shown on the license or certificate. The number is permanent. *Leading zeros contained in the six-digit number may be omitted from the seal.*

**18 VAC 10-20-780. Professional required at each place of business.**

A. Corporations, partnerships, firms, sole proprietorships, other legal entities and the professional in responsible charge maintaining a place of business in the Commonwealth of Virginia for the purpose of offering to provide architectural, engineering, land surveying, ~~or~~ certified landscape architectural, *or certified interior design* services practiced at more than one location shall have an authorized full-time Virginia licensed architect, professional engineer, land surveyor, ~~or certified~~ landscape architect, *or certified interior designer* in responsible charge of the respective profession being offered in each place of business.

# Proposed Regulations

B. Corporations, partnerships, firms, sole proprietorships, other legal entities and the professional in responsible charge maintaining any place of business in the Commonwealth of Virginia for the purpose of practicing architecture, engineering, land surveying, ~~or~~ certified landscape architecture*, or certified interior design* at that location, shall have in responsible charge at each place of business a full-time Virginia licensed architect, professional engineer, land surveyor, ~~or certified~~ landscape architect*, or certified interior designer* in residence exercising supervision and control of work in each profession being practiced.

> NOTICE: The forms used in administering 18 VAC 10-20-10 et seq., Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects Rules and Regulations are not being published due to the large number; however, the name of each form is listed below. The forms are available for public inspection at the Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects, 3600 W. Broad Street, Richmond, Virginia, or at the office of the Registrar of Regulations, General Assembly Building, 2nd Floor, Richmond, Virginia.

### FORMS

*Architect Information Sheet, 0401INFO (5/9/00).*

Architect License Application, ~~DPOR Form A-1 (rev. 10/1/99)~~ *0401LIC (5/9/00).*

~~Architect~~ Verification of ~~Registration~~ *Architect Examination and Licensure Form,* ~~DPOR Form A-2 (rev. 10/1/99)~~ *0401ELVF (11/13/00).*

Architect Experience Verification Form, ~~DPOR Form A-3 (rev. 10/1/99)~~ *0401 EXP (8/8/00).*

*Architect* Client *Experience* Verification Form, ~~DPOR Form A-4 (eff. 10/1/99)~~ *0401CEXP (5/9/00).*

*Architect Degree* Verification ~~of Degree~~ Form, DPOR Form A-5 (eff. 10/1/99) *0401DEG (5/9/00).*

Architect Reference Form, ~~DPOR Form A-6 (rev. 10/1/99)~~ *0401REF (5/9/00).*

*Professional Engineer Information Sheet, 0402INFO (3/29/01).*

Professional Engineer License Application, 0402LIC (rev. ~~10/1/99~~ *3/29/01).*

Professional Engineer ~~and Engineer in Training~~ Reference Form, ~~04REF (rev. 10/1/99)~~ *0402REF (3/29/01).*

*Professional Engineer License Reinstatement Application, 0402REI (3/30/01).*

Professional Engineer and Engineer-in-Training Degree Verification Form, ~~04DEG (rev. 10/1/99)~~ *04EDEG (3/29/01).*

Professional Engineer and Engineer-in-Training Experience Verification Form, ~~04EXP (rev. 10/1/99)~~ *04EEXP (3/29/01).*

~~Supplemental Experience Verification Form, 04SUPEXP (rev. 8/1/99).~~

*Engineer* Verification of Examination and Licensure Form, ~~0402ELVF (rev. 10/1/99)~~ *04EELVF (3/29/01).*

*Engineer-in-Training Information Sheet, 0420INFO (3/29/01).*

Engineer-in-Training Designation Application, 0420DES (rev. ~~10/1/99~~ *3/29/01).*

*Engineer-in-Training Reference Form, 0420REF (3/29/01).*

~~Professional Engineer and Engineer in Training Degree Verification Form, 04DEG (rev. 10/1/99).~~

Engineer Examination Scheduling Form, ~~9906VA-EngAppP65 (rev. 1999)~~ *04EXAM (11/1/00).*

*Land Surveyor Information Sheet, 0403INFO (1/1/00).*

~~Application for~~ Land Surveyor A *License Application,* ~~DPOR LSA Form 1 (eff. 10/1/99)~~ *0403LIC (1/1/01).*

*Land Surveyor B Information Sheet, 0404INFO (1/1/01).*

~~Application for Licensing as a~~ Land Surveyor B *License Application,* ~~DPOR Form LSB 2 (eff. 12/15/93)~~ *0404LIC (1/1/01).*

*Land Surveyor and Land Surveyor-in-Training Degree Verification Form, 04LSDEG (1/1/01).*

~~Verification of Out of State Licensure Registration and/or Examination~~ *Land Surveyor Verification of Examination and Licensure Form,* ~~DPOR LSA Form 2 (eff. 2/21/95)~~ *04LSELVF (1/1/01).*

~~Report of Professional Experience (RPE)~~ *Land Surveyor & Land Surveyor-in-Training Experience Verification Form,* ~~DPOR LSA Form 3 (eff. 2/21/95)~~ *04LSEXP (1/1/01).*

~~Report of Professional Experience Continuation Sheet~~ *Land Surveyor & Land Surveyor-in-Training Supplemental Experience Verification Form,* ~~DPOR LSA Form 3C (eff. 2/21/95)~~ *04SLSEXP (1/1/01).*

*Land Surveyor-in-Training Information Sheet, 0430INFO (1/1/01).*

~~Application for~~ Land Surveyor-In-Training *Designation Application,* ~~DPOR LS In Training Form 1 (eff. 10/1/99)~~ *0430DES (1/1/01).*

*Surveyor Examination Scheduling Form, LSEXAM (6/1/00).*

*Landscape Architect Information Sheet, 0406INFO (9/18/00).*

Landscape Architect ~~License~~ *Certificate* Application, ~~DPOR Form LA 1 (rev. 10/1/99)~~ *0406CERT (7/1/00).*

~~Landscape Architecture Review Summary Sheet (rev. 4/3/95).~~

Verification of ~~Registration~~ *Landscape Architect Examination and Certification* Form, ~~DPOR Form LA 2 (rev. 10/1/99)~~ *0406ELVF (7/1/00).*

Landscape Architect Experience Verification Form *for Examination and Comity Applicants,* ~~DPOR Form LA 3 (rev. 10/1/97)~~ *0406EXP (7/1/00).*

*Landscape Architect Experience Verification Form for Grandfather Provision Applicants, 0406GEXP (7/1/00).*

# Proposed Regulations

~~Landscape Architect Reference Form, DPOR Form LA 4 (rev. 10/1/99).~~

*Landscape Architect Degree* Verification ~~of Degree~~ Form, ~~DPOR Form LA 5 (rev. 10/1/99)~~ *0406DEG (7/1/00).*

*Interior Designer Information Sheet, 0412INFO (1/1/01).*

Interior Design ~~Certification~~ *Certificate* Application, ~~DPOR Form ID 1 (rev. 10/1/99)~~ *0412CERT (1/1/01).*

~~Interior Design~~ Verification of ~~Registration~~ *Interior Designer Examination and Certification Form,* ~~DPOR Form ID 2 (rev. 10/1/99)~~ *0412ELVF (1/1/01).*

*Interior Designer Degree* Verification ~~of Degree~~ Form, ~~DPOR Form ID 3 (rev. 10/1/99)~~ *0412DEG (1/1/01).*

~~Interior Design Reference Form, DPOR Form ID 4 (rev. 10/1/99).~~

Interior ~~Design~~ *Designer* Experience Verification Form, ~~DPOR Form ID 5 (rev. 10/1/99)~~ *0412EXP (1/1/01).*

Professional Corporation Registration Application (rev. ~~10/1/99~~ *6/6/00*).

Business Entity Registration Application (rev. 10/1/99).

Branch Office Application (rev. 10/1/99).

Professional Limited Liability Company Application Form (rev. 10/1/99).

### DOCUMENTS INCORPORATED BY REFERENCE

Handbook for Interns and Architects, ~~1998-1999~~ *2000-2001* Edition, National Council of Architectural Registration Boards.

VA.R. Doc. No. R00-175; Filed April 30, 2001, 2:32 p.m.

## VIRGINIA BOARD FOR ASBESTOS AND LEAD

<u>Title of Regulation:</u> **18 VAC 15-20-10 et seq. Virginia Asbestos Licensing Regulations (all sections affected).**

<u>Statutory Authority:</u> § 54.1-501 of the Code of Virginia.

<u>Public Hearing Date:</u> July 9, 2001 - 2 p.m.
  Public comments may be submitted until 5 p.m. on July 20, 2001.
    (See Calendar of Events section
    for additional information)

<u>Agency Contact:</u> David E. Dick, Assistant Director, Virginia Board for Asbestos and Lead, 3600 W. Broad Street, Richmond, VA 23230, telephone (804) 367-2648.

<u>Basis:</u> The proposed regulations are based on the EPA model accreditation plan (MAP). The MAP establishes the minimum requirements for licensure of asbestos professionals. The proposed regulations are no more stringent than the MAP. Project monitor's licensure is suggested by the MAP and is required by Virginia statute.

To date, two federal agencies have been principally responsible for generating regulations for asbestos control. These two agencies are the U.S. Occupational Safety and Health Administration (OSHA) and U.S. Environmental Protection Agency (EPA).

Specifically covered are the OSHA Asbestos Standards (29 CFR 1910.1001, 29 CFR 1926.1101, 29 CFR 1915.1001, and 29 CFR 1910.134); the EPA Worker Protection Rule; The National Emission Standards for Hazardous Air Pollutants (NESHAP); the Asbestos Hazard Emergency Response Act (AHERA); and the EPA Model Accreditation Plan (MAP).

The construction industry standard (29 CFR 1926.1101) covers employees engaged in demolition and construction, and certain related activities likely to involve asbestos exposure.

The EPA Worker Protection Rule extends the OSHA standards to state and local employees who perform asbestos work and who are not covered by the OSHA Asbestos Standards, or by a state OSHA plan. The Rule currently parallels 1986 OSHA requirements and requires medical examinations, air monitoring and reporting, protective equipment, work practices and recordkeeping.

EPA's rules concerning the application, removal, and disposal of asbestos-containing materials were issued under National Emission Standards for Hazardous Air Pollutants (NESHAP).

Final AHERA regulations became effective December 14, 1987. Included in this Act were provisions directing the EPA to establish rules and regulations addressing asbestos-containing materials (ACM) in schools. Specifically, EPA was directed to address the issues of: (i) identifying, (ii) evaluating, and (iii) controlling ACM in schools.

On February 3, 1994, the EPA Asbestos Model Accreditation Plan (MAP) was published in the Federal Register as 40 CFR Part 763 Appendix C to Subpart E. The MAP is the driving force behind the licensure of asbestos professionals and set forth the guidelines for the States' asbestos programs.

The board's authority to promulgate the proposed regulations is contained in §§ 54.1-201 and 54.1-501 of the Code of Virginia.

Section 54.1-501 of the Code of Virginia mandates that the Board for Asbestos and Lead implement Chapter 5 of Title 54.1 of the Code of Virginia, by promulgating regulations that include requirements to:

1. Carry out § 54.1-501 of the Code of Virginia in compliance with the Administrative Process Act to include but not be limited to the prescription of fees, procedures, and qualifications for the issuance and renewal and govern conflicts of interest of asbestos licenses;

2. Approve the criteria for accredited asbestos training programs, training managers and principle instructors;

3. Approve accredited asbestos training programs, examinations and the grading system for testing applicants for asbestos licensure;

4. Promulgate regulations governing the licensing of and establishing performance criteria applicable to asbestos analytical laboratories;

# Proposed Regulations

5. Promulgate regulations governing the functions and duties of project monitors on asbestos projects, and training requirements for project monitors.

Purpose: These amendments are essential to continuing the implementation of federal mandates and to address a clear and imminent threat to the health, safety and welfare of the public. Various sources have estimated that upwards of 12,000 workers will die of asbestos-related diseases every year. Most of these workers will become ill 10 to 40 years after they started working with or around asbestos.

Asbestos is a naturally occurring mineral that breaks up into microscopic fibers. The fibers accumulate in the lungs and can lead to various diseases. After 10 to 40 years from the date of exposure, asbestos can cause asbestosis, lung cancer, mesothelioma, and other cancers. There is no dose response to asbestos, so it is possible to die from mesothelioma after being exposed to a single fiber of asbestos.

Training is vital so that personnel in the asbestos field do not run the risk of exposing themselves, subsequent occupants and occupants in adjacent areas to a known carcinogen.

By requiring training and licensure of personnel in the asbestos abatement field, the amended regulations will help to protect the health, safety, and welfare of the public.

Substance:

18 VAC 15-20-10 has been amended to add the meanings of acronyms used throughout the regulation document.

18 VAC 15-20-20 has been amended to add, delete or modify the definitions of terms used throughout the regulation document.

18 VAC 15-20-21 has been added to make clear that the board may waive regulation requirements only when no harm to the public will result and to explain that the burden of proof which demonstrates continued public protection rests with the party requesting the waiver.

18 VAC 15-20-30 has been revised for clarity and ease of use. Much of the revision reflects the relocation of language or requirements from other sections of the existing regulations. The result is a section that allows one to quickly determine the general requirements to obtain and renew licensure.

18 VAC 15-20-40 has been amended to change the name of the form required to document qualifying experience and to allow a letter from an employer to be substituted for the experience verification form.

18 VAC 15-20-50 has been amended to delete references to the deregulated RFS disciplines and to enhance clarity.

18 VAC 15-20-60 has been amended to provide more specific information concerning license renewal, to change the date that individual licensees must complete refresher training and to add a renewal requirement for accredited asbestos training programs.

18 VAC 15-20-70 has been amended to reflect the renewal requirement for accredited asbestos training programs, to provide an additional refresher training option for project monitors, and to limit to one the number of times a single training certificate may be used to renew an individual license. Other revisions to the language have been made for clarity.

18 VAC 15-20-80 has been amended to extend the requirement to report name and address changes to accredited asbestos training programs.

18 VAC 15-20-90 has been amended to move the general requirements to qualify for a worker license to 18 VAC 15-20-30.

18 VAC 15-20-100 requires applications be accompanied by the appropriate fee and has been repealed in its entirety. The language now appears in 18 VAC 15-20-50.

18 VAC 15-20-101 is a new section containing the specific entry requirements for licensure as an asbestos supervisor in 18 VAC 15-20-30.

18 VAC 15-20-110 has been amended to specifically require an application and fee, and to state more specifically which occupational or professional licenses are required to qualify for an asbestos contractor license.

18 VAC 15-20-120, 18 VAC 15-20-130 and 18 VAC 15-20-140 have been repealed in their entirety. The standards established in the repealed sections have been moved to 18 VAC 15-20-451, 18 VAC 15-20-452 and 18 VAC 15-20-453.

18 VAC 15-20-150 has been amended to empower the Board to deny the asbestos contractor license application of any firm whose owners, officers or directors have a financial interest in an asbestos contractor whose asbestos license has been revoked, suspended or denied renewal.

18 VAC 15-20-160 prohibits the transfer of an asbestos contractor license and has been repealed in its entirety. Its substance now appears as 18 VAC 15-20-454.

18 VAC 15-20-170, 18 VAC 15-20-180, 18 VAC 15-20-190, 18 VAC 15-20-200, 18 VAC 15-20-210, 18 VAC 15-20-220, 18 VAC 15-20-230 and 18 VAC 15-20-240 have been repealed in their entirety to implement the provisions of House Bill 951, passed by the 1996 Session of the Virginia General Assembly, which deregulated asbestos roofing, flooring and siding activities.

18 VAC 15-20-250 establishes the qualifications for inspections and has been amended to reorganize the existing regulation provisions and to delete the references to qualifying experience that have been revised and included in 18 VAC 15-20-251.

18 VAC 15-20-251 is a new section drawn from 18 VAC 15-20-250 as a part of the reorganization of the sections.

18 VAC 15-20-260 describes the management plan to be prepared by management planners, and has been repealed in its entirety. Its substance has been made a part of 18 VAC 15-20-459 and 18 VAC 15-20-459.1.

18 VAC 15-20-270 establishes entry standards for management planners and has been amended to reorganize the existing regulation provisions and to delete the references

## Proposed Regulations

to qualifying experience that have been revised and included in 18 VAC 15-20-271. Obsolete and ineffective language has been deleted and language has been added to allow one to qualify for a license after having completed a specific number of management plans.

18 VAC 15-20-271 is a new section drawn from 18 VAC 15-20-270 as a part of the reorganization of the sections and continues the substance of language deleted from 18 VAC 15-20-270.

18 VAC 15-20-280 sets the duties and functions of project designers and has been repealed in its entirety. Its substance now appears in 18 VAC 15-20-457.

18 VAC 15-20-290 establishes the entry standards for project designers, has been amended to reorganize the existing regulation provisions, and to delete the references to qualifying experience that have been revised and included in 18 VAC 15-20-291.

18 VAC 15-20-291 is a new section drawn from 18 VAC 15-20-290 as a part of the reorganization of the sections and continues the substance of 18 VAC 15-20-290.

18 VAC 15-20-300 establishes the duties and functions of project monitors, has been repealed in its entirety and moved to 18 VAC 15-20-455 under a new regulation part created for project monitor standards of conduct and practice.

18 VAC 15-20-310 specifies the types of abatement projects that must have a project monitor. The section has been repealed in its entirety. The regulation required project monitors on specific projects but stopped short of making any specific party responsible to assure the presence of project monitors. As a result, the regulation is unenforceable.

18 VAC 15-20-320 exempts residential buildings from the project monitor requirements and has been repealed in its entirety for substantially the same reasons as cited above for 18 VAC 15-20-310.

18 VAC 15-20-330 establishes the license qualifications for project monitors and has been revised and reorganized for clarity. The language establishing qualifying experience in subsection E has been rephrased and moved to subsection B. Subsections C and D have been rephrased, deleted in their entirety and moved to subsections A and B of 18 VAC 15-20-332, project monitor training requirements. The substance of the first sentence of subsection F has been moved to 18 VAC 15-20-456 D, project monitor responsibilities, and the substance of the remainder of the subsection has been revised and moved to 18 VAC 15-20-331, qualifying experience.

18 VAC 15-20-331 and 18 VAC 15-20-332 are new sections and have been addressed under 18 VAC 15-20-330 above.

18 VAC 15-20-340 establishes the general standards of performance for asbestos analytical laboratories, has been repealed and moved to 18 VAC 15-20-459.2 under Part XVII establishing standards of practice and conduct for asbestos analytical laboratories.

18 VAC 15-20-350 establishes the license application requirements for asbestos analytical laboratories and has

been repealed in its entirety. The substance has been moved to 18 VAC 15-20-40.

18 VAC 15-20-360 establishes the licensing qualifications for asbestos analytical laboratories and has been rephrased for clarity.

18 VAC 15-20-370 establishes the requirement to submit a completed application along with a fee in order to apply for an asbestos analytical laboratory license and is repealed in its entirety. The substance has been moved to 18 VAC 15-20-40.

18 VAC 15-20-380 and 18 VAC 15-20-390 deal with laboratory change of status and license certificate, have been repealed in their entirety and their substance moved to 18 VAC 15-20-459.4 and 18 VAC 15-20-459.5 as a part of the regulation reorganization.

18 VAC 15-20-400 establishes the responsibility of all licensees to the public and establishes performance standards in specific situations.

18 VAC 15-20-410 establishes performance standards for public statements made by regulants and is unchanged from the current regulation.

18 VAC 15-20-420 establishes solicitation of work standards for regulants and is unchanged from the current regulation.

18 VAC 15-20-430 establishes professional responsibility standards for regulants and is unchanged from the current regulation.

18 VAC 15-20-440 establishes a requirement for regulants to maintain good standing in other jurisdictions in which they may be regulated. There is no change from the current regulation.

18 VAC 15-20-450 enumerates the grounds for disciplinary action that may be taken by the Board against regulants who fail to comply with the provisions of the regulations. The language has been amended for clarity and is substantially unchanged from the current regulation.

18 VAC 15-20-451 is a new section created to continue the asbestos contractor responsibilities that were repealed as 18 VAC 15-20-120.

18 VAC 15-20-452 is a new section created to continue the requirement to maintain certain training and license records on asbestos abatement sites that was repealed as 18 VAC 15-20-130.

18 VAC 15-20-453 is a new section created to continue the conflict of interest provisions that were repealed as 18 VAC 15-20-140.

18 VAC 15-20-454 is a new section created to continue the prohibition against contractor license transfers that was repealed as 18 VAC 15-20-160.

18 VAC 15-20-455 is a new section created to establish the duties and functions of project monitors and contains the substance of repealed 18 VAC 15-20-300.

18 VAC 15-20-456 is a new section created to establish the responsibilities of project monitors and is a new standard,

# Proposed Regulations

except for subsection D, which is drawn from the first sentence of subsection F of 18 VAC 15-20-330.

18 VAC 15-20-457 is a new section created to establish the duties and functions of project designers and contains the language of repealed 18 VAC 15-20-280.

18 VAC 15-20-458 is a new section created to establish the responsibilities of project designers and is a new requirement proposed by the Board to document, in writing, the project designs describing abatement work to be undertaken by a contractor.

18 VAC 15-20-459 is a new section created to establish the duties and functions of inspectors and management planners. Subsection A is new and simply sets out the objective of asbestos inspections, which is essentially to find suspect materials and determine if they contain asbestos. Subsection B is drawn from repealed 18 VAC 15-20-260 and has been rephrased to emphasize the objective of managing remaining asbestos containing materials in a building.

18 VAC 15-20-459.1 is a new section created to establish the responsibilities of inspectors and management planners. Subsections A and B are new and require that inspections be conducted in compliance with the Asbestos Hazard Emergency Response Act (AHERA) and provide minimum standards for inspection reports.

18 VAC 15-20-459.2 establishes general standards of practice and conduct for asbestos analytical laboratories and is a new section. It is drawn from repealed 18 VAC 15-20-340.

18 VAC 15-20-459.3 is a new section created to establish laboratory responsibilities for the analysis they perform. Some of its substance was drawn from 18 VAC 15-20-360.

18 VAC 15-20-459.4 and 18 VAC 15-20-459.5 are new sections created to establish change of status and license certificate standards for laboratories. They have been drawn from repealed 18 VAC 15-20-380 and 18 VAC 15-20-390, respectively.

18 VAC 15-20-459.6 establishes the approval standards for accredited asbestos training programs and is the same as repealed 18 VAC 15-20-620, except for subdivision 7 of subsection A. Subdivision 7 has been changed to require a copy of the course examination and answer sheet rather than a detailed statement of how the examination was developed.

18 VAC 15-20-459.7 establishes the approval process used by the department to process and approve training program applications. This new provision articulates the procedure that has been in use by the department for many years.

18 VAC 15-20-459.8 establishes the examination requirement to be met by all training programs and is drawn, with minor language changes, from deleted 18 VAC 15-20-630.

18 VAC 15-20-459.9 describes how training programs are to handle letters of approval, and how records are to be maintained and made available to the board or its representatives. The language is draw, with minor changes, from repealed 18 VAC 15-20-650.

18 VAC 15-20-459.10 establishes standards for refresher training programs approval and is drawn, with minor changes, from repealed 18 VAC 15-20-650.

18 VAC 15-20-459.11 establishes a new renewal requirement for accredited asbestos training programs. The absence of a renewal requirement has created problems for the public and the department. Renewal will allow the department to track and regulate those programs continuing in operation.

18 VAC 15-20-459.12 establishes the procedure to be followed by training programs to have changes made to their approved programs and is drawn from repealed 18 VAC 15-20-660.

18 VAC 15-20-459.13 establishes the requirements to have a training program approval transferred and is drawn from repealed 18 VAC 15-20-670.

18 VAC 15-20-459.14 establishes the authority of the department to obtain access to training activities for the purpose of assuring compliance and is drawn from repealed 18 VAC 15-20-680.

18 VAC 15-20-459.15 establishes the grounds for suspension or revocation of a training program's approval and is drawn from 18 VAC 15-20-690.

18 VAC 15-20-460 establishes general record keeping requirements for those approved to perform asbestos training. Language concerning certain obsolete or superceded federal provisions was deleted.

18 VAC 15-20-470 establishes specific record keeping requirements for approved training programs. The requirement to submit a course participant list at the end of each course has been deleted. Many participants do not apply to the department for licensure. The lists were filed and rarely used.

18 VAC 15-20-480 establishes the course outline and syllabus standards for training programs and is substantially unchanged.

18 VAC 15-20-490 establishes the standards for certificates of course completion that shall be prepared and presented by the training program to each individual passing each course. The standards are substantially unchanged.

18 VAC 15-20-500 establishes the standards for course material and equipment to be used during training programs. The language describing the equipment list and how superceded equipment lists are to be maintained has been amended for clarity.

18 VAC 15-20-510 establishes the standards for approval of instructors, has been repealed in its entirety, revised substantially and now appears as 18 VAC 15-20-511.

18 VAC 15-20-511 is a new section and establishes the qualifications for asbestos training program instructors. It continues the substance of repealed 18 VAC 15-20-510.

18 VAC 15-20-520 establishes the standard for the number of instructors to be used in training programs and is unchanged except for a minor phrasing change.

## Proposed Regulations

18 VAC 15-20-530 establishes student to instructor ratios for training programs and remains unchanged except for language revisions that add to clarity.

18 VAC 15-20-540 requires that all initial and refresher training programs be discipline specific. The language remains unchanged.

18 VAC 15-20-550 requires each training program to be completed within two weeks and has been amended for clarity.

18 VAC 15-20-560 limits the amount of training that an individual may receive in a single day. The section has been amended to allow more than four hours of training during the evening if it is conducted during the student's second or third shift.

18 VAC 15-20-570 requires all programs to be taught in English, with the single exception of asbestos worker programs. There is no change from current requirements except for minor language changes.

18 VAC 15-20-580 continues the standards for examinations used to test comprehension and learning at the end of each training program. There are some minor language revisions, but no change in substance.

18 VAC 15-20-590 continues a requirement to notify the board of any change in address, telephone number or instructors within 30 days. There is no change from current requirements.

18 VAC 15-20-600 continues a requirement for training providers to notify the board if they cease training and give the board the opportunity to take possession of their training records. There are only minor changes in phrasing.

18 VAC 15-20-610 requires training programs comply with EPA ASHARA and the EPA Model Accreditation Plan. There is no change from the current requirement.

18 VAC 15-20-620 through 18 VAC 15-20-680 have been repealed in their entirety and now appear as 18 VAC 15-20-459.6 through 18 VAC 15-20-459.15.

18 VAC 15-20-700 through 18 VAC 15-20-880 set the standards for asbestos training programs and contain only minor amendments.

18 VAC 15-20-890 through 18 VAC 15-20-950 concern roofing, flooring and siding (RFS) training and are repealed in their entirety to implement House Bill 951, passed by the 1996 Session of the Virginia General Assembly.

18 VAC 15-20-960 enumerates the current fee structure, is redundant to 18 VAC 15-20-50 and has been repealed in its entirety.

Issues: Asbestos is a known carcinogen that kills thousands of people every year. Both federal and state regulation are necessary to protect the public and the asbestos workforce.

The primary advantage to the public of implementing the new regulatory provision is the continued protection to the public resulting from the availability of competent and trained personnel to work in the hazardous field of asbestos abatement. The primary advantage to the Commonwealth is to be able to regulate the workforce necessary to meet both federal and state asbestos regulations. The disadvantages to the public and the Commonwealth are the costs related to asbestos abatement and the administration of the regulatory program.

Given that one asbestos fiber in the human lung can cause mesothelioma, a cancer that results in death, and that much of the asbestos work is done in public schools, the advantages far outweigh the disadvantages.

Department of Planning and Budget's Economic Impact Analysis: The Department of Planning and Budget (DPB) has analyzed the economic impact of this proposed regulation in accordance with § 9-6.14:7.1 G of the Administrative Process Act and Executive Order Number 25 (98). Section 9-6.14:7.1 G requires that such economic impact analyses include, but need not be limited to, the projected number of businesses or other entities to whom the regulation would apply, the identity of any localities and types of businesses or other entities particularly affected, the projected number of persons and employment positions to be affected, the projected costs to affected businesses or entities to implement or comply with the regulation, and the impact on the use and value of private property. The analysis presented below represents DPB's best estimate of these economic impacts.

Summary of the proposed regulation. Asbestos abatement contractors, workers, supervisors, inspectors, management planners, project designers, project monitors, and the programs that provide asbestos training are required to have a license in the Commonwealth. The proposed changes to asbestos regulations include (i) providing more flexibility to meet the experience requirements for asbestos licensees, (ii) providing additional options for asbestos analytical laboratories to meet accreditation requirements, and (iii) requiring renewal of asbestos training program licenses every two years.

Estimated economic impact. The term asbestos refers to a number of fibrous minerals. Components of a fiber bundle are called "fibrils." Fibrils may remain airborne for several hours when dispersed into the air. Fibrils, in the air, pose adverse health affects such as asbestosis, lung cancer, and mesothelioma. Because of inherent desired characteristics such as heat resistance and insulating capabilities, asbestos has widespread use in homes, schools, public and commercial buildings.

Under the current regulations, asbestos inspectors, management planners, and project designers are required to work under the supervision of a licensed professional for varying lengths of time depending on their educational background. Professionals with a bachelor's degree, associate's degree, or high school diploma are required to have six months, 12 months, and 24 months experience working under the supervision of a licensed professional, respectively. The Board for Asbestos and Lead has determined that necessary knowledge can also be gained in a shorter time by working on a sufficient number of projects. The proposed changes recognize this fact by providing an additional option to demonstrate necessary knowledge for handling asbestos. Under the proposed changes, asbestos inspectors, management planners, and project designers can

# Proposed Regulations

demonstrate professional qualification by working on five example reports with a bachelor's degree in a related field, 10 example reports with an associate's degree in a related field, and 15 example reports with a high school diploma under the supervision of a licensed professional. Thus, the proposed changes provide additional options to meet licensing requirements for qualified applicants. This particular change is expected to provide net benefits assuming that this option provides sufficient knowledge to perform competent asbestos work unsupervised. The proposed changes will allow some applicants to complete the requirements in a shorter time frame than that otherwise would be required.

Currently, asbestos analytical laboratories providing Phase Contrast Microscopy (PCM) analysis[1] must meet certain accreditation requirements. DPOR is currently accepting accreditation from two institutions. The proposed changes will recognize a third accreditation institution named Asbestos Analyst Registry (AAR). Fees charged by AAR are believed to be slightly lower than the fees charged by the other two institutions. Recognition of an additional accreditation institution is expected to provide more flexibility to regulated laboratories. Also, if the accreditation fee charged by AAR is less than what is charged by the other two institutions, regulated laboratories will be able to reduce their costs in obtaining accreditation.

Under the current regulations, providers of asbestos training programs are not required to renew their licenses once they are issued a license. Proposed changes will require providers of training programs to renew their licenses every two years. DPOR points out that there are problems with the current system. It is difficult for DPOR to maintain up-to-date information on providers that are in business. DPOR is having difficulties in locating providers' operations of business and determining if they continue to provide training. Thus, DPOR has been failing to provide correct information when potential licensees ask for an available training program in Virginia. In addition, DPOR conducts checks on an irregular schedule to make sure that the training programs comply with the regulations. Renewal of licenses every two years may increase the likelihood that training programs will be subject to an irregular inspection because of more accurate provider information. Thus, the proposed regulations may promote the incentives of training providers to maintain the quality level of training at what is required to issue a license. In short, the proposed regulations will likely allow DPOR to maintain an up-to-date database and provide incentives for providers to maintain the quality of training.

On the other hand, the proposed renewal provision will introduce administrative costs. DPOR believes that there are about 60 to 80 training providers in business that would be interested in renewing their licenses. DPOR will charge $50 per application renewal to recover the administrative costs. Thus, it is expected that DPOR will receive $3,000 to $4,000 in license fees from providers biannually.

Businesses and entities affected. The proposed regulations will affect approximately 4,318 individuals and 319 firms that provide asbestos related services. In addition, 61 laboratories providing microscopic asbestos analysis services and about 60 to 80 asbestos training programs will be affected.

Localities particularly affected. The proposed regulations apply throughout the Commonwealth.

Projected impact on employment. No significant net effect on employment is expected.

Effects on the use and value of private property. The proposed regulations are not expected to significantly affect the use and value of private property.

<u>Agency's Response to the Department of Planning and Budget's Economic Impact Analysis:</u> The agency agrees with the Department of Planning and Budget's Economic Impact Analysis.

<u>Summary:</u>

*The proposed amendments revise definitions; delete the roofing, flooring and siding provisions (abolished by House Bill 951, effective July 1, 1996); clarify fees for initial approval of accredited asbestos training programs; and create a biennial renewal requirement and fee for accredited asbestos training programs. Project monitors who also hold a valid supervisor or project designer license may renew their project monitor license by completing the supervisor or project designer refresher training. Language has been added to make clear that a refresher training certificate may be used only once to renew a license. The entry standards for inspectors, management planners and project designers have been changed to allow applicants to present evidence of minimal competence. Project monitors will be required on projects involving more than 260 linear feet or 160 square feet of asbestos-containing materials. An additional option to qualify for an asbestos and analytical laboratory license has been added and performance standards for laboratory operation have been added.*

**18 VAC 15-20-10. Scope.**

The purpose of this section is to identify ~~those in the asbestos industry~~ *individuals and firms* who need ~~a specific Virginia asbestos license~~ *to be licensed.* ~~The following lists the types of asbestos license and those required to be licensed.~~

Asbestos ~~Contractors~~ *Contractor's* License: Required for ~~companies~~ *firms* that contract with another person, for compensation, to carry out an asbestos abatement project *that exceeds 10 linear or 10 square feet.*

~~Asbestos RFS Contractors License: Required for companies that contract with another person, for compensation, to remove nonfriable asbestos containing roofing, flooring, or siding. This material must remain nonfriable during the entire removal process. Employees of RFS contractors are not required to be licensed, however, they must have RFS training specific to the type of nonfriable asbestos containing material they remove (roofing, flooring, or siding).~~

Asbestos ~~Worker~~ *Worker's* License: Required for ~~those~~ *individuals* who remove or otherwise engage in an asbestos project.*

---

[1] PCM analysis is a method to analyze the presence of fibers in collected air samples.

## Proposed Regulations

Asbestos ~~Supervisor~~ *Supervisor's* License: Required for ~~those~~ *individuals* who supervise an asbestos abatement project. The Commonwealth of Virginia National Emission Standards for Hazardous Air Pollutants (NESHAP) Program recognizes the "competent person" as an individual licensed under this classification.*

Asbestos ~~Building Inspector~~ *Inspector's License*: Required for ~~those~~ *individuals* who inspect buildings to identify~~, classify, record, sample, test and prioritize by exposure potential~~ asbestos-containing material.*

~~RFS Inspector License: Required for those who identify the presence of asbestos containing roofing, flooring or siding material through sampling and interpretation of testing reports prepared by a licensed asbestos analytical laboratory.~~

Asbestos Management ~~Planners~~ *Planner's* License: Required for ~~those~~ *individuals* who prepare or update an asbestos management plan.*

Asbestos Project ~~Monitors~~ *Monitor's* License: Required for ~~those~~ *individuals* who act as a project monitor on asbestos abatement sites. Project monitors who analyze *Phase Contrast Microscopy (*PCM) asbestos air samples on an asbestos abatement project ~~must~~ *shall* be employed by a firm that holds a valid Virginia Asbestos Analytical Laboratory license*, and shall have National Institute of Occupational Safety and Health (NIOSH) 582 training, or equivalent, as approved by the American Industrial Hygiene Association (AIHA)*.

Asbestos Analytical Laboratory License: Required for laboratories ~~who~~ *that* analyze air or bulk samples for the presence of asbestos by *Polarized Light Microscopy (*PLM), PCM, or *Transmission Electron Microscopy (*TEM).

Asbestos Project ~~Designers~~ *Designer's* License: Required for ~~those~~ *individuals* who prepare or update an asbestos abatement project design, specifications for asbestos abatement projects, and addenda to the specifications.*

*Accredited Asbestos Training Program: Required for those who offer asbestos training programs to individuals seeking licensure as an asbestos worker, supervisor, inspector, management planner, project monitor or project designer.*

* Employees who conduct asbestos response actions, inspections, prepare management plans or project designs for their employer, on property owned or leased by the employer, are exempt from Virginia asbestos licensure~~,~~*;* however, they are required to meet all EPA training requirements.

PART II.
DEFINITIONS *AND GENERAL*.

**18 VAC 15-20-20. Definitions.**

The following words and terms, when used in this chapter, shall have the following meanings, unless the context clearly indicates otherwise:

"AAR" means Asbestos Analyst Registry.

"AAT" means Asbestos Analyst Testing.

"Accredited asbestos training program" means a training program that has been approved by the board to provide training for individuals to engage in asbestos abatement, conduct asbestos inspections, prepare management plans, prepare project designs or act as a project monitor.

"Accredited asbestos training provider" means a firm or individual who has been approved by the board to offer an accredited asbestos training program.

"ACM" means asbestos containing material.

"AHERA" means Asbestos Hazard Emergency Response Act. 40 CFR *Part* 763, Subpart E.

"AIHA" means American Industrial Hygiene Association.

"Approval letter" means a written notice confirming the firm or individual applicant's licensure or accreditation by the board.

"Asbestos" means ~~any material containing more than 1.0% asbestos by area as determined by microscopy.*~~ *the asbestiform varieties of actinolite, amosite, anthophyllite, chrysotile, crocidolite, and tremolite.*

"Asbestos Analytical Laboratory License" means an authorization issued by the ~~department~~ *board* to perform phase contrast, polarized light, or transmission electron microscopy on material known or suspected to contain asbestos.~~*~~

"Asbestos contractor" means any person who has met the board's requirements and has been issued an asbestos contractor's license by the board to enter into contracts to perform asbestos projects.

"Asbestos Contractor's License" means an authorization issued by the ~~department~~ *board* permitting a person to enter into contracts to perform an asbestos abatement project.~~*~~

"Asbestos containing material" or "ACM" means any material or product which contains more than 1.0% asbestos ~~by area as determined by microscopy~~ *or such percentage as established by EPA final rule.*

"Asbestos inspector" means any person who performs an ~~on-site investigation to identify, classify, record, sample, test and prioritize by exposure potential asbestos containing materials~~ *inspection as defined in this chapter.*

"Asbestos Inspector's License" means an authorization issued by the ~~department~~ *board* permitting a person to perform on-site investigations to identify, classify, record, sample, test and prioritize by exposure potential asbestos-containing materials.~~*~~

"Asbestos Management Plan" means a program designed to control or abate any potential risk to human health from asbestos.~~*~~

"Asbestos management planner" means any person preparing or updating a management plan.

"Asbestos Management Planner's License" means an authorization issued by the ~~department~~ *board* permitting a person to ~~develop or alter~~ *prepare or update* an asbestos management plan.~~*~~

"Asbestos project" or "asbestos abatement project" means an activity involving job set-up for containment, removal,

# Proposed Regulations

encapsulation, enclosure, encasement, renovation, repair, construction or alteration of asbestos-containing materials. An asbestos project or asbestos abatement project shall not include nonfriable asbestos containing roofing, flooring and siding material which when installed, encapsulated or removed does not become friable.*

*"Asbestos project design"* means any descriptive form written as instructions or drafted as a plan describing the construction of an asbestos abatement area or site, response action or work practices to be utilized on the asbestos abatement project.

*"Asbestos project designer"* means any person providing an asbestos project design or specifications for an asbestos abatement project.

*"Asbestos Project Designer's License"* means an authorization issued by the ~~department~~ *board* permitting a person to design an asbestos abatement project.*

*"Asbestos project monitor"* means any person hired by a building owner, *lessee* or his agent to monitor, inspect, provide visual clearance or clearance monitoring of an asbestos abatement project.

*"Asbestos Project ~~Monitor~~ Monitor's License"* means an authorization issued by the ~~department~~ *board* permitting a person to monitor an asbestos project, subject to ~~department board~~ regulations.*

*"Asbestos supervisor"* means any person so designated by an asbestos contractor who provides on-site supervision and direction to the workers engaged in asbestos projects.*

*"Asbestos Supervisor's License"* means an authorization issued by the ~~department~~ *board* permitting an individual to supervise and work on an asbestos project.

*"Asbestos worker"* means any person who engages in asbestos abatement ~~activity~~ *project*.

*"Asbestos Worker's License"* means an authorization issued by the ~~department~~ *board* permitting an individual to work on an asbestos project.*

*"ASHARA"* means Asbestos School Hazard Abatement Reauthorization Act, 40 CFR *Part* 763, Subpart E.

*"Board"* means the Virginia ~~Asbestos Licensing~~ Board *for Asbestos and Lead*.

*"Department"* means the Department of Professional and Occupational Regulation.*

~~"Demolition" means the wrecking or taking out of any load-supporting structural member of a structure or solid barrier which is known to contain or be enclosing an asbestos-containing material.~~

*"Director"* means the Director of the Department of Professional and Occupational Regulation.*

*"Direct supervision"* means a licensed or accredited inspector, management planner, project monitor or project designer, who undertakes to supervise the activities of an unlicensed inspector, management planner, project monitor or project designer, shall be physically present on the premises at all times while any unlicensed inspector, management planner, project monitor or project designer under his supervision is engaged in the activities of an inspector, management planner, project monitor or project designer.

*"Employee"* means all persons in the service of another under any contract of hire, express or implied, oral or written.

*"Encapsulation"* means the treatment of *asbestos containing material (ACM)* with a material that surrounds or embeds asbestos fibers in an adhesive matrix to prevent the release of fibers, as the encapsulant creates a membrane over the surface (bridging encapsulant) or penetrates the material and binds its components together (penetrating encapsulant).

*"Encasement"* means any process by which an asbestos containing material *(ACM)* is sprayed with an insulating sealer which is then mechanically fastened to the asbestos covered substrate. The insulating sealer is then covered with a sealer to give structural strength and durability.

*"Enclosure"* means the construction or installation over or around the *asbestos containing material (ACM)* of any leak tight solid or flexible coverings, which will not deteriorate or decompose for an extended period of time, so as to conceal the ACM, contain ACM fibers, and render the ACM inaccessible.

*"Environmental remediation activity"* means any activity planned or carried out for the purpose of reducing or eliminating any environmental hazard, including activities necessary to train individuals in the proper or lawful conduct of such activities, which are regulated by federal or state law or regulation.

*"EPA"* means United States Environmental Protection Agency.

*"Financial interest"* means financial benefit accruing to an ~~officer or an employee~~ *individual* or to a member of his immediate family. Such interest shall exist by reason of (i) ownership in a business if the ownership exceeds 3.0% of the total equity of the business; (ii) annual gross income that exceeds, or may be reasonably anticipated to exceed, $1,000 from ownership in real or personal property or a business,; (iii) salary, other compensation, fringe benefits, or benefits from the use of property, or any combination of it, paid or provided by a business that exceeds or may be reasonably expected to exceed $1,000 annually,; (iv) ownership of real or personal property if the interest exceeds $1,000 in value and excluding ownership in business, income, salary, other compensation, fringe benefits or benefits from the use of property.

*"Friable"* means that the material when dry, may be crumbled, pulverized or reduced to powder by hand pressure and includes previously nonfriable material after such previously nonfriable material becomes damaged to the extent that when dry it may be crumbled, pulverized, or reduced to powder by hand pressure.*

~~"Full approval" means approval given to a training provider for a course that has met the requirements of this chapter.~~

*"Guest instructor"* means an instructor who is invited to instruct a specific topic or topics in an accredited asbestos

Proposed Regulations

*training program and whose instruction is limited to two hours per day.*

*"Hands-on experience"* means the physical participation of students in an asbestos training ~~class~~ *program*. The physical participation includes mock sampling and inspection techniques, report preparation, writing project specifications, glovebag demonstrations and containment construction.

*"Immediate family"* means (i) a spouse, (ii) a sibling or step sibling, (iii) a parent or step parent, (iv) children or step children, ~~and~~ *or* (v) any other person residing in the same household as the ~~officer or employee~~ *individual*.

*"Inspection"* means an activity undertaken to determine the presence or location, or to access the condition of, friable or nonfriable asbestos containing material (ACM) or suspected ACM, whether by visual or physical examination, or by collecting samples of such material. This term includes reinspections of friable and nonfriable known or assumed ACM that has been previously identified. The term does not include the following:

*1. Periodic surveillance of the type described in 40 CFR 763.92(b) solely for the purpose of recording or reporting a change in the condition of known or assumed ACM;*

*2. Inspections performed by employees or agents of federal, state, or local government solely for the purpose of determining compliance with applicable statutes or regulations; or*

*3. Visual inspections solely for the purpose of determining completion of response actions.*

*"Instructor"* means a person who instructs one or more accredited asbestos training programs, to include the principal instructor, but excluding guest instructors.

~~*"Local education agency"* or *"LEA"* shall have the meaning provided in the USEPA AHERA regulations set forth in 40 CFR 763.[*]~~

*"NIOSH"* means National Institute of Occupational Safety and Health.

*"NIST"* means National Institute of Standards and Technology.

*"NVLAP" means National Voluntary Laboratory Accreditation Program.*

*"Occupied"* means any area of any building designed or intended for human ~~habitation~~ *occupancy* for any purpose.

~~*"Officer"* means any person appointed, elected or hired by any company, whether or not he receives compensation or any other emolument of office.~~

*"OSHA"* means the U.S. Department of Labor Occupational Safety and Health Administration.

*"PAT"* means Proficiency Analytical Testing.

*"Person"* means a corporation, partnership, sole proprietorship, firm, enterprise, franchise, association or any other individual or entity.[*]

*"Preliminary review"* means a review conducted by the ~~board~~ *department* following the submission of training materials to ascertain if the proposed training ~~course~~ *program* meets the standards established by this chapter.

~~*"Primary*~~ *Principal instructor"* means an instructor whose main responsibility is to instruct ~~courses~~ *accredited asbestos training programs*, supervise other instructors and manage the overall *training* course curriculum.[*]

*"PCM"* means phase contrast microscopy.

*"PLM"* means polarized light microscopy.

~~*"RFS Contractor's License"* means an authorization issued by the department permitting a person to enter into contracts to install, remove or encapsulate nonfriable asbestos containing roofing, flooring and siding materials.~~

~~*"RFS inspector"* means any person performing on-site investigations to identify, classify, record or sample suspect asbestos containing roofing, flooring or siding materials.~~

~~*"RFS Inspector's License"* an authorization issued by the department authorizing a person to identify the presence of asbestos containing roofing, flooring or siding material through sampling and interpretation of testing reports prepared by a licensed asbestos analytical laboratory.[*]~~

*"Removal"* means the physical removal of *asbestos containing material (ACM)* ~~and disposal of it~~ in accordance with all applicable regulations.

*"Renovation"* means altering in any way, one or more facility components.

*"Repair"* means returning damaged *asbestos containing material (ACM)* to an undamaged condition or to an intact state so as to prevent fiber release.

*"Residential buildings"* means site-built homes, modular homes, condominium units, mobile homes, manufactured housing, and duplexes, or other multi-unit dwellings consisting of four units or ~~less which~~ *fewer that* are currently in use or intended for use only for residential purposes.

*"Response action"* means any method, including removal, encapsulation, enclosure ~~or~~, encasement, *or operation and maintenance,* that ~~remediates an~~ *protects human health and the environment from friable* asbestos containing material.

~~*"Site"* means an area established by the employer or contractor to demarcate areas where the airborne concentration of asbestos exceeds or can reasonably be expected to exceed the permissible exposure limit. The area may take the form of a temporary enclosure as defined by 29 CFR 1926.58(e)(6) or be demarcated in any manner which restricts employees from entering the area.~~

*"Small-scale, short-duration" (SSSD) means activities involving the removal of three linear or three square feet or less of friable asbestos containing material (ACM) if required in the performance of another maintenance activity, replacement of asbestos-containing gaskets, installation, repair or other maintenance work through or proximate to ACM.*

# Proposed Regulations

~~"Structure" means any building or load supporting framework whether fixed or portable utilized for occupancy, storage, or conveyance of public utilities or industrial materials.~~

"Substantial change" means a change in overall ~~course curriculum~~ training program, materials, primary instructors, directors, ownership, facilities, equipment, examinations, and certificates of completion. The addition of updated regulations, exam questions or news articles shall not be considered a substantial change.

"TEM" means transmission electron microscopy.

~~"USEPA" means United States Environmental Protection Agency.~~

"Visual inspection" means a process of looking for conditions, which if not corrected during the asbestos abatement project, will lead to residual asbestos-containing dust or debris. Visual inspection includes examination of an asbestos abatement project area prior to clearance air monitoring for evidence that the project has been successfully completed as indicated by the absence of residue, dust and debris.

~~* Cited from § 54.1-500 of the Code of Virginia~~

**18 VAC 15-20-21. Waiver of the requirements of this chapter.**

Except as required by law, the board may, in its reasonable discretion, waive any of the requirements of this chapter when in its judgment it finds that the waiver in no way lessens the protection provided by this chapter and Title 54.1 of the Code of Virginia to the public health, safety and welfare. The burden of proof which demonstrates continued public protection rests with the party requesting the waiver. Documents referenced are in effect as they existed as of the date the act or action has occurred.

PART III.
GENERAL ENTRY AND RENEWAL REQUIREMENTS.

**18 VAC 15-20-30. License application.**

A. ~~Individual and business applicants are responsible for obtaining a current application. All requests for applications should be directed to:~~ Application for asbestos licensure shall be made on forms provided by the department.

~~Assistant Director~~
~~Virginia Board for Asbestos and Lead~~
~~Virginia Department of Professional and Occupational Regulation~~
~~3600 West Broad Street~~
~~Richmond, Virginia 23230~~

B. Each individual applicant shall be at least 18 years of age.

~~B. Individuals~~ C. Each individual applying for initial licensure as a supervisor, inspector, management planner, project designer or project monitor shall provide ~~proof~~ evidence of successful completion of an EPA/AHERA or board-approved initial asbestos training ~~course~~ program and all subsequent EPA/AHERA or board-approved refresher courses, relevant to the ~~applicants~~ applicant's discipline. ~~If, at any time, there has been a lapse of AHERA accreditation of more than 24 months, the applicant must show successful completion within~~ the past 12 months of an EPA/AHERA or board-approved initial asbestos training course, relevant to the applicants discipline. The date of training completion shall be no later than 12 months before the date the department receives the application.

D. Each individual applying for initial licensure as a worker shall provide proof of successful completion of (i) an EPA/AHERA or board-approved initial asbestos worker training program and all subsequent EPA/AHERA or board-approved asbestos worker refresher training program or (ii) proof of successful completion of an EPA/AHERA or board-approved initial supervisor course and all subsequent EPA/AHERA or board-approved supervisor refresher training program. The date of training completion shall be no later than 12 months before the date the department receives the application.

E. Each applicant for licensure as an asbestos contractor shall submit a completed asbestos contractors application to the department.

F. Each applicant for licensure as an asbestos analytical laboratory shall submit a completed asbestos analytical laboratory application and all documents required by this chapter to the department.

G. Each applicant for approval as an accredited asbestos training program shall submit to the board a completed accredited asbestos training program application and all documents required by this chapter.

~~C.~~ H. Each application for a license shall be signed by the applicant and shall include a certification, by the applicant, that within three years prior to the application date, the applicant's license or other authorization to perform asbestos related work has not been suspended or revoked by any jurisdiction and that no enforcement action by any jurisdiction is pending against the applicant.

~~D.~~ I. In the event disciplinary actions have been taken against the applicant, in any jurisdiction, the applicant shall submit the following information~~, as the board may deny an applicant's request for a license based on prior disciplinary actions which indicate that the asbestos related work may not be performed in a manner that would protect the public health, safety and welfare~~:

1. A complete list of all prior disciplinary actions, including any sanctions imposed on the applicant by any jurisdiction or any state or federal court.

2. A description of any asbestos abatement or inspection activities, or both, conducted by the applicant that were terminated prior to completion, including the circumstances of the termination.

3. A copy of all reports compiled by the enforcement agency or a copy of a final report.

~~E. All applications~~ J. Each application shall be completed according to the instructions provided by the department with the application. Incomplete applications will be returned to the applicant; fees received ~~will~~ shall not be refunded.

## Proposed Regulations

~~Applicants who submit checks which are dishonored by the institution on which they are drawn shall pay a $25 service fee in addition to the application fee required by this chapter.~~

**18 VAC 15-20-40. Experience and Educational Verification ~~Form (Form A)~~ *Forms*.**

Each application for inspector, management planner, project monitor and project designer shall include an Experience ~~and Education~~ Verification Form ~~(Form A)~~ completed by the applicant and signed by a supervisor verifying the job description of the applicant during the term of employment. *The* form ~~A~~ shall contain the name and address of the employer, a complete and concise job description, a job title, the dates of employment *or dates of work performed* and the signature, typewritten or printed name, address and phone number of the supervisor verifying the experience. In lieu of a verifying signature for experience, an applicant who is self employed may submit a copy of three completed inspections, management plans, project designs or project monitor reports, whichever is applicable. If verification of a degree is required, the Degree Verification Form ~~must~~ *shall* be sent directly from the school *to the department*. ~~An incomplete Form A will be returned to the applicant with an explanation for the return, and will constitute an incomplete application for licensure. Form A may be resubmitted following completion by the applicant~~ *A letter from a supervisor verifying the experience may be submitted in lieu of the Experience Verification Form.*

**18 VAC 15-20-50. Fees.**

A. The fee for an initial *application for* or a renewal of an asbestos worker, supervisor, inspector, ~~RFS inspector,~~ management planner, project designer, or project monitor license shall be $25.

B. The renewal fee for individual licenses not renewed within 30 days after ~~the noted~~ *its* expiration date shall be $50.

C. The fee for an initial *application for* or a renewal of an asbestos analytical laboratory license shall be $40.

D. The renewal fee for asbestos analytical laboratory licenses not renewed within 30 days after ~~the noted~~ *its* expiration date shall be $65.

E. The fee for an initial *application for* or a renewal of an asbestos ~~Contractor License and RFS Asbestos Contractor~~ *contractor's* license shall be $40.

F. The renewal fee for asbestos contractor licenses ~~or RFS Contractors Licenses~~ not renewed within 30 days after ~~the noted~~ *its* expiration date shall be $65.

G. *The fee for an initial application for approval of an accredited asbestos training program shall be $400 per day of training.*

H. *The renewal fee for an accredited asbestos training program shall be $50 per training provider.*

I. *The renewal fee for accredited asbestos training programs not renewed within 30 days after its expiration date shall be $75 per training provider.*

~~G.~~ *J.* A license not renewed within six months after the expiration date printed on the license shall not be renewed and the ~~licensee~~ *person* shall apply for a new license.

K. *All checks or money orders shall be made payable to the Treasurer of Virginia.*

~~H. Applicants~~ *L. Persons* who submit a dishonored check will be charged a $25 service fee in addition to the required application fee.

*M. Fees received shall not be refunded.*

**18 VAC 15-20-60. Expiration.**

~~All~~ *A. Each individual* asbestos ~~licenses~~ *license* issued under this chapter shall expire one year from the last day of the month ~~in which they are issued as indicated on the license~~ *wherein the applicant's initial training or most recent refresher training required by 18 VAC 15-20-30 was completed.*

*B. Each asbestos contractor and each asbestos analytical laboratory license issued under this chapter shall expire one year from the last day of the month in which it was issued.*

*C. Each accredited asbestos training program approved prior to [the effective date of these regulations] shall expire 24 months from the last day of the month in which it was approved and may be renewed for 24 months at a time thereafter. Each accredited asbestos training program approved after [the effective date of these regulations] shall expire 24 months from the last day of the month in which it was approved.*

**18 VAC 15-20-70. Renewal application.**

A. The department ~~will~~ *shall* mail a renewal notice to ~~the~~ *each* licensee *and to each approved accredited asbestos training program* at the last known address. The notice shall outline the procedures for renewal and the renewal fee amount. Failure to receive the notice shall not relieve the licensee *or the approved accredited asbestos training program* of the obligation to renew *in a timely fashion.*

B. Prior to the expiration date shown on the license *or approval letter*, each ~~licensee~~ *licensed asbestos contractor, licensed asbestos analytical laboratory and approved accredited asbestos training program* desiring to renew the license *or approval* shall return ~~to the board~~ the renewal notice and appropriate fee *to the department*. Should the licensee fail to receive the renewal notice, a copy of the current license may be submitted with the required fee. *Should an approved accredited asbestos training program fail to receive the renewal notice, a letter indicating the desire to renew and the applicable fee may be submitted.*

C. ~~For individual licenses, only asbestos refresher training courses approved by the board shall meet the~~ *Prior to the expiration date shown on the individual's current license, the individual desiring to renew that license shall provide evidence of meeting the annual refresher* training requirement for license renewal *and the appropriate fee.* Asbestos refresher ~~courses~~ *training programs* approved by the ~~US~~*EPA* under AHERA Regulations will not fulfill the renewal requirements unless the ~~course~~ *training program* is also a ~~Virginia~~ *board*-approved asbestos refresher training ~~course~~

# Proposed Regulations

*program.* ~~All refresher courses must be discipline specific. Applicants for renewal shall forward proof that the annual retraining requirements and an examination has been successfully completed.~~ A copy of the *training* certificate meeting the requirements outlined in ~~18 VAC 15-20-490 of~~ this chapter shall accompany the renewal ~~card~~ *notice* and fee.

~~D. If the renewal fee is not received by the department within 30 days after the expiration date noted on the license, a late renewal fee shall be required in addition to the renewal fee as stated in 18 VAC 15-20-50.~~

~~E. Licensees failing to renew their licenses within six months after the expiration date noted on the license shall not be permitted to renew their licenses and shall apply as new applicants. Applicants shall reapply in accordance with Part III of this chapter.~~

*D. Project monitors who also hold a valid Virginia asbestos supervisor or project designer license may meet the renewal training requirements by completing the supervisor refresher or project designer refresher, whichever is applicable. Project monitors who hold only a project monitor license shall complete an accredited asbestos project monitor refresher training program to meet the renewal training requirements.*

*E. Annual refresher training certificates shall only be used once to renew an individual license.*

*F. Each license and each accredited asbestos training program approval that is not renewed within 30 days of the expiration date on the license or accreditation shall be subject to late fees as established in 18 VAC 15-20-50.*

*G. Each license and each approved accredited asbestos training program not renewed within six months after the expiration date shall not be renewed and the licensee or approved accredited asbestos training program shall apply for a new license or new approval.*

## 18 VAC 15-20-80. Change of address or name.

~~All licensees~~ *Each licensee and approved accredited asbestos training program* shall notify the board, in writing, of any change of address or name. This notification shall be sent to the board within 30 days of such relocation or name change.

PART IV.
ASBESTOS WORKER ~~AND SUPERVISOR~~ LICENSING REQUIREMENTS.

## 18 VAC 15-20-90. Qualifications for licensure.

Each individual applying to the board for licensure as an asbestos worker ~~or asbestos supervisor shall have the following qualifications:~~ *shall submit a completed application, all training documentation as required by 18 VAC 15-20-30 D and the appropriate fee as required by 18 VAC 15-20-50.*

~~1. Applicants shall be at least 18 years of age.~~

~~2. Applicants shall provide all evidence of completion of an EPA/AHERA approved training course as per 18 VAC 15-20-30 B.~~

## 18 VAC 15-20-100. ~~Completed application.~~ *(Repealed.)*

~~A completed application, as defined in 18 VAC 15-20-30, shall be accompanied by the required fee. All checks or money orders shall be made payable to the Treasurer of Virginia. No application will be processed if it is not accompanied by the required fee.~~

PART V.
*ASBESTOS SUPERVISOR LICENSING REQUIREMENTS.*

## 18 VAC 15-20-101.  Qualifications for licensure.

*Each individual applying to the board for licensure as an asbestos supervisor shall submit a completed application, all training documentation as required by 18 VAC 15-20-30 C and the appropriate fee as required by 18 VAC 15-20-50.*

PART ~~V~~ *VI*.
ASBESTOS CONTRACTOR LICENSING REQUIREMENTS.

## 18 VAC 15-20-110. Qualifications for licensure.

~~Applicants shall have all occupational or professional licenses as required by state statute or local ordinance to transact the business of an asbestos contractor in addition to the requirements in this chapter.~~

*A. Each applicant shall submit a completed asbestos contractor application and fee as required by 18 VAC 15-20-50.*

*B. Each applicant shall hold a valid Virginia contractor license with an asbestos specialty and shall be in compliance with all other requirements found in Chapter 11 (§ 54.1-1100 et seq.) of Title 54.1 of the Code of Virginia governing the regulation of contractors.*

## 18 VAC 15-20-120 through 18 VAC 15-20-140. *(Repealed.)*

## 18 VAC 15-20-150. Denial of license.

The board may refuse to issue a license to any asbestos contractor ~~who is shown to have a substantial identity of interest with~~ *applicant if the applicant or its owners, officers or directors have a financial interest in* an asbestos contractor ~~or RFS contractor~~ whose asbestos license has been revoked, suspended or ~~not renewed~~ *denied renewal in any jurisdiction.* ~~A substantial identity of interest is defined to include, but is not limited to, (i) a controlling financial interest by the individual or corporate principals of the asbestos contractor whose license has been revoked or not renewed or (ii) any officers or directors whose license has been denied, revoked, or not renewed.~~

## 18 VAC 15-20-160 through 18 VAC 15-20-240. *(Repealed.)*

PART ~~VIII~~ *VII*.
ASBESTOS INSPECTOR LICENSING REQUIREMENTS.

## 18 VAC 15-20-250. Qualifications for licensure.

*A.* Each individual applying to the board for licensure as an asbestos inspector shall ~~have the following qualifications:~~ *submit a completed application, all training documents as required by 18 VAC 15-20-30 C, the appropriate fee as established in 18 VAC 15-20-50, and evidence of meeting the experience requirements as established in subsection B of*

# Proposed Regulations

*this section. Evidence of experience and education shall comply with 18 VAC 15-20-40.*

~~1. Applicants shall be at least 18 years of age;~~

~~2. The applicant must have successfully completed an asbestos inspector training course and examination approved by the board or an USEPA accredited AHERA inspector training course and examination. Applicants shall submit all training documents in accordance with 18 VAC 15-20-30 B;~~

~~3.~~ *B.* The applicant shall ~~be required to~~ provide ~~proof~~ *evidence* of experience in performing asbestos inspections in buildings or industrial facilities, including collecting bulk samples, categorizing ACM, assessing ACM and preparing inspection reports. ~~Experience may be gained by acting as an inspector, being in responsible charge of inspectors, or being under the direct supervision of an inspector~~ *The amount of experience required is dependent on the applicant's formal education and is* as follows:

~~a. Acting as an inspector accredited (after December 17, 1987) according to AHERA or the Virginia Asbestos Licensing Program;~~

~~b. Being in responsible charge of persons accredited as inspectors according to AHERA or the Virginia Asbestos Licensing Program; or~~

~~c. Being under the direct supervision of an inspector accredited according to AHERA or the Virginia Asbestos Licensing Program. All reports prepared by the unlicensed individual must be signed by the licensed or accredited individual in charge. The licensed or accredited individual in charge assumes responsibility for all reports prepared by the unlicensed individual.~~

~~4.~~ *1.* An applicant with a bachelor's degree in engineering, architecture, industrial hygiene, science or a related field ~~must~~ *shall* have at least six months experience ~~as described above~~ *or have completed a minimum of five inspections.* ~~The applicant must submit the Experience and Educational Form (Form A) as noted in 18 VAC 15-20-40.~~

~~5.~~ *2.* An applicant with a two-year associate's degree in engineering, architecture, industrial hygiene, science or a related field ~~must~~ *shall* have at least 12 months experience ~~as described above~~ *or have completed a minimum of 10 inspections.* ~~The applicant must submit the Experience and Educational Form (Form A) as noted in 18 VAC 15-20-40.~~

~~6.~~ *3.* An applicant with a high school diploma ~~must~~ *shall* have at least 24 months experience ~~as described above~~ *or have completed a minimum of 15 inspections.* ~~The applicant must submit the Experience Verification Form (Form A) as noted in 18 VAC 15-20-40.~~

**18 VAC 15-20-251. Qualifying experience.**

*Experience may be obtained by:*

*1. Conducting asbestos inspections in jurisdictions outside of Virginia in accordance with all federal, state and local statutes.*

*2. Conducting asbestos inspections under the direct supervision, as defined in this chapter, of a licensed inspector, or EPA-accredited inspector where no license is required. All reports prepared by the unlicensed individual shall be signed by the licensed or EPA-accredited inspector in charge. The licensed or EPA-accredited inspector assumes responsibility for all sampling and reports prepared by the unlicensed individual.*

PART ~~IX~~ *VIII.*
ASBESTOS MANAGEMENT PLANNER LICENSING
REQUIREMENTS.

**18 VAC 15-20-260. ~~Management plan.~~** *(Repealed.)*

~~The management planner is responsible for preparing or updating a management plan in response to an asbestos inspection. This document identifies asbestos containing materials, specifies training, work permitting system, cleaning and work practices, and surveillance procedures to be utilized by maintenance and custodial staff performing routine maintenance. A management plan is prepared following an asbestos inspection.~~

**18 VAC 15-20-270. Qualifications for licensure.**

A. Each individual applying to the board for licensure as an asbestos management planner shall ~~have the following qualifications:~~ *submit a completed application, all training documents as required by 18 VAC 15-20-30 C, the appropriate fee as required by 18 VAC 15-20-50, and evidence of meeting the experience requirements established by 18 VAC 15-20-250 B and subsection B of this section. The applicant shall also meet all qualifications to be licensed as an asbestos inspector, whether or not the license is held. Evidence of experience and education shall comply with 18 VAC 15-20-40.*

~~1. Applicants shall be at least 18 years of age.~~

~~2. The applicant must have successfully completed an asbestos management planner training course and examination approved by the board or a USEPA accredited AHERA management planner training course and examination. Applicants shall submit all training documents in accordance with 18 VAC 15-20-30 B.~~

~~3. The applicant must meet all of the qualifications to be licensed as an asbestos inspector, whether or not the asbestos inspector license is held.~~

~~4.~~ *B.* The applicant ~~is required to~~ *shall* provide ~~proof~~ *evidence* of experience evaluating inspection reports, selecting response actions, analyzing the cost of response actions, ranking response actions, preparing operations and maintenance plans and preparing management plans. *The amount of experience required is dependent on the applicant's formal education and is as follows:*

~~B. Experience may be gained by acting as a management planner, being in responsible charge of management planners or being under the direct supervision of a management planner as follows:~~

~~1. Any experience gained after December 17, 1987, must be gained acting as a management planner accredited~~

# Proposed Regulations

according to AHERA, or the Virginia Asbestos Licensing Program, being in responsible charge of persons accredited as management planners according to AHERA or being under the direct supervision of a management planner accredited according to AHERA or the Virginia Asbestos Licensing Program. All reports prepared by the unlicensed individual must be signed by the licensed or accredited person in charge, who assumes responsibility; or

2. Experience gained as an inspector as outlined in 18 VAC 15-20-250 may be substituted for the management planner experience requirements.

C. 1. An applicant with a bachelor's degree in engineering, architecture, industrial hygiene, science or a related field must *shall* have at least six months experience as described above *or shall have completed a minimum of five management plans.* The applicant must submit the Experience and Educational Verification Form (Form A) as noted in 18 VAC 15-20-40.

D. 2. An applicant with a two-year associate's degree in engineering, architecture, industrial hygiene, science or a related field must *shall* have at least 12 months experience as described above *or shall have completed a minimum of 10 management plans.* The applicant must submit the Experience and Educational Form (Form A) as noted in 18 VAC 15-20-40.

E. 3. An applicant with a high school diploma must *shall* have at least 24 months experience as described above *or shall have completed a minimum of 15 management plans.* The applicant must submit the Experience Verification Form (Form A) as noted in 18 VAC 15-20-40.

### 18 VAC 15-20-271. Qualifying experience.

*Experience may be obtained by:*

*1. Preparing management plans or conducting asbestos inspections in jurisdictions outside of Virginia in accordance with all federal, state and local statutes.*

*2. Preparing management plans or conducting asbestos inspections under the direct supervision, as defined in this chapter, of a licensed management planner or inspector, or EPA-accredited management planner or inspector where no license is required. All reports prepared by the unlicensed individual shall be signed by the licensed or EPA-accredited management planner or inspector in charge. The licensed or EPA-accredited management planner or inspector assumes responsibility for all sampling and reports prepared by the unlicensed individual.*

PART X *IX.*
ASBESTOS PROJECT DESIGNER LICENSING REQUIREMENTS.

### 18 VAC 15-20-280. Duties and functions. *(Repealed.)*

The duties and functions of a project designer include, but are not limited to, preparing an asbestos abatement project design, specifications for asbestos abatement projects and addenda to abatement specifications.

### 18 VAC 15-20-290. Qualifications for licensure.

A. Each individual applying to the board for licensing *licensure* as an asbestos project designer shall have the following qualifications: *submit a completed application, all training documents as established in 18 VAC 15-20-30 C, the appropriate fee as established in 18 VAC 15-20-50, and evidence of meeting the experience requirements as established in subsection B of this section. Evidence of experience and education shall comply with 18 VAC 15-20-40.*

1. Applicants shall be at least 18 years of age;

2. Applicants shall provide evidence of completion of an EPA/AHERA approved or board approved asbestos project designer training course. All training documents must be submitted in accordance with 18 VAC 15-20-30 B; and

3. After May 1, 1994, *B.* The applicant shall provide proof *evidence* of experience in the preparation of project designs or project specifications on the Form A as noted in 18 VAC 15-20-40. Experience may be gained for licensure as a project designer. *The amount of experience required is dependent on the applicant's formal education and is* as follows:

a. Acting as a project designer prior to September 1, 1993, according to AHERA or the Virginia Asbestos Licensing Program regulations; or

b. Being under the direct supervision of a project designer accredited according to AHERA, or licensed as an project designer by the Virginia Asbestos Licensing Program or another jurisdiction with an Environmental Protection Agency approved accreditation program. All work prepared by the unlicensed individual must be signed by the accredited or licensed designer in charge. The accredited or licensed individual assumes all responsibility for work prepared by the unlicensed individual.

B. 1. An applicant with a Bachelor of Science *bachelor's* degree in engineering, architecture, industrial hygiene, physical science or related field must *shall* have six months experience as described above *or shall have completed a minimum of five project designs.* The applicant must submit the Experience and Educational Verification Form (Form A) as noted in 18 VAC 15-20-40.

C. 2. An applicant with a two-year associate's degree in engineering, architecture, industrial hygiene, physical science or related field must *shall* have 12 months experience as described above *or shall have completed a minimum of 10 project designs.* The applicant must submit the Experience and Educational Verification Form (Form A) as noted in 18 VAC 15-20-40.

D. 3. An applicant with a high school diploma must *shall* have at least 24 months experience as described above *or shall have completed a minimum of 15 project designs.* The applicant must submit the Experience Verification Form (Form A) as noted in 18 VAC 15-20-40.

# Proposed Regulations

**18 VAC 15-20-291. Qualifying experience.**

*Experience may be obtained by:*

*1. Preparing asbestos project designs in jurisdictions outside of Virginia in accordance with all federal, state and local statutes.*

*2. Preparing asbestos project designs under the direct supervision, as defined in this chapter, of a licensed asbestos project designer, or EPA-accredited asbestos project designer where no license is required. All project designs prepared by the unlicensed individual shall be signed by the licensed EPA-accredited project designer in charge. The licensed or EPA-accredited project designer assumes responsibility for all project design reports prepared by the unlicensed individual.*

PART ~~XI~~ X.
ASBESTOS PROJECT MONITOR LICENSING
REQUIREMENTS.

**18 VAC 15-20-300 through 18 VAC 15-20-320. (Repealed.)**

**18 VAC 15-20-330. Qualifications for licensure.**

A. Each individual applying ~~shall be at least 18 years of age~~ for licensure as an asbestos project monitor shall submit a completed application, all training documents as required by 18 VAC 15-20-30 C, the appropriate fee as established in 18 VAC 15-20-50, and evidence of meeting the experience requirements as established in subsection B of this section. Evidence of experience and education shall comply with 18 VAC 15-20-40.

B. The applicant ~~must have a high school diploma or an equivalent~~ shall provide evidence of experience in performing asbestos project monitoring through field work on project sites. This includes, but is not limited to, evaluating and monitoring asbestos work practices, collecting environmental asbestos air samples during abatement, performing visual inspections and taking final air samples to grant clearance for asbestos abatement projects. Each applicant shall provide evidence of 160 hours of said experience.

~~C. An applicant currently certified by the USEPA as a project designer or asbestos supervisor may successfully complete an asbestos project monitor training course of 16 hours and examination.~~

~~D. An applicant not currently certified as a project designer or asbestos supervisor shall successfully complete a comprehensive asbestos project monitor training course of 40 hours and examination approved by the board.~~

~~E. The applicant shall provide proof of performing 160 hours of asbestos project monitoring training through field work on project sites, including evaluating and monitoring the asbestos work practices. The field work shall also include collecting environmental air samples during the abatement work and granting final clearance by performing visual inspections and collecting aggressive final air samples. The applicant shall submit the Experience Verification Form (Form A), as noted in 18 VAC 15-20-40, to verify the above experience.~~

~~F. Project monitors who analyze PCM air samples on site must be employed by a Virginia licensed asbestos analytical laboratory.~~

~~Experience may be gained to qualify for licensure as follows:~~

~~1. Acting as a project monitor after becoming licensed by the department as a project designer or an asbestos supervisor;~~

~~2. Being under the direct supervision of a person acting as a project monitor who is licensed by the board as a project designer or an asbestos supervisor before July 1, 1992, or under the direct supervision of a licensed project monitor after January 1, 1992. All reports compiled by an unlicensed project monitor must be signed by the licensed project monitor who is responsible for his supervision. The licensed individual in charge is at all times responsible for the activities of the unlicensed project monitor.~~

~~G. An applicant with a bachelor's degree in engineering, architecture, industrial hygiene, science or a related field must have at least 120 hours experience as described. The applicant must submit the Experience and Educational Verification Form (Form A) as noted in 18 VAC 15-20-40.~~

**18 VAC 15-20-331. Qualifying experience.**

*Experience may be obtained by:*

*1. Acting as an asbestos project monitor in jurisdictions outside of Virginia in accordance with all federal, state and local statutes.*

*2. Acting as an asbestos project monitor under the direct supervision, as defined in this chapter, of a licensed asbestos project monitor, or an accredited asbestos project monitor where no license is required. All project monitoring reports prepared by the unlicensed individual shall be signed by the licensed or accredited project monitor in charge. The licensed or accredited project monitor assumes responsibility for all reports and documents prepared by the unlicensed individual.*

**18 VAC 15-20-332. Project monitor training requirements.**

*A. An applicant currently certified by the EPA as an asbestos project designer or asbestos supervisor shall successfully complete a board-approved asbestos project monitor training program of 16 hours and examination. Evidence of current project designer or current supervisor accreditation shall be submitted with the application.*

*B. An applicant not currently certified as an asbestos project designer or asbestos supervisor shall successfully complete a board-approved asbestos project monitor training program of 40 hours and examination. Evidence of completion of the 40-hour training program shall be submitted with the application.*

*C. Only project monitor training programs that are board approved will be accepted for meeting the training requirements.*

# Proposed Regulations

PART ~~XII~~ *XI.*
ASBESTOS ANALYTICAL LABORATORY ~~LICENSE~~
*LICENSING* REQUIREMENTS.

**18 VAC 15-20-340 through 18 VAC 15-20-360. *(Repealed.)***

**18 VAC 15-20-361. Qualifications for licensure.**

*A. Each applicant for an asbestos analytical laboratory license shall submit a completed application, the appropriate fee as required by 18 VAC 15-20-50, and evidence of meeting the standards to perform one or more of the analyses described in subsections B, C and D of this section. Each license issued shall indicate which kind of analysis the asbestos analytical laboratory is seeking authorization to perform.*

*B. For authorization to analyze bulk materials using PLM, the applicant shall provide evidence that the asbestos analytical laboratory is currently NVLAP accredited for bulk asbestos fiber analysis or evidence that the asbestos analytical laboratory is AIHA accredited and proficient in the AIHA bulk asbestos program. A copy of the NVLAP Certificate of Accreditation, Scope of Accreditation and documentation of NVLAP proficiency or a copy of an AIHA accreditation certificate and proof of proficiency in the AIHA bulk program shall be submitted with the application for licensure.*

*C. For authorization to analyze airborne fibers using PCM:*

*1. For fixed laboratory sites, the applicant shall provide evidence that each facility is accredited by AIHA or that each facility has been rated "proficient" in the PAT Program's most recent round of asbestos evaluations, or the applicant shall provide evidence that each analyst is listed or has applied for listing in the Asbestos Analyst Registry (AAR) and has a performance rating of "acceptable" for the most recent Asbestos Analyst Testing (AAT) round. The applicant shall also provide evidence that each analyst has completed the NIOSH 582 training program or equivalent as approved by the AIHA.*

*2. For laboratories that will be conducting on-site analysis, the applicant shall provide evidence that each on-site analyst is listed or the applicant shall provide evidence that each analyst is listed or has applied for listing in the AAR and has a performance rating of "acceptable" for the most recent AAT round within six months after the implementation date of this chapter.*

*D. For licensure to analyze asbestos airborne fibers using TEM, the applicant shall provide evidence that the asbestos analytical laboratory is currently NVLAP accredited to analyze asbestos airborne fibers using TEM. A copy of the NVLAP Certificate of Accreditation, Scope of Accreditation and documentation of NVLAP proficiency shall be submitted with the application.*

**18 VAC 15-20-370 through 18 VAC 15-20-390. *(Repealed.)***

PART ~~XIII~~ *XII.*
*GENERAL* STANDARDS OF PRACTICE AND CONDUCT.

**18 VAC 15-20-400. Responsibility to the public.**

The primary obligation of the ~~licensee or approved entity~~ *regulant* is to the public. If the ~~licensee or approved entity's~~ *regulant's* judgment is overruled under circumstances when the safety, health, property and welfare of the public are endangered, the ~~licensee or approved entity~~ *regulant* shall inform the employer or client of the possible consequences and notify appropriate authorities if the situation is not resolved. The ~~licensee or approved entity~~ *regulant* shall take such action only when his authority to correct a problem has been ignored or overruled.

**18 VAC 15-20-410. Public statements.**

A. The ~~licensee or approved entity~~ *regulant* shall be truthful in all matters relating to the performance of asbestos abatement or asbestos consulting services.

B. When serving as an expert or technical witness, the ~~licensee or approved entity~~ *regulant* shall express an opinion only when it is based on an adequate knowledge of the facts in issue and on a background of technical competence in the subject matter. Except when appearing as an expert witness in court or an administrative proceeding when the parties are represented by counsel, the ~~licensee or approved entity~~ *regulant* shall issue no statements, reports, criticisms, or arguments on matters relating to practices which are inspired or paid for by an interested party or parties, unless one has prefaced the comment by disclosing the identities of the party or parties on whose behalf the ~~licensee or approved entity~~ *regulant* is speaking, and by revealing any self-interest.

C. A ~~licensee or approved entity~~ *regulant* shall not knowingly make a materially false statement, submit falsified documents or fail to disclose a material fact requested in connection with an application submitted to the board by any individual or business entity for licensure or renewal.

**18 VAC 15-20-420. Solicitation of work.**

In the course of soliciting work:

1. The ~~licensee or approved entity~~ *regulant* shall not bribe.

2. The ~~licensee or approved entity~~ *regulant* shall not falsify or permit misrepresentation of the ~~licensee or approved entity's~~ *regulant's* work or an associate's academic or professional qualifications, nor shall the ~~licensee or approved entity~~ *regulant* misrepresent the degree of responsibility for prior assignments.

*3.* Materials used in the solicitation of employment shall not misrepresent facts concerning employers, employees, associates, joint ventures or past accomplishments of any kind.

~~3.~~ *4.* Materials used in the solicitation of services shall not misrepresent facts of approval, federal, or state requirements.

**18 VAC 15-20-430. Professional responsibility.**

A. The licensee or approved entity shall, upon request or demand, produce to the board, or any of its representatives, any plan, document, book, record or copy of it in his possession concerning a transaction covered by this chapter, and shall cooperate in the investigation of a complaint filed with the board against a licensee or approved entity.

B. A licensee or approved entity shall not use the design, plans or work of another licensee or approved entity without

# Proposed Regulations

the original professional's knowledge and consent and after consent, a thorough review to the extent that full responsibility ~~may~~ *shall* be assumed by the user.

*C. Accredited asbestos training providers shall admit board representatives for the purpose of conducting an on-site audit, or any other purpose necessary to evaluate compliance with this chapter and other applicable laws and regulations.*

**18 VAC 15-20-440. Good standing in other jurisdictions.**

~~A licensee or approved entity licensed to practice~~ *A Regulants who perform* project monitoring, project design, inspections, management planning, *asbestos abatement* training, ~~contractual~~ *asbestos contracting* or supervisor work in other jurisdictions shall be in good standing in every jurisdiction where licensed, certified, or approved and shall not have had a license, ~~certificate~~ *certification* or approval suspended, revoked or surrendered in connection with a disciplinary action.

*B. Regulants shall notify the board in writing no later than 10 days after the final disciplinary action taken by another jurisdiction against their license or other approval to conduct asbestos abatement activities.*

*C. Regulants may be subject to disciplinary action or removal of an asbestos training program accreditation for disciplinary actions taken by another jurisdiction.*

**18 VAC 15-20-450. ~~Prohibited acts~~ *Grounds for disciplinary action.***

A. The ~~following may be grounds for disciplinary action by the~~ board *shall have the authority to fine any licensee or accredited asbestos training provider or instructor, and to deny renewal, suspend, revoke or deny application for any license or approval as an accredited asbestos training provider or instructor provided for under Chapter 5 (§ 54.1-500 et seq.) or Title 54.1 of the Code of Virginia for:*

1. ~~The licensee, training provider, or primary instructor has violated~~ *Violating* or ~~induced~~ *inducing* another person to violate any of the provisions of ~~Chapters~~ *Chapter* 1, 2, 3, or 5 of Title 54.1 of the Code of Virginia, or any of the provisions of this chapter.

2. ~~The licensee has obtained his~~ *Obtaining a* license*, approval as an accredited asbestos training provider or approval as an instructor* through fraudulent means.

3. ~~The licensee has altered~~ *Altering* a Virginia Asbestos License issued by the ~~Commonwealth~~ *board* or *a training* certificate issued by ~~a~~ *an accredited asbestos* training ~~provider~~ *program*.

4. ~~The licensee, training provider or primary instructor violates~~ *Violating* any provision of AHERA or ASHARA*, or any federal or state regulation pertinent to asbestos activity.*

5. ~~The licensee has~~ *Having* been found guilty by the board, an administrative body, or by a court of any ~~material~~ misrepresentation in the course of performing his *asbestos-related* operating duties.

6. ~~The licensee has~~ *Subject to the provisions of § 54.1-204 of the Code of Virginia, having* been convicted or found guilty, regardless of *adjudication in any* jurisdiction *of the United States*, of any felony or *of any misdemeanor involving lying, cheating, or stealing, or of any* violation *while engaged in environmental remediation activity,* which resulted in the significant harm or the imminent and substantial threat of significant harm to human health or the environment *there being no appeal pending therefrom or the time for appeal having elasped*. Any plea of nolo contendere shall be considered a conviction for the purposes of this chapter. ~~The record of a conviction authenticated in such form as to be admissible in evidence under the laws of the jurisdiction where convicted,~~ *A certified copy of the final order, decree or case decision by a court or regulatory agency with lawful authority to issue such order, decree or case decision* shall be admissible as prima facie evidence of such conviction *or discipline.*

7. Failing to notify the board in writing within 30 days of pleading guilty or nolo contendere or being convicted or found guilty of any felony *or of any misdemeanor involving lying, cheating, or stealing or of any violation while engaged in environmental remediation activity* which resulted in the significant harm or the imminent and substantial threat of significant harm to human health or the environment.

8. Negligence, or a continued pattern of incompetence, in the practice of the discipline in which the asbestos license is held.

9. Failing or neglecting to send any information or documentation that was requested by the board or its representatives.

*10. Refusing to allow state or federal representatives access to any area of an abatement site for the purpose of lawful compliance inspections.*

B. Any individual *or firm* whose license *or approval as an accredited asbestos training provider* is revoked under this section shall not be eligible to reapply for a period of one year from the effective date of the final order of revocation. The individual *or firm* shall meet all education, experience and training requirements, complete the application and submit the required fee for consideration as a new applicant.

*PART XIII.*
*STANDARDS OF PRACTICE AND CONDUCT FOR LICENSED ASBESTOS CONTRACTORS.*

**18 VAC 15-20-451. Asbestos contractor responsibilities.**

*A. Licensed asbestos contractors shall comply with all requirements, procedures, standards and regulations covering any part of an asbestos project established by the U.S. Environmental Protection Agency, the U.S. Occupational Safety and Health Administration, the Virginia Department of Labor and Industry and Divisions of Air Pollution and Waste Management of the Department of Environmental Quality (§ 54.1-517 Code of Virginia).*

*B. Licensed asbestos contractors shall comply with the requirements found in § 54.1-1100 of the Code of Virginia governing the regulation of general contractors.*

# Proposed Regulations

C. A licensed asbestos contractor shall employ only licensed asbestos supervisors and workers to perform work on any asbestos project.

D. A licensed asbestos contractor shall ensure that a licensed asbestos supervisor is present at each job site while an asbestos project is in progress.

**18 VAC 15-20-452. Maintenance of licensing and training records at the asbestos job site.**

A. The asbestos contractor shall be responsible for maintaining at each job site a list of each licensed worker and supervisor, or copy of the licenses of each asbestos worker and supervisor. This list shall include the current license numbers and the license expiration dates of those workers and supervisors. This section does not relieve the contractor of any specific AHERA and ASHARA requirements concerning training certificates.

B. A licensed asbestos contractor shall maintain a copy of its Virginia asbestos contractor license on each job site.

C. Records maintained at the job site shall be available for review by the Department of Labor and Industry, the Department of Professional and Occupational Regulation, and all other agencies having authorization to inspect an asbestos job site.

**18 VAC 15-20-453. Conflict of interest.**

The following situations and relationships between license categories are deemed to represent a conflict of interest and are prohibited.

1. It is a conflict of interest and a violation of these regulations for an asbestos contractor to have an employee/employer relationship with, or financial interest in, a laboratory utilized by the contractor for asbestos sample analysis. Laboratories owned by the building owner performing analysis on suspect asbestos samples taken from the building owners' property are exempt from this section.

2. It is a conflict of interest and a violation of these regulations for an asbestos contractor to have an employee/employer relationship with an asbestos project monitor working on an asbestos project performed by that asbestos contractor. An asbestos contractor shall not have any financial interests in the firm of which a project monitor is an employee and provides project monitoring services for that contractor. This section does not relieve a contractor of the OSHA personal monitoring requirements set forth in 29 CFR 1926.1101.

3. It is a conflict of interest and a violation of these regulations for an asbestos contractor to enter into a contract to perform an asbestos project if the asbestos inspection or project design was performed by individuals with an employer/employee relationship with, or financial interest in, the asbestos contractor, unless the asbestos contractor provides the building owner with the Virginia Asbestos Licensing Consumer Information Sheet and the Virginia Asbestos Licensing Inspector/Project Designer/Contractor Disclosure Form as prescribed by the department. The asbestos contractor's relationship with the asbestos inspector or project designer on the project shall be disclosed. The disclosure form shall be signed and dated by the licensed contractor and submitted as part of the bid. The disclosure form shall be kept on the asbestos project site and available for review.

**18 VAC 15-20-454. Transfer of asbestos contractor license.**

The transfer of an asbestos contractor license is prohibited.

PART XIV.
STANDARDS OF PRACTICE AND CONDUCT FOR
ASBESTOS PROJECT MONITORS.

**18 VAC 15-20-455. Duties and functions.**

The duties and functions of a project monitor include, but are not limited to, observing and monitoring the activities of an asbestos abatement contractor on asbestos projects to determine that proper work practices are used and compliance with all asbestos laws and regulations is maintained, collecting environmental air samples during the asbestos project, performing visual inspections of the work area and granting final clearance upon completion of the asbestos project.

**18 VAC 15-20-456. Responsibilities.**

A. Asbestos project monitors shall conduct inspections of the contractor's work practices and inspections of the containment each day abatement is performed.

B. Asbestos project monitors shall maintain a daily log of all work performed. The daily log shall include, but not be limited to, inspection reports, air sampling data, type of work performed by the contractor, problems encountered and corrective action taken.

C. Asbestos project monitors shall take final air samples on all abatement projects, except for abatement projects in residential buildings.

D. Project monitors who analyze PCM air samples on site shall be employed by a licensed analytical laboratory and shall be listed or have applied for listing in the AAR.

PART XV.
STANDARDS OF PRACTICE AND CONDUCT FOR
ASBESTOS PROJECT DESIGNERS.

**18 VAC 15-20-457. Duties and functions.**

The duties and functions of a project designer include, but are not limited to, preparing an asbestos abatement project design, specifications for asbestos abatement projects and addenda to abatement specifications.

**18 VAC 15-20-458. Responsibilities.**

A. Licensed asbestos project designers shall prepare a written project design for each asbestos abatement project, except projects conducted in residential buildings.

B. The project design shall include, but is not limited to:

1. Scope of work.

2. Order of work.

## Proposed Regulations

3. Work methods and practices to be used.

4. Number and type of final air samples to be taken.

PART XVI.
STANDARDS OF PRACTICE AND CONDUCT FOR
ASBESTOS INSPECTORS AND MANAGEMENT
PLANNERS

**18 VAC 15-20-459. Duties and functions.**

A. The duties and functions of an asbestos inspector include, but are not limited to, determining the presence and location of friable and nonfriable ACM, determining the condition of ACM, and sampling suspect ACM.

B. The duties and functions of an asbestos management planner include, but are not limited to, preparing management plans to effectively manage ACM that will remain in the building.

**18 VAC 15-20-459.1. Responsibilities.**

A. Asbestos inspectors shall conduct all asbestos inspections in accordance with 40 CFR 763.86.

B. Asbestos inspectors shall prepare a written inspection report following an asbestos inspection. The report shall contain, but is not limited to:

1. Inspector's name and license number.

2. Location of all samples taken.

3. Location and type of all ACM and assumed ACM.

4. Assessment of all ACM and assumed ACM.

5. Copy of the laboratory report.

C. Asbestos management planners shall prepare all management plans in accordance with 40 CFR 763.88.

PART XVII.
STANDARDS OF PRACTICE AND CONDUCT FOR
ASBESTOS ANALYTICAL LABORATORIES.

**18 VAC 15-20-459.2. General.**

Asbestos analytical laboratories shall comply with all requirements, procedures, standards and regulations covering all aspects of asbestos analytical services as established by this chapter.

**18 VAC 15-20-459.3. Responsibilities.**

A. Each asbestos analytical laboratory using PLM to analyze bulk suspect material for the presence of asbestos shall analyze the material in accordance with "Interim Method for the Determination of Asbestos in Bulk Insulation Samples" found in Appendix A to Subpart F of 40 CFR Part 763 or the NIOSH method 9002.

B. Each asbestos analytical laboratory using PCM to analyze air samples for the presence of airborne fibers shall use the method outlined in Appendix A of OSHA's 1926.1101 regulation or shall use the most recent version of NIOSH's 7400 method.

C. Each asbestos analytical laboratory using TEM to analyze air samples for the presence of airborne asbestos fibers shall use the method outlined in Appendix A to Subpart E of 40 CFR Part 763 or shall use the most recent version of NIOSH's 7402 method.

**18 VAC 15-20-459.4. Change of status.**

A. The licensee shall notify the department immediately of any addition or deletion regarding employment of trained and experienced supervisors, and any changes regarding the signing officer's relationship with the company.

B. The licensee shall notify the board within 10 business days upon the loss of accreditation or proficiency rating by NVLAP or AIHA by any laboratory location.

C. The licensee shall notify the board, in writing, if the analysis to be performed is different from the type of analysis in which the initial license was issued. The licensee shall submit a new application reflecting the changes and submit the qualifications required by this chapter to perform the analysis. The above information shall be submitted to the board prior to performing the analysis. No additional fees are required to upgrade the analytical laboratory license.

**18 VAC 15-20-459.5. License certificate.**

A. The transfer of an asbestos analytical laboratory license is prohibited. Whenever there is any change in the controlling interest of the legal entity licensed, a new license is required.

B. A copy of the current asbestos analytical laboratory license will be on site at all times where analysis is performed, including project sites. The license shall be available for review by the department.

C. The board shall require asbestos analytical laboratories that wish to become or to remain licensed in the Commonwealth to conform to any future additional standards or regulations set forth by the EPA or accrediting entity.

D. The licensee shall permit the board to conduct periodic on-site inspections and evaluations of licensed asbestos analytical laboratory facilities. The inspections shall include, but not be limited to, equipment, procedure and protocol records, training and accreditation documentation and any other program evaluation results on file. Prior notice of such inspections is not required.

PART XVIII.
ACCREDITED ASBESTOS TRAINING PROGRAM
APPROVAL.

**18 VAC 15-20-459.6. Accredited asbestos training program requirements.**

A. Training programs desiring board approval shall meet the minimum requirements established in this chapter. Persons requesting approval as an accredited asbestos training program to prepare training program participants for licensure requirements shall submit an accredited asbestos Training Program Review and Audit Application with the following required information:

1. Training provider's business name, physical address, mailing address, and phone number.

# Proposed Regulations

2. Copies of approval letters issued by EPA or other states granting approval of asbestos training programs presented by the provider.

3. Applicable fee.

4. The training program curriculum.

5. A narrative explanation that states how the training program meets the requirements for approval in the following areas:

   a. Length of training in hours.

   b. Amount and type of hands-on training.

   c. Examinations (length, format and passing score).

   d. Topics covered in the training program.

   e. Assurances of test security and how exams are administered.

6. A copy of all training program materials including, but not limited to, student manuals, instructor notebooks, handouts, and training aids.

7. A copy of the examination(s) used and applicable answer sheets.

8. The names and qualifications, including education and experience, of each instructor and subject areas that each instructor will teach.

9. A description of and an example of a certificate that will be issued to students who successfully complete the accredited asbestos training program. The certificate shall contain the information required by this chapter.

10. A proposed training program date for auditing purposes. The proposed date will be confirmed or an alternate date will be proposed within 10 business days after receipt of a complete accredited asbestos training program submission and the required fee.

B. A complete submission shall consist of all information required by this section. Receipt of application and deposit of fees by the department in no way indicates approval of a training program.

C. A complete application shall be submitted to the department no less than 45 days prior to the requested audit date.

## 18 VAC 15-20-459.7. Approval process.

A. Upon receipt of a completed application, a preliminary review will be conducted to ensure all written material and other documentation is accurate and up to date. If any deficiencies are noted, a letter will be sent to the applicant indicating the deficiencies and necessary steps to correct them. All deficiencies noted during the preliminary review shall be corrected prior to the on-site audit.

B. Upon successful completion of the preliminary review, an on-site audit shall be conducted to complete the application process. If any deficiencies are noted during the audit, the training provider will be informed, either in writing or verbally, and offered an opportunity to correct them. Once the audit is complete and any deficiencies corrected, a letter of approval will be sent to the accredited asbestos training program.

## 18 VAC 15-20-459.8. Examination.

All accredited asbestos training programs approved by the board shall have a monitored, final written examination, except for asbestos workers needing an oral examination. The board recommends the examination include a practical component to test skill in asbestos abatement techniques. Students shall obtain a minimum examination grade of 70% correct. Records of the participant's examination shall be maintained in accordance with this chapter.

## 18 VAC 15-20-459.9. Letters of approval.

Letters of approval for accredited asbestos training programs shall be maintained at the business address listed on the approval letter and made accessible to the public. Each provider of an approved accredited asbestos training program shall maintain all records at the business address. The required records shall be available for review upon demand by the board or its representatives.

## 18 VAC 15-20-459.10. Refresher approval.

A. Refresher training programs shall be one day (8 hours) for supervisors, workers, project designers and project monitors, and one-half day (4 hours) for inspectors and management planners. The refresher training program shall review federal and state regulations; discuss changes to the regulations, if applicable, and developments in state-of-the-art procedures; and review key aspects of the initial training program.

B. Persons wishing to sponsor refresher training programs shall submit a training program review and audit application as established in 18 VAC 15-20-459.6.

## 18 VAC 15-20-459.11. Renewal of accredited asbestos training programs.

Providers of accredited asbestos training programs desiring to renew their approval shall submit the renewal notice to the department along with the following:

1. Appropriate fee.

2. List of training programs for which they are renewing.

3. Any changes made to the training program(s).

4. Dates on which the training material was last updated.

## 18 VAC 15-20-459.12. Changes to an approved accredited asbestos training program.

Once an accredited asbestos training program has been approved, prior to the continuation of the accredited asbestos training program, substantial changes in the information required by subdivisions 1 through 5 of this section shall be submitted to the board for review and approval. The board will state its approval or disapproval of the changes by mail.

1. Training program curriculum.

2. Training program examination.

3. Training program materials.

4. Primary instructors and work practice instructors.

# Proposed Regulations

*5. Certificate of completion.*

**18 VAC 15-20-459.13. Transfer of approval of an accredited asbestos training program.**

*The transfer of the approval of an accredited asbestos training program will require a review by the following procedure:*

*1. The applicant for transfer shall submit an application to the department and materials for review to determine if substantial changes have been made to the program. All submissions shall be in accordance with 18 VAC 15-20-459.6.*

*2. Receipt of applications and deposit of fees submitted does not indicate approval of the transfer.*

*3. A review of the submitted materials shall be performed to determine if substantial changes have been made. A substantial change is defined as a change in training program materials, curriculum, primary instructors or facilities at the time of transfer of the accredited asbestos training program. A complete field audit may be conducted of any applicant believed to have made a substantial change.*

**18 VAC 15-20-459.14. Access by the department.**

*Accredited asbestos training program providers shall permit department representatives to attend, evaluate, and monitor any accredited asbestos training program. Prior notice of attendance by agency representatives is not required.*

**18 VAC 15-20-459.15. Suspension or revocation of approval of an accredited asbestos training program.**

*A. The board may withdraw approval of any accredited asbestos training program for the following reasons:*

*1. The school, instructors, or training programs no longer meet the standards established in this chapter.*

*2. The board determines that the provider is not conducting the training in a manner that meets the requirements as set forth in this chapter.*

*3. Suspension or revocation of training approval in another state or by the EPA.*

*B. Decisions regarding withdrawal of approval shall be made by the board under the provisions of the Virginia Administrative Process Act (§ 9-6.14:1 et seq. of the Code of Virginia).*

PART ~~XIV~~ *XIX.*
~~TRAINING PROVIDER REQUIREMENTS~~ *ACCREDITED ASBESTOS TRAINING PROGRAM PERFORMANCE STANDARDS.*

## 18 VAC 15-20-460. General.

This part outlines the record keeping responsibilities for ~~an individual, a business, an agency, an institution or a sponsor~~ *a provider* performing asbestos training under Virginia law. All records are required to be available for review by representatives of the board. Records required to be maintained by the training provider ~~must~~ *shall* be maintained

at the ~~address on the Certificate of Approval of the asbestos training course. All training requirements are in accordance with ASHARA (40 CFR 763 Appendix C to Subpart E ), the EPA April 1990 memorandum, or recommended EPA policy~~ *physical location of the accredited asbestos training provider.*

## 18 VAC 15-20-470. Record keeping.

A. For all *accredited asbestos* training ~~courses~~ *programs* approved by the board, *the* training ~~providers~~ *provider* shall keep a list of all ~~course~~ *training program* participants attending the *accredited asbestos* training ~~course~~ *program.* The list shall contain the following minimum information:

1. Training provider;

2. Date of training;

3. Location of training ~~course~~ *program* presentation;

4. Type and length of training;

5. ~~Course~~ *Training program* director and primary instructor;

6. ~~Course participants~~ *Training program participant's* name as it will appear on the Certificate of Completion to be issued by the training provider;

7. ~~Participants~~ *Participant's* employer, if applicable;

8. ~~Participants~~ *Participant's* name, address, and social security number;

9. ~~Participants~~ *Participant's* Virginia asbestos license number, if applicable;

10. The resulting certificate number assigned to a participant who successfully completes the ~~course~~ *accredited asbestos training program* when applicable and expiration date; and

11. The participant's examination score, when applicable.

B. The ~~course~~ *training program* participant list shall be completed by the training provider and ~~course~~ *training program* participants daily.

C. The ~~course~~ *training program* participant listing shall be retained by the training provider for three years following the date of completion of the training ~~course~~ *program.*

~~D. The course participant list shall be submitted to the board within five working days, after the last day of the course.~~

~~E.~~ *D.* The training provider shall retain all examinations completed by ~~course~~ *training program* participants for a period of three years.

*E. Training providers shall notify the department no less than 48 hours prior to conducting an accredited asbestos training program. The department will not recognize training certificates from approved training providers that fail to notify.*

## 18 VAC 15-20-480. ~~Course~~ *Accredited asbestos training program* outline and syllabus.

A. Prior to the start of the *accredited asbestos* training ~~course~~ *program,* the training provider shall prepare a course outline or syllabus. The outline shall contain the following minimum information:

# Proposed Regulations

1. ~~Course~~ *Training program* title and length of training;

2. Starting time of each day of training;

3. ~~Course~~ *Training program* section, inclusive length of training time for each section and instructor for each ~~course~~ *program* section;

4. Scheduled breaks and inclusive length of breaks;

5. Scheduled lunch break and inclusive length of break;

6. Scheduled hands-on training, a description of the training to be performed, length of training and name of the instructor or instructors; and

7. Examination and inclusive length of examination time.

B. The training provider shall disseminate the ~~course~~ *training program* outline or syllabus to all ~~course~~ *training program* participants. A copy of the course outline shall be retained by the training provider for a period of three years following the completion of the training ~~course~~ *program*.

**18 VAC 15-20-490. Certificates of completion.**

A. Following attendance of the *accredited asbestos* training ~~course~~ *program* and successful completion of an examination by the ~~course~~ *training program* participant, the training provider shall issue a Certificate of Completion to the ~~course~~ *training program* participant. The certificate shall contain the following minimum information:

1. Training provider's business name;

2. Training provider's business address and phone number;

3. Location of training;

4. Typewritten or printed name of ~~course~~ *training program* participant;

5. ~~Course~~ *Training program* title and length of training in hours;

6. Certificate number;

7. Inclusive ~~course~~ *training program* dates;

8. Examination date;

9. An expiration date one year ~~subsequent to~~ *after* the date of completion of the *accredited asbestos* training ~~course~~ *program*;

10. For ~~courses~~ *training programs* covered under 40 CFR *Part* 763, Subpart E, Appendix C, a statement that the person receiving the certificate has completed the requisite training for asbestos accreditation under TSCA Title II;

11. Statement of attendance and successful completion of an examination by the ~~course~~ *training program* participant; and

12. Signature and typewritten or printed name of ~~course~~ *the accredited asbestos training program* director or administrator and primary instructor. The signature may be a printed facsimile.

B. Changes to the Certificate of Completion shall be submitted to the board for review and approval prior to issuance to ~~course~~ *training program* participants.

**18 VAC 15-20-500. ~~Course~~ *Training program* materials: ~~course~~ *training program* manuals; video instruction; training equipment.**

A. All training ~~course~~ *program* participants shall be issued a ~~course~~ *training program* manual for the asbestos training ~~course~~ *program*.

~~All materials will be legible and, in the case of Virginia approved training courses, submitted for review and approval by the board at least 45 days prior to being used by a course participant in an asbestos training course.~~

~~The training provider shall retain a copy on file for a period of three years following any amendments to the manual.~~

B. Use of video instruction is permitted as a method of instruction in ~~a Virginia approved~~ *an accredited* asbestos training ~~course~~ *program, provided that videos are not the sole and primary source of instruction unless they are interactive videos.*

~~Videos shall not be the primary source of instruction unless it is an interactive video.~~

~~All videos utilized in a Virginia approved asbestos training course shall have undergone the review and approval process required in Part XIV of this chapter.~~

Videos shall be made available to the board, if requested, during an on-site audit or inspection.

C. In no case will equipment utilized for display or part of hands-on training have been utilized on an asbestos abatement project site.

Equipment will be dedicated for training use only.

The training provider shall keep a listing of all equipment utilized for training on file.

The equipment list will contain the following minimum information:

1. Equipment brand name;

2. Equipment description; and

3. A statement of how the equipment is to be utilized in the *accredited* asbestos training ~~course~~ *program*.

The *dated* equipment list will be updated as new equipment is added as part of an *accredited* asbestos training program and ~~retained~~ *each list must be maintained* for a period of three years.

**18 VAC 15-20-510. ~~Approval of instructors.~~ *(Repealed.)***

~~A. The qualifications of all instructors are required to be reviewed by the board prior to the instructor teaching in a Virginia approved asbestos training course. If the board deems the instructor's qualifications inadequate, the department will promptly notify the provider. Guest lecturers who do not teach a course on a routine basis are exempt from this section.~~

## Proposed Regulations

B. Each training provider shall appoint one instructor to act as the primary instructor. The primary instructor will be responsible for the overall training program and act as a point of contact to the board. The training provider shall notify the board in writing of the appointed primary instructor.

C. Training providers shall notify the board in writing whenever it changes course instructors.

### 18 VAC 15-20-511. Instructor qualifications.

A. An approved accredited asbestos training program shall employ a training manager who:

1. Has a minimum of two years experience in teaching adults; or

2. Has a minimum of three years experience in the asbestos abatement industry.

B. An approved accredited asbestos training program shall use principal instructors who:

1. Have a minimum of 24 hours of asbestos specific training; and

2. Have a minimum of two years experience in the asbestos abatement industry, or have a minimum of two years in teaching adults.

C. Documentation of all instructor qualifications shall be reviewed and approved by the board prior to the instructor teaching in an accredited asbestos training program.

D. Guest instructors are exempt from instructor qualifications and are limited to no more than two hours of training per day.

### 18 VAC 15-20-520. Number of instructors required to provide training.

A. The board strongly recommends a minimum of two instructors to teach a Virginia approved an accredited asbestos initial worker course training program.

B. The board requires At least two instructors shall be used for each Virginia approved supervisor, inspector, management planner, project designer and project monitor initial course accredited asbestos training program.

C. One instructor is adequate per refresher course training program.

D. At least one instructor shall be in the class classroom and available to the students at all times during the course training program.

### 18 VAC 15-20-530. Student to instructor ratios.

A. Hands-on training is to means an evaluation that tests the trainee's ability to satisfactorily perform the work practices and procedures in this chapter and shall be overseen by the instructor at a ratio of no more then than 10 students to one instructor.

B. There shall be no more than three course training program participants in any hands-on exercise, except for a hands-on training exercise which involves building containments.

### 18 VAC 15-20-540. Distinct training disciplines.

All initial and refresher accredited asbestos training courses programs shall be discipline specific.

### 18 VAC 15-20-550. Completion of training.

The total hours of actual training must for an initial training program, including examinations, shall be completed within a single two-week time frame, from the start time of initial training to finish.

### 18 VAC 15-20-560. Length of training.

The following are the requirements for length of training for a Virginia approved an accredited asbestos training course program:

1. In no case shall actual asbestos training exceed eight hours in a 24-hour period;

2. Training given during evening hours (after 5 p.m. and before 8 a.m.) may not exceed four hours, except training that is conducted during the student's second or third shift of working hours; and

3. Training performed on weekends (Friday after 5 p.m. to Monday 8 a.m.) may not exceed 16 hours.

### 18 VAC 15-20-570. Non-English speaking accredited asbestos training courses programs.

All Virginia approved asbestos training courses programs shall be taught in English. Accredited asbestos worker training courses programs are exempt from this section.

### 18 VAC 15-20-580. Examinations.

A. All accredited asbestos training courses approved by the board and utilized for licensure by the board programs shall contain an examination following the instructional portion of the accredited asbestos training course program. This requirement shall apply to all Virginia approved courses accredited asbestos training programs regardless of course training program location.

B. Oral examinations, except for workers, are not permitted in a Virginia approved an accredited asbestos training course program. Trainers who provide worker oral examinations shall issue an answer sheet to be marked by the student. The student shall sign the answer sheet and it shall become a part of the trainers training provider's required record keeping under 18 VAC 15-20-470 E.

C. Examinations in languages other than English are permitted in accredited asbestos worker courses training programs only.

D. Examinations shall be given in the language of the training program's course instruction.

E. Reexamination following unsuccessful completion of the examination is permitted in a Virginia approved asbestos training course. The reexamination shall be limited to one attempt to pass following the initial examination. If the participant fails to achieve a 70% passing score after the second attempt, the participant must shall retake the accredited asbestos training course program before he is

# Proposed Regulations

permitted to take a retest. The training provider shall retain all the examinations completed by the ~~course~~ *training program* participant in compliance with ~~18 VAC 15-20-470 E~~ *the record keeping requirements of this chapter.*

**18 VAC 15-20-590. Change of address, phone number or contact person.**

~~Training providers approved by the board~~ *Providers of accredited asbestos training programs* are required to notify the board in writing of changes of address, phone number or primary instructor within 30 business days ~~of~~ *after* changes to *any* of these items.

**18 VAC 15-20-600. Termination of training.**

When a ~~board-approved~~ training provider ceases to conduct *any of its* training *courses*, ~~the training provider~~ *it* shall notify the board in writing and give the board the opportunity to take possession of the provider's asbestos training records *relating to such courses.*

**18 VAC 15-20-610. EPA ASHARA compliance.**

All Virginia-approved *accredited* asbestos training ~~providers~~ *programs* shall be in compliance with all training and record keeping requirements established by the ~~US~~EPA Model Accreditation Plan, 40 CFR *Part* 763, Subpart E.

~~PART XV.~~
~~TRAINING COURSE APPROVAL PROCESS.~~

**18 VAC 15-20-620 through 18 VAC 15-20-690. *(Repealed.)***

PART ~~XVI~~ *XX.*
*ACCREDITED ASBESTOS* TRAINING ~~COURSE REQUIREMENTS~~ *PROGRAM STANDARDS.*

**18 VAC 15-20-700. General.**

In all of the following *accredited asbestos* training ~~course~~ *program* requirements, one day shall be equal to eight hours*, inclusive of lunch and breaks.* ~~In all refresher training course requirements one day shall be equal to eight hours. All training courses, except project monitor, shall meet the minimum requirements set forth in ASHARA (40 CFR 763).~~

**18 VAC 15-20-710. Worker training.**

Asbestos abatement workers shall complete at least a four-day (32 hours) training ~~course~~ *program* as outlined below. All training ~~courses~~ *programs* shall be approved by the board. The *accredited asbestos* training ~~course~~ *program* shall include lectures, demonstrations, at least 14 hours of hands-on training, a ~~course~~ *training program* review, and an examination.

The training shall address the following topics:

1. Physical characteristics of asbestos.

   a. Identification of asbestos.

   b. Aerodynamic characteristics.

   c. Typical uses and physical appearance.

   d. A summary of abatement control options.

2. Potential health effects related to asbestos exposure.

   a. The nature of asbestos-related diseases.

   b. Routes of exposure, dose-response relationships and the lack of a safe exposure level.

   c. Synergism between cigarette smoking and asbestos exposure.

   d. Latency period for disease.

3. Employee personal protective equipment.

   a. Classes and characteristics of respirator types.

   b. Limitations of respirators and their proper selection, inspection, donning, use, maintenance, and storage procedures.

   c. Methods for field testing of the facepiece-to-face seal (positive and negative pressure fitting tests).

   d. Qualitative and quantitative fit testing procedures.

   e. Variability between field and laboratory protection factors.

   f. Factors that alter respirator fit (eg., facial hair).

   g. The components of a proper respiratory protection program.

   h. Selection and use of personal protective clothing; use, storage, and handling of nondisposable clothing.

   i. Regulations covering personal protective equipment.

4. State-of-the-art work practices.

   a. Asbestos abatement activities including descriptions of construction and maintenance of barriers and decontamination enclosure systems.

   b. Positioning of warning signs.

   c. Electrical and ventilation system lock-out.

   d. Working techniques for minimizing fiber release, use of wet methods, use of negative pressure ventilation equipment, use of high efficiency particulate air (HEPA) vacuums.

   e. Clean-up and disposal procedures.

   f. Work practices for removal, encapsulation, enclosure, and repair.

   g. Emergency procedures for sudden releases.

   h. Potential exposure situations, and transport and disposal procedures.

   i. Recommended and prohibited work practices.

5. Personal hygiene.

   a. Entry and exit procedures for the work area, use of showers, avoidance of eating, drinking, smoking, and chewing (gum or tobacco) in the work area.

   b. Potential exposures, ~~such as~~ *including* family exposure.

6. Additional safety hazards.

## Proposed Regulations

a. Hazards encountered during abatement activities and how to deal with them, including electrical hazards, heat stress, air contaminants other than asbestos, fire and explosion hazards.

b. Scaffold and ladder hazards.

c. Slips, trips and falls.

d. Confined spaces.

7. Medical monitoring.

a. OSHA requirements for a pulmonary function test.

b. Chest X-rays and a medical history for each employee.

8. Air monitoring.

a. Procedures to determine airborne concentrations of asbestos fibers.

b. Focusing on how personal air sampling is performed and the reasons for it.

9. Relevant federal, state and local regulatory requirements, procedures and standards, with particular attention directed at relevant ~~US~~EPA, OSHA, and state regulations concerning asbestos abatement workers and Department of Transportation regulations (49 CFR 172 Subpart H), with emphasis on packaging requirements and marking of containers of ACM waste.

10. Establishment of respiratory protection programs.

11. ~~Course~~ *Training program* review. A review of key aspects of the *accredited asbestos* training ~~course~~ *program.*

**18 VAC 15-20-720. Examinations: Asbestos abatement worker.**

Upon completion of an approved initial training ~~course~~ *program,* a closed-book examination will be administered. Demonstration testing will also be permitted as part of the examination. Each examination shall cover the topics included in the training ~~course~~ *program.* Persons who pass the examination and fulfill the ~~course~~ *training program* requirements will receive a Certificate of Completion as specified in ~~18 VAC 15-20-490~~ *this chapter.* The following are the requirements for an examination:

1. Fifty multiple choice questions; and

2. Passing score: 70% correct.

**18 VAC 15-20-730. Refresher training ~~course~~ *program.***

A. *Accredited asbestos* refresher ~~courses~~ *training programs* shall be one day (eight hours) for asbestos abatement workers. The ~~course~~ *training programs* shall review federal and state regulations, discuss changes to the regulations, if applicable, and developments in state-of-the-art procedures. A review of the following topics from the initial ~~course~~ *accredited asbestos training program shall be included in the accredited asbestos worker refresher training program:*

1. Potential health effects related to asbestos exposure;

2. Employee personal protective equipment;

3. State-of-the-art work practices (with emphasis on work practices for removal, encapsulation, *encasement,* enclosure and repair and proper working techniques for minimizing fiber release, use of wet methods, use of negative pressure ventilation equipment and the use of high efficiency particulate air (HEPA) vacuums);

4. Personal hygiene; and

5. Additional safety hazards.

B. A written closed-book examination shall be included in the refresher ~~course~~ *training program.* The examination will consist of no fewer than 50 questions. The passing score will be 70% correct. Persons who pass the examination and fulfill the ~~course~~ *training program* requirements will receive a Certificate of Completion as specified in ~~18 VAC 15-20-490~~ *this chapter.*

**18 VAC 15-20-740. Supervisor training.**

Asbestos abatement supervisors shall complete a five-day (40 hours) training ~~course~~ *program* as outlined below. The training ~~course~~ *program* shall include ~~lecture~~ *lectures,* demonstrations, ~~course~~ *training program* review, examination, and at least 14 hours of hands-on training which allows supervisors the experience of performing actual tasks associated with asbestos abatement. The ~~supervisor's~~ *accredited asbestos supervisor* training ~~course~~ *program* shall address the following topics:

1. The role of the supervisor in the asbestos abatement process.

2. The physical characteristics of asbestos and asbestos-containing materials.

a. Identification of asbestos.

b. Aerodynamic characteristics.

c. Typical uses, physical appearance.

d. A review of hazard assessment considerations.

e. A summary of abatement control options.

3. Potential health effects related to asbestos exposure.

a. The nature of asbestos-related diseases.

b. Routes of exposure, dose-response relationships and the lack of a safe exposure level.

c. Synergism between cigarette smoking and asbestos exposure.

d. Latency period for disease.

4. Employee personal protective equipment.

a. Classes and characteristics of respirator types.

b. Limitations of respirators and their proper selection, inspection, donning, use, maintenance and storage procedures.

c. Methods for field testing of the facepiece-to-face seal (positive and negative pressure fitting tests).

d. Qualitative and quantitative fit testing procedures.

# Proposed Regulations

e. Variability between field and laboratory protection factors.

f. Factors that alter respirator fit (e.g., facial hair, dental work, weight loss or gain).

g. The components of a proper respiratory protection program.

h. Selection and use of personal protective clothing; use, storage and handling of nondisposable clothing.

i. Regulations covering personal protective equipment.

5. State-of-the-art work practices.

a. Work practices for asbestos abatement activities including descriptions of proper construction and maintenance of barriers and decontamination enclosure systems.

b. Positioning of warning signs.

c. Electrical and ventilation system lock-out.

d. Working techniques for minimizing fiber release, use of wet methods, use of negative pressure ventilation equipment, and use of high efficiency particulate air (HEPA) vacuums.

e. Clean-up and disposal procedures.

f. Work practices for removal, encapsulation, encasement, enclosure and repair.

g. Emergency procedures for sudden releases.

h. Potential exposure situations.

i. Transport and disposal procedures.

j. Recommended and prohibited work practices.

k. Discussion of new abatement related techniques and methodologies.

6. Personal hygiene.

a. Entry and exit procedures for the work area; use of showers; and avoidance of eating, drinking, smoking, and chewing (gum or tobacco) in the work area.

b. Potential exposures, such as family exposure, shall also be included.

7. Additional safety hazards.

a. Hazards encountered during abatement activities and how to deal with them, including electrical hazards, heat stress, air contaminants other than asbestos, fire and explosion hazards.

b. Scaffold and ladder hazards.

c. Slips, trips and falls.

d. Confined spaces.

8. Medical monitoring. OSHA requirements for a pulmonary function test, chest X-rays and a medical history for each employee.

9. Air monitoring.

a. Procedures to determine airborne concentration of asbestos fibers, including a description of aggressive sampling, sampling equipment and methods.

b. Reasons for air monitoring.

c. Types of samples and interpretation of results, specifically from analysis performed by polarized light, phase-contrast, and electron microscopy analyses.

10. Relevant federal, state, and local regulatory requirements, procedures and standards including:

a. Requirements of TSCA Title II;

b. 40 CFR *Part* 61, National Emission Standards for Hazardous Air Pollutants, Subparts A (General Provisions) and M (National Emission Standards for Asbestos);

c. OSHA Standards for ~~permissible exposure to airborne concentrations of asbestos fibers and~~ Respiratory Protection (29 CFR 1910.134);

d. OSHA Asbestos Construction Standard (29 CFR ~~1926.58~~ *1926.1101*);

e. ~~US~~EPA Worker Protection Rule, 40 CFR *Part* 763, Subpart G;

f. Requirements for Asbestos-Containing Waste Materials, 9 VAC 20-80-640; and

g. 49 CFR *Part* 172, Subpart H, Department of Transportation regulations covering packaging, proper marking of shipping containers and shipping papers.

11. A review of NESHAP Guidance Documents.

a. Common Questions on the Asbestos NESHAP.

b. Asbestos NESHAP: Regulated Asbestos Containing Materials Guidance (EPA 340/1-90-018).

c. Asbestos NESHAP: Adequately Wet Guidance (EPA 340/1-90-019).

d. Reporting and Record Keeping Requirements for Waste Disposal: A Field Guide (EPA 340/1-90-016).

12. Respiratory protection programs and medical surveillance programs.

13. Insurance and liability issues.

a. Contractor issues, worker's compensation coverage, and exclusions.

b. Third-party liabilities and defenses.

c. Insurance coverage and exclusions.

14. Record keeping for asbestos abatement projects:

a. Records required by federal, state, and local regulations.

b. Records recommended for legal and insurance purposes.

15. Supervisory techniques for asbestos abatement activities. Supervisory practices to enforce and reinforce

# Proposed Regulations

the required work practices and to discourage unsafe work practices.

16. Contract specifications. Discussions of key elements that are included in contract specifications.

17. ~~Course~~ *Training program* review. A review of key aspects of the *accredited asbestos* training ~~course~~ *program*.

## 18 VAC 15-20-750. Examinations: asbestos abatement supervisors.

Upon completion of an approved *accredited asbestos* initial training ~~course~~ *program*, a closed-book examination will be administered. Demonstration testing will also be permitted as part of the examination. Each examination shall cover the topics included in the training ~~course~~ *program*. Persons who pass the examination and fulfill the ~~course~~ *training program* requirements will receive a Certificate of Completion as specified in ~~18 VAC 15-20-490~~ *this chapter*. The following are the requirements for an examination:

1. One hundred multiple choice questions; and

2. Passing score: 70% correct.

## 18 VAC 15-20-760. Refresher training ~~course~~ *program*.

A. *Accredited asbestos* refresher ~~courses~~ *training programs* shall be one day (eight hours) for asbestos abatement supervisors. The ~~course~~ *training program* shall review federal and state regulations, discuss changes to the regulations, if applicable, and developments in state-of-the-art procedures. A review of the following topics from the initial ~~course~~ *accredited asbestos training program* shall be included in the asbestos supervisor refresher ~~course~~ *training program*:

1. Potential health effects related to asbestos exposure;

2. Employee personal protective equipment; including medical monitoring and respiratory protection program;

3. State-of-the-art work practices (with emphasis on work practices for removal, encapsulation, enclosure and repair and proper working techniques for minimizing fiber release, use of wet methods, use of negative pressure ventilation equipment and the use of high efficiency particulate air (HEPA) vacuums);

4. Additional safety hazards and medical monitoring;

5. Review of the Asbestos NESHAP, OSHA and DOT requirements; and

6. Review of Virginia regulations concerning asbestos licensing, removal and disposal.

B. A written closed-book examination shall be included in the refresher ~~course~~ *training program*. The examination will consist of no fewer than 50 questions. The passing score will be 70% correct. Persons who pass the refresher ~~course~~ *training program* examination will receive a Certificate of Completion. The certificate shall conform to ~~18 VAC 15-20-490~~ *the requirements of this chapter*.

## 18 VAC 15-20-770. Inspector training.

A. Asbestos inspectors shall complete a three-day (24 hours) *accredited asbestos* training ~~course~~ *program* as outlined below. The ~~course~~ *training program* shall include lectures, demonstrations, four hours of hands-on training, ~~course~~ *training program* review and a written examination. The *accredited asbestos* inspector training ~~course~~ *program* shall address the following topics:

1. ~~Course~~ *Training program* overview.

a. The role of the inspector in the asbestos abatement industry.

b. A discussion of inspection requirements and criteria for AHERA, NESHAPs and state agencies.

2. Background information on asbestos.

a. Identification of asbestos, and examples and discussion of the uses and locations of asbestos in buildings.

b. Physical appearance of asbestos.

3. Potential health effects related to asbestos exposure.

a. The nature of asbestos-related diseases.

b. Routes of exposure, dose-response relationships and the lack of a safe exposure level.

c. The synergism between cigarette smoking and asbestos exposure.

d. Latency period for asbestos-related diseases, a discussion of the relationship of asbestos exposure to asbestosis, lung cancer, mesothelioma and cancer of other organs.

4. Functions/qualifications for inspectors.

a. Discussions of prior experience and qualifications for inspectors and management planners.

b. Discussions of the functions of an accredited inspector as compared to those of an accredited management planner.

c. Discussion of the inspection process including inventory of ACM and physical assessment.

5. Legal liabilities and defenses.

a. Responsibilities of the inspector, a discussion of comprehensive general liability policies, claims made and occurrence policies, environment and pollution liability policy clauses; state liability insurance requirements.

b. Bonding and relationship of insurance availability to bond availability.

6. Understanding building systems.

a. The relationship between building systems, including: an overview of common building physical plan layout; heat, ventilation and air conditioning (HVAC) system types; physical organization; and where asbestos is found on HVAC components.

## Proposed Regulations

b. Building mechanical systems, their types and organization and where to look for asbestos on such systems.

c. Inspecting electrical systems, including appropriate safety precautions.

d. Reading building plans and as-built drawings.

7. Public/employee/building occupant relations.

a. Notification of employee organizations about the inspection.

b. Signs to warn building occupants.

c. Tactics in dealing with occupants and the press.

d. Scheduling inspections to minimize disruptions.

e. Education of building occupants about actions being taken.

8. Preinspection planning and review of previous inspection records.

a. Scheduling the inspection and obtaining access.

b. Building record review; identification of probable homogeneous areas from building plans or as-built drawings.

c. Consultation with maintenance or building personnel.

d. Review of previous inspection, sampling, and abatement records of a building.

e. The role of the inspector in exclusions for previously performed inspections.

9. Inspection for friable and nonfriable ~~asbestos containing material (~~ACM~~)~~ and assessment of the condition of friable ACM.

a. Procedures to follow in conducting visual inspections for friable and nonfriable ACM.

b. Types of building materials that may contain asbestos.

c. Touching materials to determine friability.

d. Open return air plenums and their importance in HVAC systems.

e. Assessing damage, significant damage, potential damage, and potential significant damage.

f. Amount of suspected ACM, both in total quantity and as a percentage of the total area.

g. Type of damage.

h. Accessibility.

i. Material's potential for disturbance.

j. Known or suspected causes of damage or significant damage, and deterioration as assessment factors.

10. Bulk sampling/documentation of asbestos in schools.

a. Detailed discussion of the "Simplified Sampling Scheme for Friable Surfacing Materials" (~~US~~EPA 560/5-85-030a October 1985).

b. Techniques to ensure sampling in a randomly distributed manner for other than friable surfacing materials.

c. Techniques for bulk sampling.

d. Sampling equipment the inspector should use.

e. Patching or repair of damage done in sampling; an inspector's repair kit.

f. Discussion of polarized light microscopy.

g. Choosing an accredited laboratory to analyze bulk samples.

h. Quality control and quality assurance procedures.

11. Inspector respiratory protection and equipment.

a. Classes and characteristics of respirator types.

b. Limitations of respirators.

c. Selection, inspection, donning, use, maintenance, and storage procedures for respirators.

d. Methods for field testing of the facepiece-to-face seal (positive and negative pressure fitting tests); qualitative and quantitative fit testing procedures.

e. Variability between field and laboratory protection factors.

f. Factors that alter respirator fit (e.g., facial hair, dental work, weight loss or gain).

g. The components of a proper respiratory protection program.

h. Selection and use of personal protective clothing.

i. Use, storage, and handling of nondisposable clothing.

12. Record keeping and writing the inspection report.

a. Labeling of samples and keying sample identification to sampling location.

b. Recommendations on sample labeling.

c. Detailing of ACM inventory.

d. Photographs of selected sampling areas and examples of ACM condition.

e. Information required for inclusion in the management plan by TSCA Title II section 203 (i)(1).

13. Regulatory review.

a. ~~USEPA~~ *EPA* Worker Protection Rule found at 40 CFR *Part* 763, Subpart G.

b. TSCA Title II.

c. OSHA Asbestos Construction Standard (29 CFR ~~1926.58~~ *1926.1101*).

# Proposed Regulations

d. OSHA respirator requirements (29 CFR 1910.134).

e. The friable ACM in Schools Rule found at 40 CFR *Part* 763, Subpart F.

f. Applicable state and local regulations.

g. Differences in federal and state requirements where they apply and the effects, if any, on public and nonpublic schools, and commercial and public buildings.

14. Field trip.

a. Including a field exercise with a walk-through inspection.

b. On-site discussion of information gathering and determination of sampling locations.

c. On-site practice in physical assessment.

d. Classroom discussion of field exercise.

15. ~~Course~~ *Training program* review. A review of key aspects of the *accredited asbestos* training ~~course~~ *program*.

## 18 VAC 15-20-780. Examinations: asbestos inspectors.

Upon completion of an ~~approved~~ *accredited asbestos* inspector training ~~course~~ *program*, a closed-book examination will be administered. Each examination shall cover the topics included in the inspector training ~~course~~ *program*. Persons who pass the examination and fulfill ~~course~~ *training program* requirements will receive a Certificate of Completion as specified in ~~18 VAC 15-20 400~~ *this chapter*. The following are the requirements for examination:

1. One hundred multiple choice questions; and

2. Passing score: 70% correct.

## 18 VAC 15-20-790. Refresher training ~~course~~ *program*.

A. *Accredited asbestos* refresher ~~courses~~ *training programs* shall be ~~1/2~~ *one-half* day (four hours) for inspectors. The ~~course~~ *training program* shall review federal and state regulations, discuss changes to the regulations, if applicable, and review developments in state-of-the-art procedures. A review of the following topics from the initial ~~course~~ *accredited asbestos training program* shall be included in the *accredited* asbestos inspector refresher ~~course~~ *training program*:

1. Inspection for friable and nonfriable asbestos-containing material (ACM) and assessment of the condition of friable ACM;

2. Bulk sampling/documentation of asbestos in schools; and

3. Reinspection and reassessment techniques.

B. The use of exercises to encourage interactive learning and participation is suggested. These exercises may take the form of reviewing building plans, inspection reports, a video or photo walk-through of an area to be inspected and written interviews with maintenance personnel to draw upon items covered in the initial *accredited asbestos* inspector ~~course~~ *training program*.

C. A written closed-book examination will be administered covering the topics included in the asbestos inspector refresher training ~~course~~ *program*. The examination will consist of no fewer than 50 questions. The passing score will be 70% correct. Persons who pass the asbestos inspector refresher training ~~course~~ *program* examination will receive a Certificate of Completion as specified in ~~18 VAC 15-20 400~~ *this chapter*.

## 18 VAC 15-20-800. Asbestos management planner training.

Asbestos management planners ~~seeking accreditation must~~ *shall* complete an *accredited asbestos* inspector training ~~course~~ *program* as ~~outlined above~~ *provided in 18 VAC 15-20-770* and a two-day management planner training ~~course~~ *program*. The two-day *(16 hours) accredited asbestos* training program shall include lectures, demonstrations, ~~course~~ *program* review, and a written examination. The *accredited asbestos* management planner training ~~course~~ *program* shall address the following topics:

1. ~~Course~~ *Training program* overview.

a. The role of the management planner.

b. Operations and maintenance programs.

c. Setting work priorities; protection of building occupants.

2. Evaluation/interpretation of survey results.

a. Review of TSCA Title II requirements for inspection and management plans as given in section 203(i)(1) of TSCA Title II.

b. Summarized field data and laboratory results; comparison between field inspector's data sheet with laboratory results and site survey.

3. Hazard assessment.

a. Amplification of the difference between physical assessment and hazard assessment.

b. The role of the management planner in hazard assessment.

c. Explanation of significant damage, damage, potential damage, and potential significant damage and use of a description (or decision tree) code for assessment of ACM; assessment of friable ACM.

d. Relationship of accessibility, vibration sources, use of adjoining space, air plenums and other factors to hazard assessment.

4. Legal implications.

a. Liability; insurance issues specific to management planners.

b. Liabilities associated with interim control measures, in-house maintenance, repair, and removal.

c. Use of results from previous inspections.

5. Evaluation and selection of control options.

# Proposed Regulations

a. Overview of encapsulation, enclosure, interim operations and maintenance, and removal; advantages and disadvantages of each method.

b. Response actions described via a decision tree or other appropriate method; work practices for each response action.

c. Staging and prioritizing of work in both vacant and occupied buildings.

d. The need for containment barriers and decontamination in response actions.

6. Role of other professionals.

a. Use of industrial hygienists, engineers and architects in developing technical specifications for response actions.

b. Any requirements that may exist for an architect to sign-off on plans.

c. Team approach to designing of high-quality job specifications.

7. Developing an operations and maintenance (O&M) plan.

a. Purpose of the plan.

b. Discussion of applicable ~~US~~EPA guidance documents.

c. What actions should be taken by custodial staff: proper cleaning procedures; steam cleaning and high efficiency particulate ~~aerosol~~ *air* (HEPA) vacuuming.

d. Reducing disturbance of ACM.

e. Scheduling O&M for off-hours; rescheduling or canceling renovation in areas with ACM.

f. Boiler room maintenance.

g. Disposal of ACM.

h. In-house procedures for ACM: bridging and penetrating encapsulants, pipe fittings, metal sleeves, poly vinyl chloride (PVC), canvas, and wet wraps; muslin with straps; fiber mesh cloth; mineral wool, and insulating cement.

i. Discussion of employee protection programs and staff training.

j. Case study in developing an O&M plan (development, implementation process, and problems that have been experienced).

~~8. Regulatory review.~~

~~a. Focusing on the OSHA Asbestos Construction Standard found in 29 CFR 1926.58.~~

~~b. The National Emission Standard for Hazardous Air Pollutants (NESHAPS) found at 40 CFR 61, Subparts A (General Provisions) and M (National Emission Standard for Asbestos).~~

~~c. USEPA Worker Protection Rule found in 40 CFR 763, Subpart G; TSCA Title II.~~

~~d. Applicable state regulations.~~

~~9.~~ *8.* Record keeping for the management planner.

a. Use of field inspector's data sheet along with laboratory results.

b. On-going record keeping as a means to track asbestos disturbance.

c. Procedures for record keeping.

~~10.~~ *9.* Assembling and submitting the management plan.

a. Plan requirements in TSCA Title II section 203(I)(1).

b. The management plan as a planning tool.

~~11.~~ *10.* Financing abatement actions.

a. Economic analysis and cost estimates.

b. Development of cost estimates.

c. Present costs of abatement versus future operations and maintenance costs.

d. Asbestos School Hazard Abatement Act grants and loans.

~~12.~~ *11.* A review of key aspects of the *accredited asbestos* training ~~course~~ *program*.

**18 VAC 15-20-810. Examinations: asbestos management planners.**

Upon completion of an ~~approved~~ *accredited asbestos* management planner training ~~course~~ *program*, a closed-book examination shall be administered. Each examination shall cover the topics included in the management planner training ~~course~~ *program*. Persons who pass the examination and fulfill ~~course~~ *training program* requirements will receive a Certificate of Completion as specified in ~~18 VAC 15-20-490~~ *this chapter*. The following are the requirements for examination:

1. One hundred multiple choice questions; and

2. Passing score: 70% correct.

**18 VAC 15-20-820. Refresher training ~~course~~ *program*.**

A. Management planners shall attend the inspector refresher ~~course~~ *training program* of ~~1/2~~ *one-half* day (four hours) plus an additional ~~1/2~~ *one-half* day (four hours) on management planning. The ~~course~~ *training program* shall review federal and state regulations, discuss changes, if applicable, and review developments in state-of-the-art procedures. A review of the following topics from the initial *accredited asbestos* management planner training ~~course~~ *program* shall be included in the asbestos management planner refresher training ~~course~~ *program*:

1. Evaluation and interpretation of survey results;

2. Hazard assessment;

3. Evaluation and selection of control options; and

4. Developing an Operations and Maintenance plan.

B. The use of exercises to encourage interactive learning and participation is suggested. These exercises may take the form

## Proposed Regulations

of reviewing inspection reports, a video or photo walk-through of a building to have a management plan prepared for and a review of reinspection or abatement reports to update or prepare a management plan to draw upon items covered in the *accredited asbestos* inspector ~~course~~ *training program* and the initial *accredited asbestos* management planner ~~course~~ *training program*.

C. A written closed-book examination will be administered covering the topics included in the asbestos ~~inspector~~ *management planner* refresher ~~course~~ *training program*. The examination will consist of no fewer than 50 questions. The passing score will be 70% correct. Persons who pass the asbestos management planner refresher training ~~course program~~ examination will receive a Certificate of Completion as specified in ~~18 VAC 15-20-490~~ *this chapter*.

### 18 VAC 15-20-830. Asbestos project designer training.

Asbestos project designers shall complete a three-day *(24 hours) accredited* asbestos project designer training ~~course program~~ as outlined below. The three-day asbestos project designer training program shall include lectures, demonstrations, a field trip, ~~course~~ *training program* review, and a written examination. The three-day asbestos project designer training ~~course~~ *program* shall address the following topics:

1. ~~Course~~ *Training program* overview.

   a. The role of the project designer in the asbestos abatement industry.

   b. Discussion of what a project design is.

2. Background information on asbestos.

   a. Identification of asbestos; examples and discussion of the uses and locations of asbestos in buildings.

   b. Physical appearance of asbestos.

3. Potential health effects related to asbestos exposure.

   a. Nature of asbestos-related diseases.

   b. Routes of exposure, dose-response relationships and the lack of a safe exposure level.

   c. The synergistic effect between cigarette smoking and asbestos exposure.

   d. The latency period of asbestos-related diseases; a discussion of the relationship between asbestos exposure and asbestosis, lung cancer, mesothelioma, and cancer of other organs.

4. Overview of abatement construction projects.

   a. Abatement as a portion of a renovation project.

   b. OSHA requirements for notification of other contractors on a multi-employer site (29 CFR ~~1926.58~~ *1926.1101*).

5. Safety system design specifications.

   a. Construction and maintenance of containment barriers and decontamination enclosure systems.

   b. Positioning of warning signs.

c. Electrical and ventilation system lock-out.

d. Proper working techniques for minimizing fiber release.

e. Entry and exit procedures for the work area, use of wet methods, use of negative pressure exhaust ventilation equipment, use of high efficiency particulate ~~aerosol~~ *air* (HEPA) vacuums, proper clean-up and disposal of asbestos, work practices as they apply to encapsulation, enclosure, and repair, use of glove bags and a demonstration of glove bag use.

6. Field trip.

   a. Visit ~~an~~ *a* proposed abatement site or other suitable building site, including on-site discussions of abatement design.

   b. Building walk-through inspection, and discussion following the walk-through.

7. Employee personal protective equipment.

   a. Classes and characteristics of respirator types.

   b. Limitations of respirators, proper selection, inspection, donning, use, maintenance, and storage procedures.

   c. Methods for field testing of the ~~face to facepiece~~ *facepiece-to-face* seal (positive and negative pressure fitting tests).

   d. Qualitative and quantitative fit testing procedures.

   e. Variability between field and laboratory protection factors, factors that alter respirator fit (e.g., facial hair, dental work and weight loss or gain).

   f. Components of a proper respiratory protection program.

   g. Selection and use of personal protective clothing, use, storage and handling of nondisposable clothing.

   h. Regulations covering personal protective equipment.

8. Additional safety hazards.

   a. Hazards encountered during abatement activities and how to deal with them.

   b. Electrical hazards, heat stress, air contaminants other than asbestos, fire and explosion hazards.

9. Fiber aerodynamics and control.

   a. Aerodynamic characteristics of asbestos fibers.

   b. Importance of proper containment barriers.

   c. Settling time for asbestos fibers.

   d. Wet methods in abatement.

   e. Aggressive air monitoring following abatement.

   f. Aggressive air movement and negative pressure exhaust ventilation as a clean-up method.

10. Designing abatement solutions.

    a. Discussions of removal, enclosure, and encapsulation methods.

## Proposed Regulations

b. Asbestos waste disposal.

11. Budgeting/cost estimation.

a. Development of cost estimates.

b. Present costs of abatement versus future operations and maintenance costs.

c. Setting priorities for abatement jobs to reduce cost.

12. Writing abatement specifications.

a. Means and methods specifications versus performance specifications.

b. Design of abatement in occupied buildings.

c. Modification of guide specifications to a particular building.

d. Worker and building occupant health/medical considerations.

e. Replacement of ACM with non-asbestos substitutes.

f. Clearance of work area after abatement.

g. Air monitoring for clearance.

13. Preparing abatement drawings.

a. Use of as-built drawings.

b. Use of inspection photographs and on-site reports.

c. Particular problems in abatement drawings.

14. Contract preparation and administration.

15. Legal/liabilities/defenses.

a. Insurance considerations, bonding, hold harmless clauses, and use of abatement contractor's liability insurance.

b. Claims-made versus occurrence policies.

16. Replacement of asbestos with asbestos-free substitutes.

17. Role of other consultants.

a. Development of technical specification sections by industrial hygienists or engineers.

b. The multi-disciplinary team approach to abatement design.

c. The use and responsibilities of a project monitor on the abatement site.

18. Occupied buildings.

a. Special design procedures required in occupied buildings.

b. Education of occupants.

c. Extra monitoring recommendations.

d. Staging of work to minimize occupant exposure.

e. Scheduling of renovation to minimize exposure.

19. Relevant federal, state and local regulatory requirements. Procedures and standards including:

a. Requirements of TSCA Title II;

b. 40 CFR *Part* 61, National Emission Standards for Hazardous Air Pollutants, Subparts A (General Provisions) and M (National Emission Standard for Asbestos);

c. OSHA standards for ~~permissible exposure to airborne concentrations of asbestos fibers and~~ respiratory protection (29 CFR 1910.134);

d. ~~US~~EPA Worker Protection Rule, found at 40 CFR *Part* 763, Subpart G;

e. OSHA Asbestos Construction Standard found at 29 CFR ~~1926.58~~ *1926.1101*; and

f. OSHA Hazard Communication Standard found in 29 CFR 1926.59.

20. A review of key aspects of the *accredited asbestos* training ~~course~~ *program*.

### 18 VAC 15-20-840. Examinations: asbestos project designers.

Upon completion of an ~~approved~~ *accredited* asbestos project designer training ~~course~~ *program*, a closed-book examination will be administered. Each examination shall cover the topics included in the asbestos project designer training ~~course~~ *program*. Persons who pass the examination and fulfill ~~course~~ *training program* requirements will receive a Certificate of Completion as specified in ~~18 VAC 15-20-490~~ *this chapter*. The following are the requirements for examination:

1. One hundred multiple choice questions; and

2. Passing score: 70% correct.

### 18 VAC 15-20-850. Refresher training ~~course~~ *program*.

A. *The accredited asbestos* project designer refresher training *program* shall be one day (eight hours) in length. The ~~course~~ *training program* shall review federal and state regulations, discuss changes to the regulations, if applicable, and review developments in state-of-the-art procedures. A review of the following topics from the initial project designer training ~~course~~ *program* shall be included in the *accredited* asbestos project designer refresher training ~~course~~ *program*:

1. Safety system design specifications;

2. Writing abatement specifications;

3. Employee personal protective equipment; and

4. Budgeting and cost estimation.

B. The use of exercises to encourage interactive learning and participation is suggested. These exercises may take the form of reviewing inspection reports, a video or photo walk-through of a building to prepare a response action, a review of a mock-up cost list of equipment and materials utilized for various response actions to be designed within certain budget constraints and recommending a response action based upon the cost, budget and material condition constraints.

## Proposed Regulations

C. A written closed-book examination will be administered covering the topics included in the asbestos project designer refresher ~~courses~~ *training program*. The examination will consist of no fewer than 50 questions. The passing score will be 70% correct. Persons who pass the asbestos project designer refresher training ~~course~~ *program* will receive a Certificate of Completion as specified in ~~18 VAC 15-20-490~~ *this chapter*.

**18 VAC 15-20-860. Project monitor training.**

A. Asbestos abatement project monitors shall complete a five-day (40 hours) *accredited asbestos* training ~~course~~ *program* as outlined below. All training ~~courses~~ *programs* shall be approved by the ~~department~~ *board*. The *accredited asbestos* training ~~course~~ *program* shall include ~~lecture~~ *lectures*, demonstrations, ~~course~~ *training program* review, examination, and at least six hours of hands-on training which allows project monitors the experience of performing actual tasks associated with asbestos project monitoring. Those applicants who hold current supervisors or project designers ~~certification~~ *accreditation* need not complete the entire 40-hour *accredited asbestos* training ~~course~~ *program,* but may complete the 16-hour portion of the ~~course beginning at topic number 11~~ *training program described in subdivision B 1 of this section* and take the examination. The comprehensive 40-hour *accredited asbestos* project monitor training ~~course~~ *program* shall address the following topics:

1. The physical characteristics of asbestos and asbestos-containing materials.

    a. Identification of asbestos.

    b. Typical uses and locations in buildings, physical appearance.

    c. A review of hazard assessment control options.

    d. A summary of abatement control options.

2. Potential health effects related to asbestos exposure.

    a. The nature of asbestos-related diseases.

    b. Routes of exposure, dose-response relationships and the lack of a safe exposure level.

    c. Synergism between cigarette smoking and asbestos exposure.

    d. Latency period for disease; a discussion of the relationship between asbestos exposure and asbestosis, lung cancer, mesothelioma, and cancer of the other organs.

3. Employee personal protective equipment.

    a. Classes and characteristics of respirator types.

    b. Limitations of respirators and their proper selection, inspection, donning, use, maintenance and storage procedures.

    c. Methods for field testing of the facepiece-to-face seal (positive and negative pressure fitting tests).

    d. Qualitative and quantitative fit testing procedures.

    e. Variability between field and laboratory protection factors.

    f. Factors that alter respirator fit (e.g., facial hair, dental work, weight loss or gain).

    g. The components of a proper respiratory protection program.

    h. Selection and uses of personal protective clothing; use, storage, and handling of nondisposable clothing.

    i. Regulations covering personal protection equipment.

4. State of the art work practices.

    a. Work practices for asbestos abatement activities including description of proper construction and maintenance barriers and decontamination enclosure systems.

    b. Positioning of warning signs.

    c. Electrical and ventilation system lock-out.

    d. Working techniques for minimizing fiber release, use of wet methods, use of negative pressure ventilation equipment, use of high efficiency particulate air (HEPA) vacuums. Entry and exit procedures for work area.

    e. Clean-up and disposal procedures.

    f. Work practices for removal, encapsulation, enclosure and repair. Use of glove bags and a demonstration of glove bag use.

    g. Emergency procedures for sudden release.

    h. Potential exposure situations.

    i. Transport and disposal procedures.

    j. Recommended and prohibited work practices.

    k. Discussion of new abatement related techniques and methodologies.

5. Personal hygiene.

    a. Entry and exit procedures for the work area; use of showers; avoidance of eating, drinking, smoking, and chewing (gum or tobacco) in the work area.

    b. Potential exposures, such as family exposure, shall also be included.

6. Additional safety hazards as covered in OSHA CFR *Parts* 1926 and 1910 to include:

    a. Hazards encountered during the abatement activities and how to deal with them, including electrical hazards, heat stress, air contaminants other than asbestos, fire, and explosion hazards;

    b. Scaffold and ladder hazards;

    c. Slips, trips and falls; and

    d. Confined spaces.

# Proposed Regulations

7. Medical monitoring. OSHA requirements for a pulmonary function test, chest x-rays and a medical history for each employee.

8. Respiratory protection programs and medical surveillance programs.

9. Insurance and liability issues:

a. Contractor issues, worker's compensation coverage, and exclusions.

b. Third-party liabilities and defenses.

c. Insurance coverage and exclusions.

10. Relevant federal, state and local regulatory requirements, procedures and standards including:

a. Requirements of TSCA Title II;

b. 40 CFR *Part* 61 National Emission Standards for Hazardous Air Pollutants, Subparts A (General Provisions) and M (National Emission Standards for Asbestos);

c. OSHA Standards to ~~permissible exposure to airborne concentrations of asbestos fibers and~~ respiratory protection (29 CFR 1910.134);

d. OSHA Asbestos Construction Standard (29 CFR ~~1926.58~~ *1926.1101*);

e. OSHA Hazard Communication Standard (29 CFR 1926.59);

f. ~~US~~EPA Worker Protection Rule, 40 CFR *Part* 763~~, Subpart G~~;

g. Requirements of Asbestos-Containing Waste Materials, 9 VAC 20-80-640;

h. DOT 49 CFR *Parts* 171 and 172 Subpart H; and

i. Virginia asbestos licensing regulations.

B. The material outlined below encompasses the 16-hour *accredited asbestos* project monitor training ~~course~~ *program*. Those applicants who are currently accredited as supervisors or project designers need only ~~to~~ complete ~~this~~ *the* 16-hour project ~~monitors course~~ *monitor training program* and examination. The comprehensive 40-hour project monitor training program includes the preceding topics and continues below.

1. Air monitoring.

a. NIOSH Asbestos Monitoring Procedure. Procedures to determine airborne concentration of asbestos fibers, including a description of aggressive sampling, sampling equipment and methods.

(1) Explanation of analytical methods, measures of precision, control of errors, collecting ~~measurement~~ samples, fiber counts, sampling and calibration equipment, statistics, quality control techniques in sampling.

(2) Review of OSHA Asbestos Regulations 29 CFR *Part* 1926, Subpart F, 1-6.

b. Sampling strategy.

(1) Why samples are taken.

(2) Sampling inside and outside of containment area.

(3) Placement of pumps.

c. Reasons for air monitoring.

d. Types of samples and interpretation of results, specifically from analysis performed by polarized light, phase-contrast, and electron microscopy analyses.

e. Final clearance.

2. Overview of supervisory techniques for asbestos abatement activities to include the information covered in the *accredited* asbestos ~~supervisor's~~ *supervisor* training ~~course~~ *program*. A review of the required work practices and safety considerations.

3. Field Trip.

a. Visit a proposed abatement site or other suitable building site, including on-site discussions of abatement design.

b. Building walk-through inspection and discussion following the walk through.

4. Fiber aerodynamics and control.

a. Aerodynamic characteristics of asbestos fibers.

b. Importance of proper containment barriers.

c. Settling time for asbestos fibers.

d. Wet methods in abatement.

e. Aggressive air monitoring following abatement.

f. Aggressive air movement and negative pressure exhaust ventilation as a clean-up method.

5. Project specifications. Discussion of key elements that are included in contract specifications.

a. Means and methods specifications versus performance specifications.

b. Considerations for design of abatement in occupied buildings.

c. Worker and building occupant health/medical considerations.

d. Replacement of ACM with nonasbestos substitutes.

e. Clearance of work area after abatement.

f. Use of as-built drawings.

g. Use of inspection photographs and on-site reports.

h. Particular problems in abatement drawings.

6. Conducting inspections.

a. Inspection prior to containment to assure condition of items and proper precleaning.

## Proposed Regulations

b. Inspection of containment prior to commencement of abatement to assure that containment is complete and proper.

c. Daily work and containment inspections.

d. Final visual inspection and a discussion of the ASTM E1368 method.

7. Record keeping and documentation.

a. Project logs.

b. Inspection reports.

c. Waste shipment record requirements (WSR).

d. Record keeping required by federal, state or local regulations.

e. Record keeping required for insurance purposes.

8. Role of project monitor in relation to:

a. Building owner,

b. Building occupants,

c. Abatement contractor, and

d. Other consultants.

9. Occupied buildings.

a. Special procedures recommended in occupied buildings.

b. Extra monitoring recommendations.

10. A review of NESHAP Guidance Documents.

a. Common Questions on the Asbestos NESHAP.

b. Asbestos NESHAP: Regulated Asbestos Containing Materials Guidance (EPA 340/1-90-018).

c. Asbestos NESHAP: Adequately Wet Guidance (EPA 340/1-90-019).

11. A review of key aspects of the *accredited asbestos* training course *program*.

12. Examination.

**18 VAC 15-20-870. Examination: asbestos project monitors.**

Upon completion of an approved *accredited* asbestos project monitor training course *program*, a closed-book examination will be administered. Each examination shall cover the topics included in the project monitoring *monitor* training course *program*. Persons who pass the examination and fulfill course *training program* requirements will receive a Certificate of Completion as specified in 18 VAC 15-20-490 *this chapter*. The following are the requirements for examination:

1. One hundred multiple choice questions; and

2. Passing score: 70% correct.

**18 VAC 15-20-880. Refresher training course *program*.**

A. *Accredited asbestos* project monitor refresher training *program* shall be one day (eight hours). The course *training program* shall review federal and state regulations, discuss changes to the regulations, if applicable, and review developments in state-of-the-art procedures. A review of the following topics from the initial *accredited asbestos* project monitor training course *program* shall be included in the asbestos project monitor refresher training course *program*:

1. State-of-the-art work practices;

2. Occupied buildings;

3. Employee personal protective equipment;

4. Fiber aerodynamics and control; and

5. Record keeping and documentation.

B. The use of exercises to encourage interactive learning and participation is suggested. These exercises may take the form of reviewing inspection reports, a video or photo walk-through of a building to determine a sampling strategy, a review of a mock-up abatement area to determine that containment is adequate, or review of a mock-up abatement area where a visual inspection may be performed.

C. A written closed-book examination will be administered covering the topics included in the asbestos project monitor refresher courses *training program*. The examination will consist of no fewer than 50 questions. The passing score will be 70% correct. Persons who pass the asbestos project monitor refresher training course *program* examination will receive a Certificate of Completion as specified in 18 VAC 15-20-490 *this chapter*.

**18 VAC 15-20-890 through 18 VAC 15-20-960. (Repealed.)**

VA.R. Doc. No. R00-185; Filed May 1, 2001, 2:27 p.m.

## AUCTIONEERS BOARD

<u>Title of Regulation:</u> **18 VAC 25-21-10 et seq. Rules and Regulations of the Virginia Auctioneers Board (amending 18 VAC 25-21-10, 18 VAC 25-21-20, 18 VAC 25-21-30, 18 VAC 25-21-40, 18 VAC 25-21-50, 18 VAC 25-21-60, 18 VAC 25-21-90, 18 VAC 25-21-110, 18 VAC 25-21-180, and 18 VAC 25-21-200; adding 18 VAC 25-21-210 and 18 VAC 25-21-220).**

<u>Statutory Authority:</u> §§ 54.1-201 and 54.1-602 of the Code of Virginia.

<u>Public Hearing Date:</u> July 21, 2001 - 10 a.m.
  Public comments may be submitted until July 20, 2001.
    (See Calendar of Events section
    for additional information)

<u>Agency Contact:</u> Mark N. Courtney, Assistant Director, Auctioneers Board, 3600 W. Broad Street, Richmond, VA 23230, telephone (804) 367-8514.

<u>Basis:</u> Section 54.1-602 of the Code of Virginia requires the Auctioneers Board to develop and administer a regulatory system to regulate individuals and businesses in Virginia that

# Proposed Regulations

practice auctioneering. While the board is mandated to establish regulations, the content of the regulations is up to the discretion of the board.

Purpose: The regulations are essential to comply with state mandates. In order to protect the public, the board is clarifying its regulations that disciplinary action in another jurisdiction relating to auctioneering may prevent licensure in Virginia and that board-approved auction schools will have to include the board's regulations in their curriculum, periodically certify that they continue to comply with the board's requirements and clarify that the board may withdraw approval for a school failing to comply with the board's requirements. The remainder of the changes are to ensure that the board's intent is clearly reflected in the regulations and to remove unnecessary or outdated items from the regulations.

Substance:

18 VAC 25-21-10 – Delete the definitions that are either not utilized in the body of the regulations or are already contained in the Code of Virginia.

18 VAC 25-21-20 – Clarify that disciplinary action in another jurisdiction relating to auctioneering may prevent licensure in Virginia. Remove the option of substituting 25 auctions in lieu of education as this option was deleted when § 54.1-603 B 3 of the Code of Virginia was last amended.

Clarify language in 18 VAC 25-21-30, 18 VAC 25-21-40, 18 VAC 25-21-50, 18 VAC 25-21-110, and 18 VAC 25-21-180.

18 VAC 25-21-60 – Modify to reflect changes in the Code of Virginia.

18 VAC 25-21-90 A – Clarify language to reflect lower fee.

18 VAC 25-21-90 B – Modify the reinstatement requirements so that:

1. Anyone may reinstate within one year of expiration by completing the required application and submitting it with the required fee and bond;

2. Anyone whose license has been expired for more than one year, but less than two years may reinstate by completing the required application, submitting it with the required fee and bond, and either sitting for and passing the examination or applying via reciprocity; and

3. Anyone whose license has been expired for two years or more shall be required to apply as a new applicant and meet the entry requirements that are in place as of the date that they make application.

18 VAC 25-21-200 – Modify to require that the schools seeking board approval comply with the following:

1. Include the board's regulations in their curriculums;

2. Periodically certify that they continue to comply with the board's requirements; and

3. Clarify that the board may withdraw approval for a school failing to comply with the board's requirements.

Issues: The primary advantage to the public is that the board is clarifying its regulations that disciplinary action in another jurisdiction relating to auctioneering may prevent licensure in Virginia. Further, the proposed changes will help ensure that the board's regulants will have a clearer set of regulations that do not contain unnecessary items. In addition, the board will be better able to protect the public by being able to ensure that board-approved schools continue to comply with the board's requirements, and if they do not, the board's approval may be withdrawn. The only disadvantage is that individuals whose license has been expired for more than two years would have to retake the examination unless they are licensed in another state with which Virginia has a reciprocity agreement. This is expected to be a rare occurrence.

Department of Planning and Budget's Economic Impact Analysis: The Department of Planning and Budget (DPB) has analyzed the economic impact of this proposed regulation in accordance with § 9-6.14:7.1 G of the Administrative Process Act and Executive Order Number 25 (98). Section 9-6.14:7.1 G requires that such economic impact analyses include, but need not be limited to, the projected number of businesses or other entities to whom the regulation would apply, the identity of any localities and types of businesses or other entities particularly affected, the projected number of persons and employment positions to be affected, the projected costs to affected businesses or entities to implement or comply with the regulation, and the impact on the use and value of private property. The analysis presented below represents DPB's best estimate of these economic impacts.

Summary of the proposed regulation. The Auctioneers Board (board) proposes to add language specifying the reinstatement process for individuals and firms whose licenses have expired. Additionally, the board proposes to require that courses on auctioneering include coverage of these regulations in order to be approved for use in licensing.

Estimated economic impact.

Reinstatement Process. Under the current regulations, "any individual or firm licensee … who fails to renew his license within six calendar months after the expiration date of the license, shall be required to apply for reinstatement of the license. The applicant shall submit to the Department of Professional and Occupational Regulation (DPOR) a reinstatement application and fee." The board proposes to add language specifying that if the license has expired for two years or more, "the applicant shall be required to submit the examination fee and sit for and pass the Virginia Licensed Auctioneer's Examination," unless he or she is licensed by a state with whom the board has established reciprocity. According to DPOR, the board has had the authority to require licensees with expired licenses to retake the examination, but has not had occasion to exercise that option; all individuals or firms with licenses expired for at least two years who have applied for reinstatement have had licenses through other states and qualified for reinstatement through reciprocity.

Individuals seeking to regain their license will have been inactive in the profession, unless they were practicing illegally. It is possible that these individuals are less likely to be aware of changes in these regulations and the auctioneering

# Proposed Regulations

profession than working auctioneers. The proposed requirement to retake and pass the examination for reinstatement may be beneficial to the public by reducing the risk that reinstated auctioneers, for example, improperly handle escrow money due to ignorance of changes in the law. There is no data available that would allow estimates of the magnitude of this potential benefit. Specifically, there is no known evidence that two years of inactivity by an auctioneer actually produces a significant risk to the public.

The only requirement to renew an auctioneer's license is to pay a $70 fee once every two years. There are no requirements for experience, continuing education, or reexamination. Thus, there is no reason to believe that someone who has paid the renewal fee on time, but has not actively worked as an auctioneer, is any more knowledgeable about changes in these regulations and the auctioneering profession than someone seeking to reinstate his or her license. For example say that Woman A and Woman B independently decide to have a baby and take two years off from auctioneering before returning to work. Woman A pays the $70 renewal fee to remain licensed during her sabbatical, while Woman B does not. Woman A's payment of the $70 fee in no way makes her more knowledgeable about changes in these regulations and the auctioneering profession than Woman B; but under the proposal, Woman B would be required to retake the exam while Woman A would be exempt. In this case, two people who are identical in terms of their qualifications are treated differently by the regulations.

If auctioneers are to be required to retake the examination at all, perhaps the determination of who should retake the exam should be based upon whether the individual has recent experience working as an auctioneer rather than whether a fee is paid or not. A provision could say that an individual who has not worked as an auctioneer during the last "x" years would be required to retake and pass the exam in order to retain or reinstate his or her license. Such a requirement would apply to all individuals whose lack of recent experience may put the public at risk due to ignorance of changes to laws and procedures relating to the profession. There is no available evidence that the potential risk to the public from an auctioneer with two years of inactivity is enough to warrant the cost to the auctioneer of retaking the test. Furthermore, if an auctioneer's inactivity *does* produce a significant risk to the public, then it seems likely that this would be true of all inactive auctioneers, whether they pay a fee to remain licensed or not.

On the other hand, the board's proposal to mandate that individuals who seek to regain their license after two years or more without it must retake the qualifying exam and apply anew for a license, would not likely create a large new burden for the potential people so situated. According to DPOR, the current pass rate for the exam, entirely taken by first-time applicants, is 88%. Thus, experienced auctioneers would likely not have much trouble passing, particularly if they take the time to review any changes in law since they last practiced. The exams are offered every day at five test centers dispersed across the state.[1] The cost would be $40

for a new license, plus a $40 examination fee and the time and travel associated with studying for and taking the exam. This compares to a $120 reinstatement fee under the current regulations.

In summary, there is no data available to determine whether two years or more of inactivity by an auctioneer produces a significant risk to the public. Thus, we cannot accurately estimate the potential benefit to the public of requiring that individuals must retake the qualifying exam if their license has been expired for two years or more. The fees for affected individuals would be only $80 under the proposed regulations, versus $120 under the current regulations. But, the affected individuals would also have the added time and transportation costs associated with preparing and taking the exam and would face the small probability of failing the exam. Thus, affected individuals who value their time, transportation costs, and the problems associated with the small probability of failing at more than $40 would find the costs to be higher under the proposed regulations; while affected individuals who value their time, transportation costs, and the problems associated with the small probability of failing at less than $40 would find the costs to be lower under the proposed regulations.

Course Approval. In order to obtain an auctioneering license, applicants are required to "successfully complete a course of study at a school of auctioneering which has obtained course approval from the board …" In order to gain or maintain course approval, the board proposes to require schools to include coverage of these regulations in the coursework. The proposed requirement will produce some small costs to schools that seek approval for their auctioneering classes. Most schools that have courses approved by the board (13 out of 15)[2] are not located in the Commonwealth. Schools may comply with the requirement by distributing the regulations to students accompanied by a brief discussion.[3] Also, DPOR does send free copies of the regulations to the schools. Thus, the actual cost to the schools will not be large.

The proposed requirement may be beneficial in that it may help reduce the likelihood that auctioneers licensed in Virginia put the public at risk due to ignorance of the specifics of these regulations. For example, understanding the requirements of the regulations may reduce the probability that auctioneers improperly handle escrow money (an issue addressed in the regulations). But, in order to gain a Virginia auctioneer's license (other than by reciprocity), the individual is already required in the current regulations to pass an examination which tests knowledge about the regulations (as well as other subject matter). Thus, the benefit of the proposed requirement, while not easily measured, would likely be quite limited.

Businesses and entities affected. The approximately 1,320 individuals and 180 firms[4] who currently possess a Virginia auctioneers license are potentially affected by the proposed amendments. The two Virginia schools and the 13 out-of-

# Proposed Regulations

state schools that have courses approved by the board are also affected.

Localities particularly affected. The proposed amendments potentially affect all localities in Virginia.

Projected impact on employment. The proposed amendments to these regulations are not expected to significantly affect employment.

Effects on the use and value of private property. Private schools that offer auctioneering classes will be required to add an element to their classes (Virginia regulations). This will have negligible effect on the value of the schools.

Agency's Response to the Department of Planning and Budget's Economic Impact Analysis: Partially concur. Currently, in order to renew a license, an auctioneer must submit the renewal fee along with proof of the required bond in a minimum amount of at least $10,000. By submitting a bond, there is proof from an insurance company that the individual is not an unacceptable risk. Individuals who would be affected by the proposed change to the reinstatement requirement would not have submitted such documentation to the board in over four years (two-year license term plus the two years after expiration) and would not have been practicing in any other jurisdiction with which the Virginia board has a reciprocal agreement. Therefore, the examination is necessary to ensure these individuals are still minimally competent to practice in Virginia.

Summary:

*The proposed amendments clarify language, delete duplicate and unutilized definitions, remove unnecessary requirements, and modify certain requirements in this chapter. Substantive changes include: (i) clarifying that disciplinary action in another jurisdiction relating to auctioneering may prevent licensure in Virginia; (ii) removing the option allowing 25 auctions to substitute or be used in lieu of meeting the education requirements; (iii) modification of requirements for license reinstatement; and (iv) modification of compliance requirements for schools.*

**18 VAC 25-21-10. Definitions.**

The following words and terms~~,~~ when used in this chapter~~,~~ shall have the following meanings unless the context clearly indicates otherwise:

~~*"Absolute auction"* means an auction where at the time of the auction sale the real or personal property to be sold will pass to the highest bidder regardless of the amount of the highest and last bid.~~

~~*"Auction"* means the sale of goods or real estate by means of exchanges between an auctioneer and members of his audience, the exchanges consisting of a series of invitations for offers made by the auctioneer, offers made by members of the audience, and acceptance by the auctioneer of the highest or more favorable offer.~~

~~*"Auctioneer"* means any person who conducts or offers to conduct an auction.~~

~~*"Auction firm"* means any corporation, partnership or entity, except a sole proprietorship, performing any of the acts of an auctioneer as defined in this section.~~

~~*"Board"* means the Auctioneers Board.~~

~~*"Director"* means the Director of the Department of Professional and Occupational Regulation.~~

~~*"Estate auctions"* means the liquidation at auction of real or personal property of a specified person.~~

*"Owner"* means the bona fide owner of the real or personal property being offered for sale; in the case of a corporation, partnership, or other entity, except a sole proprietorship, an authorized officer, director, or partner may be deemed to be "owner" of the real or personal property being offered for sale, provided such entity is licensed to do business in the Commonwealth of Virginia.

~~*"Person"* means any natural person, association, partnership, or corporation, and the officers, directors, and employees of a corporation.~~

~~*"Regular business"* means recurring, routine, planned activities performed for profit by those persons, corporations, partnerships, entities, charitable, religious, fraternal or political and all other profit or nonprofit organizations who do not meet the exemptions of § 54.1-601 of the Code of Virginia.~~

~~*"Reserve auction"* means the auctioneer reserves the right to reject any and all bids.~~

**18 VAC 25-21-20. Licensure.**

All persons or firms as defined in § 54.1-600 of the Code of Virginia who conduct auctions or offer their services to sell at auction in the Commonwealth are required to file a licensure application and pay the specified fee to the board. Applicants for individual licensure shall meet the following requirements:

1. Be at least 18 years of age.

2. Shall not have been *previously found by any regulatory board or agency to have violated any applicable regulations or laws in the course of performing auctioneer duties or* convicted within the past five years of a criminal offense related to auction activity in Virginia or any other jurisdiction. Any plea of nolo contendere shall be considered a conviction for purposes of this paragraph. ~~The record of a conviction authenticated in such form as to be admissible in evidence under the laws of the jurisdiction where convicted shall be admissible as prima facie evidence of such conviction.~~ *A certified copy of a final order, decree or case decision by a court or regulatory agency with the lawful authority to issue such order shall be admissible as prima facie evidence of such conviction or discipline.*

3. Successfully complete a course of study at a school of auctioneering ~~which~~ *that* has obtained course approval from the board, or an equivalent course ~~or conducted at least 25 auctions within the past eight years at which the applicant has called the bids,~~ *and* has passed the Virginia Licensed Auctioneer's Examination~~,~~ administered by the Auctioneers Board.

# Proposed Regulations

**18 VAC 25-21-30. Bond required.**

All applicants shall submit evidence that a surety bond, executed by a surety company authorized to do business in the Commonwealth and in at least the amount of $10,000, has been obtained. Proof of current bond must be submitted in order to obtain or renew the license. ~~Bonds shall be for a term of two years and run concurrently with the two year term of the license.~~ *The bond must commence no later than the effective date of the license and shall expire no sooner than the date of expiration of the license.*

**18 VAC 25-21-40. License by reciprocity.**

The board may issue a license to any applicant ~~or active officer in a,~~ *individual or* firm holding a license in any state, territory, or possession of the United States, with whom the board has established an act of reciprocity provided the requirements and standards under which the license was issued are substantially equivalent to those established by the board. At the time of application for licensure, the applicant must be currently licensed in the state in which reciprocity is established with the Commonwealth of Virginia. *The board may deny an application if the licensed auctioneer or firm has been found guilty (i) by any regulatory board or agency to have violated any applicable regulations or laws in the course of performing auctioneering duties or (ii) by a court of any criminal offense or material misrepresentation in the course of performing auctioneer duties. A certified copy of a final order, decree or case decision by a court or regulatory agency with the lawful authority to issue such order shall be admissible as prima facie evidence of such conviction or discipline.*

Nonresident applicants shall also file with the board an irrevocable consent that service of process upon the director is valid and binding as the service of process upon the applicant.

**18 VAC 25-21-50. Application.**

A. All applicants, ~~corporations,~~ *both individual and* firms, ~~or active officers~~ seeking licensure by reciprocity or examination shall submit a fully executed and notarized application with the appropriate fee or fees attached. ~~Incomplete applications will be returned to the applicant.~~ *Applicants will be notified if their application is incomplete.*

Applications for licensure by examination must be received by the Department of Professional and Occupational Regulation 45 days prior to a scheduled examination in order to be eligible to sit for that examination.

B. If a corporation, the application shall include certified true copies of the articles of incorporation, bylaws and charter, and, if a foreign corporation, a certificate of authority issued by the State Corporation Commission.

C. All applications will be reviewed by the Auctioneers Board staff to determine eligibility for examination and licensure within 30 days of receipt at the offices of the Department of Professional and Occupational Regulation. *However, failure to review an application within 30 days of receipt shall not imply or result in the automatic approval of the application.* No applicant will be approved for licensure unless all requirements of this part of this chapter are met.

~~D. Applicants may appeal the initial application review to the board in writing within 60 days of the staff's determination.~~

**18 VAC 25-21-60. Examination.**

The examination shall test the applicant's knowledge of the following:

1. The auction business including fundamentals of auctioneering, elementary principles of real estate, preparation of contracts, advertising, final settlement statements, arithmetic and percentages, and ethics.

2. The Virginia statutes entitled Auctioneers' Licensure Act, §§ 54.1-600 through 54.1-606 of the Code of Virginia; bulk transfers, §§ ~~8.6-101 through 8.6-111~~ *8.6A-101 through 8.6A-110* and 8.2-328 of the Code of Virginia; sales tax laws, Title 58.1 of the Code of Virginia; and the rules and regulations of the board.

**18 VAC 25-21-90. Failure to renew.**

A. Any individual or firm licensee who fails to renew a license within 30 days after the license expires, shall be required to pay a late renewal fee ~~which shall be equal to twice the regular renewal fee.~~

B. Any individual or firm licensee, *including individuals initially licensed pursuant to § 54.1-603 A of the Code of Virginia,* who fails to renew his license within six calendar months after the expiration date of the license shall be required to apply for reinstatement of the license. The applicant shall submit to the Department of Professional and Occupational Regulation a reinstatement application and fee *and comply with the following paragraph.*

*If the license has expired for six months or more, but less than two years, the applicant shall be required to submit a reinstatement application, which shall be evaluated by the board to determine if the applicant meets the renewal requirements. A license that is reinstated shall be deemed as having been continuous without interruption. Nothing in these regulations shall divest the board of its authority to discipline a license holder for a violation of the law or regulation during the period of time for which the regulant was licensed.*

*C. If the license has expired for two years or more, the applicant shall be required to submit a new application and meet current entry requirements that are in effect as of the date the application is received by the board office. The applicant shall be required to submit the examination fee and sit for and pass the Virginia Licensed Auctioneer's Examination or comply with the provisions contained in 18 VAC 25-21-40. Any auctioneering activity conducted between the time the previous license expired and the effective date of the new license shall be considered unlicensed activity.*

~~C.~~ *D.* The date the renewal application is received by the Department of Professional and Occupational Regulation or its agent will determine whether a license will be renewed without penalty or will be subject to reinstatement requirements.

~~D.~~ *E.* Auctioneer individual and firm licenses issued under this regulation shall expire 24 months from the last day of the

# Proposed Regulations

month in which the license was issued as indicated on the license.

**18 VAC 25-21-110. Contracts.**

When an auctioneer agrees to conduct an auction, a contract shall be drawn setting forth the particulars of the terms and conditions under which the auctioneer received the real or personal property for auction and particulars for the disbursement of the proceeds. Each contract for auction shall include the following:

1. a. A detailed list of the real or personal property received for sale. If a list cannot be made at the time of signing of the contract, then a list must be made a part of the contract (and attached) prior to auction of the real or personal property for that day; or

b. If the auctioneer enters into a contract to sell items on a consignment basis where the total value of all the items to be sold at any one action does not exceed $500, and the owner of the items agrees to waive this requirement in writing on a document separate from, but made a part of, the contract, then ~~this~~ *the* requirement *contained in subdivision 1 a of this section* is not applicable.

2. The name, address, telephone number, and license number of the Virginia auctioneer or auction firm.

3. The name, address and telephone number of the owner.

4. The date, time and place of the auction or auctions at which the real or personal property is scheduled to be auctioned.

5. The fee or percentage of gross sales the auctioneer or auction firm will charge the owner and what services are included in the fee, such as preparation, travel, labor, advertising and any other auction related expenses.

6. By what date the owner is to be paid and who is responsible for disbursing the funds.

7. A statement that the clerk sheets, or other evidence to properly account for all items sold, shall be given or made available for inspection by the owner on a daily basis.

8. The following statement above the owner's signature line: "I have read and accepted the terms of this contract."

9. A legible executed copy of the contract shall be given to the owner at the time of execution.

**18 VAC 25-21-180. Discipline.**

A. The board has the power to fine any individual or firm licensee, or to suspend or revoke any license issued under the provisions of Chapter 6 (§ 54.1-600 et seq.) of Title 54.1 of the Code of Virginia and the regulations of the board pursuant to the provisions of the Administrative Process Act (§ 9-6.14:1 et seq. of the Code of Virginia) if it finds that:

1. The license was obtained or renewed through fraud or misrepresentation;

2. The licensed auctioneer or firm has been found guilty ~~by the board or~~ by a court of any criminal offense or material misrepresentation in the course of performing ~~his~~

auctioneer duties. *A certified copy of a final order, decree or case decision by a court with the lawful authority to issue such order shall be admissible as prima facie evidence of such conviction or discipline*;

*3. The licensed auctioneer or firm has been found by any regulatory board or agency to have violated any applicable regulations or laws in the course of performing auctioneer duties. A certified copy of a final order, decree or case decision by a court or regulatory agency with the lawful authority to issue such order shall be admissible as prima facie evidence of such conviction or discipline*;

~~3.~~ *4.* The licensed auctioneer or firm has not demonstrated reasonable care, judgment, or application of his knowledge and ability in the performance of ~~his~~ auctioneering duties;

~~4.~~ *5.* The license auctioneer or firm violated or induced another person to violate any provisions of Chapters 1, 2, 3, ~~and~~ *or* 6 of Title 54.1 of the Code of Virginia, or any ~~provisions~~ *provision* of this chapter; or

~~5.~~ *6.* The licensee, auction firm, or firm owner refuses or fails, upon request or demand, to produce to the board or any of its agents any document, book, or copy thereof in licensee's or owner's possession concerning the performance of auctioneering duties.

B. The board, in its discretion, may refuse to grant or renew a license of any person for any of the reasons specified in subsection A of this section.

**18 VAC 25-21-200. Requirements for course approval.**

To receive course approval the institution must offer *to Virginia candidates* a minimum of 80 hours of classroom and field instruction in the conduct of auction business to include fundamentals of auctioneering, elementary principles of real estate, brokerage, contract drawing, advertising, sale preparation, bid calling, settlement statements ~~and~~, *ethics and exposure to the current rules and regulations of the Virginia Auctioneers Board.* There must be at least five instructors who have been licensed ~~or certified~~ auctioneers for at least five years and who specialize in different fields of the auction business.

**18 VAC 25-21-210. Amendments and changes.**

*Any change in the information provided by the school to the board as required by 18 VAC 25-21-190, 18 VAC 25-21-200 or 18 VAC 25-21-220 shall be reported to the board in writing within 30 days of such an occurrence.*

**18 VAC 25-21-220. Periodic requalification for continued course approval.**

*At times established by the board, the board may require that schools that have previously obtained course approval provide the board with evidence, in a form set forth by the board, that they continue to comply with the requirements of 18 VAC 25-21-190 and 18 VAC 25-21-200. Failure to continue to comply with the board's requirements or respond to such a request may result in the board withdrawing its approval.*

# Proposed Regulations

NOTICE: The forms used in administering 18 VAC 25-21-10 et seq., Rules and Regulations of the Virginia Auctioneers Board are not being published due to the large number; however, the name of each form is listed below. The forms are available for public inspection at the Auctioneers Board, 3600 W. Broad Street, Richmond, Virginia, or at the office of the Registrar of Regulations, General Assembly Building, 2nd Floor, Richmond, Virginia.

## FORMS

License Application, 29LIC (eff. 10/98).

*License By Examination Application, 29EXLIC (4/18/00).*

*License By Reciprocity & Reinstatement Application, 29R&RLIC (4/18/00).*

Auctioneer Surety Bond Form, 29IBOND (eff. 7/98 *rev. 4/18/00*).

Firm License Application, 29FIRM (eff. 10/98 *rev. 4/18/00*).

Auction Firm Surety Bond Form, 29FBOND (eff. 7/98 *rev. 4/18/00*).

Application Supplement (States with Approved Reciprocal Agreements and Virginia Approved Auctioneering Schools), 29ST & SCL (eff. 7/99 *rev. 4/19/01*).

*Application for Training Course Approval, 29CRS (3/2/01).*

VA.R. Doc. No. R00-46; Filed April 30, 2001, 2:31 p.m.

## BOARD FOR CONTRACTORS

**Title of Regulation: 18 VAC 50-30-10 et seq. Tradesman Rules and Regulations (amending 18 VAC 50-30-10, 18 VAC 50-30-20, 18 VAC 50-30-40, 18 VAC 50-30-50, 18 VAC 50-30-90, and 18 VAC 50-30-200).**

Statutory Authority: §§ 54.1-201 and 54.1-1102 of the Code of Virginia.

Public Hearing Date: July 18, 2001 - 1 p.m.
Public comments may be submitted until July 20, 2001.
(See Calendar of Events section for additional information)

Agency Contact: Nancy Taylor Feldman, Assistant Director, Board for Contractors, 3600 W. Broad Street, Richmond, VA 23230, telephone (804) 367-8590.

Basis: Section 54.1-1102 of the Code of Virginia provides the authority for the Board for Contractors to promulgate regulations not inconsistent with statute necessary for the licensure of tradesmen.

Purpose: The purpose of the amendments is to include the separate trades of Liquefied Petroleum Gas Fitter and Natural Gas Fitter Provider as provided by amendments to §§ 54.1-1128 through 54.1-1135 of the Code of Virginia during the 1997, 1999 and 2000 sessions of the General Assembly. These workers are added to the group of trades deemed most dangerous in the construction industry to better provide for the health, safety and welfare of the citizens of Virginia.

Substance:

18 VAC 50-30-10. Adds the definitions of "liquefied petroleum gas fitter" (LPG) and "natural gas fitter provider" (NGF) due to statutory requirements. The definition for "Incidental" is added to clarify its usage in the regulations. The trades listed in this section were alphabetized for clarity. The definition of "Gasfitter" was changed to remove incorrect limits and to be consistent with statutory language.

18 VAC 50-30-20. The list of trades in the section title and text was alphabetized to be consistent.

18 VAC 50-30-40. Language was added to this section to identify the requirements necessary to qualify to take the LPG/NGF journeyman examination.

18 VAC 50-30-50. The changes in this section were added due to statutory requirements for exemption from the examination. The list of trades was alphabetized to be consistent.

18 VAC 50-30-90. Subsection H was added to identify the fee necessary for LPG and NGF.

18 VAC 50-30-200. Language about the education of LPG and NGF was added to the first paragraph to establish minimum competency requirements. In paragraph two, wording was changed to be consistent with the regulatory definition of "Formal vocational training."

Issues: In amending these regulations, the board will reduce the entry requirements to enable qualified individuals to practice their trade. At the same time, the board is providing the necessary public protection through the increased assurance that licensed tradesmen have met minimum standards of competency. The tradesman licensee, who wishes to offer liquefied petroleum gas and natural gas installation and repair to the general public, will benefit because the scope of work will allow him to practice as a separate trade. The primary advantage to the board and the Commonwealth is the compliance to statutory requirements and the public's understanding.

Department of Planning and Budget's Economic Impact Analysis: The Department of Planning and Budget (DPB) has analyzed the economic impact of this proposed regulation in accordance with § 9-6.14:7.1 G of the Administrative Process Act and Executive Order Number 25 (98). Section 9-6.14:7.1 G requires that such economic impact analyses include, but need not be limited to, the projected number of businesses or other entities to whom the regulation would apply, the identity of any localities and types of businesses or other entities particularly affected, the projected number of persons and employment positions to be affected, the projected costs to affected businesses or entities to implement or comply with the regulation, and the impact on the use and value of private property. The analysis presented below represents DPB's best estimate of these economic impacts.

Summary of the proposed regulation. The Board of Contractors proposes to add two licensed trades, liquefied petroleum gas fitting and natural gas fitting, to these regulations.

# Proposed Regulations

Estimated economic impact. Under the current regulations, an individual must be licensed as a gas fitter to legally perform natural gas fitting or liquefied petroleum gas fitting for compensation. Only licensed HVAC tradesmen and plumbers may take the examination necessary to become a licensed gas fitter.

Under the proposed regulations, two new licensed trades exist, liquefied petroleum gas fitting and natural gas fitting. An individual may perform liquefied petroleum gas fitting for compensation if he obtains a liquefied petroleum gas fitting license; and an individual may perform natural gas fitting for compensation if he obtains a natural gas fitting license. In order to obtain a liquefied petroleum gas fitting license or a natural gas fitting license, the applicant must pass a liquefied petroleum gas fitting licensure exam or a natural gas fitting licensure exam, respectively.[1] Prior to taking either examination, the applicant must meet one of four specified combinations of experience and education relevant to his field. Unlike the gas fitter licensure examination, the applicant is not required to be a licensed HVAC tradesman or plumber prior to taking either the liquefied petroleum gas fitting licensure exam or the natural gas fitter licensure exam.

Adding the liquefied petroleum gas fitting and natural gas fitting licensed trades to the regulations will potentially be beneficial for people who wish to specialize in such work, consumers, and certain businesses, but may be detrimental for currently licensed gas fitters. Individuals who wish to perform natural gas fitting or liquefied petroleum gas fitting for compensation may obtain licensure to do such work by demonstrating knowledge and experience relevant to the work. But unlike under the current regulations, they would not be required to expend the time and dollars necessary to first become a licensed plumber or HVAC tradesman. Thus, individuals who wish to do only natural gas fitting or liquefied petroleum gas fitting work, but not other plumbing or HVAC work, will save time and money.

There are likely some people who are willing to spend the time and dollars necessary to obtain the knowledge and experience needed for natural gas fitting or liquefied petroleum gas fitting licensure if prior HVAC or plumbing licensure is not required, but would not be willing to spend the time and dollars necessary to obtain the knowledge and experience needed for HVAC or plumbing licensure and gas fitting licensure. Thus, the creation of the two new licensed trades will likely increase the supply of natural gas fitting and liquefied petroleum gas fitting services. The increased supply of services may result in lower market prices for the services, which would be beneficial for consumers. Also, some businesses that are not direct consumers of gas fitting services may benefit from the potential lower prices of gas fitting services. For example, a consumer considering the purchase of gas logs will consider the cost of installation in their purchase decision. If the cost of gas fitting is lower, the merchant may be able sell more gas logs at a fixed price for the product. On the other hand, the current providers of natural gas fitting and liquefied petroleum gas fitting services, plumber-gas fitters and HVAC tradesmen-gas fitters, may face reduced demand and lower prices for their gas fitting services due to increased competition. Current and future licensed plumbers and HVAC tradesmen must pass a gas fitting qualifying exam in order to obtain a gas fitter license. After July 1, 2005, all individuals will need to pass a field relevant exam in order to obtain a liquefied petroleum gas fitter license or a natural gas fitter license. The proposed regulations specify that individuals applying for licensure as either a liquefied petroleum gas fitter or a natural gas fitter before July 1, 2005 shall be deemed to have fulfilled the examination requirements if they are able to demonstrate at least five years experience working under the supervision of a gas fitter. In other words, these individuals will be able to obtain licensure without passing an examination to demonstrate their field specific knowledge. If five years experience as an apprentice is sufficient for licensure without examination, then requiring the passing of a field relevant exam for after July 1, 2005 would produce wasted time and expense. If on the other hand, requiring the passing of a field relevant exam is necessary to ensure competence and protect the public, then the exemption from examination puts the public at undue risk.

Businesses and entities affected. According to the Department of Professional and Occupational Regulation, there are 7,918 individuals currently licensed to perform gas-fitting work. The Liquefied Petroleum Gas Association expects approximately 1,000 individuals to register with the liquefied petroleum gas-fitting specialty, and natural gas companies expect about 1,000 people to seek natural gas fitting licensure.[2] All of these individuals are potentially affected by the proposed regulations. Additionally, any individuals considering licensure to perform natural gas fitting and liquefied petroleum gas fitting work, as well as consumers and businesses that sell products that involve gas fitting installation, are affected by the proposed regulations.

Localities particularly affected. The proposed regulations potentially affect all localities in the Commonwealth.

Projected impact on employment. The creation of the two new trades will likely increase the number of individuals and businesses that provide gas-fitting services. Net employment for gas fitting may increase. Also, firms that sell products that require gas-fitting installation may be able to increase their sales with lower installation costs. If sales for such firms do increase, then employment may increase at these businesses as well.

Effects on the use and value of private property. Businesses that currently do not offer liquefied petroleum or natural gas fitting may begin to offer one or both of the services due to the proposed regulations. The increased supply of gas fitting services may result in lower market prices for the services. Firms or individuals that purchase liquefied petroleum or natural gas fitting services would see their costs reduced, potentially increasing their net value. Businesses that sell products that require gas-fitting installation may be able to increase their sales with lower installation costs, consequently increasing the firms' profits. The value of businesses that

---

[1] An examination exemption is discussed later in the analysis.

[2] Source: Department of Professional and Occupational Regulation

# Proposed Regulations

currently offer liquefied petroleum or natural gas fitting services may be reduced if the market price for their services is reduced by increased competition.

Agency's Response to the Department of Planning and Budget's Economic Impact Analysis: The Board for Contractors – Tradesman and the Department of Professional and Occupational Regulation provided the information contained in the Economic Impact Analysis prepared by the Department of Planning and Budget (DPB). The information is accurate and the board and the department have no objection to the statement.

Summary:

*The proposed amendments add two licensed trades, liquefied petroleum gas fitting and natural gas fitting, to these regulations.*

**18 VAC 50-30-10. Definitions.**

The following words and terms when used in this chapter shall have the following meanings, unless the context clearly indicates otherwise:

*"Affidavit"* means a written statement of facts, made voluntarily, and confirmed by the oath or affirmation of the party making it, taken before a notary or other person having the authority to administer such oath or affirmation.

*"Apprentice"* means a person who assists tradesmen while gaining knowledge of the trade through on-the-job training and related instruction in accordance with the Virginia Voluntary Apprenticeship Act (§ 40.1-117 et seq. of the Code of Virginia).

*"Approved"* means approved by the Department of Professional and Occupational Regulation.

*"Backflow prevention device testing"* means performing functional procedures to ascertain that the device is still providing the necessary backflow protection in accordance with the Virginia Uniform Statewide Building Code.

*"Backflow prevention device work"* consists of and is limited to the following: (i) maintenance; (ii) repair; (iii) testing; or (iv) periodic inspection of cross connection control devices, including but not limited to reduced pressure principle backflow preventors, double check-valve assemblies, double-detector check-valve assemblies, pressure type vacuum breaker assemblies, and other such devices designed, installed, and maintained in such a manner so as to prevent the contamination of the potable water supply by the introduction of nonpotable liquids, solids, or gases, thus ensuring that the potable water supply remains unaltered and free from impurities, odor, discoloration, bacteria, and other contaminants which would make the potable water supply unfit or unsafe for consumption and use.

*"Backflow prevention device worker"* means any individual who engages in, or offers to engage in, the maintenance, repair, testing or periodic inspection of cross connection control devices.

*"Board"* means the Board for Contractors.

*"Building official/inspector"* is an employee of the state, a local building department or other political subdivision who enforces the Virginia Uniform Statewide Building Code.

*"Department"* means the Department of Professional and Occupational Regulation.

*"Division"* means a limited subcategory within any of the trades, as approved by the department.

*"Electrical work"* consists of, but is not limited to, the following: (i) planning and layout of details for installation or modifications of electrical apparatus and controls including preparation of sketches showing location of wiring and equipment; (ii) measuring, cutting, bending, threading, assembling and installing electrical conduits; (iii) performing maintenance on electrical systems and apparatus; (iv) observation of installed systems or apparatus to detect hazards and need for adjustments, relocation or replacement; and (v) repairing faulty systems or apparatus.

*"Electrician"* means a tradesman who does electrical work including the construction, repair, maintenance, alteration or removal of electrical systems in accordance with the National Electrical Code and the Virginia Uniform Statewide Building Code.

*"Formal vocational training"* means courses in the trade administered at an accredited educational facility; or formal training, approved by the department, conducted by trade associations, businesses, the military, correspondence schools or other similar training organizations.

*"Gas fitter"* means a tradesman who does gas fitting related work usually as a division within the HVAC or plumbing trades in accordance with the Virginia Uniform Statewide Building Code. This work includes the installation, repair, improvement or removal of *liquefied petroleum or natural* gas piping, ~~propane~~ tanks, and appliances annexed to real property.

*"Helper"* or *"laborer"* means a person who assists a licensed tradesman.

*"HVAC tradesman"* means an individual whose work includes the installation, alteration, repair or maintenance of heating systems, ventilating systems, cooling systems, steam and hot water heating systems, boilers, process piping, backflow prevention devices, and mechanical refrigeration systems, including tanks incidental to the system.

*"Incidental" means work that is necessary for that particular repair or installation.*

*"Journeyman"* means a person who possesses the necessary ability, proficiency and qualifications to install, repair and maintain specific types of materials and equipment, utilizing a working knowledge sufficient to comply with the pertinent provisions of the Virginia Uniform Statewide Building Code and according to plans and specifications.

*"Licensed tradesman"* means an individual who meets the requirements for licensure that relate to the trade which he practices.

*"Liquefied petroleum gas fitter"* means any individual who engages in, or offers to engage in, work for the general public for compensation in work that includes the installation, repair,*

# Proposed Regulations

*improvement, alterations or removal of piping, liquefied petroleum gas tanks and appliances (excluding hot water heaters, boilers and central heating systems that require a heating, ventilation and air conditioning or plumbing certification) annexed to real property.*

*"Maintenance"* means the reconstruction or renewal of any part of a backflow device for the purpose of maintaining its proper operation. This does not include the actions of removing, replacing or installing, except for winterization.

*"Master"* means a person who possesses the necessary ability, proficiency and qualifications to plan and lay out the details for installation and supervise the work of installing, repairing and maintaining specific types of materials and equipment utilizing a working knowledge sufficient to comply with the pertinent provisions of the Virginia Uniform Statewide Building Code.

*"Natural gas fitter provider" means any individual who engages in, or offers to engage in, work for the general public for compensation in the incidental repair, testing, or removal of natural gas piping or fitting annexed to real property, excluding new installation of gas piping for hot water heaters, boilers, central heating systems, or other natural gas equipment that requires heating, ventilation and air conditioning or plumbing certification.*

*"Periodic inspection"* means to examine a cross connection control device in accordance with the requirements of the locality to be sure that the device is in place and functioning in accordance with the standards of the Virginia Uniform Statewide Building Code.

*"Plumber"* means a tradesman who does plumbing work in accordance with the Virginia Uniform Statewide Building Code.

*"Plumbing work"* means work that includes the installation, maintenance, extension, or alteration or removal of piping, fixtures, appliances, and appurtenances in connection with any of the following:

1. Backflow prevention devices;

2. Boilers;

3. Domestic sprinklers;

4. Hot water baseboard heating systems;

5. Hydronic heating systems;

6. Process piping;

7. Public/private water supply systems within or adjacent to any building, structure or conveyance;

8. Sanitary or storm drainage facilities;

9. Steam heating systems;

10. Storage tanks incidental to the installation of related systems;

11. Venting systems; or

12. Water heaters.

These plumbing tradesmen may also install, maintain, extend or alter the following:

1. Liquid waste systems;

2. Sewerage systems;

3. Storm water systems; and

4. Water supply systems.

*"Regulant"* means a tradesman license or backflow prevention device certification card holder.

*"Reinstatement"* means having a tradesman license or backflow prevention device worker certification card restored to effectiveness after the expiration date has passed.

*"Renewal"* means continuing the effectiveness of a tradesman license or a backflow prevention device worker certification card for another period of time.

*"Repair"* means the reconstruction or renewal of any part of a backflow prevention device for the purpose of returning to service a currently installed device. This does not include the removal or replacement of a defective device by the installation of a rebuilt or new device.

*"Supervisor"* means the licensed master or journeyman tradesman who has the responsibility to ensure that the installation is in accordance with the applicable provisions of the Virginia Uniform Statewide Building Code, one of whom must be on the job site at all times during installation.

*"Testing organization"* means an independent testing organization whose main function is to develop and administer examinations.

*"Trade"* means any of the following: ~~plumbing; heating, ventilation and air conditioning (HVAC); or electrical work~~ *electrical, gas fitting, HVAC (heating, ventilation and air conditioning), liquefied petroleum gas fitting, natural gas fitting, plumbing,* and divisions within them.

*"Tradesman"* means a person who engages in or offers to engage in, for the general public for compensation, any of the trades covered by this chapter.

*"Water distribution systems"* include fire sprinkler systems, highway/heavy, HVAC, lawn irrigation systems, plumbing, or water purveyor work.

**18 VAC 50-30-20. Requirements for licensure as a journeyman or master tradesman engaging in the trades of** ~~plumbing, plumbing gas fitting, HVAC (heating, ventilation and air conditioning), HVAC gas fitting, or electrical~~**,** *gas fitting, HVAC (heating, ventilation and air conditioning), liquefied petroleum gas fitting, natural gas fitting, and plumbing* **or** ~~for~~ **certification as a backflow prevention device worker.**

Each individual who engages in, or offers to engage in, electrical, ~~plumbing~~ *gas fitting,* HVAC, *liquefied petroleum gas fitting, natural gas fitting, plumbing* or backflow prevention device work for the general public for compensation shall meet or exceed the requirements set forth in this section prior to issuance of the license or certification card.

# Proposed Regulations

The applicant shall be required to take an oral or written examination to determine his general knowledge of the trade in which he desires licensure or certification. If the applicant successfully completes the examination, an application furnished by the department shall be completed. The application shall contain the applicant's name, home address, place of employment, and business address; information on the knowledge, skills, abilities and education or training of the applicant; and an affidavit stating that the information on the application is correct. If the application is satisfactory to the board, a license or certification card shall be issued.

**18 VAC 50-30-40. Evidence of ability and proficiency.**

A. Applicants for examination to be licensed as a journeyman shall furnish evidence that one of the following experience and education standards has been attained:

1. Four years of practical experience in the trade and 240 hours of formal vocational training in the trade. Experience in excess of four years may be substituted for formal vocational training at a ratio of one year of experience for 80 hours of formal training, but not to exceed 200 hours;

*2. Four years of practical experience and 80 hours of vocational training for liquefied petroleum gas fitters and natural gas fitter providers except that no substitute experience will be allowed for liquefied petroleum gas and natural gas workers;*

~~2.~~ *3.* An associate degree or a certificate of completion from at least a two-year program in a tradesman related field from an accredited community college or technical school as evidenced by a transcript from the educational institution and two years of practical experience in the trade for which licensure is desired;

~~3.~~ *4.* A bachelor's degree received from an accredited college or university in an engineering curriculum related to the trade and one year of practical experience in the trade for which licensure is desired; or

~~4.~~ *5.* On or after July 1, 1995, an applicant with 10 years of practical experience in the trade as verified by reference letters of experience from any of the following: building officials, building inspectors, current or former employers, contractors, engineers, architects or current or past clients attesting to the applicant's work in the trade, may be granted permission to sit for the journeyman's level examination without having to meet the educational requirements.

B. Applicants for examination to be licensed as a master shall furnish evidence that one of the following experience standards has been attained:

1. Evidence that they have one year of experience as a licensed journeyman; or

2. On or after July 1, 1995, an applicant with 10 years of practical experience in the trade, as verified by reference letters of experience from any of the following: building officials, building inspectors, current or former employers, contractors, engineers, architects or current or past clients, attesting to the applicant's work in the trade, may be granted permission to sit for the master's level examination without having to meet the educational requirements.

C. Individuals who have successfully passed the Class A contractors trade examination prior to January 1, 1991, administered by the Virginia Board for Contractors in a certified trade shall be deemed qualified as a master in that trade in accordance with this chapter.

D. Applicants for examination to be certified as a backflow prevention device worker shall furnish evidence that one of the following experience and education standards has been attained:

1. Four years of practical experience in water distribution systems and 40 hours of formal vocational training in a school approved by the board; or

2. Applicants with seven or more years of experience may qualify with 16 hours of formal vocational training in an approved school.

The board accepts the American Society of Sanitary Engineers' (ASSE) standards for testing procedures. Other programs could be approved after board review. The board requires all backflow training to include instruction in a wet lab.

**18 VAC 50-30-50. Exemptions from examination; exemptions from licensure.**

A. An individual certified or licensed by any one of the following agencies shall not be required to fulfill the examination requirement:

1. The Department of Housing and Community Development prior to July 1, 1995;

2. Any local governing body prior to July 1, 1978; or

3. Any Virginia locality backflow prevention device worker certification issued prior to July 1, 1998.

B. Other methods of exemption from examination are as follows:

1. Successful completion of an apprenticeship program which is approved by the Virginia Apprenticeship Council as evidenced by providing a certificate of completion or other official document.

2. Any tradesman who had a Class B registration in the trade prior to January 1, 1991, and has been continuously licensed as a Class B contractor. Candidates for this exemption must submit documentation from the Board for Contractors.

3. Individuals applying for certification as backflow prevention device workers between July 1, 1998, and July 1, 1999, shall be deemed to have fulfilled the examination requirements if they are able to demonstrate the required years of discipline-free experience and education or training set forth in 18 VAC 50-30-40 D 2. These individuals shall provide the following with their application:

a. An affidavit from a building official, building inspector or Virginia water purveyor attesting to at least seven

# Proposed Regulations

years of experience and competency in the field on a form provided by the department; and

b. A certificate or other documentation that an appropriate course of instruction of at least 16 hours at an approved school has been successfully completed prior to July 7, 1999.

*4. a. Individuals applying for licensure as a liquefied petroleum gas fitter within one year of the effective date of the board's final regulations, who are able to demonstrate that they have at least five years' experience as a liquefied petroleum gas fitter, are exempted from the examination requirements. This item refers to master tradesmen.*

*b. Individuals applying for licensure as a liquefied petroleum gas fitter between July 1, 2000, and July 1, 2005, shall be deemed to have fulfilled the examination requirements if they are able to demonstrate that they have at least five years' experience in an apprenticeship capacity under the direct supervision of a gas fitter. This item refers to journeymen tradesmen.*

*5. a. Individuals applying for a natural gas fitter provider license within one year of the effective date of the board's final regulations shall be deemed to have fulfilled the examination requirement if they are able to demonstrate that they have five years' prior experience as a natural gas fitter provider. This item refers to master tradesmen.*

*b. Individuals applying for a natural gas fitter provider license between July 1, 1999, and July 1, 2004, shall be deemed to have fulfilled the examination requirement if they are able to demonstrate that they have at least five years' experience in an apprenticeship capacity under the direct supervision of a gas fitter. This item refers to journeymen tradesmen.*

C. Exemptions from licensure are as follows:

1. Helpers or laborers who assist licensed tradesmen;

2. Any person who performs ~~plumbing, plumbing gas fitting, HVAC, HVAC gas fitting, or~~ electrical, *gas fitting, HVAC, liquefied petroleum gas fitting, natural gas fitting, or plumbing* work not for the general public for compensation;

3. Any person who installs television or telephone cables, lightning arrestor systems, or wiring or equipment operating at less than 50 volts;

4. Installers of wood stove equipment, masonry chimneys or prefabricated fireplaces shall be exempt from certification as a HVAC tradesman; and

5. Any person who is performing work on any ship, boat, barge or other floating vessel.

**18 VAC 50-30-90. Fees for licensure, certification and examination.**

A. Each check or money order shall be made payable to the Treasurer of Virginia. All fees required by the board are nonrefundable and the date of receipt by the department or its agent is the date that will be used to determine whether or not it is on time. Fees remain active for a period of one year from the date of receipt and all applications must be completed within that time frame.

B. In the event that a check, money draft or similar instrument for payment of a fee required by statute or regulation is not honored by the bank or financial institution named, the applicant or regulant shall be required to remit fees sufficient to cover the original fee, plus the additional processing charge of $25.

C. Tradesman license--original fee--by examination. The fee for an initial tradesman license shall be $40.

D. Tradesman license--original fee--without an examination, through successful completion of an appropriate apprenticeship program offered through the Virginia Voluntary Apprenticeship Act. The fee for an initial tradesman license shall be $40.

E. Commencing July 1, 1995, the Department of Professional and Occupational Regulation will institute a program of issuing tradesmen's cards. Those tradesmen who hold valid tradesmen cards issued by local governing bodies prior to July 1, 1978, or by the Department of Housing and Community Development prior to July 1, 1995, must replace the old cards with new cards issued by the Board for Contractors.

In order to obtain the tradesman card issued by the Board for Contractors, the individual must use the current application form provided by the Department of Professional and Occupational Regulation. The fee for card exchange application and processing is $10. As a matter of administrative necessity, the department will assign expiration dates in a manner that will stagger renewals for these applicants. Once the initial period ends, all renewals will be for a period of 24 months.

F. Commencing July 1, 1998, the Department of Professional and Occupational Regulation will institute a voluntary program of issuing backflow prevention device worker certification cards. Those individuals who hold valid backflow prevention device worker certifications issued by local governing bodies or the Virginia Department of Health prior to that date may replace those cards with new cards issued by the board.

In order to obtain the backflow prevention device worker certification card issued by the board, the individual must use the current application form provided by the department. The fee for the card exchange application and processing is $10. The term of certification will be for a period of 24 months.

G. Backflow prevention device worker certification through the "grandfather" clause of § 54.1-1131 B 2 of the Code of Virginia. The fee for an initial certification shall be $40.

*H. Commencing on the effective date of the board's final regulations, the Department of Professional and Occupational Regulation will add the trades of liquefied petroleum gas fitter and natural gas fitter provider to the trades regulated by the Board for Contractors. The fee for the initial licensure shall be $40.*

## Proposed Regulations

**18 VAC 50-30-200. Professional education.**

A. Pursuant to § 54.1-1130 of the Code of Virginia, unless certified through exemption, candidates for licensure as journeymen are required to (i) complete 240 hours classroom hours of tradesman educational courses in their specialty *or 80 classroom hours of training for liquefied petroleum gas fitters and natural gas fitter providers* and four years of practical experience in the trade for which licensure is desired to qualify to sit for the licensing examination, (ii) have an associate degree or a certificate of completion from at least a two-year program in a trade-related field from an accredited community college or technical school as evidenced by a transcript from the educational institution and two years of practical experience in the trade for which licensure is desired, or (iii) have a bachelor's degree received from an accredited college or university in an engineering curriculum related to the trade and one year of practical experience in the trade for which licensure is desired (see Part II, 18 VAC 50-30-20 et seq., of this chapter).

Tradesman courses must be completed through accredited colleges, universities, junior and community colleges; adult distributive, marketing and formal vocational training as defined in this chapter; Virginia Apprenticeship Council programs; or proprietary schools approved by the Virginia Department of Education.

B. Backflow prevention device worker courses must be completed through schools approved by the board. The board accepts the American Society of Sanitary Engineers' (ASSE) standards for testing procedures. Other programs could be approved after board review. The board requires all backflow training to include instruction in a wet lab.

---

NOTICE: The forms used in administering 18 VAC 50-30-10 et seq., Tradesman Rules and Regulations are not being published due to the number of pages; however, the name of each form is listed below. The forms are available for public inspection at the Board for Contractors, 3600 W. Broad Street, Richmond, Virginia, or at the office of the Registrar of Regulations, General Assembly Building, 2nd Floor, Richmond, Virginia.

---

FORMS

Tradesman License Application, 2710LIC (~~6/98~~ *rev. 5/01*).

Backflow Prevention Device Worker Certification Application, 2710BPD (~~6/98~~ *rev. 10/99*).

~~Backflow Prevention Device Worker Certification Experience Reference Form, 2710BEXP (6/98).~~

Complaint Form (rev. ~~7/98~~ *8/00*).

VA.R. Doc. No. R01-11; Filed May 1, 2001, 2:24 p.m.

◆ ▬▬▬▬▬▬▬▬▬▬▬ ◆

# FINAL REGULATIONS

For information concerning Final Regulations, see Information Page.

**Symbol Key**

Roman type indicates existing text of regulations.  *Italic type* indicates new text.  Language which has been stricken indicates
text to be deleted.  [Bracketed language] indicates a change from the proposed text of the regulation.

## TITLE 4.  CONSERVATION AND NATURAL RESOURCES

### MARINE RESOURCES COMMISSION

REGISTRAR'S NOTICE:   The following regulations filed by the Marine Resources Commission are exempt from the Administrative Process Act in accordance with § 9-6.14:4.1 F of the Code of Virginia; however, the commission is required to publish the full text of final regulations.

Title of Regulation: **4 VAC 20-40-10 et seq.  Pertaining to Crab Catch Limits (amending 4 VAC 20-40-20).**

Statutory Authority: § 28.2-201 of the Code of Virginia.

Effective Date: May 1, 2001.

Summary:

*The amendment revises the lawful catch limit for the crab dredge fishery.*

Agency Contact:  Copies of the regulation may be obtained from Deborah R. Cawthon, Marine Resources Commission, P.O. Box 756, Newport News, VA 23607, telephone (757) 247-2248.

**4 VAC 20-40-20. Catch limit.**

During the lawful crab dredge season, no one boat shall take or catch more than ~~20~~ *17* barrels of crabs in any one day. Each barrel shall be a regular crab barrel not more than level full.

VA.R. Doc. No. R01-180; Filed May 1, 2001, 3:18 p.m.

* * * * * * * *

Title of Regulation: **4 VAC 20-270-10 et seq.  Pertaining to Crabbing (amending 4 VAC 20-270-40).**

Statutory Authority: § 28.2-201 of the Code of Virginia.

Effective Date: May 1, 2001.

Summary:

*The amendment establishes a prohibition against all commercial crab pot and peeler pot activities during Wednesdays, from June 6 through August 22, 2001.*

Agency Contact:  Copies of the regulation may be obtained from Deborah R. Cawthon, Marine Resources Commission, P.O. Box 756, Newport News, VA 23607, telephone (757) 247-2248.

**4 VAC 20-270-40. Season limits.**

A. It shall be unlawful for any person to knowingly place, set, fish or leave any hard crab pot or peeler crab pot in any tidal waters of Virginia from December 1 through March 31.

*B. It shall be unlawful for any person using crab pot or peeler pot to engage in any commercial crabbing activities, including the placing, setting, moving, baiting or fishing of crab pots or peeler pots, during any Wednesday, from June 6 through August 22.*

~~B.~~ *C.* It shall be unlawful for any person to knowingly place, set, fish or leave any fish pot in any tidal waters from March 27 through March 31, except as provided in subdivisions 1 and 2 of this subsection.

1. It shall be lawful for any person to place, set, or fish any fish pot in those waters located upriver of the following boundary lines:

a. In the James River the boundary shall be a line connecting Hog Point and the downstream point at the mouth of College Creek.

b. In the York River the boundary lines shall be the Route 33 bridges at West Point.

c. In the Rappahannock River the boundary line shall be the Route 360 bridge at Tappahannock.

2. This subsection shall not apply to lawful eel pots as described in 4 VAC 20-500-50.

VA.R. Doc. No. R01-181; Filed May 1, 2001, 3:18 p.m.

* * * * * * * *

Title of Regulation: **4 VAC 20-450-10 et seq.  Pertaining to the Taking of Bluefish (amending 4 VAC 20-450-30).**

Statutory Authority: § 28.2-201 of the Code of Virginia.

Effective Date: May 1, 2001.

Summary:

*The amendment revises the annual bluefish landing quota.*

Agency Contact:  Copies of the regulation may be obtained from Deborah R. Cawthon, Marine Resources Commission, P.O. Box 756, Newport News, VA 23607, telephone (757) 247-2248.

**4 VAC 20-450-30. Commercial landings quota.**

A. During the period of January 1, ~~1995,~~ through December 31, ~~1995,~~ commercial landings of bluefish shall be limited to ~~013,788~~ *1,138,412* pounds.

B. When it is projected that 95% of the commercial landings quota has been realized, a notice will be posted to close

# Final Regulations

commercial harvest and landings from the bluefish fishery within five days of posting.

C. It shall be unlawful for any person to harvest or land bluefish for commercial purposes after the closure date set forth in the notice described in subsection B of this section.

VA.R. Doc. No. R01-182; Filed May 1, 2001, 3:18 p.m.

* * * * * * * *

Title of Regulation: **4 VAC 20-670-10 et seq. Pertaining to Recreational Gear Licenses (adding 4 VAC 20-670-25).**

Statutory Authority: § 28.2-201 of the Code of Virginia.

Effective Date: May 1, 2001.

Summary:

*The amendment establishes a harvest limit, where previously there were no harvest limits.*

Agency Contact: Copies of the regulation may be obtained from Deborah R. Cawthon, Marine Resources Commission, P.O. Box 756, Newport News, VA 23607, telephone (757) 247-2248.

*4 VAC 20-670-25. Harvest limits.*

*It shall be unlawful for any person licensed to use recreational crab pot, recreational crab trap or recreational ordinary crab trotline, as described in 4 VAC 20-670-20, to take or possess more than one bushel of hard crabs and two dozen peeler crabs, in any one day, for personal use.*

VA.R. Doc. No. R01-183; Filed May 1, 2001, 3:16 p.m.

* * * * * * * *

Title of Regulation: **4 VAC 20-910-10 et seq. Pertaining to Scup (Porgy) (amending 4 VAC 20-910-45).**

Statutory Authority: § 28.2-201 of the Code of Virginia.

Effective Date: May 1, 2001.

Summary:

*The amendment revises the May 1 through October 31 harvest and landing limits for scup.*

Agency Contact: Copies of the regulation may be obtained from Deborah R. Cawthon, Marine Resources Commission, P.O. Box 756, Newport News, VA 23607, telephone (757) 247-2248.

**4 VAC 20-910-45. Possession limits and harvest quotas.**

A. During the period January 1 through April 30 of each year, it shall be unlawful for any person to possess aboard any vessel or to land in Virginia more than 10,000 pounds of scup; except when it is projected and announced that 85% of the coastwide quota for this period has been landed, it shall be unlawful for any person to possess aboard any vessel or to land in Virginia more than 1,000 pounds of scup.

B. During the period November 1 through December 31 of each year, it shall be unlawful for any person to possess aboard any vessel or to land in Virginia more than 500 pounds of scup; except when it is announced that 50% of the coastwide quota for this period has been taken, it shall be unlawful for any person to possess aboard any vessel or land in Virginia more than 200 pounds of scup, until such time that the coastwide quota for this period has been reached.

C. During the period May 1 through October 31 of each year, the commercial harvest and landing of scup in Virginia shall be limited to 2,149 *2,774* pounds.

D. For each of the time periods set forth in this section, the Marine Resources Commission will give timely notice to the industry of calculated poundage possession limits and quotas and any adjustments thereto. It shall be unlawful for any person to possess or to land any scup for commercial purposes after any winter period coastwide quota or summer period Virginia quota has been attained and announced as such.

E. It shall be unlawful for any buyer of seafood to receive any scup after any commercial harvest or landing quota has been attained and announced as such.

F. It shall be unlawful for any person fishing with hook and line, rod and reel, spear, gig or other recreational gear to possess more than 50 scup. When fishing is from a boat or vessel where the entire catch is held in a common hold or container, the possession limit shall be for the boat or vessel and shall be equal to the number of persons on board legally eligible to fish multiplied by 50. The captain or operator of the boat or vessel shall be responsible for any boat or vessel possession limit. Any scup taken after the possession limit has been reached shall be returned to the water immediately.

VA.R. Doc. No. R01-184; Filed May 1, 2001, 3:16 p.m.

◆ ━━━━━━━━━━━━━━━━━━━━━ ◆

## TITLE 5. CORPORATIONS

### STATE CORPORATION COMMISSION

REGISTRAR'S NOTICE: The State Corporation Commission is exempt from the Administrative Process Act in accordance with § 9-6.14:4.1 A 2 of the Code of Virginia, which exempts courts, any agency of the Supreme Court, and any agency which by the Constitution is expressly granted any of the powers of a court of record.

Title of Regulation: **5 VAC 5-10-10 et seq. State Corporation Commission Rules of Practice and Procedure (REPEALED).**

Title of Regulation: **5 VAC 5-20-10 et seq. State Corporation Commission Rules of Practice and Procedure.**

Statutory Authority: §§ 12.1-13 and 12.1-25 of the Code of Virginia.

Effective Date: June 1, 2001.

Summary:

*The amended rules repeal the existing State Corporation Commission Rules of Practice and Procedure (5 VAC 5-10-10 et seq.) in their entirety and promulgate revised State*

# Final Regulations

*Corporation Commission Rules of Practice and Procedure (5 VAC 5-20-10 et seq.). The revised rules include general provisions relating to applicability and good faith pleading and practice, provisions related to the commencement of formal proceedings, procedures in formal proceedings, and discovery and hearing preparation procedures.*

<u>Agency Contact:</u> Interested persons with questions should contact William H. Chambliss, General Counsel, Office of General Counsel, State Corporation Commission, P.O. Box 1197, Richmond, Virginia 23218, telephone (804) 371-9671. Copying costs are $1.00 for the first two pages and 50¢ for each page thereafter.

AT RICHMOND, APRIL 30, 2001.

COMMONWEALTH OF VIRGINIA <u>ex rel:</u>

STATE CORPORATION COMMISSION

CASE NO. CLK000311

<u>Ex Parte</u>: In the matter concerning revised State Corporation Commission Rules of Practice and Procedure

<u>FINAL ORDER PROMULGATING STATE CORPORATION</u>

<u>COMMISSION RULES OF PRACTICE AND PROCEDURE</u>

In 1974, the State Corporation Commission ("Commission") issued its Rules of Practice and Procedure ("Rules"), now codified at 5 VAC 5-10-10 et seq. The Commission revised its Rules by Order dated June 12, 1986, in Case No. CLK860572.[1] Since 1974 and 1986, many changes have occurred in the industries and businesses subject to the regulatory authority of the Commission, including the introduction of competitive forces in the establishment of rates and provision of services formerly established by economic regulation, or the increased interest in reliance on these market forces.

By Order entered on July 18, 2000, the Commission issued a proposed, revised version of the Rules ("Proposed Rules") and invited interested parties to comment on and suggest modifications or supplements to, or request hearing on, the Proposed Rules. The Proposed Rules were published in the Virginia Register of Regulations and were made available in the Clerk of the Commission's office, as well as on the Commission's website. Interested parties were given until September 22, 2000, to file comments, proposals, or requests with the Clerk of the Commission.

Nine parties submitted comments on September 22, 2000.[2] The parties submitting comments were AEP-VA ("AEP"),

AT&T Communications of Virginia, Inc. ("AT&T"), Columbia Gas of Virginia, Inc. ("Columbia Gas"), Cox, Old Dominion Electric Cooperative and the Virginia, Maryland & Delaware Association of Electric Cooperatives ("Coops"), the Office of the Attorney General, Division of Consumer Counsel ("AG"), Verizon, Virginia Electric and Power Company ("Virginia Power"), and Washington Gas Light Company ("Washington Gas"). AEP was the only party to request a hearing to permit oral argument on the Rules, although the other parties submitted revisions and most expressed a desire to participate if a hearing were held.

On November 28, 2000, the Commission entered its Order Setting Matter for Hearing in this proceeding. The Commission determined that the issues to be decided were purely legal in nature. As a result, the Commission scheduled this matter for January 9, 2001, for the purpose of hearing legal argument on the Proposed Rules and comments thereto. The Commission further ordered the parties and Staff to meet and attempt to narrow the issues. Prior to the hearing, the parties and Staff met and greatly narrowed the issues in controversy. These collaborative efforts resulted in additional modifications to the Proposed Rules, which were considered by all parties and the Commission at the hearing.

The Commission convened a hearing on this matter on January 9, 2001. All parties who submitted comments, as well as Staff, appeared by counsel at the hearing. The transcript of the proceedings was filed on January 29, 2001.

NOW THE COMMISSION, upon consideration of the evidentiary record, arguments, and the applicable law, is of the opinion and finds that the Rules set out in Attachment A hereto should be adopted, effective June 1, 2001.[3] The Commission has considered all of the comments, revisions, argument of the parties, and the law applicable to these Rules in making its determination in this matter. As the market and regulatory environment changes, it is the Commission's hope that these Rules will be flexible enough to embrace these developments, while continuing to retain the hallmarks of due process and fair dealing that have been a tradition at the Commission. The Commission commends the parties and Staff for narrowing the issues in dispute prior to the start of the hearing. This successful collaborative effort has greatly improved the Rules.

While it is not necessary for us to comment on each and every rule where we have made changes, several Rules that were the subject of some controversy or were substantially revised since the inception of this proceeding require discussion.

RULE 50[4]

At the hearing, it was noted that § 12.1-30.1 of the Code of Virginia specifically provides that the Commissioners are responsible for notifying the parties of a requested ex parte

---

[1] Commonwealth of Virginia, At the relation of the State Corporation Commission, Ex Parte: In the Matter of revising the Rules of Practice and Procedure of the State Corporation Commission.

[2] Cox Virginia Telcom, Inc. ("Cox") submitted revised comments on September 29, 2000, which were identical to the comments Cox filed on September 22, 2000, except that one item was omitted from the September 29, 2000, filing. No party objected to Cox's revision, and the Commission has considered Cox's September 29, 2000, comments as part of its deliberations on the Rules.

[3] The new Rules will not, however, negate the provisions of any order entered prior to the effective date of these Rules.

[4] For convenience, each Rule discussed will be referred to in this short form. The full citation for the Rule is 5 VAC 5-20-50.

# Final Regulations

consultation by another party, as well as providing other parties the opportunity to participate.[5] While no parties suggested that the existing rule[6] was not working, the language of § 12.1-30.1 of the Code of Virginia is mandatory.[7] The Commission is therefore altering Rule 50 to track nearly verbatim the last sentence of § 12.1-30.1 of the Code of Virginia.

RULE 60

One of the contested issues at the hearing was what restrictions on ex parte contact with the Commissioners and Hearing Examiners during pending formal proceedings should be applicable to the Commission Staff. All parties agree that the Staff is in a different position than the other participants. Most parties appeared satisfied with the present situation and several stated specifically that the present rule should continue.[8] Two parties, AEP and the Coops, argued in their comments as well as at the hearing that the Staff should be treated as a party and be subject to the same restrictions and obligations as parties.[9] AEP's and the Coops' written comments went even further in advocating that the Staff be treated as a party.

AEP urged that the ex parte contact prohibition apply in a limited way to the Staff. Specifically, AEP's proposed prohibition would not apply to the entire Staff, but only to the particular individuals who are involved in preparing and presenting testimony on a specific topic.[10] AEP asserted that this bar would not apply to the directors of the different divisions, or to Staff counsel, but only to the individuals "most directly involved in disputed topics and disputed issues of fact and law before the Commission."[11]

The Coops argued, as a first step, for the creation of a Chinese wall between the Staff member most directly involved in the proceeding and the Commissioners or Hearing Examiner. This prohibition would also apply to Staff counsel assigned to the case.[12]

AEP and the Coops did not cite any legal support for their position, but instead argued that, at least in some cases, there was an appearance of unfairness in the failure to prohibit Staff from communicating with the Commissioners regarding a pending proceeding.

---

[5] Tr. at 33-34.

[6] Rule 4:13.

[7] "The rules shall provide, among other provisions, that no commissioner shall consult with any party or any person acting on behalf of any party with respect to such proceeding without giving adequate notice and opportunity for all parties to participate."

[8] See Tr. at 42 (Virginia Power); 42-43 (AG); 43-44 (Verizon); 45 (AT&T).

[9] AEP and the Coops also argued that the Staff should be subject to the same discovery obligations as other parties.

[10] Tr. at 47.

[11] Tr. at 48.

[12] Tr. at 52.

The Commission certainly wishes to avoid the appearance of impropriety, but the practical and legal difficulties inherent in AEP's and the Coops' position are readily apparent. Putting aside the legal and statutory issues,[13] two practical problems exist with AEP's and the Coops' proposed solutions to this issue. First, it is very difficult to draw a bright line between those who would be permitted to communicate with the Commissioners and those who would be prohibited. For example, there may be multiple individuals with varying degrees of knowledge of a particular case who could be affected by an ex parte bar. Would the Staff person be permitted to communicate with the Division Director, who is required to be knowledgeable of ongoing cases, or would the ex parte bar prohibit the Division Director from advising the Commissioners as to any information learned from the employee behind the Chinese wall? This leads to the second issue.

It appears that additional Staff would be required to support separate advisory and advocacy roles.[14] In some cases, more than one member of the Staff is involved in preparing for and testifying in a given case. If these Staff members were prohibited from communicating with the Commissioners, the Commissioners would be without advice on complex technical matters unless additional advisory Staff resources were procured. These advisory Staff members would need to be as knowledgeable as the Staff members testifying in the proceeding and trying the case.

Furthermore, the record is devoid of any evidence, anecdotal or otherwise, to support the view that there are, in fact, improper ex parte Staff communications occurring which result in violations of due process or fair dealing. AEP expressly disavowed the existence of such problems.[15] For all of these reasons, the Commission will adopt Rule 60 without the changes suggested by AEP and the Coops. We note that Rule 60 does include ex parte limits on the

---

[13] The General Assembly has recognized implicitly in § 12.1-30.1 of the Code of Virginia that the Staff and parties are not the same. Both the title of the statute, and more importantly, the text, of § 12.1-30.1 of the Code of Virginia refer to the parties "or" the Staff. Indeed, if the Staff was to be treated as the equivalent of a party, there would be no need to refer to "the staff" at all.
Another statute legally supporting the present structure is § 12.1-18 of the Code of Virginia. That section provides for the appointment by the Commission of the various assistants and "such other subordinates and employees. . . all of whom shall serve at the pleasure of the Commission." It is plain from this language that the Staff is an extension of, and accountable to, the Commission, which places the Staff in a fundamentally different position from other parties. Neither AEP nor the Coops has addressed how the Staff could be accountable and responsive to the Commission in accordance with this statutory mandate, and yet be isolated behind a Chinese wall and prohibited from communicating with the Commission regarding a pending proceeding. Such isolation by a portion of the Staff does not appear to be contemplated by the plain language of § 12.1-18 of the Code of Virginia.

[14] See Tr. at 42-43, 57, and 67-70.

[15] See Tr. at 55. The Coops argued that ". . . we've run into more situations where we have the feeling that Staff is advocating a role rather than just the feeling of the public interest where issues are raised purely by Staff." Tr. at 72.

---

## Final Regulations

Commission and Staff designed to protect due process and fair dealing. Specifically, Rule 60 provides that:

> [N]o facts nor legal arguments likely to influence a pending formal proceeding and not of record in that proceeding shall be furnished ex parte to any commissioner or hearing examiner by any member of the commission staff.

RULE 80

In the final version of this rule, the Commission is eliminating from the Rule discussed at the hearing the sentence that read, "[t]he commission may, at its discretion, permit cross-examination of public witness testimony, and may limit public witness testimony if it appears that the testimonies of the witnesses will be substantially similar, or for other good cause." The Commission continues to believe that public witnesses may be cross-examined like any other witness. Furthermore, the Commission deems this sentence unnecessary to establish the proposition that the Commission has the inherent power to control proceedings in its own courtroom and maintain proper decorum therein.

RULES 260 & 270

Two primary issues need to be addressed in these rules. First is the suggestion that Staff should be subject to the same discovery obligations as parties. The Commission will provide two new avenues for parties to obtain additional information concerning the Staff's position in certain cases, as well as the basis for the Staff's position.[16] Rules 260 and 270 provide this newly established avenue of discovery for parties.

Pursuant to Rule 270, in actions pursuant to Rule 80 A, the Staff must compile and file with the Clerk of the Commission three copies of any workpapers that support the recommendations made in its testimony or report. These workpapers will be made available for public inspection and copying during regular business hours.

The Commission has made one addition to Rule 260 pertaining to the filing of workpapers by Staff, which is directed in Rule 270. The first paragraph of Rule 260 has been amended to permit parties to discover factual information that supports the workpapers submitted by the Staff to the Clerk of the Commission pursuant to Rule 270. This was suggested by one of the parties,[17] and would further enhance the new obligation on the Staff in Rule 270.

The second issue in Rule 260 involves the interplay of the last two paragraphs. While current Rule 6:4[18] contains similar language to Rule 260 as discussed at the hearing, the parties were unable to reconcile the apparent conflict between the two paragraphs regarding the shifting of the burden on the

inquiring party if the burden of deriving or ascertaining the response is substantially the same, and the apparent shielding of this same information as possible work product in the last paragraph. For this reason, the Commission has eliminated the last paragraph of Rule 260 as discussed at the hearing.[19] The work product doctrine, like any other objection not specifically mentioned in the Rules of Practice and Procedure, remains viable in Commission practice.

Accordingly, IT IS ORDERED THAT:

(1) The current Rules of Practice and Procedure, as set forth in 5 VAC 5-10-10 through 5 VAC 5-10-620 should be, and they are hereby, REPEALED, effective as of June 1, 2001;

(2) The new Rules of Practice and Procedure, as set forth in 5 VAC 5-20-10 through 5 VAC 5-20-280, attached to this order as Attachment A, should be, and they are hereby, ADOPTED, effective as of June 1, 2001;

(3) A copy of this Order and the Rules adopted herein shall be forwarded to the Virginia Register of Regulations for publication; and

(4) This case shall be dismissed from the Commission's docket of active proceedings, and the papers filed herein shall be placed in the Commission's file for ended causes.

AN ATTESTED COPY HEREOF shall be sent by the Clerk of the Commission to:  John F. Dudley, Senior Assistant Attorney General & Chief, Division of Consumer Counsel, Office of the Attorney General, 900 East Main Street, Richmond, Virginia 23219; James C. Dimitri, Esquire, McGuireWoods LLP, Counsel to Virginia Electric and Power Company, One James Center, 901 East Cary Street, Richmond, Virginia 23219-4030; Richard D. Gary, Esquire, Hunton & Williams, Counsel to Verizon, Riverfront Plaza, East Tower, 951 Byrd Street, Richmond, Virginia 23219-4074; Wilma R. McCarey, Esquire, General Attorney and Government Affairs Vice President, AT&T Communications of Virginia, Inc., Room 3-D, 3033 Chain Bridge Road, Oakton, Virginia 22185; Donald R. Hayes, Senior Attorney, Washington Gas Light Company, 1100 H Street, N.W., Washington, D.C. 20080; Kodwo Ghartey-Tagoe, Esquire, McGuireWoods LLP, Counsel to Columbia Gas of Virginia, Inc., One James Center, 901 East Cary Street, Richmond, Virginia 23219-4030; John W. Montgomery, Jr., Esquire, Counsel to Cox Virginia Telcom, Inc., 4900 Cutshaw Avenue, Suite 200, Richmond, Virginia 23230; John A. Pirko, Esquire, LeClair Ryan, P.C., Counsel to Old Dominion Electric Cooperative and the Virginia, Maryland & Delaware Association of Electric Cooperatives, Innsbrook Corporate Center, 4201 Dominion Boulevard, Suite 200, Glen Allen, Virginia 23060; Michael J. Quinan, Esquire, Woods, Rogers & Hazlegrove, Counsel to AEP-VA, 823 East Main Street, Suite 1200, Richmond, Virginia 23209; Robert M. Gillespie, Esquire, Christian & Barton, 909 East Main Street, Suite 1200, Richmond, Virginia 23219; Donald G. Owens, Esquire, Troutman, Sanders, Mays and Valentine, 1111 East Main

---

[16] In addition, Rule 280 A provides that, in investigative, disciplinary, penal, and other adjudicatory proceedings, upon written motion of the defendant, the Commission shall provide the defendant with access to certain statements of the defendant within the custody, possession, or control of Commission Staff.

[17] See Comments of Verizon filed September 22, 2000, in Case No. CLK000311 at 9-10.

[18] Rule 5 VAC 5-10-480.

[19] "Interrogatories or document requests that solicit answers requiring the assembling or preparation of information that might reasonably be considered original work product are subject to objection."

# Final Regulations

Street, P.O. Box 1122, Richmond, Virginia 23218-1122; and the Commission's Office of General Counsel.

*CHAPTER 20.*
*STATE CORPORATION COMMISSION RULES OF PRACTICE AND PROCEDURE.*

*PART I.*
*GENERAL PROVISIONS.*

**5 VAC 5-20-10.  Applicability.**

*The State Corporation Commission Rules of Practice and Procedure are promulgated pursuant to the authority of § 12.1-25 of the Code of Virginia and are applicable to the regulatory and adjudicatory proceedings of the State Corporation Commission except where superseded by more specific rules for particular types of cases or proceedings.* [*When necessary to serve the ends of justice in a particular case,* ] *the commission may grant* [ *,* ] *upon motion or its own initiative* [ *,* ] *a waiver or modification of any of the provisions of the rules, except 5 VAC 5-20-220, under terms and conditions and to the extent it deems appropriate.  These rules* [ ~~have no application~~ *do not apply* ] *to the internal administration or organization of the commission in matters such as the procurement of goods and services, personnel actions, and similar issues, nor to matters* [ ~~finally determined by administrative action of~~ ] *that are being handled administratively by* ] *a division or bureau of the commission.*

**5 VAC 5-20-20.   Good faith pleading and practice** [ ~~;~~ ~~sanctions~~ ].

*Every pleading, written motion, or other paper presented for filing by a party represented by an attorney shall be signed by at least one attorney of record in* [ ~~his~~ *the attorney's* ] *individual name, and the attorney's mailing address and telephone number, and where available, telefax number and email address, shall be stated.* [ ~~A party who is~~ *An individual* ] *not represented by an attorney shall sign* [ ~~his~~ *the individual's* ] *pleading, motion, or other paper and* [ *shall* ] *state* [ ~~his~~ *the individual's* ] *mailing address and telephone number.* [ ~~In the case of a business entity, each signature shall be that of a qualified officer or agent.~~ *A partnership not represented by an attorney shall have a partner sign the partnership's pleading, motion, or other paper, and shall state the partnership's mailing address and telephone number.  A nonlawyer may only represent the interests of another before the commission in the presentation of facts, figures, or factual conclusions, as distinguished from legal arguments or conclusions.  In the case of an individual or entity not represented by counsel, each signature shall be that of a qualified officer or agent.* ] *The pleadings need not be under oath unless so required by statute.* [ *The commission may provide, by order, a manner for acceptance of electronic signatures in particular cases.* ]

*The signature of an attorney or party constitutes a certification* [ ~~by him~~ ] *that (i)* [ ~~he~~ *the attorney or party* ] *has read the pleading, motion, or other paper; (ii) to the best of* [ ~~his~~ *the attorney's or party's* ] *knowledge, information, and belief formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and (iii) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the*

*cost of litigation.  A pleading, written motion, or other paper will not be accepted for filing by the Clerk of the Commission if not signed.*

*An oral motion made by an attorney or party in a commission proceeding constitutes a representation* [ ~~by him~~ ] *that* [ *the motion* ] *(i)* [ ~~it~~ ] *is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law* [ *;* ] *and (ii)* [ ~~it~~ ] *is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.*

[ ~~If a pleading, motion, or other paper is signed or made in violation of this rule, the commission may impose an appropriate sanction upon the person who signed the paper or made the motion, the party that the person represents, or both.~~ ]

**5 VAC 5-20-30.  Counsel.**

[ *Except as otherwise provided in 5 VAC 50-20-20,* ] *no person other than a properly licensed attorney at law shall* [ *file pleadings or papers or appear at a hearing to* ] *represent the interests of* [ ~~a~~ *another* ] *person or entity before the commission* [ ~~, other than in the presentation of facts, figures, or factual conclusions which are distinguished from legal conclusions.  An officer or director of a corporation may make factual presentations on behalf of the corporation~~ ].  *An attorney admitted to practice in another jurisdiction, but not licensed in Virginia, may be permitted to appear in a particular proceeding pending before the commission in association with a member of the Virginia State Bar.  The Virginia State Bar member will be counsel of record for every purpose related to the conduct and disposition of the proceeding.*

[ *In all appropriate proceedings before the commission, the Division of Consumer Counsel, Office of the Attorney General, may appear and represent and be heard on behalf of consumers' interests, and investigate matters relating to such appearance, and otherwise may participate to the extent reasonably necessary to discharge its statutory duties.* ]

**5 VAC 5-20-40.   Photographs and broadcasting of proceedings.**

*Electronic media and still photography coverage of commission hearings will be allowed at the discretion of the commission.*

**5 VAC 5-20-50.   Consultation by parties with commissioners** [ *and hearing examiners* ].

*No* [ *commissioner or hearing examiner shall consult with any* ] *party* [ ~~,~~ *or any person acting on behalf of any party* [ ~~, may communicate ex parte with any commissioner~~ ] *with respect to* [ ~~the merits of any proceeding~~ *a* ] *pending* [ ~~before the commission~~ *formal proceeding without giving adequate notice and opportunity for all parties to participate* ].

**5 VAC 5-20-60.  Commission staff.**

*The commissioners* [ *and hearing examiners* ] *shall be free at all times to confer with any member of the commission staff.  However, no facts* [ *or legal arguments* ] *likely to influence a pending formal proceeding and not of record in that proceeding shall be furnished ex parte to any commissioner*

# Final Regulations

[ or hearing examiner ] by any member of the commission staff.

### 5 VAC 5-20-70. Informal complaints.

All correspondence and informal complaints shall be referred to the appropriate division or bureau of the commission. The head of the division or bureau receiving this correspondence or complaint shall attempt to resolve the matter presented. Matters not resolved [ to the satisfaction of all participating parties ] by the informal [ proceeding process ] may be reviewed by the full commission upon the proper filing of a formal proceeding in accordance with the rules [ by any party to the informal process ].

PART II.
COMMENCEMENT OF FORMAL PROCEEDINGS.

### 5 VAC 5-20-80. Regulatory proceedings.

A. Application. Except where otherwise provided by statute, [ rule or commissioner order, ] a person or entity seeking to engage in an industry or business subject to the commission's regulatory control, or to make changes in any previously authorized service, rate, facility, or other aspect of such industry or business [ that, by statute or rule, must be approved by the commission ], shall file an application requesting authority to do so. The application shall contain (i) a specific statement of the action sought; (ii) a statement of the facts that the applicant is prepared to prove that would warrant the action sought; (iii) a statement of the legal basis for such action; and (iv) any other information required by law or regulation. Any person or entity filing an application shall be a party to that proceeding.

B. Participation as a respondent. A notice of participation as a respondent is the proper initial response to an application. A notice of participation shall be filed within the time prescribed by the commission and shall contain (i) a precise statement of the interest of the respondent; (ii) a statement of the specific action sought [ to the extent then known ]; and (iii) the factual and legal basis for the action. Any person or entity filing a notice of participation as a respondent shall be a party to that proceeding. [ The Division of Consumer Counsel, Office of the Attorney General, may participate as a respondent in any proceeding. ]

C. Public witnesses. Any person or entity not participating in a matter pursuant to subsection A or B of this section may make known [ his or its their ] position in any regulatory proceeding by filing written comments in advance of the hearing [ if provided for by commission order ] or by attending the hearing, noting an appearance in the manner prescribed by the commission, and giving oral testimony. Public witnesses may not otherwise participate in the proceeding, be included in the service list, or be considered a party to the proceeding. [ The commission may, at its discretion, limit public witness testimony only if it appears that the testimonies of the witnesses will be substantially similar. ]

D. Commission staff. The commission staff may appear and participate in [ fully ] any proceeding [ in order ] to see that pertinent issues on behalf of the general public interest are clearly presented to the commission. The staff may, inter alia, conduct investigations and discovery, evaluate the issues

raised, testify and offer exhibits, file briefs and make argument, and be subject to cross-examination when testifying. Neither the commission staff collectively nor any individual member of the commission staff shall be considered a party to the case for any purpose by virtue of participation in a proceeding.

### 5 VAC 5-20-90. Adjudicatory proceedings.

A. Initiation of proceedings. Investigative, disciplinary, penal, and other adjudicatory proceedings may be initiated by motion of the commission staff or upon the commission's own motion. [ These Further ] proceedings shall be [ commenced controlled ] by the issuance of a rule to show cause [ giving , which shall give ] notice to the defendant, [ stating state ] the allegations against the defendant, [ and setting provide for a response from the defendant and, where appropriate, set ] the matter for hearing. A rule to show cause shall be served in the manner provided by § 12.1-19.1 or § 12.1-29 of the Code of Virginia. The commission staff shall prove the case by clear and convincing evidence.

B. Answer. An answer is the proper initial responsive pleading to a rule to show cause. An answer shall be filed within 21 days of service of the rule to show cause, unless the commission shall order otherwise. The answer shall state, in narrative form, each defendant's responses to the allegations in the rule to show cause and any affirmative defenses asserted by the defendant. Failure to file a timely answer may result in the entry of judgment by default against the party failing to respond.

### 5 VAC 5-20-100. Other proceedings.

A. Promulgation of general orders, rules, or regulations. [ A person seeking initiation of a rulemaking procedure before the commission shall file an application meeting the requirements of 5 VAC 5-20-80-A. ] Before promulgating a general order, rule, or regulation, the commission shall, by order upon an application or upon its own motion, require reasonable notice of the contents of the proposed general order, rule, or regulation, including publication in the Virginia Register of Regulations, and afford interested persons an opportunity to comment, present evidence, and be heard. A copy of each general order, rule, and regulation adopted in final form by the commission shall be filed with the Registrar of Regulations for publication in the Virginia Register of Regulations.

B. Petitions in other matters. Persons having a cause before the commission, whether by statute, rule, regulation, or otherwise, against a defendant, including the commission, a commission bureau, or a commission division, shall proceed by filing a written petition containing (i) the identity of the parties; (ii) a statement of the action sought and the legal basis for the commission's jurisdiction to take the action sought; (iii) a statement of the facts, proof of which would warrant the action sought; (iv) a statement of the legal basis for the action; and (v) a certificate showing service upon the defendant.

Within 21 days of service of a petition under this rule, the defendant shall file an answer containing, in narrative form, (i) a response to each allegation of the petition and (ii) a statement of each affirmative defense asserted by the

# Final Regulations

defendant. Failure to file a timely answer may result in entry of judgment by default against the defendant failing to respond. Upon order of the commission, the commission staff may participate in any proceeding under this rule in which it is not a defendant to the same extent as permitted by 5 VAC 5-20-80 D.

C. Declaratory judgments. Persons having no other adequate remedy may petition the commission for a declaratory judgment. The petition shall meet the requirements of subsection B of this section and, in addition, contain a statement of the basis for concluding that an actual controversy exists [ between the parties ]. In the proceeding, the commission shall by order provide for the necessary notice, responsive pleadings, and participation by [ persons against whom the declaratory judgment is sought interested parties ].

*PART III.*
*PROCEDURES IN FORMAL PROCEEDINGS.*

### 5 VAC 5-20-110. Motions.

Motions may be filed for the same purposes recognized by the courts of record in the Commonwealth. Unless otherwise ordered by the commission, [ a any ] response to a motion must be filed within [ 10 14 ] days of the filing of the motion, and [ a any ] reply by the moving party [ may must ] be filed within [ seven 10 ] days of the filing of the response.

### 5 VAC 5-20-120. Procedure before hearing examiners.

A. Assignment. The commission may, by order, assign a matter pending before it to a hearing examiner. Unless otherwise ordered, the hearing examiner shall conduct all further proceedings in the matter on behalf of the commission in accordance with the rules. In the discharge of his duties, the hearing examiner shall exercise all the adjudicatory powers possessed by the commission including, inter alia, the power to administer oaths; require the attendance of witnesses and parties; require the production of documents; schedule and conduct pre-hearing conferences; admit or exclude evidence; grant or deny continuances; and rule on motions, matters of law, and procedural questions. The hearing examiner shall [ , upon conclusion of all assigned duties, ] issue a written final report and recommendation to the commission at the conclusion of the proceedings.

B. Objections [ and certification of issues ]. An objection to a ruling by the hearing examiner shall be stated with [ reasonable clarity the reasons therefor ] at the time of the ruling, and the objection may be argued to the commission as part of a response to the hearing examiner's report. A ruling by the hearing examiner that denies further participation by a party in interest or the commission staff in a proceeding that has not been concluded may be immediately appealed to the commission by filing a written motion with the commission for review. [Upon the motion of any party or the staff, or upon the hearing examiner's own initiative, ] the hearing examiner may certify any other [ material ] issue to the commission for its consideration and resolution. Pending resolution by the commission of a ruling appealed or certified, the hearing examiner shall retain procedural control of the proceeding.

C. Responses to hearing examiner reports. Unless otherwise ordered by the hearing examiner, responses supporting or objecting to the hearing examiner's final report must be filed within [ 15 21 ] days of the issuance of the report. A reply to a response to the hearing examiner's report may only be filed with leave of the commission. The commission may accept, modify, or reject the hearing examiner's recommendations in any manner consistent with law and the evidence, notwithstanding an absence of objections to the hearing examiner's report.

### 5 VAC 5-20-130. Amendment of pleadings.

[ Amendment of pleadings may be permitted by the commission where the ends of justice so require, upon written motion showing good cause. Responses to amended pleadings may be permitted as directed by the commission. No amendment shall be made to any formal pleading after it is filed except by leave of the commission, which leave shall be liberally granted in the furtherance of justice. The commission shall make such provision for notice and for opportunity to respond to the amended pleadings as it may deem necessary and proper. ]

### 5 VAC 5-20-140. Filing and service.

A formal pleading or other related document shall be considered filed with the commission upon receipt of the original and required copies by the Clerk of the Commission no later than the time established for the closing of business of the clerk's office on the day the item is due. The original and copies shall be stamped by the Clerk [ of the Commission ] to show the time and date of receipt. The commission may by order make provision for electronic filing of documents [ , including facsimile ].

[ When a filing would otherwise be due on a day when the clerk's office is not open for public business, the filing will be timely if made on the next regular business day when the office is open to the public. When a period of 15 days or fewer is permitted to make a filing or take other action pursuant to commission rule or order, intervening weekends or holidays shall not be counted in determining the due date. ]

Service of a formal pleading, brief, or other document filed with the commission required to be served on the parties to a proceeding or upon the commission staff, shall be effected by delivery of a true copy to the party or staff, or by deposit of a true copy into the United States mail properly addressed and stamped, on or before the date of filing. Service on a party may be made by service on the party's counsel. At the foot of a formal pleading, brief, or other document required to be served, the party making service shall append [ either acceptance of service or ] a certificate of counsel of record that copies were mailed or delivered as required. The commission may, by order, provide for electronic [ filing or ] service of documents [ , including facsimile ]. Notices, findings of fact, opinions, decisions, orders, or other paper to be served by the commission may be served by United States mail. However, all writs, processes, and orders of the commission, when acting in conformity with § 12.1-27 of the Code of Virginia, shall be attested and served in compliance with § 12.1-19.1 or § 12.1-29 of the Code of Virginia.

# Final Regulations

### 5 VAC 5-20-150.  Copies and format.

Applications, petitions, responsive pleadings, briefs, and other documents must be filed in an original and 15 copies.  One copy of each responsive pleading or brief must be served on each party and the commission staff counsel assigned to the matter, or, if no counsel has been assigned, on the general counsel.  Each document must be filed on standard size white opaque paper, 8-1/2 by 11 inches in dimension, and must be capable of being reproduced in copies of archival quality.  Pleadings shall be bound or attached on the left side and contain adequate margins.  Each page following the first page must be numbered.  If necessary, a document may be filed in consecutively numbered volumes, each of which may not exceed three inches in thickness.  Pleadings containing more than one exhibit should have dividers separating each exhibit and should contain an index.  Exhibits such as maps, plats, and photographs not easily reduced to standard size may be filed in a different size, as necessary.  All filed documents shall be fully collated and assembled into complete and proper sets ready for distribution and use, without the need for further assembly, sorting, or rearrangement.  The Clerk of the Commission may reject the filing of any document not conforming to the requirements of this rule.

### 5 VAC 5-20-160.  Memorandum of completeness.

With respect to the filing of a rate application or an application seeking [ ~~action~~ actions ], that by statute or rule must be completed within a certain number of days, a memorandum shall be filed by an appropriate member of the commission staff within 10 [ ~~working~~ ] days of the filing of the application stating whether all necessary requirements [ imposed by statute or rule ] for filing the application have been met and all required information has been filed.  If the requirements have not been met, the memorandum shall state with specificity the remaining items to be filed.  The Clerk of the Commission [ immediately ] shall serve a copy of the memorandum on the filing party.  The first day of the period within which action on the application must be concluded shall be set forth in the memorandum and shall be the initial date of filing of applications that are found to be complete upon filing.  Applications found to require supplementation shall be complete upon the date of filing of the last item identified in the staff memorandum. [ Applications shall be deemed complete upon filing if the memorandum of completeness is not timely filed. ]

### 5 VAC 5-20-170.  Confidential information.

A person who proposes in a formal proceeding that information be withheld from public disclosure on the ground that it contains trade secrets, privileged, or confidential commercial or financial information shall file this information under seal with the Clerk of the Commission, [ ~~together with a motion requesting the withholding, accompanied by an affidavit that (i) identifies the information sought to be withheld and the person making the affidavit and (ii) contains a full statement of the reasons forming the basis for the claim that the information should be withheld from public disclosure~~ or otherwise submit the information under seal to the commission staff as may be required ].  One copy of all such information also shall be submitted under seal to the commission staff counsel assigned to the matter, or, where no counsel has been assigned, to the general counsel who, until ordered otherwise by the commission, shall disclose the information only to the members of the commission staff directly assigned to the matter as necessary in the discharge of their duties.  Staff counsel and all members of the commission staff, until otherwise ordered by the commission, shall maintain the information in strict confidence and shall not disclose its contents to members of the public, or to other staff members not assigned to the matter.  The commission staff or any party may object to the proposed withholding of the information.

[ Upon challenge, the filing party shall demonstrate to the satisfaction of the commission that the information should be withheld from public disclosure. ] If the commission determines that the information should be withheld from public disclosure, it may nevertheless require the information to be disclosed to parties to a proceeding under appropriate protective order. [ ~~This rule shall apply to material offered in support of or opposition to the application and to responses and objections to interrogatories and other discovery as practicable.~~

Whenever a document is filed with the clerk under seal, an expurgated or redacted version of the document deemed by the filing party or determined by the commission to be confidential shall be filed with the clerk for use and review by the public.

When the information at issue is not required to be filed or made a part of the record, a party who wishes to withhold confidential information from filing or production may move the commission for a protective order without filing the materials.  In considering such motion, the commission may require production of the confidential materials for inspection in camera, if necessary. ]

### 5 VAC 5-20-180.  Official transcript of hearing.

The official transcript of a hearing before the commission or a hearing examiner shall be that prepared by the court reporters retained by the commission and certified by the court reporter as a true and correct transcript of the proceeding.  Transcripts of proceedings shall not be prepared except in cases assigned to a hearing examiner, when directed by the commission, or when requested by a party desiring to purchase a copy.  Parties desiring to purchase copies of the transcript shall make arrangement for purchase with the court reporter.  When a transcript is prepared, a copy thereof shall be made available for public inspection in the Clerk of the Commission's office. [ ~~Within 15 days of the filing of the transcript, the commission staff or a party who believes the transcript contains substantive errors may propose corrections, in writing, which shall be filed with the Clerk of the Commission, and copies of which shall be served on the court reporter, all parties, and commission staff counsel.  If the court reporter receives no objection to the proposed corrections within 10 days of the filing of the proposed corrections, the reporter will revise the transcript accordingly, and the corrected version will become the official transcript.  A party or the commission staff may object to a proposed correction by filing an objection within seven days of the filing~~

# Final Regulations

*of the proposed correction. If objections are filed, the matter will be resolved by the commission or hearing examiner, as the case may be.* By agreement of the parties, or as the commission may by order provide, corrections may be made to the transcript. ]

**5 VAC 5-20-190. Rules of evidence.**

*In proceedings under 5 VAC 5-20-90, and all other proceedings in which the commission shall be called upon to decide or render judgment only in its capacity as a court of record, the common law and statutory rules of evidence shall be as observed and administered by the courts of record of the Commonwealth. In other proceedings, evidentiary rules shall not be [ unreasonably ] used to prevent the receipt of evidence having substantial probative effect.*

**5 VAC 5-20-200. Briefs.**

*Written briefs may be authorized at the discretion of the commission [ , except in proceedings under 5 VAC 5-20-100 A, where briefs may be filed by right ]. The time for filing briefs and reply briefs, if authorized, shall be set at the time they are authorized. The commission may limit the length of a brief. The commission may by order provide for the electronic filing or service of briefs.*

**5 VAC 5-20-210. Oral argument.**

*The commission may authorize oral argument, limited as the commission may direct, on any pertinent matter at any time during the course of [ the ] proceeding.*

**5 VAC 5-20-220. Petition for rehearing or reconsideration.**

*Final judgments, orders, and decrees of the commission, except judgments prescribed by § 12.1-36 of the Code of Virginia, and except as provided in §§ 13.1-614 and 13.1-813 of the Code of Virginia, shall remain under the control of the commission and subject to modification or vacation for 21 days after the date of entry. [ Except for good cause shown, a petition for rehearing or reconsideration must be filed not later than 20 days after the date of entry of the judgment, order, or decree. The filing of a petition will not suspend the execution of the judgment, order, or decree, nor extend the time for taking an appeal, unless the commission, within the 21-day period following entry of the final judgment, order or decree, shall provide for a suspension in an order or decree granting the petition. ] A petition for rehearing or reconsideration must be [ filed not later than 20 days after the date of entry of this judgment, order, or decree. The filing of a petition will not suspend the execution of the judgment, order, or decree, nor extend the time for taking an appeal, unless the commission, within the 21-day period following entry of the final judgment, order or decree, shall provide for a suspension in an order or decree granting the petition. A petition for rehearing or reconsideration must be delivered to served on ] all parties and [ delivered to ] commission staff counsel on or before the day on which it is filed. The commission will not entertain responses to, or requests for oral argument on, a petition. An order granting a rehearing or reconsideration will be served on all parties and commission staff counsel by the Clerk of the Commission.*

**5 VAC 5-20-230. Extension of time.**

*The commission may, at its discretion, grant a continuance, postponement, or extension of time for the filing of a document or the taking of an action required or permitted by these rules, except for petitions for rehearing or reconsideration filed pursuant to 5 VAC 5-20-220. [ Except for good cause shown, ] motions for extensions shall be made in writing, served on all parties and commission staff counsel, and filed with the commission at least three days prior to the date [ the action sought ] to be extended [ , except for good cause shown is due ].*

PART IV.
DISCOVERY AND HEARING PREPARATION PROCEDURES.

**5 VAC 5-20-240. Prepared testimony and exhibits.**

*Following the filing of an application dependent upon complicated or technical proof, the commission may direct the applicant to prepare and file the testimony and exhibits by which the applicant expects to establish its case. [ Respondents, ] In all proceedings in which an applicant is required to file testimony, [ respondents ] shall be permitted [ and may be directed by the commission or hearing examiner ] to file [ , on or before a date certain, ] testimony and exhibits by which they expect to establish their case [ , as directed by the commission . Any respondent that chooses not to file testimony and exhibits by that date may not thereafter present testimony or exhibits except by leave of the commission, but may fully participate in the proceeding and engage in cross-examination of the testimony and exhibits of commission staff and other parties ]. The commission staff also shall file testimony and exhibits when directed to do so by the commission. Failure to comply with the directions of the commission, without good cause shown, may result in rejection of the testimony and exhibits by the commission. With leave of the commission [ and unless a timely objection is made ], the commission staff or a party may correct or supplement any prepared testimony and exhibits before or during the hearing. In all proceedings, all evidence must be verified by the witness before introduction into the record, and the admissibility of the evidence shall be subject to the same standards as if the testimony were offered orally at hearing [ , unless, with the consent of the commission, the staff and all parties stipulate the introduction of testimony without need for verification ]. An original and 15 copies of prepared testimony and exhibits shall be filed unless otherwise specified in the commission's scheduling order and public notice. Documents of unusual bulk or weight and physical exhibits other than documents need not be filed in advance, but shall be described and made available for pretrial examination.*

**5 VAC 5-20-250. Process, witnesses, and production of documents and things.**

*A. Subpoenas. Commission staff and a party to a proceeding shall be entitled to process, to convene parties, to compel the attendance of witnesses, and to compel the production of books, papers, documents, or things provided in this rule.*

*[ B. ] Commission [ issuance and enforcement of other regulatory agency subpoenas. Upon motion by commission ]*

# Final Regulations

staff counsel [ , the commission ] may [ petition the commission to ] issue and enforce subpoenas at the request of a regulatory agency of another jurisdiction if the activity for which the information is sought by the other agency, if occurring in the Commonwealth, would be a violation of the laws of the Commonwealth that are administered by the commission.

[ A motion requesting the issuance of a commission subpoena shall include:

1. A copy of the original subpoena issued by the regulatory agency to the named defendant;

2. An affidavit of the requesting agency administrator stating the basis for the issuance of the subpoena under that state's laws; and

3. A memorandum from the commission's corresponding division director providing the basis for the issuance of the commission subpoena. ]

[ B. C. ] Documents. [ In a pending case, at the request of commission staff or any party, the Clerk of the Commission shall issue a subpoena. When a matter is under investigation by commission staff, before a formal proceeding has been established, ] whenever it appears to the commission by affidavit filed with the Clerk of the Commission by the commission staff or [ a party to a proceeding an individual ], that a book, writing, document, or thing sufficiently described in the affidavit, is in the possession, or under the control, of an identified person [ not a party to a proceeding nor a member of the commission's staff ] and is material and proper to be produced [ in the proceeding ], the commission [ will may ] order the Clerk of the Commission to issue a subpoena and to have the subpoena duly served, together with an attested copy of the commission's order compelling production at a reasonable place and time as described in the commission's order.

[ C. D. ] Witnesses. [ Subpoenas for witnesses shall be by order of the commission upon motion timely filed with the Clerk of the Commission. The motion, if granted, will be subject to such conditions and restrictions as the commission shall deem proper. In a pending case, at the request of commission staff or any party, the Clerk of the Commission shall issue a subpoena ].

**5 VAC 5-20-260. Interrogatories to parties or requests for production of documents and things.**

The commission staff and a party in a formal proceeding before the commission, other than a proceeding under [ 5 VAC 5-20-80 A 5 VAC 5-20-100 A and C ], may serve written interrogatories [ or requests for production of documents ] upon a party, to be answered by the party served, or if the party served is an entity, by an officer or agent of the entity, who shall furnish to the requesting party information as is known. Interrogatories [ or requests for production of documents ] that cannot be timely answered before the scheduled hearing date may be served only with leave of the commission for good cause shown and upon such conditions as the commission may prescribe. No interrogatories [ or requests for production of documents ] may be served upon a member of the commission staff [ , except to discover factual

information that supports the workpapers submitted by the staff to the Clerk of the Commission pursuant to 5 VAC 5-20-270. All interrogatories and requests for production of documents shall be filed with the Clerk of the Commission ].

The response to each interrogatory [ or document request ] shall [ be signed by identify by name ] the person making the response. Objections, if any, to specified questions shall be stated with specificity, citing appropriate legal authority, and served with the list of responses. Responses and objections to interrogatories [ or requests for production of documents ] shall be served within [ 10 14 ] days of receipt, unless otherwise ordered by the commission. Upon motion promptly made and accompanied by a copy of the interrogatory [ or document request ] and [ the ] response or objection that is subject to the motion, the commission will rule upon the validity of the objection; the objection otherwise will be considered sustained.

Interrogatories [ or requests for production of documents ] may relate to any matter [ , ] not privileged, which is relevant to the subject matter involved, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things, and the identity and location of persons having knowledge of evidentiary value. It is not grounds for objection that the information sought will be inadmissible at the hearing if the information appears reasonably calculated to lead to the discovery of admissible evidence.

Where the response to an interrogatory [ or document request ] may only be derived or ascertained from the business records of the party questioned, from an examination, audit, or inspection of business records, or from a compilation, abstract, or summary of business records, and the burden of deriving or ascertaining the response is substantially the same for one entity as for the other, a response is sufficient if it (i) identifies by name and location all records from which the response may be derived or ascertained [ ; ] and (ii) tenders to the inquiring party reasonable opportunity to examine, audit, or inspect the records subject to objection as to their proprietary or confidential nature. The inquiring party bears the expense of making copies, compilations, abstracts, or summaries.

[ Discovery of original work product or material prepared in anticipation of litigation may not be obtained by a party, unless it is demonstrated that a substantial need exists for the material and that substantially equivalent material cannot be obtained by other means without undue hardship. In ordering such discovery, the commission will prevent disclosure of the mental impressions, conclusions, opinions, or legal theory of an attorney. ]

**5 VAC 5-20-270. Hearing preparation.**

In a formal proceeding, a party or the commission staff may serve on a party a request to examine the workpapers supporting the testimony or exhibits of a witness whose prepared testimony has been filed in accordance with 5 VAC 5-20-240. The movant may [ make request ] abstracts or summaries of the workpapers, and may [ make request ] copies of the workpapers upon payment of the reasonable cost of duplication or reproduction. Copies requested by the

# Final Regulations

commission staff shall be furnished without payment of copying costs. In actions pursuant to 5 VAC 5-20-80 A [ , ] the commission staff, upon the filing of its testimony, exhibits, or report, will compile and file with the Clerk of the Commission three copies of any workpapers that support the recommendations made in its testimony or report. The Clerk of the Commission shall make the workpapers available for public inspection [ and copying ] during regular business hours.

**5 VAC 5-20-280. Discovery in 5 VAC 5-20-90 proceedings.**

The following applies only to proceedings in which a defendant is subject to monetary or injunctive penalties, or revocation, cancellation, or curtailment of a license, certificate of authority, registration, or similar authority previously issued by the commission to the defendant:

1. *Discovery of material in possession of the commission staff.* Upon written motion of the defendant, the commission shall permit the defendant to inspect and, at the defendant's expense, copy or photograph any relevant [ ; (i) ] written or recorded statements, the existence of which is known [ , after reasonable inquiry, ] by the commission staff counsel assigned to the matter to be within the custody, possession, or control of commission staff, made by the defendant, or representatives, or agents of the defendant if the defendant is other than an individual, to a commission staff member or law enforcement officer [ ; and (ii) evidence that might reasonably be considered to be exculpatory of the defendant and which is known by commission staff counsel to be within the custody, possession, or control of the commission staff ].

A motion by the defendant under this rule shall be filed and served at least 10 days before the hearing date. The motion shall include all relief sought. A subsequent motion may be made only upon a showing of cause as to why the motion would be in the interest of justice. An order granting relief under this section shall specify the time, place, and manner of making discovery and inspection permitted, and may prescribe such terms and conditions as the commission may determine.

Nothing in this rule shall require the disclosure of any information, the disclosure of which is prohibited by statute. The disclosure of the results of a commission staff investigation or work product of commission staff counsel shall not be required.

2. *Depositions.* After commencement of an action to which this rule applies, the commission staff or a party may take the testimony of a party or another person or entity, other than a member of the commission staff, by deposition on oral examination or by written questions. Depositions may be used for any purpose for which they may be used in the courts of record of the Commonwealth. Except where the commission or hearing examiner finds that an emergency exists, no deposition may be taken later than 10 days in advance of the formal hearing. The attendance of witnesses at depositions may be compelled by subpoena. Examination and cross-examination of the witness shall be as at hearing. Depositions may be taken in the City of Richmond or in the town, city, or county in which the deposed party resides, is employed, or does business. The

parties and the commission staff, by agreement, may designate another place for the taking of the deposition. Reasonable notice of the intent to take a deposition must be given in writing to the commission staff counsel and to each party to the action, stating the time and place where the deposition is to be taken. A deposition may be taken before any person (the "officer") authorized to administer oaths by the laws of the jurisdiction in which the deposition is to be taken. The officer shall certify his authorization in writing, administer the oath to the deponent, record or cause to be recorded the testimony given, and note any objections raised. In lieu of participating in the oral examination, a party or the commission staff may deliver sealed written questions to the officer, who shall propound the questions to the witness. The officer may terminate the deposition if convinced that the examination is being conducted in bad faith or in an unreasonable manner. Costs of the deposition shall be borne by the party noticing the deposition, unless otherwise ordered by the commission.

3. *Requests for admissions.* The commission staff or a party to a proceeding may serve upon a party written requests for admission. Each matter on which an admission is requested shall be stated separately. A matter shall be deemed admitted unless within 21 days of the service of the request, or some other period the commission may designate, the party to whom the request is directed serves upon the requesting party a written answer addressing or objecting to the request. The response shall set forth in specific terms a denial of the matter set forth or an explanation as to the reasons the responding party cannot truthfully admit or deny the matter set forth. Requests for admission shall be filed with the Clerk of the Commission and simultaneously served on commission staff counsel and on all parties to the matter.

VA.R. Doc. Nos. R00-235 and R00-236; Filed May 1, 2001, 11:26 a.m.

◆ ━━━━━━━━━━━━━━━━ ◆

# TITLE 12.  HEALTH

## DEPARTMENT OF MEDICAL ASSISTANCE SERVICES

REGISTRAR'S NOTICE: The following regulatory action is exempt from the Administrative Process Act in accordance with § 9-6.14:4.1 C 4 (c) of the Code of Virginia, which excludes regulations that are necessary to meet the requirements of federal law or regulations, provided such regulations do not differ materially from those required by federal law or regulation. The Department of Medical Assistance Services will receive, consider and respond to petitions by any interested person at any time with respect to reconsideration or revision.

Title of Regulation: **12 VAC 30-30-10 et seq. Groups Covered and Agencies Responsible for Eligibility Determination (amending 12 VAC 30-30-20).**

Statutory Authority: § 32.1-325 of the Code of Virginia.

# Final Regulations

Effective Date: July 1, 2001.

Summary:

*This regulatory action provides Medicaid coverage to uninsured women under age 65 who have been screened under the Centers for Disease Control and Prevention's Breast and Cervical Cancer Early Detection Program and need treatment for breast or cervical cancer, including pre-cancerous conditions of the breast or cervix.*

Agency Contact: Copies of the regulations may be obtained from Victoria P. Simmons, Regulatory Coordinator, Department of Medical Assistance Services, 600 East Broad Street, Suite 1300, Richmond, VA 23219, telephone (804) 786-7959.

**12 VAC 30-30-20. Optional groups other than the medically needy.**

The Title IV A agency determines eligibility for Title XIX services.

1. Caretakers and pregnant women who meet the income and resource requirements of AFDC but who do not receive cash assistance.

2. Individuals who would be eligible for AFDC, SSI or an optional state supplement as specified in 42 CFR 435.230, if they were not in a medical institution.

3. A group or groups of individuals who would be eligible for Medicaid under the plan if they were in a NF or an ICF/MR, who but for the provision of home and community-based services under a waiver granted under 42 CFR Part 441, Subpart G would require institutionalization, and who will receive home and community-based services under the waiver. The group or groups covered are listed in the waiver request. This option is effective on the effective date of the state's § 1915(c) waiver under which this group(s) is covered. In the event an existing § 1915(c) waiver is amended to cover this group(s), this option is effective on the effective date of the amendment.

4. Individuals who would be eligible for Medicaid under the plan if they were in a medical institution, who are terminally ill, and who receive hospice care in accordance with a voluntary election described in § 1905(o) of the Act.

5. The state does not cover all individuals who are not described in § 1902(a)(10)(A)(i) of the Act, who meet the income and resource requirements of the AFDC state plan and who are under the age of 21.

6. The state does cover reasonable classifications of these individuals as follows:

(1) Individuals for whom public agencies are assuming full or partial financial responsibility and who are:

(a) In foster homes (and are under the age of 21).

(b) In private institutions (and are under the age of 21).

(c) In addition to the group under subdivisions 5 (1) (a) and (b) of this section, individuals placed in foster homes or private institutions by private nonprofit agencies (and are under the age of 21).

(2) Individuals in adoptions subsidized in full or part by a public agency (who are under the age of 21).

(3) Individuals in NFs (who are under the age of 21). NF services are provided under this plan.

(4) In addition to the group under subdivision 6 (3) of this section, individuals in ICFs/MR (who are under the age of 21).

7. A child for whom there is in effect a state adoption assistance agreement (other than under Title IV-E of the Act), who, as determined by the state adoption agency, cannot be placed for adoption without medical assistance because the child has special care needs for medical or rehabilitative care, and who before execution of the agreement:

a. Was eligible for Medicaid under the state's approved Medicaid plan; or

b. Would have been eligible for Medicaid if the standards and methodologies of the Title IV-E foster care program were applied rather than the AFDC standards and methodologies.

The state covers individuals under the age of 21.

8. Section 1902(f) states and SSI criteria states without agreements under §§ 1616 and 1634 of the Act.

The following groups of individuals who receive a state supplementary payment under an approved optional state supplementary payment program that meets the following conditions. The supplement is:

a. Based on need and paid in cash on a regular basis.

b. Equal to the difference between the individual's countable income and the income standard used to determine eligibility for the supplement.

c. Available to all individuals in each classification and available on a statewide basis.

d. Paid to one or more of the classifications of individuals listed below:

(1) Aged individuals in domiciliary facilities or other group living arrangements as defined under SSI.

(2) Blind individuals in domiciliary facilities or other group living arrangements as defined under SSI.

(3) Disabled individuals in domiciliary facilities or other group living arrangements as defined under SSI.

(4) Individuals receiving a state administered optional state supplement that meets the conditions specified in 42 CFR 435.230.

The supplement varies in income standard by political subdivisions according to cost-of-living differences.

The standards for optional state supplementary payments are listed in 12 VAC 30-40-250.

9. Individuals who are in institutions for at least 30 consecutive days and who are eligible under a special

# Final Regulations

income level. Eligibility begins on the first day of the 30-day period. These individuals meet the income standards specified in 12 VAC 30-40-220.

The state covers all individuals as described above.

10. Reserved.

11. Individuals required to enroll in cost-effective employer-based group health plans remain eligible for a minimum enrollment period of one month.

*12. Women who have been screened for breast or cervical cancer under the Centers for Disease Control and Prevention Breast and Cervical Cancer Early Detection Program established under Title XV of the Public Health Service Act in accordance with § 1504 of the Act and need treatment for breast or cervical cancer, including a precancerous condition of the breast or cervix. These women are not otherwise covered under creditable coverage, as defined in § 2701 (c) of the Public Health Services Act, are not eligible for Medicaid under any mandatory categorically needy eligibility group, and have not attained age 65.*

VA.R. Doc. No. R01-175; Filed April 25, 2001, 2:48 p.m.

* * * * * * * *

REGISTRAR'S NOTICE: The Department of Medical Assistance Services is claiming an exclusion from the Administrative Process Act in accordance with § 9-6.14:4.1 C 4 (a) of the Code of Virginia, which excludes regulations that are necessary to conform to changes in Virginia statutory law or the appropriation act where no agency discretion is involved. The Department of Medical Assistance Services will receive, consider and respond to petitions by any interested person at any time with respect to reconsideration or revision.

Title of Regulation: **12 VAC 30-30-10 et seq. Groups Covered and Agencies Responsible for Eligibility Determination (amending 12 VAC 30-30-20).**
**12 VAC 30-40-10 et seq. Eligibility Conditions and Requirements (amending 12 VAC 30-40-220).**

Statutory Authority: § 32.1-325 of the Code of Virginia.

Effective Date: July 1, 2001.

Summary:

*This action amends the Plan for Medical Assistance concerning covered groups of optional categorically needy individuals due to action taken by the 2000 Session of the General Assembly in the 2000 appropriation act.*

*In 1988, Congress created an optional categorically needy group under §1902(m) of the Social Security Act, which permits states to grant full Medicaid benefits to aged and disabled individuals whose income is at some percentage of poverty up to a federal maximum of 100% of the federal poverty level.*

*In the 2000 appropriation act, the General Assembly mandated that, on July 1, 2001, the department amend the State Plan for Medical Assistance to add the category of eligibility described in § 1902(m) of the Social Security Act*

*for elderly and disabled individuals with income levels up to 80% of the federal poverty level.*

*Low income aged and disabled noninstitutionalized individuals face a hardship when trying to pay for non-Medicare covered medical services, especially pharmacy services. This change will assist more aged and disabled Virginians to become eligible for full Medicaid benefits.*

Agency Contact: Copies of the regulation may be obtained from Victoria P. Simmons, Regulatory Coordinator, Department of Medical Assistance Services, 600 East Broad Street, Suite 1300, Richmond, VA 23219, telephone (804) 786-7959.

**12 VAC 30-30-20. Optional groups other than the medically needy.**

The Title IV A agency determines eligibility for Title XIX services.

1. Caretakers and pregnant women who meet the income and resource requirements of AFDC but who do not receive cash assistance.

2. Individuals who would be eligible for AFDC, SSI or an optional state supplement as specified in 42 CFR 435.230, if they were not in a medical institution.

3. A group or groups of individuals who would be eligible for Medicaid under the plan if they were in a NF or an ICF/MR, who but for the provision of home and community-based services under a waiver granted under 42 CFR Part 441, Subpart G would require institutionalization, and who will receive home and community-based services under the waiver. The group or groups covered are listed in the waiver request. This option is effective on the effective date of the state's § 1915(c) waiver under which this group(s) is covered. In the event an existing § 1915(c) waiver is amended to cover this group(s), this option is effective on the effective date of the amendment.

4. Individuals who would be eligible for Medicaid under the plan if they were in a medical institution, who are terminally ill, and who receive hospice care in accordance with a voluntary election described in § 1905(o) of the Act.

5. The state does not cover all individuals who are not described in § 1902(a)(10)(A)(i) of the Act, who meet the income and resource requirements of the AFDC state plan and who are under the age of 21.

6. The state does cover reasonable classifications of these individuals as follows:

~~(1)~~ a. Individuals for whom public agencies are assuming full or partial financial responsibility and who are:

~~(a)~~ *(1)* In foster homes (and are under the age of 21).

~~(b)~~ *(2)* In private institutions (and are under the age of 21).

~~(c)~~ *(3)* In addition to the group under subdivisions 5 (1) (a) and (b) of this section, individuals placed in foster homes or private institutions by private nonprofit agencies (and are under the age of 21).

# Final Regulations

(2) *b.* Individuals in adoptions subsidized in full or part by a public agency (who are under the age of 21).

(3) *c.* Individuals in NFs (who are under the age of 21). NF services are provided under this plan.

(4) *d.* In addition to the group under subdivision 6 (3) of this section, individuals in ICFs/MR (who are under the age of 21).

7. A child for whom there is in effect a state adoption assistance agreement (other than under Title IV-E of the Act), who, as determined by the state adoption agency, cannot be placed for adoption without medical assistance because the child has special care needs for medical or rehabilitative care, and who before execution of the agreement:

a. Was eligible for Medicaid under the state's approved Medicaid plan; or

b. Would have been eligible for Medicaid if the standards and methodologies of the Title IV-E foster care program were applied rather than the AFDC standards and methodologies.

The state covers individuals under the age of 21.

8. Section 1902(f) states and SSI criteria states without agreements under §§ 1616 and 1634 of the Act.

The following groups of individuals who receive a state supplementary payment under an approved optional state supplementary payment program that meets the following conditions. The supplement is:

a. Based on need and paid in cash on a regular basis.

b. Equal to the difference between the individual's countable income and the income standard used to determine eligibility for the supplement.

c. Available to all individuals in each classification and available on a statewide basis.

d. Paid to one or more of the classifications of individuals listed below:

(1) Aged individuals in domiciliary facilities or other group living arrangements as defined under SSI.

(2) Blind individuals in domiciliary facilities or other group living arrangements as defined under SSI.

(3) Disabled individuals in domiciliary facilities or other group living arrangements as defined under SSI.

(4) Individuals receiving a state administered optional state supplement that meets the conditions specified in 42 CFR 435.230.

The supplement varies in income standard by political subdivisions according to cost-of-living differences.

The standards for optional state supplementary payments are listed in 12 VAC 30-40-250.

9. Individuals who are in institutions for at least 30 consecutive days and who are eligible under a special income level. Eligibility begins on the first day of the 30-day period. These individuals meet the income standards specified in 12 VAC 30-40-220.

The state covers all individuals as described above.

10. Reserved. *Individuals who are 65 years of age or older or who are disabled as determined under § 1614 (a) (3) of the Act, whose income does not exceed the income level specified in 12 VAC 30-40-220 for a family of the same size, and whose resources do not exceed the maximum amount allowed under SSI.*

11. Individuals required to enroll in cost-effective employer-based group health plans remain eligible for a minimum enrollment period of one month.

**12 VAC 30-40-220. Income eligibility levels.**

A. Mandatory categorically needy.

1. AFDC-related groups other than poverty level pregnant women and infants.

| Family Size | Need Standard | Payment Standard | Maximum Payment Amounts |
|---|---|---|---|
| | See Table 1 | See Table 2 | |

STANDARDS OF ASSISTANCE

GROUP I

| Size of Assistance Unit | Table 1 (100%) | Table 2 (90%) |
|---|---|---|
| 1 | $ 146 | $ 131 |
| 2 | 229 | 207 |
| 3 | 295 | 265 |
| 4 | 358 | 322 |
| 5 | 422 | 380 |
| 6 | 473 | 427 |
| 7 | 535 | 482 |
| 8 | 602 | 541 |
| 9 | 657 | 591 |
| 10 | 718 | 647 |
| Each person above 10 | 61 | 56 |

MAXIMUM REIMBURSABLE PAYMENT $403

GROUP II

| Size of Assistance Unit | Table 1 (100%) | Table 2 (90%) |
|---|---|---|
| 1 | $ 174 | $ 157 |
| 2 | 257 | 231 |
| 3 | 322 | 291 |
| 4 | 386 | 347 |
| 5 | 457 | 410 |
| 6 | 509 | 458 |
| 7 | 570 | 512 |
| 8 | 636 | 572 |
| 9 | 692 | 623 |
| 10 | 754 | 678 |
| Each person above 10 | 61 | 56 |

# Final Regulations

MAXIMUM REIMBURSABLE PAYMENT $435

### GROUP III

| Size of Assistance Unit | Table 1 (100%) | Table 2 (90%) |
|---|---|---|
| 1 | $ 243 | $ 220 |
| 2 | 327 | 294 |
| 3 | 393 | 354 |
| 4 | 457 | 410 |
| 5 | 542 | 488 |
| 6 | 593 | 534 |
| 7 | 655 | 590 |
| 8 | 721 | 650 |
| 9 | 779 | 701 |
| 10 | 838 | 755 |
| Each person above 10 | 61 | 56 |

MAXIMUM REIMBURSABLE PAYMENT $518

2. Pregnant women and infants under 1902(a)(10)(i)(IV) of the Act:

Effective April 1, 1990, based on 133% of the official federal income poverty level.

3. Children under § 1902(a)(10)(i)(VI) of the Act (children who have attained age 1 but have not attained age 6), the income eligibility level is 133% of the federal poverty level (as revised annually in the Federal Register) for the size family involved.

4. For children under § 1902(a)(10)(i)(VII) of the Act (children who were born after September 30, 1983, and have attained age 6 but have not attained age 19), the income eligibility level is 100% of the federal poverty level (as revised annually in the Federal Register) for the size family involved.

B. Treatment of COLA for groups with income related to federal poverty level.

1. If an individual receives a Title II benefit, any amount attributable to the most recent increase in the monthly insurance benefit as a result of a Title II COLA is not counted as income during a "transition period" beginning with January, when the Title II benefit for December is received, and ending with the last day of the month following the month of publication of the revised annual federal poverty level.

2. For individuals with Title II income, the revised poverty levels are not effective until the first day of the month following the end of the transition period.

3. For individuals not receiving Title II income, the revised poverty levels are effective no later than the beginning of the month following the date of publication.

C. Qualified Medicare beneficiaries with incomes related to federal poverty level.

The levels for determining income eligibility for groups of qualified Medicare beneficiaries under the provisions of § 1905(p)(2)(A) of the Act are as follows:

Section 1902(f) states which as of January 1, 1987, used income standards more restrictive than SSI. (VA did not apply a more restrictive income standard as of January 1, 1987.)

Based on the following percentage of the official federal income poverty level:

Effective Jan. 1, 1989: 85%

Effective Jan. 1, 1990: 90% (no more than 100)

Effective Jan. 1, 1991: 100% (no more than 100)

Effective Jan. 1, 1992: 100%

*D. Aged and disabled individuals described in § 1902 (m) (1) of the Act; Level for determining income eligibility for aged and disabled persons described in § 1902 (m) (1) of the Act is 80% of the official federal income poverty level (as revised annually in the Federal Register) for the size family involved.*

~~D.~~ E. Income levels - medically needy.

1. The following income levels are applicable to all groups, urban and rural.

2. The agency has methods for excluding from its claim for FFP payments made on behalf of individuals whose income exceeds these limits.

| (1) | (2) | | | (3) |
|---|---|---|---|---|
| Family Size | Net income level protected for maintenance for 12 months | | | Amount by which Column 2 exceeds limits specified in 42 CFR 435.1007[1] |
| | Group I | Group II | Group III | |
| 1 | ~~$2,600~~ 2,691.00 | ~~$3,000~~ 3,105.00 | ~~$3,900~~ 4,036.50 | $0 |
| 2 | ~~$3,400~~ 3,519.00 | ~~$3,700~~ 3,824.00 | ~~$4,800~~ 4,867.00 | $0 |
| 3 | ~~$3,900~~ 4,306.50 | ~~$4,300~~ 4,450.50 | ~~$5,300~~ 5,485.50 | $0 |
| 4 | ~~$4,400~~ 4,554.00 | ~~$4,800~~ 4,968.00 | ~~$5,800~~ 6,003.00 | $0 |
| 5 | ~~$4,900~~ 5,071.50 | ~~$5,300~~ 5,485.50 | ~~$6,300~~ 6,520.50 | $0 |
| 6 | ~~$5,400~~ 5,589.00 | ~~$5,800~~ 6,003.00 | ~~$6,800~~ 7,038.00 | $0 |
| 7 | ~~$5,900~~ 6,106.50 | ~~$6,300~~ 6,520.50 | ~~$7,300~~ 7,555.50 | $0 |
| 8 | ~~$6,500~~ 6,727.50 | ~~$6,900~~ 7,141.50 | ~~$7,800~~ 8,073.00 | $0 |
| 9 | ~~$7,100~~ 7,348.50 | ~~$7,500~~ 7,762.50 | ~~$8,500~~ 8,797.50 | $0 |
| 10 | ~~$7,800~~ 8,073.00 | ~~$8,200~~ 8,487.00 | ~~$9,100~~ 9,418.50 | $0 |

For each additional

# Final Regulations

person, add:  $~~$600$~~ 695.52 $~~$600$~~ 695.52 $~~$600$~~ 695.52 $0

[1] As authorized in § 4718 of OBRA '90.

## Grouping of Localities

### GROUP I

#### Counties

| | |
|---|---|
| Accomack | King George |
| Alleghany | King and Queen |
| Amelia | King William |
| Amherst | Lancaster |
| Appomattox | Lee |
| Bath | Louisa |
| Bedford | Lunenburg |
| Bland | Madison |
| Botetourt | Matthews |
| Brunswick | Mecklenburg |
| Buchanan | Middlesex |
| Buckingham | Nelson |
| Campbell | New Kent |
| Caroline | Northampton |
| Carroll | Northumberland |
| Charles City | Nottoway |
| Charlotte | Orange |
| Clarke | Page |
| Craig | Patrick |
| Culpeper | Pittsylvania |
| Cumberland | Powhatan |
| Dickenson | Prince Edward |
| Dinwiddie | Prince George |
| Essex | Pulaski |
| Fauquier | Rappahannock |
| Floyd | Richmond |
| Fluvanna | Rockbridge |
| Franklin | Russell |
| Frederick | Scott |
| Giles | Shenandoah |
| Gloucester | Smyth |
| Goochland | Southampton |
| Grayson | Spotsylvania |
| Greene | Stafford |
| Greensville | Surry |
| Halifax | Sussex |
| Hanover | Tazewell |
| Henry | Washington |
| Highland | Westmoreland |
| Isle of Wight | Wise |
| James City | Wythe |
| York | |

#### Cities

| | |
|---|---|
| Bristol | Franklin |
| Buena Vista | Galax |
| Clifton Forge | Norton |
| Danville | Poquoson |
| Emporia | Suffolk |

### GROUP II

#### Counties

| | |
|---|---|
| Albemarle | Loudoun |

| | |
|---|---|
| Augusta | Roanoke |
| Chesterfield | Rockingham |
| Henrico | Warren |

#### Cities

| | |
|---|---|
| Chesapeake | Portsmouth |
| Covington | Radford |
| Harrisonburg | Richmond |
| Hopewell | Roanoke |
| Lexington | Salem |
| Lynchburg | Staunton |
| Martinsville | Virginia Beach |
| Newport News | Williamsburg |
| Norfolk | Winchester |
| Petersburg | |

### GROUP III

#### Counties

| | |
|---|---|
| Arlington | Montgomery |
| Fairfax | Prince William |

#### Cities

| | |
|---|---|
| Alexandria | Fredericksburg |
| Charlottesville | Hampton |
| Colonial Heights | Manassas |
| Fairfax | Manassas Park |
| Falls Church | Waynesboro |

VA.R. Doc. No. R01-177; Filed April 30, 2001, 11:34 a.m.

* * * * * * * *

REGISTRAR'S NOTICE: The Department of Medical Assistance Services is claiming an exclusion from the Administrative Process Act in accordance with § 9-6.14:4.1 C 4 (a) of the Code of Virginia, which excludes regulations that are necessary to conform to changes in Virginia statutory law or the appropriation act where no agency discretion is involved. The Department of Medical Assistance Services will receive, consider and respond to petitions by any interested person at any time with respect to reconsideration or revision.

Title of Regulation: **12 VAC 30-40-10 et seq. Eligibility Conditions and Requirements (amending 12 VAC 30-40-220).**

Statutory Authority: § 32.1-325 of the Code of Virginia.

Effective Date: July 1, 2001.

Summary:

*The amendments increase the income limits that are permitted for medically needy categories of eligible individuals. The amendments are made to comply with the 2000 appropriation act.*

Agency Contact: Copies of the regulation may be obtained from Victoria P. Simmons, Regulatory Coordinator, Department of Medical Assistance Services, 600 East Broad

# Final Regulations

Street, Suite 1300, Richmond, VA 23219, telephone (804) 786-7959.

**12 VAC 30-40-220. Income eligibility levels.**

A. Mandatory Categorically Needy

1. AFDC-related groups other than poverty level pregnant women and infants.

| Family Size | Need Standard | Payment Standard | Maximum Payment Amounts |
|---|---|---|---|
| | See Table 1 | See Table 2 | |

STANDARDS OF ASSISTANCE

GROUP I

| Size of Assistance Unit | Table 1 (100%) | Table 2 (90%) |
|---|---|---|
| 1 | ~~$146~~ *151.11* | ~~$131~~ *135.58* |
| 2 | ~~229~~ *237.01* | ~~207~~ *254.24* |
| 3 | ~~295~~ *305.32* | ~~265~~ *274.27* |
| 4 | ~~358~~ *370.53* | ~~322~~ *333.27* |
| 5 | ~~422~~ *436.77* | ~~380~~ *393.30* |
| 6 | ~~473~~ *489.55* | ~~427~~ *441.94* |
| 7 | ~~535~~ *553.72* | ~~482~~ *498.87* |
| 8 | ~~602~~ *623.07* | ~~544~~ *559.93* |
| 9 | ~~657~~ *679.99* | ~~591~~ *611.68* |
| 10 | ~~718~~ *743.13* | ~~647~~ *669.64* |
| Each person above 10 | ~~61~~ *63.13* | ~~56~~ *57.96* |

MAXIMUM REIMBURSABLE PAYMENT $403

| Size of Assistance Unit | Table 1 (100%) | Table 2 (90%) |
|---|---|---|
| 1 | ~~$174~~ *180.09* | ~~$157~~ *162.49* |
| 2 | ~~257~~ *265.99* | ~~231~~ *239.08* |
| 3 | ~~322~~ *333.27* | ~~291~~ *301.18* |
| 4 | ~~386~~ *399.51* | ~~347~~ *359.14* |
| 5 | ~~457~~ *472.99* | ~~410~~ *423.35* |
| 6 | ~~509~~ *526.81* | ~~458~~ *474.03* |
| 7 | ~~570~~ *589.95* | ~~512~~ *529.92* |
| 8 | ~~636~~ *658.26* | ~~572~~ *592.02* |
| 9 | ~~692~~ *716.22* | ~~623~~ *644.80* |
| 10 | ~~754~~ *780.39* | ~~678~~ *701.73* |
| Each person above 10 | ~~61~~ *63.13* | ~~56~~ *57.96* |

MAXIMUM REIMBURSABLE PAYMENT $435

GROUP III

| Size of Assistance Unit | Table 1 (100%) | Table 2 (90%) |
|---|---|---|
| 1 | ~~$243~~ *251.50* | ~~$220~~ *227.70* |
| 2 | ~~327~~ *338.44* | ~~294~~ *304.29* |
| 3 | ~~393~~ *406.75* | ~~354~~ *366.39* |
| 4 | ~~457~~ *472.99* | ~~410~~ *424.35* |
| 5 | ~~542~~ *560.97* | ~~488~~ *505.08* |
| 6 | ~~593~~ *613.75* | ~~534~~ *552.69* |
| 7 | ~~655~~ *677.92* | ~~590~~ *610.65* |
| 8 | ~~721~~ *745.23* | ~~650~~ *672.75* |
| 9 | ~~779~~ *806.26* | ~~701~~ *725.53* |
| 10 | ~~838~~ *868.33* | ~~755~~ *781.42* |
| Each person above 10 | ~~61~~ *63.13* | ~~56~~ *57.96* |

MAXIMUM REIMBURSABLE PAYMENT $518

2. Pregnant women and infants under 1902(a)(10)(i)(IV) of the Act:

Effective April 1, 1990, based on 133% of the official federal income poverty level.

3. Children under § 1902(a)(10)(i)(VI) of the Act (children who have attained age 1 but have not attained age 6), the income eligibility level is 133% of the federal poverty level (as revised annually in the Federal Register) for the size family involved.

4. For children under § 1902(a)(10)(i)(VII) of the Act (children who were born after September 30, 1983, and have attained age 6 but have not attained age 19), the income eligibility level is 100% of the federal poverty level (as revised annually in the Federal Register) for the size family involved.

B. Treatment of COLA for groups with income related to federal poverty level.

1. If an individual receives a Title II benefit, any amount attributable to the most recent increase in the monthly insurance benefit as a result of a Title II COLA is not counted as income during a "transition period" beginning with January, when the Title II benefit for December is received, and ending with the last day of the month following the month of publication of the revised annual federal poverty level.

2. For individuals with Title II income, the revised poverty levels are not effective until the first day of the month following the end of the transition period.

3. For individuals not receiving Title II income, the revised poverty levels are effective no later than the beginning of the month following the date of publication.

C. Qualified Medicare beneficiaries with incomes related to federal poverty level.

The levels for determining income eligibility for groups of qualified Medicare beneficiaries under the provisions of § 1905(p)(2)(A) of the Act are as follows:

Section 1902(f) states which as of January 1, 1987, used income standards more restrictive than SSI. (VA did not apply a more restrictive income standard as of January 1, 1987.)

Based on the following percentage of the official federal income poverty level:

Effective Jan. 1, 1989: 85%

Effective Jan. 1, 1990: 90% (no more than 100)

Effective Jan. 1, 1991: 100% (no more than 100)

Effective Jan. 1, 1992: 100%

D. Income levels - medically needy.

1. The following income levels are applicable to all groups, urban and rural.

# Final Regulations

2. The agency has methods for excluding from its claim for
FFP payments made on behalf of individuals whose income
exceeds these limits.

| (1) | (2) | | | (3) |
|---|---|---|---|---|
| | | | | Amount by which Column 2 exceeds limits specified in 42 CFR 435.1007[1] |
| Family Size | Net income level protected for maintenance for 12 months | | | |
| | Group I | Group II | Group III | |
| 1 | ~~$2,600~~ 2,691.00 | ~~$3,000~~ 3,105.00 | ~~$3,900~~ 4,036.50 | $0 |
| 2 | ~~$3,400~~ 3,519.00 | ~~$3,700~~ 3,824.00 | ~~$4,800~~ 4,867.00 | $0 |
| 3 | ~~$3,900~~ 4,306.50 | ~~$4,300~~ 4,450.50 | ~~$5,300~~ 5,485.50 | $0 |
| 4 | ~~$4,400~~ 4,554.00 | ~~$4,800~~ 4,968.00 | ~~$5,800~~ 6,003.00 | $0 |
| 5 | ~~$4,900~~ 5,071.50 | ~~$5,300~~ 5,485.50 | ~~$6,300~~ 6,520.50 | $0 |
| 6 | ~~$5,400~~ 5,589.00 | ~~$5,800~~ 6,003.00 | ~~$6,800~~ 7,038.00 | $0 |
| 7 | ~~$5,900~~ 6,106.50 | ~~$6,300~~ 6,520.50 | ~~$7,300~~ 7,555.50 | $0 |
| 8 | ~~$6,500~~ 6,727.50 | ~~$6,900~~ 7,141.50 | ~~$7,800~~ 8,073.00 | $0 |
| 9 | ~~$7,100~~ 7,348.50 | ~~$7,500~~ 7,762.50 | ~~$8,500~~ 8,797.50 | $0 |
| 10 | ~~$7,800~~ 8,073.00 | ~~$8,200~~ 8,487.00 | ~~$9,100~~ 9,418.50 | $0 |
| For each additional person, add: | ~~$600~~ 695.52 | ~~$600~~ 695.52 | ~~$600~~ 695.52 | $0 |

[1] As authorized in § 4718 of OBRA '90.

Grouping of Localities

GROUP I

Counties

| | |
|---|---|
| Accomack | King George |
| Alleghany | King and Queen |
| Amelia | King William |
| Amherst | Lancaster |
| Appomattox | Lee |
| Bath | Louisa |
| Bedford | Lunenburg |
| Bland | Madison |
| Botetourt | Matthews |
| Brunswick | Mecklenburg |
| Buchanan | Middlesex |
| Buckingham | Nelson |
| Campbell | New Kent |
| Caroline | Northampton |
| Carroll | Northumberland |
| Charles City | Nottoway |
| Charlotte | Orange |
| Clarke | Page |
| Craig | Patrick |
| Culpeper | Pittsylvania |
| Cumberland | Powhatan |
| Dickenson | Prince Edward |
| Dinwiddie | Prince George |
| Essex | Pulaski |
| Fauquier | Rappahannock |
| Floyd | Richmond |
| Fluvanna | Rockbridge |
| Franklin | Russell |
| Frederick | Scott |
| Giles | Shenandoah |
| Gloucester | Smyth |
| Goochland | Southampton |
| Grayson | Spotsylvania |
| Greene | Stafford |
| Greensville | Surry |
| Halifax | Sussex |
| Hanover | Tazewell |
| Henry | Washington |
| Highland | Westmoreland |
| Isle of Wight | Wise |
| James City | Wythe |
| York | |

Cities

| | |
|---|---|
| Bristol | Franklin |
| Buena Vista | Galax |
| Clifton Forge | Norton |
| Danville | Poquoson |
| Emporia | Suffolk |

GROUP II

Counties

| | |
|---|---|
| Albemarle | Loudoun |
| Augusta | Roanoke |
| Chesterfield | Rockingham |
| Henrico | Warren |

Cities

| | |
|---|---|
| Chesapeake | Portsmouth |
| Covington | Radford |
| Harrisonburg | Richmond |
| Hopewell | Roanoke |
| Lexington | Salem |
| Lynchburg | Staunton |

# Final Regulations

| | |
|---|---|
| Martinsville | Virginia Beach |
| Newport News | Williamsburg |
| Norfolk | Winchester |
| Petersburg | |

GROUP III

Counties

| | |
|---|---|
| Arlington | Montgomery |
| Fairfax | Prince William |

Cities

| | |
|---|---|
| Alexandria | Fredericksburg |
| Charlottesville | Hampton |
| Colonial Heights | Manassas |
| Fairfax | Manassas Park |
| Falls Church | Waynesboro |

VA.R. Doc. No. R01-185; Filed May 1, 2001, 4:13 p.m.

* * * * * * * *

Title of Regulation: **Individual and Family Developmental Disabilities Support Waiver.**
**12 VAC 30-50-10 et seq. Amount, Duration and Scope of Medical and Remedial Care Services (adding 12 VAC 30-50-490).**
**12 VAC 30-80-10 et seq. Methods and Standards for Establishing Payment Rates--Other Types of Care (amending 12 VAC 30-80-110).**
**12 VAC 30-120-10 et seq. Waivered Services (adding Part XI: 12 VAC 30-120-700 through 12 VAC 30-120-799).**

Statutory Authority: § 32.1-325 of the Code of Virginia and Item 319 T of Chapter 1073 of the 2000 Acts of Assembly.

Effective Date: July 1, 2001.

Summary:

*The regulation establishes the policies and procedures for a new Medicaid home and community-based care waiver to serve individuals and families of individuals with developmental disabilities. The waiver is currently operating under emergency regulations that went into effect July 1, 2000.*

*Under the Individual and Family Developmental Disabilities Support Waiver, certain Medicaid eligible individuals may become eligible to receive a wide array of home and community-based services that are not otherwise available to Medicaid eligible individuals. These services include in-home residential supports, day support, supported employment, personal care (agency directed), attendant care (consumer directed), respite care (both agency directed and consumer directed), assistive technology, environmental modifications, nursing services, therapeutic consultation, crisis stabilization, personal emergency response systems, family and caregiver training, and companion care.*

*Changes made since the proposed regulation was published are as follows:*

*1. Eliminate the requirement that persons 18 and over must be able to manage their own care, but continue to restrict cognitively impaired adults from managing their own care;*

*2. Add a minimum age criterion for eligibility;*

*3. Specify requirements for prevocational programs;*

*4. Modify provider requirements, service descriptions, and criteria to restrict service;*

*5. Remove residential program as a place of crisis stabilization service delivery;*

*6. Redefine recipient's family for purposes of establishing which family members can be reimbursed for providing personal care or respite care services, and require specific documentation of lack of providers before a family member living in the same house with the recipient will be reimbursed for personal care or respite care services; and*

*7. Redefine which services can be consumer directed and require specific documentation of lack of providers before a family member living in the same house with the recipient will be reimbursed for attendant/companion care services.*

Summary of Public Comments and Agency's Response: A summary of comments made by the public and the agency's response may be obtained from the promulgating agency or viewed at the office of the Registrar of Regulations.

Agency Contact: Copies of the regulation may be obtained from Victoria P. Simmons, Regulatory Coordinator, Department of Medical Assistance Services, 600 East Broad Street, Suite 1300, Richmond, VA 23219, telephone (804) 786-7959.

*12 VAC 30-50-490. **Case management (support coordination) for individuals with developmental disabilities, including autism.***

*A. Target group. Medicaid eligible recipients with related conditions who are six years of age and older and who are eligible to receive services under the Individual and Family Developmental Disabilities Support (IFDDS) Waiver.*

*B. Services will be provided in the entire state.*

*C. Services are not comparable in amount, duration, and scope. Authority of § 1915(g)(1) of the Social Security Act (Act) is invoked to provide services without regard to the requirements of § 1902(a)(10)(B) of the Act.*

*D. Definition of services. Support coordination services will be provided for recipients with related conditions who are participants in the home and community-based care IFDDS Waiver. Support coordination services to be provided include:*

*1. Assessment and planning services, to include developing a consumer service plan (does not include performing medical and psychiatric assessment but does include referral for such assessments);*

*2. Linking the recipient to services and supports specified in the consumer service plan;*

*3. Assisting the recipient directly for the purpose of locating, developing, or obtaining needed services and resources;*

*4. Coordinating services with other agencies and providers involved with the recipient;*

# Final Regulations

5. Enhancing community integration by contacting other entities to arrange community access and involvement, including opportunities to learn community living skills, and use vocational, civic, and recreational services;

6. Making collateral contacts with the recipient's significant others to promote implementation of the service plan and community adjustment;

7. Following up and monitoring to assess ongoing progress and ensure services are delivered;

8. Education and counseling which guides the recipient and develops a supportive relationship that promotes the service plan; and

9. Benefits counseling.

E. Qualifications of providers. In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, specific provider qualifications are:

1. To qualify as a provider of services through the DMAS for IFDDS Waiver support coordination, the service provider must meet these criteria:

    a. Have the administrative and financial management capacity to meet state and federal requirements;

    b. Have the ability to document and maintain recipient case records in accordance with state and federal requirements; and

    c. Be certified as an IFDDS support coordination agency by DMAS.

2. Providers may bill for Medicaid support coordination only when the services are provided by qualified support coordinators. The support coordinator must possess a combination of developmental disability work experience or relevant education, which indicates that the individual possesses the following knowledge, skills, and abilities, at the entry level. These must be documented or observable in the application form or supporting documentation or in the interview (with appropriate documentation).

    a. Knowledge of:

    (1) The definition, causes, and program philosophy of developmental disabilities;

    (2) Treatment modalities and intervention techniques, such as behavior management, independent living skills, training, supportive counseling, family education, crisis intervention, discharge planning and service coordination;

    (3) Different types of assessments and their uses in program planning;

    (4) Recipients' rights;

    (5) Local service delivery systems, including support services;

    (6) Types of developmental disability programs and services;

    (7) Effective oral, written, and interpersonal communication principles and techniques;

    (8) General principles of record documentation; and

    (9) The service planning process and the major components of a service plan.

    b. Skills in:

    (1) Interviewing;

    (2) Negotiating with recipients and service providers;

    (3) Observing, recording, and reporting behaviors;

    (4) Identifying and documenting a recipient's needs for resources, services, and other assistance;

    (5) Identifying services within the established service system to meet the recipient's needs;

    (6) Coordinating the provision of services by diverse public and private providers;

    (7) Analyzing and planning for the service needs of developmentally disabled persons;

    (8) Formulating, writing, and implementing recipient-specific individual service plans to promote goal attainment for recipients with developmental disabilities; and

    (9) Using assessment tools.

    c. Abilities to:

    (1) Demonstrate a positive regard for recipients and their families (e.g., treating recipients as individuals, allowing risk taking, avoiding stereotypes of developmentally disabled people, respecting recipients' and families' privacy, believing recipients can grow);

    (2) Be persistent and remain objective;

    (3) Work as a team member, maintaining effective inter- and intra-agency working relationships;

    (4) Work independently, performing positive duties under general supervision;

    (5) Communicate effectively, orally and in writing; and

    (6) Establish and maintain ongoing supportive relationships.

F. The state assures that the provision of case management (support coordination) services will not restrict an individual's free choice of providers in violation of §1902(a)(23) of the Act.

1. Eligible recipients will have free choice of the providers of support coordination services.

2. Eligible recipients will have free choice of the providers of other medical care under the plan.

G. Payment for case management (support coordination) services under the plan does not duplicate payments made to

# Final Regulations

*public agencies or private entities under other program authorities for this same purpose.*

**12 VAC 30-80-110. Fee-for-service: Case Management.**

Targeted case management for high-risk pregnant women and infants up to age two ~~and~~, for community mental health and mental retardation services, *and for individuals who have applied for or are participating in the Individual and Family Developmental Disability Support Waiver program (IFDDS Waiver)* shall be reimbursed at the lowest of: state agency fee schedule, actual charge, or Medicare (Title XVIII) allowances.

*PART XI.*
*INDIVIDUAL AND FAMILY DEVELOPMENTAL*
*DISABILITIES SUPPORT WAIVER.*

*Article 1.*
*General Requirements.*

**12 VAC 30-120-700. Definitions.**

*"Activities of daily living (ADL)" means personal care tasks, e.g., bathing, dressing, toileting, transferring, and eating/feeding. A recipient's degree of independence in performing these activities is a part of determining appropriate level of care and services.*

*"Assistive technology" means specialized medical equipment and supplies including those devices, controls, or appliances specified in the consumer service plan but not available under the State Plan for Medical Assistance that enable recipients to increase their abilities to perform activities of daily living, or to perceive, control, or communicate with the environment in which they live or that are necessary to their proper functioning.*

*"Attendant care" means long-term maintenance or support services necessary to enable the* [ ~~mentally alert and competent~~ ] *recipient to remain at or return home rather than enter or remain in an Intermediate Care Facility for the Mentally Retarded (ICF/MR). The recipient will be responsible for hiring, training, supervising and firing the personal attendant.* [ ~~Recipients 18 years of age and older must be able to manage their own affairs without help, be mentally alert, have no cognitive impairments, and not have a legal guardian. If recipients receiving services are younger than 18 years of age, the legal guardians or parents will act on behalf of minor recipients.~~ *If the recipient is unable to independently manage his own attendant care, a family caregiver can serve as the employer on behalf of the recipient. Recipients with cognitive impairments will not be able to manage their own care.* ]

*"CARF" means Commission on Accreditation of Rehabilitation Facilities.*

*"Community-based care waiver services" or "waiver services" means the range of community support services approved by the Health Care Financing Administration (HCFA) pursuant to § 1915(c) of the Social Security Act to be offered to developmentally disabled recipients who would otherwise require the level of care provided in an ICF/MR.*

[ *"Companion aide" means, for the purpose of these regulations, a domestic servant who is also exempt from worker's compensation.* ]

*"Companion services" means nonmedical care, supervision and socialization, provided to a functionally* [ *or cognitively* ] *impaired adult. The provision of companion services does not entail hands-on nursing care and is provided in accordance with a therapeutic goal in the consumer service plan. This shall not be the sole service used to divert recipients from institutional care.*

[ *"Consumer-directed companion care" means nonmedical care, supervision and socialization provided to a functionally or cognitively impaired adult. The provision of companion services does not entail hands-on nursing care and is provided in accordance with a therapeutic goal in the consumer service plan. This shall not be the sole service used to divert recipients from institutional care. The recipient will be responsible for hiring, training, supervising, and firing the personal attendant. If the recipient is unable to independently manage his own consumer-directed respite care, a family caregiver can serve as the employer on behalf of the recipient. Recipients with cognitive impairments will not be able to manage their own care.* ]

*"Consumer-directed respite care" means services given to caretakers of eligible individuals who are unable to care for themselves that are provided on an episodic or routine basis because of the absence or need for relief of those persons residing with the recipient who normally provide the care. The recipient will be responsible for hiring, training, supervising, and firing the personal attendant.* [ ~~Recipients 18 years of age and older must be able to manage their own affairs without help, be mentally alert, have no cognitive impairments, and not have a legal guardian. If a recipient receiving services is under 18 years of age, the legal guardian or parent will act on behalf of the minor.~~ *If the recipient is unable to independently manage his own consumer-directed respite care, a family caregiver can serve as the employer on behalf of the recipient. Recipients with cognitive impairments will not be able to manage their own care.*

*"Consumer directed (CD) services facilitator" means the provider contracted by DMAS that is responsible for ensuring development and monitoring of the CSP, management training, and review activities as required by DMAS for attendant care, consumer-directed companion care, and consumer-directed respite care services.* ]

*"Consumer service plan" or "CSP" means that document addressing all needs of recipients of home and community-based care developmental disability services, in all life areas. Supporting documentation developed by service providers are to be incorporated in the CSP by the support coordinator. Factors to be considered when these plans are developed may include, but are not limited to, recipients' ages and levels of functioning.*

*"Crisis stabilization" means direct intervention to persons with developmental disabilities who are experiencing serious psychiatric or behavioral problems, or both, that jeopardize their current community living situation. This service must provide temporary intensive services and supports that avert emergency psychiatric hospitalization or institutional placement or prevent other out-of-home placement. This service shall be designed to stabilize recipients and strengthen the current living situations so that recipients can*

# Final Regulations

be maintained in the community during and beyond the crisis period.

"Current functional status" means recipients' degree of dependency in performing activities of daily living.

"DMAS" means the Department of Medical Assistance Services.

"DMAS staff" means individuals who perform utilization review, recommendation of preauthorization for service type and intensity, and review of recipient level of care criteria.

"DMHMRSAS" means the Department of Mental Health, Mental Retardation and Substance Abuse Services.

"DRS" means the Department of Rehabilitative Services. [ The DRS currently operates the Personal Assistance Services Program, which is a state funded program that provides a limited amount of personal care services to Virginians. ]

"DSS" means the Department of Social Services.

"Day support" means training in intellectual, sensory, motor, and affective social development including awareness skills, sensory stimulation, use of appropriate behaviors and social skills, learning and problem solving, communication and self care, physical development, services and support activities.

"Environmental modifications" means physical adaptations to a house, place of residence, vehicle or work site, when the [ work site ] modification exceeds reasonable accommodation requirements of the Americans with Disabilities Act, necessary to ensure recipients' health and safety or enable functioning with greater independence when the adaptation is not being used to bring a substandard dwelling up to minimum habitation standards and is of direct medical or remedial benefit to recipients.

"EPSDT" means the Early Periodic Screening, Diagnosis and Treatment program administered by DMAS for children under the age of 21 according to federal guidelines which prescribe specific preventive and treatment services for Medicaid-eligible children.

"Family/caregiver training" means training and counseling services provided to families or caregivers of recipients receiving services in the IFDDS Waiver.

"Fiscal agent" means an agency or organization contracted by DMAS to handle employment, payroll, and tax responsibilities on behalf of recipients who are receiving consumer-directed attendant [ and , ] respite [ , and companion ] services.

[ "Guardian" means a person who has been legally invested with the authority and charged with the duty to take care of, manage the property of, and protect the rights of a recipient who has been declared by the circuit court to be incapacitated and incapable of administering his own affairs. The powers and duties of the guardian are defined by the court and are limited to matters within the areas where the recipient has been determined to be incapacitated. ]

"Home" means, for purposes of the IFDDS Waiver, an apartment or single family dwelling in which no more than two individuals who require services live [ with the exception of siblings living in the same dwelling with family ]. This does not include an assisted living facility [ or group home ].

"Home and community-based care" means a variety of in-home and community-based services reimbursed by the DMAS as authorized under a § 1915(c) waiver designed to offer recipients an alternative to institutionalization. Recipients may be preauthorized to receive one or more of these services either solely or in combination, based on the documented need for the service or services to avoid ICF/MR placement.

"HCFA" means the Health Care Financing Administration, which is the unit of the federal Department of Health and Human Services which administers the Medicare and Medicaid programs.

"IFDDS Waiver" means the Individual and Family Developmental Disabilities Support Waiver.

"In-home residential support services" means support provided in the developmentally disabled recipient's home, which includes training, assistance, and supervision in enabling the recipient to maintain or improve his health; assisting in performing recipient care tasks; training in activities of daily living; training and use of community resources; providing life skills training; and adapting behavior to community and home-like environments.

"Instrumental activities of daily living (IADL)" means social tasks (e.g., meal preparation, shopping, housekeeping, laundry, money management). A recipient's degree of independence in performing these activities is part of determining appropriate level of care and services.

[ "Legal guardian" means a person who has been legally invested with the authority and charged with the duty to take care of, manage the property of, and protect the rights of a recipient who has been declared by the circuit court to be incapacitated and incapable of administering his own affairs. The powers and duties of the guardian are defined by the court and are limited to matters within the areas where the recipient has been determined to be incapacitated. ]

"Mental retardation" means, as defined by the American Association on Mental Retardation (AAMR), being substantially limited in present functioning as characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests itself before age 18. A diagnosis of mental retardation is made if the person's intellectual functioning level is approximately 70 to 75 or below, as diagnosed by a licensed clinical professional; and there are related limitations in two or more applicable adaptive skill areas; and the age of onset is 18 or below. If a valid IQ score is not possible, significantly subaverage intellectual capabilities means a level of performance that is less than that observed in the vast majority of persons of comparable background. In order to be valid, the assessment of the intellectual performance must be free of errors caused by motor, sensory, emotional, language, or cultural factors.

# Final Regulations

"Nursing services" means skilled nursing services listed in the consumer service plan which are ordered by a physician and required to prevent institutionalization, not otherwise available under the State Plan for Medical Assistance, are within the scope of the state's Nurse Practice Act (Chapters 30 (§ 54.1-3000 et seq.) and 34 (§ 54.1-3400 et seq.) of the Code of Virginia, and are provided by a registered professional nurse or by a licensed practical nurse under the supervision of a registered nurse who is licensed to practice in the state.

"Participating provider" means an institution, facility, agency, partnership, corporation, or association that meets the standards and requirements set forth by DMAS, and has a current, signed contract with DMAS.

"Personal attendant" means, for purposes of this regulation, a domestic servant who is also exempt from Workers' Compensation. [ ~~Recipients shall be restricted from employing more than two personal attendants simultaneously at any given time.~~ ]

"Personal care agency" means a participating provider that renders services designed to prevent or reduce inappropriate institutional care by providing eligible recipients with personal care aides who provide personal care services.

"Personal care services" means long-term maintenance or support services necessary to enable recipients to remain [ ~~at~~ in ] or return [ ~~home~~ to the community ] rather than enter an Intermediate Care Facility for the Mentally Retarded. Personal care services include assistance with activities of daily living, nutritional support, and the environmental maintenance necessary for recipients to remain in their homes and in the community.

"Personal emergency response system (PERS)" is an electronic device that enables certain recipients at high risk of institutionalization to secure help in an emergency. PERS services are limited to those recipients who live alone or are alone for significant parts of the day and who have no regular caregiver for extended periods of time, and who would otherwise require extensive routine supervision.

"Qualified mental health professional" means a professional having: (i) at least one year of documented experience working directly with recipients who have developmental disabilities; (ii) at least a bachelor's degree in a human services field including, but not limited to, sociology, social work, special education, rehabilitation counseling, or psychology; and (iii) the required Virginia or national license, registration, or certification in accordance with his profession.

"Related conditions" means those persons who have autism or who have a severe chronic disability that meets all of the following conditions identified in 42 CFR 435.1009:

1. It is attributable to:

a. Cerebral palsy or epilepsy; or

b. Any other condition, other than mental illness, found to be closely related to mental retardation because this condition results in impairment of general intellectual functioning or adaptive behavior similar to that of mentally retarded persons, and requires treatment or services similar to those required for these persons.

2. It is manifested before the person reaches age 22.

3. It is likely to continue indefinitely.

4. It results in substantial functional limitations in three or more of the following areas of major life activity:

a. Self-care.

b. Understanding and use of language.

c. Learning.

d. Mobility.

e. Self-direction.

f. Capacity for independent living.

"Respite care" means services provided to [ unpaid ] caretakers of eligible recipients who are unable to care for themselves that is provided on an episodic or routine basis because of the absence of or need for relief of those persons residing with the recipient who normally provide the care.

"Respite care agency" means a participating provider that renders services designed to prevent or reduce inappropriate institutional care by providing respite care services to eligible recipients for their caregivers.

"Screening" means the process to evaluate the medical, nursing, and social needs of recipients referred for screening; determine Medicaid eligibility for an ICF/MR level of care; and authorize Medicaid-funded ICF/MR care or community-based care for those recipients who meet ICF/MR level of care eligibility and require that level of care.

"Screening team" means the entity contracted with the DMAS which is responsible for performing screening for the IFDDS Waiver.

[ ~~"Service coordination provider" means the provider contracted by DMAS that is responsible for ensuring development and monitoring of the CSP, management training, and review activities as required by DMAS for attendant care and consumer-directed respite care services.~~ ]

"State Plan for Medical Assistance" or "the Plan" means the document containing the covered groups, covered services and their limitations, and provider reimbursement methodologies as provided for under Title XIX of the Social Security Act.

"Support coordination" means the assessment, planning, linking, and monitoring for recipients referred for the IFDDS community-based care waiver. Support coordination: (i) ensures the development, coordination, implementation, monitoring, and modification of consumer service plans; (ii) links recipients with appropriate community resources and supports; (iii) coordinates service providers; and (iv) monitors quality of care. [ Support coordination providers cannot be service providers to recipients in the IFDDS waiver with the exception of consumer-directed service facilitators. ]

"Supporting documentation" means the specific service plan developed by the recipient service provider related solely to the specific tasks required of that service provider. Supporting documentation helps to comprise the overall CSP for the recipient.

## Final Regulations

*"Supported employment"* means training in specific skills related to paid employment and provision of ongoing or intermittent assistance and specialized supervision to enable a recipient to maintain paid employment.

*"Therapeutic consultation"* means consultation provided by members of psychology, social work, behavioral analysis, speech therapy, occupational therapy, therapeutic recreation, or physical therapy disciplines or behavior consultation to assist recipients, parents, family members, in-home residential support, day support and any other providers of support services in implementing a CSP.

**12 VAC 30-120-710. General coverage and requirements for all home and community-based care waiver services.**

A. *Waiver service populations.* Home and community-based services shall be available through a § 1915(c) waiver. Coverage shall be provided under the waiver for recipients six years of age and older with related conditions as defined in 42 CFR 435.1009, including autism, who have been determined to require the level of care provided in an intermediate care facility for the mentally retarded. The individual must not also have a diagnosis of mental retardation as defined by the American Association on Mental Retardation (AAMR).

B. *Coverage statement.*

1. Covered services shall include in-home residential supports, day support, supported employment, personal care (agency-directed), attendant care (consumer-directed), respite care (both agency- and consumer-directed), assistive technology, environmental modifications, nursing services, therapeutic consultation, crisis stabilization, personal emergency response systems (PERS), family/caregiver training, and companion care.

2. These services shall be medically appropriate and necessary to maintain these recipients in the community. Federal waiver requirements provide that the average per capita fiscal year expenditures under the waiver must not exceed the average per capita expenditures for the level of care provided in Intermediate Care Facilities for the Mentally Retarded under the State Plan that would have been made had the waiver not been granted.

3. Under this § 1915(c) waiver, DMAS waives subsection (a)(10)(B) of § 1902 of the Social Security Act related to comparability.

C. *Appeals.* Recipient appeals shall be considered pursuant to 12 VAC 30-110-10 through 12 VAC 30-110-380. Provider appeals shall be considered pursuant to 12 VAC 30-10-1000 and 12 VAC 30-20-500 through 12 VAC 30-20-599.

**12 VAC 30-120-720. Recipient qualification and eligibility requirements; intake process.**

A. Recipients receiving services under this waiver must meet the following requirements. Virginia will apply the financial eligibility criteria contained in the State Plan for the categorically needy. Virginia has elected to cover the optional categorically needy groups under 42 CFR 435.121 and 435.217. The income level used for 42 CFR 435.121 and 435.217 is 300% of the current Supplemental Security Income payment standard for one person.

1. Under this waiver, the coverage groups authorized under § 1902(a)(10)(A)(ii)(VI) of the Social Security Act will be considered as if they were institutionalized for the purpose of applying institutional deeming rules. All recipients under the waiver must meet the financial and nonfinancial Medicaid eligibility criteria and meet the institutional level of care criteria. The deeming rules are applied to waiver eligible recipients as if the recipient were residing in an institution or would require that level of care.

2. Virginia shall reduce its payment for home and community-based services provided to an individual who is eligible for Medicaid services under 42 CFR 435.217 by that amount of the individual's total income (including amounts disregarded in determining eligibility) that remains after allowable deductions for personal maintenance needs, deductions for other dependents, and medical needs have been made, according to the guidelines in 42 CFR 435.735 and § 1915(c)(3) of the Social Security Act as amended by the Consolidated Omnibus Budget Reconciliation Act of 1986. The DMAS will reduce its payment for home and community-based waiver services by the amount that remains after the deductions listed below:

a. For recipients to whom § 1924(d) applies, and for whom Virginia waives the requirement for comparability pursuant to § 1902(a)(10)(B), deduct the following in the respective order:

(1) The basic maintenance needs for an individual, which is equal to the SSI payment for one person. Due to expenses of employment, a working individual shall have an additional income allowance. For an individual employed 20 hours or more per week, earned income shall be disregarded up to a maximum of 300% SSI; for an individual employed at least eight but less than 20 hours per week, earned income shall be disregarded up to a maximum of 200% of SSI. If the individual requires a guardian or conservator who charges a fee, the fee, not to exceed an amount greater than 5.0% of the individual's total monthly income, is added to the maintenance needs allowance. However, in no case shall the total amount of the maintenance needs allowance (basic allowance plus earned income allowance plus guardianship fees) for the individual exceed 300% of SSI.

(2) For an individual with a spouse at home, the community spousal income allowance determined in accordance with § 1924(d) of the Social Security Act.

(3) For an individual with a family at home, an additional amount for the maintenance needs of the family determined in accordance with § 1924(d) of the Social Security Act.

(4) Amounts for incurred expenses for medical or remedial care that are not subject to payment by a third party including Medicare and other health insurance premiums, deductibles, or coinsurance charges and necessary medical or remedial care recognized under state law but not covered under the Plan.

# Final Regulations

b. For individuals to whom § 1924(d) does not apply and for whom Virginia waives the requirement for comparability pursuant to § 1902(a)(10)(B), deduct the following in the respective order:

(1) The basic maintenance needs for an individual, which is equal to the SSI payment for one person. Due to expenses of employment, a working individual shall have an additional income allowance. For an individual employed 20 hours or more per week, earned income shall be disregarded up to a maximum of 300% SSI; for an individual employed at least eight but less than 20 hours per week, earned income shall be disregarded up to a maximum of 200% of SSI. If the individual requires a guardian or conservator who charges a fee, the fee, not to exceed an amount greater than 5.0% of the individual's total monthly income, is added to the maintenance needs allowance. However, in no case shall the total amount of the maintenance needs allowance (basic allowance plus earned income allowance plus guardianship fees) for the individual exceed 300% of SSI.

(2) For an individual with a dependent child or children, an additional amount for the maintenance needs of the child or children which shall be equal to the medically needy income standard based on the number of dependent children.

(3) Amounts for incurred expenses for medical or remedial care that are not subject to payment by a third party including Medicare and other health insurance premiums, deductibles, or coinsurance charges and necessary medical or remedial care recognized under state law but not covered under the state medical assistance plan.

B. Assessment and authorization of home and community-based care services.

1. To ensure that Virginia's home and community-based care waiver programs serve only recipients who would otherwise be placed in an ICF/MR, home and community-based care services shall be considered only for individuals who are eligible for admission to an ICF/MR, absent a diagnosis of mental retardation. Home and community-based care services shall be the critical service that enables the individual to remain at home rather than being placed in an ICF/MR.

2. The recipient's status as an individual in need of IFDDS home and community-based care services shall be determined by the IFDDS screening team after completion of a thorough assessment of the recipient's needs and available support. Screening of home and community-based care services by the IFDDS screening team or DMAS staff is mandatory before Medicaid will assume payment responsibility of home and community-based care services.

3. The IFDDS screening team shall gather relevant medical, social, and psychological data and identify all services received by the recipient.

[ 4. Children under six years of age shall not be screened until three months prior to the month of their sixth birthday. Children under six years of age shall not be added to the waiver/wait list until the month in which their sixth birthday occurs. ]

[ 4. 5. ] An essential part of the IFDDS screening team's assessment process is determining the level of care required by applying existing DMAS ICF/MR criteria (12 VAC 30-130-430 et seq.).

[ 5. 6. ] The team shall explore alternative settings and services to provide the care needed by the individual. If placement in an ICF/MR or a combination of other services is determined to be appropriate, the IFDDS screening team shall initiate a referral for service. If Medicaid-funded home and community-based care services are determined to be the critical service to delay or avoid placement in an ICF/MR or promote exiting from an institutional setting, the IFDDS screening team shall initiate a referral for service to a support coordinator of the recipient's choice.

[ 6. 7. ] Home and community-based care services shall not be provided to any individual who also resides in a nursing facility, an ICF/MR, a hospital, an adult family home licensed by the DSS, or an assisted living facility licensed by the DSS.

[ 7. 8. ] Medicaid will not pay for any home and community-based care services delivered prior to the authorization date approved by DMAS. Any Consumer Service Plan for home- and community-based care services must be pre-approved by DMAS prior to Medicaid reimbursement for waiver services.

[ 8. 9. ] The following five criteria shall apply to all IFDDS Waiver services:

a. Individuals qualifying for IFDDS Waiver services must have a demonstrated clinical need for the service resulting in significant functional limitations in major life activities. In order to be eligible, a person must [ be six years of age or older, ] have a related condition as defined in these regulations and cannot have a diagnosis of mental retardation, and who would, in the absence of waiver services, require the level of care provided in an ICF/MR facility, the cost of which would be reimbursed under the Plan;

b. The Consumer Service Plan and services [ which that ] are delivered must be consistent with the Medicaid definition of each service;

c. Services must be approved by the support coordinator based on a current functional assessment tool approved by DMAS or other DMAS approved assessment and demonstrated need for each specific service;

d. Individuals qualifying for IFDDS Waiver services must meet the ICF/MR level of care criteria; and

e. The individual must be eligible for Medicaid as determined by the local office of DSS.

[ 9. 10. ] The IFDDS screening teams must submit the results of the comprehensive assessment and a recommendation to DMAS staff for final determination of

# Final Regulations

ICF/MR level of care and authorization for community-based care services.

C.  Screening for the IFDDS Waiver.

1.  Individuals requesting IFDDS Waiver services will be screened and will receive services on a first-come, first-served basis in accordance with available funding based on the date the recipients' applications are received. Individuals who meet at least one of the emergency criteria pursuant to 12 VAC 30-120-790 shall be eligible for immediate access to waiver services if funding is available.

2.  To be eligible for IFDDS Waiver services, the individual must:

a.  Be determined to be eligible for the ICF/MR level of care;

[ b.  Be six years of age or older, ]

[ b̶. c. ] Meet the related conditions definition as defined in 42 CFR 435.1009 or be diagnosed with autism; and

[ c̶. d. ] Not have a diagnosis of mental retardation as defined by the American Association on Mental Retardation (AAMR) as contained in 12 VAC 30-120-710.

D.  Waiver approval process:  available funding.

1.  In order to ensure cost effectiveness of the IFDDS Waiver, the funding available for the waiver will be allocated between two budget levels.  The budget will be the cost of waiver services only and will not include the costs of other Medicaid covered services.  Other Medicaid services, however, must be counted toward cost effectiveness of the IFDDS Waiver.  All services available under the waiver are available to both levels.

2.  Level one will be for individuals whose comprehensive consumer service plan (CSP) is expected to cost less than $25,000 per fiscal year.  Level two will be for individuals whose CSP is expected to cost equal to or more than $25,000.  There will not be a threshold for budget level two; however, if the actual cost of waiver services exceeds the average annual cost of ICF/MR care for an individual, the recipient's care will be coordinated by DMAS staff.

3.  Fifty-five percent of available waiver funds will be allocated to budget level one, and 40% of available waiver funds will be allocated to level two in order to ensure that the waiver will be cost effective.  The remaining 5.0% of available waiver funds will be allocated for emergencies as defined in 12 VAC 30-120-790.  Recipients who have been placed in budget level one and who subsequently require additional services that would exceed $25,000 per fiscal year must meet the emergency criteria as defined in 12 VAC 30-120-790 to receive additional funding for services.

E.  Waiver approval process:  accessing services.

1.  Once the screening entity has determined that an individual meets the eligibility criteria for IFDDS Waiver services and the individual has chosen this service, the screening entity will provide the individual with a list of available support coordinators.  The individual will choose a

support coordinator within 10 calendar days and the screening entity will forward the screening materials within 10 calendar days to the selected support coordinator.

2.  The support coordinator will contact the recipient within 10 calendar days of receipt of screening materials.  The support coordinator and the recipient or recipient's family will meet within 30 calendar days to discuss the recipient's needs, existing supports and to develop a preliminary consumer service plan (CSP) which will identify services needed and will estimate the annual waiver cost of the recipient's CSP.  If the recipient's annual waiver cost is expected to exceed the average annual cost of ICF/MR care for an individual, the recipient's support coordination will be managed by DMAS.

3.  Once the CSP has been initially developed, the support coordinator will contact DMAS to receive prior authorization to enroll the recipient in the IFDDS Waiver. [ DMAS shall, within 14 days of receiving all supporting documentation, either approve for Medicaid coverage or deny for Medicaid coverage the CSP. ]  DMAS shall only authorize waiver services for the recipient if funding is available for the entire CSP.  Once this authorization has been received, the support coordinator shall inform the recipient so that the recipient can begin choosing service providers for services listed in the CSP.  If DMAS does not have the available funding for this recipient, the recipient will be held on the waiting list until such time as funds are available to cover the cost of the CSP.

4.  Once the recipient has been authorized for the waiver, the recipient or support coordinator shall contact service providers and initiate services within 60 days.  During this time, the consumer, support coordinator, and service providers will meet to complete the CSP.  If services are not initiated within 60 days, the support coordinator must submit information to DMAS demonstrating why more time is needed to initiate services.  DMAS has authority to approve or deny the request in 30-day extensions.  The service providers will develop supporting documentation for each service and will submit a copy of these plans to the support coordinator.  The support coordinator will monitor the service providers' supporting documentation to ensure that all providers are working toward the identified goals of recipients.  The support coordinator will review and sign off on the supporting documentation and will contact DMAS for prior authorization of services and will notify the service providers when services are approved.

5.  The support coordinator will contact the recipient at a minimum on a monthly basis and as needed to coordinate services and maintain the recipient's CSP.  DMAS will conduct annual level of care reviews in which the recipient is assessed to ensure he continues to meet waiver criteria.  DMAS will review recipients' CSPs and will review the services provided by support coordinators as well as service providers.

**12 VAC 30-120-730.  General requirements for home and community-based care participating providers.**

A.  Providers approved for participation shall, at a minimum, perform the following activities:

# Final Regulations

1. Immediately notify DMAS, in writing, of any change in the information that the provider previously submitted to DMAS.

2. Assure freedom of choice to recipients in seeking medical care from any institution, pharmacy, practitioner, or other provider qualified to perform the service or services required and participating in the Medicaid Program at the time the service or services were performed.

3. Assure the recipient's freedom to reject medical care and treatment.

4. Accept referrals for services only when staff is available to initiate services and perform such services on an ongoing basis.

5. Provide services and supplies to recipients in full compliance with Title VI of the Civil Rights Act of 1964, as amended (42 USC §§ 2000d through 2000d-4a), which prohibits discrimination on the grounds of race, color, or national origin; the Virginians with Disabilities Act (Title 51.5, § 51.5-1 et seq. of the Code of Virginia); § 504 of the Rehabilitation Act of 1973, as amended (29 USC § 794), which prohibits discrimination on the basis of a disability; and the Americans with Disabilities Act, as amended (42 USC §§ 12101 through 12213), which provides comprehensive civil rights protections to recipients with disabilities in the areas of employment, public accommodations, state and local government services, and telecommunications.

6. Provide services and supplies to recipients of the same quality and in the same mode of delivery as provided to the general public.

7. Submit charges to DMAS for the provision of services and supplies to recipients in amounts not to exceed the provider's usual and customary charges to the general public. The provider must accept as payment in full the amount established by DMAS payment methodology from the first day of eligibility for the waiver services.

8. Use program-designated billing forms for submission of charges.

9. Maintain and retain business and professional records sufficient to document fully and accurately the nature, scope, and details of the care provided.

a. In general, such records shall be retained for at least five years from the last date of service or as provided by applicable state laws, whichever period is longer. However, if an audit is initiated within the required retention period, the records shall be retained until the audit is completed and every exception resolved. Records of minors shall be kept for at least five years after such minor has reached the age of 18 years.

b. Policies regarding retention of records shall apply even if the provider discontinues operation. DMAS shall be notified in writing of storage, location, and procedures for obtaining records for review should the need arise. The location, agent, or trustee shall be within the Commonwealth of Virginia.

c. An attendance log or similar document must be maintained which indicates the date, type of services rendered, and number of hours/units provided (including specific time frame).

10. The provider agrees to furnish information on request and in the form requested to DMAS, the Attorney General of Virginia or his authorized representatives, federal personnel, and the State Medicaid Fraud Control Unit. The Commonwealth's right of access to provider agencies and records shall survive any termination of the provider agreement.

11. Disclose, as requested by DMAS, all financial, beneficial, ownership, equity, surety, or other interests in any and all firms, corporations, partnerships, associations, business enterprises, joint ventures, agencies, institutions, or other legal entities providing any form of health care services to recipients of Medicaid.

12. Hold confidential and use for DMAS authorized purposes only all medical assistance information regarding recipients served. A provider shall disclose information in his possession only when the information is used in conjunction with a claim for health benefits or the data is necessary for the functioning of the DMAS. DMAS shall not disclose medical information to the public.

13. Change of Ownership. When ownership of the provider agency changes, DMAS shall be notified at least 15 calendar days before the date of change.

14. For (ICF/MR) facilities covered by § 1616(e) of the Social Security Act in which respite care as a home and community-based care service will be provided, the facilities shall be in compliance with applicable standards that meet the requirements for board and care facilities. Health and safety standards shall be monitored through the DMHMRSAS' licensure standards, 12 VAC 35-102-10 et seq.

15. Suspected Abuse or Neglect. Pursuant to §§ 63.1-55.3 and 63.1-248.3 of the Code of Virginia, if a participating provider knows or suspects that a home and community-based care recipient is being abused, neglected, or exploited, the party having knowledge or suspicion of the abuse, neglect, or exploitation shall report this immediately from first knowledge to the local DSS adult or child protective services worker and to DMAS.

16. Adherence to provider contract and the DMAS provider service manual. In addition to compliance with the general conditions and requirements, all providers enrolled by DMAS shall adhere to the conditions of participation outlined in their individual provider contracts and in the DMAS provider manual.

**12 VAC 30-120-740. Participation standards for home and community-based care participating providers.**

A. Requests for participation. Requests will be screened to determine whether the provider applicant meets the basic requirements for participation.

## Final Regulations

B.  Provider participation standards.  For DMAS to approve contracts with home and community-based care providers, the following standards shall be met:

　　1.  Licensure and certification requirements pursuant to 42 CFR 441.352.

　　2.  Disclosure of ownership pursuant to 42 CFR 455.104 and 455.105.

C.  Adherence to provider contract and special participation conditions.  In addition to compliance with the general conditions and requirements, all providers enrolled by DMAS shall adhere to the conditions of participation outlined in their provider contracts.

D.  Recipient choice of provider agencies.  The recipient will have the option of selecting the provider agency of his choice.

E.  Review of provider participation standards and renewal of contracts.  DMAS is responsible for assuring continued adherence to provider participation standards.  DMAS shall conduct ongoing monitoring of compliance with provider participation standards and DMAS policies and recertify each provider for contract renewal with DMAS to provide home and community-based services.  A provider's noncompliance with DMAS policies and procedures, as required in the provider's contract, may result in a written request from DMAS for a corrective action plan which details the steps the provider must take and the length of time permitted to achieve full compliance with the plan to correct the deficiencies which have been cited.

F.  Termination of provider participation.  A participating provider may voluntarily terminate his participation in Medicaid by providing 30 days' written notification.  DMAS shall be permitted to administratively terminate a provider from participation upon 30 days' notification.  DMAS may also cancel a contract immediately or may give notification in the event of a breach of the contract by the provider as specified in the DMAS contract.  Such action precludes further payment by DMAS for services provided to recipients subsequent to the date specified in the termination notice.

G.  Reconsideration of adverse actions.  A provider shall have the right to appeal adverse action taken by DMAS.  Adverse action includes, but shall not be limited to, termination of the provider agreement by DMAS, and retraction of payments from the provider by DMAS for noncompliance with applicable law, regulation, policy, or procedure.  All disputes regarding provider reimbursement or termination of the agreement by DMAS for any reason shall be resolved through administrative proceedings conducted at the office of DMAS in Richmond, Virginia.  These administrative proceedings and judicial review of such administrative proceedings shall be conducted pursuant to the Virginia Administrative Process Act (§ 9-6.14:1 et seq. of the Code of Virginia), the State Plan for Medical Assistance provided for in § 32.1-325 of the Code of Virginia, and duly promulgated regulations.  Court review of final agency determinations concerning provider reimbursement shall be made in accordance with the Administrative Process Act.

H.  Termination of a provider contract upon conviction of a felony.  Section 32.1-325 C of the Code of Virginia mandates that "any such [ Medicaid ] agreement or contract shall terminate upon conviction of the provider of a felony."  A provider convicted of a felony in Virginia or in any other of the 50 states or Washington, D.C., must, within 30 days, notify the Medicaid Program of this conviction and relinquish its provider agreement.  Reinstatement will be contingent upon provisions of state law.  In addition, termination of a provider contract will occur as may be required for federal financial participation.

I.  Support coordinator's responsibility for the Recipient Information Form (DMAS-122).  It is the responsibility of the support coordinator to notify DMAS and DSS, in writing, when any of the following circumstances occur:

　　1.  Home and community-based care services are implemented.

　　2.  A recipient dies.

　　3.  A recipient is discharged or terminated from services.

　　4.  Any other circumstances (including hospitalization) that cause home and community-based care services to cease or be interrupted for more than 30 days.

J.  Changes or termination of care.  It is the DMAS staff's responsibility to authorize any changes to supporting documentation of a recipient's CSP based on the recommendations of the support coordinator.  Agencies providing direct service are responsible for modifying the supporting documentation if the recipient or parent/legal guardian agrees.  The provider will submit the supporting documentation to the support coordinator any time there is a change in the recipient's condition or circumstances that may warrant a change in the amount or type of service rendered.  The support coordinator will review the need for a change and will sign the supporting documentation if he agrees to the changes.  The support coordinator will submit the revised supporting documentation to the DMAS staff to receive approval for that change.  The DMAS staff has the final authority to approve or deny the requested change to recipients' supporting documentation.

　　1.  Nonemergency termination of home and community-based care services by the participating provider.  The participating provider shall give the recipient and family and support coordinator 10 days' written notification of the intent to terminate services.  The letter shall provide the reasons for and effective date of the termination.  The effective date of services termination shall be at least 10 days from the date of the termination notification letter.

　　2.  Emergency termination of home and community-based care services by the participating provider.  In an emergency situation when the health and safety of the recipient or provider agency personnel is endangered, the support coordinator and DMAS must be notified prior to termination.  The 10-day written notification period shall not be required.  If appropriate, the local DSS adult protective services or child protective services agency must be notified immediately.

# Final Regulations

3. The DMAS termination of eligibility to receive home and community-based care services. DMAS shall have the ultimate responsibility for assuring appropriate placement of the recipient in home and community-based care services and the authority to terminate such services to the recipient for the following reasons:

a. The home and community-based care service is not the critical alternative to prevent or delay institutional (ICF/MR) placement;

b. The recipient no longer meets the institutional level of care criteria;

c. The recipient's environment does not provide for his health, safety, and welfare; or

d. An appropriate and cost-effective CSP cannot be developed.

Article 2.
Covered Services and Limitations and Related Provider Requirements.

**12 VAC 30-120-750. In-home residential support services.**

A. Service description. In-home residential support services shall be based in the recipient's home. The service shall be designed to enable recipients qualifying for the IFDDS Waiver to be maintained in their homes and shall include: (i) training in or reinforcement of functional skills and appropriate behavior related to a recipient's health and safety, personal care, activities of daily living and use of community resources; (ii) assistance with medication management and monitoring the recipient's health, nutrition, and physical condition; (iii) life skills training; (iv) cognitive rehabilitation; and (v) assistance with personal care activities of daily living and use of community resources. Service providers shall be reimbursed only for the amount and type of in-home residential support services included in the recipient's approved CSP. In-home residential support services shall not be authorized in the CSP unless the recipient requires these services and these services exceed services provided by the family or other caregiver. Services will not be provided for a continuous 24-hour period.

1. This service must be provided on a recipient-specific basis according to the CSP, supporting documentation, and service setting requirements.

2. This service may not be provided to any recipient who simultaneously receives personal care or attendant care services under the IFDDS Waiver or other residential program that provides a comparable level of care.

3. Room and board and general supervision shall not be components of this service.

4. This service shall not be used solely to provide routine or emergency respite care for the parent or parents or other caregivers with whom the recipient lives.

B. Criteria.

1. All recipients must meet the following criteria in order for Medicaid to reimburse for in-home residential support services. The recipient must meet the eligibility requirements for this waiver service as herein defined. The recipient shall have a demonstrated need for supports to be provided by staff who are paid by the in-home residential support provider.

2. A functional assessment must be conducted to evaluate each recipient in his home environment and community settings.

3. Routine supervision/oversight of direct care staff. To provide additional assurance for the protection or preservation of a recipient's health and safety, there are specific requirements for the supervision and oversight of direct care staff providing residential support as outlined below. For all in-home residential support services provided under a DMHMRSAS license:

a. An employee of the agency, typically by position, must be formally designated as the supervisor of each direct care staff person who is providing in-home residential support services.

b. The supervisor must have and document at least one supervisory contact per month with each staff person regarding service delivery and staff performance.

c. The supervisor must observe each staff person delivering services at least semi-annually. Staff performance and service delivery according to the CSP should be documented, along with evaluation and evidence of recipient satisfaction with service delivery by staff.

d. Providers of in-home residential supports must also have and document at least one monthly contact with the recipient regarding satisfaction with services delivered by each staff person. If the recipient has a guardian, the guardian should be contacted.

4. The in-home residential support supporting documentation must indicate the necessary amount and type of activities required by the recipient, the schedule of residential support services, the total number of hours per day, and the total number of hours per week of in-home residential support.

5. Medicaid reimbursement is available only for in-home residential support services provided when the recipient is present and when a qualified provider is providing the services.

C. Service units and service limitations. In-home residential supports shall be reimbursed on an hourly basis for time the in-home residential support staff is working directly with the recipient. Total monthly billing cannot exceed the total hours authorized in the CSP. The provider must maintain documentation of the date and times that the services are provided, services that were provided, and specific circumstances which prevented provision of all of the scheduled services.

D. Provider requirements. In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, each in-home residential support service provider must be licensed by DMHMRSAS as a provider of supportive residential services or have CARF

# Final Regulations

certification. The provider must also have training in the characteristics of developmental disabilities and appropriate interventions, strategies, and support methods for persons with developmental disabilities and functional limitations.

1. For DMHMRSAS licensed programs, a CSP and ongoing documentation must be consistent with licensing regulations. [ For CARF certified programs, a CSP and ongoing documentation must be consistent with subdivisions 2 through 5 of this subsection. ]

2. Documentation must confirm attendance and the amount of time in services and provide specific information regarding the recipient's response to various settings and supports as agreed to in the supporting documentation objectives. Assessment results must be available in at least a daily note or a weekly summary. Data must be collected as described in the CSP, analyzed, summarized, and then clearly addressed in the regular supporting documentation.

3. The supporting documentation must be reviewed by the provider with the recipient, and this review submitted to the support coordinator, at least semi-annually, with goals, objectives, and activities modified as appropriate.

4. Documentation must be maintained for routine supervision and oversight of all in-home residential support staff. All significant contacts described in this section must be documented.

5. Documentation must be completed and signed by the staff person designated to perform the supervision and oversight and include:

a. Date of contact or observation;

b. Person or persons contacted or observed;

c. A note regarding staff performance and supporting documentation service delivery for monthly contact and semi-annual home visits;

d. Semi-annual observation documentation must also address recipient satisfaction with service provision; and

e. Any action planned or taken to correct problems identified during supervision and oversight.

**12 VAC 30-120-751. Reserved.**

**12 VAC 30-120-752. Day support services.**

A. Service description. Day support services shall include a variety of training, support, and supervision offered in a setting (other than the home or recipient residence), which allows peer interactions and community integration. When services are provided through alternative payment sources, the consumer service plan shall not authorize them as a waiver funded expenditure. Service providers are reimbursed only for the amount and type of day support services included in the recipient's approved CSP based on the setting, intensity, and duration of the service to be delivered.

B. Criteria. For day support services, recipients must demonstrate the need for functional training, assistance, and specialized training offered in settings other than the recipient's own residence that allow an opportunity for being productive and contributing members of communities. In addition, day support services will be available for recipients who cannot benefit from supported employment services and who need the services for accessing in-home supported living services, increasing levels of independent skills within current daily living situations, or sustaining skills necessary for continuing the level of independence in current daily living situations.

1. A functional assessment should be conducted by the provider to evaluate each recipient in his home environment and community settings.

2. Levels of day support. The amount and type of day support included in the recipient's consumer service plan is determined according to the services required for that recipient. There are two types of day support: center-based, which is provided partly or entirely in a segregated setting; or noncenter-based, which is provided entirely in community settings. Both types of day support may be provided at either intensive or regular levels. To be authorized at the intensive level, the recipient must have extensive disability-related difficulties and require additional, ongoing support to fully participate in programming and to accomplish his service goals; or the recipient requires extensive constant supervision to reduce or eliminate behaviors that preclude full participation in the program. A formal, written behavioral program is required to address behaviors such as, but not limited to, withdrawal, self-injury, aggression, or self-stimulation.

C. Service units and service limitations. Day support cannot be regularly or temporarily (e.g., due to inclement weather or recipient illness) provided in a recipient's home or other residential setting without written prior approval from DMAS. [ If prevocational services are offered, the plan of care must contain documentation regarding whether prevocational services are available in vocational rehabilitation agencies through § 110 of the Rehabilitation Act of 1973 or in Special Education services through § 602 (16) and (17) of the Individuals with Disabilities Act. When services are provided through these sources, the plan of care shall not authorize them as a waiver expenditure. Compensation for prevocational services can only be made when the individual's productivity is less than 50% of the minimum wage. ] Noncenter-based day support services must be separate and distinguishable from either in-home residential support services or personal care services. There must be separate supporting documentation for each service and each must be clearly differentiated in documentation and corresponding billing. The supporting documentation must provide an estimate of the amount of day support required by the recipient. The maximum is 780 units per calendar year. Transportation shall not be billable as a day support service.

1. One unit shall be 1 to 3.99 hours of service a day.

2. Two units are 4 to 6.99 hours of service a day.

3. Three units are 7 or more hours of service a day.

D. Provider requirements. In addition to meeting the general conditions and requirements for home and community-based

# Final Regulations

*care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, day support providers need to meet additional requirements.*

*1.  For DMHMRSAS programs licensed as day support programs, the CSP, supporting documentation, and ongoing documentation must be consistent with licensing regulations.   For programs certified by CARF as day support programs, there must be supporting documentation, which contains at a minimum, the following elements:*

*a.  The recipient's strengths, desired outcomes, required or desired supports and training needs;*

*b.  The recipient's goals and, for a training goal, a sequence of measurable objectives to meet the above identified outcomes;*

*c.  Services to be rendered and the frequency of services to accomplish the above goals and objectives;*

*d.  All individuals or organizations that will provide the services specified in the statement of services;*

*e.  A timetable for the accomplishment of the recipient's goals and objectives;*

*f.  The estimated duration of the recipient's needs for services; and*

*g.  The individual or individuals responsible for the overall coordination and integration of the services specified in the CSP.*

*2.  Documentation must confirm the recipient's attendance and amount of time in services and provide specific information regarding the recipient's response to various settings and supports as agreed to in the supporting documentation objectives.   Assessment results shall be available in at least a daily note or a weekly summary.*

*a.  The supporting documentation must be reviewed by the provider with the recipient, and this review submitted to the support coordinator at least semi-annually with goals, objectives, and activities modified as appropriate.*

*b.  An attendance log or similar document must be maintained that indicates the date, type of services rendered, and the number of hours and units provided (including specific time frame).*

*c.  Documentation must indicate whether the services were center-based or noncenter-based.*

*d.  If intensive day support services are requested, in order to verify which of these criteria the recipient met, documentation must be present in the recipient's record to indicate the specific supports and the reasons they are needed.   For reauthorization of intensive day support services, there must be clear documentation of the ongoing needs and associated staff supports.*

**12 VAC 30-120-753.  Reserved.**

**12 VAC 30-120-754.  Supported employment services.**

*A.  Service description.*

*1.  Supported employment services shall include training in specific skills related to paid employment and provision of ongoing or intermittent assistance or specialized training to enable a recipient to maintain paid employment. Each supporting documentation must contain documentation regarding whether supported employment services are available in vocational rehabilitation agencies through the Rehabilitation Act of 1973 or in special education services through 20 USC § 1401 of the Individuals with Disabilities Education Act (IDEA).  Providers of these DRS and IDEA services cannot be reimbursed by Medicaid with the IFDDS Waiver funds.  Waiver service providers are reimbursed only for the amount and type of habilitation services included in the recipient's approved CSP based on the intensity and duration of the service delivered. Reimbursement shall be limited to actual interventions by the provider of supported employment, not for the amount of time the recipient is in the supported employment environment.*

*2.  Supported employment can be provided in one of two models.  Recipient supported employment is defined as intermittent support, usually provided one on one by a job coach to a recipient in a supported employment position. Group supported employment is defined as continuous support provided by staff to eight or fewer recipients with disabilities in an enclave, work crew, or bench work/entrepreneurial model.  The recipient's assessment and CSP must clearly reflect the recipient's need for training and supports.*

*B.  Criteria for receipt of services.*

*1.  Only job development tasks that specifically include the recipient are allowable job search activities under the IFDDS Waiver supported employment and only after determining this service is not available from DRS.*

*2.  In order to qualify for these services, the recipient shall have a demonstrated need for training, specialized supervision, or assistance in paid employment and for whom competitive employment at or above the minimum wage is unlikely without this support and who, because of the disability, needs ongoing support, including supervision, training and transportation to perform in a work setting.*

*3.  A functional assessment should be conducted to evaluate each recipient in his home environment and community settings.*

*4.  The supporting documentation must provide the amount of supported employment required by the recipient. Service providers are reimbursed only for the amount and type of supported employment included in the recipient's CSP.*

*C.  Service units and service limitations.*

*1.  Supported employment for recipient job placement will be billed on an hourly basis.  Transportation cannot be billable as a supported employment service.*

# Final Regulations

2. Group models of supported employment (enclaves, work crews and entrepreneurial model of supported employment) will be billed at the unit rate.

a. One unit is 1 to 3.99 hours of service a day.

b. Two units are 4 to 6.99 or more hours of service a day.

c. Three units are 7 or more hours of service a day.

3. For the recipient job placement model, reimbursement of supported employment will be limited to actual documented interventions or collateral contacts by the provider, not the amount of time the recipient is in the supported employment situation.

D. Provider requirements. In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, specific provider qualifications are as follows:

1. Supported employment services shall be provided by agencies that [ either ] are [ licensed by the DMHMRSAS as a day support service or are ] programs certified by CARF to provide supported employment services [ or are DRS vendors of supported employment services ].

2. Recipient ineligibility for [ supported employment services through ] DRS or Special Education services must be documented in the recipient's record, as applicable. If the recipient is older than 22 years and, therefore, not eligible for Special Education funding, documentation is required only for lack of DRS funding. Acceptable documentation would include a copy of a letter from DRS or the local school system or a record of a phone call (name, date, person contacted) documented in the support coordinator's case notes, Consumer Profile/Social assessment or on the supported employment supporting documentation. Unless the recipient's circumstances change, the original verification can be forwarded into the current record or repeated on the supporting documentation or revised Consumer Profile/Social Assessment on an annual basis.

3. Supporting documentation and ongoing documentation consistent with licensing regulations, if a DMHMRSAS licensed program.

4. For non-DMHMRSAS programs [ licensed certified ] as supported employment programs, there must be supporting documentation that contains, at a minimum, the following elements:

a. The recipient's strengths, desired outcomes, required/desired supports and training needs;

b. The recipient's goals and, for a training goal, a sequence of measurable objectives to meet the above identified outcomes;

c. Services to be rendered and the frequency of services to accomplish the above goals and objectives;

d. All individuals or organizations that will provide the services specified in the statement of services;

e. A timetable for the accomplishment of the recipient's goals and objectives;

f. The estimated duration of the recipient's needs for services; and

g. Individuals responsible for the overall coordination and integration of the services specified in the plan.

5. Documentation must confirm attendance and provide specific information regarding the recipient's response to various settings and supports as agreed to in the supporting documentation objectives. Assessment results should be available in at least a daily note or weekly summary.

6. The supporting documentation must be reviewed by the provider with the recipient, and this review submitted to the support coordinator, at least semi-annually, with goals, objectives and activities modified as appropriate.

**12 VAC 30-120-755. Reserved.**

**12 VAC 30-120-756. Therapeutic consultation.**

A. Service description. Therapeutic consultation is available under the waiver for Virginia licensed or certified practitioners in psychology, social work, occupational therapy, physical therapy, therapeutic recreation, rehabilitation [ engineering ], and speech [ /language ] therapy. Behavior consultation performed by these individuals may also be a covered waiver service. These services may be provided, based on the recipient's CSP, for those recipients for whom specialized consultation is clinically necessary to enable their utilization of waiver services. Therapeutic consultation services [ , other than behavior consultation, ] may be provided in in-home residential or day support settings or in office settings in conjunction with another waiver service. Only behavior consultation may be offered in the absence of any other waiver service when the consultation provided to informal caregivers is determined to be necessary to prevent institutionalization. Therapeutic consultation service providers are reimbursed according to the amount and type of service authorized in the CSP based on an hourly fee for service.

B. Criteria. In order to qualify for these services, the recipient shall have a demonstrated need for consultation in any of these services. Documented need must indicate that the CSP cannot be implemented effectively and efficiently without such consultation from this service.

1. The recipient's CSP must clearly reflect the recipient's needs, as documented in the social assessment, for specialized consultation provided to caregivers in order to implement the CSP effectively.

2. Therapeutic consultation services may neither include direct therapy provided to waiver recipients nor duplicate the activities of other services that are available to the recipient through the State Plan of Medical Assistance.

C. Service units and service limitations. The unit of service shall equal one hour. The services must be explicitly detailed in the supporting documentation. Travel time, written preparation, and telephone communication are in-kind expenses within this service and are not billable as separate

# Final Regulations

*items. Therapeutic consultation may not be billed solely for purposes of monitoring.*

*D. Provider requirements. In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, professionals rendering therapeutic consultation services, including behavior consultation services, shall meet all applicable state licensure or certification requirements. Persons providing rehabilitation [ engineering shall be contracted with DRS consultation shall be rehabilitation engineers or certified rehabilitation specialists ].*

*1. Supporting documentation for therapeutic consultation. The following information is required in the supporting documentation:*

*a. Identifying information: recipient's name and Medicaid number; provider name and provider number; responsible person and telephone number; effective dates for supporting documentation; and semi-annual review dates, if applicable;*

*b. Targeted objectives, time frames, and expected outcomes;*

*c. Specific consultation; and*

*d. The expected outcomes.*

*2. Monthly and contact notes shall include:*

*a. Summary of consultative activities for the month;*

*b. Dates, locations, and times of service delivery;*

*c. Supporting documentation objectives addressed;*

*d. Specific details of the activities conducted;*

*e. Services delivered as planned or modified; and*

*f. Effectiveness of the strategies and recipients' and caregivers' satisfaction with service.*

*3. Semi-annual reviews are required by the service provider if consultation extends three months or longer, are to be forwarded to the support coordinator, and must include:*

*a. Activities related to the therapeutic consultation supporting documentation;*

*b. Recipient status and satisfaction with services; and*

*c. Consultation outcomes and effectiveness of support plan.*

*4. If consultation services extend less than three months, the provider must forward monthly contact notes or a summary of them to the support coordinator for the semi-annual review.*

*5. A written support plan, detailing the interventions and strategies for staff, family, or caregivers to use to better support the recipient in the service.*

*6. A final disposition summary must be forwarded to the support coordinator within 30 days following the end of this service and must include:*

*a. Strategies utilized;*

*b. Objectives met;*

*c. Unresolved issues; and*

*d. Consultant recommendations.*

**12 VAC 30-120-757. Reserved.**

**12 VAC 30-120-758. Environmental modifications.**

*A. Service description. Environmental modifications shall be available to recipients who are receiving at least one other waiver service. Environmental modifications shall be defined as those physical adaptations to the home, required by the individual's CSP, that are necessary to ensure the health, welfare, and safety of the individual, or that enable the individual to function with greater independence in the home and, without which, the individual would require institutionalization. Such adaptations may include the installation of ramps and grab-bars, widening of doorways, modification of bathroom facilities, or installation of specialized electric and plumbing systems which are necessary to accommodate the medical equipment and supplies that are necessary for the welfare of the individual. Excluded are those adaptations or improvements to the home that are of general utility and are not of direct medical or remedial benefit to the individual, such as carpeting, roof repairs, central air conditioning, etc. Adaptations that add to the total square footage of the home shall be excluded from this benefit. All services shall be provided in accordance with applicable state or local building codes. Modifications can be made to a vehicle if it is the primary vehicle being used by the individual.*

*B. Criteria. In order to qualify for these services, the recipient must have a demonstrated need for equipment or modifications of a remedial or medical benefit offered primarily in a recipient's home, vehicle, community activity setting, or day program to specifically improve the recipient's personal functioning. This service shall encompass those items not otherwise covered in the State Plan for Medical Assistance or through another program [ (e.g., DRS or the Consumer Service Fund) ].*

*C. Service units and service limitations. A maximum limit of $5,000 may be reimbursed per calendar year. Costs for environmental modifications shall not be carried over from year to year. All environmental modifications must be prior authorized by DMAS.*

*D. Provider requirements. In addition to meeting the general conditions and requirements for HCBC participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, environmental modifications must be provided in accordance with all applicable state or local building codes by contractors who have a provider agreement with DMAS.*

## Final Regulations

**12 VAC 30-120-759. Reserved.**

**12 VAC 30-120-760. Skilled nursing services.**

A. *Service description. Skilled nursing services shall be provided for recipients with serious medical conditions and complex health care needs who require specific skilled nursing services that cannot be provided by non-nursing personnel. Skilled nursing may be provided in the recipient's home or other community setting on a regularly scheduled or intermittent need basis.*

B. *Criteria. In order to qualify for these services, the recipient must demonstrated complex health care needs that require specific skilled nursing services ordered by a physician and that cannot be otherwise accessed under the Title XIX State Plan for Medical Assistance. The recipient's CSP must stipulate that this service is necessary in order to prevent institutionalization.*

C. *Service units and service limitations. Skilled nursing services to be rendered by either registered or licensed practical nurses are provided in hourly units.*

D. *Provider requirements. Skilled nursing services shall be provided by either a DMAS enrolled private duty nursing, a home health provider, or a licensed registered nurse or licensed practical nurse contracted or employed by a Community Services Board. In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, in order to be approved for skilled nursing contracts, the provider must:*

1. *If a home health agency, be certified by the VDH for Medicaid participation and have a DMAS contract for private duty nursing;*

2. *Demonstrate a prior successful health care delivery business or practice;*

3. *Operate from a business office; and*

4. *If community services boards employ or subcontract with and directly supervise a registered nurse (RN) or a licensed practical nurse (LPN) with a current and valid license issued by the Virginia State Board of Nursing, the RN or LPN must have at least two years of related clinical nursing experience that may include work in an acute care hospital, public health clinic, home health agency, or nursing home.*

**12 VAC 30-120-761. Reserved.**

**12 VAC 30-120-762. Assistive technology.**

A. *Service description. Assistive technology [ (AT) ] is available to recipients who are receiving at least one other waiver service and may be provided in a residential or nonresidential setting.*

B. *Criteria. In order to qualify for these services, the recipient must have a demonstrated need for equipment or modification for remedial or medical benefit primarily in a recipient's home, vehicle, community activity setting, or day program to specifically serve to improve the recipient's personal functioning. This shall encompass those items not*

*otherwise covered under the State Plan for Medical Assistance. [ Assistive technology shall be covered in the least expensive, most cost-effective manner. ]*

C. *Service units and service limitations. A maximum limit of $5,000 may be reimbursed per calendar year. Costs for assistive technology cannot be carried over from year to year. [ AT will not be approved for purposes of convenience or restraint. An independent consultation must be obtained for each AT request prior to approval by DMAS. All assistive technology must be prior authorized by DMAS. ]*

D. *Provider requirements. In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, assistive technology shall be provided by agencies under contract with the DMAS as durable medical equipment and supply providers. [ Independent consultants shall be speech/language therapists, physical therapists, occupational therapists, physicians, behavioral therapists, certified rehabilitation specialists, or rehabilitation engineers. ]*

**12 VAC 30-120-763. Reserved.**

**12 VAC 30-120-764. Crisis stabilization services.**

A. *Service description. Crisis stabilization services shall provide, as appropriate, neuropsychological, psychiatric, psychological and functional assessments and stabilization, medication management and behavior assessment and support, and intensive crisis coordination with other agencies and providers. These services shall be provided to:*

1. *Assist planning and delivery of services and supports to maintain community placement of the recipient;*

2. *Train family members and other care givers and service providers in positive behavioral supports to maintain the recipient in the community; and*

3. *Provide temporary crisis supervision to ensure the safety of the recipient and others;*

B. *Criteria.*

1. *In order to receive crisis stabilization services, the recipient must meet at least one of the following criteria:*

a. *The recipient is experiencing marked reduction in psychiatric, adaptive, or behavioral functioning;*

b. *The recipient is experiencing extreme increase in emotional distress;*

c. *The recipient needs continuous intervention to maintain stability; or*

d. *The recipient is causing harm to self or others.*

2. *The recipient must be at risk of at least one of the following:*

a. *Psychiatric hospitalization;*

b. *Emergency ICF/MR placement;*

c. *Disruption of community status (living arrangement, day placement, or school); or*

# Final Regulations

*d. Causing harm to self or others.*

*C.   Service units and service limitations.  Crisis stabilization services must be authorized following a documented face-to-face assessment conducted by a qualified mental health professional.*

*1.   The unit for each component of the service is one hour.  This service  may be authorized in 15-day increments, but no more than 60 days in a calendar year may be used.  The actual service units per episode shall be based on the documented clinical needs of the recipients being served.  Extension of services beyond the 15-day limit per authorization must be authorized following a documented face-to-face reassessment conducted by a qualified professional.*

*2.   Crisis stabilization services may be provided directly in the following settings (the examples below are not exclusive):*

*a.   The home of a recipient who lives with family or other primary caregiver or caregivers;*

*b.   The home of a recipient who lives independently or semi-independently to augment any current services and support;*

*[ c.  A community-based residential program to augment current services and supports; ]*

*[ d. c. ] A day program or setting to augment current services and supports; or*

*[ e. d. ] A respite care setting to augment current services and supports.*

*3.   Crisis supervision may be provided as a component of this service only if clinical or behavioral interventions allowed under this service are also provided during the authorized period.  Crisis supervision must be provided face-to-face with the recipient.*

*4.   Crisis stabilization services shall not be used for continuous long-term care.  Room and board and general supervision are not components of this service.*

*D.   Provider requirements.  In addition to the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, the following specific provider qualifications apply:*

*1.   Crisis stabilization services shall be provided by agencies licensed by DMHMRSAS as a provider of outpatient, residential, supportive residential services, or day support services.  The provider agency must employ or utilize qualified licensed mental health professionals or other qualified personnel competent to provide crisis stabilization and related activities to recipients with developmental disabilities who are experiencing serious behavioral problems.*

*2.   Crisis stabilization supporting documentation must be developed (or revised, in the case of a request for an extension) and submitted to the support coordinator for authorization within 72 hours of assessment or reassessment.*

*3.   Documentation indicating the dates and times of crisis stabilization services and amount and type of service provided must be recorded in the recipient's record.*

*4.   Documentation of qualifications of providers must be maintained for review by DMAS staff. This service shall be designed to stabilize the recipient and strengthen the current semi-independent living situation, or situation with family or other primary care givers, so the recipient can be maintained during and beyond the crisis period.*

**12 VAC 30-120-765.  Reserved.**

**12 VAC 30-120-766.  Personal care services.**

*A.   Service description.  Personal care services may be offered to recipients in their homes and communities as an alternative to more costly institutional care.  This service shall provide care to recipients with activities of daily living, medication or other medical needs or the monitoring of health status or physical condition. [ Recipients shall be permitted to share service hours for no more than two individuals living in the same home. ]*

*B.   Criteria.   In order to qualify for these services, the individual must demonstrate a need for such personal care.*

*C.   Service units and service limitations.  Recipients can have personal care and in-home residential support services in their service plan but cannot receive in-home residential supports and personal care services at the same time.  Each recipient must have an emergency back-up plan in case the personal care aide does not show up for work as expected.*

*D.   Provider requirements.  In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, personal care providers must meet additional provider requirements.*

*1.   Personal care services shall be provided by a DMAS certified personal care provider or by a DMHMRSAS licensed residential support provider.*

*2.   The personal care provider must:*

*a.   Demonstrate a prior successful health care delivery business.*

*b.   Operate from a business office.*

*c.   Employ or subcontract with and directly supervise an RN or an LPN who will provide ongoing supervision of all personal care aides.*

*(1)  The supervising RN and LPN must be currently licensed to practice in the Commonwealth and have at least two years of related clinical nursing experience that may include work in an acute care hospital, public health clinic, home health agency, or nursing facility.*

*(2)  The RN supervisor must make an initial assessment comprehensive home visit prior to the start of care for all new recipients admitted to personal care. The RN supervisor must also perform any subsequent reassessments or changes to the supporting documentation.*

# Final Regulations

*(3) The RN or LPN must make supervisory visits as often as needed to ensure both quality and appropriateness of services. The minimum frequency of these visits is every 30 to 90 days depending on recipient needs.*

*(4) The supervising RN or LPN summary must note:*

*(a) Whether personal care services continue to be appropriate;*

*(b) Whether the plan is adequate to meet the need or if changes are indicated in the plan;*

*(c) Any special tasks performed by the aide and the aide's qualifications to perform these tasks;*

*(d) Recipient's satisfaction with the service;*

*(e) Hospitalization or change in medical condition or functioning status;*

*(f) Other services received and their amount; and*

*(g) The presence or absence of the aide in the home during the RN's or LPN's visit.*

*(5) Employ and directly supervise personal care aides who will provide direct care to personal care recipients. Each aide hired by the provider agency shall be evaluated by the provider agency to ensure compliance with minimum qualifications as required by the DMAS. Each aide must:*

*(a) Be able to read and write;*

*(b) Have completed 40 hours of training consistent with the DMAS standards. Prior to assigning an aide to a recipient, the provider agency must ensure that the aide has satisfactorily completed a training program consistent with DMAS standards;*

*(c) Be physically able to do the work;*

*(d) Have a satisfactory work record as evidenced by two references from prior job experiences, including no evidence of possible abuse, neglect, or exploitation of aged or incapacitated adults or children; and*

*(e) Not be a member of the recipient's family (family is defined as parents [ of minor children ], spouses, [ ~~children, siblings, grandparents, legal guardian, and grandchildren)~~ or legally responsible relatives. Payment will not be made for services furnished by other family members unless there is objective written documentation as to why there are no other providers available to provide the care. ]*

*3. Provider inability to render services and substitution of aides.*

*a. When a personal care aide is absent and the agency has no other aide available to provide services, the provider agency is responsible for ensuring that services continue to recipients. The agency may either obtain a substitute aide from another agency if the lapse in coverage is to be less than two weeks in duration, or transfer the recipient to another agency.*

*b. During temporary, short-term lapses in coverage not to exceed two weeks in duration, the following procedures must apply:*

*(1) The personal care agency having recipient responsibility must provide the RN or LPN supervision for the substitute aide.*

*(2) The agency providing the substitute aide must send a copy of the aide's signed daily records signed by the recipient to the personal care agency having recipient care responsibility.*

*(3) The provider agency having recipient responsibility must bill DMAS for services rendered by the substitute aide.*

*c. If a provider agency secures a substitute aide, the provider agency is responsible for ensuring that all DMAS requirements continue to be met including documentation of services rendered by the substitute aide and documentation that the substitute aide's qualifications meet DMAS' requirements.*

*4. Required documentation in recipients' records. The provider agency must maintain all records of each personal care recipient. At a minimum these records must contain:*

*a. The most recently updated CSP and supporting documentation, all provider agency documentation, and all DMAS-122 forms;*

*b. All the DMAS utilization review forms;*

*c. Initial assessment by the RN supervisory nurse completed prior to or on the date services are initiated and subsequent reassessments and changes to supporting documentation by the RN supervisory nurse;*

*d. Nurses notes recorded and dated during any contacts with the personal care aide and during supervisory visits to the recipient's home;*

*e. All correspondence to the recipient and to DMAS;*

*f. Reassessments made during the provision of services; and*

*g. Contacts made with family, physicians, DMAS, formal and informal service providers, and all professionals concerning the recipient.*

*h. All personal care aide records. The personal care aide record must contain:*

*(1) The specific services delivered to the recipient by the aide and the recipient's responses;*

*(2) The aide's arrival and departure times;*

*(3) The aide's weekly comments or observations about the recipient to include observations of the recipient's physical and emotional condition, daily activities, and responses to services rendered; and*

# Final Regulations

(4) The aide's and recipient's weekly signatures to verify that personal care services during that week have been rendered.

i. Signatures, times, and dates shall not be placed on the aide record prior to the last date of the week that the services are delivered.

**12 VAC 30-120-767.  Reserved.**

**12 VAC 30-120-768.  Respite care services.**

A.    Service description.    Respite care means services specifically designed to provide a temporary but periodic or routine relief to the [ unpaid ] primary caregiver of a recipient who is incapacitated or dependent due to physical [ or cognitive ] disability.  Respite care services include assistance with personal hygiene, nutritional support, and environmental maintenance authorized as either episodic, temporary relief, or as a routine periodic relief of the caregiver.  Persons can have respite care and in-home residential support services in their service plan but cannot receive in-home residential supports and respite care services simultaneously.

B.    Criteria.    Respite care may only be offered to recipients who have a primary [ unpaid ] caregiver living in the home who requires temporary relief to avoid institutionalization of the recipient.  Respite care is designed to focus on the need of the caregiver for temporary relief and to help prevent the breakdown of the caregiver due to the physical burden and emotional stress of providing continuous support and care to the dependent recipient.

C.    Service units and service limitations.    Respite care services are limited to a maximum of 30 days or 720 hours per year.

D.    Provider requirements.    In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, providers must meet the following qualifications:

1.    Respite care services shall be provided by a DMAS certified personal care provider, a DMHMRSAS licensed supportive in-home residential support provider, respite care services provider (ICF/MR), or in-home respite care provider.

2.    The respite care provider must employ or subcontract with and directly supervise an RN or an LPN who will provide ongoing supervision of all respite care aides.

a.    The RN and LPN must be currently licensed to practice in the Commonwealth and have at least two years of related clinical nursing experience, which may include work in an acute care hospital, public health clinic, home health agency, or nursing facility.

b.    Based on continuing evaluations of the aides' performances and recipients' needs, the RN or LPN supervisor shall identify any gaps in the aides' abilities to function competently and shall provide training as indicated.

c.    The RN supervisor must make an initial assessment visit prior to the start of care for any recipient admitted to

respite care.  The RN supervisor must also perform any subsequent reassessments or changes to the supporting documentation.

d.    The RN or LPN must make supervisory visits as often as needed to ensure both quality and appropriateness of services.

(1) When respite care services are received on a routine basis, the minimum acceptable frequency of these supervisory visits shall be every 30 to 90 days.

(2) When respite care services are not received on a routine basis, but are episodic in nature, the RN or LPN is not required to conduct a supervisory visit every 30 to 90 days.  Instead, the nurse supervisor must conduct the initial home visit with the respite care aide immediately preceding the start of care and make a second home visit within the respite care period.

(3) When respite care services are routine in nature and offered in conjunction with personal care, the 30 to 90 day supervisory visit conducted for personal care may serve as the RN or LPN visit for respite care.  However, the RN or LPN supervisor must document supervision of respite care separately.    For this purpose, the same recipient record can be used with a separate section for respite care documentation.

e.    The RN or LPN must document in a summary note:

(1) Whether respite care services continue to be appropriate.

(2) Whether the supporting documentation is adequate to meet the recipient's needs or if changes need to be made.

(3) The recipient's satisfaction with the service.

(4) Any hospitalization or change in medical condition or functioning status.

(5) Other services received and the amount.

(6) The presence or absence of the aide in the home during the visit.

3.    Employ and directly supervise respite care aides who provide direct care to respite care recipients.  Each aide hired by the provider agency shall be evaluated by the provider agency to ensure compliance with minimum qualifications.  Each aide must:

a.    Be able to read and write;

b.    Have completed 40 hours of training consistent with the DMAS standards.  Prior to assigning an aide to a recipient, the provider agency must ensure that the aide has satisfactorily completed a training program consistent with the DMAS standards;

c.    Be evaluated in his job performance by the RN or LPN supervisor;

d.    Be physically able to do the work;

e.    Have a satisfactory work record as evidenced by two references from prior job experiences, including no

# Final Regulations

evidence of possible abuse, neglect or exploitation of aged or incapacitated adults or children; and

f.  Not be a member of a recipient's family (family is defined as parents [ of minor children ], spouses, [ children, siblings, legal guardian, grandparents, and grandchildren) or legally responsible relatives.  Payment will not be made for services furnished by other family members unless there is objective written documentation as to why there are no other providers available to provide the care. ]

4.  Inability to provide services and substitution of aides.  When a respite care aide is absent and the respite care provider agency has no other aide available to provide services, the provider agency is responsible for ensuring that services continue to recipients.

a.  If a provider agency cannot supply a respite care aide to render authorized services, the agency may either obtain a substitute aide from another agency if the lapse in coverage is to be less than two weeks in duration, or may transfer the recipient's care to another agency.

b.  If no other provider agency is available who can supply an aide, the provider agency shall notify the recipient or family so that they may contact the support coordinator to request a screening if ICF/MR placement is desired.

c.  During temporary, short-term lapses in coverage, not to exceed two weeks in duration, a substitute aide may be secured from another respite care provider agency or other home care agency.  Under these circumstances, the following requirements apply:

(1)  The respite care agency having recipient responsibility is responsible for providing the RN or LPN supervision for the substitute aide.

(2)  The respite care agency having recipient care responsibility must obtain a copy of the aide's daily records signed by the recipient and the substitute aide from the respite care agency providing the substitute aide.  All documentation of services rendered by the substitute aide must be in the recipient's record.  The documentation of the substitute aide's qualifications must also be obtained and recorded in the personnel files of the agency having recipient care responsibility.  The two agencies involved are responsible for negotiating the financial arrangements of paying the substitute aide.

(3)  Only the provider agency having recipient responsibility may bill DMAS for services rendered by the substitute aide.

d.  Substitute aides obtained from other agencies may be used only in cases where no other arrangements can be made for recipient respite care services coverage and may be used only on a temporary basis.  If a substitute aide is needed for more than two weeks, the case must be transferred to another respite care provider agency that has the aide capability to serve the recipient or recipients.

5.  Required documentation for recipients' records.  The provider agency must maintain all records of each respite care recipient.  These records must be separated from those of other nonwaiver services, such as home health services.  These records will be reviewed periodically by the DMAS staff.  At a minimum these records must contain:

a.  The most recent CSP and supporting documentation, all respite care assessments, and all DMAS-122 forms;

b.  All DMAS utilization review forms;

c.  Initial assessment by the RN supervisory nurse completed prior to or on the date services are initiated and subsequent reassessments and changes to supporting documentation by the RN supervisory nurse;

d.  Nurses' notes recorded and dated during significant contacts with the respite care aide and during supervisory visits to the recipient's home;

e.  All correspondence to the recipient and to the DMAS;

f.  Reassessments made during the provision of services; and

g.  Significant contacts made with family, physicians, the DMAS, and all professionals concerning the recipient.

6.  Respite care aide record of services rendered and recipient's responses.  The aide record must contain:

a.  The specific services delivered to the recipient by the respite care aide and the recipient's response.

b.  The arrival and departure time of the aide for respite care services only.

c.  Comments or observations recorded weekly about the recipient.  Aide comments must include, at a minimum, observation of the recipient's physical and emotional condition, daily activities, and the recipient's response to services rendered.

d.  The signature of the aide and the recipient once each week to verify that respite care services have been rendered.

e.  Signatures, times, and dates shall not be placed on the aide record prior to the last date of the week that the services are delivered.

7.  Copies of all aide records shall be subject to review by state and federal Medicaid representatives.

**12 VAC 30-120-769.  Reserved.**

**12 VAC 30-120-770.  Consumer-directed services: attendant care [ , companion care, ] and [ consumer-directed ] respite care.**

A.  Service definition.

1.  [ a. ] Attendant services include hands-on care specific to the needs of a [ medically stable, physically disabled ] recipient.  Attendant care includes assistance with ADLs, bowel/bladder programs, range of motion exercises, routine wound care that does not include sterile technique, and external catheter care.  Supportive services are those that

# Final Regulations

substitute for the absence, loss, diminution, or impairment of a physical function. When specified, supportive services may include assistance with instrumental activities of daily living (IADLs) that are incidental to the care furnished, or that are essential to the health and welfare of the recipient. Attendant care does not include either practical or professional nursing services or those practices regulated in Chapters 30 (§ 54.1-3000 et seq.) and 34 (§ 54.1-3400 et seq.) of Title 54.1 of the Code of Virginia, as appropriate. Recipients can have attendant care and in-home residential support services in their service plan but cannot receive these two services simultaneously.

[ b. ] An additional component to attendant care will be work-related attendant services. This service will extend the ability of the personal attendant to provide assistance in the workplace. These services include filing, retrieving work materials that are out of reach, providing travel assistance for a consumer with a mobility impairment, helping a consumer with organizational skills, reading handwritten mail to a consumer with a visual impairment, or ensuring that a sign language interpreter is present during staff meetings to accommodate an employee with a hearing impairment.

2. Consumer-directed respite care means services specifically designed to provide a temporary but periodic or routine relief to the primary [ unpaid ] caregiver of a recipient who is incapacitated or dependent due to frailty or physical disability. Respite care services includes assistance with personal hygiene, nutritional support, and environmental maintenance authorized as either episodic, temporary relief, or as a routine periodic relief of the caregiver.

[ 3. Companion care is a covered service when its purpose is to supervise or monitor those individuals who require the physical presence of an aide to insure their safety during times when no other supportive individuals are available. ]

[ 3. 4. ] DMAS shall contract for the services of a fiscal agent for attendant care [ , companion care, ] and consumer-directed respite care services. The fiscal agent will be reimbursed by DMAS to perform certain tasks as an agent for the recipient/employer who is receiving [ attendant care or consumer-directed respite care consumer-directed services ]. The fiscal agent will handle responsibilities for the recipient for employment taxes. The fiscal agent will seek and obtain all necessary authorizations and approvals of the Internal Revenue Services in order to fulfill all of these duties.

B. Criteria.

1. In order to qualify for [ these services attendant care ], the recipient must demonstrate a need for personal care in activities of daily living, medication or other medical needs, or monitoring health status or physical condition.

2. Consumer-directed respite care may only be offered to recipients who have a primary [ unpaid ] caregiver living in the home who requires temporary relief to avoid institutionalization of the recipient, and it is designed to focus on the need of the caregiver for temporary relief.

[ 3. The inclusion of companion care in the CSP is appropriate only when the recipient cannot be left alone at any time due to mental or severe physical incapacitation. This includes recipients who cannot use a phone to call for help due to a physical or neurological disability. Recipients can only receive companion care due to their inability to call for help if PERS is not appropriate for them. ]

[ 3. 4. ] Attendant care [ , companion care, ] and consumer-directed respite care services are available to recipients who [ are mentally alert, have no cognitive impairments, and who ] would otherwise require the level of care provided in an ICF/MR. [ If 18 years of age or older, recipients must be able to manage their own affairs without help and not have a legal guardian. If recipients receiving services are under 18 years of age, the legal guardian or parent will act on behalf of the minor. ] Recipients [ and their parent or legal guardian, if minors ] who are eligible for [ attendant care and ] consumer-directed [ respite care services ] must have the capability to hire and train their own personal attendants [ or companions ] and supervise the attendant's [ or companion's ] performance. [ Recipients with cognitive impairments will not be able to manage their own care. If a recipient is unable to direct his own care, a family caregiver may serve as the employer on behalf of the recipient. Recipients are permitted to share hours for no more than two individuals living in the same home. ]

[ 4. 5. ] Responsibilities as employer. The recipient [ , or if the recipient is unable then a family caregiver, ] is the employer in this service and is responsible for hiring, training, supervising, and firing personal attendants [ and companions ]. [ If the recipient is a minor, the recipient's parent or legal guardian will serve on behalf of the recipient and monitor the recipient's care. ] Specific duties include checking references of personal attendants [ /companions ], determining that personal attendants [ /companions ] meet basic qualifications, training personal attendants [ /companions ], supervising the personal attendant's [ /companion's ] performance, and submitting timesheets to the service coordinator and fiscal agent on a consistent and timely basis. The recipient [ or family caregiver ] must have an emergency back-up plan in case the personal attendant [ /companion ] does not show up for work as expected or terminates employment without prior notice.

C. Service units and service limitations.

1. Consumer-directed respite care services are limited to a maximum of 30 days or 720 hours per calendar year.

[ 2. The amount of companion care time included in the CSP must be no more than is necessary to prevent the physical deterioration or injury to the recipient. In no event may the amount of time relegated solely to companion care on the CSP exceed eight hours per day. ]

[ 2. 3. ] Recipients can have consumer-directed respite care and attendant care and in-home residential support services in their service plans but cannot receive these services simultaneously.

[ 3. 4. ] For attendant care and consumer-directed respite care services, recipients [ or family caregivers ] will hire

# Final Regulations

their own personal attendants and manage and supervise the attendants' performances.

The attendant [ /companion ] must meet the following requirements:

a. Be 18 years of age or older;

b. Have the required skills to perform [ ~~attendant care~~ consumer-directed ] services as specified in the recipient's supporting documentation;

c. Possess basic math, reading, and writing skills;

d. Possess a valid Social Security number;

e. Submit to a criminal records check and, if the recipient is a minor, the child protective services registry. The personal attendant [ /companion ] will not be compensated for services provided to the recipient if the records check verifies the personal attendant [ /companion ] has been convicted of crimes described in § 32.1-162.9:1 of the Code of Virginia or if the personal attendant [ /companion ] has a complaint confirmed by the DSS child protective services registry.

f. Be willing to attend training at the recipient's or [ ~~family's~~ family caregiver's ] request;

g. Understand and agree to comply with the DMAS IFDDS Waiver requirements;

h. Receive periodic TB screening, CPR training and an annual flu shot; and

i. Be willing to register in a personal attendant registry, which will be maintained by the [ ~~service coordinator~~ consumer-directed services facilitator ] chosen by the recipient or recipient's parent or guardian.

[ ~~4.~~ 5. ] Restrictions. Attendants cannot be [ ~~members of the recipients' family. Family is defined as a parent or stepparent, spouse, children or stepchildren, legal guardian, siblings or stepsiblings, grandparents or stepgrandparents, grandchildren, or stepgrandchildren~~ spouses, parents of minor children, or legally responsible relatives. Payment will not be made for services furnished by other family members unless there is objective written documentation as to why there are no other providers available to provide the care ].

[ ~~5.~~ 6. ] Retention, hiring, and substitution of attendants. Upon the recipient's request, the [ ~~service coordination~~ CD services facilitation ] provider shall provide the recipient [ or family caregiver ] with a list of persons on the personal attendant registry who can provide temporary assistance until the attendant returns or the recipient or [ ~~recipient's parent or legal guardian~~ family caregiver ] is able to select and hire a new personal attendant. If a recipient or [ ~~recipient's parent or legal guardian~~ family caregiver ] is consistently unable to retain and hire the employment of an attendant to provide attendant or consumer-directed respite services, the service coordination provider must contact the support coordinator and DMAS to transfer the recipient, at the recipient's [ or family caregiver's ] choice, to a provider

that provides Medicaid-funded agency-directed personal care [ , companion care ] or respite care services. The [ ~~service coordination~~ CD services facilitation ] provider will make arrangements with the support coordinator to have the recipient transferred.

D. Provider qualifications. In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, provider must meet the following qualifications:

1. To be enrolled as a Medicaid [ ~~service coordination~~ CD services facilitation ] provider and maintain provider status, the [ ~~service coordination~~ CD services facilitation ] provider must operate from a business office and have sufficient qualified staff who will function as [ ~~service coordination~~ CD services facilitators ] to perform the needed plans of care development and monitoring, reassessments, service coordination, and support activities as required. It is preferred that the employee of the [ ~~service coordination~~ CD services facilitation ] provider possess a minimum of an undergraduate degree in a human services field or be a registered nurse currently licensed to practice in the Commonwealth. In addition, it is preferable that the individual have two years of satisfactory experience in the human services field working with persons with [ ~~severe physical disabilities or with the elderly~~ developmental disabilities ]. The individual must possess a combination of work experience and relevant education which indicates possession of the following knowledge, skills, and abilities. Such knowledge, skills and abilities must be documented on the application form, found in supporting documentation, or be observed during the job interview. Observations during the interview must be documented. The knowledge, skills, and abilities include:

a. Knowledge of:

(1) Types of functional limitations and health problems that are common to different disability types and the aging process as well as strategies to reduce limitations and health problems;

(2) Physical assistance typically required by people with developmental disabilities, such as transferring, bathing techniques, bowel and bladder care, and the approximate time those activities normally take;

(3) Equipment and environmental modifications commonly used and required by people with developmental disabilities that reduce the need for human help and improves safety;

(4) Various long-term care program requirements, including nursing home [ , ICF/MR, ] and assisted living facility placement criteria, Medicaid waiver services, and other federal, state, and local resources that provide personal care services;

(5) IFDDS Waiver requirements, as well as the administrative duties for which the recipient will be responsible;

# Final Regulations

(6) Conducting assessments (including environmental, psychosocial, health, and functional factors) and their uses in care planning;

(7) Interviewing techniques;

(8) The recipient's right to make decisions about, direct the provisions of, and control his attendant care and consumer-directed respite care services, including hiring, training, managing, approving time sheets, and firing an attendant;

(9) The principles of human behavior and interpersonal relationships; and

(10) General principles of record documentation.

b. Skills in:

(1) Negotiating with recipients and service providers;

(2) Observing, recording, and reporting behaviors;

(3) Identifying, developing, or providing services to persons with developmental disabilities; and

(4) Identifying services within the established services system to meet the recipient's needs.

c. Abilities to:

(1) Report findings of the assessment or onsite visit, either in writing or an alternative format for persons who have visual impairments;

(2) Demonstrate a positive regard for recipients and their families;

(3) Be persistent and remain objective;

(4) Work independently, performing position duties under general supervision;

(5) Communicate effectively, orally and in writing; and

(6) Develop a rapport and communicate with different types of persons from diverse cultural backgrounds.

2. If the [ service coordination CD services facilitation ] staff employed by the [ service coordination CD services facilitation ] provider is not an RN, the [ service coordination CD services facilitation ] provider must have RN consulting services available, either by a staffing arrangement or through a contracted consulting arrangement. The RN consultant is to be available as needed to consult with recipients and [ service coordination CD services facilitation ] providers on issues related to the health needs of the recipient.

3. Initiation of services and service monitoring.

a. Attendant care services. The [ service coordination CD services facilitation ] provider must make an initial comprehensive home visit to develop the supporting documentation with the recipient [ or family caregiver ] and provide management training. After the initial visit, two routine onsite visits must occur in the recipient's home within 60 days of the initiation of care or the initial visit to monitor the supporting documentation. The [ service coordination CD services facilitation ] provider

will continue to monitor the supporting documentation on an as needed basis, not to exceed a maximum of one routine onsite visit every 30 days but no less than the minimum of one routine onsite visit every 90 days per recipient. The initial comprehensive visit is done only once upon the recipient's entry into the service. If a waiver recipient changes [ service coordination CD services facilitation ] agencies, the new [ service coordination CD services facilitation ] provider must bill for a reassessment in lieu of a comprehensive visit.

b. Consumer-directed respite [ and companion ] services. The [ service coordination CD services facilitation ] provider must make an initial comprehensive home visit to develop the supporting documentation with the recipient or [ parent or legal guardian family caregiver ] and will provide management training. After the initial visit, the [ service coordinator CD services facilitator ] will periodically review the utilization of [ companion ] services at a minimum of every six months or [ , for respite services, either every six months or ] upon the use of 300 respite care hours [ , whichever comes first ]. The initial comprehensive visit is done only once upon the recipient's entry into the service. If a waiver recipient changes [ service coordination CD services facilitation ] agencies, the new [ service coordination CD services facilitation ] provider must bill for a reassessment in lieu of a comprehensive visit.

4. [ Service coordinator CD services facilitator ] reassessments for consumer-directed [ respite and attendant care services ]. A reassessment of the recipient's level of care will occur six months after initial entry into the program, and subsequent reevaluations will occur at a minimum of every six months. During visits to the recipient's home, the [ service coordination CD services facilitation ] provider must observe, evaluate, and document the adequacy and appropriateness of personal attendant services with regard to the recipient's current functioning and cognitive status, medical, and social needs. The [ service coordination CD services facilitation ] provider's summary must include, but not necessarily be limited to:

a. Whether attendant care or consumer-directed respite care services continue to be appropriate and medically necessary to prevent institutionalization;

b. Whether the service is adequate to meet the recipient's needs;

c. Any special tasks performed by the attendant [ /companion ] and the attendant's [ /companion's ] qualifications to perform these tasks;

d. Recipient's satisfaction with the service;

e. Hospitalization or change in medical condition, functioning, or cognitive status;

f. Other services received and their amount; and

g. The presence or absence of the attendant in the home during the [ service coordinator's CD services facilitator's ] visit.

# Final Regulations

5. The [ ~~service coordination~~ CD services facilitation ] provider must be available to the recipient by telephone.

6. The [ ~~service coordination~~ CD services facilitation ] provider must submit a criminal record check pertaining to the personal attendant [ /companion ] on behalf of the recipient and report findings of the criminal record check to the recipient or the [ ~~recipient's legal guardian or parent~~ family caregiver ] and the program's fiscal agent. Personal attendants [ /companions ] will not be reimbursed for services provided to the recipient effective with the date the criminal record check confirms a personal attendant has been found to have been convicted of a crime as described in § 32.1-162.9:1 of the Code of Virginia [ or if the personal attendant/companion has a confirmed record on the DSS Child Protective Services Registry ]. If the recipient is a minor, the personal attendant [ /companion ] must also be screened through the DSS child protective services registry.

7. The [ ~~service coordination~~ CD services facilitation ] provider shall verify bi-weekly timesheets signed by the recipient or the [ ~~legal guardian or parent~~ family caregiver ] and the personal attendant [ /companion ] to ensure that the number of CSP approved hours are not exceeded. If discrepancies are identified, the [ ~~service coordination~~ CD services facilitation ] provider must contact the recipient to resolve discrepancies and must notify the fiscal agent. If a recipient is consistently being identified as having discrepancies in his timesheets, the [ ~~service coordination~~ CD services facilitation ] provider must contact the support coordinator to resolve the situation. The [ ~~service coordination~~ CD services facilitation ] provider cannot verify timesheets for personal attendants [ /companions ] who have been convicted of crimes described in § 32.1-162.9:1 of the Code of Virginia [ or who have a confirmed case with the DSS Child Protective Services Registry ] and must notify the fiscal agent.

8. Personal attendant registry. The [ ~~service coordination~~ CD services facilitation ] provider must maintain a personal attendant registry.

9. Required documentation in recipients' records. The [ ~~service coordination~~ CD services facilitation ] provider must maintain all records of each recipient. At a minimum these records must contain:

a. All copies of the CSP, all supporting documentation, and all DMAS-122 forms.

b. All DMAS utilization review forms.

c. [ ~~Service coordination~~ CD services facilitation ] provider's notes contemporaneously recorded and dated during any contacts with the recipient and during visits to the recipient's home.

d. All correspondence to the recipient and to DMAS.

e. Reassessments made during the provision of services.

f. Records of contacts made with family, physicians, DMAS, formal and informal service providers, and all professionals concerning the recipient.

g. All training provided to the personal attendant [ /companion ] or attendants [ /companions ] on behalf of the recipient [ or family caregiver ].

h. All management training provided to the recipients [ or family caregivers ], including the recipient's [ or family caregiver's ] responsibility for the accuracy of the timesheets.

i. All documents signed by the recipient or the recipient's [ ~~parent or legal guardian~~ family caregivers ] that acknowledge the responsibilities of the services.

**12 VAC 30-120-771. Reserved.**

**12 VAC 30-120-772. Family/caregiver training.**

A. Service description. Family or caregiver training is the provision of identified training and education related to disabilities, community integration, family dynamics, stress management, behavior interventions and mental health to a parent, other family members or primary caregiver. For purposes of this service, "family" is defined as the persons who live with or provide care to or support a waiver recipient, and may include a [ ~~parent~~ ], spouse, children, relatives, a legal guardian, foster family, or in-laws. "Family" does not include individuals who are employed to care for the recipient. All family training must be included in the recipient's written CSP.

B. Criteria. The need for the training and the content of the training in order to assist family or caregivers with maintaining the recipient at home must be documented in the recipient's CSP. The training must be necessary in order to improve the family or caregiver's ability to give care and support.

C. Service units and service limitations. Services will be billed hourly and must be prior authorized. Recipients may receive up to 80 hours of family/caregiver training per calendar year.

D. Provider requirements. In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, providers must meet the following qualifications:

1. Family/caregiver training must be provided on an individual basis, in small groups or through seminars and conferences provided by Medicaid-certified family and caregiver training providers.

2. Family/caregiver training must be provided by individuals with expertise who work for an agency with experience in or demonstrated knowledge of the training topic and who work for an agency or organization that has a provider agreement with DMAS to provide these services. Individuals must also have the appropriate licensure or certification as required for the specific professional field associated with the training area. Licensed practical counselors, licensed clinical social workers, and licensed psychologists can enroll as individual practitioners with DMAS to provide family/caregiver training.

# Final Regulations

*12 VAC 30-120-773.  Reserved.*

*12 VAC 30-120-774.  Personal Emergency Response System (PERS).*

*A.     Service description.     PERS is a service which electronically monitors recipient safety in the home and provides access to emergency crisis intervention for medical or environmental emergencies through the provision of a two-way voice communication system that dials a 24-hour response or monitoring center upon activation and via the recipient's home telephone line.*

*B.     Criteria.   PERS can be authorized when there is no one else is in the home who is competent and continuously available to call for help in an emergency.  If the recipient's caregiver has a business in the home, such as a day care center, PERS will only be approved if the recipient is evaluated as being dependent in orientation and behavior pattern.*

*C.     Service units and service limitations.*

*1.   A unit of service shall include administrative costs, time, labor, and supplies associated with the installation, maintenance, and monitoring of the PERS.   A unit of service is one-month rental price set by DMAS.  The one-time installation of the unit includes installation, account activation, recipient and caregiver instruction, and removal of equipment.*

*2.   PERS services must be capable of being activated by a remote wireless device and be connected to the recipient's telephone line.   The PERS console unit must provide hands-free voice-to-voice communication with the response center.    The activating device must be waterproof, automatically transmit to the response center an activator low battery alert signal prior to the battery losing power, and be able to be worn by the recipient.*

*D.   Provider requirements. In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, providers must also meet the following qualifications:*

*1.   A PERS provider is a certified home health or personal care agency, a durable medical equipment provider, a hospital or a PERS manufacturer that has the ability to provide PERS equipment, direct services (i.e., installation, equipment maintenance and service calls), and PERS monitoring.*

*2.    The PERS provider must provide an emergency response center staff with fully trained operators that are capable of receiving signals for help from a recipient's PERS equipment 24 hours a day, 365, or 366 as appropriate, days per year; determining whether an emergency exists; and notifying an emergency response organization or an emergency responder that the PERS recipient needs emergency help.*

*3.    A PERS provider must comply with all applicable Virginia statutes and all applicable regulations of DMAS and all other governmental agencies having jurisdiction over the services to be performed.*

*4.  The PERS provider has the primary responsibility to furnish, install, maintain, test, and service the PERS equipment, as required to keep it fully operational.  The provider shall replace or repair the PERS device within 24 hours of the recipient's notification of a malfunction of the console unit, activating devices or medication-monitoring unit while the original equipment is being repaired.*

*5.   The PERS provider must properly install all PERS equipment into a PERS recipient's functioning telephone line and must furnish all supplies necessary to ensure that the system is installed and working properly.*

*6.   The PERS installation includes local seize line circuitry, which guarantees that the unit will have priority over the telephone connected to the console unit should the phone be off the hook or in use when the unit is activated.*

*7.   A PERS provider must maintain all installed PERS equipment in proper working order.*

*8.   A PERS provider must maintain a data record for each PERS recipient at no additional cost to DMAS.  The record must document all of the following:*

*a.  Delivery date and installation date of the PERS;*

*b.  Enrollee/caregiver signature verifying receipt of PERS device;*

*c.   Verification by a test that the PERS device is operational, monthly or more frequently as needed;*

*d.  Updated and current recipient responder and contact information, as provided by the recipient or the recipient's care provider; and*

*e.  A case log documenting recipient system utilization and recipient or responder contacts and communications.*

*9.   The PERS provider must have back-up monitoring capacity in case the primary system cannot handle incoming emergency signals.*

*10.  All PERS equipment must be approved by the Federal Communications Commission and meet the Underwriters' Laboratories, Inc. (UL) safety standard Number 1635 for Digital Alarm Communicator System Units and Number 1637, which is the UL safety standard for home health care signaling equipment.  The UL listing mark on the equipment will be accepted as evidence of the equipment's compliance with such standard.  The PERS device must be automatically reset by the response center after each activation ensuring that subsequent signals can be transmitted without requiring manual reset by the recipient.*

*11.  A PERS provider must furnish education, data, and ongoing assistance to DMAS to familiarize staff with the service, allow for ongoing evaluation and refinement of the program, and must instruct the recipient, caregiver, and responders in the use of the PERS service.*

*12.  The emergency response activator must be activated either by breath, by touch, or by some other means, and must be usable by persons who are visually or hearing impaired or physically disabled.  The emergency response communicator must be capable of operating without external power during a power failure at the recipient's*

# Final Regulations

home for a minimum period of 24 hours and automatically transmit a low battery alert signal to the response center if the back-up battery is low. The emergency response console unit must also be able to self-disconnect and redial the back-up monitoring site without the recipient resetting the system in the event it cannot get its signal accepted at the response center.

13. Monitoring agencies must be capable of continuously monitoring and responding to emergencies under all conditions, including power failures and mechanical malfunctions. It is the PERS provider's responsibility to ensure that the monitoring agency and the agency's equipment meets the following requirements. The monitoring agency must be capable of simultaneously responding to multiple signals for help from recipients' PERS equipment. The monitoring agency's equipment must include the following:

a. A primary receiver and a back-up receiver, which must be independent and interchangeable;

b. A back-up information retrieval system;

c. A clock printer, which must print out the time and date of the emergency signal, the PERS recipient's identification code, and the emergency code that indicates whether the signal is active, passive, or a responder test;

d. A back-up power supply;

e. A separate telephone service;

f. A toll free number to be used by the PERS equipment in order to contact the primary or back-up response center; and

g. A telephone line monitor, which must give visual and audible signals when the incoming telephone line is disconnected for more than 10 seconds.

14. The monitoring agency must maintain detailed technical and operations manuals that describe PERS elements, including the installation, functioning, and testing of PERS equipment; emergency response protocols; and recordkeeping and reporting procedures.

15. The PERS provider shall document and furnish a written report to the support coordinator each emergency signal that results in action being taken on behalf of the recipient. This excludes test signals or activations made in error.

**12 VAC 30-120-775. Reserved.**

**12 VAC 30-120-776. Companion care.**

A. Service description. Companion care is a covered service when its purpose is to supervise or monitor those individuals who require the physical presence of an aide to ensure their safety during times when no other supportive individuals are available.

B. Criteria.

1. The inclusion of companion care in the CSP is appropriate only when the recipient cannot be left alone at any time due to mental or severe physical incapacitation. This includes recipients who cannot use a phone to call for help due to a physical or neurological disability. Recipients can only receive companion care due to their inability to call for help if PERS is not appropriate for them.

2. Recipients who have a current, uncontrolled medical condition which would make them unable to call for help during a rapid deterioration can be approved for companion care if there is documentation that the recipient has had recurring attacks during the two-month period prior to the authorization of companion care. Companion care shall not be covered if required only because the recipient does not have a telephone in the home or because the recipient does not speak English.

3. There must be a clear and present danger to the recipient as a result of being left unsupervised. Companion care cannot be authorized for persons whose only need for companion care is for assistance exiting the home in the event of an emergency.

C. Service units and service limitations.

1. The amount of companion care time included in the CSP must be no more than is necessary to prevent the physical deterioration or injury to the recipient. In no event may the amount of time relegated solely to companion care on the CSP exceed eight hours per day.

2. A companion care aide cannot provide supervision to recipients who are on ventilators or continuous tube feedings or those who require suctioning of their airways.

3. Companion care will be authorized for family members to sleep either during the day or during the night when the recipient cannot be left alone at any time due to the recipient's severe agitation and physically wandering behavior. Companion aide services must be necessary to ensure the recipient's safety if the recipient cannot be left unsupervised due to health and safety concerns.

4. Companion care can be authorized when no one else is in the home who is competent to call for help in an emergency. [ If the recipient's caregiver has his business in the home, such as a day care center, companion care will only be considered if the recipient is dependent in orientation and behavior pattern. ]

D. Provider requirements. In addition to meeting the general conditions and requirements for home and community-based care participating providers as specified in 12 VAC 30-120-730 and 12 VAC 30-120-740, providers must meet the following qualifications:

1. Companion aide qualifications. Agencies must employ individuals to provide companion care who meet the following requirements:

a. Be at least 18 years of age;

b. Possess basic reading, writing, and math skills;

c. Be capable of following a care plan with minimal supervision;

# Final Regulations

*d. Submit to a criminal history record check. The companion will not be compensated for services provided to the recipient if the records check verifies the companion has been convicted of crimes described in § 32.1-162.9:1 of the Code of Virginia;*

*e. Possess a valid Social Security number; and*

*f. Be capable of aiding in the activities of daily living or instrumental activities of daily living.*

*2. Companions will be employees of agencies that will contract with DMAS to provide companion services. Agencies will be required to have a companion care supervisor to monitor companion care services. The supervisor must be a certified Home Health Aide, an LPN, or an RN, and must have a current license or certification to practice in the Commonwealth.*

*3. The provider agency must conduct an initial home visit within the first three days of initiating companion care services to document the efficacy and appropriateness of services and to establish a service plan for the recipient. The agency must provide follow-up home visits to monitor the provision of services every four months or as often as needed. The recipient must be reassessed for services every six months.*

**12 VAC 30-120-777 through 12 VAC 30-120-779. Reserved.**

**12 VAC 30-120-780. Reevaluation of service need and utilization review.**

*A. The Consumer Service Plan (CSP).*

*1. The CSP shall be developed by the support coordinator mutually with other service providers, the recipient, the recipient's parents or legal guardians for minors, consultants, and other interested parties based on relevant, current assessment data. The CSP process determines the services to be rendered to recipients, the frequency of services, the type of service provider, and a description of the services to be offered. All CSPs developed by the support coordinators are subject to approval by DMAS. DMAS is the single state authority responsible for the supervision of the administration of the community-based care waiver.*

*2. The support coordinator is responsible for continuous monitoring of the appropriateness of the recipient's supporting documentation and revisions to the CSP as indicated by the changing needs of the recipient. At a minimum, the support coordinator must review the CSP every three months to determine whether service goals and objectives are being met and whether any modifications to the CSP are necessary.*

*3. The DMAS staff shall review the CSP every 12 months or more frequently as required to assure proper utilization of services. Any modification to the amount or type of services in the CSP must be authorized by DMAS.*

*B. Review of level of care.*

*1. The DMAS shall complete an annual comprehensive reassessment, in coordination with the recipient, family,*

*and service providers. If warranted, the DMAS will coordinate a medical examination and a psychological evaluation for every waiver recipient. The reassessment must include an update of the assessment instrument and any other appropriate assessment data.*

*2. A medical examination must be completed for adults based on need identified by the provider, recipient, support coordinator, or DMAS staff. Medical examinations for children must be completed according to the recommended frequency and periodicity of the EPSDT program.*

*3. A psychological evaluation or standardized developmental assessment for children over six years of age must reflect the current psychological status (diagnosis), adaptive level of functioning, and cognitive abilities. A new psychological evaluation is required whenever the recipient's functioning has undergone significant change and is no longer reflective of the past psychological evaluation.*

*C. Documentation required.*

*1. The support coordination agency must maintain the following documentation for review by the DMAS staff for each waiver recipient:*

*a. All assessment summaries and all CSPs completed for the recipient and maintained for a period of not less than five years [ from recipients' start of care ];*

*b. All individual providers' supporting documentation from any provider rendering waiver services to the recipient;*

*c. All supporting documentation related to any change in the CSP;*

*d. All related communication with the providers, recipient, consultants, DMHMRSAS, DMAS, DSS, DRS or other related parties; and*

*e. An ongoing log which documents all contacts made by the support coordinator related to the waiver recipient.*

*2. The recipient service providers must maintain the following documentation for review by the DMAS staff for each waiver recipient:*

*a. All supporting documentation developed for that recipient and maintained for a period of not less than five years [ from the date of the recipient's entry to waiver services ];*

*b. An attendance log which documents the date services were rendered and the amount and type of services rendered; and*

*c. Appropriate progress notes reflecting recipient's status and, as appropriate, progress toward the goals on the supporting documentation.*

**12 VAC 30-120-790. Eligibility criteria for emergency access to the waiver.**

*A. Subject to available funding, individuals must meet at least one of the emergency criteria to be eligible for immediate access to waiver services without consideration to the length*

# Final Regulations

of time an individual has been waiting to access services. In the absence of waiver services, the individual would not be able to remain in his home.

B. The criteria are:

1. The primary caregiver has a serious illness, has been hospitalized, or has died;

2. The individual has been determined by the DSS to have been abused or neglected and is in need of immediate waiver services;

3. The individual has behaviors which present risk to personal or public safety; or

4. The individual presents extreme physical, emotional, or financial burden at home and the family or caregiver is unable to continue to provide care.

> NOTICE: The forms used in administering the Individual and Family Developmental Disabilities Support Waiver regulations are not being published due to the large number; however, the name of each form is listed below. The forms are available for public inspection at the Department of Medical Assistance Services, 600 E. Broad Street, Suite 1300, Richmond, Virginia, or at the office of the Registrar of Regulations, General Assembly Building, 2nd Floor, Richmond, Virginia.

## FORMS

**12 VAC 30-50-10 et seq.  Amount, Duration and Scope of Medical and Remedial Care Services.**

Virginia Uniform Assessment Instrument, UAI, Virginia Long-Term Care Council, 1994.

I.V. Therapy Implementation Form, DMAS-354, eff. 6/1/98.

Health Insurance Claim Form, Form HCFA-1500, 12/90.

Virginia Uniform Assessment Instrument, UAI, Virginia Long-Term Care Council, 1994.

Certificate of Medical Necessity-Durable Medical Equipment and Supplies, DMAS-352 (rev. 8/95).

*Questionnaire to Assess an Applicant's Ability to Independently Manage Personal Attendant Services in the CD-PAS Waiver or DD Waiver, DMAS-95 Addendum (eff. 8/00).*

*DD Waiver Enrollment Request, DMAS-453 (eff. 1/3/01).*

*DD Waiver Consumer Service Plan, DMAS-456 (eff. 1/3/01).*

*DD Medicaid Waiver--Level of Functioning Survey--Summary Sheet, DMAS-458 (eff. 1/01).*

*Documentation of Recipient Choice between Institutional Care or Home and Community-Based Services (eff. 8/00).*

**12 VAC 30-80-10 et seq.  Methods and Standards for Establishing Payment Rates--Other Types of Care.**

Pharmacy Claim Form (3/96).

Compound Prescription Pharmacy Claim Form (3/96).

I.V. Therapy Implementation Form, DMAS-354, eff. 6/1/98.

*Questionnaire to Assess an Applicant's Ability to Independently Manage Personal Attendant Services in the CD-PAS Waiver or DD Waiver, DMAS-95 Addendum (eff. 8/00).*

*DD Waiver Enrollment Request, DMAS-453 (eff. 1/3/01).*

*DD Waiver Consumer Service Plan, DMAS-456 (eff. 1/3/01).*

*DD Medicaid Waiver--Level of Functioning Survey--Summary Sheet, DMAS-458 (eff. 1/01).*

*Documentation of Recipient Choice between Institutional Care or Home and Community-Based Services (eff. 8/00).*

**12 VAC 30-120-10 et seq.  Waivered Services.**

Virginia Uniform Assessment Instrument (UAI), 1994.

Medicaid Funded Long-Term Care Service Authorization Form, DMAS-96, revised 8/97.

Service Coordinator Plan of Care, DMAS-97B, revised 6/97.

Patient Information, DMAS-122, revised ~~11/84~~ 12/98.

Questionnaire: Assessing a Recipient's Ability to Independently Manage Personal Attendant Services, 2/98.

*Questionnaire to Assess an Applicant's Ability to Independently Manage Personal Attendant Services in the CD-PAS Waiver or DD Waiver, DMAS-95 Addendum (eff. 8/00).*

*DD Waiver Enrollment Request, DMAS-453 (eff. 1/3/01).*

*DD Waiver Consumer Service Plan, DMAS-456 (eff. 1/3/01).*

*DD Medicaid Waiver--Level of Functioning Survey--Summary Sheet, DMAS-458 (eff. 1/01).*

*Documentation of Recipient Choice between Institutional Care or Home and Community-Based Services (eff. 8/00).*

VA.R. Doc. No. R00-231; Filed May 1, 2001, 4:14 p.m.

# Final Regulations

* * * * * * * *

Title of Regulation: 12 VAC 30-90-10 et seq. Methods and Standards for Establishing Payment Rates-Long Term Care (2000 Nursing Home Payment System) (amending 12 VAC 30-90-20, 12 VAC 30-90-30, 12 VAC 30-90-31, [ *12 VAC 30-90-33,* ] 12 VAC 30-90-34, 12 VAC 30-90-35, 12 VAC 30-90-36, 12 VAC 30-90-37, 12 VAC 30-90-38, 12 VAC 30-90-39, 12 VAC 30-90-40, 12 VAC 30-90-41, 12 VAC 30-90-50, 12 VAC 30-90-51, [ *12 VAC 30-90-55,* ] 12 VAC 30-90-60, 12 VAC 30-90-65, 12 VAC 30-90-70, 12 VAC 30-90-80, 12 VAC 30-90-120, 12 VAC 30-90-123, 12 VAC 30-90-160, 12 VAC 30-90-170, 12 VAC 30-90-221, 12 VAC 30-90-240, 12 VAC 30-90-250, 12 VAC 30-90-253, 12 VAC 30-90-264, 12 VAC 30-90-266, 12 VAC 30-90-270, 12 VAC 30-90-272, and 12 VAC 30-90-280; adding [ *12 VAC 30-90-19,* ] 12 VAC 30-90-29, 12 VAC 30-90-136, and 12 VAC 30-90-165; repealing 12 VAC 30-90-42, 12 VAC 30-90-43, 12 VAC 30-90-130, 12 VAC 30-90-131, 12 VAC 30-90-132, 12 VAC 30-90-133, 12 VAC 30-90-135, and 12 VAC 30-90-260).

Statutory Authority: § 32.1-325 of the Code of Virginia and Item 319 (II) of Chapter 1073 of the 2000 Acts of Assembly.

Effective Date: July 1, 2001.

Summary:

*The amendments increase payments for operating costs and implement a new capital payment methodology. The proposed changes included:*

*1. Recalculating direct care ceilings and setting the ceilings at 112% of the median of the base year cost per day, and recalculating direct and indirect ceilings using a new base year at least every two years.*

*2. Setting direct care rates without application of occupancy standards and setting indirect and capital rates with an occupancy standard of 90%.*

*3. Adjusting rates to restore funding for the negative impact of case mix adjustment on aggregate payments.*

*4. Eliminating the direct care efficiency incentive payment.*

*5. Adjusting rates to incorporate into direct care payments the amount of $21,700,000, adjusted for inflation to FY2001, appropriated by the 1999 Session of the General Assembly.*

*6. Implementing a revised capital payment policy called "Fair Rental Value" system.*

*7. Eliminating the recapture of depreciation expense payments by the Medicaid program.*

*Changes described in items 1 through 6 above are authorized by the 2000 Appropriation Act. The change identified in item 7 is proposed as a result of Chapter 728 of the 1999 Acts of Assembly, which eliminated the department's authority to recapture depreciation expense payments.*

*Changes made since publication of the proposed regulation are as follows:*

*1. The number of facilities in a chain shall be determined by counting nursing facilities, hospitals, and any other health care facilities that are licensed to admit patients or residents, whether or not they participate in the Medicaid program. Facilities in Virginia and in other states shall be counted in determining the number of facilities in a chain. Facilities shall be considered to form a chain if there is common ownership of the physical assets, or a common operator, or both.*

*2. Return on equity (ROE) capital for leased facilities shall be phased out along with the methodology described in Article 2. Leased facilities shall be eligible for ROE after July 1, 2001, only if they were eligible for ROE on June 30, 2000. Return on equity shall be equal to the rental rate percentage used in connection with the fair rental value (FRV) methodology described in Article 3.*

*3. If the seller of facilities that change ownership after June 30, 2000, is not part of a chain organization, or if it is part of a chain organization consisting of no more than two facilities, this seller shall be paid the per diem rate described in Article 3.*

*4. A hospital-based nursing facility shall be one for which a combined cost report is submitted on behalf of both the hospital and the nursing facility.*

*5. A decline in the replacement facility's total occupancy of 20 percentage points in the replacement facility's first cost reporting period shall be considered to indicate a substantial change when compared to the lower of the old facility's previous two cost reporting periods. The replacement facility shall receive the previous operator's operating rates if it does not qualify to be considered a new facility.*

*6. New language was added to capture the adjustment to the occupancy requirement calculation for specialized care providers since the specialized care program began.*

*7. A new section was added to provide for additional reimbursement to locally-owned nursing facilities across the Commonwealth.*

Summary of Public Comments and Agency's Response: A summary of comments made by the public and the agency's response may be obtained from the promulgating agency or viewed at the office of the Registrar of Regulations.

Agency Contact: Copies of the regulation may be obtained from Victoria P. Simmons, Regulatory Coordinator, Department of Medical Assistance Services, 600 East Broad Street, Suite 1300, Richmond, VA 23219, telephone (804) 786-7959.

PART II.
NURSING HOME PAYMENT SYSTEMS.

SUBPART I.
GENERAL.

[ 12 VAC 30-90-19. Additional reimbursement for locally-owned nursing facilities.

*A. Subject to legislative authorization as required and the availability of local, state, and federal funds, and based upon*

# Final Regulations

a transfer agreement and the subsequent transfer of funds, DMAS makes additional payments to local government nursing facilities. A local government nursing facility is defined as a provider owned or operated by a county, city, or other local government agency, instrumentality, authority or commission.

B. DMAS uses the following methodology to calculate the additional Medicaid payments to local government nursing facilities:

1. For each state fiscal year, DMAS calculates the maximum additional payments that it can make to the local government nursing facilities in conformance with 42 CFR 447.272 (a).

2. DMAS determines a total additional payment amount to be made in a manner not to exceed the maximum additional payment amount calculated in subdivision 1 of this subsection.

3. Using the latest fiscal period for which the local government nursing facilities have completed cost reports on file with DMAS, the department determines the total Medicaid days reported by each local government nursing facility for that fiscal period.

4. DMAS divides the total Medicaid days for each local government nursing facility by the total Medicaid days for all local government nursing facilities to determine the supplementation factor for each.

5. For each local government nursing facility, the department multiplies the local government nursing facility's supplementation factor determined in step 4 above by the total additional payment amount identified in step 2 above to determine the additional payment to be made to each local government nursing facility. ]

**12 VAC 30-90-20. Nursing home payment system; generally.**

A. Effective ~~October 1, 1990~~ *July 1, 2001*, the payment methodology for nursing facility (NF) reimbursement by the Virginia Department of Medical Assistance Services (DMAS) is set forth in this part. ~~The formula provides for incentive payments to efficiently operated NFs and contains payment limitations for those nursing facilities operating less efficiently. A cost efficiency incentive encourages cost containment by allowing the provider to retain a percentage of the difference between the prospectively determined operating cost rate and the ceiling.~~

B. Three separate cost components are used: plant *or capital, as appropriate,* cost~~,~~; operating cost*;* and nurse aide training and competency evaluation program and competency evaluation program (NATCEPs) costs. The rates, which are determined on a facility-by-facility basis, shall be based on annual cost reports filed by each provider.

C. *Effective July 1, 2001,* in determining the ceiling limitations, there shall be direct patient care medians established for nursing facilities in the Virginia portion of the Washington DC-MD-VA Metropolitan Statistical Area (MSA), the Richmond-Petersburg Metropolitan Statistical Area (MSA), and in the rest of the state. There shall be indirect patient care

medians established for nursing facilities in the Virginia portion of the Washington DC-MD-VA MSA, *and for NFs with less than 61 beds in the rest of the state, and for NFs with more than 60 beds in the rest of the state.* The Washington DC-MD-VA MSA and the Richmond-Petersburg MSA shall include those cities and counties as listed and changed from time to time by the Health Care Financing Administration (HCFA). A nursing facility located in a jurisdiction which HCFA adds to or removes from the Washington DC-MD-VA MSA or the Richmond-Petersburg MSA shall be placed in its new peer group, for purposes of reimbursement, at the beginning of its next fiscal year following the effective date of HCFA's final rule.

D. Institutions for mental diseases providing nursing services for individuals age 65 and older shall be exempt from the prospective payment system as defined in [ ~~12 VAC 30-90-35~~ *Articles 1 (12 VAC 30-90-29), 3 (12 VAC 39-90-35 et seq.)* ], [ ~~12 VAC 30-90-40~~ *4 (12 VAC 39-90-40 et seq.)* ], [ ~~12 VAC 30-90-60~~ *6, (12 VAC 30-90-60 et seq.)* ], and [ ~~12 VAC 30-90-80~~ *8 (12 VAC 30-90-80 et seq.) of this subpart* ], as are mental retardation facilities. All other sections of this payment system relating to reimbursable cost limitations shall apply. These facilities shall continue to be reimbursed retrospectively on the basis of reasonable costs in accordance with Medicare ~~and Medicaid~~ principles of reimbursement *and Medicaid principles of reimbursement in effect on June 30, 2000*, except that those that are defined as skilled nursing facilities (SNFs) and are operated by the Department of Mental Health, Mental Retardation and Substance Abuse Services shall not be subject to the routine cost limits that are normally required and applicable under Medicare principles of reimbursement. Reimbursement to Intermediate Care Facilities for the Mentally Retarded (ICF/MR) shall be limited to the highest rate paid to a state ICF/MR institution, approved each July 1 by DMAS.

E. Except as specifically modified herein, Medicare principles of reimbursement, as amended from time to time, shall be used to establish the allowable costs in the rate calculations. Allowable costs must be classified in accordance with the DMAS uniform chart of accounts (see 12 VAC 30-90-270 *through 12 VAC 30-90-276*) and must be identifiable and ~~verified~~ *verifiable* by contemporaneous documentation.

All matters of reimbursement which are part of the DMAS reimbursement system shall supersede Medicare principles of reimbursement. Wherever the DMAS reimbursement system conflicts with Medicare principles of reimbursement, the DMAS reimbursement system shall take precedence. Appendices are a part of the DMAS reimbursement system.

SUBPART II.
RATE DETERMINATION PROCEDURES.

*Article 1.*
*Transition to New Capital Payment Methodology.*

**12 VAC 30-90-29. Transition to new capital payment methodology.**

A. *This section provides for a transition to a new capital payment methodology. The methodology that will be phased out for most facilities is described in Article 2 (12 VAC 30-90-*

# Final Regulations

30 et seq.) of this subpart. The methodology that will be phased in for most facilities is described in Article 3 (12 VAC 30-90-35 et seq.) of this subpart. The terms and timing of the transition are described in this section.

B. Nursing facilities enrolled in the Medicaid program prior to July 1, 2000, shall be paid for capital related costs under a transition policy from July 1, 2000, through June 30, 2012. Facilities and beds paid under the transition policy shall receive payments as follows:

1. During SFY 2001, each facility's capital per diem shall be the facility's capital per diem on June 30, 2000. The methodology under which this per diem is determined shall be the plant cost reimbursement methodology in effect as of June 30, 2000.

2. During SFY 2002, each facility subject to the transition policy shall be paid for capital costs under the methodology described in Article 2 (12 VAC 30-90-30 et seq.) of this subpart.

3. During SFY 2003 through SFY 2012, each facility subject to the transition policy shall have a capital per diem that is a percentage of the per diem described in Article 2 (12 VAC 30-90-30 et seq.) of this subpart plus a percentage of the per diem described in Article 3 (12 VAC 30-90-35 et seq.) of this subpart. The percentage associated with the per diem described in Article 2 shall be 90% for services provided in SFY 2003, 80% for services in SFY 2004, 70% for services in SFY 2005, and so on until the percentage is 0% for services in SFY 2012. The percentage associated with the per diem described in Article 3 shall be equal to 100% minus the percentage associated with the per diem described in Article 2. In SFY 2012, the capital per diem shall be based entirely on the per diem described in Article 3.

[ ~~C. Effective July 1, 2001, there shall no longer be a payment for return on equity for leased nursing facilities.~~ Return on equity (ROE) for leased facilities shall be phased out along with the methodology described in Article 2 (12 VAC 30-90-30 et seq.) of this subpart. Leased facilities shall be eligible for ROE after July 1, 2001, only if they were receiving ROE on June 30, 2000. ]

D. Effective July 1, 2001, newly constructed facilities and new and replacement beds of previously enrolled facilities completed after July 1, 2000, shall be paid entirely under the methodology described in Article 3 (12 VAC 30-90-35 et seq.) of this subpart without application of the transition policy. However, facilities and beds with COPN applications submitted as of June 30, 2000, shall be subject to the transition policy. Facilities changing ownership after June 30, 2000, shall be paid [ ~~, during the transition period, the lesser of~~ ] the per diem [ rate ] described in Article 3 [ ~~or the transition policy payment. An exception to the policy provided in this subsection shall be made for facilities changing ownership after June 30, 2000, if they are not part of a chain organization or if they are part of a chain organization consisting of no more than two facilities. The exception is that beginning July 1, 2002, facilities meeting this criterion shall be paid the per diem described in Article 3~~ if the facility being sold is not part of a chain organization, or if it is part of a chain organization consisting of no more than two health care

facilities. For purposes of this provision, the number of facilities in a chain shall be determined by counting nursing facilities, hospitals, and any other health care facilities that are licensed to admit patients or residents, whether or not they participate in the Medicaid program. Facilities in Virginia and in other states shall be counted in determining the number of facilities in a chain. Facilities shall be considered to form a chain if there is common ownership of the physical assets, or a common operator, or both ].

E. Emergency regulations effective July 1, 2000, provided for a facility specific fixed capital per diem applicable to services in SFY 2001 that is not to be adjusted at settlement. After SFY 2001, the per diem that would have been applicable to SFY 2001 under the methodology in Article 2 (12 VAC 30-90-30 et seq.) of this subpart shall be calculated. If there are two provider fiscal years that overlap SFY 2001, this per diem shall be a combination of the two applicable per diem amounts. If the per diem provided in the emergency regulations is lower than the per diem based on Article 2, the difference, multiplied by the days in SFY 2001, shall be paid to the facility. If the per diem provided in the emergency regulations is higher, the difference, multiplied by the days, shall be collected from the facility in the settlement of the provider year settled after the difference is calculated.

Article ~~1~~ 2.
Plant Cost Component.

## 12 VAC 30-90-30. Plant cost.

A. This article describes a capital payment methodology that will be phased out for most nursing facilities by SFY 2012. The terms and timing of the transition to a different methodology are described in 12 VAC 30-90-29. The methodology that will eventually replace this one for most facilities is described in Article 3 (12 VAC 30-90-35 et seq.) of this subpart.

B. Plant cost shall include actual allowable depreciation, interest, rent or lease payments for buildings and equipment as well as property insurance, property taxes and debt financing costs allowable under Medicare principles of reimbursement or as defined herein.

~~B.~~ C. Effective July 1, 2001, to calculate the reimbursement rate, plant cost shall be converted to a per diem amount by dividing it by the greater of actual patient days or the number of patient days computed as ~~95%~~ 90% of the daily licensed bed complement during the applicable cost reporting period. [ For facilities that also provide specialized care services, see subdivision 10 of 12 VAC 30-90-264 for special procedures for computing the number of patient days required to meet the 90% occupancy requirement. ]

~~C. For NFs of 30 beds or less, to calculate the reimbursement rate, the number of patient days will be computed as not less than 85% of the daily licensed bed complement.~~

D. Costs related to equipment and portions of a building/facility not available for patient care related activities are nonreimbursable plant costs.

# Final Regulations

**12 VAC 30-90-31. New nursing facilities and bed additions.**

A. Providers shall be required to obtain three competitive bids when (i) constructing a new physical plant or renovating a section of the plant when changing the licensed bed capacity, and (ii) purchasing fixed equipment or major movable equipment related to such projects.

All bids must be obtained in an open competitive market manner, and subject to disclosure to DMAS prior to initial rate setting. (Related parties see 12 VAC 30-90-51.)

B. Reimbursable costs for building and fixed equipment shall be based upon the 3/4 (25% of the surveyed projects with costs above the median, 75% with costs below the median) *75th percentile* square foot costs for NFs published annually in the R.S. Means Building Construction Cost Data as adjusted by the appropriate R.S. Means Square Foot Costs "Location Factor" for Virginia for the locality in which the NF is located. Where the specific location is not listed in the R.S. Means Square Foot Costs "Location Factor" for Virginia, the facility's zip code shall be used to determine the appropriate locality factor from the U.S. Postal Services National Five Digit Zip Code for Virginia and the R.S. Means Square Foot Costs "Location Factors." The provider shall have the option of selecting the construction cost limit which is effective on the date the Certificate of Public Need (COPN) is issued or the date the NF is licensed. Total cost shall be calculated by multiplying the above 3/4 *75th percentile* square foot cost by 385 square feet (the average per bed square footage). Total costs for building additions shall be calculated by multiplying the square footage of the project by the applicable components of the construction cost in the R.S. Means Square Foot Costs, not to exceed the total per bed cost for a new NF. Reasonable limits for renovations shall be determined by the appropriate costs in the R.S. Means Repair and Remodeling Cost Data, not to exceed the total R.S. Means Building Construction Cost Data 3/4 *75th percentile* square foot costs for [ nursing homes *NFs* ].

C. New NFs and bed additions to existing NFs must have prior approval under the state's Certificate of Public Need Law and Licensure regulations in order to receive Medicaid reimbursement.

D. However in no case shall allowable reimbursed costs exceed 110% of the amounts approved in the original COPN, or 100% of the amounts approved in the original COPN as modified by any "significant change" COPN, where a provider has satisfied the requirements of the State Department of Health with respect to obtaining prior written approval for a "significant change" to a COPN which has previously been issued (see 12 VAC 5-220-10 et seq.).

**[ 12 VAC 30-90-33. Financing.**

A. The DMAS shall continue its policy to disallow cost increases due to the refinancing of a mortgage debt, except when required by the mortgage holder to finance expansions or renovations. Refinancing shall also be permitted in cases where refinancing would produce a lower interest rate and result in a cost savings. The total net aggregate allowable costs incurred for all cost reporting periods related to the refinancing cannot exceed the total net aggregate costs that would have been allowable had the refinancing not occurred.

1. Refinancing incentive. Effective July 1, 1991, for mortgages refinanced on or after that date, the DMAS will pay a refinancing incentive to encourage nursing facilities to refinance fixed-rate, fixed-term mortgage debt when such arrangements would benefit both the Commonwealth and the providers. The refinancing incentive payments will be made for the 10-year period following an allowable refinancing action, or through the end of the refinancing period should the loan be less than 10 years, subject to a savings being realized by application of the refinancing calculation for each of these years. The refinancing incentive payment shall be computed on the net savings from such refinancing applicable to each provider cost reporting period. Interest expense and amortization of loan costs on mortgage debt applicable to the cost report period for mortgage debt which is refinanced shall be compared to the interest expense and amortization of loan costs on the new mortgage debt for the cost reporting period.

2. Calculation of refinancing incentive. The incentive shall be computed by calculating two index numbers, the old debt financing index and the new debt financing index. The old debt financing index shall be computed by multiplying the term (months) which would have been remaining on the old debt at the end of the provider's cost report period by the interest rate for the old debt. The new debt index shall be computed by multiplying the remaining term (months) of the new debt at the end of the cost reporting period by the new interest rate. The new debt index shall be divided by the old debt index to achieve a savings ratio for the period. The savings ratio shall be subtracted from a factor of 1 to determine the refinancing incentive factor.

3. Calculation of net savings. The gross savings for the period shall be computed by subtracting the allowable new debt interest for the period from the allowable old debt interest for the period. The net savings for the period shall be computed by subtracting allowable new loan costs for the period from allowable gross savings applicable to the period. Any remaining unamortized old loan costs may be recovered in full to the extent of net savings produced for the period.

4. Calculation of incentive amount. The net savings for the period, after deduction of any unamortized old loan and debt cancellation costs, shall be multiplied by the refinancing incentive factor to determine the refinancing incentive amount. The result shall be the incentive payment for the cost reporting period, which shall be included in the cost report settlement, subject to per diem computations under 12 VAC 30-90-30 B and C, and 12 VAC 30-90-55 A.

5. Where a savings is produced by a provider refinancing his old mortgage for a longer time period, the DMAS shall calculate the refinancing incentive and payment in accordance with subdivisions A 1 through A 4 of this section for the incentive period. Should the calculation produce both positive and negative incentives, the provider's total incentive payments shall not exceed any net positive amount for the entire incentive period. Where a

## Final Regulations

savings is produced by refinancing with either a principal balloon payment at the end of the refinancing period, or a variable interest rate, no incentive payment will be made, since the true savings to the Commonwealth cannot be accurately computed.

6. All refinancings must be supported by adequate and verifiable documentation and allowable under DMAS regulations to receive the refinancing savings incentive.

7. Balloon loan reimbursement. This subdivision applies to the construction and acquisition of nursing facilities (as defined in 12 VAC 30-90-31 and 12 VAC 30-90-34) and major capital expenditures (as defined in 12 VAC 30-90-32) that are financed with balloon loans. A balloon loan requires periodic payments to be made that do not fully amortize the principal balance over the term of the loan; the remaining balance must be repaid at the end of a specified time period. Demand notes and loans with call provisions shall not be deemed to be balloon loans.

a. Incurred interest. Reimbursement for interest of a balloon loan and subsequent refinancings shall be considered a variable interest rate loan under subsection B of this section.

(1) A standard amortization period of 27 years, from the inception date of the original balloon loan, must be computed by the provider and submitted to DMAS and used as the amortization period for loans for renovation, construction, or purchase of a nursing facility.

(2) A standard amortization period of 15 years, from the inception [ *date* ] of the original balloon loan, must be used as the amortization period for loans on furniture, fixtures, and equipment.

(3) A loan which is used partially for the acquisition of buildings, land, and land improvements and partially for the purchase of furniture, fixtures, and equipment must be prorated for the purpose of determining the amortization period.

b. The allowable interest rate shall be limited to the interest rate upper limit in effect on the date of the original balloon loan, unless another rate is allowable under subsection B of this section.

c. Financing costs. The limitations on financing costs set forth in subsection B of this section shall apply to balloon loans. Financing costs exceeding the limitations set forth in these sections shall be allowed to the extent that such excess financing costs may be offset by any available interest savings.

(1) A 27-year amortization period must be used for deferred financing costs associated with the construction or purchase of a nursing facility.

(2) A 15-year amortization period must be used for deferred financing costs associated with financing of furniture, fixtures, and movable equipment.

(3) Financing costs associated with a loan used partially for the acquisition of buildings, land, and land improvements and partially for the purchase of furniture, fixtures, and equipment must be prorated for determination of the amortization period.

d. Cumulative credit computation. The computation of allowable interest and financing costs for balloon loans shall be calculated using the following procedures:

(1) A standard amortization schedule of allowable costs based upon the upper limits for interest and financing costs shall be computed by the provider and submitted to DMAS for the applicable 27-year or 15-year periods on the original balloon loan.

(2) For each cost reporting period, the provider shall be allowed the lesser of loan costs (interest and financing costs) computed in accordance with subdivision 7 a of this subsection, or the actual loan costs incurred during the period.

(3) To the extent that there is a "credit" created by the actual loan costs being less than the loan costs computed on the amortization schedule in some periods, the provider may recover any otherwise allowable costs which result from the refinancing, extension, or renewal of the balloon loan, and any loan costs which have been disallowed because the loan costs are over the limitation for some periods. However, the cumulative actual loan cost reimbursement may not exceed the cumulative allowable loan cost as computed on the amortization schedule to that date.

(4) In refinancing or refinancings of the original balloon loan which involve additional borrowings in excess of the balance due on the original balloon loan, the excess over the balance due on the balloon loan shall be treated as new debt subject to the DMAS financing policies and regulations. Any interest and financing costs incurred on the refinancing shall be allocated pro rata between the refinancing of the balloon loan and the new debt.

(5) In the event of a sale of the facility, any unused balance of cumulative credit or cumulative provider excess costs would follow the balloon loan or the refinancing of the balloon loan if the balloon loan or its refinancing is paid by the buyer under the same terms as previously paid by the seller. Examples of this are (i) the buyer assumes the existing instrument containing the same rates and terms by the purchaser; or (ii) the balance of the balloon loan or its refinancings is financed by the seller to the buyer under the same rates and terms of the existing loan as part of the sale of the facility. If the loan is otherwise paid in full at any time and the facility is sold before the full 27-year or 15-year amortization period has expired, the balance of unused cumulative credit or cumulative provider excess costs shall expire and not be considered an allowable cost.

e. In accordance with subdivision A 5 of this section, no refinancing incentive shall be available for refinancings, extensions, or renewals of balloon loans.

# Final Regulations

f. The balloon loan and refinancing of the balloon loan shall be subject to all requirements for allowable borrowing, except as otherwise provided by this subsection.

B. Interest rate upper limit. Financing for all NFs and expansions which require a COPN and all renovations and purchases shall be subject to the following limitations:

1. Interest expenses for debt financing which is exempt from federal income taxes shall be limited to:

The average weekly rates for Baa municipal rated bonds as published in Cragie Incorporated Municipal Finance Newsletter as published weekly (Representative reoffering from general obligation bonds), plus one percentage point (100 basis points), during the week in which commitment for construction financing or closing for permanent financing takes place.

2.a. Effective on and after July 1, 1990, the interest rate upper limit for debt financing by NFs that are subject to prospective reimbursement shall be the average of the rate for 10-year and 30-year U.S. Treasury Constant Maturities, as published in the weekly Federal Reserve Statistical Release (H.15), plus two percentage points (200 basis points).

This limit (i) shall apply only to debt financing which is not exempt from federal income tax, and (ii) shall not be available to NF's which are eligible for such tax exempt financing unless and until a NF has demonstrated to the DMAS that the NF failed, in a good faith effort, to obtain any available debt financing which is exempt from federal income tax. For construction financing, the limit shall be determined as of the date on which commitment takes place. For permanent financing, the limit shall be determined as of the date of closing. The limit shall apply to allowable interest expenses during the term of the financing.

b. The new interest rate upper limit shall also apply, effective July 1, 1990, to construction financing committed to or permanent financing closed after December 31, 1986, but before July 1, 1990, which is not exempt from federal income tax. The limit shall be determined as of July 1, 1990, and shall apply to allowable interest expenses for the term of the financing remaining on or after July 1, 1990.

3. Variable interest rate upper limit.

a. The limitation set forth in subdivisions 1 and 2 of this subsection shall be applied to debt financing which bears a variable interest rate as follows. The interest rate upper limit shall be determined on the date on which commitment for construction financing or closing for permanent financing takes place, and shall apply to allowable interest expenses during the term of such financing as if a fixed interest rate for the financing period had been obtained. A "fixed rate loan amortization schedule" shall be created for the loan period, using the interest rate cap in effect on the date of commitment for construction financing or the date of closing for permanent financing.

b. If the interest rate for any cost reporting period is below the limit determined in subdivision 3 a above, no adjustment will be made to the provider's interest expense for that period, and a "carryover credit" to the extent of the amount allowable under the "fixed rate loan amortization schedule" will be created, but not paid. If the interest rate in a future cost reporting period is above the limit determined in subdivision 3 a above, the provider will be paid this "carryover credit" from prior period(s), not to exceed the cumulative carryover credit or [ ~~his~~ *its* ] actual cost, whichever is less.

c. The provider shall be responsible for preparing a verifiable and auditable schedule to support cumulative computations of interest claimed under the "carryover credit," and shall submit such a schedule with each cost report.

4. The limitation set forth in subdivisions 1, 2, and 3 of this subsection shall be applicable to financing for land, buildings, fixed equipment, major movable equipment, working capital for construction and permanent financing.

5. Where bond issues are used as a source of financing, the date of sale shall be considered as the date of closing.

6. The aggregate of the following costs shall be limited to 5.0% of the total allowable project costs:

a. Examination Fees

b. Guarantee Fees

c. Financing Expenses (service fees, placement fees, feasibility studies, etc.)

d. Underwriters Discounts

e. Loan Points

7. The aggregate of the following financing costs shall be limited to 2.0% of the total allowable project costs:

a. Legal Fees

b. Cost Certification Fees

c. Title and Recording Costs

d. Printing and Engraving Costs

e. Rating Agency Fees

C. DMAS shall allow costs associated with mortgage life insurance premiums in accordance with § 2130 of the HCFA-Pub. 15, Provider Reimbursement Manual (PRM-15).

D. Interest expense on a debt service reserve fund is an allowable expense if required by the terms of the financing agreement. However, interest income resulting from such fund shall be used by DMAS to offset interest expense. ]

**12 VAC 30-90-34. Purchases of nursing facilities (NF).**

A. In the event of a sale of a NF, the purchaser must have a current license and certification to receive DMAS reimbursement as a provider- *and must notify DMAS of the sale within 30 days of the date legal title passes to the purchaser. The notification* [ ~~should~~ *shall* ] *include:*

# Final Regulations

*1. That a sale or transfer is about to be made or has already occurred;*

*2. The location and general description of the property; and*

*3. The names and addresses of the transferee and transferor and for all such business names and addresses of the transferor for the last three years.*

B. The following reimbursement principles shall apply to the purchase of a NF:

1. The allowable cost of a bona fide sale of a facility (whether or not the parties to the sale were, are, or will be providers of Medicaid services) shall be the lowest of the sales price, the replacement cost value determined by independent appraisal, or the limitations of Subpart XVI - Revaluation of Assets (12 VAC 30-90-260 et seq.). Revaluation of assets shall be permitted only when a bona fide sale of assets occurs.

2. Notwithstanding the provisions of 12 VAC 30-90-51, where there is a sale between related parties (whether or not they were, are or will be providers of Medicaid services), the buyer's allowable cost basis for the nursing facility shall be the seller's allowable depreciated historical cost (net book value), as determined for Medicaid reimbursement.

3. For purposes of Medicaid reimbursement, a "bona fide" sale shall mean a transfer of title and possession for consideration between parties which are not related. Parties shall be deemed to be "related" if they are related by reasons of common ownership or control. If the parties are members of an immediate family, the sale shall be presumed to be between related parties if the ownership or control by immediate family members, when aggregated together, meets the definitions of "common ownership" or "control." See 12 VAC 30-90-51 C for definitions of "common ownership," "control," "immediate family," and "significant ownership or control."

4. The useful life of the fixed assets of the facility shall be determined by AHA guidelines.

5. The buyer's basis in the purchased assets shall be reduced by the value of the depreciation recapture due the state by the provider seller, until arrangements for repayment have been agreed upon by DMAS.

6. In the event the NF is owned by the seller for less than five years, the reimbursable cost basis of the purchased NF to the buyer, shall be the seller's allowable historical cost as determined by DMAS.

C. An appraisal expert shall be defined as an individual or a firm that is experienced and specializes in multi-purpose appraisals of plant assets involving the establishing or reconstructing of the historical cost of such assets. Such an appraisal expert employs a specially trained and supervised staff with a complete range of appraisal and cost construction techniques; is experienced in appraisals of plant assets used by providers, and demonstrates a knowledge and understanding of the regulations involving applicable reimbursement principles, particularly those pertinent to depreciation; and is unrelated to either the buyer or seller.

D. At a minimum, appraisals must include a breakdown by cost category as follows:

1. Building; fixed equipment; movable equipment; land; land improvements.

2. The estimated useful life computed in accordance with AHA guidelines of the three categories, building, fixed equipment, and movable equipment must be included in the appraisal. This information shall be utilized to compute depreciation schedules.

E. Depreciation recapture.

1. The provider seller of the facility shall make a retrospective settlement with DMAS in instances where a gain was made on disposition. The department shall recapture the depreciation paid to the provider by Medicaid for the period of participation in the Program to the extent there is gain realized on the sale of the depreciable assets. A final cost report and refund of depreciation expense, where applicable, shall be due within 30 days from the transfer of title (as defined below).

2. No depreciation adjustment shall be made in the event of a loss or abandonment.

F. Reimbursable depreciation.

1. For the purpose of this section, "sale or transfer" shall mean any agreement between the transferor and the transferee by which the former, in consideration of the payment or promise of payment of a certain price in money, transfers to the latter the title and possession of the property.

2. Upon the sale or transfer of the real and tangible personal property comprising a licensed nursing facility certified to provide services to DMAS, the transferor or other person liable therein shall reimburse to the Commonwealth the amount of depreciation previously allowed as a reasonable cost of providing such services and subject to recapture under the provisions of the State Plan for Medical Assistance. The amount of reimbursable depreciation shall be paid to the Commonwealth within 30 days of the sale or transfer of the real property unless an alternative form of repayment, the term of which shall not exceed one year, is approved by the director.

3. Prior to the transfer, the transferor shall file a written request by certified or registered mail to the director for a letter of verification that he either does not owe the Commonwealth any amount for reimbursable depreciation or that he has repaid any amount owed the Commonwealth for reimbursable depreciation or that an alternative form of repayment has been approved by the director. The request for a letter of verification shall state:

a. That a sale or transfer is about to be made;

b. The location and general description of the property to be sold or transferred;

c. The names and addresses of the transferee and transferor and all such business names and addresses of the transferor for the last three years; and

# Final Regulations

d. ~~Whether or not there is a debt owing to the Commonwealth for the amount of depreciation charges previously allowed and reimbursed as a reasonable cost to the transferor under the Virginia Medical Assistance Program.~~

~~4. Within 90 days after receipt of the request, the director shall determine whether or not there is an amount due to the Commonwealth by the nursing facility by reason of depreciation charges previously allowed and reimbursed as a reasonable cost under DMAS and shall notify the transferor of such sum, if any.~~

~~5. The transferor shall provide a copy of this section and a copy of his request for a letter of verification to the prospective transferee via certified mail at least 30 days prior to the transfer. However, whether or not the transferor provides a copy of this section and his request for verification to the prospective transferee as required herein, the transferee shall be deemed to be notified of the requirements of this law.~~

~~6. After the transferor has made arrangements satisfactory to the director to repay the amount due or if there is no amount due, the director shall issue a letter of verification to the transferor in recordable form stating that the transferor has complied with the provisions of this section and setting forth the term of any alternative repayment agreement. The failure of the transferor to reimburse to the Commonwealth the amount of depreciation previously allowed as a reasonable cost of providing service to DMAS in a timely manner renders the transfer of the nursing facility ineffective as to the Commonwealth.~~

~~7. Upon a finding by the director that such sale or transfer is ineffective as to the Commonwealth, DMAS may collect any sum owing by any means available by law, including devising a schedule for reducing the Medicaid reimbursement to the transferee up to the amount owed the Commonwealth for reimbursable depreciation by the transferor or other person liable therein. Medicaid reimbursement to the transferee shall continue to be so reduced until repayment is made in full or the terms of the repayment are agreed to by the transferor or person liable therein.~~

~~8. In the event the transferor or other person liable therein defaults on any such repayment agreement the reductions of Medicaid reimbursement to the transferee may resume.~~

~~An action brought or initiated to reduce the transferee's Medicaid reimbursement or an action for attachment or levy shall not be brought or initiated more than six months after the date on which the sale or transfer has taken place unless the sale or transfer has been concealed or a letter of verification has not been obtained by the transferor or the transferor defaults on a repayment agreement approved by the director.~~

B. *The following reimbursement principles shall apply to the purchase of a NF:*

*1. The allowable cost of a [ bona fide ] purchase of an existing nursing facility (whether or not the parties to the sale are, were, or will be providers of Medicaid services [ ~~and whether or not the parties are related at the time of~~*

*~~the sale~~* ] *shall be the seller's allowable depreciated historical cost (net book value) as determined for Medicaid reimbursement.* [ *The amount of allowable debt or borrowing to finance such a purchase shall be limited to the greater of the amount of the seller's net book value of the assets purchased, or the seller's related allowable debt, both as determined for Medicaid reimbursement plus required financing costs limited in accordance with the provisions of 12 VAC 30-90-33 B 6 and B 7.*

*2. For purposes of Medicaid reimbursement, a "bona fide" purchase shall mean a transfer of title and possession for consideration between parties that are not related. Parties shall be deemed to be "related" if they are related by reasons of common ownership or control. If the parties are members of an immediate family, the sale shall be presumed to be between related parties if the ownership or control by immediate family members, when aggregated together, meets the definitions of "common ownership" or "control." See 12 VAC 30-90-51 C for definitions of "common ownership," "control," "immediate family," and "significant ownership or control."* ]

[ *~~2.~~ 3.* ] *The useful life of the fixed assets of the facility shall be the seller's remaining depreciable lives as determined for Medicaid reimbursement.*

[ *~~3.~~ 4.* ] *The seller must file a final cost report within 150 days of the date of sale.*

*Article 3.*
*Fair Rental Value Capital Payment System.*

**12 VAC 30-90-35. ~~[Reserved]~~ General applicability.**

*This article describes a capital payment methodology that will be phased in for most nursing facilities by SFY 2012. The terms and timing of the transition to a different methodology are described in 12 VAC 30-90-29. The methodology that this one will replace for most facilities is described in Article 2 (12 VAC 30-90-30 et seq.) of this subpart.*

**12 VAC 30-90-36. ~~[Reserved]~~ Nursing Facility Capital Payment Methodology.**

*A. Applicability. The capital payment methodology described in this article shall be applicable to freestanding nursing facilities but not to hospital-based facilities. Hospital-based facilities shall continue to be reimbursed under the methodology contained in Article 2 (12 VAC 30-90-30 et seq.) of this subpart.* [ *For purposes of this provision, a hospital-based nursing facility shall be one for which a combined cost report is submitted on behalf of both the hospital and the nursing facility.* ]

*B. Definitions. The following words and terms when used in this article shall have the following meaning unless the context clearly indicates otherwise:*

*"Capital costs" means costs that include the cost elements of depreciation, interest, financing costs, rent and lease costs for property, building and equipment, property insurance and property taxes.*

*"Date of acquisition" means the date legal title passed to the buyer. If a legal titling date is not determinable for a nursing*

# Final Regulations

facility building, date of acquisition shall be considered to be the date a certificate of occupancy was issued by the appropriate licensing or building inspection agency of the locality where the nursing facility is located.

"Facility average age" means for a facility the weighted average of the ages of all capitalized assets of the facility, with the weights equal to the expenditures for those assets. The calculation of average age shall take into account land improvements, building and fixed equipment, and major movable equipment. The basis for the calculation of average age shall be the schedule of assets submitted annually to the department in accordance with the provisions of this section.

"Facility imputed gross square feet" means a number that is determined by multiplying the facility's number of nursing facility licensed beds licensed by the Virginia Department of Health by the imputed number of gross square feet per bed. The imputed number of gross square feet per bed shall be 461 for facilities of 90 or fewer beds, and 438 for facilities of more than 90 beds. The number of licensed nursing facility beds shall be the number on the last day of the provider's most recent fiscal year end for which a cost report has been filed.

"Factor for land and soft costs" means a factor equaling 1.429 that adjusts the construction cost amount to recognize land and capitalized costs associated with construction of a facility that are not part of the R.S. Means construction cost amount.

"Fixed capital replacement value" means an amount equal to the R.S. Means 75th percentile nursing home construction cost per square foot, times the applicable R.S. Means historical cost index factor, times the factor for land and soft costs, times the applicable R.S. Means "Location Factor," times facility imputed gross square feet.

"FRV depreciation rate" means a depreciation rate equal to 2.86% per year.

"Hospital-based facility" means one for which a single combined [ ~~Medicaid~~ Medicare ] cost report is filed that includes the costs of both the hospital and the nursing home.

"Movable capital replacement value" means a value equal to $3,475 per bed in SFY 2001, and shall be increased each July 1 by the same R.S. Means historical cost index factor that is used to calculate the fixed capital replacement value. Each year's updated movable capital replacement value shall be used in the calculation of each provider's rate for the provider year beginning on or after the date the new value becomes effective.

"R.S. Means 75th percentile nursing construction cost per square foot" means the 75th percentile value published in the 59th Annual Edition of the R.S. Means Building Construction Cost Data, 2001. In the 2000 edition of the R.S. Means publication this value is $110, which is reported as a January 2000 value.

"R.S. Means historical cost index factor" means the ratio of the two most recent R.S. Means Historical Cost Indexes published in the 59th Annual Edition of the R.S. Means Building Construction Cost Data, 2001. In the 2000 edition of this R.S. Means publication these two values are 117.6 (for 1999) and 115.1 (for 1998). The ratio of these values, and

therefore the factor to be used, would be 1.022. This factor would be used to adjust the January 2000 value for the one year of change from January 2000 to January 2001, the midpoint of the prospective rate year (SFY 2001). The resulting cost value that would be used in SFY 2001 is $112.42. The indexes used in this calculation do not match the time period for which a factor is needed. They relate to 1998 and 1999, while 2000 and 2001 would be ideal. However, R.S. Means does not publish index forecasts, so the most recent available indexes shall be used.

"R.S. Means Location Factors" means those published in the 22nd Annual Edition of the R.S. Means Square Foot Costs, 2001. The 2000 location factors are shown in the following Table 1. They will be updated annually and distributed to providers based upon the most recent available data.

TABLE 1
R.S. MEANS COMMERCIAL CONSTRUCTION COST
LOCATION FACTORS (2000)

| Zip Code | Principal City | Location Factor |
|----------|----------------|-----------------|
| 220-221 | Fairfax | 0.90 |
| 222 | Arlington | 0.90 |
| 223 | Alexandria | 0.91 |
| 224-225 | Fredericksburg | 0.85 |
| 226 | Winchester | 0.80 |
| 227 | Culpeper | 0.80 |
| 228 | Harrisonburg | 0.77 |
| 229 | Charlottesville | 0.82 |
| 230-232 | Richmond | 0.85 |
| 233-235 | Norfolk | 0.82 |
| 236 | Newport News | 0.82 |
| 237 | Portsmouth | 0.81 |
| 238 | Petersburg | 0.84 |
| 239 | Farmville | 0.74 |
| 240-241 | Roanoke | 0.77 |
| 242 | Bristol | 0.75 |
| 243 | Pulaski | 0.70 |
| 244 | Staunton | 0.76 |
| 245 | Lynchburg | 0.77 |
| 246 | Grundy | 0.70 |

"Rental rate" means for a prospective year a rate equal to two percentage points plus the yield on U.S. Treasury Bonds with maturity over 10 years, averaged over the most recent three calendar years for which data are available, as published by the Federal Reserve (Federal Reserve Statistical Release H.15 Selected Interest Rates ( [ ~~www.bog.frb.fed.us/releases/~~ ] (www.Federalreserve.gov/releases/) ]. Rental rates may not fall below 9.0% or exceed 11% and will be updated annually on or about July 1 each year. The rate will be published and distributed to providers annually. Changes in the rental rate shall be effective for the providers' fiscal year beginning on or after July 1.

"Required occupancy percentage" means an occupancy percentage of 90%.

"SFY" means State Fiscal Year (July 1 through June 30).

1. Fair Rental Value Payment for Capital. Effective for dates of service on or after July 1, 2001, the [ ~~state agency~~

# Final Regulations

DMAS ] shall pay nursing facility capital related costs under a Fair Rental Value (FRV) methodology. The payment made under this methodology shall be the only payment for capital related costs, and no separate payment shall be made for depreciation or interest expense, lease costs, property taxes, insurance, or any other capital related cost, including home office capital costs. This payment is considered to cover costs related to land, buildings and fixed equipment, major movable equipment, and any other capital related item. This shall be the case regardless of whether the property is owned or leased by the operator. The department shall review the operation and performance of the FRV methodology every two years.

2. FRV Rate Year. The FRV payment rate shall be a per diem rate determined each year for each facility using the most recent available data from settled cost reports, or from other verified sources as specified herein. The per diem rate shall be determined prospectively and shall apply for the entire fiscal year. Each provider shall receive a new capital per diem rate each year effective at the start of the provider's fiscal year. Data elements that are provider specific shall be revised at that time and shall rely on the [ filed  settled ] cost report and schedule of assets of the previous year. Data elements that are not provider specific, including those published by R.S. Means and the rental rate, shall be determined annually on or about July 1, and shall apply to provider fiscal years beginning on or after July 1. That is, each July 1 DMAS shall determine the R.S. Means values and the rental rate, and these shall apply to all provider fiscal years beginning on or after July 1.

**12 VAC 30-90-37. [Reserved] Calculation of FRV per diem rate for capital; calculation of FRV rental amount; change of ownership.**

A. Calculation of FRV per diem rate for capital. The facility FRV per diem rate shall be equal to the sum of the facility FRV rental amount and the facility's allowable property tax and insurance cost from the most recent settled cost report, divided by the greater of actual patient days or 90% of the potential patient days for all licensed beds throughout the cost reporting period. [ For facilities that also provide specialized care services, see subdivision 10 of 12 VAC 30-90-264 for special procedures for computing the number of patient days required to meet the 90% occupancy requirement. ]

B. Calculation of FRV rental amount. The facility FRV rental amount shall be equal to the facility prospective year total value times the rental rate.

1. The facility prospective year total value shall be equal to the facility prospective year replacement value minus FRV depreciation. FRV depreciation equals the prospective year replacement value multiplied by the product of facility average age and the depreciation rate. FRV depreciation cannot exceed 60% of the prospective year replacement value.

2. The facility prospective year replacement value shall be equal to the fixed capital replacement value plus the movable equipment replacement value.

C. Change of ownership. As provided in connection with schedule of assets reporting, the sale of nursing facility assets after June 30, 2000, shall not result in a change to the schedule of assets or to the calculation of average age for purposes of reimbursement under the FRV methodology. Therefore, any sale or transfer of assets after this date shall not affect the FRV per diem rate. [ Changes of ownership for purposes of determining the FRV payment shall occur if there is a sale of stock, assets, or sales between related or unrelated parties. For purposes of this section, change of ownership shall be deemed to have occurred if there is a sale of stock, assets, or sales between related or unrelated parties. ]

**12 VAC 30-90-38. [Reserved] Schedule of assets reporting.**

A. For the calculation of facility average age, the department shall use a "schedule of assets" that lists, by year of acquisition, the allowable acquisition cost of facilities' assets, including land improvements, buildings and fixed equipment, and major movable equipment. This schedule shall be submitted annually by the provider on forms to be provided by the department, and shall be audited by the department. The principles of reimbursement for plant cost described in Article 2 (12 VAC 30-90-30 et seq.) of this subpart shall be used to determine allowable cost.

B. The schedule of assets used in the calculation of average age shall be submitted with the provider's cost report.

C. Facilities failing to submit the schedule of assets timely shall have their nursing facility per diem rate set to zero.

D. Capital expenditures are to be included on the schedule of assets. These do not include land purchases, but do include land improvements, renovations, additions, upgrading to new standards, and equipment purchases. Capital expenditures shall be capital related expenditures costing $50,000 or more each, in aggregate for like items, or in aggregate for a particular project. These include purchases of similar type equipment or like items within a 12-month period. For facilities with 30 or fewer beds, an amount of $25,000, rather than $50,000, shall apply. The limits of $50,000 and $25,000 shall apply only to expenditures after July 1, 2000.

E. Items reportable on the schedule of assets may be removed only when disposed of.

F. Acquisition costs related to any sale or change in the ownership of a nursing facility or the assets of a nursing facility shall not be included in the schedule of assets if the transaction occurred after June 30, 2000. Whether such a transaction is the result of a sale of assets, acquisition of capital stock, merger, or any other type of change in ownership, related costs shall not be reported on the schedule of assets.

G. In addition to verifying the schedule of assets, audits of NF allowable capital costs shall continue to be performed in accordance with regulations described in Article 2.

# Final Regulations

**12 VAC 30-90-39.** ~~[Reserved]~~ *Purchases of nursing facilities (NF).*

*A. In the event of a sale of a NF, the purchaser must have a current license and certification to receive DMAS reimbursement as a provider and must notify DMAS of the sale within 30 days of the date legal title passes to the purchaser. The notification [* ~~should~~ *shall ] include:*

*1. That a sale or transfer is about to be made or has already occurred;*

*2. The location and general description of the property;*

*3. The names and addresses of the transferee and transferor and all such business names and addresses of the transferor for the last three years;*

*B. The seller must file a final cost report within 150 days of the date of the facility sale.*

Article ~~2~~ *4.*
Operating Cost Component.

**12 VAC 30-90-40. Operating cost.**

~~A.~~ *Effective July 1, 2001,* operating cost shall be the total allowable inpatient cost less plant cost *or capital, as appropriate,* and NATCEPs costs. See ~~Part~~ *Subpart* VII *(12 VAC 30-90-170 et seq.) of this part* for rate determination procedures for NATCEPs costs. ~~To calculate the reimbursement rate, operating cost shall be converted to a per diem amount by dividing it by the greater of actual patient days, or the number of patient days computed as 95% of the daily licensed bed complement during the applicable cost reporting period.~~ *Operating cost shall be made up of direct patient care operating cost and indirect patient care operating cost. Direct patient care operating cost is defined in Appendix I (12 VAC 30-90-271). Indirect patient care operating cost includes all operating costs not defined as direct patient care operating costs or NATCEPS costs in Appendix I (12 VAC 30-90-272). For purposes of calculating the reimbursement rate, the direct patient care operating cost per day shall be the Medicaid portion of the direct patient care operating cost divided by the nursing facility's number of Medicaid patient days in the cost reporting period. The indirect patient care operating cost per day shall be the Medicaid portion of the indirect patient care operating cost divided by the greater of the actual number of Medicaid patient days in the cost reporting period, or 90% of the potential patient days for all licensed beds throughout the cost reporting period times the Medicaid utilization percentage. [ For facilities that also provide specialized care services, see subdivision 10 of 12 VAC 30-90-264 for special procedures for computing the number of patient days required to meet the 90% occupancy requirement. ]*

~~B. For NFs of 30 beds or less, to calculate the reimbursement rate the number of patient days will continue to be computed as not less than 85% of the daily licensed bed complement.~~

**12 VAC 30-90-41. Nursing facility reimbursement formula.**

A. Effective on and after October 1, 1990, all NFs subject to the prospective payment system shall be reimbursed under a revised formula entitled "The Patient Intensity Rating System (PIRS)." PIRS is a patient based methodology which links NFs per diem rates to the intensity of services required by a NFs patient mix. Three classes were developed which group patients together based on similar functional characteristics and service needs.

1. Any NF receiving Medicaid payments on or after October 1, 1990, shall satisfy all the requirements of § 1919(b) through (d) of the Social Security Act as they relate to provision of services, residents' rights and administration and other matters.

2. Direct and indirect group ceilings *and rates*.

a. In accordance with 12 VAC 30-90-20 C, direct patient care operating cost peer groups shall be established for the Virginia portion of the Washington DC-MD-VA MSA, the Richmond-Petersburg MSA and the rest of the state. Direct patient care operating costs shall be as defined in ~~12 VAC 30-90-270~~ *12 VAC 30-90-271*.

b. *Effective July 1, 2001,* indirect patient care operating cost peer groups shall be established for the Virginia portion of the Washington DC-MD-VA MSA, *for the rest of the state for facilities with less than 61 licensed beds* and for the rest of the state *for facilities with more than 60 licensed beds.* ~~Indirect patient care operating costs shall include all other operating costs, not defined in 12 VAC 30-90-270 as direct patient care operating costs and NATCEPs costs.~~

~~c. Effective July 1, 1995, existing indirect peer group ceilings of nursing facilities shall be adjusted according to the schedule below. These adjustments shall be added to the ceiling in effect for each facility on July 1, 1995, and shall apply from that day until the end of the facility's fiscal year in progress at that time. Peer group ceilings for the subsequent fiscal year shall be calculated by adding the adjustments below to the existing interim ceiling. The resulting adjusted interim ceiling shall be increased by 100% of historical inflation to the beginning of the facility's next fiscal year to obtain the new "interim" ceiling, and by 50% of the forecast inflation to the end of the facility's next fiscal year. This action increases the number of indirect patient care operating cost peer groups to a total of eight, four peer groups for the area within the Washington DC-MD-VA MSA, and four for the rest of the state.~~

| ~~Licensed Bed Size~~ | ~~Ceiling Adjustment~~ |
|---|---|
| ~~1 to 30~~ | ~~add $1.89~~ |
| ~~31 to 60~~ | ~~add $1.28~~ |
| ~~61 to 90~~ | ~~add $0.62~~ |
| ~~Over 90~~ | ~~add $0.00~~ |

3. Each NFs Service Intensity Index (SII) shall be calculated for each semiannual period of a NFs fiscal year based upon data reported by that NF and entered into DMAS' Long Term Care Information System (LTCIS). Data will be reported on the multidimensional assessment form prescribed by DMAS (now ~~DMAS-95~~ *DMAS-80*) at the time of admission and then twice a year for every Medicaid recipient in a NF. The NFs SII, derived from the assessment data, will be normalized by dividing it by the average for all NFs in the state.

# Final Regulations

See 2 VAC 30-90-300 for the PIRS class structure, the relative resource cost assigned to each class, the method of computing each NFs facility score and the methodology of computing the NFs semiannual SIIs.

4. The normalized SII shall ~~be used to calculate the initial direct patient care operating cost peer group medians. It shall also~~ be used to calculate the direct patient care operating cost prospective ceilings and direct patient care operating cost prospective rates for each semiannual period of a NFs subsequent fiscal years.

~~a. The normalized SII, as determined during the quarter ended September 30, 1990, shall be used to calculate the initial direct patient care operating cost peer group medians.~~

~~b.~~ *a.* A NFs direct patient care operating cost prospective ceiling shall be the product of the NFs peer group direct patient care ceiling and the NFs normalized SII for the previous semiannual period. A NFs direct patient care operating cost prospective ceiling will be calculated semiannually.

~~c.~~ *b.* An ~~SSI~~ *SII* rate adjustment, if any, shall be applied to a NFs prospective direct patient care operating cost base rate for each semiannual period of a NFs fiscal year. The SII determined in the second semiannual period of the previous fiscal year shall be divided by the average of the previous fiscal year's SIIs to determine the SII rate adjustment, if any, to the first semiannual period of the subsequent fiscal year's prospective direct patient care operating cost base rate. The SII determined in the first semiannual period of the subsequent fiscal year shall be divided by the average of the previous fiscal year's SIIs to determine the SII rate adjustment, if any, to the second semiannual period of the subsequent fiscal year's prospective direct patient care operating cost base rate.

~~d.~~ *c.* See 12 VAC 30-90-300 for an illustration of how the SII is used to adjust direct patient care operating ceilings and the semiannual rate adjustments to the prospective direct patient care operating cost base rate.

~~5. An adjustment factor shall be applied to both the direct patient care and indirect patient care peer group medians to determine the appropriate initial peer group ceilings.~~

~~a. The DMAS shall calculate the estimated gross NF reimbursement required for the forecasted number of NF bed days during fiscal year 1991 under the prospective payment system in effect through September 30, 1990, as modified to incorporate the estimated additional NF reimbursement mandated by the provisions of § 1902(a)(13)(A) of the Social Security Act as amended by § 4211(b)(1) of the Omnibus Budget Reconciliation Act of 1987.~~

~~b. The DMAS shall calculate the estimated gross NF reimbursement required for the forecasted number of NF bed days during FY 1991 under the PIRS prospective payment system.~~

~~c. The DMAS shall determine the differential between a and b above and shall adjust the peer group medians~~ ~~within the PIRS as appropriate to reduce the differential to zero.~~

~~d. The adjusted PIRS peer group medians shall become the initial peer group ceilings.~~

*5. Effective for services on and after July 1, 2001, the following [ ~~change~~ changes ] shall be made to the direct and indirect payment methods.*

*a. The direct patient care operating ceiling shall be set at 112% of the median of facility specific direct cost per day. The calculation of the median shall be based on cost reports from freestanding nursing homes for provider fiscal years ending in calendar year 1998. The median used to set the direct ceiling shall be revised every two years using more recent data. In addition, for ceilings effective during July 1, 2000, through June 30, 2002, the ceiling calculated as described herein shall be increased by two per diem amounts. The first per diem amount shall equal $21,716,649, increased for inflation from SFY 2000 to SFY 2001, divided by Medicaid days in SFY 2000. The second per diem amount shall equal $1,400,000 divided by Medicaid days in SFY 2000. When this ceiling calculation is completed for services after June 30, 2002, the per diem amount related to the amount of $21,716,649 shall not be added.*

*b. Facility specific direct cost per day amounts used to calculate direct reimbursement rates for dates of service on and after July 1, 2000, shall be increased by the two per diem amounts described in subdivision 5 a of this subsection. However, the per diem related to the amount of $21,716,649 shall be included only in proportion to the number of calendar days in the provider fiscal year the data are taken from that do not fall after July 1, 1999. That is, for a cost report from a provider fiscal year ending December 31, 1999, the specified increase would apply to about half of the year.*

*c. The indirect patient care operating ceiling shall be set at 106.9% of the median of facility specific indirect cost per day. The calculation of the median shall be based on cost reports from freestanding nursing homes for provider fiscal years ending in calendar year 1998.*

B. The allowance for inflation shall be based on the percentage of change in the moving average of the Skilled Nursing Facility Market Basket of Routine Service Costs, as developed by Data Resources, Incorporated, adjusted for Virginia, determined in the quarter in which the NFs most recent fiscal year ended. NFs shall have their prospective operating cost ceilings and prospective operating cost rates established in accordance with the following methodology:

1. The initial peer group ceilings established under ~~subsection A of~~ this section shall be the final peer group ceilings for a NF's first full or partial *cost reporting* fiscal year under PIRS ~~and shall be considered as the initial "interim ceilings" for calculating the subsequent fiscal year's peer group ceilings.~~ Peer group ceilings for subsequent fiscal years shall be calculated by ~~adjusting the initial "interim" ceilings by a "percentage factor" which shall eliminate any allowances for inflation after September 30,~~

# Final Regulations

~~1990, calculated in both subdivisions A 5 a and A 5 c of this section. The adjusted initial "interim" ceilings shall be considered as the final "interim ceiling." Peer group ceilings for subsequent fiscal years shall be calculated by adjusting the final "interim" ceiling, as determined above, by 100% of historical inflation from October 1, 1990~~ *use of the adjusted medians determined at June 30, 2000, for direct and indirect cost. These adjusted medians shall be considered the final interim ceilings for subsequent fiscal years. The final interim ceilings determined above shall be adjusted by adding 100% of historical inflation from June 30, 2000, to the beginning of the NFs next fiscal year to obtain the* new "interim" ceilings, and 50% of the forecasted inflation to the end of the NFs next fiscal year.

2. A NFs average allowable operating cost rates, as determined from its most recent fiscal year's cost report, shall be adjusted by 50% of historical inflation and 50% of the forecasted inflation to calculate its prospective operating cost base rates.

C. The PIRS method shall still require comparison of the prospective operating cost rates to the prospective operating ceilings. The provider shall be reimbursed the lower of the prospective operating cost rates or prospective operating ceilings.

D. Nonoperating costs. ~~Allowable~~ Plant *or capital, as appropriate,* costs shall be reimbursed in accordance with ~~this article~~ *Articles 1, 2, and 3 of this subpart.* Plant costs shall not include the component of cost related to making or producing a supply or service.

NATCEPs cost shall be reimbursed in accordance with 12 VAC 30-90-170.

E. The prospective rate for each NF shall be based upon operating cost and plant/*capital* cost components or charges, whichever is lower, plus NATCEPs costs. The disallowance of nonreimbursable operating costs in any current fiscal year shall be reflected in a subsequent year's prospective rate determination. Disallowances of nonreimbursable plant *or capital, as appropriate,* costs and NATCEPs costs shall be reflected in the year in which the nonreimbursable costs are included.

F. *Effective July 1, 2001,* for those NFs whose *indirect* operating cost rates are below the ceilings, an incentive plan shall be established whereby a NF shall be paid, on a sliding scale, up to 25% of the difference between its allowable *indirect* operating cost rates and the *indirect* peer group ceilings ~~under the PIRS~~.

1. The following table presents four incentive examples ~~under the PIRS~~:

| Peer Group Ceilings | Allowable Cost Per Day | Difference | % of Ceiling | Sliding Scale | *Scale %* Difference |
|---|---|---|---|---|---|
| $30.00 | $27.00 | $ 3.00 | 10% | $ .30 | 10% |
| 30.00 | 22.50 | 7.50 | 25% | 1.88 | 25% |
| 30.00 | 20.00 | 10.00 | 33% | 2.50 | 25% |
| 30.00 | 30.00 | 0 | 0 | | |

2. ~~Separate~~ Efficiency incentives shall be calculated *only* for ~~both~~ the ~~direct and~~ indirect patient care operating ceilings and costs. *Effective July 1, 2001, a direct care efficiency incentive shall no longer be paid.*

G. Quality of care requirement. A cost efficiency incentive shall not be paid to a NF for the prorated period of time that it is not in conformance with substantive, nonwaived life, safety, or quality of care standards.

H. Sale of facility. In the event of the sale of a NF, the prospective base operating cost rates for the new owner's first fiscal period shall be the seller's prospective base operating cost rates before the sale.

I. Public notice. To comply with the requirements of § 1902(a)(28)(c) of the Social Security Act, DMAS shall make available to the public the data and methodology used in establishing Medicaid payment rates for nursing facilities. Copies may be obtained by request under the existing procedures of the Virginia Freedom of Information Act.

**12 VAC 30-90-42.** ~~Phase-in period.~~ *(Repealed.)*

~~A. To assist NFs in converting to the PIRS methodology, a phase-in period shall be provided until June 30, 1992.~~

~~B. From October 1, 1990, through June 30, 1991, a NF's prospective operating cost rate shall be a blended rate calculated at 33% of the PIRS operating cost rates determined by 12 VAC 30-90-41 and 67% of the "current" operating rate determined by subsection D below.~~

~~C. From July 1, 1991, through June 30, 1992, a NF's prospective operating cost rate shall be a blended rate calculated at 67% of the PIRS operating cost rates determined by 12 VAC 30-90-41 and 33% of the "current" operating rate determined by subsection D below.~~

~~D. The following methodology shall be applied to calculate a NF's "current" operating rate:~~

~~1. Each NF shall receive as its base "current" operating rate, the weighted average prospective operating cost per diems and efficiency incentive per diems if applicable, calculated by DMAS to be effective September 30, 1990.~~

~~2. The base "current" operating rate established above shall be the "current" operating rate for the NF's first partial fiscal year under PIRS. The base "current" operating rate shall be adjusted by appropriate allowance for historical inflation and 50% of the forecasted inflation based on the methodology contained in 12 VAC 30-90-41 B at the beginning of each of the NF's fiscal years which starts during the phase-in period, October 1, 1990, through June 30, 1992, to determine the NF's prospective "current"~~

# Final Regulations

operating rate. See 12 VAC 30-90-300 for example calculations.

**12 VAC 30-90-43. Nursing facility rate change. *(Repealed.)***

For the period beginning July 1, 1991, and ending June 30, 1992, the per diem operating rate for each NF shall be adjusted. This shall be accomplished by applying a uniform adjustment factor to the rate of each NF.

Article 3 *5.*
Allowable Cost Identification.

**12 VAC 30-90-50. Allowable costs.**

A. Costs which are included in rate determination procedures and final settlement shall be only those allowable, reasonable costs which are acceptable under the Medicare principles of reimbursement, except as specifically modified in the Plan and as may be subject to individual or ceiling cost limitations and which are classified in accordance with the DMAS uniform chart of accounts (see *Appendix I (*12 VAC 30-90-270 *through 12 VAC 30-90-276)* of Part III of this chapter).

B. Certification. The cost of meeting all certification standards for NF requirements as required by the appropriate state agencies, by state laws, or by federal legislation or regulations.

C. Operating costs.

1. Direct patient care operating costs shall be defined in [ *Appendix I (12 VAC 30-90-270 through 12 VAC 30-90-276) of Part III of this chapter* 12 VAC 30-90-271 ].

2. Allowable direct patient care operating costs shall exclude (i) personal physician fees, and (ii) pharmacy services and prescribed legend and nonlegend drugs provided by nursing facilities which operate licensed in-house pharmacies. These services shall be billed directly to DMAS through separate provider agreements and DMAS shall pay directly in accordance with 12 VAC 30-80-10 et seq.

3. Indirect patient care operating costs include all other operating costs, not identified as direct patient care operating costs and NATCEPs costs in *Appendix I (*12 VAC 30-90-270 *through 12 VAC 30-90-276) of Part III of this chapter*, which are allowable under the Medicare principles of reimbursement, except as specifically modified herein and as may be subject to individual cost or ceiling limitations.

D. Allowances/goodwill. Bad debts, goodwill, charity, courtesy, and all other contractual allowances shall not be recognized as [ an ] allowable [ cost *costs* ].

E. Cost of protecting employees from blood borne pathogens. Effective July 1, 1994, reimbursement of allowable costs shall be adjusted in the following way to recognize the costs of complying with requirements of the Occupational Safety and Health Administration (OSHA) for protecting employees against exposure to blood borne pathogens.

1. Hepatitis B immunization. The statewide median of the reasonable acquisition cost per unit of immunization times the number of immunizations provided to eligible employees during facility fiscal years ending during SFY 1994, divided by Medicaid days in the same fiscal period, shall be added to the indirect peer group ceiling effective July 1, 1994. This increase to the ceilings shall not exceed $.09 per day for SFY 1995.

2. Other OSHA compliance costs. The indirect peer group ceilings shall be increased by $.07, effective July 1, 1994, to recognize continuing OSHA compliance costs other than immunization.

3. Data submission by nursing facilities. Nursing facilities shall provide for fiscal years ending during SFY 1994, on forms provided by DMAS, (i) the names, job titles and social security numbers of individuals immunized, the number of immunizations provided to each and the dates of immunization; and (ii) the acquisition cost of immunization.

**12 VAC 30-90-51. Purchases/related organizations.**

A. Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control shall be included in the allowable cost of the provider at the cost to the related organization, provided that such costs do not exceed the price of comparable services, facilities or supplies. Purchases of existing NFs by related parties shall be governed by the provisions of 12 VAC 30-90-34 B [ 2 *1* ].

Allowable cost applicable to management services furnished to the provider by organizations related to the provider by common ownership or control shall be lesser of the cost to the related organization or the per patient day ceiling limitation established for management services cost. (See 12 VAC 30-90-290.)

B. "Related to the provider" shall mean that the provider is related by reasons of common ownership or control by the organization furnishing the services, facilities, or supplies.

C. Common ownership exists when an individual or individuals or entity or entities possess significant ownership or equity in the parties to the transaction. Control exists where an individual or individuals or entity or entities have the power, directly or indirectly, significantly to influence or direct the actions or policies of the parties to the transaction. Significant ownership or control shall be deemed to exist where an individual is a "person with an ownership or control interest" within the meaning of 42 CFR 455.101. If the parties to the transaction are members of an immediate family, as defined below, the transaction shall be presumed to be between related parties if the ownership or control by immediate family members, when aggregated together, meets the definitions of "common ownership" or "control," as set forth above. Immediate family shall be defined to include, but not be limited to, the following: (i) husband and wife, (ii) natural parent, child and sibling, (iii) adopted child and adoptive parent, (iv) step-parent, step-child, step-sister, and step-brother, (v) father-in-law, mother-in-law, sister-in-law, brother-in-law, son-in-law and daughter-in-law, and (vi) grandparent and grandchild.

D. Exception to the related organization principle.

# Final Regulations

1. Effective with cost reports having fiscal years beginning on or after July 1, 1986, an exception to the related organization principle shall be allowed. Under this exception, charges by a related organization to a provider for goods or services shall be allowable cost to the provider if all four of the conditions set out below are met.

2. The exception applies if the provider demonstrates by convincing evidence to the satisfaction of DMAS that the following criteria have been met:

a. The supplying organization is a bona fide separate organization. This means that the supplier is a separate sole proprietorship, partnership, joint venture, association or corporation and not merely an operating division of the provider organization.

b. A substantial part of the supplying organization's business activity of the type carried on with the provider is transacted with other organizations not related to the provider and the supplier by common ownership or control and there is an open, competitive market for the type of goods or services furnished by the organization. In determining whether the activities are of similar type, it is important to also consider the scope of the activity.

For example, a full service management contract would not be considered the same type of business activity as a minor data processing contract. The requirement that there be an open, competitive market is merely intended to assure that the item supplied has a readily discernible price that is established through arms-length bargaining by well informed buyers and sellers.

c. The goods or services shall be those which commonly are obtained by institutions such as the provider from other organizations and are not a basic element of patient care ordinarily furnished directly to patients by such institutions. This requirement means that institutions such as the provider typically obtain the good or services from outside sources rather than producing the item internally.

d. The charge to the provider is in line with the charge for such services, or supplies in the open market and no more than the charge made under comparable circumstances to others by the organization for such goods or services. The phrase "open market" takes the same meaning as "open, competitive market" in subdivision b above.

3. Where all of the conditions of this exception are met, the charges by the supplier to the provider for such goods or services shall be allowable as costs.

4. This exception does not apply to the purchase, lease or construction of assets such as property, buildings, fixed equipment or major movable equipment. The terms "goods and services" may not be interpreted or construed to mean capital costs associated with such purchases, leases, or construction.

[ E. Three competitive bids shall not be required for the building and fixed equipment components of a construction project outlined in 12 VAC 30-90-31. Reimbursement shall be in accordance with subsection A of this section with the limitations stated in 12 VAC 30-90-31 B. ]

[ **12 VAC 30-90-55. Provider payments.**

A. Limitations.

1. Payments to providers, shall not exceed charges for covered services except for (i) public providers furnishing services free of charge or at a nominal charge (ii) nonpublic provider whose charges are 60% or less of the allowable reimbursement represented by the charges and that demonstrates its charges are less than allowable reimbursement because its customary practice is to charge patients based on their ability to pay. Nominal charge shall be defined as total charges that are 60% or less of the allowable reimbursement of services represented by these charges. Providers qualifying in this section shall receive allowable reimbursement as determined in this Plan.

2. Allowable reimbursement in excess of charges may be carried forward for payment in the two succeeding cost reporting periods. A new provider may carry forward unreimbursed allowable reimbursement in the five succeeding cost reporting periods.

3. Providers may be reimbursed the carry forward to a succeeding cost reporting period (i) if total charges for the services provided in that subsequent period exceed the total allowable reimbursement in that period (ii) to the extent that the accumulation of the carry forward and the allowable reimbursement in that subsequent period do not exceed the providers' direct and indirect care operating ceilings plus allowable plant cost.

B. Payment for service shall be based upon the rate in effect when the service was rendered.

C. For cost reports filed on or after August 1, 1992, an interim settlement shall be made by DMAS within 180 days after receipt and review of the cost report. ~~The 180 day time frame shall similarly apply to cost reports filed but not interim settled as of August 1, 1992.~~ The word "review," for purposes of interim settlement, shall include verification that all financial and other data specifically requested by DMAS is submitted with the cost report. Review shall also mean examination of the cost report and other required submission for obvious errors, inconsistency, inclusion of past disallowed costs, unresolved prior year cost adjustments and a complete signed cost report that conforms to the current DMAS requirements herein.

However, an interim settlement shall not be made when one of the following conditions exists:

1. Cost report filed by a terminated provider;

2. Insolvency of the provider at the time the cost report is submitted;

3. Lack of a valid provider agreement and decertification;

4. Moneys owed to DMAS;

5. Errors or inconsistencies in the cost report; or

6. Incomplete/nonacceptable cost report. ]

## Final Regulations

Article 4 6.
New Nursing Facilities.

**12 VAC 30-90-60. Interim rate.**

A. A new facility shall be defined as follows:

1. A facility that is newly enrolled and new construction has taken place through the COPN process; or

2. A facility that is newly enrolled which was previously denied payments for new admissions and was subsequently terminated from the program.

B. Upon a showing of good cause, and approval of the DMAS, an existing NF that expands its bed capacity by 50% or more shall have the option of retaining its prospective rate or being treated as a new NF.

C. A replacement facility or one that has changed location may not be considered a new facility if it serves the same inpatient population.  An exception may be granted by DMAS if the provider can demonstrate that the occupancy substantially changed as a result of the facility being replaced or changing location.  A [ change decline ] in [ the replacement facility's ] total occupancy of 20 [ % percentage points, in the replacement facility's first cost reporting period, ] shall be considered to indicate a substantial change when compared to [ the lower of ] the [ old facility's ] previous two prior cost reporting periods. [ The replacement facility shall receive the previous operator's operating rates if it does not qualify to be considered a new facility. ]

D. A change in either ownership or adverse financial conditions (e.g., bankruptcy), or both, of a provider does not change a nursing facility's status to be considered a new facility.

A. E. Effective July 1, 2001, for all new or expanded NFs the 95% 90% occupancy requirement for indirect and capital costs shall be waived for establishing the first cost reporting period interim rate. This first cost reporting period shall not exceed 12 13 months from the date of the NFs certification.

B. Upon a showing of good cause, and approval of the DMAS, an existing NF that expands its bed capacity by 50% or more shall have the option of retaining its prospective rate, or being treated as a new NF.

C. F. The 95% 90% occupancy requirement for indirect and capital costs shall be applied to the first and subsequent cost reporting periods' actual indirect and capital costs for establishing such NFs second and future cost reporting periods' prospective reimbursement rates. The 95% 90% occupancy requirement shall be considered as having been satisfied if the new NF achieved a 95% 90% occupancy at any point in time during the first cost reporting period.

D. G. A new NFs interim rate for the first cost reporting period shall be determined based upon the lower of its anticipated allowable cost determined from a detailed budget (or pro forma cost report) prepared by the provider and accepted by the DMAS, or the appropriate operating ceilings or charges.

E. H. Effective July 1, 2001, on the first day of its second cost reporting period, a new nursing facility's interim plant or capital, as appropriate, rate shall be converted to a per diem amount by dividing it its allowable plant/capital costs for its first cost reporting period by 90% of the potential number of patient days computed as 95% of the daily for all licensed bed complement beds during the first cost reporting period.

F. Any NF receiving reimbursement under new NF status shall not be eligible to receive the blended phase in period rate under 12 VAC 30-90-42.

G. I. During its first semiannual period of operation, a newly constructed or newly enrolled NF shall have an assigned SII based upon its peer group's average SII for direct patient care. An expanded NF receiving new NF treatment shall receive the SII calculated for its last semiannual period prior to obtaining new NF status.

**12 VAC 30-90-65. Final rate.**

The DMAS shall reimburse the lower of the appropriate operating ceilings, charges or actual allowable cost for a new NF's first cost reporting period of operation, subject to the procedures outlined above in 12 VAC 30-90-60 A, C, E, and F, and H.

Upon determination of the actual allowable operating cost for direct patient care and indirect patient care the per diem amounts shall be used to determine if the provider is below the peer group ceiling used to set its interim rate. If indirect costs are below those ceilings the ceiling, an efficiency incentive shall be paid at settlement of the first year cost report.

This incentive will allow a NF to be paid up to 25% of the difference between its actual allowable indirect operating cost and the peer group ceiling used to set the interim rate. (Refer to 12 VAC 30-90-41 F.)

Article 5 7.
Cost Reports.

**12 VAC 30-90-70. Cost report submission.**

A. Cost reports are due not later than 150 days after the provider's fiscal year end.  If a complete cost report is not received within 150 days after the end of the provider's fiscal year, it is considered delinquent.  The cost report shall be deemed complete for the purpose of cost settlement when DMAS has received all of the following (note that if the audited financial statements required by subdivisions 3 and 6 7 b of this subsection are received not later than 120 days after the provider's fiscal year end and all other items listed are received not later than 90 days after the provider's fiscal year end, the cost report shall be considered to have been filed at 90 days):

1. Completed cost reporting form(s) provided by DMAS, with signed certification(s);

2. The provider's trial balance showing adjusting journal entries;

3. a. The provider's audited financial statements including, but not limited to, a balance sheet, a statement of income and expenses, a statement of retained earnings (or fund balance), a statement of cash flows, the auditor's report

# Final Regulations

in which he expresses his opinion or, if circumstances require, disclaims an opinion based on generally accepted auditing standards, footnotes to the financial statements, and the management report. Multi-facility providers shall be governed by subdivision ~~6~~ *7* of this subsection;

b. Schedule of restricted cash funds that identify the purpose of each fund and the amount;

c. Schedule of investments by type (stock, bond, etc.), amount, and current market value;

4. Schedules which reconcile financial statements and trial balance to expenses claimed in the cost report;

5. Depreciation schedule;

6. *Schedule of assets as defined in 12 VAC 30-90-37;*

*7.* Nursing facilities which are part of a chain organization must also file:

a. Home office cost report;

b. Audited consolidated financial statements of the chain organization including the auditor's report in which he expresses his opinion or, if circumstances require, disclaims an opinion based on generally accepted auditing standards, the management report and footnotes to the financial statements;

c. The nursing facility's financial statements including, but not limited to, a balance sheet, a statement of income and expenses, a statement of retained earnings (or fund balance), and a statement of cash flows;

d. Schedule of restricted cash funds that identify the purpose of each fund and the amount;

e. Schedule of investments by type (stock, bond, etc.), amount, and current market value; and

~~7.~~ *8.* Such other analytical information or supporting documentation that may be required by DMAS.

B. When cost reports are delinquent, the provider's interim rate shall be reduced to zero. For example, for a September 30 fiscal year end, payments will be reduced starting with the payment on and after March 1.

C. After the overdue cost report is received, desk reviewed, and a new prospective rate established, the amounts withheld shall be computed and paid. If the provider fails to submit a complete cost report within 180 days after the fiscal year end, a penalty in the amount of 10% of the balance withheld shall be forfeited to DMAS.

Article ~~6~~ *8.*
Prospective Rates.

**12 VAC 30-90-80. Time frames.**

A. For cost reports filed on or after August 1, 1992, a prospective rate shall be determined by DMAS within ~~90~~ *180* days of the receipt of a complete cost report. (See 12 VAC 30-90-70 A.) ~~The 180-day time frame shall similarly apply to cost reports filed but for which a prospective rate has not been set as of August 1, 1992.~~ Rate adjustments shall be

made retroactive to the first day of the provider's new cost reporting year. Where a field audit is necessary to set a prospective rate, the DMAS shall have an additional ~~90~~ *120* days to determine any appropriate adjustments to the prospective rate as a result of such field audit. This time period shall be extended if delays are attributed to the provider.

B. Subsequent to establishing the prospective rate DMAS shall conclude the desk audit of a providers' cost report and determine if further field audit activity is necessary. The DMAS will seek repayment or make retroactive settlements when audit adjustments are made to costs claimed for reimbursement.

Article ~~7~~ *9.*
Retrospective Rates.

Article ~~8~~ *10.*
Record Retention.

**12 VAC 30-90-110. Record retention.**

A. Time frames. All of the NF's accounting and related records, including the general ledger, books of original entry, and statistical data must be maintained for a minimum of five years, or until all affected cost reports are final settled.

Certain information must be maintained for the duration of the provider's participation in the [ ~~DMAS~~ *Medicaid program* ] and until such time as all cost reports are settled. Examples of such information are set forth in subsection B of this section.

B. Types of records to be maintained. Information which must be maintained for the duration of the provider's participation in the [ ~~DMAS~~ *Medicaid program* ] includes, but is not limited to:

1. Real and tangible property records, including leases and the underlying cost of ownership;

2. Itemized depreciation schedules; and

3. Mortgage documents, loan agreements, and amortization schedules;

4. Copies of all cost reports filed with the DMAS together with supporting financial statements.

C. Record availability. The records must be available for audits by DMAS staff. Where such records are not available, costs shall be disallowed.

Article ~~9~~ *11.*
Audits.

**12 VAC 30-90-120. Audit overview; scope of audit.**

A. Desk audits shall be performed to verify the completeness and accuracy of the cost report, and reasonableness of costs claimed for reimbursement. Field audits, as determined necessary by the DMAS, shall be performed on the records of each participating provider to determine that costs included for reimbursement were accurately determined and reasonable, and do not exceed the ceilings or other reimbursement limitations established by the DMAS.

B. The scope of the audit includes, but shall not be limited to: trial balance verification, analysis of fixed assets, *schedule of assets,* indebtedness, selected revenues, leases and the

# Final Regulations

underlying cost of ownership, rentals and other contractual obligations, and costs to related organizations. The audit scope may also include various other analyses and studies relating to issues and questions unique to the NF and identified by the DMAS. Census and related statistics, patient trust funds, and billing procedures are also subject to audit.

## 12 VAC 30-90-123. Field audit exit conference.

A. The provider shall be offered an exit conference to be executed within 15 days following completion of the on-site audit activities, unless other time frames are mutually agreed to by the DMAS and provider. Where two or more providers are part of a chain organization or under common ownership, DMAS shall have up to 90 days after completion of all related on-site audit activities to offer an exit conference for all such NFs. The exit conference shall be conducted at the site of the audit or at a location mutually agreeable to the DMAS and the provider.

B. The purpose of the exit conference shall be to enable the DMAS auditor to discuss such matters as the auditor deems necessary, to review the proposed field audit adjustments, and to present supportive references. The provider will be given an opportunity during the exit conference to present additional documentation and agreement or disagreement with the audit adjustments.

C. All remaining adjustments, including those for which additional documentation is insufficient or not accepted by the DMAS, shall be applied to the applicable cost report or reports regardless of the provider's approval or disapproval.

D. The provider shall sign an exit conference form that acknowledges the review of proposed adjustments.

E. After the exit conference the DMAS shall perform a review of all remaining field audit adjustments. Within a reasonable time and after all documents have been submitted by the provider, the DMAS shall transmit in writing to the provider a final field audit adjustment report (FAAR), *if revised,* which will include all remaining adjustments not resolved during the exit conference. The provider shall have 15 days from the date of the letter which transmits the FAAR, to submit any additional documentation which may affect adjustments in the FAAR.

## 12 VAC 30-90-130. ~~Dispute resolution for nonstate operated nursing facilities.~~ *(Repealed.)*

~~A. NF's have the right to appeal the DMAS's interpretation and application of state and federal Medicaid and applicable Medicare principles of reimbursement in accordance with the Administrative Process Act, § 9-6.14:1 et seq. and § 32.1-325.1 of the Code of Virginia.~~

~~B. Nonappealable issues are identified below:~~

~~1. The use of state and federal Medicaid and applicable Medicare principles of reimbursement.~~

~~2. The organization of participating NF's into peer groups according to location as a proxy for cost variation across facilities with similar operating characteristics. The use of individual ceilings as a proxy for determining efficient operation within each peer group.~~

~~3. Calculation of the initial peer group ceilings using the most recent cost settled data available to DMAS that reflects NF operating costs inflated to September 30, 1990.~~

~~4. The use of the moving average of the Skilled Nursing Facility market basket of routine service costs, as developed by Data Resources, Incorporated, adjusted for Virginia, as the prospective escalator.~~

~~5. The establishment of separate ceilings for direct operating costs and indirect operating costs.~~

~~6. The use of Service Intensity Indexes to identify the resource needs of given NFs patient mix relative to the needs present in other NFs.~~

~~7. The development of Service Intensity Indexes based on:~~

~~a. Determination of resource indexes for each patient class that measures relative resource cost.~~

~~b. Determination of each NF's average relative resource cost index across all patients.~~

~~c. Standardizing the average relative resource cost indexes of each NF across all NF's.~~

~~8. The use of the DMAS Long Term Care Information System (LTCIS), assessment form (currently DMAS 95), Virginia Center on Aging Study, the State of Maryland Time and Motion Study of the Provision of Nursing Service in Long Term Care Facilities, and the KPMG Peat Marwick Survey of Virginia long term care NF's nursing wages to determine the patient class system and resource indexes for each patient class.~~

~~9. The establishment of payment rates based on service intensity indexes.~~

## 12 VAC 30-90-131. ~~Conditions for appeal.~~ *(Repealed.)*

~~An appeal shall not be heard until the following conditions are met:~~

~~1. Where appeals result from desk or field audit adjustments, the provider shall have received a notification of program reimbursement (NPR) in writing from the DMAS.~~

~~2. Any and all moneys due to DMAS shall be paid in full, unless a repayment plan has been agreed to by DMAS.~~

~~3. All first level appeal requests shall be filed in writing with the DMAS within 90 business days following the date of a DMAS notice of program reimbursement that adjustments have been made to a specific cost report.~~

## 12 VAC 30-90-132. ~~Appeal procedure.~~ *(Repealed.)*

~~A. There shall be two levels of administrative appeal.~~

~~B. Informal appeals shall be decided by the Director of the Appeals Division after an informal fact finding conference is held. The decision of the Director of the Appeals Division shall be sent in writing to the provider within 90 business days following conclusion of the informal fact finding conference.~~

~~C. If the provider disagrees with such initial decision the provider may, at its discretion, file a notice of appeal to the~~

# Final Regulations

~~Director of the DMAS. Such notice shall be in writing and filed within 30 business days of the date of the initial decision.~~

~~D. Within 30 business days of the date of such notice of appeal, the director shall appoint a hearing officer to conduct the proceedings, to review the issues and the evidence presented, and to make a written recommendation.~~

~~E. The director shall notify the provider of his final decision within the time frames set for disposition of appeals in this subpart and the Administrative Process Act, § 9-6.14:1 et seq. of the Code of Virginia.~~

~~F. The director's final written decision shall conclude the provider's administrative appeal.~~

~~G. Formal hearing procedures, as developed by DMAS, shall control the conduct of the formal administrative proceedings.~~

**12 VAC 30-90-133.** ~~**Appeals time frames.**~~ *(Repealed.)*

~~Appeal time frames noted throughout this section may be extended for the following reasons:~~

~~1. The provider submits a written request prior to the due date requesting an extension for good cause and the DMAS approves the extension.~~

~~2. Delays on the part of the NF documented by the DMAS shall automatically extend DMAS's time frame to the extent of the time delayed.~~

~~3. Extensions of time frames shall be granted to the DMAS for good cause shown.~~

~~4. When appeals for multiple years are submitted by a NF or a chain organization or common owners are coordinating appeals for more than one NF, the time frames shall be reasonably extended for the benefit of the DMAS.~~

~~5. Disputes relating to the time lines established in 12 VAC 30-90-132 B or to the grant of extensions to the DMAS shall be resolved by application to the Director of the DMAS or his designee.~~

**12 VAC 30-90-135.** ~~**Reimbursement of legal fees associated with appeals having substantial merit.** (Repealed.)~~

~~A. The Department of Medical Assistance Services shall reimburse a nursing facility for reasonable and necessary legal fees associated with an informal or formal appeal brought pursuant to the Administrative Process Act, only if the nursing facility substantially prevails on the merit of the appeal. The term "substantially prevails" is defined as being successful on more than 50% of the issue as appealed and on more than 50% of the amount under appeal. The reimbursement of legal fees remains subject to the State Plan for Medical Assistance and all existing ceilings. Any legal fees claimed must be supported by adequate, detailed, and verifiable documentation.~~

~~B. Subject to the requirements of subsection A of this section, the reimbursable legal fees will be included in the calculation of total allowable costs in the fiscal year the appeal process is concluded and Medicaid will reimburse the nursing facility for its Medicaid proportionate share.~~

**12 VAC 30-90-136. Elements of capital payment methodology not subject to appeal.**

*Elements of the capital payment methodology that shall not be subject to appeal shall be:*

*1. The definitions provided in Article 3 (12 VAC 30-90-35 et seq.) of Subpart II of this chapter, and the application of those definitions to the FRV rate calculation.*

*2. The transition policy described in 12 VAC 30-90-29.*

*3. The formula for determining the FRV per diem rate described in Article 3 of Subpart II of this chapter.*

*4. The calculation of the FRV rental amount described in Article 3 of Subpart II of this chapter.*

*5. The exclusion of certain beds from the transition policy as provided in Article 3 of Subpart II of this chapter.*

SUBPART VI.
STOCK TRANSACTIONS.

*Article 1.
Plant Cost Applicable.*

**12 VAC 30-90-160. Stock acquisition; merger of unrelated and related parties.**

A. [ The acquisition of the capital stock of a provider does not constitute a basis for revaluation of the provider's assets. ] Any cost associated with ~~such~~ an acquisition of *capital stock* shall not be an allowable cost. [ The provider selling its stock continues as a provider after the sale, and the purchaser is only a stockholder of the provider. ]

B. In the case of a merger which combines two or more unrelated corporations under the regulations of the Code of Virginia, there will be only one surviving corporation. If the surviving corporation, which will own the assets and liabilities of the merged corporation, is not a provider, a Certificate of Public Need, if applicable, must be issued to the surviving corporation.

The nonsurviving corporation shall be subject to the policies applicable to terminated providers, including those relating to gain or loss on sales of NFs.

C. The statutory merger of two or more related parties or the consolidation of two or more related providers resulting in a new corporate entity shall be treated as a transaction between related parties. No revaluation shall be permitted for the surviving corporation.

*Article 2.
Capital Cost Applicable.*

**12 VAC 30-90-165. Stock acquisition; merger of unrelated and related parties.**

*A. The acquisition of the capital stock of a provider does not constitute a basis for revaluation of the provider's assets. Any cost associated with an acquisition of capital stock shall not be an allowable cost. The provider selling its stock continues as a provider after the sale, and the purchaser is only a stockholder of the provider.*

## Final Regulations

*B. In the case of a merger that combines two or more unrelated corporations under the Code of Virginia, there will be only one surviving corporation. If the surviving corporation that will own the assets and liabilities of the merged corporation is not a provider, a Certificate of Public Need, if applicable, must be issued to the surviving corporation.*

*The nonsurviving corporation shall be subject to the policies applicable to terminated providers, including those relating to gain or loss on sales of NFs.*

*C. The statutory merger of two or more related parties or the consolidation of two or more related providers resulting in a new corporate entity shall be treated as a transaction between related parties. No revaluation shall be permitted for the surviving corporation.*

**12 VAC 30-90-170. NATCEPs costs.**

A. The Omnibus Budget Reconciliation Act of 1989 (OBRA 89) amended § 1903(a)(2)(B) of the Social Security Act to fund actual NATCEPs costs incurred by NFs separately from the NF's medical assistance services reimbursement rates.

B. NATCEPs costs shall be as defined in *Appendix I (*12 VAC 30-90-270 *through 12 VAC 30-90-276).*

C. To calculate the reimbursement rate, NATCEPs costs contained in the most recently filed cost report shall be converted to a per diem amount by dividing allowable NATCEPs costs by the actual number of NF's patient days.

D. The NATCEPs interim reimbursement rate determined in subsection C of this section shall be added to the prospective operating cost and plant cost components or charges, whichever is lower, to determine the NF's prospective rate. The NATCEPs interim reimbursement rate shall not be adjusted for inflation.

E. Reimbursement of NF costs for training and competency evaluation of nurse aides must take into account the NF's use of trained nurse aides in caring for Medicaid, Medicare and private pay patients. Medicaid shall not be charged for that portion of NATCEPs costs which are properly charged to Medicare or private pay services. The final retrospective reimbursement for NATCEPs costs shall be the reimbursement rate as calculated from the most recently filed cost report by the methodology in subsection C of this section times the Medicaid patient days from the DMAS MMR-240.

F. Disallowance of nonreimbursable NATCEPs costs shall be reflected in the year in which the nonreimbursable costs were claimed.

G. Payments to providers for allowable NATCEPs costs shall not be considered in the comparison of the lower allowable reimbursement or charges for covered services, as outlined in 12 VAC 30-90-55 A.

**12 VAC 30-90-221. Time frames.**

A. Start up cost time frames.

~~1.~~ *A.* Start-up costs are incurred from the time preparation begins on a newly constructed or purchased building, wing, floor, unit, or expansion thereof to the time the first patient (whether Medicaid or non-Medicaid) is admitted for treatment,

or where the start-up costs apply only to nonrevenue producing patient care functions or nonallowable functions, to the time the areas are used for their intended purposes.

~~2.~~ *B.* If a provider intends to prepare all portions of its entire facility at the same time, start-up costs for all portions of the facility shall be accumulated in a single deferred charge account and shall be amortized when the first patient is admitted for treatment.

~~3.~~ *C.* If a provider intends to prepare portions of its facility on a piecemeal basis (i.e., preparation of a floor or wing of a provider's facility is delayed), start-up costs shall be capitalized and amortized separately for the portion or portions of the provider's facility prepared during different time periods.

~~4.~~ *D.* Moreover, if a provider expands its NF by constructing or purchasing additional buildings or wings, start-up costs shall be capitalized and amortized separately for these areas.

~~B.~~ *E.* Depreciation time frames.

1. Costs of the provider's facility and building equipment shall be depreciated using the straight line method over the lives of these assets starting with the month the first patient is admitted for treatment.

2. Where portions of the provider's NF are prepared for patient care services after the initial start-up period, those asset costs applicable to each portion shall be depreciated over the remaining lives of the applicable assets. If the portion of the NF is a nonrevenue-producing patient care area or nonallowable area, depreciation shall begin when the area is opened for its intended purpose. Costs of major movable equipment, however, shall be depreciated over the useful life of each item starting with the month the item is placed into operation.

**12 VAC 30-90-240. Home office *operating* costs.**

A. Home office *operating* costs shall be allowable to the extent they are reasonable, relate to patient care, and provide cost savings to the provider.

B. Provider purchases from related organizations, whether for services, or supplies, shall be limited to the lower of the related organizations actual cost or the price of comparable purchases made elsewhere.

C. Home office *operating* costs shall be allocated in accordance with § 2150.3, PRM-15.

D. Home office costs associated with providing management services to nonrelated entities shall not be recognized as allowable reimbursable cost.

E. Allowable and nonallowable home office costs shall be recognized in accordance with § 2150.2, PRM-15.

F. Item 398 D Chapter 723 of 1987 Acts of Assembly (as amended), effective April 8, 1987, eliminated reimbursement of return on equity capital to proprietary providers for periods or portions thereof on or after July 1, 1987.

# Final Regulations

**12 VAC 30-90-250. Lump sum payment.**

When the provider files a cost report indicating that an overpayment has occurred, full refund shall be remitted with the cost report. In cases where DMAS discovers an overpayment during desk audit, field audit, or final settlement, DMAS shall promptly send the first demand letter requesting a lump sum refund. ~~Recovery shall be undertaken even though the provider disputes in whole or in part DMAS' determination of the overpayment.~~

**12 VAC 30-90-253. Extension request documentation.**

In the written request for an extended repayment schedule, the provider shall document the need for an extended (beyond 30 days) repayment and submit a written proposal scheduling the dates and amounts of repayments. *The provider must make payments in accordance with the proposed schedule while the schedule is pending approval.* If DMAS approves the schedule, DMAS shall send the provider written notification of the approved repayment schedule, which shall be effective retroactive to the date the provider submitted the proposal.

**12 VAC 30-90-260.** ~~Change of ownership.~~ *(Repealed.)*

~~A. Under the Consolidated Omnibus Budget Reconciliation Act of 1985, Public Law 99-272, reimbursement for capital upon the change of ownership of a NF is restricted to the lesser of:~~

~~1. One half of the percentage increase (as measured from the date of acquisition by the seller to the date of the change of ownership), in the Dodge Construction Cost Index applied in the aggregate with respect to those facilities that have undergone a change of ownership during the fiscal year, or~~

~~2. One half of the percentage increase (as measured from the date of acquisition by the seller to the date of the change of ownership) in the Consumer Price Index for All Urban Consumers (CPI-U) applied in the aggregate with respect to those facilities that have undergone a change of ownership during the fiscal year.~~

~~B. To comply with the provisions of COBRA 1985, effective October 1, 1986, the DMAS shall separately apply the following computations to the capital assets of each facility which has undergone a change of ownership:~~

~~1. One half of the percentage increase (as measured from the date of acquisition by the seller to the date of change of ownership), in the Dodge Construction Cost Index, or~~

~~2. One half of the percentage increase (as measured from the date of acquisition by the seller to the date of the change of ownership) in the Consumer Price Index for All Urban Consumers (CPI-U).~~

~~C. Change of ownership is deemed to have occurred only when there has been a bona fide sale of assets of a NF (See 12 VAC 30-90-34 B 3 for the definition of "bona fide" sale).~~

~~D. Reimbursement for capital assets which have been revalued when a facility has undergone a change of ownership shall be limited to the lesser of:~~

~~1. The amounts computed in subsection B above;~~

~~2. Appraised replacement cost value; or~~

~~3. Purchase price.~~

~~E. Date of acquisition is deemed to have occurred on the date legal title passed to the seller. If a legal titling date is not determinable, date of acquisition shall be considered to be the date a certificate of occupancy was issued by the appropriate licensing or building inspection agency of the locality where the nursing facility is located.~~

**12 VAC 30-90-264. Specialized care services.**

Specialized care services provided in conformance with 12 VAC 30-60-40 E and H, 12 VAC 30-60-320 and 12 VAC 30-60-340 shall be reimbursed under the following methodology. The nursing facilities that provide adult specialized care for the categories of Ventilator Dependent Care, Comprehensive Rehabilitation Care, and Complex Health Care will be placed in one group for rate determination. The nursing facilities that provide pediatric specialized care in a dedicated pediatric unit of eight beds or more will be placed in a second group for rate determination.

1. Routine operating cost. Routine operating cost shall be defined as in 12 VAC 30-90-271 and 12 VAC 30-90-272. To calculate the routine operating cost reimbursement rate, routine operating cost shall be converted to a per diem amount by dividing it by actual patient days.

2. Allowable cost identification and cost reimbursement limitations. The provisions of Article ~~3~~ *5* (12 VAC 30-90-50 et seq.) of *Subpart II of* Part II of this chapter and of Appendix III (12 VAC 30-90-290) of Part III of this chapter shall apply to specialized care cost and reimbursement.

3. Routine operating cost rates. Each facility shall be reimbursed a prospective rate for routine operating costs. This rate will be the lesser of the facility-specific prospective routine operating ceiling, or the facility-specific prospective routine operating cost per day plus an efficiency incentive. This efficiency incentive shall be calculated by the same method as in 12 VAC 30-90-41.

4. Facility-specific prospective routine operating ceiling. Each nursing facility's prospective routine operating ceiling shall be calculated as:

a. Statewide ceiling. The statewide routine operating ceiling shall be the weighted average (weighted by 1994 days) of specialized care rates in effect on July 1, 1996, reduced by statewide weighted average ancillary and capital cost per day amounts based on audited 1994 cost data from the 12 facilities whose 1994 FY specialized care costs were audited during 1996. This routine operating ceiling amount shall be adjusted for inflation by the percentage of change in the moving average of the Virginia specific Skilled Nursing Facility Market Basket of Routine Service Costs, as developed by DRI/McGraw-Hill, using the second quarter 1996 DRI table. The respective statewide operating ceilings will be adjusted each quarter in which the provider's most recent fiscal year ends, by adjusting the most recent interim ceiling by 100% of historical inflation and 50% of

## Final Regulations

forecasted inflation to the end of the provider's next fiscal year.

b. The portion of the statewide routine operating ceiling relating to nursing salaries (as determined by the 1994 audited cost report data, or 67.22%) will be wage adjusted using a normalized wage index. The normalized wage index shall be the wage index applicable to the individual provider's geographic location under Medicare rules of reimbursement for skilled nursing facilities, divided by the statewide average of such wage indices across the state. This normalization of wage indices shall be updated January 1, after each time the Health Care Financing Administration (HCFA) publishes wage indices for skilled nursing facilities. Updated normalization shall be effective for fiscal years starting on and after the January 1 for which the normalization is calculated.

c. The percentage of the statewide routine operating ceiling relating to the nursing labor and nonlabor costs (as determined by the 1994 audited cost report data or 71.05%) will be adjusted by the nursing facility's specialized care average Resource Utilization Groups, Version III (RUG-III) Nursing-Only Normalized Case Mix Index (NCMI). The NCMI for each nursing facility will be based on all specialized care patient days rendered during the six-month period prior to that in which the ceiling applies (see subdivision 6 below).

5. Normalized case mix index (NCMI). Case mix shall be measured by RUG-III nursing-only index scores based on Minimum Data Set (MDS) data. The RUG-III nursing-only weights developed at the national level by the Health Care Financing Administration (HCFA) (see 12 VAC 30-90-320) shall be used to calculate a facility-specific case mix index (CMI). The facility-specific CMI, divided by the statewide CMI shall be the facility's NCMI. The steps in the calculation are as follows:

a. The facility-specific CMI for purposes of this rate calculation shall be the average of the national RUG-III Nursing-Only weights calculated across all patient days in the facility during the six months prior to the six-month period to which the NCMI shall be applied to the facility's routine operating cost and ceiling.

b. The statewide CMI for purposes of this rate calculation shall be the average of the national RUG-III Nursing-Only weights calculated across all specialized care patient days in all Specialized Care Nursing facilities in the state during the six months prior to the six-month period to which the NCMI shall be applied. A new statewide CMI shall be calculated for each six-month period for which a provider-specific rate must be set.

c. The facility-specific NCMI for purposes of this rate calculation shall be the facility-specific CMI from (a) above divided by the statewide CMI from (b) above.

d. Each facility's NCMI shall be updated semiannually, at the start and the midpoint of the facility's fiscal year.

e. Patient days for which the lowest RUG-III weight is imputed, as provided in subdivision 14 c of this section, shall not be included in the calculation of the NCMI.

6. Facility-specific prospective routine operating base cost per day: The facility-specific routine operating cost per day to be used in the calculation of the routine operating rate and the efficiency incentive shall be the actual routine cost per day from the most recent fiscal year's cost report, adjusted (using DRI-Virginia inflation factors) by 50% of historical inflation and 50% of the forecasted inflation, and adjusted for case mix as described below:

a. An NCMI rate adjustment shall be applied to each facility's prospective routine nursing labor and nonlabor operating base cost per day for each semiannual period of the facility's fiscal year.

b. The NCMI calculated for the second semiannual period of the previous fiscal year shall be divided by the average of that (previous) fiscal year's two semiannual NCMIs to yield an "NCMI cost rate adjustment" to the prospective nursing labor and nonlabor operating cost base rate in the first semiannual period of the subsequent fiscal year.

c. The NCMI determined in the first semiannual period of the subsequent fiscal year shall be divided by the average of the previous fiscal year's two semiannual NCMIs to determine the NCMI cost rate adjustment to the prospective nursing labor and nonlabor operating base cost per day in the second semiannual period of the subsequent fiscal year.

See 12 VAC 30-90-310 for an illustration of how the NCMI is used to adjust routine operating cost ceilings and semiannual NCMI adjustments to the prospective routine operating base cost rates.

7. Interim rates. Interim rates, for processing claims during the year, shall be calculated from the most recent settled cost report and Minimum Data Set (MDS) data available at the time the interim rates must be set, except that failure to submit cost and MDS data timely may result in adjustment to interim rates as provided elsewhere.

8. Ancillary costs. Specialized care ancillary costs will be paid on a pass-through basis for those Medicaid specialized care patients who do not have Medicare or any other sufficient third-party insurance coverage. Ancillary costs will be reimbursed as follows:

a. All covered ancillary services, except kinetic therapy devices, will be reimbursed for reasonable costs as defined in the current NHPS. See 12 VAC 30-90-290 for the cost reimbursement limitations.

b. Kinetic therapy devices will have a limit per day (based on 1994 audited cost report data inflated to the rate period). See 12 VAC 30-90-290 for the cost reimbursement limitations.

c. Kinetic therapy devices will be reimbursed only if a resident is being treated for wounds that meet specialized care Complex Health Care Category wound care criteria. Residents receiving this wound care must

## Final Regulations

require kinetic bed therapy (that is, low air loss mattresses, fluidized beds, and/or rotating/turning beds) and require treatment for a grade (stage) IV decubitus, a large surgical wound that cannot be closed, or second to third degree burns covering more than 10% of the body.

9. Covered ancillary services are defined as follows: laboratory, X-ray, medical supplies (e.g., infusion pumps, incontinence supplies), physical therapy, occupational therapy, speech therapy, inhalation therapy, IV therapy, enteral feedings, and kinetic therapy. The following are not specialized care ancillary services and are excluded from specialized care reimbursement: physician services, psychologist services, total parenteral nutrition (TPN), and drugs. These services must be separately billed to DMAS. An interim rate for the covered ancillary services will be determined (using data from the most recent settled cost report) by dividing allowable ancillary costs by the number of patient days for the same cost reporting period. The interim rate will be retroactively cost settled based on the specialized care nursing facility cost reporting period.

10. Capital costs ~~(excluding pediatric specialized care units)~~. *Effective July 1,* [ *2000* *2001* ] *,* capital cost reimbursement shall be in accordance with *12 VAC 30-90-35 through 12 VAC 30-90-37 inclusive* ~~the current NHPS~~, except that the ~~95% (85% if applicable)~~ *90%* occupancy requirement shall not be separately applied to specialized care. Capital cost related to specialized care patients will be cost settled on the respective nursing facility's cost reporting period. In this cost settlement the ~~95% (85% if applicable)~~ *90%* occupancy requirement shall be applied to all the nursing facility's licensed nursing facility beds inclusive of specialized care. ~~An occupancy requirement of 70% shall be applied to distinct part pediatric specialized care units.~~

[ *To apply this requirement, the following calculation shall be carried out.*

*a. Licensed beds, including specialized care beds, times days in the cost reporint period shall equal available days.*

*b. 90% of available days shall equal 90% occupancy days.*

*c. 90% occupancy days, minus actual resident days including specialized care days shall equal the shortfall of days if it is positive. It shall be set to zero if it is negative.*

*d. Actual resident days not including specialized care days, plus the shortfall of days shall equal the minimum number of days to be used to calculate the capital cost per day.* ]

11. Nurse aide training and competency evaluation programs and competency evaluation programs (NATCEP) costs. NATCEPS costs will be paid on a pass-through basis in accordance with the current NHPS.

12. Pediatric routine operating cost rate. For pediatric specialized care in a distinct part pediatric specialized care unit, one routine operating cost ceiling will be developed. The routine operating cost ceiling will be computed as follows:

a. The Complex Health Care Payment Rate effective July 1, 1996, and updated for inflation, will be reduced by (i) the weighted average capital cost per day developed from the 1994 audit data and (ii) the weighted average ancillary cost per day from the 1994 audit data updated for inflation in the same manner as described in subdivision 4 a of this subsection.

b. The statewide operating ceiling shall be adjusted for each nursing facility in the same manner as described in subdivisions 4 and 5 of this section.

c. The final routine operating cost reimbursement rate shall be computed as described for other than pediatric units in subdivision 3 of this section.

13. Pediatric unit capital cost. Pediatric capital costs will be reimbursed in accordance with the current NHPS, except that the occupancy requirement shall be 70% rather than ~~95% or 85%~~ *90%.* ~~An interim capital rate will be calculated from the latest cost report and retrospectively cost settled on the respective specialized care provider's cost reporting period.~~

14. MDS data submission. MDS data relating to specialized care patients must be submitted to the department in a submission separate from that which applies to all nursing facility patients.

a. Within 30 days of the end of each month, each specialized care nursing facility shall submit to the department, separately from its submission of MDS data for all patients, a copy of each MDS Version 2.0 which has been completed in the month for a Medicaid specialized care patient in the nursing facility. This shall include (i) the MDS required within 14 days of admission to the nursing facility (if the patient is admitted as a specialized care patient), (ii) the one required by the department upon admission to specialized care, (iii) the one required within 12 months of the most recent full assessment, and (iv) the one required whenever there is a significant change of status.

b. In addition to the monthly data submission required in (a) above, the same categories of MDS data required in (a) above shall be submitted for all patients receiving specialized care from January 1, 1996, through December 31, 1996, and shall be due February 28, 1997.

c. If a provider does not submit a complete MDS record for any patient within the required timeframe, the department shall assume that the RUG-III weight for that patient, for any time period for which a complete record is not provided, is the lowest RUG-III weight in use for specialized care patients. A complete MDS record is one that is complete for purposes of transmission and acceptance by the Health Care Financing Administration.

15. Case mix measures in the initial semiannual periods. In any semiannual periods for which calculations in 12 VAC 39-90-310 requires an NCMI from a semiannual period beginning before January 1996, the case mix used shall be the case mix applicable to the first semiannual period beginning after January 1, 1996, that is a semiannual period in the respective provider's fiscal period. For

## Final Regulations

example, December year-end providers' rates applicable to the month of December 1996, would normally require (in Appendix I (12 VAC 30-90-270 et seq.) of Part III of this chapter) an NCMI from July to December 1995, and one from January to June 1996, to calculate a rate for July to December 1996. However, because this calculation requires an NCMI from a period before January 1996, the NCMIs that shall be used will be those applicable to the next semiannual period. The NCMI from January to June 1996, and from July to December 1996, shall be applied to December 1996, as well as to January to June 1997. Similarly, a provider with a March year end would have it's rate in December 1996, through March 1997, calculated based on an NCMI from April through September 1996, and October 1996, through March 1997.

16. Cost reports of specialized care providers are due not later than 150 days after the end of the provider's fiscal year. Except for this provision, the requirements of 12 VAC 30-90-70 and 12 VAC 30-90-80 shall apply.

**12 VAC 30-90-266. Traumatic Brain Injury (TBI) payment.**

DMAS shall provide a fixed per day payment for nursing facility residents with TBI served in the program in accordance with resident and provider criteria, in addition to the reimbursement otherwise payable under the provisions of the Nursing Home Payment System. Effective for dates of service on and after August 19, 1998, a per day rate add-on shall be paid for recipients who meet the eligibility criteria for these TBI payments and who are residents in a designated nursing facility TBI unit of 20 beds or more that meets the provider eligibility criteria. The value of the rate add-on shall be $22 on August 19, 1998, and thereafter. The rate add-on for any qualifying provider's fiscal year shall be reviewed annually to determine the appropriateness of the amount, *not to exceed $50 per patient day,* and any changes will be published and distributed to the providers. (Refer to 12 VAC 30-90-330, Traumatic brain injury diagnoses, for related resident and provider requirements.)

PART III.
NURSING HOME PAYMENT SYSTEM APPENDICES.

Appendix I.
Uniform Expense Classification.

**12 VAC 30-90-270. Uniform Expense Classification.**

This appendix describes the classification of expenses applicable to the Nursing Facility Payment System.

Allowable expenses shall meet all of the following requirements: necessity, reasonableness, nonduplication, related to patient care, not exceeding the limits and/or ceilings established in the Payment System and meet applicable Medicare principles of reimbursement. *All of the references to 12 VAC 30-90-270 occurring in previous Part II shall be understood to include 12 VAC 30-90-270 through 12 VAC 30-90-276.*

**12 VAC 30-90-272. Indirect patient care operating costs.**

A. Administrative and general.

1. Administrator/owner assistant administrator. Compensation of individuals responsible for administering the operations of the nursing facility. (See 12 VAC 30-90-50 and Appendix III (12 VAC 30-90-290) for limitations.)

2. Other administrative and fiscal services. Gross salaries of all personnel in administrative, personnel, fiscal, billing and admitting, communications and purchasing departments.

3. Management fees. Cost of fees for providing necessary management services related to nursing facility operations. (See Appendix III (12 VAC 30-90-290) for limitations.)

4. Professional fees--accounting. Fees paid to independent outside auditors and accountants.

5. Professional fees--legal. Fees paid to attorneys. (See Appendix III (12 VAC 30-90-290) for limitations.)

6. Professional fees--other. Fees, other than accounting or legal, for professional services related to nursing facility patient care.

7. Director's fees. Fees paid for attendance at scheduled meetings which serve as reimbursement for time, travel, and services provided. (See Appendix III (12 VAC 30-90-290) for limitations.)

8. Membership fees. Fees related to membership in health care organizations which promote objectives in the providers' field of health care activities. (See Appendix III (12 VAC 30-90-290) for limitations.)

9. Advertising (classified). Cost of advertising to recruit new employees and yellow pages advertising.

10. Public relations. Cost of promotional expenses including brochures and other informational documents regarding the nursing facility.

11. Telephone. Cost of telephone service used by employees of the nursing facility.

12. Subscriptions. Cost of subscribing to newspapers, magazines, and periodicals.

13. Office supplies. Cost of supplies used in administrative departments (e.g., pencils, papers, erasers, staples).

14. Minor furniture and equipment. Cost of furniture and equipment which does not qualify as a capital asset.

15. Printing and postage. Cost of reproducing documents which are reasonable, necessary and related to nursing facility patient care and cost of postage and freight charges.

16. Travel. Cost of travel (airfare, auto mileage, lodging, meals, etc. by administrator or other authorized personnel on official nursing facility business). (See 12 VAC 30-90-290 for limitations.)

17. Auto. All costs of maintaining nursing facility vehicles, including gas, oil, tires, licenses, maintenance of such vehicles.

## Final Regulations

18. License fees. Fees for licenses, including state, county, and local business licenses, and VHSCRC filing fees.

19. Liability insurance. Cost of insuring the facility against liability claims, *including malpractice*.

20. Interest. Other than mortgage and equipment.

21. Amortization/start-up costs. Amortization of allowable Start-Up Costs (See 12 VAC 30-90-220).

22. Amortization/organizational costs. Amortization of allowable organization costs (See 12 VAC 30-90-220).

B. Employee benefits.

1. FICA (Social Security). Cost of employer's portion of Social Security Tax.

2. State unemployment. State unemployment insurance costs.

3. Federal unemployment. Federal unemployment insurance costs.

4. Workers' compensation. Cost of workers' compensation insurance.

5. Health insurance. Cost of employer's contribution to employee health insurance.

6. Group life insurance. Cost of employer's contribution to employee group life insurance.

7. Pension plan. Employer's cost of providing pension program for employees.

8. Other employee benefits. Cost of awards and recognition ceremonies for recognition and incentive programs, disability insurance, child care, and other commonly offered employee benefits which are nondiscriminatory.

C. Dietary expenses.

1. Salaries. Gross salary of kitchen personnel, including dietary supervisor, cooks, helpers and dishwashers.

2. Supplies. Cost of items such as soap, detergent, napkins, paper cups, and straws.

3. Dishes and utensils. Cost of knives, forks, spoons, plates, cups, saucers, bowls and glasses.

4. Consultants. Fees paid to consulting dietitians.

5. Purchased services. Costs of dietary services performed on a contract basis.

6. Food. Cost of raw food.

7. Nutrient oral feedings. Cost of nutrients in oral feedings.

D. Housekeeping expenses.

1. Salaries. Gross salary of housekeeping personnel, including housekeepers, maids and janitors.

2. Supplies. Cost of cleaners, soap, detergents, brooms, and lavatory supplies.

3. Purchased services. Cost of housekeeping services performed on a contract basis.

E. Laundry expenses.

1. Salaries. Gross salary of laundry personnel.

2. Linen. Cost of sheets, blankets, and pillows.

3. Supplies. Cost of such items as soap, detergent, starch and bleach.

4. Purchased services. Cost of other services, including commercial laundry service.

F. Maintenance and operation of plant.

1. Salaries. Gross salary of personnel involved in operating and maintaining the physical plant, including maintenance men or plant engineer and security services.

2. Supplies. Cost of supplies used in maintaining the physical plant, including light bulbs, nails, lumber, glass.

3. Painting. Supplies and contract services.

4. Gardening. Supplies and contract services.

5. Heating. Cost of heating oil, natural gas, or coal.

6. Electricity. Self-explanatory.

7. Water, sewer, and trash removal. Self-explanatory.

8. Purchased services. Cost of maintaining the physical plant, fixed equipment, movable equipment and furniture and fixtures on a contract basis.

9. Repairs and maintenance. Supplies and contract services involved with repairing the facility's capital assets.

G. Medical records expenses.

1. Salaries--medical records. Gross salary of licensed medical records personnel and other department personnel.

2. Utilization review. Fees paid to physicians attending utilization review committee meetings.

3. Supplies. All supplies used in the department.

4. Purchased services. Medical records services provided on a contract basis.

H. Quality assurance services.

1. Salaries. Gross salary of personnel providing quality assessment and assurance activities.

2. Purchased services. Cost of quality assessment and assurance services provided on a contract basis.

3. Supplies. Cost of all supplies used in the department or activity.

I. Social service expenses.

1. Salaries. Salary of personnel providing medically-related social services. A facility with more than 120 beds must employ a full-time qualified social worker.

2. Purchased services. Cost of medically-related social services provided on a contract basis.

3. Supplies. Cost of all supplies used in the department.

# Final Regulations

J. Patient activity expenses.

1. Salaries. Gross salary of personnel providing recreational programs to patients, such as arts and crafts, church services and other social activities.

2. Supplies. Cost of items used in the activities program (i.e., games, art and craft supplies and puzzles).

3. Purchased services. Cost of services provided on a contract basis.

K. Educational activities expenses. (Other than NATCEPs costs, see 12 VAC 30-90-270.)

1. Salaries. Gross salaries of training personnel.

2. Supplies. Cost of all supplies used in this activity.

3. Purchased services. Cost of training programs provided on a contract basis.

L. Other nursing Administrative costs.

1. Salaries--other nursing administration. Gross salaries of ward clerks and nursing administration support staff.

2. Subscriptions. Cost of subscribing to newspapers, magazines and periodicals.

3. Office supplies. Cost of supplies used in nursing administrative departments (e.g., pencils, papers, erasers, staples).

4. Purchased services. Cost of nursing administrative consultants, ward clerks, nursing administration support staff performed on a contract basis.

5. Advertising (classified). Cost of advertising to recruit all nursing service personnel.

M. Home office costs. Allowable operating costs incurred by a home office which are directly assigned to the nursing facility or pooled operating costs that are allocated to the nursing facility in accordance with 12 VAC 30-90-240.

Appendix II.
Leasing of Facilities.

**12 VAC 30-90-280. Leasing of facilities.**

*The substance of this appendix shall apply only to Article 2 (12 VAC 30-90-30 et seq.) of Subpart II of Part II of this chapter.*

I. Determination of allowable lease costs.

A. The provisions of this ~~Part~~ *(appendix II)* shall apply to all lease agreements, including sales and leaseback agreements and lease purchase agreements, and including whether or not such agreements are between parties which are related (as defined in 12 VAC 30-90-50 of the Nursing Home Payment System (NHPS)).

B. Reimbursement of lease costs pursuant to a lease between parties which are not related shall be limited to the DMAS allowable cost of ownership as determined in *subsection* E below. Reimbursement of lease costs pursuant to a lease between parties which are related (as defined in 12 VAC 30-90-50) shall be limited to the DMAS allowable cost

of ownership. Whether the lease is between parties which are or are not related, the computation of the allowable annual lease expense shall be subject to DMAS audit.

C. The DMAS allowable cost of ownership shall be determined by the historical cost of the facility to the owner of record at the date the lease becomes effective. When a lease agreement is in effect, whether during the original term or a subsequent renewal, no increase in the reimbursement shall be allowed as a result of a subsequent sale of the facility.

D. When a bona fide sale has taken place, the facility must have been held by the seller for a period of no less than five years for a lease effected subsequent to the sale date to be compared to the buyer's cost of ownership. Where the facility has been held for less than 5 years, the allowable lease cost shall be computed using the seller's historical cost.

E. Reimbursement of lease costs pursuant to a lease between parties which are not related (as defined in 12 VAC 30-90-50) shall be limited to the DMAS allowable cost of ownership. The following reimbursement principles shall apply to leases, other than those covered in 12 VAC 30-90-50 and ~~subdivision~~ *subsection* IV ~~(~~ *of this* appendix ~~II)~~, entered into on or after October 1, 1990:

1. An "Allowable Cost of Ownership" schedule shall be created for the lease period to compare the total lease expense to the allowable cost of ownership.

2. If the lease cost for any cost reporting period is below the cost of ownership for that period, no adjustment shall be made to the lease cost, and a "carryover credit" to the extent of the amount allowable for that period under the "Allowable Cost of Ownership" schedule shall be created but not paid.

3. If the lease cost for a future cost reporting period is greater than the "Cost of Ownership" for that period, the provider shall be paid this "carryover credit" from prior period(s), not to exceed the cumulative carryover credit or his actual lease cost, whichever is less. At no time during the lease period shall DMAS reimbursement exceed the actual cumulative "Cost of Ownership."

4. Once DMAS has determined the allowable cost of ownership, the provider shall be responsible for preparing a verifiable and auditable schedule to support cumulative computations of cost of ownership vs. lease cost to support the "carryover credit" as reported in the "Allowable Cost of Ownership" schedule, and shall submit such a schedule with each cost report.

II. Documentation of costs of ownership.

A. Leases shall provide that the lessee or DMAS shall have access to any and all documents required to establish the underlying cost of ownership.

B. In those instances where the lessor will not share this information with the lessee, the lessor can forward this information direct to DMAS for confidential review.

III. Computation of cost of ownership.

# Final Regulations

A. Before any rate determination for allowable lease costs is made, the lessee must supply a schedule comparing lease expense to the underlying cost of ownership for the life of the lease. Supporting documentation, including but not limited to, the lease and the actual cost of ownership (mortgage instruments, financial statements, purchase agreements, etc.) must be included with this schedule.

B. The underlying straight-line depreciation, interest, property taxes, insurance, and amortization of legal and commitment fees shall be used to determine the cost of ownership for comparison to the lease costs. Any cost associated with the acquisition of a lease other than those outlined herein shall not be considered allowable unless specifically approved by the Department of Medical Assistance Services.

1. Straight line depreciation.

a. Depreciation shall be computed on a straight line basis only.

b. New or additions facilities shall be depreciated in accordance with AHA Guidelines.

c. Allowable depreciation for on-going facilities shall be computed on the historical cost of the facility determined in accordance with limits on allowable building and fixed equipment cost.

d. The limits contained in 12 VAC 30-90-30, and Part VI (12 VAC 30-90-160) shall apply, as appropriate, whether the facility is newly constructed or an on-going facility.

2. Interest. Interest expense shall be limited to actual expense incurred by the owner of the facility in servicing long-term debt and shall be subject to the interest rate limitations stated in 12 VAC 30-90-30.

3. Taxes and insurance. Taxes are limited to actual incurred real estate and property taxes. Insurance is limited to the actual cost of mortgage insurance, fire and property liability insurance. When included in the lease as the direct responsibility of the lessee, such taxes and insurance shall not be a part of the computation of the cost of ownership.

4. Legal and commitment fees. Amortization of actual incurred closing costs paid by the owner, such as attorney's fees, recording fees, transfer taxes and service or "finance" charges from the lending institution may be included in the comparison of the cost of ownership computation. Such fees shall be subject to limitations and tests of reasonableness stated in these regulations. These costs shall be amortized over the life of the mortgage.

5. Return on Equity.

a. Return on equity will be limited to the equity of the facility's owner when determining allowable lease expense. Return on equity [ ~~will~~ *shall* ] be [ ~~limited to 10%~~ *equal to the rental rate percentage used in connection with the fair rental value (FRV) methodology described in Article 3 (12 VAC 30-90-35 et seq.) of Subpart II of Part II of this chapter* ]. For the purpose of determining allowable lease expense, equity will be computed in accordance with PRM-15 principles. The allowable base will be determined by monthly averaging of the annual equity balances. The base will be increased by the

amount of paid up principal in a period but will be reduced by depreciation expense in that period.

b. Item 398D of the 1987 Appropriations Act (as amended), effective April 8, 1987 eliminated reimbursement of return on equity capital to proprietary providers for periods or portions thereof on or after July 1, 1987.

c. [ ~~This elimination of return on equity capital effective July 1, 2001, applies to all computations of allowable plant or capital cost under the methodology in effect on June 30, 2000.~~ *Leased facilities shall be eligible for return on equity capital after July 1, 2001, only if they were receiving return on equity capital on June 30, 2000.* ]

IV. Leases approved prior to August 18, 1975.

A. Leases approved prior to August 18, 1975, shall have the terms of those leases honored for reimbursement throughout the duration of the lease.

B. Renewals and extensions to these leases shall be honored for reimbursement purposes only when the dollar amount negotiated at the time of renewal does not exceed the amount in effect at the termination date of the existing lease. No escalation clauses shall be approved.

C. Payments of rental costs for leases reimbursed pursuant to subsection A above shall be allowed whether the provider occupies the premises as a lessee, sublessee, assignee, or otherwise. Regardless of the terms of any present or future document creating a provider's tenancy or right of possession, and regardless of whether the terms thereof or the parties thereto may change from time to time, future reimbursement shall be limited to the lesser of (1) the amount actually paid by the provider, or (2) the amount reimbursable by DMAS under these regulations as of the effective date this amendment. In the event extensions or renewals are approved pursuant to subsection B of this section, no escalation clauses shall be approved or honored for reimbursement purposes.

V. Nothing in this (appendix II) shall be construed as assuring providers that reimbursement for rental costs will continue to be reimbursable under any further revisions of or amendment to these regulations.

---

NOTICE:  The forms used in administering 12 VAC 30-90-10 et seq., Methods and Standards for Establishing Payment Rates-Long Term Care, are not being published due to the large number; however, the name of each form is listed below.  The forms are available for public inspection at the Department of Medical Assistance Services, 600 E. Broad Street, Suite 1300, Richmond, Virginia, or at the office of the Registrar of Regulations, General Assembly Building, 2nd Floor, Richmond, Virginia.

---

## FORMS

Certificate of Medical Necessity--Durable Medical Equipment and Supplies, DMAS-352, Revised August 1995.

**Cost Reporting Forms *for Nursing Facility with Multiple Level of Care or Hospital-Based Nursing Facilities* (PIRS 1090 Series).**

# Final Regulations

Facility Description and Statistical Data, Schedule A-1, eff. 7/1/93.

Certification by Officer or Administrator of Provider, Schedule A-2, eff. 7/1/93.

*Computation of Patient Intensity Reimbursement System Base Operating Costs, Schedule A-3, eff. 7/1/93.*

*Computation of Direct Patient Care Nursing Service Costs, Schedule A-4, eff. 7/1/99.*

Reclassification and Adjustment of Trial Balance of Expenses, Schedule B, eff. 7/1/93.

Reclassifications, Schedule B-1, eff. 7/1/93.

Analysis of Administrative and General  Other, Schedule B-2, eff. 7/1/93.

Adjustment to Expenses, Schedule B-4, eff. 7/1/93.

Cost Allocation  Employee Benefits, Schedule B-5, Part I, eff. 7/1/93.

Cost Allocation Employee  Benefits  Statistical  Basis, Schedule B-5, Part II, eff. 7/1/93.

Computation of Title XIX Direct Patient Care Ancillary Service Costs, Schedule C, eff. 7/1/93.

Statement of Cost of Services from Related Organizations, Schedule D, eff. 7/1/93.

Statement of Compensation of Owners, Schedule E, eff. 7/1/93 *10/1/90.*

Statement of Compensation of Administrators and/or Assistant Administrators, Schedule F, eff. 7/1/93 *10/1/90.*

Balance Sheet, Schedule G, eff. 7/1/93.

Statement of Patient Revenues, Schedule G-1, eff. 7/1/93.

Statement of Operations, Schedule G-2, eff. 7/1/93.

Computation of Title XIX *(Medicaid)* Base Costs and Prospective Reimbursement Rate/*PIRS*, Schedule H, Part I, eff. 7/1/93 *7/1/99.*

Computation of Prospective Direct and Indirect Patient Care Profit Incentive Rates, Schedule H-1, eff. 7/1/93 *10/1/90.*

Calculation of Medical Service Reimbursement Settlement, Schedule J, eff. 7/1/93 *7/1/99.*

Computation of Nursing Facility Medical Service Potential Prospective Reimbursement, Schedule J, Part II, eff. 7/1/93.

Settlement Computations, Schedule J, Part III, eff. 7/1/93.

Analysis of Nursing Facility Interim Payments for Title XIX Services, Schedule J, Part IV, eff. 7/1/93.

Analysis of Quarterly Title XIX Patient Days, Schedule J, Part V, eff. 7/1/93.

Accumulation of Title XIX Charges, Schedule J, Part VI, eff. 7/1/93.

Calculation of NATCEPs Reimbursement Settlement, Schedule J-1, eff. 7/1/93 *7/1/92.*

Calculation of Criminal Record Check Costs Reimbursement, Schedule J-2, eff. 7/1/93.

Debt and Interest Expense, Schedule K, eff. 7/1/93.

Limitation on Federal Participation for Capital Expenditures Questionnaire, Schedule L, eff. 7/1/93.

Nurse Aide Training and Competency Evaluation Program Costs and Competency Evaluation Programs (NATCEPs), Schedule N, eff. 7/1/93 *10/1/90.*

*Computation of Nursing Salaries and Benefits Cost Increase Related to July 1, 1999 PIRS Rate Modification, Schedule S, rev. 11/30/99.*

**Cost Reporting Forms for Nursing Facility (Single Level of Care) (PIRS 1090 Series).**

*Facility Description and Statistical Data, Schedule A, eff. 10/1/90.*

*Certification by Officer or Administrator of Provider, Schedule A-2, eff. 10/1/90.*

*Reclassification and Adjustment of Trial Balance of Expenses, Schedule B, not dated.*

*Reclassifications, Schedule B-1, not dated.*

*Analysis of Administrative and General--Other, Schedule B-2, eff. 10/1/90.*

*Adjustment to Expenses, Schedule B-4, eff. 10/1/90.*

*Cost Allocation--Employee Benefits, Schedule B-5, Part I, eff. 7/1/93.*

*Cost Allocation--Employee Benefits Statistical Basis, Schedule B-5, Part II, eff. 7/1/93.*

*Computation of Title XIX Direct Patient Care Ancillary Service Costs, Schedule C, eff. 7/1/93.*

*Statement of Cost of Services from Related Organizations, Schedule D, eff. 10/1/90.*

*Statement of Compensation of Owners, Schedule E, eff. 10/1/90.*

*Statement of Compensation of Administrators and/or Assistant Administrators, Schedule F, eff. 10/1/90.*

*Balance Sheet, Schedule G, not dated.*

*Statement of Patient Revenues, Schedule G-1, eff. 10/1/90.*

*Statement of Operations, Schedule G-2, eff. 10/1/90.*

*Computation of Title XIX (Medicaid) Base Costs and Prospective Reimbursement Rate, Schedule H, eff. 7/1/99.*

*Computation of Prospective Direct and Indirect Patient Care Profit Incentive Rates, Schedule H-1, eff. 10/1/90.*

*Calculation of Medical Service Reimbursement Settlement, Schedule J, eff. 7/1/99.*

*Calculation of NATCEPs Reimbursement Settlement, Schedule J-1, eff. 7/1/92.*

# Final Regulations

*Calculation of Criminal Record Check Costs Reimbursement, Schedule J-2, eff. 7/1/93.*

*Debt and Interest Expense, Schedule K, eff. 7/1/93.*

*Limitation on Federal Participation for Capital Expenditures Questionnaire, Schedule L, eff. 10/1/90.*

*Nurse Aide Training and Competency Evaluation Program Costs and Competency Evaluation Programs (NATCEPs), Schedule N, eff. 10/1/90.*

*Computation of Nursing Salaries and Benefits Cost Increase Related to July 1, 1999 PIRS Rate Modification, Schedule S, rev. 11/30/99.*

Computation of Specialized Care Base Operating Costs, Pediatric, Schedule SC-3, ~~eff. 12/1/96~~ *rev. 7/98.*

Computation of Specialized Care Direct Patient Care Nursing Service Costs, Pediatric, Schedule SC-4, ~~eff. 12/1/96~~ *rev. 7/98.*

Computation of Specialized Care Kinetic Therapy Ancillary Service Costs, Pediatric, Schedule SC-5, ~~eff. 12/1/96~~ *rev. 7/98.*

Computation of Specialized Care Direct Patient Care Ancillary Service Costs, Pediatric, Schedule SC-6, ~~eff. 12/1/96~~ *rev. 7/98.*

Computation of Specialized Care Base Costs and Prospective Rate, Pediatric, Schedule SC-7P, ~~eff. 12/1/96~~ *rev. 7/00.*

Computation of Prospective Specialized Care Operating Efficiency Incentive Rates, Pediatric, Schedule SC-8P, ~~eff. 12/1/96~~ *rev. 7/98.*

Part I Computation of Nursing Facility Specialized Care Settlement, Part II Analysis of Nursing Facility Specialized Care Interim Payments for Title XIX Services, Part III Analysis of Quarterly Title XIX (Medicaid) Specialized Care Patient Days, Pediatric, Schedule SC-9, ~~eff. 12/1/96~~ *rev. 7/00.*

Computation of Specialized Care Base Operating Costs, *Adult,* Schedule SC-3, ~~eff. 12/1/96~~ *rev. 7/98.*

Computation of Specialized Care Direct Patient Care Nursing Service Costs, *Adult,* Schedule SC-4, ~~eff. 12/1/96~~ *rev. 7/98.*

Computation of Specialized Care Kinetic Therapy Ancillary Service Costs, *Adult,* Schedule SC-5, ~~eff. 12/1/96~~ *rev. 7/98.*

Computation of Specialized Care Direct Patient Care Ancillary Service Costs, *Adult,* Schedule SC-6, ~~eff. 12/1/96~~ *rev. 7/98.*

Computation of Specialized Care Base Costs and Prospective Rate, Adult, Schedule SC-7, ~~eff. 12/1/96~~ *rev. 7/98.*

Computation of Prospective Specialized Care Operating Efficiency Incentive Rates, Adult, Schedule SC-8, ~~eff. 12/1/96~~ *rev. 7/98.*

Part I Computation of Nursing Facility Specialized Care Settlement, Part II Analysis of Nursing Facility Specialized Care Interim Payments for Title XIX Services, Part III Analysis of Quarterly Title XIX (Medicaid) Specialized Care Patient Days, Adult, Schedule SC-9, ~~eff. 12/1/96~~ *rev. 1/00.*

*Cost Reporting Forms for Nursing Facilities with Other Long-Term Care Services, HCPA-2540-96 Worksheets, eff. 7/96.*

<u>DOCUMENTS INCORPORATED BY REFERENCE</u>

R.S. Means Building Construction *Cost* Data, ~~"Location Factor."~~ *59th Annual Edition, 2001.*

*R.S. Means Square Foot Costs, 22nd Annual Edition, 2001.*

R.S. Means Repair and Remodeling Cost Data, 22nd Annual Edition, 2001.

Estimated Useful Lives of Depreciable Assets, *rev. 1993 Edition,* American Hospital Association.

~~Cragie Incorporated Municipal Finance Newsletter.~~

Federal Reserve Statistical Release (H. 15), *updated daily.*

Provider Reimbursement Manual, HCFA-Pub. 15 (PRM-15), Health Care Financing Administration.

Skilled Nursing Facility Market Basket of Routine Service Costs, ~~Data Resources~~ *updated quarterly, DRI/McGraw Hill.*

Nursing Facility Reimbursement Report, MMR-240, *updated monthly,* Department of Medical Assistance Services.

VA.R. Doc. No. R00-281; Filed May 2, 2001, 12:01 p.m.

◆ ━━━━━━━━━━━━━━━ ◆

## TITLE 18.  PROFESSIONAL AND OCCUPATIONAL LICENSING

### BOARD OF COUNSELING

<u>Title of Regulation:</u>  **18 VAC 115-60-10 et seq. Regulations Governing the Practice of Licensed Substance Abuse Treatment Practitioners (amending 18 VAC 115-60-20, 18 VAC 115-60-40, 18 VAC 115-60-50, 18 VAC 115-60-120, and 18 VAC 115-60-150).**

<u>Statutory Authority:</u>  § 54.1-2400 and Chapter 35 (§ 54.1-3500 et seq.) of Title 54.1 of the Code of Virginia.

<u>Effective Date:</u>  June 20, 2001.

<u>Summary:</u>

*The board has adopted fee changes in compliance with a statutory requirement for the board to collect sufficient revenue to cover the expenditures of administering the regulatory program. The fees are equivalent to those recently adopted by the board as final regulations for its other two licensure categories and have been developed in accordance with the agency's Principles for Fee Development.*

*The renewal fee will increase the cost of renewal by $15 per year. An amendment provides for an initial licensure fee with the licensure application fee that will increase the cost of applying for licensure from $100 to $140. A new flat fee of $165 for reinstatement of a license lapsed more than one year will replace the current requirement to reapply under the current regulations. Also included is a fee of $500 for*

# Final Regulations

*reinstatement of a license following disciplinary action which resulted in revocation or suspension of a license.*

Summary of Public Comment and Agency's Response:  No public comments were received by the promulgating agency.

Agency Contact:  Copies of the regulation may be obtained from Evelyn Brown, Executive Director, Board of Counseling, 6606 West Broad Street, 4th Floor, Richmond, VA  23230, telephone (804) 662-9967, FAX (804) 662-9943 or (804) 662-7191/TDD.

REGISTRAR'S NOTICE:  The proposed regulation was adopted as published in 17:10 VA.R. 1514-1521 January 29, 2001, without change.  Therefore, pursuant to § 9-6.14:22 A of the Code of Virginia, the text of the final regulation is not set out.

VA.R. Doc. No. R00-65; Filed May 2, 2001, 10:44 a.m.

## BOARD OF PSYCHOLOGY

Title of Regulation:  **18 VAC 125-20-10 et seq.  Regulations Governing the Practice of Psychology (amending 18 VAC 125-20-30, 18 VAC 125-20-120, 18 VAC 125-20-130, and 18 VAC 125-20-160; adding 18 VAC 125-20-121, 18 VAC 125-20-122, and 18 VAC 125-20-123).**

Statutory Authority:  §§ 54.1-2400 and 54.1-3606.1 of the Code of Virginia.

Effective Date:  June 20, 2001.

Summary:

*The amendments establish continuing education requirements for the renewal of psychologist licensure.  As required by the statute, the amendments include a requirement of 14 contact hours of continuing education courses each year, for a total of 28 hours for each biennial licensure renewal.  The amendments include a provision for an inactive licensure status to accommodate individuals who are not actively practicing psychology and who may be unable to meet the continuing education requirements.*

*The board made a change to the proposed regulation by adding a requirement for approved providers to maintain documentation of course titles and objectives for a period of four years and made clarifying changes.*

Summary of Public Comments and Agency's Response:  A summary of comments made by the public and the agency's response may be obtained from the promulgating agency or viewed at the office of the Registrar of Regulations.

Agency Contact:  Copies of the regulation may be obtained from Evelyn B. Brown, Department of Health Professions, 6606 W. Broad St., 4th Floor, Richmond, VA 23230-1717, telephone (804) 662-9913.

**18 VAC 125-20-30. Fees required by the board.**

A. The board has established fees for the following:

| | Applied psychologists Clinical psychologists School psychologists | School psychologists-limited |
|---|---|---|
| 1. Registration of residency (per residency request) | $50 | |
| 2. Add or change supervisor | $25 | |
| 3. Application processing and initial licensure | $200 | $85 |
| 4. Biennial renewal of *active* license | $225 | $100 |
| *5. Biennial renewal of inactive license* | *$115* | [ *$50* ] |
| ~~5.~~ 6. Late renewal | $80 | $35 |
| ~~6.~~ 7. Verification of license to another jurisdiction | $25 | $25 |
| ~~7.~~ 8. Duplicate license | $5 | $5 |
| ~~8.~~ 9. Additional or replacement wall certificate | $15 | $15 |
| ~~9.~~ 10. Returned check | $25 | $25 |
| ~~10.~~ 11. Reinstatement of a lapsed license | $270 | $125 |
| ~~11.~~ 12. Reinstatement following revocation or suspension | $500 | $500 |
| [ ~~13. Continuing education provider review fee~~ | | ~~$200~~ ] |

[ B.  The fee for review of a continuing education provider seeking board approval shall be $200. ]

[ ~~B.~~ C. ] Fees shall be paid by check or money order made payable to the Treasurer of Virginia and forwarded to the board. All fees are nonrefundable.

[ ~~C.~~ D. ] Examination fees shall be established and made payable as determined by the board.

**18 VAC 125-20-120.  Biennial renewal of licensure.**

Every license issued by the board shall expire on the last day of the licensee's birth month of each even-numbered year.

1. Every licensee who intends to continue to practice shall, on or before the expiration date of the license, submit to the board a license renewal application on forms supplied by the board and the renewal fee prescribed in 18 VAC 125-20-30.

2. *Beginning with the 2004 renewal, licensees who wish to maintain an active license shall pay the appropriate fee and* [ ~~document~~ verify ] *on the renewal form compliance with the continuing education requirements prescribed in 18 VAC 125-20-121.  First-time licensees are not required to* [ ~~document~~ verify ] *continuing education on the first renewal date following initial licensure.*

3. *A licensee who wishes to place his license in inactive status may do so upon payment of the fee prescribed in*

# Final Regulations

*18 VAC 125-20-30. No person shall practice psychology in Virginia unless he holds a current active license. An inactive licensee may activate his license by fulfilling the reactivation requirements set forth in 18 VAC 125-20-130.*

*4. Licensees shall notify the board office in writing of any change of address. Failure of a licensee to receive a renewal notice and application forms from the board shall not excuse the licensee from the renewal requirement.*

### 18 VAC 125-20-121. Continuing education course requirements for renewal of an active license.

*A. After January 1, 2004, [ licensed psychologists licensees ] shall be required to have completed a minimum of 14 hours of board-approved continuing education courses each year for a total of 28 hours for each biennial licensure renewal. A minimum of three of these hours shall be in courses that emphasize the ethics, standards of practice or laws governing the profession of psychology in Virginia.*

*B. For the purpose of this section, "course" means an organized program of study, classroom experience or similar educational experience that is directly related to the practice of psychology and is provided by a board-approved provider that meets the criteria specified in 18 VAC 125-20-122. At least half of the required hours shall be earned in face-to-face educational experiences.*

*C. Courses must be directly related to the scope of practice in the category of licensure held. Continuing education courses for clinical psychologists shall emphasize, but not be limited to, the diagnosis, treatment and care of patients with moderate and severe mental disorders.*

*D. The board may grant an extension for good cause of up to one year for the completion of continuing education requirements upon written request from the licensee prior to the renewal date. Such extension shall not relieve the licensee of the continuing education requirement.*

*E. The board may grant an exemption for all or part of the continuing education requirements for one renewal cycle due to circumstances determined by the board to be beyond the control of the licensee.*

### 18 VAC 125-20-122. Continuing education providers.

*A. The following organizations are recognized by the board as providers of continuing education:*

*1. Any board-approved psychological association [ or providers approved by such an association ].*

*2. Any board-approved association or organization of mental health, health or psychoeducational providers [ or providers approved by such an association or organization ].*

*3. Any board-approved association or organization providing courses related to forensic psychology [ or providers approved by such an association or organization ].*

*4. Any regionally accredited institution of higher learning.*

*5. Any governmental agency or facility that offers mental health, health or psychoeducational services.*

*6. Any licensed hospital or facility that offers mental health, health or psychoeducational services.*

*B. Course providers not listed in subsection A of this section may apply for approval by the board as continuing education providers.*

*1. To be considered for board approval, a continuing education provider shall submit:*

*a. Documentation of an instructional plan for continuing education courses that are primarily psychological in nature with systematized instruction provided by licensed psychologists or other licensed mental health service providers; and*

*b. The provider review fee set forth under 18 VAC 125-20-30.*

*2. Board approval of continuing education providers under this subsection shall expire two years from the date of issuance, and may be renewed upon submission of documentation and provider review fee as required by the board.*

*C. Continuing education providers approved under subsection A or B of this section shall:*

*1. [ Document and ] Maintain [ records documentation of the course titles and objectives and ] of licensee attendance and completion of courses for a period of four years.*

*2. Monitor attendance at classroom or similar face-to-face educational experiences.*

*3. Provide a certificate of completion for licensees who successfully complete a course.*

### 18 VAC 125-20-123. Documenting compliance with continuing education requirements.

*A. All licensees in active status are required to maintain original documentation for a period of four years.*

*B. After the end of each renewal period, the board may conduct a random audit of licensees to verify compliance with the requirement for that renewal period.*

*C. Upon request, a licensee shall provide documentation as follows:*

*1. Official transcripts showing credit hours earned from an accredited institution; or*

*2. Certificates of completion from approved providers.*

*D. Compliance with continuing education requirements, including the maintenance of records and the relevance of the courses to the category of licensure, is the responsibility of the licensee. The board may request additional information if such compliance is not clear from the transcripts or certificates.*

*E. Continuing education hours required by disciplinary order shall not be used to satisfy renewal requirements.*

# Final Regulations

**18 VAC 125-20-130. Late renewal; reinstatement; reactivation.**

A. A person whose license has expired may renew it within two years after its expiration date by paying the penalty fee prescribed in 18 VAC 125-20-30 and the license renewal fee for the biennium the license was not renewed.

B. A person whose license has not been renewed for two years or more and who wishes to resume practice shall:

1. Present evidence ~~satisfactory~~ to the board ~~regarding continued competency to perform the duties regulated by the board~~ *of having met all applicable continuing education requirements equal to the number of years the license has lapsed, not to exceed four years;*

2. ~~Upon approval for reinstatement,~~ Pay the reinstatement fee as prescribed in 18 VAC 125-20-30; and

3. Submit verification of any professional certification or licensure obtained in any other jurisdiction subsequent to the initial application for licensure.

*C. A psychologist wishing to reactivate an inactive license shall submit the renewal fee for active licensure minus any fee already paid for inactive licensure renewal, and document completion of continued competency hours equal to the number of years the license has been inactive, not to exceed four years.*

**18 VAC 125-20-160. Grounds for disciplinary action or denial of licensure.**

The board may take disciplinary action or deny a license for any of the following causes:

1. Conviction of a felony, or a misdemeanor involving moral turpitude;

2. Procuring of a license by fraud or misrepresentation;

3. Misuse of drugs or alcohol to the extent that it interferes with professional functioning;

4. Negligence in professional conduct or violation of practice standards including but not limited to this chapter;

5. Performing functions outside areas of competency;

6. Mental, emotional, or physical incompetence to practice the profession; ~~or~~

*7. Failure to comply with the continued competency requirements set forth in this chapter; or*

~~7.~~ *8.* Violating or aiding and abetting another to violate any statute applicable to the practice of the profession regulated or any provision of this chapter.

NOTICE: The forms used in administering 18 VAC 125-20-10 et seq., Regulations Governing the Practice of Psychology, are not being published due to the large number; however, the name of each form is listed below. The forms are available for public inspection at the Department of Professional and Occupational Regulation, 3600 W. Broad Street, Richmond, Virginia, or at the office of the Registrar of Regulations, General Assembly Building, 2nd Floor, Richmond, Virginia.

FORMS

Psychologist Application for Licensure by Examination, PSYEX1 (rev. 2/00).

Application for Licensure as a School Psychologist-Limited, SCHLTD 1 (eff. 8/00).

Employment Verification Form, SCHLTD 2 (eff. 8/00).

Registration of Residency – Post-Graduate Degree Supervised Experience, PSY2 (rev. 2/00).

Psychologist Application for Licensure by Endorsement, PSYEN1 (rev. 2/00).

Psychologist Application for Reinstatement of a Lapsed License, PSYREIN (eff. 2/00).

Psychologist Application for Reinstatement Following Disciplinary Action, PSYREDISC (eff. 2/00).

Verification of Post-Degree Supervision, PSY3 (rev. 6/99).

Internship Verification, PSY4 (rev. 6/99).

Licensure/Certification Verification, PSY5 (rev. 6/99).

Areas of Graduate Study, PSY6 (rev. 6/99).

Renewal Notice and Application (rev. ~~2/00~~ *1/01*).

VA.R. Doc. No. R00-212; Filed May 2, 2001, 10:47 a.m.

◆ ━━━━━━━━━━━━━━ ◆

# TITLE 20. PUBLIC UTILITIES AND TELECOMMUNICATIONS

## STATE CORPORATION COMMISSION

REGISTRAR'S NOTICE: The distribution lists that are referenced as Appendices A through E in the following order are not being published. However, these lists are available for public inspection at the State Corporation Commission, Document Control Center, Tyler Building, 1st Floor, 1300 East Main Street, Richmond, Virginia 23219, from 8:15 a.m. to 5 p.m., Monday through Friday; or may be viewed at the Virginia Code Commission, General Assembly Building, 2nd Floor, 910 Capitol Street, Richmond, Virginia 23219, during regular office hours.

Title of Regulation: **20 VAC 5-309-10 et seq. Rules for Enforcement of the Underground Utility Damage Prevention Act (amending 20 VAC 5-309-10, 20 VAC 5-309-20, [ *20 VAC 5-309-30,* ] 20 VAC 5-309-40, 20 VAC 5-309-50, and 20 VAC 5-309-70; adding 20 VAC 5-309-15 and 20 VAC 5-309-90 through [ ~~20 VAC 5-309-230~~ *20 VAC 5-309-180* ]).**

Statutory Authority: §§ 12.1-13 and 56-265.30 of the Code of Virginia.

Effective Date: July 1, 2001.

# Final Regulations

Summary:

*The regulations prescribe, among other things (i) the procedures by which the commission will enforce the Underground Utility Damage Prevention Act, Chapter 10.3 (§ 56-265.14 et seq.) of Title 56 of the Code of Virginia; (ii) procedures to be followed during emergency excavations; (iii) marking requirements for underground utility lines; (iv) data required to be provided by operators to the notification centers; (v) excavators' responsibilities to avoid damage, dislocating, or disturbances of underground utility lines; (vi) requirements for trenchless excavation; (vii) excavator responsibilities to protect and preserve markings; (viii) the obligation of excavators to verify that they are at the correct excavation location and to check for unmarked utility lines; and (ix) the operator's responsibilities to maintain accurate installation records.*

*The 2001 General Assembly amended § 56-265.30 of the Code of Virginia to provide that nothing in Chapter 10.3 of Title 56 shall be construed to authorize the commission to promulgate any rules or regulations pursuant to its authority to enforce that chapter that require any person, other than jurisdictional gas or hazardous liquid operators, to report to the commission any probable violation of the chapter or any incident involving damage, dislocation, or disturbance of any utility line. See 2001 Va. Acts, ch. 399. Since Part III of the rules adopted by the commission's December 19, 2000, order provided for mandatory reports of damages to underground utility lines by nongas operators, Part III has been eliminated to conform the rules to the change in § 56-265.30 of the Code of Virginia, effective July 1, 2001. Therefore, this revised final regulation eliminates Part III, Reporting Probable Violations of the Act by Nongas Operators, that was published in 17:9 VA.R. January 15, 2001.*

Agency Contact: Massoud Tahamtani, Assistant Director, Division of Energy Regulation, State Corporation Commission, P.O. Box 1197, 1300 E. Main Street, Richmond, Virginia 23218, telephone (804) 371-9264. Copying charges are $1.00 for the first two pages, and $.50 for each page thereafter.

AT RICHMOND, DECEMBER 19, 2000

COMMONWEALTH OF VIRGINIA, ex rel.

STATE CORPORATION COMMISSION

CASE NO. PUE990786

Ex Parte: In the matter
concerning Rules implementing
the State Corporation Commission's
authority to enforce the
Underground Utility Damage
Prevention Act

ORDER CONFORMING RULES TO STATUTORY CHANGE

On December 19, 2000, the State Corporation Commission ("Commission") entered an Order adopting "Rules for Enforcement of the Underground Utility Damage Prevention Act" ("Rules") that will become effective on July 1, 2001. Part III of the Rules (20 VAC 5-309-90 thru 20 VAC 5-309-120) prescribes the circumstances under which electric, telecommunications, cable TV and cable TV telecommunications operators, and water or sewer operators have to report to the Commission probable violations of the Underground Utility Damage Prevention Act, Chapter 10.3 (§ 56-265.15 et seq.) of Title 56 of the Code of Virginia ("the Act"). During the 2001 session of the General Assembly, § 56-265.30 of the Act was amended to add the following subsection:

B. Nothing in this chapter [Chapter 10.3] shall be construed to authorize the Commission to promulgate any rules or regulations pursuant to its authority to enforce this chapter that require any person, other than jurisdictional gas or hazardous liquid operators, to report to the Commission any probable violation of this chapter or any incident involving damage, dislocation or disturbance of any utility line.

2001 Va. Acts ch. 399.

NOW, UPON CONSIDERATION of the revision to § 56-265.30 of the Code of Virginia, the Commission is of the opinion and finds that Part III (20 VAC 5-309-90 thru 20 VAC 5-309-120) should be removed from the Rules for Enforcement of the Underground Utility Damage Prevention Act to conform these Rules (Attachment A hereto) to the provisions of the Underground Utility Damage Prevention Act, as amended by 2001 Va. Acts, ch. 399; that the remaining Rules shall be renumbered to reflect the removal of Part III; that a copy of this Order and renumbered Rules should be forwarded to the Virginia Register of Regulations for publication therein; and that this matter should be dismissed from the Commission's docket of active proceedings.

Accordingly, IT IS ORDERED THAT:

(1) Part III of the Rules shall be eliminated to conform the Rules to § 56-265.30 B of the Code of Virginia, effective July 1, 2001.

(2) A copy of this Order and the attached Rules reflecting the elimination of Part III shall be forwarded to the Virginia Register of Regulations for publication.

(3) This case shall be dismissed from the Commission's docket of active proceedings.

AN ATTESTED COPY hereof shall be sent by the Clerk of the Commission to: all the certificated water and sewer utilities subject to the Commission's regulation as set out in Appendix A hereto; all of the telephone companies regulated by the Commission as set out in Appendix B hereto; all of Virginia's certificated interexchange carriers as set out in Appendix C hereto; all the certificated gas companies as set out in Appendix D hereto; all the certificated electric cooperatives and electric companies as set out in Appendix E hereto; John F. Dudley, Senior Assistant Attorney General, Division of Consumer Counsel, Office of Attorney General, 900 East Main Street, Second Floor, Richmond, Virginia 23219; Cynthia Oakey, Esquire, and Karen L. Bell, Esquire, Virginia Electric and Power Company, One James River Plaza, P.O. Box 26666, Richmond, Virginia 23261; Kodwo Ghartey-Tagoe, Esquire, McGuireWoods L.L.P., One James Center, 901 East Cary Street, Richmond, Virginia 23219-

## Final Regulations

4030; Gray Pruitt, 2415 Grenoble Road, Richmond, Virginia 23294; Thomas A. Dick, 1108 East Main Street, Suite 904, Richmond, Virginia 23219; Honorable Malfourd W. Trumbo, P.O. Box 448, Fincastle, Virginia 24090; Richard L. Hall, Vice President, W. R. Hall, Inc., 1214 Bill Street, Norfolk, Virginia 23518; Kevin Robertson, Miss Utility Supervisor, Capco Construction Corp., 15433 Farm Creek Drive, Woodbridge, Virginia 22191; Larry Friedman, Sr. Vice President, Long Fence Company, Inc., P.O. Box 220429, Chantilly, Virginia 20153-0429; Robert L. Kent, President, J. L. Kent & Sons, Inc., P.O. Box 69, Spotsylvania, Virginia 22553; John F. Gionfriddo, Town of Vienna, 127 Center Street South, Vienna, Virginia 22180; R. Lance Terpenny, Town Manager, and Wayne O. Nelson, P.E., Director of Engineering and Public Works, Town of Christiansburg, 100 East Main Street, Christiansburg, Virginia 24073-3029; Mike Bowersox, Ben Lewis Plumbing, Inc. U.S.A., 20220 Frederick Road, P.O. Box 93, Germantown, Maryland 20875-0093; John G. Whitacre, Engineer, Frederick County Sanitation Authority, P.O. Box 1877, Winchester, Virginia 22604-8377; Jim Stepahin, Executive Director, Virginia Utility & Heavy Contractors Council, 9303 Center Street, Suite 109, Manassas, Virginia 20110-5547; Peter S. Fortin, P.E., Engineering Manager, City of Norfolk, Department of Utilities, P.O. Box 1080, Norfolk, Virginia 23501; Russell L. Quesenberry, Safety Officer, S. W. Rodgers Co., Inc., P.O. Box 398, Gainesville, Virginia 20156; William M. Hackworth, City Attorney, and Gary E. Tegenkamp, Assistant City Attorney, City of Roanoke, Dept. of Utility Line Services, 464 Municipal Building, 215 Church Avenue, S.W., Roanoke, Virginia 24011; Bettie L. Cahoon, Construction Inspector Supervisor, City of Chesapeake, Department of Public Utilities, P.O. Box 15225, Chesapeake, Virginia 23328; Steven C. Vermillion, Executive Director, Associated General Contractors of Virginia, Inc., P.O. Box 5700, Glen Allen, Virginia 23058-5700; Christopher J. Dolena, Engineer II, City of Virginia Beach, Department of Public Utilities, 3500 Dam Neck Road, Virginia Beach, Virginia 23456; Rodney W. McClain, General Manager, Stoney Creek Sanitary District, Toms Brook-Maurertown Sanitary District, P.O. Box 42, Basye, Virginia 22810; Richard P. Chaffin, Secretary-Treasurer, May Bros., Inc., General Contractors, P.O. Box 165, Forest, Virginia 24551; Stanley C. Feuerberg, General Manager, Northern Virginia Electric Cooperative, P.O. Box 2710, Manassas, Virginia 20108-2710; John E. Moore, Director of Public Works, Town of Herndon, P.O. Box 427, Herndon, Virginia 20172-0427; Louis S. Kiger, F. L. Showalter, Inc., 2900 Fulks Street, P.O. Box 11525, Lynchburg, Virginia 24506-1525; Margaret L. Palmer, Vice President, Guy C. Eavers Excavating Corp., P.O. Box 124, Staunton, Virginia 24402-0124; John Garrett, Engineering Field Supervisor/Utilities Locator, Planning & Engineering Dept., Town of Blacksburg, 300 South Main Street, Blacksburg, Virginia 24060; Frank Boxley, Jr., President, Central & Southwest Virginia Utility Contractors Association, P.O. Box 5772, Roanoke, Virginia 24012; J. David Austin, State Utility Engineer, Department of Transportation, Commonwealth of Virginia, 1401 East Broad Street, Richmond, Virginia 23219-2000; Philip J. Bray, Esquire, The Potomac Edison Company, d/b/a Allegheny Power, 10435 Downsville Pike, Hagerstown, Maryland 21740-1766;

Robert B. Evans, Esquire, Washington Gas Light Company, 1100 H Street, N.W., Washington, D.C. 20080; Stephen T. Theis, Corporate Director of Safety, Health & Environment, Henkels & McCoy, Inc., P.O. Box 950, Blue Bell, Pennsylvania 19422-0900; Michael J. Quinan, Esquire, Woods, Rogers & Hazlegrove, P.L.C., 823 East Main Street, Suite 1200, Richmond, Virginia 23219; Terry St. Clair, Jack St. Clair, Inc., P.O. Box 12961, Roanoke, Virginia 24030; Robert A. Omberg, Esquire, LeClair Ryan, P.C., Innsbrook Corporate Center, 4201 Dominion Boulevard, Suite 200, Glen Allen, Virginia 23060; Richard D. Gary, Esquire, Hunton & Williams, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219-4074; Dennis Showalter, Utiliquest, L.L.C., 4390 Forbes Boulevard, Suite 100, Lanham, Maryland 20726; James B. Wright, Senior Attorney, Sprint, 14111 Capital Boulevard, Wake Forest, North Carolina 27587-5900; Larry G. Conner, Sr., P.E., President, Aaron J. Conner General Contractor, Inc., P.O. Box 6068, Roanoke, Virginia 24017; Charlie C. Crowder, Jr., General Manager, Fairfax County Water Authority, 8570 Executive Park Avenue, P.O. Box 1500, Merrifield, Virginia 22116-0815; M. Daniel Kuhns, Jr., Distribution Superintendent, Newport News Waterworks, 2600 Washington Avenue, Newport News, Virginia 23607; Tim Rioux, Area Manager, UTILX Corporation, 8391 Euclid Avenue, Unit D, Manassas, Virginia 20111; James S. Copenhaver, Senior Attorney, Columbia Gas of Virginia, Inc., P.O. Box 35674, Richmond, Virginia 23235-0674; Marvin McClain, Jr., Director of Quality Management, Utiliquest, L.L.C., 11781 Lee Jackson Highway, Fairfax, Virginia 22033; Diane L. Freeman, Administrative Assistant, Atlas Plumbing & Mechanical, L.L.C., 9095 Owens Court, Manassas Park, Virginia 20111; David R. Conner, President, E. C. Pace Company, Inc., P.O. Box 12685, Roanoke, Virginia 24027; Gary L. Robertson, Utility Director, County of Roanoke Utility Department, 1206 Kessler Mill Road, Salem, Virginia 24153; Diana L. McColgan, Utility Coordinator, Arlington County, Department of Public Works, Engineering Division, #1 Courthouse Plaza, Suite 813, 2100 Clarendon Boulevard, Arlington, Virginia 22201; Ronald L. Willhite, Director, Regulatory Affairs, LG&E Energy Corp., 220 West Main Street, P.O. Box 32030, Louisville, Kentucky 40232; Moe M. Wadda, P.E., Civil Engineer, City of Falls Church, Department of Environmental Services, Harry E. Wells Building, 300 Park Avenue, Falls Church, Virginia 22046-3332; Philip Monger, Director of Public Works, City of Harrisonburg, Water & Sewer Operations Center, 2155 Beery Road, Harrisonburg, Virginia 22801; Ifty Khan, Director, Fairfax County Wastewater Collection Division, 6000 Fred's Oak Road, Burke, Virginia 22015; Roy E. Covington, P.E., Assistant Director of Utilities, Chesterfield County, P.O. Box 40, Chesterfield, Virginia 23832-0040; Dustin L. Harbaugh, Risk Manager, Flippo Construction Company, Inc., General Contractors, 3820 Penn-Belt Place, Forestville, Maryland 20747; Kenneth E. Tawney, Esquire, Columbia Gas Transmission Corp., P.O. Box 1273, Charleston, West Virginia 25325-1273; Jeffrey M. Karp, Esquire, and Heather A. Thomas, Esquire, Swidler Berlin Shereff Friedman, L.L.P., 3000 K Street, N.W., Suite 300, Washington, D.C. 20007; Robert M. Gillespie, Esquire, Christian & Barton, L.L.P., 909 East Main Street, Suite 1200, Richmond, Virginia 23219-3095; Theodore F. Adams, III, Esquire, and Matthew B. Kirsner, Esquire, Mays &

# Final Regulations

Valentine, L.L.P., P.O. Box 1122, Richmond, Virginia 23218; Dale P. Moore, Director of Rates, Regulatory Affairs, and Financial Planning, Roanoke Gas Company, P.O. Box 13007, Roanoke, Virginia 24030; John Berrettini, Accurate Locating, Inc., 1327 Ashton Road, Suite 101, Hanover, Maryland 21076; Danny Hylton, Operations Supervisor, Campbell County Utilities and Service Authority, 20644 Timberlake Road, Lynchburg, Virginia 24502; John R. Kern, Vice President of Operations, General Excavation Inc., 9745 James Madison Highway, Warrenton, Virginia 20187; Jack Watts, Loss Control, Contracting Enterprises Incorporated, P.O. Box 13725, Roanoke, Virginia 24036; and the Commission's Office of General Counsel and Division of Energy Regulation.

PART I.
GENERAL PROVISIONS.

**20 VAC 5-309-10. Purpose.**

These rules delineate procedures used by the State Corporation Commission (commission) to enforce the provisions of Chapter 10.3 (§ 56-265.15 et seq.) of Title 56 of the Code of Virginia, also known as the Underground Utility Damage Prevention Act (Act). *The rules further detail certain standards and requirements for the protection of underground utility lines to facilitate the commission's enforcement of the Act.*

***20 VAC 5-309-15. Definitions.***

*The following words and terms when used in this chapter shall have the following meanings, unless the context clearly indicates otherwise:*

~~"Abandoned utility line" means an underground utility line that is no longer used in connection with storage or conveyance of products listed under the definition of "utility line" in § 56-265.15 of the Code of Virginia and is physically disconnected from the operating system.~~

*"Division" means the State Corporation Commission's Division of Energy Regulation.*

*"Installation records of a utility line" means maps, drawings, diagram, sketches, or any other depictions or descriptions of an underground utility line that reflect the location at the time of installation in a reasonably accurate manner.*

*"Locate" or "marking" means an operator's or its contract locator's markings of an underground utility line.*

*"Serious impact on public health" means any condition involving a water or sewer utility line that creates, or may create, a danger to the health and well-being of the public.*

PART II.
ENFORCEMENT.

**20 VAC 5-309-20. Report of probable violations.**

Any person, as defined in § 56-265.15 of the Code of Virginia, may report probable violations of Chapter 10.3 of Title 56 to the State Corporation Commission, Division of Energy Regulation (division). The reports of probable violations may be submitted to the division in writing, by phone, *fax, e-mail,* or in person. All written reports of probable violations shall include the information requested on SCC Form DPA-1, if available. All probable violations shall be reported to the division within 30 days of a person becoming aware of the circumstances constituting the probable violations.

**20 VAC 5-309-30. Commission staff investigation of probable violations.**

Upon receipt of a report of a probable violation, the Commission staff ("staff") shall conduct an investigation to examine all the relevant facts regarding the reported probable violation. The investigation may include, among other things, records verification, informal meetings, teleconferences, and photo-documentation. *Responses to reports of probable violations may be provided to the division in writing, by phone, fax, e-mail or in person.* Upon completion of the investigation, the staff shall review its findings and recommendations with the Advisory Committee established in accordance with § 56-265.31 of the Act.

**20 VAC 5-309-40. Advisory Committee review of probable violations.**

A. The Advisory Committee (committee), established by the commission, shall meet on a periodic basis to review probable violations of the Act and the staff's findings and recommendations relative to such violations. Upon determination of either the staff or the committee that a violation may have occurred, and that an enforcement action is required, the staff shall take one or more of the following actions:

1. Issue a warning letter to the person alleged to have committed the violation (respondent);

*2. Issue an information letter to a county, city, or town alleged to have committed the violation;*

~~2.~~ *3.* Enter settlement negotiations with the respondent. Upon reaching agreement on settlement terms, the division shall present the proposed settlement to the commission for final acceptance or rejection; or

~~3.~~ *4.* Request the issuance of a "Rule to Show Cause" order pursuant to Rule 4:11 ( [ ~~5 VAC 5-10-230~~ *5 VAC 5-20-90* ] ) of the commission's Rules of Practice and Procedure.

B. In the event that the staff but not the committee recommends enforcement action [ *against a probable violator* ], [ *notwithstanding 20 VAC 5-309-40 A 3,* ] the staff may [ ~~request the commission to issue~~ *not pursue a settlement with the probable violator absent the initiation of* ] a rule to show cause [ ~~to make a final determination regarding any alleged violations of the Act, and shall, as part of its request for enforcement action,~~ *As part of its request for a rule to show cause, staff shall* ] report to the commission the committee's [ ~~recommendation~~ *recommendations* ] and reason or reasons [ ~~therefor~~ *for the committee's recommendations* ].

C. As soon as practicable after its establishment, the committee shall develop and implement a set of bylaws. These bylaws shall delineate the committee's practice and procedures relative to performing the duties assigned by the commission, including the review of probable violations of the Act.

# Final Regulations

D. If deemed necessary, the committee shall establish one or more subcommittees of experts in the operations covered by the Act. These subcommittees shall assist the committee in performing its assigned duties.

**20 VAC 5-309-50. Commission action.**

A. The commission may accept or reject a proposed settlement to resolve probable violations of the Act. If the commission rejects a proposed settlement, a public hearing will be scheduled to receive evidence and take appropriate enforcement action as provided by the commission's Rules of Practice and Procedure *(* [ *5 VAC 5-10-10* 5 VAC 5-20-10 ] *et seq.)*.

B. If the commission finds, after a hearing, that a violation has occurred or is continuing, it may issue a remedial order. The remedial order may direct the party or parties to take any action which is consistent with such party's or parties' obligations under the Act, including the payment of a civil penalty as provided by § 56-265.32 of the Code of Virginia. A remedial order issued by the commission under this section shall be effective upon issuance, in accordance with its terms, unless stayed, suspended, modified or rescinded.

C. If the commission finds that a violation has occurred or is continuing and presents an immediate potential danger to life, health, property, or essential public service, the commission may issue a temporary injunction and schedule a hearing and require the respondent to show cause why it should not be enjoined on account of the alleged violation or violations of the Act.

**20 VAC 5-309-70. Petition for reconsideration.**

Any person subject to an order from the Virginia State Corporation Commission may petition the commission for reconsideration of its order under Rule 8:9 *(* [ *5 VAC 5-10-610* 5 VAC 5-20-220 ] *)* of the commission's Rules of Practice and Procedure.

*PART III.*
*ADMINISTRATIVE RULES.*

*20 VAC 5-309-90. Data request to the division.*

*Upon request, the division shall provide to any person information or documents gathered by the division in the course of the division's investigation of probable violations under the Underground Utility Damage Prevention Act. Such documents or information may include a list of violations and probable violations of the Act, provided that such information or documents have not been determined by the commission or a court of competent jurisdiction to be confidential or privileged.*

[ *PART IV.* III.
*REPORTING PROBABLE VIOLATIONS OF THE ACT BY NONGAS OPERATORS.*

*20 VAC 5-309-100* 90. *Reporting requirements for electric operators.*

*All operators of electric utility lines shall report all probable violations of the Act to the division involving damages*

*impacting affecting 1,000 or more customer meters and/or resulting in injury requiring in patient hospitalization or fatality.*

*20 VAC 5-309-110* 100. *Reporting requirements for telecommunication operators.*

*All operators of telecommunication utility lines shall report all probable violations of the Act to the division involving damages to underground outside facilities affecting 1,000 or more access lines.*

*20 VAC 5-309-120* 110. *Reporting requirements for cable TV and cable TV and telecommunication operators.*

*All operators of cable TV and cable TV and telecommunication utility lines shall report all probable violations of the Act to the division involving damages to underground outside plant facilities impacting affecting 1,000 or more customers.*

*20 VAC 5-309-130* 120. *Reporting requirements for water and or sewer operators.*

*All operators of water and or sewer utility lines shall report all probable violations of the Act to the division involving damages resulting in an injury requiring in-patient hospitalization, fatality, or having a serious impact on public health.* ]

PART *V.* [ *IV.* III. ]
EMERGENCY EXCAVATION OR DEMOLITION.

**20 VAC 5-309-** *140* [ *130* 90 ] **. Emergency excavation or demolition.**

When excavation or demolition is required during an emergency as defined in § 56-265.15 of the Code of Virginia, all reasonable precautions shall be taken to protect underground utility lines that may be located at the site of the excavation. These precautions shall include, but are not limited to, the following:

1. Dispatched personnel or crews responding to the emergency shall notify the notification center and request an emergency locate of the underground utility lines at the earliest reasonable opportunity;

2. After arriving at the site, the person responding to the emergency shall determine the need for immediate action;

3. If immediate action is required, all reasonable precautions shall be taken to protect the underground utility lines. These actions shall include, but are not limited to, the following:

a. Conduct a thorough site assessment to determine the location of underground utility lines;

b. Locate the underground utility lines with acceptable equipment, if possible;

c. Hand dig around the underground utility lines;

d. Directly notify the utility line operators, if necessary; and

# Final Regulations

e. If prudent, the excavator shall wait for marking of the excavation area by operators having utility lines in the excavation area.

*PART V~~I~~. [ ~~V.~~ IV. ]*
*MARKING OF UNDERGROUND UTILITY LINES.*

~~20 VAC 5-309-150.~~ [ ~~Temporary 20 VAC 5-309-140~~ 20 VAC 5-309-100 ] . *Marking of underground utility lines.*

All ~~temporary~~ markings shall, at a minimum, conform with the requirements of this ~~article~~ part.

[ ~~20 VAC 5-309-160 150~~ 20 VAC 5-309-110 ] . *General marking requirements.*

A. All markings shall be suitable for their intended purpose for a period of 15 working days from the time of notification by the excavator to the notification center.

B. Markings shall be made at sufficient intervals to clearly indicate the approximate horizontal location and direction of the underground utility line. However, the distance between any two marks indicating the same utility line shall not exceed 20 feet. Site conditions or directional changes of the underground utility line shall be considered to determine the need for shorter distance between marks.

C. Markings of underground utility lines shall be by means of stakes, paint, flags, or combination thereof. The terrain, site conditions, and the type and extent of the proposed excavation shall be considered to determine the most suitable means to mark underground utility lines.

D. Paint marks shall be approximately 8 to 10 inches in length and one to two inches in width except when "spot" marking is necessary.

E. A minimum of three separate marks shall be made for each underground utility line marking.

F. ~~All~~ Valve box covers that are at grade and visible shall be marked with the appropriate color in accordance with the Act.

G. If in the process of marking an underground utility line, a customer-owned underground utility line of the same type is discovered, the operator or its contract locator shall make ~~every~~ a reasonable effort to contact the excavator or the customer to advise ~~him~~ of the presence of the line.

H. Where the proposed excavation crosses an underground utility line, markings shall be at intervals that clearly define the route of the underground line.

I. All markings shall extend ~~at least 10 feet,~~ if practical, a reasonable distance beyond the boundaries of the specific location of the proposed work as detailed on the ticket.

~~J. In an area designated as a historic location, stakes or flags with appropriate color coding shall be used instead of paint, to the extent practical.~~

~~K.~~ J. If the use of line marking ~~would be~~ is considered damaging to property (driveways, landscaping, historic locations to the extent boundaries are known), "spot" marking or other suitable marking methods shall be used.

~~L.~~ K. Markings shall be valid for an excavation site for 15 days from the time of notification by the excavator or until one of the following events occurs:

1. The markings become faded, illegible or destroyed; or

2. If the markings were placed in response to an emergency and the emergency condition ~~no longer exists~~ has ceased to exist.

~~M.~~ L. Where permitted by the operator's records, all utility lines of the same type in the same trench owned by the same operator shall be marked individually or by a single mark. If a single mark is used, the number of the utility lines shall be indicated at every other mark.

~~N.~~ M. Operators or their contract locators shall use all ~~available~~ information~~, including but not limited to the installation records of utility lines,~~ necessary to mark their facilities accurately.

~~O.~~ N. Markings of an underground pipeline greater than 12 inches in nominal outside dimension shall include the size in inches at every other mark.

~~P.~~ O. Duct structures and conduit systems shall be marked in accordance with the horizontal marking symbols for such structures and conduit systems set out in the National Utility Locating Contractor's Association's (NULCA's) standards.

~~Q.~~ P. In areas where marks would be destroyed, offset markings shall be made using horizontal marking symbols by NULCA's marking standards.

*PART V~~II~~. [ ~~VI.~~ V. ]*
*SUPPLEMENTAL RULES, ETC.*

[ ~~20 VAC 5-309-170 160~~ 20 VAC 5-309-120 ] . *Clear evidence.*

"Clear evidence" as used in § 56-265.24 C of the Code of Virginia shall include, but is not limited to, visual evidence of an unmarked utility line, knowledge of the presence of a utility line, or faded marks from previous marking of a utility line.

[ ~~20 VAC 5-309-180 170~~ 20 VAC 5-309-130 ] . *Notification center data update.*

Every operator required by § 56-265.16:1 A of the Code of Virginia to join the notification center shall provide ~~an update of the data relative to the operators' utility lines~~ to the notification center data that will allow proper notification to the operator of excavation near the operator's utility lines. This data shall be provided as soon as possible, but no later than 15 days after ~~a utility line is installed~~ an operator installs or acquires underground facilities it had not previously identified to the notification center. In the case of sanitary sewers, the data shall be provided no later than 15 days after the utility line is accepted by the operator.

[ ~~20 VAC 5-309-190 180~~ 20 VAC 5-309-140 ] . *Excavator's responsibilities to avoid damage, dislocating or disturbances of utility lines.*

Any person excavating around underground utility lines shall take all reasonable steps to protect such utility lines. These steps shall include, but are not limited to, the following:

# Final Regulations

*1. The excavator shall plan the excavation in such a manner to avoid damage to, and minimize interference with, underground utility lines in and near the construction area;*

*2. The excavator shall maintain a reasonable clearance, to include the width of the utility line, if known, plus 24 inches, between the marked or staked location of an underground utility line and the cutting edge or point of any mechanized equipment, considering the known limit of control of the cutting edge or point to avoid damage to the utility line; and*

*3. The excavator shall provide proper support for underground utility lines during excavation activities. During backfill operations, the excavator shall use ~~proper~~ the same or similar backfill material that was originally around the utility line, ensure there is proper compaction around the utility line, ~~and~~ protect all ~~utility warning tapes and~~ tracer wires, and protect or replace warning tapes.*

**[ ~~20 VAC 5-309-200 190~~ 20 VAC 5-309-150 ] . Requirement for trenchless excavation.**

*Any person conducting trenchless excavation shall take all reasonable steps necessary to protect and support underground utility lines. These steps shall include, but are not limited to the following:*

*1. The excavator should verify that all utility lines in the area are marked;*

*2. The excavator shall ensure that bore equipment stakes are installed at a safe distance from marked utility lines;*

*3. When grounding rods are used, the excavator shall ensure that they are installed at a safe distance (at least 24 inches plus the width of the utility line, if known) away from the marked or staked location of utility lines;*

*4. The excavator shall ensure sufficient clearance is maintained between the bore path and any underground utility lines during pullback;*

*5. The excavator shall give special consideration to water and sewer systems within the area that cannot be located accurately;*

*6. Unless prohibited by other laws, ordinances, regulations, or rules of governmental and regulatory authorities having jurisdiction, the excavator shall expose all utility lines which will be in the bore path by hand digging to establish the underground utility line's location prior to commencing bore. For a parallel type bore, unless prohibited by other laws, ordinances, regulations, or rules of governmental and regulatory authorities having jurisdiction, the excavator shall expose the utility line by hand digging at reasonable distances along the bore path;*

*7. The excavator shall ensure the drill head locating device is functioning properly and within its specification;*

*8. The excavator shall visually check the drill head as it passes through potholes, entrances, and exit pits; and*

*9. If the depth indicated by the locating device is lower than the bottom of the pothole or pit, the excavator shall cease boring until the hole/pit can be hand excavated further to maintain a visual inspection of the drill head.*

**[ ~~20 VAC 5-309-210 200~~ 20 VAC 5-309-160 ] . Operator's responsibilities to maintain accurate records.**

~~For all new underground utility lines, excluding electric, phone, cable TV, water and sewer service lines, installed after July 1, 2001,~~ *The operator shall prepare and maintain reasonably accurate installation records of the underground utility* ~~line. These records shall indicate if all or a portion of the utility line has been abandoned~~ *lines installed after July 1, 2001, other than electric, telecommunications, cable TV, water, and sewer underground service lines connected to a single family dwelling unit.*

**[ ~~20 VAC 5-309-220 210~~ 20 VAC 5-309-170 ] . Responsibility to protect and preserve marking.**

*Every excavator ~~should~~ shall be responsible to reasonably protect and preserve markings from the time the excavator begins work until markings are no longer required for the proper and safe excavation near the utility line.*

**[ ~~20 VAC 5-309-230 220~~ 20 VAC 5-309-180 ] . Excavator site inspection.**

*Prior to excavation, excavators shall verify they are at the correct location and shall verify locate markings and, to the best of their ability, check for unmarked utility lines. If unmarked utility lines are identified, the excavator shall comply with the requirements of § 56-265.24 C of the Code of Virginia.*

VA.R. Doc. No. R00-211; Filed April 25, 2001, 4:14 p.m.

◆ ━━━━━━━━━━━━━ ◆

# TITLE 22.  SOCIAL SERVICES

## STATE BOARD OF SOCIAL SERVICES

<u>Title of Regulation:</u>  **22 VAC 40-230-10 et seq.  Agency Placement Adoptions - Preplacement Services (REPEALED).**

<u>Statutory Authority:</u>  § 63.1-25 of the Code of Virginia.

<u>Effective Date:</u>  June 20, 2001.

<u>Summary:</u>

*This regulation required the development of an adoption placement plan when adoption was selected as the goal for a child in foster care.  The regulation was redundant with existing state and federal law and, therefore, is repealed.*

<u>Summary of Public Comment and Agency's Response:</u>  No public comments were received by the promulgating agency.

<u>Agency Contact:</u>  Brenda Kerr, Department of Social Services, 730 East Broad Street, Richmond, VA 23219-1849, telephone (804) 692-1273.

VA.R. Doc. No. R99-234; Filed May 1, 2001, 1:52 p.m.

* * * * * * * *

# Final Regulations

Title of Regulation:  **22 VAC 40-480-10 et seq.  Relocation Assistance General Relief Program (REPEALED).**

Statutory Authority:  §§ 63.1-25 and 63.1-106 of the Code of Virginia.

Effective Date: June 20, 2001.

Summary:

*The Board of Social Services determined that this regulation was no longer needed and therefore repealed the relocation assistance component of the general relief program since a use history indicated that only one local agency had used the component in the last five years.*

Summary of Public Comment and Agency's Response:  No public comments were received by the promulgating agency.

Agency Contact:  Richard Martin, Department of Social Services, 730 East Broad Street, Richmond, VA 23219, telephone (804) 692-1825.

VA.R. Doc. No. R99-237; Filed May 1, 2001, 1:52 p.m.

**\* \* \* \* \* \* \* \***

Title of Regulation:  **22 VAC 40-690-10 et seq.  Virginia Child Care Provider Scholarship Program (formerly Child Day Care Care Scholarship Programs) (amending 22 VAC 40-690-10, 22 VAC 40-690-20, 22 VAC 40-690-30, 22 VAC 40-690-40, and 22 VAC 40-690-60; adding 22 VAC 40-690-15, 22 VAC 40-690-35, 22 VAC 40-690-55, and 22 VAC 40-690-65; repealing 22 VAC 40-690-50 and 22 VAC 40-690-70).**

Statutory Authority:  § 63.1-25 of the Code of Virginia.

Effective Date:  September 1, 2001.

Summary:

*The regulation has been amended to accurately reflect the current scholarship program. The regulation originally was written for the administration of two scholarship programs. The Child Development Associate (CDA) Credential scholarship program was discontinued in 1995. The other scholarship program is the college tuition program and this program currently exists.  The current regulation only addresses scholarships for courses taken at the community colleges; this amended regulation addresses scholarships for courses taken at all Virginia public institutions of higher learning and Virginia private colleges and universities.*

*Two areas have been substantively changed since the proposed action was published.  Program eligibility and course subject areas have been expanded.  The final regulation allows all persons employed in child care programs in Virginia to be eligible to participate in the program.  It also allows the additional subject areas of child care administration and child care provider preparation and developmental courses to be included in the list of approved courses.*

Summary of Public Comments and Agency' Response:  A summary of comments made by the public and the agency's response may be obtained from the promulgating agency or viewed at the office of the Registrar of Regulations.

Agency Contact:  Copies of the regulation may be obtained from Rhonda Harrell, Department of Social Services, 730 East Broad Street, 7th Floor, Richmond, VA 23219, telephone (804) 692-1775.

CHAPTER 690.
*VIRGINIA* CHILD ~~DAY~~ CARE *PROVIDER* SCHOLARSHIP ~~PROGRAMS~~ *PROGRAM.*

PART I.
~~INTRODUCTION.~~ *GENERAL PROVISIONS.*

**22 VAC 40-690-10.  Definitions.**

The following words and terms~~,~~ when used in this chapter~~,~~ shall have the following meanings, unless the context clearly indicates otherwise.

*"Applicant"* means any individual who is applying for a ~~Child Development Associate Credential~~ *scholarship for college tuition.*

~~*"Career Studies Certificate in Early Childhood"* means a certificate program offered by an accredited two-year college in the area of early childhood development. The specific course work for the certificate is determined by the college, but should include at least 12 semester hours of course work.~~

~~*"CDA"* means the abbreviation for Child Development Associate.~~

~~*"Child Development Associate (CDA) credential"* means the competency-based national credential awarded to individuals who work with children ages five and under. A CDA credential can be earned in three settings (center-based, family-day care, and home visitor) and with two age groups (0 through 36 months and three through five years old). In addition, a bilingual specialization can be obtained. The credential is valid for three years and can be renewed for five-year periods.~~

~~*"Competency areas"* means the areas of child care in which the CDA candidate must demonstrate competency.~~

~~*"Council for Early Childhood Professional Recognition"* means the subsidiary of the National Association for the Education of Young Children which is responsible for the issuance of the CDA credential.~~

~~*"Evaluation process"* means the CDA requirement that the candidate document and demonstrate skill in the above-referenced competency areas while working with young children.~~

~~*"Family unit"* means persons residing within the same household.~~

~~*"Foundation course"* means the course CHD 120 taught by the community colleges.~~

~~*"Income eligibility"* means that applicants meet the current federal or state criteria for eligibility based on income.~~

~~*"Preapproved"* means that a candidate for a CDA credential has been approved for award of CDA registration and assessment fees prior to requesting disbursement of funds to the Council for Early Childhood Professional Recognition.~~

# Final Regulations

~~"Registration and assessment fees" means the amount charged by the Council for Early Childhood Professional Recognition for registration and assessment in the Child Development Associate Credential Program.~~

~~"State approved program" means licensed child care centers, group family day care homes, and family day care systems, religiously exempt child care facilities, and family day care homes approved or registered by local social services agencies or community agencies approved by the Department of Social Services.~~

"Child care program" means a regularly operating service arrangement for children where, during the absence of a parent or guardian, a person or organization has agreed to assume responsibility for the supervision, protection, and well-being of a child under the age of 13 for less than a 24-hour period. Child care includes care provided in the child's own home as well as care provided outside of the child's home in settings such as a private home, child care center, school, camp, recreational facility, or religious organization.

"Child care provider" means a person who is currently employed or plans to work in a child care program.

"Colleges and universities" means those Virginia based public and private accredited institutions of higher learning approved by the State Council of Higher Education for Virginia. This includes all in-state accredited Virginia public colleges, universities, two-year colleges, and community colleges; and all accredited Virginia private not-for-profit and private for-profit colleges and universities.

"Course" means any [ undergraduate ] class [ ~~at the foundation level in the areas of child care or child development of children from~~ that focuses on preparing students to be child care providers. The courses shall focus on children between ] birth [ ~~through age~~ and ] 12 [ years of age, and be in the subject areas of care or development of children, the administration of child care programs, or basic language, math, and sciences skills needed to promote growth and development in children. The courses shall be approved by the department and ] taught by Virginia's public or private colleges and universities [ ~~that has been approved by the department~~ ].

"Department" means the Virginia Department of Social Services.

## 22 VAC 40-690-15.  Purpose and intent.

The purpose of the Virginia Child Care Provider Scholarship Program is to provide tuition assistance to child care providers. The intent of the program is to provide child care providers with a foundation in child care and child development. The anticipated benefit of an increased knowledge and skills base [ ~~of~~ for ] child care providers will be an improved level of care provided to Virginia's children.

PART II.
ADMINISTRATIVE PROCEDURES.
~~Article 1.~~
~~Application and Selection.~~

## 22 VAC 40-690-20.  Application *process.*

A. *All persons interested in obtaining a* scholarship ~~applicants~~ must submit a scholarship application form~~, available from the Division of Licensing Programs,~~ to the ~~Division of Licensing Programs~~ *Virginia Department of Social Services.*

*Note:    Applications are available through the Virginia Department of Social Services.*

B. A separate application must be ~~filled out~~ *submitted* for each ~~scholarship award applied for, i.e., for the foundation course, other courses applicable to the career studies certificate program, and the registration and assessment award semester.~~

~~C. A Certificate of Income Verification, also available from the Division of Licensing Programs, must be included as part of the first application.~~

~~D. Applicants must be domiciled in Virginia and currently working in a child care program which meets the eligibility requirements of the granting agency. Preference will be given to applicants who have worked in a child care setting for at least three months before the course begins.~~

~~E. Applicants must indicate which community college they plan to attend. If the applicant wishes to attend another institution of higher learning, tuition will be paid up to the amount currently charged for the same course in the community college system.~~

~~F. Applications must be~~ *C. Only complete applications, both initial and resubmitted,* received ~~at least one month prior to~~ *by* the ~~beginning of a course for full consideration~~ *deadline indicated on the application shall be considered.* ~~Applications received after this date may be funded if moneys are available.~~

~~G. Applicants will be notified by telephone of incomplete applications.~~

*D. Applicants shall verify that the selected courses are being offered by the selected college or university for the applicable semester prior to applying for scholarships.*

*E. The selection of courses or colleges and universities may not be changed once the scholarship has been awarded unless the selected class is full or has been cancelled.*

## 22 VAC 40-690-30.  Selection [ *and eligibility* ].

*A.* Applications will be processed and scholarships awarded in order of date received~~, with the following exceptions:~~ *until all available funds designated for the semester have been obligated or the application deadline has occurred, whichever comes first.*

~~1. Preference will be given to persons who wish to take the foundation course (CHD 120);~~

# Final Regulations

2. Preference will be given to persons indicating an intent to obtain the CDA;

3. To the extent possible, scholarships will be awarded to reflect the general diversity of child care providers considering such factors as rural or urban and profit or nonprofit settings and the various types of child care providers (center based, family day care, and home visitor); or

4. To the extent possible after the above three considerations are met, scholarships will be awarded in proportion to the concentration of child day care programs within the geographic areas served by the various community colleges.

Article 2.
Disbursement of Funds.

B. In order for an applicant to be eligible for a scholarship, he must meet all of the following criteria. The applicant must:

1. Be [ one of the following: ]

[ a. An employee of a child care program located in Virginia; or ]

[ b. ] Domiciled in Virginia as defined in § 23-7.4 of the Code of Virginia [ as determined by the institution's domicile officer or other qualified person; and (i) employed in a child care program outside of Virginia or (ii) have declared an intent to become employed in child care.

2. Be employed in or plan to work in a child care program; ]

[ 3. 2. ] Select a department-approved course for which he has not previously received scholarship funds; and

[ 4. 3. ] Have no more than three occurrences of the following for courses for which the applicant received a Virginia Child Care Provider Scholarship:

a. Did not register for the course after receiving an award;

b. Did not complete the course and received a grade of "W" for withdrawal; or

c. Did not receive a passing grade.

C. An applicant does not have to be enrolled in or have already taken a course in early childhood education or a related major to be eligible for a scholarship.

D. Scholarships will only be awarded if the department has adequate information to process scholarship requests. The department must have received final course grades and payment information on courses that have been previously approved for scholarships. In addition, scholarships will be awarded on a conditional basis for those persons who are [ approved to be currently enrolled in one or more courses paid for by scholarship funds and who are ] in jeopardy of becoming ineligible to receive a scholarship as specified in subdivision B [ 4 3 ] of this section. In these instances, the department will review enrollment and grade information when provided by the institution for the current enrollment

period and if the applicant is in compliance with subdivision B [ 4 3 ] of this section, the scholarship will be fully awarded.

E. The scholarship will only pay tuition and the technology fee for each course. [ Public institutions will only be reimbursed at the in-state rates. ]

F. Applicants shall not receive scholarships for more than two courses per semester.

G. Scholarships shall not be transferred between semesters or individuals.

H. Scholarships are awarded only for courses approved by the department. The department will determine whether a course [ qualifies as a foundation level course in the areas of child care or child development meets the definition of a "course" as defined in 22 VAC 40-690-10 ].

I. Recipients may receive a total lifetime award of no more than eight community college courses or their monetary equivalent.

J. A recipient may use scholarship funds to attend any combination of Virginia [ community colleges, public two-year colleges, or ] public or private [ accredited two-year or ] four-year institutions over [ a period of ] time.

K. All applicants will be notified in writing regarding the acceptance or denial of their application.

**22 VAC 40-690-35. Appeal process.**

A. Any person denied a scholarship who believes the denial was contrary to law or regulations may request an informal conference, as provided for by § 9-6.14:11 of the Code of Virginia, with the designee of the Commissioner, by filing a written Notice of Appeal with the department within 33 days of the [ date on the ] denial letter. The Notice of Appeal must be received by the department within the 33-day time period. The decision of the informal conference shall constitute a final agency case decision and shall be appealable as provided for in Article 4 (§ 9-6.14:15 et seq.) of Chapter 1.1:1 of Title 9 of the Code of Virginia. The informal conference may be conducted by telephone if both parties consent.

B. No person shall have a right to appeal any denial due to lack of scholarship funds, untimely application, or incomplete application.

**22 VAC 40-690-40. ~~Community~~ College ~~scholarships~~ and university agreements.**

A. ~~Community colleges or other accredited institutions of higher learning~~ Colleges and universities will be notified in writing when scholarships are awarded to applicants ~~in their regions~~ planning to attend their institutions.

B. ~~When scholarship holders have enrolled and attended the first class, the community college or accredited institution of higher learning may bill the Division of Licensing Programs for tuition, using an Interagency Transfer or invoice.~~ The department shall enter into a written agreement with all colleges and universities that ordinarily have five or more students per semester using scholarship funds regarding the operation of the scholarship program. The agreement shall address the areas of, but not [ be ] limited to, verification of

# Final Regulations

*Virginia residency, billing procedures, and provision of final course grades. Specifically, these institutions shall:*

*1. [ ~~Only accept a scholarship from a person who is determined to be~~ Determine whether applicants that are not employed in child care programs located in Virginia are ] domiciled in Virginia as defined in § 23-7.4 of the Code of Virginia [ and provide the department with verification of such ];*

*[ 2. Provide the department each semester, but no later than at the time of billing, with the tuition rate category of each person for which the institution plans to bill or is billing the scholarship program. ]*

*[ ~~2.~~ 3. ] Submit one bill to the department per institution per semester after the college or university's published add/drop period has occurred. Colleges and universities shall submit a request for payment prior to the end of the semester for which the scholarship was awarded. Such request must be in a department-approved format; and*

*[ ~~3.~~ 4. ] Provide the department with final course grades for classes paid for by the scholarship program within one month following the end of each semester.*

*C. ~~If a scholarship holder withdraws from the class, the community college or accredited institution of higher learning will reimburse the Division of Licensing Programs as provided in college procedures and policies.~~ All other eligible Virginia public and private colleges and universities may enter into an agreement as outlined in subsection B of this section or place the responsibility on the student to seek reimbursement from the department.*

## 22 VAC 40-690-50.   ~~CDA registration and assessment scholarship.~~ *(Repealed.)*

~~A. Two months prior to applying for assessment, the CDA candidate, who must have been preapproved for this scholarship, must notify the Division of Licensing Programs of their intent to be assessed by sending the CDA assessment request form to the Division of Licensing Programs.~~

~~B. Upon the preapproved candidate's notification of intent to be assessed, the division will prepare a check for the full amount of registration and assessment fees and send it to the Council for Early Childhood Professional Recognition with the CDA assessment request form.~~

Article 3.
Maintenance of Statistical Information.

## 22 VAC 40-690-55.  Disbursement of funds.

*Funds will be disbursed to the colleges and universities upon receipt of an Interagency Transfer (IAT) or invoice in accordance with the Commonwealth Accounting Policies and Procedures. In the event that the department does not have a written agreement with a college or university, the funds will be disbursed to the recipient upon [ ~~verification of Virginia residency,~~ ] proof of tuition payment and [ ~~proof of~~ ] course enrollment through the end of the college's or university's published add/drop period.*

## 22 VAC 40-690-60.   ~~Wage~~ *Gathering and maintaining information.*

~~Current hourly wage information will be requested in writing from those individuals successfully obtaining the CDA credential:~~

~~1. At the time they request disbursement of funds to the Council for Early Childhood Professional Recognition;~~

~~2. One year later; and~~

~~3. Two years later.~~

*A. The department will maintain identifying, employment, and educational information on all applicants for a minimum of five years. This information will be obtained from the applications and subsequent information submitted by the colleges or universities or recipients as requested.*

*B. Additional information may be requested of any applicant receiving a scholarship as the department deems necessary to carry out its accountability functions.*

## 22 VAC 40-690-65.  Recipient responsibilities.

*A. A recipient must submit final course grades for classes paid by the Virginia Child Care [ Provider ] Scholarship Program to the department within one month of completion of the course unless the college or university does so.*

*Note: All colleges and universities are requested to provide final course grades to the department for the classes paid by the scholarship program as outlined in 22 VAC 40-690-40 B [ ~~3~~ 4 ]. Grades will be used to determine eligibility as outlined in 22 VAC 40-690-30 B [ ~~4 of this regulation~~ 3 ].*

*B. By accepting the award, the recipient agrees to participate in any surveys conducted by the department regarding the scholarship program and comply with any requests for additional information as stated in 22 VAC 40-690-60.*

*C. The recipient is responsible for all expenses related to taking the courses with the exception of the amount of the award which only pays for tuition and the technology fee. [ ~~Awards~~ The total lifetime award ] will pay [ ~~for~~ ] the entire [ ~~amount of the in-state~~ ] tuition [ ~~rate~~ ] and technology fee [ for eight courses ] at the community colleges [ at the in-state tuition rate ]. Recipients who attend other types of institutions [ ~~may~~ or are not eligible for in-state tuition rates shall ] be required to pay [ ~~a portion of their~~ any additional ] tuition and technology fees [ ~~for the amount~~ ] that [ ~~exceeds~~ exceed ] the total lifetime award. Additional expenses for all recipients include, but are not limited to, other college or university fees, books, transportation, and child care.*

## 22 VAC 40-690-70.   ~~Additional statistical information.~~ *(Repealed.)*

~~Other statistical information may be requested of any applicant receiving a scholarship from this program.~~

NOTICE: The forms used in administering 22 VAC 40-690-10 et seq., Virginia Child Care Provider Scholarship Program, are listed below. Any amended or added forms are reflected in the listing and are published following the listing.

## Final Regulations

Virginia Child Care Provider Scholarship Program Application
Form, *Form # 032-05-032/4 (rev. 2/01).*

~~Virginia Child Care Provider Scholarship Program Certificate
of Income.~~

## Final Regulations

# OVERVIEW OF THE
# VIRGINIA CHILD CARE PROVIDER
# SCHOLARSHIP PROGRAM

### What is the scholarship program?

The Virginia Child Care Provider Scholarship Program provides tuition assistance to "domiciled residents" who are employed in child care or who plan to enter the field of child care and want to attend courses in child care and child development taught at Virginia's institutions of higher learning. The purpose of the scholarship program is to provide child care providers with a foundation in child care and child development. The scholarship program is funded through the Child Care and Development Fund which is financed through federal funding. Approved courses may be used toward obtaining such achievements as a *Career Studies Certificate in Early Childhood Education*, a *Career Studies Certificate in School-Age Child Care Education*, an *Advanced Career Studies Certificate in Early Childhood Education*, and an *Associates Degree in Early Childhood Education*.

### How does the scholarship program operate?

#### Application Process

- **Application Periods.** Scholarship applications must be submitted during the appropriate application period. Application periods are: fall semesters: June 15 – August 31, spring semesters: October 1 – December 15, and summer semesters: March 15 – May 15. Applications received outside these periods will not be processed.

- **Process Order.** All awards will be made on a first come, first served basis to those applicants who submit completed applications and meet program eligibility requirements.

- **Notification.** If you are awarded a scholarship, you will be notified by mail. We will notify your institution that you have been awarded a scholarship. Duplicate award letters will not be provided. Thus, it is essential that you maintain the award letter for at least one year.

#### Establishing and Maintaining Eligibility

- **Residency.** The program is only available to Virginia "domiciled residents." You must be determined a Virginia "domiciled resident" by your college/university to be eligible for a scholarship.

#### Courses and Institutions

- **Course approval.** The scholarship only pays for courses that have been approved by the Virginia Department of Social Services and are taught at Virginia's public and private colleges and universities.

- **Selection.** The selection of course and college may not be changed once the scholarship has been awarded unless the course was canceled or is filled. This office must be contacted prior to making any substitutions for a course that was canceled or is filled.

- **Institutions.** You may attend various institutions using scholarships funds. You are not limited to attending only one institution for all courses paid with scholarship funds.

#### Awards

- **Limitations.** The scholarship is good only for the semester for which it was awarded and to the person to whom it was awarded.

- **Amount.** The scholarship award is $115.86. That amount may be applied to the cost of in-state tuition and the technology fee for any Department approved course taught at a Virginia institution of higher learning. This amount will cover the entire amount of tuition and the technology fee for a community college three-hour course. Any additional fees, tuition, or expenses will be the responsibility of the recipient. Most fees will be the student's responsibility.

- **Maximum Benefits.** The scholarship will pay for a maximum of two courses per semester and a maximum lifetime award of eight courses.

#### Billing

- **Limitations.** Funds can only be used to pay for a course one time. If you cannot use the scholarship for the designated semester, either do not enroll or withdraw prior to the end of the institution's published add/drop period to prevent the Department from being billed. It is very important that you follow registration and withdrawal policies of the college/university.

- **Payee.** Payment will either be made to the student or college/university. Currently, payments for all students attending community colleges are made to the colleges. The Department is billed for all students who enroll and do not withdraw prior to the closing of the institution's published add/drop period. Any other college or university may bill this Department. For those institutions that do not have an agreement with the Department, it may be necessary for the student to pay for the course and then request reimbursement from the Department.

## Final Regulations

### Additional Responsibilities

- **Final Course Grades.** Final course grades for all courses paid with scholarship funds must be provided to the Virginia Department of Social Services within one month of the end of the semester. Institutions have been requested to provide this information to the Department. However, if we do not receive your grade, it will be your responsibility to submit it as part of the terms for receiving a scholarship and in order to be eligible for subsequent scholarships.

- **Additional Information.** Recipients are expected to provide any additional information requested by the Department to carry out program accountability functions.

### Applications

An application can be obtained by: (1) calling the Scholarship Program Hotline at 1-866-636-1608 or in Richmond 225-3110 or (2) using the Department of Social Services' website: www.dss.state.va.us and clicking on "child day care" and selecting "forms and applications."



### DIRECTIONS FOR COMPLETING THE APPLICATION

- Please type or print clearly. Applications will only be considered if complete and readable. Incomplete or illegible applications will not be processed and will be returned.
- Before mailing the application, you MUST contact the Virginia college/university that you plan to attend so that they can verify that you are "domiciled" in Virginia AND to determine if the course(s) you have selected will be offered during the semester that you are requesting a scholarship. You must also confirm your college's registration dates and class start dates. If you are requesting a scholarship for two courses, you have the option of attending two different institutions.
- Only mail in one scholarship application per semester. All questions **must** be answered and the application signed for the application to be considered.
- This form is **only** for those persons interested in attending Virginia's public and private colleges and universities. Scholarship funds can not be used to attend any other type of institution or organization.
- **RETURN COMPLETED APPLICATION TO:** Ms. Charlene Harris, Virginia Child Care Provider Scholarship Program, Virginia Department of Social Services, Division of Licensing Programs, 730 East Broad Street, 7th Floor, Richmond, Virginia 23219-1849. **Faxed or e-mailed applications will not be accepted.**
- Applications should be submitted according to the following schedule: **March 15 – May 15 for summer semesters, June 15 – August 31 for fall semesters, and October 1 – December 15 for spring semesters.** In order for an application to be considered, it must be received by the Scholarship Program or postmarked no later than **May 15 for summer semester, August 31 for fall semester, and December 15 for spring semester.**
- It is suggested that you retain a copy of your completed application for your records.

### INQUIRIES ABOUT THE STATUS OF YOUR APPLICATION

Most applications are processed within five days of receipt which means that you should receive your notification within 14 days of mailing your application. We ask that you allow a minimum of 14 days from the date you mailed the application form before contacting us. This will help expedite the application process for everyone. Should you need to reach us, please contact us at 1-866-636-1608 or in Richmond 225-3110.



## Final Regulations

# VIRGINIA CHILD CARE PROVIDER SCHOLARSHIP PROGRAM
# APPLICATION FORM TO ATTEND
# VIRGINIA'S PUBLIC AND PRIVATE COLLEGES AND UNIVERSITIES

An application will only be considered if all questions are answered and it is received by the Virginia Child Care Provider Scholarship Program or postmarked no later than May 15 for summer semester, August 31 for fall semester, and December 15 for spring semester.

## PART 1

**1. Indicate the period for which you are requesting a scholarship.** Check the semester and fill in the year.
- ☐ FALL 20___
- ☐ SPRING 20___
- ☐ SUMMER 20___

**2. Personal Information**

Full Legal Name: _____

Daytime Telephone: (____) _____

Social Security Number: _____

Home Address: _____

_____

ZIP _____ Telephone:(____) _____

Have you ever applied for a scholarship beginning with Spring 1999 semester? ____ yes ____ no

**3. Employment Information**

**I.  All applicants must complete this section**

Please indicate type of facility where you are employed:
- ☐ Licensed Child Day Center
- ☐ Religious Exempt Child Day Center
- ☐ Licensed Family Day Home
- ☐ Voluntary Registered Family Day Home
- ☐ Local DSS Approved Family Day Home
- ☐ Other _____
- ☐ Not Currently Working in Child Care

**II.  Only complete if you are currently employed in child care**

**a.  How long have you worked in child care?**

____ weeks ____ months ____ years

**b. Name, address, and telephone number of center/home at which you work:**

Name: _____

Address: _____

Zip _____ Telephone:(____) _____

**4. COMPLETE THIS SECTION IF YOU ARE PLANNING TO ATTEND A PUBLIC COMMUNITY COLLEGE.**

**A.  Course Selection**

Check the course(s) you are applying for. (You may select up to two courses)
- ☐ Methods & Materials in the Language Arts for Children (CHD118)
- ☐ Introduction to Early Childhood Education or Foundation Course (CHD 120)
- ☐ Creative Activities (CHD 125/145)
- ☐ Methods & Materials for Developing Science & Mathematical Concepts in Children (CHD 126/146)
- ☐ Guiding Behavior (CHD 205)
- ☐ Introduction to Exceptional Children (CHD 210)
- ☐ Child Health & Nutrition (HLT 135/EDU 235)

**4.A. Course Selection (continued)**
- ☐ Child Care Psychology (PSY 135) or Child Psychology (PSY 235)
- ☐ Introduction to School-Age Child Care (CHD 220)
- ☐ Curriculum Development for School-Age Child Care (CHD 225)
- ☐ Behavior Management for School-Age Child Care (CHD 230)
- ☐ Health and Recreation for School-Age Child Care (CHD 235)

**B.    College Selection**

Check the institution you plan to attend:

NOTE: If you want to request scholarships for two courses at two different institutions for this semester, please check both institutions and write each course number by the appropriate college.

### PUBLIC: COMMUNITY COLLEGES
- ☐ Blue Ridge Community College
- ☐ Central Virginia Community College
- ☐ Dabney S. Lancaster Community College
- ☐ Danville Community College
- ☐ Eastern Shore Community College
- ☐ Germanna Community College
- ☐ J. Sargeant Reynolds Community College
- ☐ John Tyler Community College
- ☐ Lord Fairfax Community College
- ☐ Mountain Empire Community College
- ☐ New River Community College
- ☐ Northern Virginia Community College
- ☐ Patrick Henry Community College
- ☐ Paul D. Camp Community College
- ☐ Piedmont Virginia Community College
- ☐ Rappahannock Community College
- ☐ Southside Virginia Community College
- ☐ Southwest Virginia Community College
- ☐ Thomas Nelson Community College
- ☐ Tidewater Community College
- ☐ Virginia Highlands Community College
- ☐ Virginia Western Community College
- ☐ Wytheville Community College

**5.    Please read and sign the statement below.**
My signature declares under penalty of perjury that all information provided is complete and true. I give my permission for the college/university to release my grade(s) to the Virginia Department of Social Services. I agree to participant in providing any additional information to the Virginia Department of Social Services that is required of scholarship recipients.

_____
Signature

Date: _____

NOTE:  If you are interested in attending a Virginia public college/university other than a community college or a Virginia private college, you must complete page 2.  All applicants must submit pages 3 & 4.

OVER →

# Final Regulations

**6. COMPLETE THIS SECTION IF YOU ARE PLANNING TO ATTEND A PRIVATE OR PUBLIC COLLEGE OR UNIVERSITY OTHER THAN A COMMUNITY COLLEGE.**

**A. Course Selection**
Below provide the title and number of the course(s) you are requesting a scholarship for and the equivalent community college course(s) listed in #4.A of this application. (You may select up to two courses.) A course will only be approved if it is comparable to an approved community college course. You **must** submit a course description for the course(s) for which you are requesting a scholarship.

**Requested course title and number :**

Course 1: _____

Course 2: _____

**Equivalent community college course title or number:**

Course 1: _____

Course 2: _____

Please attach a copy of a college/university document such as the catalog or registration information that contains a course description for the course(s) for which you are requesting a scholarship.

Requested course description attached ___ yes ___ no

**B. College or University Selection**

Check the institution you plan to attend:

NOTE: If you want to request scholarships for two courses at two different institutions for this semester, please check both institutions and write each course number by the appropriate college.

### PUBLIC: TWO-YEAR AND FOUR-YEAR

- ☐ Christopher Newport University
- ☐ College of William and Mary
- ☐ George Mason University
- ☐ James Madison University
- ☐ Longwood College
- ☐ Mary Washington College
- ☐ Norfolk State University
- ☐ Old Dominion University
- ☐ Radford University
- ☐ Richard Bland College
- ☐ University of Virginia
- ☐ University of Virginia's College at Wise
- ☐ Virginia Commonwealth University
- ☐ Virginia Military Institute
- ☐ Virginia Polytechnic Institute and State University
- ☐ Virginia State University

**6.B. College or University Selection (continued)**

Check the institution you plan to attend:

### PRIVATE: NOT-FOR-PROFIT AND FOR-PROFIT

- ☐ American Military University
- ☐ Appalachian School of Law
- ☐ Atlantic University
- ☐ Averett College
- ☐ Bluefield College
- ☐ Bridgewater College
- ☐ Bryant and Stratton College
- ☐ Catholic Distance University
- ☐ Christendom College
- ☐ CHRV College of Health Sciences
- ☐ Dominion College
- ☐ Eastern Mennonite University
- ☐ ECPI College of Technology
- ☐ ECPI Technical College
- ☐ Emory and Henry College
- ☐ Ferrum College
- ☐ Hampden-Sydney College
- ☐ Hampton University
- ☐ Hollins University
- ☐ Institute of Textile Tech
- ☐ Institute for Faith and Psychological Sciences
- ☐ Liberty University
- ☐ Lynchburg College
- ☐ Mary Baldwin College
- ☐ Marymount University
- ☐ Medical College of Hampton Roads –EVMS
- ☐ National Business College
- ☐ Patrick Henry College
- ☐ Protestant Episcopal Theological Seminary in Virginia/Virginia Theological Seminary
- ☐ Randolph-Macon College
- ☐ Randolph-Macon Women's College
- ☐ Regent University
- ☐ Roanoke College
- ☐ Saint Paul's College
- ☐ School of Islamic and Social Sciences
- ☐ Shenandoah University
- ☐ Southern Virginia College
- ☐ Stratford College
- ☐ Sweet Briar College
- ☐ Tidewater Tech
- ☐ Union Theological Seminary and Presbyterian School for Christian Education
- ☐ University of Management and Technology
- ☐ University of Northern Virginia
- ☐ University of Richmond
- ☐ Virginia Intermont College
- ☐ Virginia International University
- ☐ Virginia Union University
- ☐ Virginia University of Lynchburg
- ☐ Virginia Wesleyan College
- ☐ Washington and Lee University
- ☐ World College



**VSS**
PEOPLE HELPING PEOPLE
COMMONWEALTH OF VIRGINIA
**DEPARTMENT OF SOCIAL SERVICES**

FORM #032-05-032/4 (2/01)

## Final Regulations

**III. PERSONS WHO ARE SELF-EMPLOYED FAMILY DAY HOME PROVIDERS:**
*This section to be completed by the family day home provider and person certifying or verifying his/her employment.*

**A.  To be completed by the applicant**
I, _____ am certifying that I am a self-employed owner/operator of
      (Name of Family Day Home Operator)

_____ and have been in this position for _____.
      (Name of Child Care Program)                                                (length of time)

Verification of my status is provided as indicated below.

Date: _____    Signature: _____
                                                                      (Family Day Home Operator)

Check one:

☐  1.  Copy of state license, business license, certificate, or approval. (attach a copy) *Acceptable documents include a license from the Virginia Department of Social Services, a business license or approval from a local government, certificate from a voluntarily registered family day home organization, or certification by a provider organization.*

☐  2.  Signed statement from a current customer (parent who currently has a child in my family day home program)

☐  3.  Signed statement from a college/university representative (i.e., professor, advisor, admissions officer, etc.)

**NOTE:  If you are submitting one of the acceptable documents indicated in #1 above, it is not necessary for you to have someone complete part B of this section.**

**B.  To be completed by the Verifier/Certifier**  *Complete either number 1 or number 2.*

    **1.  Parent**
I, _____ am verifying that _____
            (Name of Customer)                                              (Name of Family Day Home Operator)

currently provides child care on a regular basis for one or more of my children.

    **2.  College/University Representative**
I, _____ am certifying that _____
            (Name of Certifier)                                              (Name of Family Day Home Operator)

has informed me that he/she operates a family day home business.

    **3.  Signature of Parent or College/University Representative**

Date: _____    Signature: _____
                                                                      (Verifier/Certifier)
Relationship: _____    Printed Name: of Verifier/Certifier _____

**IV.  PERSONS WHO ARE NOT CURRENTLY EMPLOYED, BUT WHO INTEND TO BECOME EMPLOYED IN CHILD CARE**
*This section to be completed by the applicant and person certifying the applicant's intent.  Likely certifiers include college/university professors, prospective employers, family members, or friends.*

**A.  To be completed by the applicant**
I, _____, by signing below am declaring my intent to enter the field of child care.
      (Name of Applicant)
Date: _____    Signature: _____
                                                                      (Signature of Applicant)

**B.  To be completed by the Certifier**
I, _____ am certifying that _____
            (Name of Certifier)                                              (Name of Applicant)
has informed me that he/she intends to become a child care provider.

Date: _____    Signature: _____
                                                                      (Certifier)
Relationship: _____    Printed Name: of Certifier _____

VA.R. Doc. No. R98-314; Filed May 1, 2001, 1:53 p.m.

# Final Regulations

\* \* \* \* \* \* \* \*

Title of Regulation: **22 VAC 40-900-10 et seq.  Community Service Block Grant Guidelines (REPEALED).**

Statutory Authority:  §§ 2.1-590 and 63.1-25 of the Code of Virginia.

Effective Date:  June 20, 2001.

Summary:

*This action repeals the regulation entitled "Community Services Block Grant Guidelines."  The regulation was promulgated in 1982 and had not been updated since.  This regulation is being replaced by a new regulation in a separate regulatory package.*

Summary of Public Comment and Agency's Response:  No public comments were received by the promulgating agency.

Agency Contact:  Phyl Parrish, Department of Social Services, 730 East Broad Street, Richmond, VA 23219-1849, telephone (804) 692-1895.

VA.R. Doc. No. R00-14; Filed May 1, 2001, 1:53 p.m.

\* \* \* \* \* \* \* \*

Title of Regulation:  **22 VAC 40-901-10 et seq.  Community Services Block Grant Program.**

Statutory Authority:  § 2.1-590 and 63.1-25 of the Code of Virginia.

Effective Date:  June 20, 2001.

Summary:

*The regulation sets forth the formula used for the distribution of Community Services Block Grant funds to local community action agencies and requires that community action agencies provide matching funds equal to 20% of the grant award.  This regulation replaces the program regulation that has been in effect since 1982.*

Summary of Public Comment and Agency's Response:  No public comments were received by the promulgating agency.

Agency Contact:  Phyl Parrish, Department of Social Services, 730 East Broad Street, Richmond, VA 23219-1849, telephone (804) 692-1895.

*CHAPTER 901.*
*COMMUNITY SERVICES BLOCK GRANT PROGRAM.*

**22 VAC 40-901-10.  Definitions.**

*The following words and terms when used in this chapter shall have the following meanings, unless the context clearly indicates otherwise:*

*"Community action agency" means a local subdivision of the Commonwealth, a combination of political subdivisions, a separate public agency or a private, nonprofit agency that has the authority under its applicable charter or laws to receive funds to support community action activities and other appropriate measures designed to identify and deal with the causes of poverty in the Commonwealth, and that is designated as a community action agency by federal law, federal regulations or the Governor.*

*"Community action statewide organization" means community action programs, organized on a statewide basis, to enhance the capability of community action agencies.*

*"Local share" means cash or in-kind goods and services donated to community action agencies or community action statewide organizations to carry out their responsibilities.*

**22 VAC 40-901-20.  Allocation formula.**

*All increased state or federal funds shall be distributed to local community action agencies based the following formula:  75% based on low-income population, 20% based on number of jurisdictions, and 5.0% based on square mileage served.  This formula shall be adjusted to ensure that no agency receives less than 1.5% of any increase.*

**22 VAC 40-901-30.  Matching contributions.**

*A community action agency or a community action statewide organization must provide a local share from nonfederal sources equal to a minimum of 20% of the grant award from the state.*

VA.R. Doc. No. R00-13; Filed May 1, 2001, 1:52 p.m.

◆ ━━━━━━━━━━━━━━━━━━━━━ ◆

# TITLE 24.  TRANSPORTATION AND MOTOR VEHICLES

## COMMONWEALTH TRANSPORTATION BOARD

REGISTRAR'S NOTICE:  The following regulation was filed by description with the Registrar of Regulations in accordance with § 2.3 of the Virginia Code Commission Regulations implementing the Virginia Register Act.  Section 2.3 of the Virginia Code Commission Regulations allows the Registrar to authorize the filing of a regulatory document by description in lieu of filing the entire text pursuant to criteria identified in that section.

Title of Regulation:  **24 VAC 30-240-10.  Certification Procedures for the Disadvantaged Business Enterprise/Women-Owned Business Enterprise (DBE/WBE) Program.**

Statutory Authority:  § 33.1-12 of the Code of Virginia.

Effective Date:  May 1, 2001.

Exemptions Claimed:

*This regulation is exempt from the Administrative Process Act pursuant to § 9-6.14:4.1 B 2 of the Code of Virginia, which exempts agency action involving the award or denial of state contracts, as well as decisions regarding compliance therewith.  Subdivision 2 f of § 2.3 of the Virginia Code Commission Regulations allows regulations concerning public contracts to be filed by description subject to the authorization of the Registrar of Regulations.*

## Final Regulations

Summary:

*This regulation sets forth the requirements to be followed by firms seeking certification as a Disadvantaged/Women-Owned Business Enterprise (DBE/WBE) as a prerequisite for bidding on contracts awarded by the Commonwealth Transportation Board (CTB) in a series of forms. The CTB, under the authority granted it by § 33.1-12 (2) and (7) of the Code of Virginia, concerning the awarding of contracts and the establishment policies concerning VDOT operations, respectively, has approved procedures for prequalification (see 24 VAC 30-130-10) which are also included in the procedures for this regulation. The program is required by federal regulation (49 CFR Part 26), and is designed to determine the following:*

*1. If the applicant firm meets federal requirements and guidelines to be considered a small business under applicable law and regulation (49 CFR Part 26 and Section 3 of the Small Business Act);*

*2. If protected class individuals (women and minorities) own the firm;*

*3. The identity of those individuals with managerial and operational control of the firm; and*

*4. If the firm has the basic expertise, capital, equipment, and other resources to perform highway and related types of work.*

*Form C-32 (Prequalification/Certification) is designed to collect financial information from applicants, as well as data on affiliated companies, prior work experience, and assets owned or leased by the applicants. Form C-46 (Rules Governing Prequalification and Certification) contains definitions, a description of the application process, a discussion of reviews by the Department at selected steps in the application procedure, how certification is awarded or denied, plus a description of processes for recertification and decertification. The Personal Financial Statement Form collects financial information from Disadvantaged Business Enterprise (DBE) Program participants relating to their eligibility to participate. Other forms are included for construction firms and consulting engineering forms to complete for attendance at mandatory DBE orientation sessions.*

The documents are available for inspection at the following location:

Virginia Department of Transportation
Equal Opportunity Division
1401 East Broad Street, Room 1403
Richmond, VA 23219

VA.R. Doc. No. R01-186; Filed May 1, 2001, 2:05 p.m.

* * * * * * * *

REGISTRAR'S NOTICE: The Commonwealth Transportation Board is claiming an exemption from the Administrative Process Act in accordance with § 9-6.14:4.1 B 11 of the Code of Virginia, which exempts regulations relating to traffic signs, markers, or control devices.

Title of Regulation:    **24 VAC 30-561-10.  Adoption of the Federal Manual on Uniform Traffic Control Devices.**

Statutory Authority:  §§ 33.1-12 (3) and 46.2-830 of the Code of Virginia.

Effective Date:  May 2, 2001.

Summary:

*The amendments make technical corrections to the regulation by modifying the catchline to more accurately describe the section's content and by eliminating unnecessary language.*

Agency Contact:  Copies of the regulation may be obtained from David L. Roberts, Department of Transportation, 1401 East Broad Street, Richmond, VA 23219, telephone (804) 786-3620.

**24 VAC 30-561-20.  ~~Effective date of revisions to the Incorporation by reference of the~~ federal Manual on Uniform Traffic Control Devices.**

The MUTCD originally approved by the FHWA in accordance with Title 23 USC§§ 109 (b) and (d) and 402 (a), and 23 CFR 1204.4, is incorporated by reference in 23 CFR Part 655, Subpart F. ~~The most recent revisions to the MUTCD appeared in 6 FR 1364 1373, January 9, 1997.~~

VA.R. Doc. No. R01-189; Filed May 2, 2001, 10:55 a.m.

◆ ━━━━━━━━━━━━━━━━ ◆

# EMERGENCY REGULATIONS

## TITLE 4. CONSERVATION AND NATURAL RESOURCES

### MARINE RESOURCES COMMISSION

Title of Regulation: **4 VAC 20-950-10 et seq. Pertaining to Black Sea Bass (amending 4 VAC 20-950-45).**

Statutory Authority: §§ 28.2-201 and 28.2-210 of the Code of Virginia.

Effective Date: April 24, 2001 through May 23, 2001.

Summary:

*The amendments revise the threshold amount of landings, which triggers a lowering of possession limits, as they pertain to those three periods of time (quarters), and establish prohibitions associated with the achievement of that 40% (threshold) of the coastwide quota for certain designated periods.*

Agency Contact: Copies of the regulation may be obtained from Deborah R. Cawthon, Marine Resources Commission, P.O. Box 756, Newport News, VA 23607, telephone (757) 247-2248.

**4 VAC 20-950-45. Possession limits and harvest quotas.**

A. During the period January 1 through March 31 of each year, it shall be unlawful for any person to possess aboard any vessel or to land in Virginia more than 9,000 pounds of black sea bass, except when it is announced that 75% of the coastwide quota for this period has been taken; then, it shall be unlawful for any person to possess aboard any vessel or land in Virginia more than 4,500 pounds of black sea bass, until such time that the coastwide quota for this period has been reached.

B. During the period April 1 through June 30 of each year, it shall be unlawful for any person to possess aboard any vessel or to land in Virginia more than 1,500 pounds of black sea bass~~, except~~. When it is announced that ~~50%~~ *40%* of the coastwide quota for this period has been taken~~, then, it shall be unlawful for any person to possess aboard any vessel or land in Virginia more than 750 pounds of black sea bass, until such time that the coastwide quota for this period has been reached~~ *the provisions of subsection E of this section shall apply.*

C. During the period July 1 through September 30 of each year, it shall be unlawful for any person to possess aboard any vessel or to land in Virginia more than 1,000 pounds of black sea bass~~, except~~. When it is announced that ~~50%~~ *40%* of the coastwide quota for this period has been taken~~, then, it shall be unlawful for any person to possess aboard any vessel or land in Virginia more than 500 pounds of black sea bass, until such time that the coastwide quota for this period has been reached~~ *the provisions of subsection E of this section shall apply.*

D. During the period October 1 through December 31 of each year, it shall be unlawful for any person to possess aboard any vessel or to land in Virginia more than 2,000 pounds of black sea bass~~, except~~. When it is announced that ~~50%~~ *40%* of the coastwide quota for this period has been taken~~, then, it shall be unlawful for any person to possess aboard any vessel or land in Virginia more than 1,000 pounds of black sea bass, until such time that the coastwide quota for this period has been reached~~ *the provisions of subsection E of this section shall apply.*

E. When it is announced that 40% of the coastwide quota for any of the periods designated in subsections B, C, and D of this section has been taken, it shall be unlawful for any person to do any of the following:

1. Possess aboard any vessel in Virginia waters more than 1,000 pounds of black sea bass.

2. Land black sea bass in Virginia, for commercial purposes, more than four times within each consecutive seven-day period, with the first seven-day period beginning upon the announcement that 40% of the coastwide quota for the period has been taken.

3. Land in Virginia more than a total of 1,000 pounds of black sea bass during each consecutive seven-day period, with the first seven-day period beginning upon the announcement that 40% of the coastwide quota for the period has been taken.

4. Fail to contact, within 24 hours of landing, the Marine Resources Commission's Interactive Voice Recording system to report the name of the vessel and fisherman and the weight of each landing of black sea bass.

~~E.~~ *F.* It shall be unlawful for any person to possess or to land any black sea bass for commercial purposes after the coastwide quota for the designated period as described in subsections A through D of this section has been attained and announced as such.

~~F.~~ *G.* It shall be unlawful for any buyer of seafood to receive any black sea bass after any commercial harvest quota has been attained and announced as such.

~~G.~~ *H.* It shall be unlawful for any person to possess or to land any black sea bass for recreational purposes, from March 1 through March 31 and from July 15 through August 14 of each year.

~~H.~~ *I.* It shall be unlawful for any person fishing with hook and line, rod and reel, spear, gig or other recreational gear to possess more than 25 black sea bass. When fishing is from a boat or vessel where the entire catch is held in a common hold or container, the possession limit shall be for the boat or vessel and shall be equal to the number of persons on board legally eligible to fish multiplied by 25. The captain or operator of the boat or vessel shall be responsible for any boat or vessel possession limit. Any black sea bass taken after the possession limit has been reached shall be returned to the water immediately.

~~I.~~ *J.* Possession of any quantity of black sea bass that exceeds the possession limit described in subsection ~~H~~ *I* of this section shall be presumed to be for commercial purposes.

/s/ William A. Pruitt
Commissioner

VA.R. Doc. No. R01-174; Filed April 24, 2001, 4:31 p.m.

# GENERAL NOTICES/ERRATA

## DEPARTMENT OF ENVIRONMENTAL QUALITY

### Total Maximum Daily Load (TMDL) for Benthic Impairment

The Department of Environmental Quality (DEQ) and the Department of Conservation and Recreation (DCR) seek written and oral comments from interested persons on the development of a Total Maximum Daily Loads (TMDLs) for benthic impairment on the following streams: Castaline Spring Branch (0.8 miles), Cockran Spring Branch (0.8 miles), Coursey Springs Branch/ Pheasanty Run (0.43 miles), Lacey Spring Branch (0.2 miles), Montebello Spring Branch (0.02 miles), and Orndorff Spring Branch (0.15 miles). The Castaline Spring Branch segment, located in Augusta County, begins at the Castaline Trout Farm discharge and extends to the confluent with Byrd Spring. The Cockran Spring Branch segment, located in Augusta County, begins at the Castaline Trout Farm discharge and extends to the confluence with Middle River. The Coursey Springs Branch/Pheasanty Run, located in Bath County, begins at the Coursey Springs Trout Cultural Station discharge and extends to the confluence with Cowpasture River. The Lacey Spring Branch segment, located in Rockingham County, begins at the Shenandoah Fisheries Trout Farm discharge and extends to the confluence with Smith Creek. The Montebello Spring Branch segment, located in Nelson County, begins at the Montebello Fish Cultural Station discharge and extends to the confluence with Mill Creek. The Orndorff Spring Branch segment, located in Shenandoah County, begins at the Orndorff Trout Farm discharge and extends to the confluence with Cedar Creek.

The Virginia's 1998 303(d) TMDL Priority List and Report identified the segments as impaired due to violations of the state's water quality for General Standard (Benthics). Section 303(d) of the Clean Water Act and § 62.1-44.19:7.C of the Code of Virginia require DEQ to develop TMDLs for pollutants responsible for each impaired water contained in Virginia's 303(d) TMDL Priority List and Report.

The first public meeting on the development of the TMDLs for the 6 segments will be held on Tuesday, June 12, 2001, at 7 p.m. in the Conference Room at the Department of Environmental Quality, located at 4411 Early Road, Harrisonburg, VA 22801. The public comment period will end on June 29, 2001. A fact sheet on the development of the TMDLs for the 6 segments is available upon request. Questions or information requests should be addressed to Rod Bodkin. Written comments should include the name, address, and telephone number of the person submitting the comments and should be sent to Rod Bodkin, Department of Environmental Quality, 4411 Early Road, Harrisonburg, VA 22801, telephone (540) 574-7801, FAX (540) 540-7878 or e-mail rvbodkin@deq.state.va.us.

### Total Maximum Daily Load (TMDL) for Black Creek and Tributaries

The Department of Environmental Quality (DEQ), The Department of Mines, Minerals and Energy, and the Department of Conservation and Recreation (DCR) seek written and oral comments from interested persons on the development of Total Maximum Daily Load (TMDL) for Black Creek and tributaries: they are listed on the 1998 303(d) TMDL Priority List and Report as impaired due to violations of the state's water quality standards for Violation of the General Standard (Benthics). The Black Creek stream segment is above the Blackwood community, west of the Town of Norton between Black Creek Ridge and White Oak Gap. This segment extends from the lake impoundment to its confluence with the Powell River near Route 58/23. The segment is 5.94 miles in length and the impairment source is Resource Extraction/Acid Mine. The TMDL will be developed for the Benthic impairment.

Section 303(d) of the Clean Water Act and § 62.1-44.19:7.C of the Code of Virginia require DEQ to develop TMDLs for pollutants responsible for each impaired water contained in Virginia's 303(d) TMDL Priority List and Report.

The first public meeting on the development of these TMDLs will be held on Tuesday, June 5, 2001, at 7 p.m. in the Buchanan Smith Building, Department of Mines, Minerals and Energy, U.S. Route 23, South, Big Stone Gap, VA 24219.

The public comment period will end on June 22, 2001. Fact sheets on the development of the TMDLs on Black Creek are available upon request. Questions or information requests should be addressed to George Joey O'Quinn. Written comments should include the name, address, and telephone number of the person submitting the comments and should be sent to Mr. O'Quinn, DMME, P.O. Drawer 900, Big Stone Gap, VA 24219, telephone (540) 523-8151, FAX (540) 523-8163 or e-mail gjo@mme.state.va.us.

### Total Maximum Daily Load (TMDL) for Fecal Coliform Bacteria on a 8.0-Mile Segment of Four Mile Run

The Department of Environmental Quality (DEQ) and the Department of Conservation and Recreation (DCR) seek written and oral comments from interested persons on the development of a Total Maximum Daily Load (TMDL) for fecal coliform bacteria on a 8.0-mile segment of Four Mile Run. This impaired segment is located in Arlington County, Fairfax County, the City of Falls Church, and the City of Alexandria and begins at the headwaters of Four Mile Run downstream to stream mile 1.46, approximately 0.27 stream miles upstream of Mount Vernon Avenue Bridge. Four Mile Run is identified in Virginia's 1998 303(d) TMDL Priority List and Report as impaired due to violations of the state's water quality standard for fecal coliform bacteria.

Section 303(d) of the Clean Water Act and § 62.1-44.19:7.C of the Code of Virginia require DEQ to develop TMDLs for pollutants responsible for each impaired water contained in Virginia's 303(d) TMDL Priority List and Report.

The first public meeting on the development of the Four Mile Run fecal coliform TMDL will be held on Thursday, June 14, 2001, at 7 p.m. in the auditorium of Arlington's Central Library located at 1015 North Quincy Street, Arlington, VA 22201.

## General Notices/Errata

The public comment period will end on June 29, 2001. A fact sheet on the development of the TMDL for fecal coliform bacteria on Four Mile Run is available upon request. Questions or information requests should be addressed to Joan Crowther. Written comments should include the name, address, and telephone number of the person submitting the comments and should be sent to Ms. Joan Crowther, Department of Environmental Quality, 13901 Crown Court, Woodbridge, VA 22193, telephone (703) 583-3828, FAX (703) 583-3841 or e-mail jccrowther@deq.state.va.us. Also see www.novaregion.org/4MileRun/tmdl for additional information.

### Total Maximum Daily Load (TMDL) for Fecal Coliform on a 6.37 Mile Segment of Moore's Creek

The Department of Environmental Quality (DEQ) and the Department of Conservation and Recreation (DCR) seek written and oral comments from interested persons on the development of a Total Maximum Daily Load (TMDL) for fecal coliform on a 6.37 mile segment of Moore's Creek. This impaired segment is located in Albemarle County and the City of Charlottesville. The segment begins at the intersection of U.S. Route 29 and Route 1106 and extends to the confluence of the Rivanna River. Virginia's 1998 303(d) TMDL Priority List and Report identified this segment as impaired due to violations of the state's water quality standard for fecal coliform.

Section 303(d) of the Clean Water Act and § 62.1-44.19:7.C of the Code of Virginia require DEQ to develop TMDLs for pollutants responsible for each impaired water contained in Virginia's 303(d) TMDL Priority List and Report.

The first public meeting on the development of the Moore's Creek TMDL will be held on Thursday, June 7, 2001, from 7 to 9 p.m. in the Totier Creek Room, Room Number 235, Albemarle County Office Building, second floor, 401 McIntire Road, Charlottesville, VA.

The public comment period will end on June 22, 2001. A fact sheet on the development of the TMDL for fecal coliform bacteria on Moore's Creek is available upon request. Questions or information requests should be addressed to Rod Bodkin. Written comments should include the name, address, and telephone number of the person submitting the comments and should be sent to Rod Bodkin, Department of Environmental Quality, 4411 Early Road, Harrisonburg, VA 22801, telephone (540) 574-7801, FAX (540) 540-7878 or e-mail rvbodkin@deq.state.va.us.

### BOARD FOR GEOLOGY

### Notice of Periodic Review

The Board for Geology (board) invites public comment on 18 VAC 70-10-10 et seq., Public Participation Guidelines. This review is being conducted under Executive Order Number Twenty-five (98). The board welcomes written comments on the performance and effectiveness of this regulation in achieving the following goal:

To meet the notification requirements contained in the Administrative Process Act and to increase input into the regulatory process in the most cost efficient manner possible.

Copies of the regulation may be obtained from the board. Written or faxed comments may be submitted through June 11, 2001. Comments or questions should be sent to William H. Ferguson, II, Regulatory Boards Administrator, Board for Geology, 3600 West Broad Street, Richmond, Virginia 23230, telephone (804) 367-2406 or FAX (804) 367-2475.

### DEPARTMENT OF SOCIAL SERVICES

### Periodic Review of Regulations

Pursuant to Executive Order Number Twenty-five (98), the Department of Social Services is currently reviewing the below listed regulation to determine if it should be terminated, amended, or retained in its current form. The review will be guided by the principles listed in Executive Order Number Twenty-five (98) and in the department's Plan for Review of Existing Agency Regulations.

The department seeks public comment regarding the regulation's interference in private enterprise and life, essential need of the regulation, less burdensome and intrusive alternatives to the regulation, specific and measurable goals that the regulation is intended to achieve, and whether the regulation is clearly written and easily understandable.

The regulation is:

22 VAC 15-30-10 et seq., Minimum Standards for Licensed Child Day Centers. Contact: Arlene Kasper, Program Development Consultant, Division of Licensing Programs, telephone (804) 692-1791, FAX (804) 692-2370 or e-mail adk7@email1.dss.state.va.us.

Written comments may be submitted until June 10, 2001, in care of the above listed contact at 730 East Broad Street, Richmond, Virginia 23219-1849, or by facsimile to the above listed number.

### VIRGINIA CODE COMMISSION

### Notice to State Agencies

**Mailing Address:** Virginia Code Commission, 910 Capitol Street, General Assembly Building, 2nd Floor, Richmond, VA 23219, FAX (804) 692-0625.

### Forms for Filing Material for Publication in *The Virginia Register of Regulations*

All agencies are required to use the appropriate forms when furnishing material for publication in *The Virginia Register of Regulations*. The forms may be obtained from: Virginia Code Commission, 910 Capitol Street, General Assembly Building, 2nd Floor, Richmond, VA 23219, telephone (804) 786-3591.

# General Notices/Errata

**Internet:** Forms and other *Virginia Register* resources may be printed or downloaded from the *Virginia Register* web page: http://legis.state.va.us/codecomm/register/regindex.htm

FORMS:

    NOTICE of INTENDED REGULATORY ACTION - RR01
    NOTICE of COMMENT PERIOD - RR02
    PROPOSED (Transmittal Sheet) - RR03
    FINAL (Transmittal Sheet) - RR04
    EMERGENCY (Transmittal Sheet) - RR05
    NOTICE of MEETING - RR06
    AGENCY RESPONSE TO LEGISLATIVE OBJECTIONS - RR08

# ERRATA

## DEPARTMENT OF STATE POLICE

<u>Title of Regulation:</u> **19 VAC 30-70-5 et seq. Motor Vehicle Safety Inspection Rules and Regulations**

<u>Publication:</u> 17:15 VA.R. 2252 April 9, 2001

<u>Correction to Final Regulation:</u> Effective date was omitted. Effective date is May 9, 2001.

# CALENDAR OF EVENTS

**Symbol Key**
♿ Location accessible to persons with disabilities
☎ Teletype (TTY)/Voice Designation

---

**NOTICE**

Only those meetings which are filed with the Registrar of Regulations by the filing deadline noted at the beginning of this publication are listed. Since some meetings are called on short notice, please be aware that this listing of meetings may be incomplete. Also, all meetings are subject to cancellation and the *Virginia Register* deadline may preclude a notice of such cancellation. If you are unable to find a meeting notice for an organization in which you are interested, please check the Commonwealth Calendar at www.vipnet.org or contact the organization directly.

For additional information on open meetings and public hearings held by the standing committees of the legislature during the interim, please call Legislative Information at (804) 698-1500 or Senate Information and Constituent Services at (804) 698-7410 or (804) 698-7419/TTY☎, or visit the General Assembly web site's Legislative Information System (http://leg1.state.va.us/lis.htm) and select "Meetings."

VIRGINIA CODE COMMISSION

---

# EXECUTIVE

## BOARD OF ACCOUNTANCY

**May 23, 2001 - 10 a.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, Conference Room 4W, Richmond, Virginia.♿

A meeting to conduct routine business. A public comment period will be held at the beginning of the meeting.

**Contact:** David E. Dick, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-2648, FAX (804) 367-6128, (804) 367-9753/TTY ☎, e-mail accountancy@dpor.state.va.us.

## DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES

### Virginia Charity Food Assistance Advisory Board

**† June 14, 2001 - 10:30 a.m.** -- Open Meeting
Washington Building, 1100 Bank Street, 2nd Floor, Board Room, Richmond, Virginia ♿

A routine meeting to discuss issues related to hunger, malnutrition, and food insecurity in the Commonwealth and potential opportunities to alleviate the problem. The board will entertain public comment at the conclusion of all other business for a period not to exceed 30 minutes. Any person who needs any accommodation in order to participate at the meeting should contact Steven W. Thomas at least five days before the meeting date so that suitable arrangements can be made.

**Contact:** Steven W. Thomas, Executive Director, Department of Agriculture and Consumer Services, 1100 Bank St., Room 809, Richmond, VA 23219, telephone (804) 786-3936, FAX (804) 371-7788.

### Consumer Affairs Advisory Committee

**† June 1, 2001 - 9:30 a.m.** -- Open Meeting
Washington Building, 1100 Bank Street, 2nd Floor, Board Room, Richmond, Virginia ♿ (Interpreter for the deaf provided upon request)

The advisory committee communicates the views and interests of Virginians on issues related to the Department of Agriculture and Consumer Services' consumer education and fraud prevention programs and their availability to citizens. Members will review the consumer education outreach efforts of the year, including those for the Virginia Cooperative Extension, National Consumer Protection Week, Senior Citizens' Month, Governor's Conference on Aging, and State Fair 2001, as well as the use of established networks for consumer outreach. Members will discuss the nomination procedures to fill vacancies and citizen terms that expire in December. The committee will entertain public comment at the conclusion of all other business for a period not to exceed 30 minutes. Any person who needs any accommodation in order to participate at the meeting should contact Evelyn A. Jez at least five days before the meeting date so that suitable arrangements can be made.

**Contact:** Evelyn A. Jez, Consumer Affairs Specialist, Department of Agriculture and Consumer Services, 1100 Bank St., Suite 1101, Richmond, VA 23219, telephone (804) 786-1308, FAX (804) 786-5112, toll-free (800) 552-9963, (800) 828-1120/TTY ☎

### Virginia Horse Industry Board

**† June 5, 2001 - 10 a.m.** -- Open Meeting
Virginia Department of Forestry, 900 Natural Resources Drive, 2nd Floor Conference Room, Charlottesville, Virginia ♿

The board is having a special meeting to discuss the proposed economic impact study of the horse industry. The board will entertain public comment at the conclusion of all other business for a period not to exceed 30 minutes. Any person who needs any accommodation in order to participate at the meeting should contact Andrea S. Heid at

---

# Calendar of Events

least five days before the meeting date so that suitable arrangements can be made.

**Contact:** Andrea S. Heid, Program Manager, Department of Agriculture and Consumer Services, 1100 Bank St., Suite 1004, Richmond, VA 23219, telephone (804) 786-5842, FAX (804) 371-7786.

## Virginia Marine Products Board

**† June 6, 2001 - 6 p.m.** -- Open Meeting
Bill's Seafood House, Route 17 and Denbigh Boulevard, Grafton, Virginia.

The board will meet to receive reports from the Executive Director of the Virginia Marine Products Board on Finance, Marketing, past and future program planning, publicity, public relations and old and new business. For directions to the restaurant call 757-898-4903. The board will entertain public comment at the conclusion of all other business for a period not to exceed 30 minutes. Any person who needs any accommodation in order to participate at the meeting should contact Shirley Estes at least five day before the meeting date so that suitable arrangements can be made.

**Contact:** Shirley Estes, Executive Director, Department of Agriculture and Consumer Services, 554 Denbigh Blvd., Suite B, Newport News, VA 23608, telephone (757) 874-3474, FAX (757) 886-0671.

## STATE AIR POLLUTION CONTROL BOARD

**May 24, 2001 - 10 a.m.** -- Open Meeting
General Assembly Building, 9th and Broad Streets, House Room C, Richmond, Virginia.

A regular meeting. A detailed agenda is available.

**Contact:** Cindy Berndt, Regulatory Coordinator, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4378, FAX (804) 698-4346, e-mail cmberndt@deq.state.va.us.

**† May 31, 2001 - 7 p.m.** – Public Hearing
Donaldson Brown Hotel and Conference Center, Conference Room D, Blacksburg, Virginia.

A public hearing to receive comments on an air permit application from VPI.

**Contact:** Gail Taber Steele, State Air Pollution Control Board, Department of Environmental Quality, 3019 Peters Creek Rd., Roanoke, VA 24019, telephone (540) 562-6761, FAX (540) 562-6725, (804) 698-4021/TTY ☎, e-mail gtsteele@deq.state.va.us.

* * * * * * * *

**June 12, 2001 -** Public comments may be submitted until this date.

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the State Air Pollution Control Board intends to amend regulations entitled: **9 VAC 5-40-10 et seq. Existing Stationary Sources (Rev. A99).** Article 4 provides a legal mechanism whereby the board is required to make source specific Reasonable Available Control Technology (RACT) determinations for all currently known major sources subject to source specific $NO_X$ RACT requirements under the federal Clean Air Act. Amendments are being proposed to delete the provisions that address seasonal applicability, certain exemptions and the emission allocation system.

Article 8 establishes emission limits along with compliance testing, monitoring, recordkeeping and reporting requirements for fuel burning equipment. Amendments are being proposed to establish an emissions rate limit for nitrogen oxides for electric generating units and nonelectric generating units and create a compliance averaging plan to provide flexibility for the sources subject to the regulation.

Statutory Authority: § 10.1-1308 of the Code of Virginia.

Public comments may be submitted until June 12, 2001, to Director, Office of Air Regulatory Development, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240.

**Contact:** Mary E. Major, Environmental Program Manager, Office of Air Regulatory Development, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4423, FAX (804) 698-4510, toll-free 1-800-592-5482 or (804) 698-4021/TTY ☎

## ALZHEIMER'S DISEASE AND RELATED DISORDERS COMMISSION

**† May 21, 2001 - 10 a.m.** -- Open Meeting
The Chamberlin Hotel, Hampton, Virginia. (Interpreter for the deaf provided upon request)

A regular meeting.

**Contact:** Janet L. Honeycutt, Director of Grant Operations, Alzheimer's Disease and Related Disorders Commission, Virginia Department for the Aging, 1600 Forest Ave., Richmond, VA 23229, telephone (804) 662-9341, FAX (804) 662-9354, toll-free (800) 552-3402, (804) 662-9333/TTY ☎, e-mail jlhoneycutt@vdh.state.va.us.

## BOARD FOR ARCHITECTS, PROFESSIONAL ENGINEERS, LAND SURVEYORS, CERTIFIED INTERIOR DESIGNERS AND LANDSCAPE ARCHITECTS

**† May 22, 2001 - 9 a.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia. (Interpreter for the deaf provided upon request)

A meeting to discuss changes to the board's regulations regarding photogrammetrists and to conduct board business. Persons desiring to participate in the meeting and requiring special accommodations or interpretative services should contact the department at least 10 days prior to this meeting so that suitable arrangements can be made for an appropriate accommodation. The department fully complies with the Americans with Disabilities Act.

## Calendar of Events

**Contact:** Mark N. Courtney, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230-4917, telephone (804) 367-8514, FAX (804) 367-2475, (804) 367-9753/TTY ☎, e-mail apelsla@dpor.state.va.us.

**May 23, 2001 - 9 a.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia.📷 (Interpreter for the deaf provided upon request)

A meeting of the Landscape Architects Section. Persons desiring to participate in the meeting and requiring special accommodations or interpretative services should contact the department at least 10 days prior to the meeting so that suitable arrangements can be made. The department fully complies with the Americans with Disabilities Act.

**Contact:** Mark N. Courtney, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230-4917, telephone (804) 367-8514, FAX (804) 367-2475, (804) 367-9753/TTY ☎, e-mail apelsla@dpor.state.va.us.

**May 30, 2001 - 9 a.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia.📷 (Interpreter for the deaf provided upon request)

A meeting of the Certified Interior Designers Section. Persons desiring to participate in the meeting and requiring special accommodations or interpretative services should contact the department at least 10 days prior to the meeting so that suitable arrangements can be made. The department fully complies with the Americans with Disabilities Act.

**Contact:** Mark N. Courtney, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230-4917, telephone (804) 367-8514, FAX (804) 367-2475, (804) 367-9753/TTY ☎, e-mail apelsla@dpor.state.va.us.

**† May 31, 2001 - 9 a.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia.📷 (Interpreter for the deaf provided upon request)

A meeting to review regulation 18 VAC 10-20-780 and to conduct board business. Persons desiring to participate in the meeting and requiring special accommodations or interpretative services should contact the department at least 10 days prior to the meeting so that suitable arrangements can be made. The department fully complies with the Americans with Disabilities Act.

**Contact:** Mark N. Courtney, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230-4917, telephone (804) 367-8514, FAX (804) 367-2475, (804) 367-9753/TTY ☎, e-mail apelsla@dpor.state.va.us.

**June 6, 2001 - 9 a.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia.📷 (Interpreter for the deaf provided upon request)

A meeting to conduct board business. Persons desiring to participate in the meeting and requiring special accommodations or interpretative services should contact the department at least 10 days prior to the meeting so that suitable arrangements can be made. The department fully complies with the Americans with Disabilities Act.

**Contact:** Mark N. Courtney, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230-4917, telephone (804) 367-8514, FAX (804) 367-2475, (804) 367-9753/TTY ☎, e-mail apelsla@dpor.state.va.us.

* * * * * * * *

**† June 6, 2001 - 9 a.m.** -- Public Hearing
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia.

**† July 20, 2001 -** Public comments may be submitted until this date.

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects intends to amend regulations entitled: **18 VAC 10-20-10 et seq. Board for Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects Regulations.** The board has clarified language, consolidated provisions, and modified wording to accord with the Code of Virginia. Substantive changes include requiring that regulants notify the board office when they leave as the responsible professional of a professional corporation, permitting use of electronic seals, signatures and dates, and adding various requirements and standards regarding land boundary surveying.

Statutory Authority: §§ 54.1-201, 54.1-404 and 54.1-411 of the Code of Virginia.

**Contact:** Mark N. Courtney, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8514, FAX (804) 367-2475 or (804) 367-9753/TTY ☎

### ART AND ARCHITECTURAL REVIEW BOARD

**June 1, 2001 - 10 a.m.** -- Open Meeting
Science Museum of Virginia, 2500 West Broad Street, Forum Room, Richmond, Virginia.📷 (Interpreter for the deaf provided upon request)

A monthly meeting to review projects submitted by state agencies.

**Contact:** Richard L. Ford, AIA, Chairman, Art and Architectural Review Board, 1011 E. Main St., Room 221, Richmond, VA 23219, telephone (804) 643-1977, FAX (804) 643-1981, (804) 786-6152/TTY ☎

# Calendar of Events

## BOARD FOR ASBESTOS AND LEAD

**† July 9, 2001 - 2 p.m.** -- Public Hearing
Department of Professional and Occupational Regulation, 3600 West Broad Street, 4th Floor, Richmond, Virginia.

**† July 20, 2001 -** Public comments may be submitted until this date.

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Virginia Board for Asbestos and Lead intends to amend regulations entitled: **18 VAC 15-20-10 et seq. Virginia Asbestos Licensing Regulations.** The proposed regulation will revise definitions; delete roofing, flooring and siding provisions, which were abolished by House Bill 951, effective July 1, 1996; clarify fees for initial approval of accredited asbestos training programs; and create a biennial renewal requirement and fee for accredited asbestos training programs. Project monitors who also hold a valid supervisor or project designer license may renew their project monitor license by completing the supervisor or project designer refresher training. Language has been added to make clear that a refresher training certificate may be used only once to renew a license. The entry standards for inspectors, management planners and project designers have been changed to allow applicants to present evidence of specific minimal competence. Project monitors will be required on projects involving more than 260 linear feet or 160 square feet of asbestos containing materials. An additional option to qualify for an asbestos and analytical laboratory license has been added and performance standards for laboratory operation have been added.

Statutory Authority: § 54.1-501 of the Code of Virginia.

**Contact:** Joseph Kossan, Regulatory Board Administrator, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-2648.

## ASSISTIVE TECHNOLOGY LOAN FUND AUTHORITY

**† June 21, 2001 - 10 a.m.** -- Open Meeting
Department of Rehabilitative Services, 8004 Franklin Farms Drive, Richmond, Virginia. ♿ (Interpreter for the deaf provided upon request)

A monthly meeting of the Board of Directors. The public is welcome and invited to make comments or suggestions to the board. The board meets in closed session when reviewing confidential information pertaining to loan applications made by Virginians with disabilities.

**Contact:** Shilpa Joshi, Assistive Technology Loan Fund Authority, 8004 Franklin Farms Dr., Richmond, VA 23288, telephone (804) 662-9000, FAX (804) 662-9533, toll-free (800) 552-5019, (804) 662-9000/TTY ☎, e-mail loanfund@erols.com.

## COMPREHENSIVE SERVICES FOR AT-RISK YOUTH AND FAMILIES

### State Executive Council

**May 30, 2001 - 9 a.m.** -- Open Meeting
**June 27, 2001 - 9 a.m.** -- Open Meeting
**July 25, 2001 - 9 a.m.** -- Open Meeting
Department of Social Services, 730 East Broad Street, Lower Level, Training Room 1, Richmond, Virginia. ♿ (Interpreter for the deaf provided upon request)

A regular meeting. An agenda will be posted on the web (http://www.csa.state.va.us) a week prior to the meeting.

**Contact:** Alan G. Saunders, Director, Comprehensive Services for At-Risk Youth and Families, 1604 Santa Rosa Rd., Suite 137, Richmond, VA 23229, telephone (804) 662-9815, FAX (804) 62-9831, e-mail AGS992@central.dss.state.va.us.

## AUCTIONEERS BOARD

**† July 12, 2001 - 10 a.m.** -- Public Hearing
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia.

**† July 20, 2001 -** Public comments may be submitted until this date.

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Auctioneers Board intends to amend regulations entitled: **18 VAC 25-21-10 et seq. Rules and Regulations of the Auctioneers Board.** The Auctioneers Board has clarified language, deleted duplicate and unutilized definitions, removed unnecessary requirements, and modified certain requirements in this chapter. Substantive changes include the following: the board has clarified that disciplinary action in another jurisdiction relating to auctioneering may prevent licensure in Virginia, has removed the option of substituting 25 auctions in lieu of educational requirements, has modified reinstatement requirements, and has modified compliance requirements for schools.

Statutory Authority: §§ 54.1-201 and 54.1-602 of the Code of Virginia.

**Contact:** Mark N. Courtney, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8514, FAX (804) 367-2475 or (804) 367-9753/TTY ☎

## BOARD FOR BARBERS AND COSMETOLOGY

**June 4, 2001 - 8:30 a.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, 4th Floor, Richmond, Virginia ♿ (Interpreter for the deaf provided upon request)

A meeting to discuss regulatory review and other matters requiring board action, including disciplinary cases. A public comment period will be held at the beginning of the meeting. All meetings are subject to cancellation. The time

## Calendar of Events

of the meeting is subject to change. Any person desiring to attend the meeting and requiring special accommodations or interpretative services should contact the department at least 10 days prior to the meeting so that suitable arrangements can be made. The department fully complies with the Americans with Disabilities Act.

**Contact:** Zelda W. Dugger, Board Administrator, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8590, FAX (804) 367-6295, (804) 367-9753/TTY ☎, e-mail barbercosmo@dpor.state.va.us.

### DEPARTMENT FOR THE BLIND AND VISION IMPAIRED

**June 9, 2001 - 10 a.m.**-- Open Meeting
Department for the Blind and Vision Impaired, 397 Azalea Avenue, Richmond, Virginia.◨ (Interpreter for the deaf provided upon request)

A quarterly meeting of the Statewide Rehabilitation Council for the Blind to advise the Department for the Blind and Vision Impaired on matters related to vocational rehabilitation services for the blind and visually impaired citizens of the Commonwealth.

**Contact:** James G. Taylor, Vocational Rehabilitation Program Director, Board for the Blind and Vision Impaired, 397 Azalea Ave., Richmond, VA, telephone (804) 371-3111.

**† July 17, 2001 - 10 a.m.** -- Open Meeting
Department for the Blind and Vision Impaired, 397 Azalea Avenue, Richmond, Virginia.◨ (Interpreter for the deaf provided upon request)

The board for the blind and vision impaired is an advisory board responsible for advising the governor, the secretary of health and human resources, the commissioner, and the general assembly in the delivery of public services to the blind and the protection of their rights. The board also reviews and comments on policies, budget and request for appropriations for the department. At this regular meeting, the board will review information regarding department activities and operations, review expenditures from the board's endowment fund, and discuss other issues raised for the board members.

**Contact:** Katherine C. Proffitt, Administrative Staff Assistant, Department for the Blind and Vision Impaired, 397 Azalea Ave., Richmond, VA 23227, telephone (804) 371-3145, FAX (804) 371-3157, toll-free (800) 622-2155, (804) 371-3140/TTY ☎, e-mail proffikc@dbvi.state.va.us.

### CHESAPEAKE BAY LOCAL ASSISTANCE BOARD

**May 22, 2001 - 10 a.m.** -- Open Meeting
James Monroe Building, 101 North 14th Street, Main Level, Conference Room C, Richmond, Virginia ◨ (Interpreter for the deaf provided upon request)

A work session to discuss the public comments, staff responses, and general discussion regarding the process relating to the adoption of the revisions of current regulation

9 VAC-10-20-10 et seq., Chesapeake Bay Preservation Area Designation and Management Regulation. Public comment will not be taken during the meeting. A Policy Committee meeting discussing perennial ditches may follow the regular meeting if time is available.

**Contact:** Scott Crafton, Regulatory Coordinator, Chesapeake Bay Local Assistance Board, James Monroe Bldg., 101 N. 14th St., 17th Floor, Richmond, VA 23219, telephone (804) 371-7503, FAX (804) 225-3447, toll-free (800) 243-7229, (800) 243-7229/TTY ☎, e-mail scrafton@cblad.state.va.us.

**June 18, 2001 - 10 a.m.** -- Open Meeting
Henrico County Government Center, 4301 East Parham Road, Administration Building, 3rd Floor Conference Room, Richmond, Virginia.◨ (Interpreter for the deaf provided upon request)

A general business meeting, including review of local Chesapeake Bay Preservation Area programs. Public comments will be taken during the meeting. A tentative agenda and map to the Henrico County Government Center will be available by June 1, 2001, from the Chesapeake Bay Local Assistance Department.

**Contact:** Carolyn J. Elliott, Administrative Assistant, Chesapeake Bay Local Assistance Board, James Monroe Bldg., 101 N. 14th St., 17th Floor, Richmond, VA 23219, telephone (804) 371-7505, FAX (804) 225-3447, toll-free (800) 243-7229, (800) 243-7229/TTY ☎, e-mail celliott@cblad.state.va.us.

### COMPENSATION BOARD

**May 22, 2001 - 11 a.m.** -- Open Meeting
**June 26, 2001- 11 a.m.** -- Open Meeting
Compensation Board, 202 North 9th Street, 10th Floor, Richmond, Virginia.◨

A monthly board meeting.

**Contact:** Cindy Waddell, Administrative Staff Assistant, Compensation Board, P.O. Box 710, Richmond, VA 23218, telephone (804) 786-0786, FAX (804) 371-0235, e-mail cwaddell@scb.state.va.us.

### DEPARTMENT OF CONSERVATION AND RECREATION

### Chippokes Plantation Farm Foundation Board of Trustees

**† May 23, 2001 - 1 p.m.** -- Open Meeting
Chippokes Plantation State Park, Mansion Conference Room, Surry, Virginia.◨ (Interpreter for the deaf provided upon request)

A general business meeting. Interpreter for the deaf must be requested two weeks prior to the meeting.

**Contact:** Katherine R. Wright, Executive Secretary, Department of Conservation and Recreation, 101 N. 14th St.,

# Calendar of Events

Richmond, VA 23219, telephone (804) 786-7950, FAX (804) 371-8500, e-mail kwright@dcr.state.va.us.

## Virginia Soil and Water Conservation Board

**† June 14, 2001 - 9 a.m.** -- Open Meeting
Location to be announced. (Interpreter for the deaf provided upon request)

A regular business meeting.

**Contact:** Leon E. App, Acting Deputy Director, Department of Conservation and Recreation, 203 Governor St., Suite 302, Richmond, VA 23219, telephone (804) 786-6124, FAX (804) 786-6141, e-mail leonapp@dcr.state.va.us.

## BOARD FOR CONTRACTORS

**† July 18, 2001 - 1 p.m.** -- Public Hearing
Department of Professional and Occupational Regulation, 3600 West Broad Street, 4th Floor, Richmond, Virginia.

**† July 20, 2001 -** Public comments may be submitted until this date.

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Board for Contractors intends to amend regulations entitled: **18 VAC 50-30-10 et seq. Tradesman Rules and Regulations.** The Board for Contractors seeks to amend its current tradesman regulations to reflect statutory changes that respond to industry changes. The regulations have not been revised since July 7, 1999. Parts of the regulation text have been revised for clarity and ease of use.

Statutory Authority: §§ 54.1-201 and 54.1-1102 of the Code of Virginia.

**Contact:** Nancy Taylor Feldman, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8590, FAX (804) 367-2474 or (804) 367-9753/TTY ☎

## DESIGN-BUILD/CONSTRUCTION MANAGEMENT REVIEW BOARD

**May 21, 2001 - 11 a.m.** -- Open Meeting
**June 18, 2001 - 11 a.m.** -- Open Meeting
Virginia War Memorial, 621 Belvidere Street, Auditorium, Richmond, Virginia. (Interpreter for the deaf provided upon request)

A monthly meeting to review requests submitted by localities to use design-build or construction management type contracts. Please contact the Division of Engineering and Buildings to confirm meeting.

**Contact:** Freddie M. Adcock, Administrative Assistant, Department of General Services, 805 E. Broad St., Room 101, Richmond, VA 23219, telephone (804) 786-3263, FAX (804) 371-7934, (804) 786-6152/TTY ☎, e-mail fadcock@dgs.state.va.us.

## BOARD OF EDUCATION

**† May 21, 2001 - 8:30 a.m.** -- Open Meeting
**† May 22, 2001 - 8:30 a.m.** -- Open Meeting
Hilton Airport, Eubanks Road, Richmond, Virginia. (Interpreter for the deaf provided upon request)

A work session of the SOL Technical Advisory Committee. Public comment will not be received. Persons requesting the services of an interpreter for the deaf should do so in advance.

**Contact:** Ms. Cam Harris, Assessment and Reporting, Board of Education, P.O. Box 2120, 101 N. 14th St., 25th Floor Richmond, VA 23219, telephone (804) 225-2102, FAX (804) 225-2524.

* * * * * * * *

May 22, 2001- Public comments may be submitted until this date.

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Board of Education intends to amend regulations entitled: **8 VAC 20-160-10 et seq. Regulations Governing the Secondary School Transcript.** The Board of Education has approved changes in the proposed regulation, since the proposed text was published in the Virginia Register on August 28, 2000, in response to public and gubernatorial comment. The board wishes to afford an additional 30-day public comment on the proposed regulation. Changes since publication of the original proposal are as follows:

1. The definition of "secondary school transcript" is amended to provide that secondary school transcripts exclude those courses purged from middle school records in accordance with 8 VAC 20-131-10 et seq.

2. A new provision requires SOL test scores to be reflected on high school transcripts beginning in Spring 2004, and that the transcript show the highest SOL test score if a test is taken more than once.

3. In compliance with Chapter 673 of the 2001 Acts of Assembly, language was added to prohibit including the accreditation status of a high school on the school profile data sheet.

Statutory Authority: §§ 22.1-16, 22.1-253.13:3 and 22.1-253.14 of the Code of Virginia.

**Contact:** Vernon Wildy, Director of Secondary Education, Department of Education, P.O. Box 2120, Richmond, VA 23218, telephone (804) 225-2877 or FAX (804) 225-2524.

**† May 23, 2001 - 10 a.m.** -- Open Meeting
State Capitol, Capitol Square, House Room 4, Richmond, Virginia. (Interpreter for the deaf provided upon request)

A meeting of the Leadership Development Committee to oversee the writing of an optional model K-12 leadership development curriculum for Virginia public schools. The meeting will be a work session to review the draft document, and public comment will not be received.

# Calendar of Events

Persons requesting the services of an interpreter for the deaf should do so in advance.

**Contact:** Dr. Linda Wallinger, Director, Secondary Instruction, Board of Education, P.O. Box 2120, 101 N. 14th St., 25th Floor Richmond, VA 23219, telephone (804) 225-2880, FAX (804) 225-2524.

**May 24, 2001 - 9 a.m.** -- Open Meeting
Sustainable Technology Park, Cape Charles, Virginia. ♿ (Interpreter for the deaf provided upon request)

**June 20, 2001 - 1 p.m.** -- Open Meeting
**July 26, 2001 - 9 a.m.** -- Open Meeting
Location to be announced. ♿ (Interpreter for the deaf provided upon request)

A regular meeting. Public comment will be received at this meeting.

**Contact:** Dr. Margaret N. Roberts, Office of Policy, Department of Education, P.O. Box 2120, 101 N. 14th St., 25th Floor, Richmond, VA 23219, telephone (804) 225-2540, FAX (804) 225-2524, e-mail mroberts@mail.vak12ed.edu.

**† June 4, 2001 - 7 p.m.** -- Public Hearing
George Wythe High School, 1 Maroon Way, Wytheville, Virginia.

**† June 4, 2001 - 7 p.m.** -- Public Hearing
Thomas Jefferson High School, 4100 West Grace Street, Richmond, Virginia. ♿ (Interpreter for the deaf provided upon request)

A public hearing on the Board of Education's newly revised Teacher Resource Guide for History and Social Science. A copy is available on the department's web site. Registration for speakers begins at 6:30 p.m. Persons requesting the services of an interpreter for the deaf should do so in advance.

**Contact:** Ms. Maureen Hijar, Office of Middle School Instruction, Department of Education, P.O. Box 2120, 101 N. 14th St., 25th Floor, Richmond, VA 23219, telephone (804) 225-3616, FAX (804) 225-2524, e-mail mroberts@mail.vak12ed.edu.

**June 20, 2001 - 9:30 a.m.** -- Open Meeting
Henrico School Board Office, 3820 Nine Mile Road, Richmond, Virginia. (Interpreter for the deaf provided upon request)

A meeting of the Accountability Advisory Committee. Unless otherwise notified in advance, sessions will be working sessions and public comment will not be received. Persons requesting the services of an interpreter for the deaf should do so in advance.

**Contact:** Cam Harris, Department of Education, James Monroe Bldg., 101 N. 14th St., 25th Floor, Richmond, VA 23219, telephone (804) 225-2102, FAX (804) 225-2524.

* * * * * * *

**† June 20, 2001 - 5:30 p.m.** -- Public Hearing
General Assembly Building, 9th and Broad Streets, Senate Room A, Richmond, Virginia.

**† July 20, 2001 -** Public comment may be submitted until this date.

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Board of Education intends to adopt regulations entitled: **8 VAC 20-630-10 et seq. Standards for State-Funded Remedial Programs.** The proposed regulations will require the collection of the minimum data necessary to comply with the intent of the Code of Virginia.

Statutory Authority: § 22.1-199.2 of the Code of Virginia.

**Contact:** Dr. Kathleen Smith, Specialist, Elementary Education, Department of Education, P.O. Box 2120, Richmond, VA 23218-2120, telephone (804) 786-5819 or (804) 225-2524.

**June 21, 2001 - 8:30 a.m.** -- Open Meeting
**June 22, 2001 - 8:30 a.m.** -- Open Meeting
Location to be announced. ♿ (Interpreter for the deaf provided upon request)

An annual planning session. Persons requesting services of an interpreter for the deaf should do so in advance. This is a working session, and public comment will not be received.

**Contact:** Dr. Margaret N. Roberts, Office of Policy, Department of Education, P.O. Box 2120, 101 N. 14th St., 25th Floor, Richmond, VA 23219, telephone (804) 225-2540, FAX (804) 225-2524, e-mail mroberts@mail.vak12ed.edu.

## LOCAL EMERGENCY PLANNING COMMITTEE - WINCHESTER

**† June 6, 2001 - 3 p.m.** -- Open Meeting
Shawnee Fire Department, 2333 Roosevelt Boulevard, Winchester, Virginia.

A regular business meeting.

**Contact:** L. A. Miller, Fire and Rescue Chief, Winchester Fire and Rescue Department, Local Emergency Planning Committee, 126 N. Cameron St., Winchester, VA 22601, telephone (540) 662-2298, (540) 662-4131/TTY ☎

## DEPARTMENT OF ENVIRONMENTAL QUALITY

**† May 21, 2001 - 7 p.m.** -- Public Hearing
Amherst Public Library, South Main Street, Amherst, Virginia. ♿

A public hearing to receive comments on the proposed amendment establishing groundwater protection standards and a variance for using alternate concentration limits for establishing groundwater protection standards for the Amherst County Sanitary Landfill.

**Contact:** Geoff Christe, Department of Environmental Quality, Department of Environmental Quality, P.O. Box 10009 Richmond, VA 23240, telephone (804) 698-4283, e-mail gxchriste@deq.state.va.us.

# Calendar of Events

**May 23, 2001 - 10 a.m.** -- Open Meeting
**June 6, 2001 - 10 a.m.** -- Open Meeting
State Capitol, Capitol Square, House Room 1, Richmond, Virginia.■

A meeting of a technical advisory committee established to advise the department on long-term solutions for the Virginia Petroleum Storage Tank Fund.

**Contact:** Elizabeth Lamp, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4322, (804) 698-4021/TTY ☎, e-mail erlamp@deq.state.va.us.

**May 24, 2001 - 10 a.m.** -- Open Meeting
**† May 31, 2001 - 10 a.m.** -- Open Meeting
Department of Environmental Quality, Piedmont Regional Office, 4949-A Cox Road, Glen Allen, Virginia.■

A meeting of the Virginia Pollution Prevention Advisory Committee, consisting of representatives of industry, government and citizens groups, to provide feedback and direction to the department on its pollution prevention activities.

**Contact:** Sharon K. Baxter, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4344, e-mail skbaxter@deq.state.va.us.

**† June 7, 2001 - 7 p.m.** -- Public Hearing
Cumberland County Public Library Building, 1539 Anderson Highway (Rt. 60), Meeting Room, Cumberland, Virginia.

A public hearing to receive comments on the draft permit amendment to establish groundwater protection standards for the Madison Sanitary Landfill and to grant a variance for the use of alternate concentration limits for establishing groundwater protection standards.

**Contact:** James Bernard, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4222, (804) 698-4021/TTY ☎, e-mail jfbernard@deq.state.va.us.

**† June 12, 2001 - 7 p.m.** -- Open Meeting
Department of Environmental Quality, 4411 Early Road, Conference Room, Harrisonburg, Virginia.■

The first public meeting on the development of TMDLs for benthic impairment on Castaline Spring Branch and Cochran Spring Branch in Augusta County, Coursey Springs Branch/Pheasanty Run in Bath County, Lacey Spring Branch in Rockingham County, Montebello Spring Branch in Nelson County and Orndorff Spring Branch in Shenandoah County. (See 5/21/01 Virginia Register for General Notice of TMDL development).

**Contact:** Rod Bodkin, Department of Environmental Quality, 4411 Early Rd., Harrisonburg, VA 22801, telephone (540) 574-7801, FAX (540) 574-7878, e-mail rvbodkin@deq.state.va.us.

**† June 14, 2001 - 7 p.m.** -- Open Meeting
Arlington Central Library, Auditorium, 1015 North Quincy Street, Arlington, Virginia.■

The first public meeting on the development of the Four Mile Run fecal coliform TMDL. (See 5/21/01 Virginia Register for General Notice of TMDL development).

**Contact:** Joan Crowther, Department of Environmental Quality, 13901 Crown Court, Woodbridge, VA 22193, telephone (703) 583-3828, FAX (703) 583-3841, e-mail jccrowther@deq.state.va.us.

## BOARD OF FUNERAL DIRECTORS AND EMBALMERS

**May 23, 2001 - 9 a.m.** -- Open Meeting
**June 6, 2001 - 10 a.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, 5th Floor, Conference Room 1, Richmond, Virginia.■

A meeting to hold formal hearings. There will not be a public comment period.

**Contact:** Cheri Emma-Leigh, Administrative Staff Assistant, Board of Funeral Directors and Embalmers, 6606 W. Broad St., 4th Floor, Richmond, VA 23230-1717, telephone (804) 662-9907, FAX (804) 662-9523, e-mail CEmma-Leigh@dhp.state.va.us.

NOTE: CHANGE IN MEETING TIME
**May 30, 2001 - 11 a.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, 5th Floor, Conference Room 1, Richmond, Virginia.■

A Special Conference Committee will hold informal hearings. There will not be a public comment period.

**Contact:** Cheri Emma-Leigh, Administrative Staff Assistant, Board of Funeral Directors and Embalmers, 6606 W. Broad St., 4th Floor, Richmond, VA 23230-1717, telephone (804) 662-9907, FAX (804) 662-9523, e-mail CEmma-Leigh@dhp.state.va.us.

**June 6, 2001 - 9 a.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, 5th Floor, Conference Room 1, Richmond, Virginia.■

A meeting to discuss general board business and elect new officers. There will be a public comment period during the first 15 minutes of the meeting.

**Contact:** Cheri Emma-Leigh, Administrative Staff Assistant, Board of Funeral Directors and Embalmers, 6606 W. Broad St., 4th Floor, Richmond, VA 23230-1717, telephone (804) 662-9907, FAX (804) 662-9523, e-mail CEmma-Leigh@dhp.state.va.us.

## BOARD OF GAME AND INLAND FISHERIES

**June 1, 2001 - 9 a.m.** -- Open Meeting
Department of Game and Inland Fisheries, 4000 West Broad Street, Richmond, Virginia.■ (Interpreter for the deaf provided upon request)

A meeting to address the Department of Game and Inland Fisheries' fiscal year 2001-2002 operating and capital budgets, and discuss general and administrative issues. The board may elect to hold a dinner Wednesday evening,

## Calendar of Events

May 31, at a location and time to be determined; and it may hold a closed session before the public session begins on June 1.

**Contact:** Phil Smith, Policy Analyst and Regulatory Coordinator, Department of Game and Inland Fisheries, 4010 W. Broad St., Richmond VA 23230, telephone (804) 367-1000, FAX (804) 367-0488, e-mail dgifweb@dgif.state.va.us.

### BOARD FOR HEARING AID SPECIALISTS

**† June 11, 2001 - 9:30 a.m.** -- Open Meeting
Richmond Hotel and Conference Center, 6531 West Broad Street, Ash Room, Conference Rooms A,B,C and D, Richmond, Virginia. (Interpreter for the deaf provided upon request)

A meeting to administer the hearing aid specialist practical examination.

**Contact:** Sharon M. Sweet, Examination Director, Board for Hearing Aid Specialists, 3600 W. Broad St., Richmond, VA 23230-4917, telephone (804) 367-8572, (804) 367-9753/TTY ☎

### STATE COUNCIL OF HIGHER EDUCATION FOR VIRGINIA

**May 22, 2001 - 8:30 a.m.** -- Open Meeting
University of Virginia, Charlottesville, Virginia.

A regular meeting. Agenda materials will be available on the website approximately one week prior to the meeting at www.schev.edu.

**Contact:** Lee Rung, Assistant to the Executive Director, State Council of Higher Education for Virginia, James Monroe Bldg., 101 N. 14th St., Richmond, VA 23219, telephone (804) 225-2602, FAX (804) 371-7911, e-mail lrung@schev.edu.

### DEPARTMENT OF HISTORIC RESOURCES

#### State Review Board and Historic Resources Board

**June 13, 2001 - 10 a.m.** -- Open Meeting
Virginia Museum of Fine Arts, 2800 Grove Avenue, Auditorium, Richmond, Virginia.

A quarterly meeting to consider (i) nominations to the Virginia Register of Historic Places and to the National Register of Historic Places; and (ii) preliminary information applications, and highway markers and easements.

**Contact:** Marc C. Wagner, Register Manager, Department of Historic Resources, 2801 Kensington Ave., Richmond, VA 23221, telephone (804) 367-2323, FAX (804) 367-2391, (804) 367-2386/TTY ☎, e-mail mwagner@dhr.state.va.us.

### HOPEWELL INDUSTRIAL SAFETY COUNCIL

**June 5, 2001 - 9 a.m.** -- Open Meeting
**† July 3, 2001 - 9 a.m.** -- Open Meeting
Hopewell Community Center, 100 West City Point Road, Hopewell, Virginia. (Interpreter for the deaf provided upon request)

Local Emergency Preparedness Committee meeting as required by SARA Title III.

**Contact:** Robert Brown, Emergency Services Coordinator, 300 N. Main Street, Hopewell, VA 23860, telephone (804) 541-2298.

### DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT

**May 30, 2001 - 10 a.m.** -- Open Meeting
Department of Housing and Community Development, 501 North 2nd Street, Richmond, Virginia.

A meeting of the Codes and Standards Committee to consider building and fire-related regulatory issues series of international codes, including provisions of the ICC.

**Contact:** Stephen W. Calhoun, CPA Senior Policy Analyst, 501 N. 2nd St., Richmond, VA 23219, telephone (804) 371-7015, FAX (804) 371-7092, (804) 371-7089/TTY ☎, e-mail scalhoun@dhcd.state.va.us.

### DEPARTMENT OF HUMAN RESOURCE MANAGEMENT

#### State Health Benefits Advisory Council

**† May 23, 2001 - 1:30 p.m.** -- Open Meeting
James Monroe Building, 101 North 14th Street, Conference Room B, Richmond, Virginia.

A regular meeting.

**Contact:** Anthony Graziano, Director of State and Local Health Benefits, Department of Human Resource Management, 101 N. 14th St., 13th Floor, Richmond, VA 23219, telephone (804) 371-8458, FAX (804) 371-0231, e-mail Measley@dhrm.state.va.us.

### VIRGINIA INFORMATION PROVIDERS NETWORK AUTHORITY

**† May 24, 2001 - 1 p.m.** -- Open Meeting
Department of Information Technology, 110 South 7th Street, Auditorium, Richmond, Virginia.

A full authority meeting.

**Contact:** Conor Powell, Virginia Information Providers Network Authority, 110 S. 7th St., Suite 135, Richmond, VA, telephone (804) 786-4583, e-mail cpowell@vipnetboard.state.va.us.

# Calendar of Events

## VIRGINIA INTERAGENCY COORDINATING COUNCIL

**June 13, 2001 - 9:30 a.m.** -- Open Meeting
Skipwith United Methodist Church, 2211 Skipwith Road, Richmond, Virginia.📷 (Interpreter for the deaf provided upon request)

A quarterly meeting to advise and assist the Department of Mental Health, Mental Retardation and Substance Abuse Services as lead agency for Part C of IDEA (early intervention for infants and toddlers with disabilities and their families). Discussion will focus on issues related to Virginia's implementation of the Part C program.

**Contact:** LaKeishia L. White, Part C Office Services Specialist, Department of Mental Health, Mental Retardation and Substance Abuse Services, Early Intervention, 9th Floor, P.O. Box 1797, Richmond, VA 23218-1797, telephone (804) 786-3710 or FAX (804) 371-7959.

## JAMESTOWN-YORKTOWN FOUNDATION

**May 24, 2001 - 10 a.m.** -- Open Meeting
**May 25, 2001 - 8 a.m.** -- Open Meeting
Williamsburg, Virginia.📷 (Interpreter for the deaf provided upon request)

A semi-annual meeting of the Board of Trustees. Public comment will not be heard.

**Contact:** Laura W. Bailey, Executive Assistant to the Board, Jamestown-Yorktown Foundation, P.O. Box 1607, Williamsburg, VA 23187, telephone (757) 253-4840, FAX (757) 253-5299, (757) 253-7236/TTY ☎, e-mail lwbailey@jyf.state.va.us.

## DEPARTMENT OF LABOR AND INDUSTRY

### Virginia Apprenticeship Council

**June 21, 2001 - 10 a.m.** -- Open Meeting
Virginia Employment Commission, 700 East Main Street, 3rd Floor, Conference Room, Richmond, Virginia.📷 (Interpreter for the deaf provided upon request)

A regular meeting.

**Contact:** Bev Donati, Assistant Program Manager, Department of Labor and Industry, Powers-Taylor Bldg., 13 S. 13th St., Richmond, VA 23219, telephone (804) 786-2382, FAX (804) 786-8418, (804) 786-2376/TTY ☎, e-mail bgd@doli.state.va.us.

### Safety and Health Codes Board

NOTE: CHANGE IN MEETING DATE
**June 11, 2001 - 10 a.m.** -- Open Meeting
General Assembly Building, 9th and Broad Streets, House Room C, Richmond, Virginia.📷 (Interpreter for the deaf provided upon request)

A regular meeting.

**Contact:** Regina P. Cobb, Agency Management Analyst Senior, Department of Labor and Industry, Powers-Taylor Bldg., 13 S. 13th St., Richmond, VA 23219, telephone (804) 786-0610, FAX (804) 786-8418, (804) 786-2376/TTY ☎, e-mail rpc@doli.state.va.us.

## STATE LIBRARY BOARD

**† May 21, 2001 - 11:30 a.m.** -- Open Meeting
Chesterfield County Public Library, 9501 Lori Road, Chesterfield, Virginia.📷

A subcommittee meeting of the State Networking Users Advisory Board to discuss the role of the board.

**Contact:** Hampton "Skip" M. Auld, Assistant Library Director, Chesterfield County Public Library, 9501 Lori Rd., P.O. Box 297, Chesterfield, VA 23832, telephone (804) 748-1767, FAX (804) 751-4679, e-mail auldh@co.chesterfield.va.

## MARINE RESOURCES COMMISSION

**May 22, 2001 - 9:30 a.m.** -- Open Meeting
**June 26, 2001 - 9:30 a.m.** -- Open Meeting
Marine Resources Commission, 2600 Washington Avenue, 4th Floor, Newport News, Virginia.📷

A monthly meeting.

**Contact:** LaVerne Lewis, Commission Secretary, Marine Resources Commission, 2600 Washington Ave., Newport News, VA 23607, telephone (757) 247-2261, FAX (757) 247-2020, toll-free (800) 541-4646, (757) 247-2292/TTY ☎, e-mail llewis@mrc.state.va.us.

## DEPARTMENT OF MEDICAL ASSISTANCE SERVICES

**† July 21, 2001 -** Public comments may be submitted until this date.

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the Department of Medical Assistance Services intends to amend regulations entitled: **12 VAC 30-20-10 et seq. Administration of Medical Assistance Services.** The purpose of the proposed amendment is to increase the amount of the copayment that Medicaid recipients are required to pay when their prescriptions are filled with brand name drugs instead of generics.

Statutory Authority: § 32.1-325 of the Code of Virginia.

Public comments may be submitted until July 21, 2001, to Marianne Rollings, R.Ph., Program Operations, Department of Medical Assistance Services, 600 East Broad Street, Suite 1300, Richmond, VA 23219.

**Contact:** Victoria P. Simmons, Regulatory Coordinator, Department of Medical Assistance Services, 600 E. Broad St., Suite 1300, Richmond, VA 23219, telephone (804) 786-7959 or FAX (804) 786-1680.

## Calendar of Events

### BOARD OF MEDICINE

**May 25, 2001 - 1 p.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, Richmond, Virginia.

**May 31, 2001 - 9:30 a.m.** -- Open Meeting
Williamsburg Marriott Hotel, Williamsburg, Virginia.

A meeting of the Informal Conference Committee to inquire into allegations that certain practitioners may have violated laws and regulations governing the practice of medicine and other healing arts in Virginia. The committee will meet in open and closed sessions pursuant to § 2.1-344 A 7 and A 15 of the Code of Virginia. Public comment will not be received.

**Contact:** Peggy Sadler or Renee Dixson, Board of Medicine, 6606 West Broad Street, 4th Floor, Richmond, VA 23230, telephone (804) 662-7332, FAX (804) 662-9517, (804) 662-7197/TTY ☎

**June 14, 2001 - 9 a.m.** -- Open Meeting
Holiday Inn Select, 2801 Plank Road, Fredericksburg, Virginia.

A meeting of the Informal Conference Committee to inquire into allegations that certain practitioners may have violated laws and regulations governing the practice of medicine and other healing arts in Virginia. Also, a panel will convene a formal hearing into allegations that certain practitioners may have violated laws and regulations governing the practice of medicine and other healing arts in Virginia. The committee/panel will meet in open and closed sessions pursuant to the Code of Virginia. Public comment will not be received.

**Contact:** Peggy Sadler or Renee Dixson, Board of Medicine, 6606 West Broad Street, Richmond, VA, telephone (804) 662-7332, FAX (804) 662-9517, (804) 662-7197/TTY ☎, e-mail PSadler@dhp.state.va.us.

**May 25, 2001 - 9:30 a.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, 5th Floor, Conference Room 2, Richmond, Virginia 🖥

A meeting of the Legislative Committee to consider legislative and regulatory issues, to review pending regulations, and to consider other information as may be presented on the agenda. Public comment on agenda items will be received at the beginning of the meeting.

**Contact:** William L. Harp, M.D., Executive Director, Board of Medicine, Southern States Bldg., 6606 W. Broad St., 4th Floor, Richmond, VA 23230-1717, telephone (804) 662-9908, FAX (804) 662-9943, (804) 662-7197/TTY ☎, e-mail wharp@dhp.state.va.us.

**June 7, 2001 - 8 a.m.** -- Open Meeting
**June 8, 2001 - 8 a.m.** -- Open Meeting
**June 9, 2001 - 8 a.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, 5th Floor, Conference Room 2, Richmond, Virginia 🖥

A meeting to conduct general board business, receive committee and board reports, and discuss any other items that may come before the board. The board will also meet to review reports and regulations, interview licensees/applicants, conduct administrative proceedings, and make decisions on disciplinary matters. The board will entertain public comments during the first 15 minutes on agenda items.

**Contact:** William L. Harp, M.D., Executive Director, Board of Medicine, Southern States Bldg., 6606 W. Broad St., 4th Floor Richmond, VA 23230-1717, telephone (804) 662-9908, FAX (804) 662-9943, (804) 662-7197/TTY ☎, e-mail wharp@dhp.state.va.us.

### VIRGINIA MUSEUM OF FINE ARTS

**June 19, 2001 - Noon** -- Open Meeting
Virginia Museum of Fine Arts, 2800 Grove Avenue, Auditorium, Richmond, Virginia 🖥

An annual meeting for the Executive and Finance Committees to approve the museum's annual budget. Public comment will not be received.

**Contact:** Suzanne Broyles, Secretary of the Museum, Virginia Museum of Fine Arts, 2800 Grove Ave., Richmond, VA 23221, telephone (804) 340-1503, FAX (804) 340-1502, (804) 340-1401/TTY ☎, e-mail sbroyles@vmfa.state.va.us.

### BOARD OF NURSING

**May 21, 2001 - 8:30 a.m.** -- Open Meeting
**May 23, 2001 - 8:30 a.m.** -- Open Meeting
**May 24, 2001 - 8:30 a.m.** -- Open Meeting
**July 16, 2001 - 8:30 a.m.** -- Open Meeting
**July 18, 2001 - 8:30 a.m.** -- Open Meeting
**July 19, 2001 - 8:30 a.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, 5th Floor, Conference Room 2, Richmond, Virginia 🖥

A panel of the board will conduct formal hearings with licensees and certificate holders. Public comment will not be received.

**Contact:** Nancy K. Durrett, R.N., Executive Director, Board of Nursing, 6606 W. Broad St., 4th Floor, Richmond, VA 23230, telephone (804) 662-9909, FAX (804) 662-9512, (804) 662-7197/TTY ☎, e-mail nursebd@dhp.state.va.us.

**† May 22, 2001 - 9 a.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, 5th Floor, Conference Room 2, Richmond, Virginia 🖥

A general business meeting to include regulatory and disciplinary actions. Public comment will be received at 11 a.m.

**Contact:** Nancy K. Durrett, R.N., Executive Director, Board of Nursing, Southern States Bldg., 6606 W. Broad St., 4th Floor, Richmond, VA 23230-1717, telephone (804) 662-9909, FAX (804) 662-9512, (804) 662-7197/TTY ☎, e-mail ndurrett@dhp.state.va.us.

## Calendar of Events

### Special Conference Committee

**June 5, 2001 - 8:30 a.m.** -- Open Meeting
**June 12, 2001 - 8:30 a.m.** -- Open Meeting
**June 18, 2001 - 8:30 a.m.** -- Open Meeting
**June 19, 2001 - 8:30 a.m.** -- Open Meeting
**June 20, 2001 - 8:30 a.m.** -- Open Meeting
**June 28, 2001 - 8:30 a.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, 5th Floor, Conference Rooms 3 and 4, Richmond, Virginia.

A Special Conference Committee, comprised of two or three members of the Virginia Board of Nursing, will conduct informal conferences with licensees or certificate holders. Public comment will not be received.

**Contact:** Nancy K. Durrett, R.N., Executive Director, Board of Nursing, 6606 W. Broad Street, 4th Floor, Richmond, VA 23230, telephone (804) 662-9909, FAX (804) 662-9512, (804) 662-7197/TTY ☎, e-mail nursebd@dhp.state.va.us.

### OLD DOMINION UNIVERSITY

**June 14, 2001 - 2:30 p.m.** -- Open Meeting
Webb University Center, Old Dominion University, Norfolk, Virginia. (Interpreter for the deaf provided upon request)

The annual meeting of the governing board of the institution to discuss business of the board and the institution as determined by the rector and the president.

**Contact:** Donna Meeks, Assistant to the Vice President for Administration and Finance, Old Dominion University, 225 Koch Hall, Norfolk, VA 23529, telephone (757) 683-3072, FAX (757) 683-5679, e-mail dmeeks@odu.edu.

### BOARD OF PHARMACY

**† May 23, 2001 - 9 a.m.** -- Open Meeting
**† June 14, 2001 - 9 a.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, 5th Floor, Conference Room 4, Richmond, Virginia.

The Special Conference Committee will hear informal conferences. Public comments will not be received.

**Contact:** Elizabeth Scott Russell, Executive Director, Board of Pharmacy, 6606 W. Broad St., 4th Floor, Richmond, VA 23230, telephone (804) 662-9911, FAX (804) 662-9313.

**† June 13, 2001 - 9 a.m.** -- Open Meeting
Department of Health Professions, 6606 West Broad Street, 5th Floor, Conference Room 2, Richmond, Virginia.

A general business meeting, including but not limited to, the election of officers and consideration of legislative proposals for the 2002 Session of the General Assembly. Public comment will be received at the beginning of the meeting.

**Contact:** Elizabeth Scott Russell, R.Ph., Executive Director, Board of Pharmacy, Southern States Bldg., 6606 W. Broad St., 4th Floor Richmond, VA 23230-1717, telephone (804) 662-9911, FAX (804) 662-9313, (804) 662-7197/TTY ☎, e-mail erussell@dhp.state.va.us.

### BOARD FOR PROFESSIONAL AND OCCUPATIONAL REGULATION

**June 8, 2001 - 10 a.m.** -- Open Meeting
Virginia Beach Central Library, 4100 Virginia Beach Boulevard, Virginia Beach, Virginia. (Interpreter for the deaf provided upon request)

A regular meeting.

**Contact:** Judith A. Spiller, Administrative Assistant, Board for Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8519, FAX (804) 367-9537, (804) 367-9753/TTY ☎, e-mail spiller@dpor.state.va.us.

**June 8, 2001 - 1 p.m.** -- Public Hearing
Virginia Beach Central Library, 4100 Virginia Beach Boulevard, Virginia Beach, Virginia. (Interpreter for the deaf provided upon request)

**† June 18, 2001 - 10 a.m.** -- Public Hearing
Virginia Department of Forestry, Natural Resources Building, 900 Natural Resources Drive, Charlottesville, Virginia. (Interpreter for the deaf provided upon request)

A public hearing regarding the need for state regulation of foresters and the need for state regulation of arborists. Interested parties are encouraged to attend and provide testimony and/or written comments. The board will receive written comments until 5 p.m. on July 31, 2001. Comments may be mailed to Debra Vought at the Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, VA 23230, e-mailed to vought@dpor.state.va.us or FAXED to (804) 367-9537. Please call (804) 367-8519 if you have questions regarding the study.

**Contact:** Judith A. Spiller, Administrative Assistant, Board for Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8519, FAX (804) 367-9537, (804) 367-9753/TTY ☎, e-mail spiller@dpor.state.va.us.

### POLYGRAPH EXAMINERS ADVISORY BOARD

**June 13, 2001 - 10 a.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia. (Interpreter for the deaf provided upon request)

A meeting to conduct board business. Persons desiring to participate in the meeting and requiring special accommodations or interpretative services should contact the department at least 10 days prior to this meeting so that suitable arrangements can be made. The department fully complies with the Americans with Disabilities Act.

**Contact:** Mark N. Courtney, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230-4917, telephone (804) 367-8514, FAX (804) 367-2475, (804) 367-9753/TTY ☎, e-mail polygraph@dpor.state.va.us.

# Calendar of Events

## REAL ESTATE BOARD

**June 5, 2001 - 4 p.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia.

A general business meeting of the Education Committee.

**Contact:** Karen W. O'Neal, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8552, FAX (804) 367-2475, e-mail reboard@dpor.state.va.us.

**June 6, 2001 - 8 a.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia.

A general business meeting of the Fair Housing Committee.

**Contact:** Karen W. O'Neal, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8552, FAX (804) 367-2475, e-mail reboard@dpor.state.va.us.

**June 6, 2001 - 9 a.m.** -- Open Meeting
Department of Professional and Occupational Regulation, 3600 West Broad Street, Richmond, Virginia.

A general business meeting.

**Contact:** Karen W. O'Neal, Assistant Director, Department of Professional and Occupational Regulation, 3600 W. Broad St., Richmond, VA 23230, telephone (804) 367-8552, FAX (804) 367-2475, e-mail reboard@dpor.state.va.us.

## VIRGINIA RESOURCES AUTHORITY

**June 12, 2001 - 9 a.m.** -- Open Meeting
Virginia Resources Authority, 707 East Main Street, 2nd Floor, Conference Room, Richmond, Virginia.

A regular meeting of the Board of Directors to (i) review and, if appropriate, approve the minutes from the most recent monthly meeting; (ii) review the authority's operations for the prior month; (iii) review applications for loans submitted to the authority for approval; (iv) consider loan commitments for approval and ratification under its various programs; (v) approve the issuance of any bonds; (vi) review the results of any bond sales; and (vii) consider such other matters and take such other actions as it may deem appropriate. Various committees of the Board of Directors may also meet immediately before or after the regular meeting and consider matters within their purview. The planned agenda of the meeting and any committee meetings will be available at the offices of the authority one week prior to the date of the meeting. Any person who needs any accommodation in order to participate in the meeting should contact the authority at least 10 days before the meeting so that suitable arrangements can be made.

**Contact:** Benjamin Hoyle, Executive Assistant, Virginia Resources Authority, 707 E. Main St., Suite 1350, Richmond, VA 23219, telephone (804) 644-3100, FAX (804) 644-3109, e-mail bhoyle@vra.state.va.us.

## SCIENCE MUSEUM OF VIRGINIA

**June 21, 2001 - 3 p.m.** -- Open Meeting
Science Museum of Virginia, 2500 West Broad Street, Richmond, Virginia. (Interpreter for the deaf provided upon request)

A quarterly meeting of the Board of Trustees.

**Contact:** Karen Raham, Administrative Assistant, Science Museum of Virginia, 2500 W. Broad St., Richmond, VA 23221, telephone (804) 864-1499, FAX (804) 864-1560, toll-free (800) 659-1727, (804) 828-1140/TTY ☎, e-mail kraham@smv.org.

## VIRGINIA SMALL BUSINESS FINANCING AUTHORITY

**May 22, 2001 - 10 a.m.** -- Open Meeting
Department of Business Assistance, 707 East Main Street, 3rd Floor, Board Room, Richmond, Virginia.

A meeting to review applications for loans submitted to the authority for approval and to conduct general business. The time is subject to change, depending upon the agenda of the board.

**Contact:** Scott E. Parsons, Executive Director, Department of Business Assistance, P.O. Box 446, Richmond, VA 23218-0446, telephone (804) 371-8254, FAX (804) 225-3384, e-mail sparsons@dba.state.va.us.

## STATE BOARD OF SOCIAL SERVICES

**May 25, 2001 -** Public comments may be submitted until this date.

Notice is hereby given in accordance with § 9-6.14:7.1 of the Code of Virginia that the State Board of Social Services intends to adopt regulations entitled: **22 VAC 40-295-10 et seq. Temporary Assistance for Need Families (TANF).** This regulation provides the rules for qualifying for TANF assistance. The regulation explains what persons are required to participate together as an assistance unit, resource criteria, income eligibility criteria, and provides streamlined processing procedures.

Statutory Authority: § 63.1-25 of the Code of Virginia.

**Contact:** Mark L. Golden, Human Services Program Consultant, State Board of Social Services, 730 E. Broad St., 7th Floor, Richmond, VA 23219, telephone (804) 692-1731 or FAX (804) 692-1704.

## COUNCIL ON TECHNOLOGY SERVICES

**† June 6, 2001 - 9 a.m.** -- Open Meeting
Department of Transportation, 1221 East Broad Street, Auditorium, Richmond, Virginia. (Interpreter for the deaf provided upon request)

A regular meeting of the Digital Opportunities Task Force.

# Calendar of Events

**Contact:** Janice M. Akers, Council on Technology Services, Washington Bldg., 1100 Bank St., Suite 901, Richmond, VA 23219, telephone (804) 786-1153, FAX (804) 371-7952, e-mail jakers@egov.state.va.us.

**† July 12, 2001 - 9 a.m.** -- Open Meeting
Department of Transportation, 1221 East Broad Street, Auditorium, Richmond, Virginia. (Interpreter for the deaf provided upon request)

A group meeting of the Council on Technology Services.

**Contact:** Jenny Wootton, Council on Technology Services, Washington Bldg., 1100 Bank St., Suite 901, Richmond, VA 23219, telephone (804) 786-0744, FAX (804) 371-7952, e-mail jwootton@egov.state.va.us.

## VIRGINIA VOLUNTARY FORMULARY BOARD

**June 4, 2001 - 10 a.m.** -- Public Hearing
Washington Building, 1100 Bank Street, Richmond, Virginia.

A public hearing to consider the adoption and issuance of revisions to the Virginia Voluntary Formulary. The proposed revisions to the Formulary add and delete drugs and drug products to the July 27, 1998, revision of the Formulary and the most recent supplement to that revision. Written comments received prior to 5 p.m. on June 4, 2001, will be made a part of the hearing record and considered by the Formulary Board. Copies of the proposed revisions to the Virginia Voluntary Formulary are available for inspection at the Bureau of Pharmacy Services, Virginia Department of Health, 101 N. 14th St., Room S-45, Richmond, Virginia 23219.

**Contact:** James K. Thomson, Director, Bureau of Pharmacy Services, Department of Health, Monroe Bldg., 101 N. 14th St., Room S-45, Richmond, VA 23219, telephone (804) 786-4326, FAX (804) 371-0236.

**† June 26, 2001 - 10:30 a.m.** -- Open Meeting
Washington Building, 1100 Bank Street, 2nd Floor Conference Room, Richmond, Virginia.

A meeting to review public hearing comments and product data for drug products being considered for inclusion in the Virginia Voluntary Formulary.

**Contact:** James K. Thomson, Director, Bureau of Pharmacy Services, Department of Health, James Monroe Bldg., 101 N. 14th St., Room S-45, Richmond, VA 23219, telephone (804) 786-4326.

## VIRGINIA WASTE MANAGEMENT BOARD

**June 7, 2001 - 10 a.m.** -- Open Meeting
Department of Environmental Quality, 629 East Main Street, 10th Floor Conference Room, Richmond, Virginia.

A public meeting to receive comments on the Virginia Waste Management Board's notice of intent to amend the Solid Waste Management Regulations.

**Contact:** Michael J. Dieter, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4146, FAX (804) 698-4327, (804) 698-4021/TTY ☎, e-mail mjdieter@deq.state.va.us.

## STATE WATER CONTROL BOARD

**May 21, 2001 - 7 p.m.** -- Public Hearing
A. T. Johnson Museum, Route 3, Montross, Virginia.

A public hearing to receive comments on the proposed reissuance of a VPDES permit for Outdoor World Corporation - Harborview Facility.

**Contact:** Denise Mosca, State Water Control Board, P.O. Box 669, Kilmarnock, VA 22482, telephone (804) 435-3181, FAX (804) 435-0485, e-mail dmmosca@deq.state.va.us,.

NOTE: CHANGE IN MEETING DATE
**† June 12, 2001 - 9:30 a.m.** -- Open Meeting
General Assembly Building, 9th and Broad Streets, House Room C, Richmond, Virginia.

A regular meeting of the State Water Control Board. Detailed agenda available approximately seven days before the meeting.

**Contact:** Cindy Berndt, Regulatory Coordinator, Department of Environmental Quality, P.O. Box 10009, Richmond, VA 23240, telephone (804) 698-4378, FAX (804) 698-4346, e-mail cmberndt@deq.state.va.us.

## VIRGINIA WORKFORCE COUNCIL

**† May 23, 2001 - 10 a.m.** -- Open Meeting
Virginia Employment Commission, 703 East Main Street, Room 304, Richmond, Virginia. (Interpreter for the deaf provided upon request)

Public comment will be received at approximately 11 a.m. Written copies of the remarks are desirable. Statewide retraining will be on the agenda.

**Contact:** Gail Robinson, Virginia Workforce Council, Virginia Employment Commission/WIA Unit, 703 East Main Street, Richmond, VA 23218, telephone (804) 225-3070, (800) 828-1120/TTY ☎, e-mail lmoseley@vec.state.va.us.

**June 12, 2001 - 10 a.m.** -- Open Meeting
Hotel Roanoke, 110 Shenandoah Avenue, N.E., Roanoke, Virginia (Interpreter for the deaf provided upon request)

Agenda to be announced.

**Contact:** Laura Moseley, WIA Unit, Virginia Workforce Council, P.O. Box 1358, Richmond, VA 23218-1358, telephone (804) 225-2795, FAX (804) 225-2190, (800) 828-1120/TTY ☎, e-mail lmoseley@vec.state.va.us.

Calendar of Events

# INDEPENDENT

## STATE LOTTERY BOARD

**June 15, 2001 - 9:30 a.m.** -- Open Meeting
State Lottery Board, Pocahontas Building, 900 East Main Street, 13th Floor, Richmond, Virginia. ♿ (Interpreter for the deaf provided upon request)

A regular meeting of the board. This meeting replaces those previously scheduled for May 16 and June 27, which have been canceled. A period for public comment will be called at the beginning of the meeting.

**Contact:** Barbara L. Robertson, State Lottery Board, 900 E. Main St., Richmond, VA 23219, telephone (804) 692-7105, FAX (804) 692-7775, e-mail brobertson@valottery.state.va.us.

## VIRGINIA RETIREMENT SYSTEM

**June 5, 2001 - 1 p.m.** -- Open Meeting
Offices of Palmer & Cay, 9020 Stony Point Parkway, Suite 200, Richmond, Virginia. ♿

The regular meeting of the Volunteer Firefighters' and Rescue Squad Workers' Service Award Fund Board.

**Contact:** Fran Tarcen, Defined Contribution Analyst, Virginia Retirement System, Palmer & Cay, 9020 Stony Point Parkway, Suite 200, Richmond, VA 23235, telephone (804) 267-3216, FAX (804) 330-1386, e-mail fran_tarcen@palmercay.com.

**† August 15, 2001 - 3 p.m.** -- Open Meeting
VRS Headquarters, 1200 East Main Street, Richmond, Virginia. ♿

Regular meetings of the Audit and Compliance Committee and the Benefits and Actuarial Committee.

**Contact:** Darla K. Glazier, Office Manager, Virginia Retirement System, VRS, P.O. Box 2500, Richmond, VA 23218, telephone (804) 649-8059, FAX (804) 786-1541, toll-free (888) 827-3847, (804) 344-3190/TTY ☎, e-mail dkestner@vrs.state.va.us.

**† August 16, 2001 - 8 a.m.** -- Open Meeting
VRS Headquarters, 1200 East Main Street, Richmond, Virginia. ♿

The regular meeting of the Virginia Retirement System's Administration and Personnel Committee.

**Contact:** Darla K. Glazier, Office Manager, Virginia Retirement System, VRS, P.O. Box 2500, Richmond, VA 23218, telephone (804) 649-8059, FAX (804) 786-1541, toll-free (888) 827-3847, (804) 344-3190/TTY ☎, e-mail dkestner@vrs.state.va.us.

**August 16, 2001 - 9 a.m.** -- Open Meeting
Virginia Retirement System Headquarters, 1200 East Main Street, Richmond, Virginia. ♿

A regular meeting of the Board of Trustees.

**Contact:** Darla K. Glazier, Office Manager, Virginia Retirement System, P.O. Box 2500, Richmond, VA 23218, telephone (804) 649-8059, FAX (804) 786-1541, toll-free (888) 827-3847, (804) 344-3190/TTY ☎, e-mail dglazier@vrs.state.va.us.

# LEGISLATIVE

## ADMINISTRATIVE LAW ADVISORY COMMITTEE

**May 31, 2001 - 1 p.m.** -- Public Hearing
General Assembly Building, 9th and Broad Streets, Richmond, Virginia. ♿ (Interpreter for the deaf provided upon request)

The Subcommittee Studying the Hearing Officer System as it Relates to Appeals of Special Education Decisions, composed of four members of the ALAC, will hold a public hearing to elicit comment from the parents of disabled children and their attorneys, local school boards, hearing officers, and the interested public concerning the Virginia Department of Education's (VDOE) Regulations Governing Special Education Programs for Children with Disabilities that went into effect on January 1, 2001, and the VDOE's Internal Operational Procedures for Implementing Virginia's Special Education Regulations Relative to the Due Process. Copies of the *Special Education Regulations* may be obtained by contacting Dr. Lissa Power deFur, the VDOE's Associate Director of Special Education and Student Services at (804) 255-2818. Copies of the Department's Internal Operational Procedures may be obtained by contacting Dr. Judy Douglas, Director of the Office of Due Process and Complaints at (804) 225-2013.

Interested persons are encouraged to submit written comments to the subcommittee prior to May 31, 2001, or at the time of the public hearing. The time allocated for oral presentation will be limited by the Chairman based on the number of individuals desiring to speak at the public hearing.

**Contact:** Bess Hodges, Program Coordinator, Administrative Law Advisory Committee, 910 Capitol St., 2nd Floor, Richmond, VA 23219, telephone (804) 786-3591, FAX (804) 692-0625, e-mail bhodges@leg.state.va.us.

## VIRGINIA CODE COMMISSION

**June 28, 2001 - 10 a.m.** Open Meeting
**July 26, 2001 - 10 a.m.** -- Open Meeting
**August 30, 2001 - 10 a.m.** -- Open Meeting
General Assembly Building, 9th and Broad Streets, 6th Floor, Speaker's Conference Room, Richmond, Virginia. ♿

A meeting to continue with the recodification of Title 63.1 of the Code of Virginia and to conduct any other business that may come before the commission. Public comment will be received at the end of the meeting.

**Contact:** Jane Chaffin, Registrar of Regulations, General Assembly Bldg., 910 Capitol Street, Richmond, VA 23219,

# Calendar of Events

telephone (804) 786-3591 FAX (804) 692-0625, e-mail jchaffin@leg.state.va.us.

### JOINT SUBCOMMITTEE STUDYING THE RESPONSIBILITIES, POLICIES, AND ACTIVITIES OF THE STATE CORPORATION COMMISSION (SJR 173/HJR 187, 2000)

**June 15, 2001 - 10 a.m.** -- Open Meeting
General Assembly Building, 9th and Broad Streets, Senate Room A, Richmond, Virginia.⌨ (Interpreter for the deaf provided upon request)

A regular meeting. Individuals requiring interpreter services or other accommodations should call or write John McE. Garrett seven working days before the meeting.

**Contact:** John McE. Garrett, Senate Committee Operations, P.O. Box 396, Richmond, VA 23218, telephone (804) 698-7450 or (804) 698-7419/TTY ☎

### VIRGINIA FREEDOM OF INFORMATION ADVISORY COUNCIL

**June 20, 2001 - 10 a.m.** -- Open Meeting
General Assembly Building, 9th and Broad Streets, House Room D, Richmond, Virginia.⌨ (Interpreter for the deaf provided upon request)

A regular meeting.

**Contact:** Maria Everett, Executive Director, Virginia Freedom of Information Advisory Council, General Assembly Building, 910 Capitol Street, 2nd Floor, Richmond, VA 23219, telephone (804) 225-3056, FAX (804) 371-0169, toll-free (866) 448-4100, e-mail meverett@leg.state.va.us.

# CHRONOLOGICAL LIST

## OPEN MEETINGS

**May 21**
† Alzheimer's Disease and Related Disorders Commission
Design-Build/Construction Management Review Board
† Education, Board of
- SOL Technical Advisory Committee
† Library Board, State
- State Networking Users Advisory Board
Nursing, Board of
Water Control Board, State

**May 22**
† Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects, Board of
† Chesapeake Bay Local Assistance Board
Compensation Board
† Education, Board of
- SOL Technical Advisory Committee
Higher Education for Virginia, State Council of
Marine Resources Commission
† Nursing, Board of

Small Business Financing Authority, Virginia

**May 23**
Accountancy, Board of
Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects, Board of
- Landscape Architects Section
† Conservation and Recreation, Department of
- Chippokes Plantation Farm Foundation
† Education, Board of
- Leadership Development Committee
Environmental Quality, Department of
Funeral Directors and Embalmers, Board of
† Human Resource Management, Department of
- State Health Benefits Advisory Council
Nursing, Board of
† Pharmacy, Board of
- Special Conference Committee
† Workforce Council, Virginia

**May 24**
Air Pollution Control Board, State
† Education, Board of
Environmental Quality, Department of
- Virginia Pollution Prevention Advisory Committee
† Information Providers Network Authority, Virginia
Jamestown-Yorktown Foundation
- Board of Trustees
Nursing, Board of

**May 25**
Jamestown-Yorktown Foundation
- Board of Trustees
Medicine, Board of
- Informal Conference Committee
- Legislative Committee

**May 30**
Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects, Board of
- Certified Interior Designers Section
At-Risk Youth and Families, Comprehensive Services for
- State Executive Council
Funeral Directors and Embalmers, Board of
- Special Conference Committee
† Housing and Community Development, Department of
- Codes and Standards Committee

**May 31**
† Administrative Law Advisory Committee
Air Pollution Control Board, State
† Architects, Professional Engineers, Land Surveyors, Certified Interior Designers and Landscape Architects, Board of
† Environmental Quality, Department of
- Virginia Pollution Prevention Advisory Committee
Medicine, Board of
- Informal Conference Committee

**June 1**
† Agriculture and Consumer Services, Department of
- Consumer Affairs Advisory Committee
Art and Architectural Review Board
Game and Inland Fisheries, Board of

**June 4**
Barbers and Cosmetology, Board for

# Calendar of Events

† Voluntary Formulary Board, Virginia

**June 5**
† Agriculture and Consumer Services, Department of
- Virginia Horse Industry Board
Hopewell Industrial Safety Council
Nursing, Board of
- Special Conference Committee
Real Estate Board
- Real Estate Education Committee
Retirement System, Virginia
- Volunteer Firefighters' and Rescue Squad Workers'
Service Award Fund Board

**June 6**
† Agriculture and Consumer Services, Department of
- Virginia Marine Products Board
Architects, Professional Engineers, Land Surveyors,
Certified Interior Designers and Landscape Architects,
Board of
† Emergency Planning Committee, Local - Winchester
Environmental Quality, Department of
† Funeral Directors and Embalmers, Board of
Real Estate Board
- Fair Housing Committee
† Technology Services, Council on
- Digital Opportunities Task Force

**June 7**
Medicine, Board of
† Waste Management, Virginia Board of

**June 8**
Medicine, Board of
Professional and Occupational Regulation, Board for

**June 9**
Blind and Vision Impaired, Department for the
- Statewide Rehabilitation Council for the Blind
Medicine, Board of

**June 11**
† Hearing Aid Specialists, Board for
Labor and Industry, Department of
- Safety and Health Codes Board

**June 12**
† Environmental Quality, Department of
Nursing, Board of
- Special Conference Committee
Resources Authority, Virginia
- Board of Directors
† Water Control Board, State
Workforce Council, Virginia

**June 13**
Historic Resources, Department of
- State Review Board and Historic Resources Board
Interagency Coordinating Council, Virginia
† Pharmacy, Board of
Polygraph Examiners Advisory Board

**June 14**
† Agriculture and Consumer Services, Department of
- Virginia Charity Food Assistance Advisory Board
† Conservation and Recreation, Department of
- Virginia Soil and Water Conservation Board
† Environmental Quality, Department of
Medicine, Board of
- Informal Conference Committee
Old Dominion University

- Board of Visitors
† Pharmacy, Board of

**June 15**
Corporation Commission, Joint Subcommittee Studying the
Responsibilities, Policies, and Activities of the State
Lottery Board, State

**June 18**
Chesapeake Bay Local Assistance Board
Design-Build/Construction Management Review Board
Nursing, Board of
- Special Conference Committee

**June 19**
Museum of Fine Arts, Virginia
- Executive and Finance Committees
Nursing, Board of
- Special Conference Committee

**June 20**
Education, Board of
- Accountability Advisory Committee
Freedom of Information Advisory Council
Nursing, Board of
- Special Conference Committee

**June 21**
† Assistive Technology Loan Fund Authority
- Board of Directors
Education, Board of
Labor and Industry, Department of
- Virginia Apprenticeship Council
Science Museum of Virginia
- Board of Trustees

**June 22**
Education, Board of

**June 26**
Compensation Board
Marine Resources Commission
† Voluntary Formulary Board, Virginia

**June 27**
At-Risk Youth and Families, Comprehensive Services for
- State Executive Council

**June 28**
Code Commission, Virginia
Nursing, Board of
- Special Conference Committee

**July 3**
† Hopewell Industrial Safety Council

**July 12**
† Technology Services, Council on

**July 16**
Nursing, Board of

**July 17**
† Blind and Vision Impaired, Department for the

**July 18**
Nursing, Board of

**July 19**
Nursing, Board of

**July 25**
At-Risk Youth and Families, Comprehensive Services for
- State Executive Council

**July 26**
Code Commission, Virginia
Education, Board of

## Calendar of Events

**August 15**
  † Retirement System, Virginia
**August 16**
  † Retirement System, Virginia
**August 30**
  † Code Commission, Virginia

### PUBLIC HEARINGS

**May 21**
  † Environmental Quality, Department of
  Water Control Board, State
**May 31**
  Administrative Law Advisory Committee
  † Air Pollution Control Board, State
**June 4**
  † Education, Board of
  Voluntary Formulary Board, Virginia
**June 6**
  † Architects, Professional Engineers, Land Surveyors,
  Certified Interior Designers and Landscape Architects,
  Board of
**June 7**
  † Environmental Quality, Department of
**June 8**
  Professional and Occupational Regulation, Board for
**June 18**
  † Professional and Occupational Regulation, Board for
**June 20**
  † Education, Board of
**July 9**
  † Asbestos and Lead, Board for
**July 12**
  † Auctioneers Board
**July 18**
  † Contractors, Board for