2453

```
 1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF VIRGINIA
 2                     NORFOLK DIVISION


 3


 4   UNITED STATES OF AMERICA,      )
                                    )
 5              Plaintiff,          )
                                    )
 6   v.                             )    Criminal Action No.:
                                    )       2:13cr156
 7   W. WAYNE PERRY, JR.            )
     and                            )
 8   ANGELA PERRY,                  )
                                    )
 9              Defendants.         )


10


11           EXCERPT OF JURY TRIAL PROCEEDINGS


12                     Volume 13
                  (Closing Arguments)
13                 Pages 2453-2596


14                 Norfolk, Virginia
                 September 15, 2014
15


16


17
     BEFORE:   THE HONORABLE MARK S. DAVIS
18             United States District Judge, and a Jury.


19


20


21


22


23


24


25
```

Paul L. McManus, RMR, FCRR Official Court Reporter

1    Appearances:

2         OFFICE OF THE UNITED STATES ATTORNEY
                    By: ALAN M. SALSBURY, ESQUIRE
3                        MELISSA E. O'BOYLE, ESQUIRE
                        Counsel for the United States
4
          WILLIAMS MULLEN, PC
5                    By: JOHN STAIGE DAVIS, V, ESQUIRE
                        GRAY BOLLING BROUGHTON, ESQUIRE
6                        Counsel for Defendant W. Perry

7         SACKS AND SACKS
                    By: ANDREW SACKS, ESQUIRE
8                        Counsel for Defendant A. Perry

9         The Defendants appearing in person.

10                         – – –

11                       I N D E X

12   Government Closing........................    2455
     Defendant W. Perry Closing...............    2496
13   Defendant A. Perry Closing...............    2538
     Government Rebuttal......................    2582
14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                      - - -

3          (Jury entered the courtroom at 11:39 a.m.)

4          THE COURT:  Everyone can be seated.

5          All right.  Ms. O'Boyle, is the government ready to

6    make its closing?

7          MS. O'BOYLE:  Yes, Your Honor.

8          THE COURT:  You may proceed.

9          MS. O'BOYLE:  May it please the court.

10         Ladies and gentlemen of the jury, the government has

11   proven beyond a reasonable doubt that W. Wayne Perry, Jr. and

12   Angela Perry executed a billing scheme to defraud Medicaid, and

13   then altered records to cover up that fraud and prevent

14   retractions back to Medicaid.

15         Now, at the beginning of this case, Mr. Salsbury told

16   you that it was a case about dishonesty, deception and fraud.

17   And now that you've heard all of the evidence, we can also

18   explain that this is a case about something else.  Good,

19   old-fashioned greed.  You saw it on full display when Wayne

20   Perry took this stand, and he looked at a chart documenting that

21   he had made more than $750,000 in 2011, only to scoff that he

22   could have made more if his staffing coordinators hadn't

23   defrauded him.  Wayne Perry, assisted by his wife Angela Perry,

24   operated Community Personal Care as a criminal enterprise, and

25   that is why the right people are here on trial today.

1           Now, at its core, this is a very simple case.  The

2  goal of the Medicaid program is a to help poor and needy people

3  obtain access to healthcare.  And Medicaid is a state and

4  federally funded healthcare program.  Now, if Wayne and Angela

5  Perry had been operating a business that had nothing to do with

6  government money, nothing at all, we would not be here today.

7  But Community Personal Care derived almost all of its income

8  from Medicaid.  And even Wayne Perry told you that the Medicaid

9  program is based on trust.  And when Wayne Perry signed

10  agreements with the Medicaid program, he promised to comply with

11  all state and federal laws and all Medicaid regulations.

12           Now, one of the basic principles governing the

13  Medicaid program is not all that difficult to understand.  You

14  can't -- a provider can't bill for services that he did not

15  provide.  There's no such thing as a free lunch, particularly

16  when you're dealing with a government program.  And as a family

17  doesn't pay a babysitter for 20 hours of work if the babysitter

18  only works for two.  Medicaid will not pay for 49 hours of care

19  if an aide was only there for seven hours.  As Angela Perry put

20  it from the witness stand on Friday, "Billing by the plan of

21  care is fraud.  We don't live in a perfect world, it's fraud."

22  Plain and simple.

23           And another basic principle is that Medicaid is paying

24  providers for a very specific type of service.  Medicaid money

25  is not a pot of gold at the end of the rainbow that providers

1   have access to for any reason.  Providers access this money by

2   providing a service, such as respite services, to relieve the

3   caregiver of the physical burden and emotional stress of

4   providing continuous support for their loved one.  But again, a

5   provider cannot bill for a service that they do not provide.

6   And let's be very, very clear here:  Wayne and Angela Perry are

7   not on trial because they violated Medicaid regulations.  These

8   rules and regulations are things that Wayne Perry clearly

9   understood.  The first 10 minutes of my cross-examination, we

10  were in agreement on practically everything.  But we presented

11  this evidence of the regulations to assist you in determining

12  whether Wayne and Angela Perry had the knowledge and the intent

13  to defraud Medicaid, and that is precisely what they're charged

14  with in the superseding indictment.

15          Now, the superseding indictment in this case charged

16  Wayne Perry and Angela Perry with committing five separate types

17  of crimes, all arising from the fraudulent billing scheme and

18  the alteration of records.  Now, the government bears the burden

19  of proving these crimes beyond a reasonable doubt, and I have

20  two goals here with my closing argument here today.  First, I'm

21  going to tell you where to locate the documentary evidence that

22  provides the basis for all the substantive charges.  And then

23  second, I want to give you some things to think about when you

24  go back into the jury room with the evidence that you heard

25  presented over the last three weeks.

1     So let's talk about Count 1, the conspiracy charge.

2  Now, the superseding indictment alleges that Wayne and Angela

3  Perry conspired together with others to achieve two different

4  purposes:  First, to obtain Medicaid money by causing to be

5  submitted false, fraudulent and fictitious claims to Medicaid.

6     Second, to alter aide records, the DMAS-90s that

7  you've seen throughout this trial, to prevent Medicaid from

8  discovering the fraud and to prevent Medicaid from recovering

9  fraudulent over payments.

10     Now, the evidence presented to support the conspiracy

11  charge is literally every piece of evidence that you received in

12  this case, every witness that testified, every document that you

13  received, all of that supports the conspiracy charge.  For

14  example, you've seen substantial evidence that the company

15  billed by the plan of care and not the aide records in 2009,

16  2010, 2011 and 2012.  For example, you have the summary charts

17  in evidence.  Exhibit 52, Velma Morris's summary chart.  If you

18  take a look at it, every single week, 46 hours billed that were

19  not supported by the aide records.  This is plan of care

20  billing, ladies and gentlemen.  And as Wayne Perry told you, "If

21  it isn't documented, it wasn't done."  And it makes sense:

22  Aides only got paid if they turned in their aide record.  And

23  aides need to get paid.

24     So this continued into 2010.  This is Emma Willard's

25  summary chart, Exhibit 32.  And if you look in 2010, again,

1  overbilling almost every single week.  Billing by the plan of

2  care that is not supported by the aide records.

3          Going into 2011, Christopher Leach's summary chart,

4  again, billing by the plan of care every week, not supported by

5  the aide records.

6          And continuing into 2012, this is Jessie Fenton,

7  Exhibit 66, again, every week billing by the plan of care and it

8  not being supported by the aide records.

9          It was systemic overbilling across patients and over a

10 period of four years.

11         Likewise, you have substantial evidence of the ongoing

12 alteration of records going on at CPC.  You have Exhibit 22A,

13 which is Elsie Johnson's aide records, a number of them in the

14 thinned chart.  You saw -- we put these up repeatedly during the

15 trial, alterations to these documents.

16         You also have Exhibit 80, which is filled with

17 examples that were pulled directly from the charts that you also

18 have in evidence, of comments being added, hours being added.

19 This is all documents that support the alteration of records

20 count.  And this is Count 14.

21         Counts 2 through 5 charge the substantive healthcare

22 fraud counts.  And you heard the court's description of these

23 elements.  Now, the court also told you that it's not necessary

24 for the government to prove that each defendant personally did

25 every act constituting the offense charged.  You can act through

1  others.  You can act through your employees.  Dee Lindsey,

2  Artincy Hobbs, Sarina Freeman, and others.  So if the acts or

3  conduct of another is deliberately ordered or directed by a

4  defendant or deliberately authorized or consented to by a

5  defendant, then the law holds that defendant responsible just

6  the same as if it was personally done by him or her.

7           So what does that mean?  That means it doesn't matter

8  that Wayne Perry wasn't the one behind the computer submitting

9  each fraudulent claim.  If the employees were acting at his

10  direction, then he is accountable.  It doesn't matter that

11  Angela Perry wasn't the one who was altering every single

12  document.  If the employees were acting at her direction, then

13  she is accountable.  And it makes sense.  You can't avoid legal

14  liability, ladies and gentlemen, just by asking other people to

15  do your dirty work.

16          So where can you locate the evidence to support

17  Counts 2 through 5?  Let's use Count 2 as an example.  You'll

18  see in the instructions it relates to Joseph Dickerson, and it

19  relates to both personal care overpayment and respite care

20  overpayment.  Now, for each of these substantive counts you have

21  the patient's chart in evidence.  Joseph Dickerson's chart is

22  Exhibit 20.  And right behind each patient chart is the summary

23  chart that relates to this patient.  And that's going to be true

24  for each of these counts:  You have the patient chart and the

25  summary chart right behind it.

1              Now, if you take a look at Exhibit 21, which is what

2    we're looking at, this is the last page.  And she prepared

3    the -- Agent Wright testified she prepared this chart by looking

4    at the claims and then taking the face sheets, the aide records

5    at their face value, and just looking at, pulling the amount

6    directly off that time sheet.  So if you look at the back page,

7    you have the personal hours billed to Medicaid and the hours

8    documented on the time sheets.

9              Now, by all means, go back behind her.  Pull out

10   Joseph Dickerson's patient chart and look at those time sheets

11   and verify what she said.  But she also testified that she went,

12   she did that exercise three times to verify the accuracy of her

13   summary charts.

14             And so Count 2 charges an over care payment based

15   on -- or overpayment based on personal care hours billed to

16   Medicaid in the amount of $5,410.47.

17             Also, the other part of this scheme was the respite

18   care, and this respite care overpayment is based on the total

19   amount of respite care billed by Community Personal Care to

20   Medicaid.

21             Now, for Mr. Dickerson, you heard from Wanda Davis.

22   She was his daughter.  She runs an in-home daycare.  And she

23   testified that she never requested respite services from

24   Community Personal Care to relieve her of the obligation of

25   taking care of her mother or her father.  And yet, 19,000 --

1   over $19,000 was billed for that purpose.  That's Count 2.

2          Count 3 is Elsie Johnson.  Again, her charts are

3   Exhibit 22, 22A with the summary chart, which is what you're

4   looking at in front of you.  Right behind it is Exhibit 23.  You

5   have the personal care overpayment and the respite care

6   overpayment as the basis for Count 3.

7          This respite care relates to Wanda McNair, who you

8   heard from.  Wanda McNair is Elsie Johnson's daughter.  She

9   works at the dental office, and she came in and testified

10  briefly for us.  She also testified that she never requested

11  respite care hours to relieve her of the burden of taking care

12  of her mother.

13         Count 4 is Elizabeth Mullen.  Her chart is at

14  Exhibit 25, and then the summary chart is Exhibit 26.  Again,

15  personal care overpayment and respite care overpayment totals

16  are in Exhibit 26.  The respite care relates to Michael Mullen

17  who you heard a bit about.  He was the dapper-looking gentleman

18  who came here from Maryland.  He testified that he had never

19  heard of respite care services, and certainly never requested

20  them.  And yet there are $35,000 in respite care services that

21  were paid for to Community Personal Care by Medicaid.  That is

22  Count 4.

23         Count 5 deals with Genevieve Roundtree.  Her chart is

24  at Exhibit 27 and her summary chart is Exhibit 28.  And if you

25  go to the last, very last page, that gives you the personal care

1    overpayment and the respite care overpayment.  Now, for

2    Genevieve Roundtree, her primary caregiver was Willaeta Freeman,

3    and Ms. Roundtree actually did live with Ms. Freeman.  And Ms.

4    Freeman testified that she recalled using respite care on a

5    couple of occasions, and as a result, Agent Wright backed those

6    occasions out of her respite care total.

7              Now, it is not necessary for the government to have

8    proven both components of each of these charges.  So what that

9    means is if you all unanimously agree that the plan of care

10   billing was a fraud and there was an overpayment related to the

11   personal care hours, and you all agree about that, then that is

12   sufficient.

13             Alternatively, if you all agree that the respite care

14   piece of this was a fraud, and you all agree on that, that is

15   sufficient as well.  It's either/or.  Or you can agree that we

16   proved it all by a reasonable doubt and you can find liability

17   based on that.  But just keep that in mind as you're going

18   through that evidence; that with respect to these, it doesn't

19   have to be both, it can be one or the other, but you all have to

20   agree as to one.

21             Now, Count 6 through 13 charge false statements

22   related to healthcare matters.  And this is where we get all the

23   way down to the individual claim, okay?  And this Count 6

24   charges -- 6 through 9 based, again, on the personal care

25   overpayment.  So this is plan of care billing.  Count 6 is

1   Robert Gould.  And if you go to Page 1 of his summary chart,

2   which is Exhibit 30, you can zero in=on the precise claim issue

3   in the indictment, which shows 217 hours billed and only 17

4   hours reflected in the time sheets for that month in October of

5   2009.  That's Count 6.

6           Count 7 is Emma Willard.  Emma Willard's chart is

7   again, exhibit, 31, the summary chart is Exhibit 32.  If you go

8   to Page 5 of this, it shows the precise claim at issue.  42

9   hours personal care hours billed to Medicaid, only 18 hours

10  documented on the time sheet.  That's the basis for the false

11  statement for Count 7.

12          Count 8 relates to Joseph Dickerson.  His chart's at

13  Exhibit 21, and -- or his patient chart is at Exhibit 20, this

14  is Exhibit 21, Page 4.  You can zero in on the precise claim at

15  issue:  49 hours billed to Medicaid, 22 hours in the chart.

16          Count 9 is Elsie Johnson.  Again, Exhibit 23 is her

17  summary chart.  If you go to Page 6, you can zero in right at

18  the claim at issue:  42 hours billed for the time frame of

19  January 1st through January 9th of 2011, five hours documented

20  on the summary chart.  This is the false statement alleged in

21  Count 9.

22          Now, Counts 10 through 13 are false claims based

23  solely on respite.  And again, Count 10, the false claim relates

24  to respite care purportedly provided for Elizabeth Mullen.  If

25  you go to Elizabeth Mullen's chart, which is Exhibit 26, this is

1  her summary chart, the very first page, and you zero in on the

2  very, very last claim on that first page, it shows $538.79 in

3  fraudulent respite care services purportedly to relieve Michael

4  Mullen, her son from Maryland, of the burden of caring for her.

5  Count 10.

6         Count 11 deals with Lucille Hatton.  Now, Ms. Hatton,

7  her summary chart is -- her patient chart is Exhibit 33, her

8  summary chart is Exhibit 34.  And if you go to Page 2 of this

9  summary chart, it shows a claim for 100 hours of respite care

10 totaling a little over a thousand dollars being submitted on

11 January 15th of 2010 for nine days of service dates at the very

12 beginning of 2010.  On the same day that Michael Mullen

13 testified, you also heard from William Hatton.  And William

14 Hatton is Lucille Hatton's son.  Like Mr. Mullen, he also

15 testified that he had never requested respite care services,

16 and.  Yet here we have a claim being submitted purportedly to

17 relieve him of the burden of caring for his mother, Lucille.

18 That's Count 11.

19        Count 12 is Virginia Scales.  Her chart is at

20 Exhibit 35 and then her summary chart is Exhibit 37 -- or I'm

21 sorry, 35 and Exhibit 36.  This is Page 7 of that summary chart.

22 And you can zero in right on the claim at issue:  59 hours of

23 respite care billed to Medicaid for $761.69.  You heard from

24 Ms. Patricia Baugh, who was Virginia Scales' listed primary

25 caregiver.  Ms. Baugh was her niece, and Ms. Scales was her

1   aunt.  Ms. Baugh testified that she didn't recall even learning

2   about respite care services until the middle of 2012.  So

3   respite care being given for her benefit in 2011 certainly

4   wasn't requested by Ms. Patricia Baugh.  That's Count 12.

5           Count 13 relates to Casey McCook.  And you heard from

6   Ms. Faulkner, who was Mr. McCook's aunt.  And she understood

7   Medicaid because she actually works in the healthcare industry

8   as well.  And she also testified that she had never even spoken

9   to anyone at Community Personal Care, and certainly had never

10  requested respite services for Casey McCook.  And yet if you go

11  to Exhibit 38 and zero in on this precise claim at issue, 109

12  hours of respite care services were submitted by Community

13  Personal Care, purportedly to relieve her of the stress and

14  burden of caring for Casey McCook.

15          Now, Counts 15 through 18 charge aggravated identity

16  theft related to the use of Medicaid identification numbers to

17  fraudulently bill Medicaid for respite services that weren't

18  provided.

19          Counts 15 and 16 relate to Judith Green.  And Judith

20  Green was one of two recipients that we brought in that

21  testified here during this trial.  She was the very tiny lady

22  who used to be a school teacher.  And she testified that she

23  never had a personal care aide at her home for more than a few

24  hours, never had care on weekends except for maybe one time, and

25  she didn't even have a primary caregiver.  And yet, her

1  exhibits, her chart is at Exhibit 39.  Exhibit 40 and Exhibit 41

2  were shown to Ms. Green reflecting 85 hours of respite care

3  being billed for two separate weeks.  She denied receiving the

4  care, denied ever signing the respite sheets, and stated that

5  she had never authorized anyone at Community Personal Care to

6  bill Medicaid for care that had not been provided to her.

7          Count 15 is based on Exhibit 40.  Count 16 is based on

8  Exhibit 41, which we also showed to Ms. Green.  And she denied

9  ever receiving the care, denied signing the documents, and yet

10 Agent Wright confirmed that Community Personal Care billed

11 Medicaid for these sheets and used Ms. Green's Medicaid

12 identification number in that bill.  That is Count 16.

13         Now, Count 17 and 18 relate to Doris Rogers and her

14 Medicaid identification number.  Now, Ms. Rogers also testified

15 before you.  She came in in a wheelchair, and she was a

16 schoolteacher, and she testified as well that she didn't have a

17 primary caregiver.  Her chart is located at Exhibit 42.  It

18 contains her Medicaid identification number.  We showed

19 Ms. Rogers Exhibit 43 and 44, which reflect 20 to 27 hours of

20 respite care that had been billed for two separate weeks.  And

21 Agent Wright confirmed that the Medicaid identification number

22 was used, these were absolutely billed.  Ms. Rogers denied

23 receiving this care, denied signing the respite sheets, and

24 stated that she had not authorized anyone to use her Medicaid

25 identification number to bill for respite care that had not been

1  provided to her.

2          Now, at one point you'll recall Ms. Rogers, who was

3  sitting right in front of the witness stand in her wheelchair,

4  we showed her the document, and she looked very perplexed.  And

5  she asked "Who did this?  How did this happen?"  And in that one

6  moment, she encapsulated the whole point of this trial:  "Who

7  did this?  How did it happen?"  Ladies and gentlemen, fraud was

8  clearly committed in this case.  There is simply no doubt about

9  it.  But the ultimate question in this case, what this case

10  really boils down to, is was this a fraud committed by the

11  Perrys, or was this a fraud committed on them.  Did Wayne Perry

12  and Angela Perry direct fraudulent activities to be done, or

13  were these simply employees running amok?

14          Over the course of this trial you heard two totally

15  different versions of what went on at Community Personal Care

16  between 2009 and 2012.  And you have, the government submits,

17  what all the other witnesses said in this case, including

18  defense witnesses, on one hand, and then you have what Angela

19  Perry and Wayne Perry said happened on the other.  And this case

20  boils down to credibility.  And credibility determinations are

21  yours and yours alone to make.  And back there in that jury

22  room, the recollection of what happened, you are the judges of

23  this evidence.  So what the attorneys recall happened and what

24  we argue here today, it's important, but at the end of the day,

25  your recollection controls.  Your recollection about what the

 1   witnesses said and whether they were being truthful controls

 2   back there in that jury room.

 3          Now, again, the government bears the burden of proof

 4   at all times in this case.  All times.  But when defendants

 5   testify, when they testify, as the judge just instructed you,

 6   you get to judge that testimony the same, in the same manner as

 7   you would judge every other witness in this case.  So let's look

 8   first at what Wayne and Angela Perry had to say about billing by

 9   the plan of care.

10          Wayne Perry told you that he never instructed his

11   employees to bill by the plan of care, he thought they were

12   billing by the aide records.  He claims he had no knowledge

13   whatsoever that his company was billing by the plan of care.  He

14   apparently learned that in this trial.  And no one, not even

15   Allison Hunter-Evans, ever raised a concern with him that the

16   company was billing by the plan of care and not by the aide

17   records.

18          Angela Perry also told you that she believed that the

19   company was billing by the aide records, and not the plan of

20   care.  She flat-out said the billing by the plan of care would

21   be fraud.  And now she at least admitted that Allison

22   Hunter-Evans did raise, on one occasion with her, the concern

23   that Wayne was billing by the plan of care.  And she recalls

24   that her response was if, if that is true, plan of care billing

25   is going to be the death of him.

1          Now, that's an interesting statement, because what she

2   recalls being said and her response to it, if plan of care is a

3   fraud, Allison Hunter-Evans was accusing her husband of a fraud.

4   And yet she doesn't ask her husband if he's billing by the plan

5   of care?  And isn't it a little strange that Angela Perry admits

6   having a conversation with Allison Hunter-Evans about billing by

7   the plan of care, but Wayne Perry claims that she never raised

8   it with him at all.

9          Now let's contrast what Wayne and Angela said from the

10  stand with everything else that you heard in this case.  Let's

11  talk about what Wayne's and Angela's employees said.  The first

12  substantive witness you heard from was Azuradee Lindsey.  Now,

13  it's never easy to be the first substantive witness in a case,

14  and I want to urge you to go back and think about what Dee

15  Lindsey said in the context of everything you else -- everything

16  else you heard that followed her testimony.

17         Ms. Lindsey testified that Wayne instructed her to

18  bill by the plan of care; that she -- he allowed her to bill by

19  the aide records for one week.  It was an experiment.  She did

20  it, she went back to him, gave him the results of it, and he

21  told her to go back to billing by the plan of care.

22         She also told you that on her own dime, on her own

23  dime, she went and took a class in Medicaid billing, and came

24  back and talked to Wayne about it, and he told her to bill by

25  the plan of care and not the aide records.  She said she knew it

1    was wrong to bill by the plan of care, but she did what Wayne

2    told her to do, because she need to keep her job.

3            And Ms. Lindsey's testimony was immediately

4    corroborated by the next witness, Artincy Hobbs.  Artincy Hobbs

5    likewise testified that she billed by the plan of care because

6    that's how Wayne told her to do it.  She testified that she

7    never used the personal care time sheets to bill.  She used the

8    respite care time sheets to bill, but she always billed by the

9    plan of care.

10           Then she testified she maintained a journal, the pink

11   journal, which is Exhibit 14 in an attempt to track the

12   hospitalizations and absences, because she was billing by the

13   plan of care, but trying to retract payments when she noticed

14   that the person didn't actually work.

15           She also testified that, after the execution of the

16   search warrant, Wayne Perry told her to now bill by the aide

17   records.  Use Generations to bill.  And so she finally started

18   to do that, and it was so much easier.

19           And Generations, Mr. Sears told you all about

20   Generations.  Generations was the computer program that they had

21   plenty of people entering in the aide records so that their

22   payroll could be accurate.  But they never billed from it.  Not

23   once.  Until after the federal search warrant.

24           Now, ladies and gentlemen, you heard from Azuradee

25   Lindsey and Artincy Hobbs.  They were the billing clerks.

 1   They're the ones that billed by the plan of care per Wayne's

 2   instruction.  But their testimony was corroborated by plenty of

 3   other witnesses.

 4          Linda Hanson was the director of nursing.  She

 5   admitted that Wayne Perry directed the billing clerks to bill by

 6   the plan of care and not the aide records, and that he continued

 7   to bill by the plan of care until she left the company.

 8          Christina Brown, another nurse, testified that the

 9   company billed by the plan of care.

10          Renee Neighbors-Everson testified that the company

11   billed by the plan of care.

12          Sherrice Ford testified that the company billed by the

13   plan of care for Medicaid billing.

14          Allison Hunter-Evans testified that she raised

15   concerns with Wayne Perry at least three times.  She figured out

16   that they were billing by the plan of care during the

17   preparation for the Clifton Gunderson audit, and she raised the

18   issue with him three times, and he never changed his procedures.

19   She also said that she talked to Angela Perry.  And it was a

20   strikingly similar conversation to what Angela Perry says

21   occurred:  That she warned -- Allison Hunter-Evans's version of

22   it was he's billing to the plan of care, to which Angela Perry

23   replied, plan of care billing is going to be the denial of him.

24          But ladies and gentlemen, the government's witnesses

25   were not the only ones to verify that plan-of-care billing was

1    the instruction given to these billing clerks.

2          Louis Wilson, the deposition that you heard, at the

3    very end, in response to a question of Mr. Sacks, Louis Wilson

4    said that it was a backwards billing process; that they were

5    billing from the care plan.

6          Jean Watson, another nurse, said that defendant --

7    that Mr. Davis and Mr. Broughton put on -- she admitted, we

8    billed by the plan of care.

9          But perhaps the most important witness who confirmed

10   this fact for you, was James Sears.  James Sears was the chief

11   financial officer of this company.  He has been Wayne Perry's

12   friend for 20 years.  20 years.  And James Sears testified that

13   they billed by the plan of care and that Wayne Perry directed

14   the billers how to bill.  And this directly contradicts Wayne

15   Perry's claim that he didn't direct anybody to bill by the plan

16   of care and he didn't even know it was happening.

17         And it stretches all bounds of common sense, ladies

18   and gentlemen, to believe that James Sears, Mr. Perry's

19   right-hand man and chief financial officer, was aware that

20   plan-of-care billing was going on at Community Personal Care;

21   that every week they were submitting fraudulent claims, but

22   somehow didn't tell his boss, Wayne Perry, about it.

23         But look at the documentary evidence.  The documentary

24   evidence also corroborates Dee Lindsey and Artincy Hobbs.  If

25   you look at the summary charts in the case, ladies and

1  gentlemen, the ones that we just went through, with all the

2  numbers, those verify that plan-of-care billing was going on.

3          Exhibit 5 tells you, shows you exactly when they

4  started billing by the aide records:  After the federal search

5  warrant.  Remember, James Sears testified that they lost a few

6  patients, a few patients between November and December, and

7  approximately eight patients between December and January.  The

8  difference in this chart, ladies and gentlemen, is because they

9  finally started billing by the aide records instead of by the

10 plan of care.

11         And you've got the white board, we've heard a lot

12 about that, where they were documenting hospitalizations; the

13 in-house communication forms where the staffing coordinators

14 were telling Ms. Hobbs and Ms. Lindsey that people were refusing

15 care; you've got the pink journal, this Government Exhibit 14.

16 Go ahead and look through it.  Page through it.  Look at it.

17 See what she was doing.  None of this -- if they were billing

18 from the aide records, then the billing would be accurate.  All

19 of these mechanisms that they were using to try to monitor

20 something that wasn't related to the plan of care, none of this

21 would be necessary.  You bill from the aide records, your

22 billing is accurate.  The only reason they used the white board,

23 a pink journal, in-house communication forms, was to track

24 changes from the plan of care.

25         Now, Wayne and Angela Perry are attempting to lay the

1  plan of care billing at the feet of criminal mastermind -- as my

2  opposing counsel is so fond of saying -- Artincy Hobbs.  Why

3  would she do this all on her own?  Because the staffing

4  coordinators bought her a Coach purse that she didn't like and

5  ultimately returned?  Ladies and gentlemen, follow the money.

6  It was not Artincy Hobbs's decision to bill by the plan of care

7  and commit ongoing Medicaid fraud so that Wayne Perry could pay

8  himself $79,000 a month.  Almost every person in this company,

9  from billing clerk, to nurse, to medical records custodian, was

10  aware of how Community Personal Care was billing Medicaid.

11  Everyone.  Except, purportedly, for the one person who was

12  responsible for ensuring that truthful claims were submitted to

13  Medicaid, and the two people who benefited the most from the

14  fraudulent billing practices.

15          The evidence has proven beyond a reasonable doubt that

16  the defendants directed the plan of care billing.  This wasn't a

17  fraudulent billing scheme committed on them, it was committed by

18  them.  And the plan of care billing permeated that entire

19  organization with fraud.  Because once you fraudulently overbill

20  Medicaid, you have to alter the records to cover it up.  The

21  fact that there was ongoing alteration of records going on, the

22  witnesses that you've heard -- and that's what you're going to

23  move to next -- all confirming that there were alterations of

24  records going on from 2009 all the way through to 2012, if

25  you're billing by the aide records, your aide records are going

1    to be accurate and there's no need for constant alteration of

2    records.  But the need for an ongoing alteration of records

3    arose because they were billing by the plan of care.  These two,

4    these two things fit together like hand in glove.

5           So let's look at what Wayne and Angela Perry had to

6    say under oath about audits.  Wayne Perry testified that he

7    never directed anyone to alter aide records, and never had any

8    knowledge that the alterations were occurring.  He said that the

9    audits had nothing to do with the aide records; that it only had

10   to do with the nursing notes.  He said he wanted the charts

11   Medicaid-ready to prevent a frustrated auditor, which simply

12   meant putting the records in, the aide records in date order.

13   And he testified that he never told anyone to match the aide

14   record to the plan of care.  Because why would he need to do

15   that?  He thought they were billing by the aide records.  You

16   don't need to do that; the aide records would match billing.

17          He also testified that, although audits are important,

18   he was only in the office for 30 to 40 minutes prior to the

19   Clifton Gunderson audit and he bought some pizza for his

20   employees.

21          Angela Perry also testified she never directed anyone

22   to alter aide records and did not know that such alterations

23   were occurring.  And about the weekend before the Clifton

24   Gunderson audit, she said that she sent everyone into a meeting

25   about the audit, but she didn't go into the meeting herself.  So

*Government Closing*                                                          2477

1    that's interesting.  You've got Angela sending people in to a

2    meeting about the audit, and you've got Wayne Perry just coming

3    in and buying pizza, and apparently didn't direct anyone to do

4    anything either, so you've got the two people who stand to lose

5    the most from a bad audit, they're apparently people that care

6    the least about the audit preparations.

7            Now, Angela Perry did, however, tell the employees

8    that it was a mandatory weekend and that she expected them to be

9    there and to put the time sheets in order to make everything

10   Medicaid-ready.  So let's again contrast that version of events

11   with what else you heard at this trial.

12           In 2008, 2009, Betty Banks testified that Wayne Perry

13   directed her to make the aide records match the plan of care.

14   And in about 2008 or 2009, we have Sabrena Tabron, who came from

15   Georgia to testify, and she testified that she saw Angela Perry

16   get a phone call from Wayne Perry, couldn't hear what Wayne

17   Perry said, but then after that telephone call, Angela Perry

18   directed her to add time to aide records by matching the plan of

19   care to the aide record.

20           Now, Ms. Tabron and Betty Banks were in marketing, and

21   they both left the company in 2009, and yet you heard very

22   similar testimony from each of them.  And they corroborate

23   everything else that follows.

24           Again, in 2010 Wayne Perry denied -- he sat on the

25   witness stand and said he never told any employee to match the

1  aide records to the plan of care.  If you recall, during his

2  cross-examination I showed him these meeting minutes from the

3  quality improvement meeting dated March 29th of 2010.  If you go

4  down to meeting minutes, most of the way down the page, Exhibit

5  86, Mr. Perry says "There are externs from Everest, and they are

6  matching the hours worked on the aide records to the plan of

7  care hours."  Again, I ask you, if you're billing by the aide

8  records, why do you need to do this?  Mr. Perry is explaining

9  that he knows exactly what's going on, and that aide records are

10  being matched to the plan of care hours.

11          We also called Jessica Smith and we showed you this

12  audit.  Jessica Smith, March 10th, 2010.  And here she's doing

13  exactly what Mr. Perry said and described in the meeting minutes

14  from that very month.  She told you she had the chart and she

15  was looking at the plan of care, she was going through the time

16  sheets and matching what was in the time sheets to the plan of

17  care, and then after that -- we showed this to Wayne Perry, and

18  he said I never saw this audit before, I did not know it was

19  going on.

20          If you look at the first pages of Exhibit 24, again,

21  we showed Mr. Perry this.  Mr. Perry said I can't tell you why

22  those two numbers don't match.  Billing for 49 units and only 28

23  units being in the chart.  He said that this wasn't for billing,

24  but yet recognized an ICN number is for billing.

25          Vernice Spain testified that this particular document

1   was given to her by Angela Perry and that Angela Perry gave her

2   the directive to get the billing down.  And so Vernice Spain and

3   the other staffing coordinators added time to the exact record

4   that was being referenced in that document.  Elsie Johnson,

5   Exhibit 22A, there were 28 hours originally in the chart, and

6   now there are 49.

7           Ladies and gentlemen, the only people who had anything

8   to lose, the only ones, if this aide record isn't corrected, is

9   Wayne and Angela Perry.  The staffing coordinators didn't have

10  to repay Medicaid if the aide record didn't match the billing.

11  That wasn't their responsibility.  The only person that had to

12  repay Medicaid if these records didn't match was Wayne Perry.

13          Now, the only -- you also heard from Mary McKay, who

14  was the aide who filled out this particular time sheet.  And she

15  testified she didn't get paid on May 4th, May 9th or May 10th,

16  because those hours weren't marked when they turned in this time

17  sheet.  But the person who did get paid, as was demonstrated in

18  the last exhibit, Exhibit 24, was the company.

19          Now, you heard a lot about the low margins related to

20  Medicaid billing.  But please ask yourselves, what is the margin

21  when you bill for an hour of care but you don't have to pay an

22  aide?  It's a lot more than sixty cents an hour.  And that's

23  precisely how Wayne Perry was able to make over $750,000 in one

24  year.

25          Now, Wayne Perry was also the individual who hired

1   Allison Hunter-Evans.  He paid her over -- he paid her $45 an

2   hour to audit his files, and he paid for her hotel

3   accommodations.  Wayne Perry wouldn't even admit that he asked

4   Allison Hunter-Evans to obtain inside information from Medicaid.

5   Allison Hunter-Evans is sending this email in Exhibit 75 to

6   Wayne Perry on November 9th of 2010.  She told you that this

7   line here, "I'm having lunch tomorrow as previously talked

8   about, so I should be able to share any knowledge that I gain

9   with you when I arrive," that that was her telling him that she

10  was going to have lunch with her friend from Medicaid and try to

11  get information about the upcoming audits to give to him.

12          His response was "Be strong tomorrow."  But when we

13  talked, when I asked Wayne Perry about this on

14  cross-examination, he didn't even know what "be strong tomorrow"

15  is referring to.

16          Finally, you have the testimony about the weekend

17  prior to the audit.  And again, ladies and gentlemen, the only

18  people, only people who had anything to lose related to this

19  weekend were Wayne and Angela Perry.

20          You heard from JoAnn Hicks from Clifton Gunderson.  If

21  an aide record is insufficient, if it doesn't meet all of those

22  elements, then it gets struck and they could very well cause a

23  retraction.  The staffing coordinators, the folks who work in

24  medical records, they're not responsible for paying that money

25  back to Medicaid.  Mr. Perry was responsible for paying that

1   money back to Medicaid.  And Wayne said that he didn't want to

2   have to pay a single cent back if he didn't have to.

3          So on March 17th, 2012, Allison sent Angela Perry an

4   email about preparing for the audit.  Now, Allison sends it to

5   Angie and says "Sorry I took so long to put a proposed game plan

6   in place, but here it is."  So why do they need a game plan in

7   place if all they're doing is pulling the charts and putting the

8   aide records in order?  It's because Angela Perry knew that

9   that's not the only thing that would be happening.  If you check

10  the second page of this email, right at the top to this email to

11  Angela Perry it says "Check comments to ensure that they include

12  observations of the recipient's physical and emotional

13  condition, daily activities, and the recipient's responses to

14  services rendered."  But Angela claims they didn't instruct

15  anyone to alter comments on aide records, and she had no

16  knowledge that they would be reviewing comments.  They were just

17  going to be putting things in date order.

18         Now, she admitted that it took her all of 10 minutes

19  to pull 10 charts and that she expected her staff to make the

20  charts Medicaid-ready.  But then she also testified that she

21  came -- she knew staff was there Friday night, she was there

22  Friday night, Saturday night, she was there Saturday night and

23  Sunday after church.  So it does not take three full days and

24  nights to put 10 charts in order.  You have the charts, ladies

25  and gentlemen.  You can take a look at them.  It doesn't take

1  that long to put 10 charts, aide records, in order.

2        Now let's take a look at a couple examples of records

3  that were altered that weekend.  Medicaid was nice enough to

4  give them a list of patients that they were going to look at,

5  and you've got Ethelene Williams on that list.  And this is

6  Exhibit 80, but you can also look at Ethelene Williams' charts.

7  Her chart's in evidence.  But this is Page 1 of Exhibit 80.

8  You've got the provider aide record, it's for Ethelene Williams,

9  and you have comments that were made in the first hand writing,

10 and then you have comments that were made in the second

11 handwriting.  "Family is supportive and patient responded well

12 to care."  Vernice Spain testified that she actually added that.

13 And it matches precisely what the staffing coordinators were

14 supposed to add in connection with Allison's email to Angela:

15 Check comments to make sure that you've got the recipient's

16 responses to services rendered.  And what did Vernice Spain add?

17 "Patient responded well to care."

18        Happened with Nellie Spence as well.  The second

19 handwriting, this is the third document in Exhibit 80, "Family

20 support, responds well to care, no complaints of pain."

21        Now, these documents, these alterations to these

22 documents have nothing to do with the staffing coordinators

23 purportedly covering up their fraud.  The only thing that these

24 additional comments and the additional time and the forged

25 signatures, the only things that those things do for these

1  records is prevent a retraction back to Medicaid.  The only

2  people who are benefiting, again, are Wayne and Angela Perry.

3  And Wayne told you from the stand, I would not like to give one

4  penny back.

5          Now, this weekend before the audit involved so many

6  people, and we brought -- you heard from a number of witnesses

7  who weren't testifying pursuant to immunity agreements or

8  anything like that, who got up here and took the stand and

9  testified about what was going on.

10         You heard from Sherrice Ford she testified that Angela

11  Perry told her that she had to be there to fix the charts, no

12  children, no church.  And Ms. Ford testified that she would only

13  identify errors on the aide records with sticky notes and did

14  not alter the aide records because she knew that it was fraud to

15  alter the aide records.  And a month later, she was fired.

16         Renee Neighbors-Everson recalled that Wayne Perry told

17  her to fix his charts; instructed her to go back and back-date

18  her signature on the aide records to give the appearance that

19  she had reviewed them when they came into the office.  Ms.

20  Everson testified that she had never signed in the RN spot

21  except for that weekend prior to the audit.  And Ms. Neighbors

22  didn't benefit from these activities this weekend.  She was

23  already working two full-time jobs to support her family.

24         And Renita Jones' testimony was consistent as well.

25  Ms. Jones spent the entire weekend adding comments.  She said

1  that she had never signed in the RN spot except for this

2  weekend.  And Ms. Jones had a vivid recollection, a vivid

3  recollection of being in Mr. Perry's office and having Mrs.

4  Perry direct her to add comments and sign for Mary Jenkins' aide

5  record.  And indeed, if you look at the aide record, there's

6  Renita Jones' signature.  She told Ms. Perry she didn't want to

7  do it, Ms. Jenkins wasn't her patient, and Ms. Perry told her to

8  do it anyway.

9        Now, Artincy Hobbs.  Artincy Hobbs testified that

10  Angela Perry told her to give the aide records to Lillie Bryant

11  because she was the artistic one.  And she was right.  You heard

12  from Lillie Bryant, ladies and gentlemen.  She was their

13  receptionist.  And she spent the entire weekend forging patient

14  signatures on aide records.  She was artistic.  She had never

15  done anything like this before.  She testified that's all she

16  did the entire weekend, was forge signatures on aide records.

17        When you are back there in the jury room, please ask

18  yourselves, who benefits?  Who benefits from this forgery?  Who

19  needed to prevent a retraction to Medicaid?  The government

20  submits that Wayne and Angela Perry's greed turned their

21  receptionist into a forgerer.

22        Now, the documents corroborate the testimony of all

23  the government witnesses and simply don't support the

24  defendant's version of the facts.  And in fact, some of the

25  documents that the defendants submitted support the government's

 1   version of events.  Exhibit 32 -- and this is Defense

 2   Exhibit 32 -- it shows that Allison Hunter-Evans was reviewing

 3   comments, additional comments, Response to Care.  But according

 4   to Wayne and Angela Perry, they thought she was just looking at

 5   nursing notes, she wasn't looking at the aide records.  Their

 6   own documents support the government's -- that they absolutely

 7   knew exactly what was going on.

 8           This was not a fraud committed on them, ladies and

 9   gentlemen.  This was a fraud perpetrated by Wayne and Angela

10   Perry to hide their plan of care billing, prevent retractions to

11   Medicaid, and to frustrate the proper administration of the

12   Medicaid program.

13           Now let's move on to talk about respite care.  Wayne

14   and Angela Perry both agree that respite services are for the

15   benefit of the primary caregiver.  They both testified that

16   Wayne Perry would say "run the respite", but that just meant to

17   call the patient and remind them to use respite hours, and they

18   never expected that the company was submitting false respite

19   claims.

20           Now, what did everybody else say?  What does the

21   evidence show?  This is July 15th, 2010.  Mr. Perry and Mr.

22   Sears discussed expenses, and there is a three-prong approach:

23   "Respite hours.  Respite hours being used to cover a

24   5,000-dollar a week deficit."  The followed week, August=4th,or

25   the following month, "We are trying to work our way out of a

1    decrease in reimbursement.  Increasing respite is a short-term

2    solution."  This is consistent with what you heard from Betty

3    Banks and Renee Neighbors.  Betty Banks told you that Wayne

4    Perry referred to as "money just sitting there."  And Renee

5    Neighbors said that he referred to it as his respite, not a

6    patient's respite.

7               Now, at the beginning of the case, Dee Lindsey

8    testified that she had already entered the Medicaid billing for

9    the week and that she heard -- overheard Angela Perry instruct

10   the staffing coordinators that Wayne needed another $40,000 and

11   that the staffing coordinators falsified respite sheets, and she

12   billed them.  And ladies and gentlemen, that is what running the

13   respite is all about.  What part of the phrase "run the respite"

14   and "burn the respite" suggests that we should only bill respite

15   in the appropriate way?  To run something is to run it down or

16   run it out.  To burn something is to destroy it.  What part of

17   those instructions suggest, "Please call the patient, remind

18   them to use respite care, and then wait for a legitimate request

19   from the primary caregiver and go ahead and follow through with

20   that"?

21               Wayne and Angela Perry gave the staffing coordinators

22   vague instructions, made them feel like their jobs were in

23   jeopardy if they didn't meet their quotas, and then let them

24   take care of everything else.  And that's exactly what they did.

25               Take a look at Exhibit 6.  Government Exhibit 6.  In

1  2009 and 2010, June was always one of the lowest months.

2  Approximately $8,000 of respite.  And it always spiked at the

3  end of the calendar year when the respite cycle ended.  But what

4  happened when there was a change in the respite billing cycle?

5  All of a sudden, June of 2011 becomes the highest month.

6  $240,000 that month alone.  This spike is because Wayne and

7  Angela Perry ordered employees to run it up at the end of the

8  billing cycle, and they did.

9         Let's make something very, very clear:  We believe

10 that we've proven beyond a reasonable doubt that both Wayne and

11 Angela Perry knew and directed the fraudulent billing practices

12 at Community Personal Care.  However, you can also, as an

13 alternative theory of liability, conclude that these defendants

14 acted knowingly if you believe that they deliberately closed

15 their eyes to what otherwise would have been obvious.  It's

16 called willful blindness, and it's the alternative theory of

17 liability in this case.  The law provides that you don't get to

18 stick your head in the sand like an ostrich while everybody else

19 does bad things, and you watch your respite go up to, balloon up

20 to $240,000, it clearly indicated that something inappropriate

21 was going on, and yet just sit back and, with your eyes closed,

22 reap the benefits.  Mr. Perry and Mrs. Perry were not running

23 Bank of America.  This was a small company.  They had their

24 offices all on one floor.  Yet they would have you believe that

25 for four years they were blissfully unaware that anything was

1  going on.  They were unaware of the plan of care billing.  They

2  were unaware that false respite sheets were being made up to

3  increase their respite to $240,000 a month.  Unaware of the

4  massive alteration of records going on at their company.  You --

5  under the law, actual knowledge and deliberate or conscious

6  avoidance of knowledge are the same thing.  And that is true for

7  all of the charges in this case.

8         Now, throughout this trial, Wayne and Angela Perry

9  have blamed two staffing coordinators, Sarina Freeman and

10  Vernice Spain, for the fraud in this case.  Ladies and

11  gentlemen, we submit that's a blatant attempt at misdirection.

12  They're trying to keep you focused on Vernice Spain and Sarina

13  Freeman to keep the focus off the real perpetrators in this

14  case.  Because the fraud is so much bigger than two staffing

15  coordinators.

16         First, Sarina Freeman and Vernice Spain did not bill

17  Medicaid and had no involvement whatsoever in plan of care

18  billing.

19         Second, Sarina Freeman and Vernice Spain didn't

20  orchestrate the alteration party prior to Clifton Gunderson

21  coming in.  They had absolutely no authority over anyone in that

22  room.  They weren't paying them.  They couldn't require Sherrice

23  Ford, Renee Neighbors-Everson to be there.  Defense witness

24  Shameka Copeland testified she was there and altered records.

25  She didn't report to Sarina Freeman.  And Allison Hunter-Evans,

1   Sarina Freeman didn't pay her, the defendant paid her.  $45 an

2   hour.  She wasn't emailing with her prior to the audit.  That

3   was Angela.  These weren't -- this wasn't Sarina Freeman and

4   Vernice Spain conspiring to alter records on their own.

5           And yes, Sarina Freeman and Vernice Spain and Tamika

6   Nichols ran the respite and got paid for false respite sheets

7   that they didn't work.  And what they presented to you, ladies

8   and gentlemen, is five months of bonus checks between July 2012

9   and November of 2012.  We're talking about a fraudulent scheme

10  that ran from 2009 through 2012.  And their defense is that his

11  staffing coordinators received some bonus checks for the last

12  five months of that scheme.

13          Wayne Perry and Angela Perry knew exactly who Sarina

14  Freeman was when she worked for them.  Nurses complained about

15  her.  They said she was unprofessional and was costing him

16  clients and aides.  Ask yourselves why.  Why would a man who

17  prides himself on running the most professional company he

18  possibly can would keep someone who his nurses were complaining

19  about as being unprofessional, who was costing him money?

20  Because she was doing his dirty work, ladies and gentlemen.

21  Sarina Freeman was keeping Wayne Perry's respite billing high,

22  she altered his business records, she did what he wanted her to

23  do.  And then after the search warrant, she became his

24  scapegoat.

25          I want to talk a little bit about Angela Perry.  And

 1   Angela Perry knew -- Angela Perry's primary defense to this case

 2   has been to cast herself as the executive gofer with no real

 3   involvement in the business.  And instead of overseeing the

 4   staffing coordinators, which is what everyone prior to her had

 5   testified to, she suddenly became the liaison between them and

 6   the nurses.  She labeled herself as an executive gofer, but this

 7   doesn't match up with the evidence in the case.  Angela Perry

 8   was not a 1950's secretary at a company referring to her husband

 9   as "Mr. Perry".  They lived together.  And they worked together

10   running this company.  She wasn't picking up Mr. Perry's dry

11   cleaning and taking dictation at meetings.  Jean Watson was

12   taking dictation at meetings.

13         This is a meeting that Angela Perry attended.  Angela

14   Perry's involvement in this meeting was her suggestion to cut

15   Lillie Bryant's salary by three dollars an hour.  And she

16   certainly had the authority to require the entire staff to work

17   prior to the Clifton Gunderson audit.  She told you she told the

18   staff that it was a mandatory weekend.  And they didn't tell her

19   no you know you're on executive gofer, you don't have any

20   authority over me, I'm not going to show up.  No.  Everybody

21   showed up, and they showed up at her request.

22         Now, you heard Angela Perry's friends and family

23   testify about her, and I have no doubt that their testimony was

24   heartfelt and truthful.  But people sometimes make horrible,

25   horrible choices, particularly when they allow their judgment to

1  be guided by greed.  Angela Perry is here today because of the

2  choices that she made.  She became a part of a conspiracy to

3  defraud Medicaid and to alter records and to cover up the fraud,

4  and she is accountable, she's accountable for those choices the

5  same way that Allison Hunter-Evans was accountable.

6         No one is suggesting that Angela Perry was the leader

7  of this conspiracy.  Wayne Perry controlled that company.

8  There's no doubt about that.  But, just like Allison

9  Hunter-Evans, Angela Perry knew the purpose of this billing

10 scheme.  She participated in it.  She directed the alteration of

11 records, and she profited from it.

12        Allison Hunter-Evans told you she worked at this

13 company on weekends.  She participated in this scheme for two

14 and a half years and got paid approximately $25,000 for her part

15 in this scheme.  She pleaded guilty to a federal felony and

16 accepted responsibility for what she did.  Angela Perry

17 participated in this scheme for four years.  Four years.  And

18 she reaped the majority of the benefits from the Medicaid fraud.

19 And yet she testified that she didn't have any idea that any of

20 it was going on at the company where she worked every single

21 day.

22        To conclude, ladies and gentlemen, Wayne Perry, he was

23 right:  In our judicial system, defendants are innocent.

24 They're innocent until proven guilty.  And that is absolutely

25 true.  And over the last three weeks, Wayne and Angela Perry

1  have had a fair trial.  You all have been so attentive, you've

2  listened to this evidence, you've looked at the documents, and

3  you've watched each witness testify, and you, you and only you,

4  get to decide who sat in that chair and who told you the truth.

5  And one of the simplest ways of answering the question of

6  whether this was a fraud perpetrated by them or on them is to

7  follow the money.  Who benefited from this scheme?  What have

8  you heard over the last three weeks?  You heard Artincy Hobbs

9  got a Coach purse that she returned.  You heard Deborah Scoggins

10 got clothes for her grandbaby.  You heard Renita Jones got a

11 carton of cigarettes from another aide.  Sherrice Ford, Lillie

12 Bryant, Renee Neighbors-Everson got nothing.  They got nothing

13 except possibly the pizza that Wayne brought to the Clifton

14 Gunderson audit meeting.

15         Vernice Spain, the records that the defendants put in,

16 she got 35 -- after taxes, she got $35,000.  Sarina Freeman got

17 $25,000.  Tamika Nichols got $9,000, all in 2012.

18         Wayne Perry?  Wayne Perry got $769,000 in 2011 alone.

19 You see, to believe Wayne and Angela Perry and what they said

20 from the witness stand, you have to set aside all rational

21 thought and common sense.  Wayne Perry testified that his

22 employees were working as a team to defraud me, and Medicaid,

23 and everybody else.  You have to believe that for four years

24 four years, Wayne and Angela Perry were enriched through

25 Medicaid fraud, but somehow had no idea that it was going on;

1    that somehow for four years the staffing coordinators, the

2    nurses, the independent contractor that the defendant hired and

3    paid for, and even his friend, James Sears, his friend for 20

4    years, the chief financial officer of his company, they all

5    conspired to execute a billing scheme to defraud Medicaid and

6    then altered the documents to cover up their fraud.  All on

7    their own.  And it's amazing that they could pull this off right

8    under the defendants' noses.  They never even suspected that it

9    was going on.

10              I tell you, defendants' employees have to be the

11   nicest people on the planet, to engage in all of this fraud, put

12   themselves in harm's way, to enrich Wayne and Angela Perry.

13              He was victimized, ladies and gentlemen, to the tune

14   of three quarters of a million dollars.

15              And then, somehow, after the federal search warrant,

16   all of these people got together to get their story straight to

17   get up on the stand and lie to you all.  Betty Banks and Sabrena

18   Tabron, who left defendant's employ in 2009; Dee Lindsey who

19   left in 2010; Lillie Bryant, Sherrice Ford, Renee

20   Neighbors-Everson, Linda Hanson who left in 2011, and even James

21   Sears, who continued to assist Wayne Perry in wrapping up the

22   business, all coordinated their testimony somehow to stay

23   consistent with each other.  They all agreed to lie and place

24   the blame on Wayne Perry and Angela Perry.

25              Ladies and gentlemen, only in Wayne's World does that

1  twisted explanation make any sense.  Here, we submit the

2  simplest explanation and the one supported by all the testimony

3  and documentary evidence you have in this case is that Community

4  Personal Care operated exactly, exactly how the defendants

5  wanted it operated.  And for four years, the defendants

6  exploited the Medicaid system, they exploited their employees,

7  and they exploited their patients.  This was his respite, and

8  the patients were nothing but a Medicaid number.  A means to an

9  end.

10        The government's proven beyond a reasonable doubt that

11  the Medicaid fraud perpetrated in this case was done by the two

12  people that sit in front of you:  Wayne and Angela Perry.  Hold

13  them accountable.  We ask you to return a verdict of guilty on

14  all counts for both.

15        THE COURT:  Ladies and gentlemen of the jury, I think

16  from a technical standpoint we may have to make a switch, and so

17  rather than just sitting here in the quiet while that's done,

18  I'm going to let you all take a brief -- step back into the jury

19  room, and Officer Connolly will check with me in about five

20  minutes or so.

21        (Jury left the courtroom.)

22        (Recess taken from 12:46 p.m. to 12:58 p.m.)

23        THE COURT:  Mr. Davis, are you all set up?

24        MR. DAVIS:  Yes, Your Honor.  Thanks.

25        THE COURT:  Okay.  We ready to bring the jury in?

 1              MR. DAVIS:  Yes.

 2              MR. SACKS:  Your Honor, I just have one question.  At

 3  the conclusion of his argument would you give us about a

 4  five-minute break just to --

 5              THE COURT:  You have to do the same switch?

 6              MR. SACKS:  I don't have to switch, but I think I may

 7  have to use the facilities.

 8              THE COURT:  Well, you're pretty -- you have good

 9  anticipation skills, apparently.  All right.  Well, I'll look at

10  you and see where you are.

11              MR. SACKS:  All right, sir.

12              THE COURT:  All right.  Let's bring the jury in.

13              (Jury entered the courtroom.)

14              THE COURT:  Everyone can be seated.

15              Mr. Davis?

16              MR. DAVIS:  Wayne Perry is innocent of these crimes.

17  It is surely true that Mr. Perry did a lot of things wrong.  He

18  neglected the business that he had worked so hard to build.  His

19  policies and procedures he actually believed in were

20  ineffectual.  And he was fooled into believing that several of

21  his mid-level employees and administrative staff were honest and

22  competent.  But Wayne Perry is no criminal.  He did not execute

23  a scheme to defraud the Medicaid system.  He didn't commit and

24  didn't intend the crimes alleged in the indictment.  As Mr.

25  Broughton told you at the beginning of the case, the wrong

1  people are on trial before you.  The only real criminals in this

2  case got off scot-free.  They were given immunity by the

3  government in exchange for testifying.

4          Now, what are the issues Carolina in this case?

5  You've heard about everything under the sun about Wayne Perry.

6  They have attacked him every possible way they can to take him

7  down.  But the core of the government's case is three things:

8          They say that Wayne Perry executed a scheme to defraud

9  Medicaid by billing by the plan of care instead of by the aide's

10  actual time.

11          They say that he executed a scheme to defraud Medicaid

12  by billing for respite hours that were either improper or were

13  entirely fictitious.

14          And then say that Mr. Perry altered and forged his

15  company's patient records with the intent to impede the Clifton

16  Gunderson audit.

17          Now, Wayne Perry's defense is very simple:  He did not

18  do these things, and he did not intend these things, and there's

19  no reliable evidence, none, that he did.

20          Let's talk about presumption of innocence.  The

21  evidence has proved that Mr. Perry did not do and did not intend

22  the frauds in this indictment.  But you don't need to go nearly

23  that far in order to find Wayne Perry not guilty.  The evidence

24  need not prove that Wayne Perry is innocent in order for you to

25  acquit in this case.  That's because of the presumption of

1   innocence.  Presumption of innocence protects every member of

2   our community.  The presumption is the foundation of your work

3   as jurors.  You must be sure that Mr. Wayne Perry, like every

4   person accused of a crime in this country, gets the full measure

5   of the presumption of innocence.  You must continue to presume

6   him innocent until and unless you decide the government has met

7   its very high burden of proof.

8          What about the burden of proof?  In one way, your job

9   as a juror is very difficult, but in another it's really very

10  easy.  It's difficult because you're given a responsibility that

11  almost no one ever has.  You hold the fate of these two people

12  in your hand.  You will decide that fate.  That's a grave

13  responsibility, which would be difficult for anyone.

14         But how is it easy?  It's easy because you're not

15  being asked to write a report on what actually happened here.

16  You don't have to determine exactly and finally what the facts

17  were.  You don't even have to decide if Wayne Perry is innocent.

18  You're only asked to decide really one question, and that is,

19  whether the government has convinced you beyond a reasonable

20  doubt that Mr. Perry committed these crimes.  That's the

21  question.  Did they prove it?  Did they prove it?  If you're

22  uncertain, if you feel like you aren't sure, if there are

23  unanswered questions that keep you from feeling confident about

24  what happened here and about what was actually intended here,

25  your work is done.  It's easy.  Mr. Perry is not guilty.  That's

 1    what's meant by the burden of proof.

 2            In our system, the burden lies with the government.

 3    We don't require any person to prove his innocence.  Our system

 4    insists that, before the government can take away a person's

 5    liberty, it must bear the entire burden of proving the

 6    accusations.  That means that if any of you have questions about

 7    important things that happened at Community Personal Care, you

 8    can't look to Mr. Perry for answers.  It was the government's

 9    responsibility to answer those questions for you.  And if you

10    wanted to hear, say, from Deborah Scoggins, the payroll clerk

11    who worked every week with Artincy Hobbs but did not testify, or

12    if you wanted to hear from Sandra Humphries, a long-time

13    registered nurse who was one of the cooperating sources for the

14    original search warrant, but didn't testify, you can't look to

15    Mr. Perry for the absence of that information.  Look to the

16    government.  You may not hold your uncertainties against a

17    defendant in a case.  And that's what it means to say the burden

18    of proof is entirely on the government.

19            Another one more basic principle of our system is that

20    the government must prove each of the elements of each offense

21    beyond a reasonable doubt.  In a criminal case, a jury might

22    decide that the accused probably committed the offense.  But

23    that wouldn't be enough.  The jury might think that the

24    defendant likely committed the offense.  Not enough there,

25    either.  The jury might be pretty sure that the defendant

1    committed the offense.  Not good enough, either.  In all of

2    those scenarios, there's only one right verdict.  The jury must

3    find the defendant not guilty of the charges.  The jury can only

4    return a verdict of guilty if you have no reasonable doubts.

5            The search for reasons to doubt often begins with a

6    question.  Is the government's evidence reliable?  Is it

7    reliable?  In this case, in this amazing case, almost none of

8    the government's evidence is reliable.  This case spanned four

9    years.  This is a supposed scheme that a CEO of a company is

10   executing every day of his life for four years, but from that

11   time frame the government has not produced any of these things:

12   An undercover meeting, let's say, where Wayne Perry meets with

13   an undercover and talks about fraud; a videotape or a photograph

14   of Wayne Perry doing a crime; a tape-recorded phone call or a

15   tape-recorded conversation involving Wayne Perry any document,

16   any document at all, showing Wayne Perry's knowledge, intent or

17   involvement in fraud.  And most amazingly at all, no text, no

18   email, except the two we've seen, in which Wayne Perry

19   communicates with a fellow conspirator.  And so that even though

20   the FBI seized all of his emails and took four computers out of

21   that business, after a four-year scheme, there's not a single

22   email in front of you that shows that Mr. Perry intended or was

23   directed or committing or involved in fraud.  That's amazing,

24   ladies and gentlemen.  That's amazing.

25           So much of the government's evidence is the opposite

1  of reliable.  A lot of it is just shreds of supposed

2  conversations, many of them five or six years ago, for which no

3  one was present and that weren't witnessed by anyone, and that

4  aren't corroborated in any way, and that aren't even further

5  investigated by the government.

6          So much of the evidence, too, comes from the mouths of

7  the immunized.  Did you, like me, lose count of the number of

8  witnesses the government immunized?  You can say a lot of things

9  about Wayne Perry, but I'll say this:  When Wayne Perry actually

10  discovered fraud at his business, he fired people.  When the

11  government discovered fraud, they handed out immunity.

12          All the patient records you've seen were selected.

13  The FBI seized over 500 patient files.  This indictment involves

14  11 named patients.  These files are the very best evidence the

15  government has.  The very best.  They don't prove that Wayne

16  Perry committed a single crime.

17          And some of the evidence they put in front of you is

18  just disgraceful.  Like Sarina Freeman said she didn't steal any

19  money.  No money was stolen.  Now, is that evidence reliable?

20  That's what I mean about reliable.  Or are there reasons to

21  doubt?  Reliable evidence is evidence that you would trust in

22  making a consequential decision in your own life.  Imagine a

23  room to which were invited all the witnesses in the case.  All

24  of the government's witnesses who came in and all of Wayne

25  Perry's witnesses.  And you're sort of sizing them up.  Imagine

1    comparing the witnesses who testified for Wayne Perry:  Four

2    nurses who are women of impeccable professionalism and

3    character, and James Sears and Shirley Davis, and a lot of other

4    people who know Wayne Perry really well.  And then you look over

5    at the government's lineup of thieves, cloaked in a blanket of

6    immunity.

7            The judge instructed you that such persons, when

8    you're dealing with their testimony, it's always to be received

9    with caution and to be considered with great care.  There's a

10   reason for that.

11           Now the government's asking you to rely on the

12   uncorroborated word of those same persons to convict Wayne Perry

13   of these felonies.  Most of you wouldn't trust the government's

14   witnesses in the same room with your own checkbook.  But if

15   that's so, how can you rely on them to be the reason for a

16   guilty verdict against Wayne Perry?  You can't.

17           Once again, when you're deliberating, we urge you to

18   carefully and thoughtfully consider all of this evidence.  Take

19   your time.  You and only you will decide this case.  If you rush

20   to judgment and if you wrongly return a guilty verdict, you

21   can't later take it back.  So consider all the reasons to doubt

22   in this case.  Leave no stone unturned as you begin your

23   collective search for whether there are reasons to doubt what

24   the government is telling you.

25           I want to talk just about one other legal principle,

1   and that's about the charges other than the conspiracy charges,

2   the so-called substantive charges, Counts 2 through 13 and 15 to

3   18.  Because when you think about the evidence and when you

4   think about what the law says, there's no question that

5   reasonable doubt exists.  Remember that every crime requires

6   certain elements, including a particular act and a particular

7   mental state, an intent, that accompanies it.  For a crime to

8   occur, both the act and the criminal intent must be proved

9   beyond a reasonable doubt.

10           Nearly all of these substantive charges involve the

11  intentional filing of a false claim to Medicaid.  This is about

12  billing entries.  This is about someone typing on a machine and

13  sending information to Medicaid.  Notice that the issue in the

14  counts is not what's on a DMAS-90 or any other record anywhere.

15  It's about the billing entry itself that goes to Medicaid.  Each

16  entry presumably involved a number of hours that was sent to

17  Medicaid for a particular service, and the government says that

18  each of those electronic claims is a separate crime.

19           Now you may still be wondering how and why Wayne Perry

20  could ever possibly be convicted of committing those crimes,

21  since there's no evidence that he was there or that he knew

22  about them or that he intended them or directed them.  As the

23  judge instructed you, though, the law does permit, in certain

24  very particular circumstances, that one person can be held

25  liable for a different person's crimes.  But the government

1  hasn't proved those circumstances here at all.  It isn't even

2  close.

3          Now, why do I say that?  Well, at least two reasons.

4  The first is, the government has to show that the particular

5  claim was false.  And here, that means that the hours billed

6  were not worked.  Otherwise the claim to Medicaid isn't false.

7  The government hasn't shown those things.  What they have shown

8  at most is that a particular patient chart which was seized at

9  the end of November 2012 did not contain a DMAS-90 time sheet

10  that supported the amount of hours billed.

11          By the way, a lot of those charts -- or some of those

12  charts -- they showed you had not just one week or one day, but

13  months missing for a person getting regular personal care.  Now,

14  what does that tell you about whether they got all the charts?

15          But what they haven't shown is that those hours

16  claimed were not worked.  The absence of a time sheet isn't

17  proof beyond a reasonable doubt.  Particularly when personal

18  care is provided to these people who really needed it and were

19  long-term patients and got care over many years every day, every

20  week, and needed that care to survive.  Time sheets can get lost

21  or misplaced or never filled out correctly ever.  Or thinned.

22  Or never filed.  But the absence of a time sheet is only that:

23  There's no time sheet.

24          In a criminal case, the government has to prove what

25  actually happened.  It has to prove it beyond a reasonable

1   doubt.  Here, the government didn't even bother.  They didn't

2   even bother.  Look at counts 6 through 9.  The government

3   charges in Counts 6 through 9 -- there is their charge -- what

4   they're saying is in Count 6 through 9 there's a particular

5   electronic claim being made on a particular date, and it has to

6   do with dates of service, and that claim was false because the

7   recipient did not receive such respite care services.  That's

8   what they're saying, right in the indictment.

9           Well, think about, these are long-term, disabled

10  patients; long-time people who every day were taken care of by

11  Community Personal Care.  Robert Gould, Emma Willard, Joseph

12  Dickerson, Elsie Johnson.  Now, did Community Personal Care

13  simply fail to show up?  And if they did, wouldn't someone

14  remember that, and wouldn't someone have fired the company ASAP?

15  But no one testified that the care wasn't provided.  No one said

16  that.  And the evidence shows that, for each of them, the

17  registered nurse visited these people regularly every 30 days,

18  some of them, and there was no issue raised about a break of

19  service.

20          Elsie Johnson, for instance.  Supposedly there was no

21  personal care at all for Elsie from January 3rd to January 9th.

22  But Deedra Davis-Hussein, a good and capable nurse, testified

23  that Elsie Johnson had a good, attentive personal care aide;

24  that she visited Elsie in December of 2010 and again in February

25  of 2011, and there was never an issue about a break in service

1    for a whole week.  That would you have been a big issue with

2    Wanda McNair and Mary McKay.

3              What about Robert Gould?  The government says he

4    didn't receive a whole month of care in October of 2009.  He was

5    getting 47 hours of care that he needed, and the government

6    says, well, we're just putting it in our indictment because

7    there was no time sheet found when we did our search warrant,

8    and so it has to be a false claim beyond a reasonable doubt.

9    And then you actually talk to the nurse who knows these people.

10   And her nursing notes show that on October 1st, 2009, which is

11   the first day this started, Deedra is with Robert Gould,

12   visiting him.  And then she returns on November 3rd, 2009 -- you

13   can see all these files, check it out -- for other issues, and

14   there's no issue about Robert Gould not receiving care for an

15   entire month.  But the government doesn't care about that.

16   Government isn't going to work any harder than it has here.  And

17   they're going to throw it in front of you and say, oh, the

18   jury's going to say, well, there's no sheets, and so we've

19   proved it.

20             Didn't prove it.  They didn't prove it at all.

21             The same is true for some of the respite hours.  For

22   Elizabeth Mullen, the government says in Count 10 there's a

23   false electronic claim for respite services for April 13th to

24   April 19th, but there was no evidence of what actually happened.

25   And Michael Mullen specifically said, if Elizabeth Mullen

1    requested respite hours, Michael might not have known, and he

2    did not know if Community Personal Care gave respite care to

3    Elizabeth Mullen on the week of April 13th to April 19th.

4    Ladies and gentlemen, that's not proof beyond a reasonable

5    doubt.

6          Deedra visited Elizabeth Mullen on April 20th, 2009,

7    she created a note, she believed that Michael Mullen was

8    present, and there was nothing about a break in service or

9    problems that week.  And so on.

10         The government threw this case in front of you.  They

11   didn't even talk to the nurses, they didn't even look at what

12   the nurses' own notes showed about how these people were being

13   taken care of.  They just put these charges in front of you,

14   it's all fraud, Mr. Wayne Perry's guilty, rack it up.

15         So that's one thing.  They have to show the claim is

16   false.  They have to show the care wasn't provided, and they

17   didn't do it.

18         The other thing they have to do is, for the

19   substantive counts, the government has to show that either the

20   person who filed the claim or someone who specifically caused

21   that claim had the necessary criminal intent, and did not act

22   out of mistake or carelessness or accident or just a misstep.

23   In other words, an electronic claim to Medicaid, even if it has

24   the wrong number of hours, is not a crime unless the person

25   making the claim or someone causing that person to act acted

 1  willfully, acted with the intent to commit a crime.  In this

 2  case, once again the government doesn't even care.  There's no

 3  evidence at all of the billing person's intent; no evidence that

 4  in filing the particular electronic claim that the billing

 5  person deliberately broke the law.  There's no evidence that any

 6  other person with specific intent caused these billings.

 7          Neither of the two billing witnesses the government

 8  called, Artincy Hobbs or Dee Lindsey, testified about their

 9  intent about any of these supposed claims.  They weren't even

10  asked about them.  If Artincy Hobbs was the billing person and

11  if she intentionally submitted false claims on these occasions,

12  you might expect a pink notebook -- which you should look at

13  very carefully -- you might expect that pink notebook would show

14  that she knew that personal care had not been provided, but she

15  sent in a false claim anyway.  But you can look at it.  For

16  Joseph Dickerson in early December 2010, for instance, it

17  doesn't show that Joseph Dickerson wasn't receiving care and so

18  I'm going to file a false claim.  It doesn't show that?

19          Now, the government also has to show, to convict Wayne

20  Perry of these substantive crimes, that the person making the

21  claim was in a conspiracy with Wayne Perry, or that he was

22  somehow causing that person to act.  And there's more on that in

23  a bit.  But the important point for now is just that, to prove

24  these substantive crimes, the government has to show beyond a

25  reasonable doubt each of the claims submitted to Medicaid was

1    actually false, and that someone had the intent in filing it to

2    commit a crime.  For the substantive counts, the government

3    hasn't come close to proving those things, and for that reason

4    alone, Mr. Wayne Perry is entitled to a not-guilty verdict on

5    every substantive count.

6            Let's talk about the facts.  There really, as I said,

7    there's three things at issue here:  Billing by the plan of

8    care, the Clifton Gunderson audit, and respite.  Let's start

9    with billing by the plan of care.

10           The government's theory is that Wayne Perry

11   deliberately executed a scheme to defraud Medicaid by billing by

12   the plan of care instead of by actual hours.  Now, I'll start

13   this by asking us to define our terms.  What does it mean to

14   bill by the plan of care?  What is a plan of care?  Well, it's a

15   schedule.  It's a starting point.  It's an expectation.  For

16   these people, it's a medical necessity.  And it's something that

17   the aides followed.  If they came an hour late, they worked an

18   hour later.  The goal and the mandate was that these patients

19   received all their care all the time.  Now, of course that

20   doesn't happen always, but it happens in the routine almost all

21   the time.  Elsie Johnson need someone there seven hours a day.

22           Now, the government would have you believe that at

23   some point -- so when we talk about billing to the plan of care,

24   I guess that means, it means to never vary, never, from the plan

25   of care hours, and to always ignore any other information about

 1   a deviation.  So never vary, and always ignore the other

 2   information.

 3            The government would have you believe that, at some

 4   point, Wayne Perry made a calculated judgment that some amount

 5   of increased revenue that comes from billing for a few

 6   additional personal care hours each week was a crime worth

 7   committing and a risk worth taking.  And so, they say, Wayne

 8   Perry deliberately chose and deliberately intended to ignore

 9   information about actual hours worked, and instead, to routinely

10   file claims based only on the plan of care.  And at the same

11   time, he was so cunning and devious that he hired employees and

12   he made administrative employees spend a great deal of time

13   determining and tracking and documenting and communicating the

14   hours that were actually worked and the deviations, but that was

15   all a big, fake charade.  Because he was always going to bill by

16   the plan of care anyway.

17            Now, think about that theory.  What reasonable doubts

18   come to mind?  Well, first of all, if Wayne Perry intended his

19   billing clerk to only bill by the plan of care and to ignore

20   information about actual hours worked, he sure spent a whole lot

21   of time having his employees trying to verify the true hours

22   worked.  Remember how operations actually worked in the

23   administrative office at Community Personal Care.  There's a

24   Roll Call 365 days a year.  This is unusual.  Louis Wilson said

25   most agencies don't even do this.  This, Nurse Wilson said, this

1   is a quality assurance measure.  The staffing coordinators were

2   asked to call patients on a daily basis to see if the aide had

3   arrived.  Every personal care aide understood that the patient

4   would be called that day to see if the aide had arrived and to

5   verify that.

6          Well, then there was the nurse's white board.  The

7   government showed it in its closing.  That was used to keep

8   track of scheduling and patients entering the hospital and

9   refusals of care.  Linda Hanson told you the information on the

10  staff white board was what went in the in-house communications

11  for billing purposes.  And Louis Wilson said I looked at the

12  white board daily, its purpose was to back out days that didn't

13  need to be billed.

14         So there's a Roll Call.  There is a white board.

15  There is a receipt by the staffing coordinators, who are the

16  managers of the office, who spend their whole morning every

17  Monday receiving these sheets.  Tamika Nichols told you that she

18  made sure the aides had the signatures, the hours worked were

19  correct, they weren't done in red ink.  She's doing quality

20  control every Monday morning to get those time sheets and to

21  look at them and verify them.

22         Shemeka Copeland said the aides turned in the time

23  sheets on Mondays to staffing coordinators.  The staffing

24  coordinators checked for errors, dates, signatures, they

25  submitted the DMAS-90s and the cover sheets, and then they would

1   go to HR and to payroll and to billing.

2          And then every Tuesday night, Artincy Hobbs

3   and Deborah Scoggins would meet late in the day and stay often

4   into the early evening with a wire basket, two chairs pulled up

5   to a desk, and every DMAS-90 turned in that week.  They would be

6   there looking at the cover sheets -- which you've never seen in

7   this case -- but going through the DMAS-90s, compiling the

8   information.  That's what Artincy Hobbs was doing, sometimes

9   getting paid overtime to do, on Tuesday nights.

10         Now, she's a full-time employee, whose only real job

11  is to bill Medicaid, and she's spending a half day on Tuesdays

12  with her hands all over DMAS-90s.  She's finalizing the billing

13  on Thursdays; on Fridays she's going over the remits to assure

14  that she didn't miss anything.  If Wayne Perry meant to bill

15  only by the plan of care, he sure didn't need Artincy Hobbs, and

16  he sure didn't need all this other stuff.

17         Well, what was the other stuff?  Well, there's the

18  pink notebook.  And the government didn't really explain that.

19  But why does this document exist?  It's so easy if you just bill

20  by the plan of care once a week that has a permanent,

21  unchanging, unvarying number on it, and that's all you do.  But

22  Artincy Hobbs is spending a good bit of her time painstakingly

23  going through and documenting the days when someone in the

24  hospital or someone's deviating.  It's right here.  Why is that?

25         And then the interoffice communication.  One of them

1   was just stuck in this book.  One of the most important

2   documents in this case is just stuck in this book.  Here it is.

3   It's an in-house communication form.  And look at the date.

4   It's dated November 26th, 2012.  That was three days before the

5   FBI showed up and took everything away.  It's at the very end of

6   the life and death of Community Personal Care.  And what it

7   shows is that Shameka Copeland, one of the staffing

8   coordinators, is sending to Artincy -- Artincy Hobbs, the

9   billing clerk, that's what she does -- this list, this careful

10  list of the various people who refused care, different things,

11  all that happened in that week.  And there it is, just stuck in

12  the book.  Now, why is that?

13          Retractions.  If you bill by the plan of care you

14  never retract anything, because it's always the same.  You never

15  vary, and you ignore all the other information.  But Community

16  Personal Care in 2000 alone -- government of course didn't study

17  this, but -- retraction, $106,000 before adjustments in 2011

18  alone.  Now, why are they retracting, correcting, trying to get

19  it right, if all we're doing is billing by the plan of care?

20          Ladies and gentlemen, there is a whole lot going on at

21  this place that's about tracking and verifying what actually

22  happened and sending it to Artincy Hobbs, whose only job is to

23  bill Medicaid.  All of these time-consuming operations were

24  totally unnecessary if Mr. Wayne Perry actually intended to bill

25  only by the plan of care and to ignore the information.  So

 1  that's one thing.  There's a whole lot going on here about

 2  actuality.

 3          But there's another thing that's more important, and

 4  that is the government's own witnesses:  Artincy Hobbs and Dee

 5  Lindsey.  What did they say about whether the only thing they

 6  did was one thing, bill by the plan of care?  And the only thing

 7  they did was ignore everything else?  Well, that's not what they

 8  said.

 9          Dee Lindsey, Dee Lindsey, who actually did this, she

10  said billing was adjusted from in-house communications.  She

11  said those communications would tell her if the patient was in

12  the hospital or didn't show up or if the patient didn't receive

13  care.  Dee Lindsey said if she found out individual adjustments

14  needed to be made, she made the adjustments.  The plan of care

15  was the starting point, not the goal.

16          Dee Lindsey said she also kept records of patients for

17  which changes or retractions were needed.  She said that Wayne

18  Perry would direct her, Dee Lindsey, to do retractions.  She

19  said she was involved in credits back to Medicaid, and she said

20  she never directed staffing coordinators to falsify anything.

21  That was Dee Lindsey.

22          And then Artincy Hobbs.  What did Artincy Hobbs say

23  about her actual job beyond saying "We bill by the plan of

24  care," whatever that exactly means?  She said if the patient was

25  in the hospital she would subtract the time.  She said she went

1    back and made changes based on in-house communications and the

2    Generations report.  She said she would bill by the plan of care

3    unless there were in-house communications.  She said she did not

4    believe the staffing coordinators were intentionally withholding

5    in-house communications.  She didn't believe that the Perrys

6    were telling the staffing coordinators to withhold any in-house

7    information.  She maintained that pink notebook, Exhibit 14.

8            Now, it's true that Artincy Hobbs said, well, she got

9    behind and she didn't always have time to accurately process the

10   information she received about actual hours.  But Artincy Hobbs'

11   shortcomings and failures, and at time perhaps inability to do

12   her job completely, they don't make Wayne Perry a criminal.

13           And wasn't this, after all, a matter of priorities for

14   Artincy Hobbs?  She apparently had time to bill thousands of

15   dollars of fake respite care time sheets that no one even signed

16   for Vernice Spain and Sarina Freeman and Tamika Nichols and

17   others, and hide them from Mr. Perry and the nurses.  When

18   you're running respite fraud, maybe you don't get to all of the

19   adjustments you should.  But again, that doesn't make Wayne

20   Perry a criminal.

21           But what else about billing by the plan of care?  If

22   Wayne Perry was dead-set on billing by the plan of care, why did

23   he invest in all this billing technology that never got off the

24   ground, but was at least an attempt?  Community Personal Care

25   used Home Trak for six months.  It couldn't get the software to

1    handle two aides for the same patient in the same week and they

2    stopped using it.

3            Mr. Sears told you the goal was to automate the entire

4    system.  Wayne Perry had a goal with Generations to automate the

5    billing process, to submit the hours through Generations and to

6    integrate it with the Paychex system.  Community Personal Care

7    was actually working on that process, and Mr. Sears said was

8    three to six months away.  What's going on there if Mr. Perry's

9    criminal scheme is exactly what he wants here?  We just push a

10   button and bill by the plan of care.

11           One other thing -- and maybe the last thing about the

12   plan of care, but the most important -- there was no evidence at

13   all in this case from Deborah Scoggins.  Deborah Scoggins was

14   the payroll clerk.  Deborah Scoggins worked every single week,

15   every single Tuesday afternoon and evening with Artincy Hobbs.

16   They went through the time sheets together.  They went every

17   Tuesday night.  Now if Wayne Perry really did execute a

18   deliberate billing scheme, he would have to direct his two

19   employees who handled payroll and billing to essentially create

20   a double set of books.  Because otherwise this doesn't make any

21   sense.  He'd have to make very clear to his billing clerk that

22   he wanted her to bill only by plan of care, and to his payroll

23   clerk that he wanted to compile a different set of numbers, and

24   that all the way forward, because of that little delta between

25   actual and plan of care, we're going to keep going and that's

1   worth committing.  And that's what they were deliberately doing,

2   so that even though they're both dealing with the time sheets

3   every Tuesday, one comes away what one set of numbers, and the

4   other comes away with another set of numbers.  But there's no

5   evidence in this case that payroll was systemically different

6   from billing.  There's no evidence of a double set of books.

7            This is an insulting case, Your Honor, and it shows

8   how superficial the government thinks you are.  They're going to

9   say we're going to show you a couple of examples of charts that

10  show there's a plan of care and there's an amount out and

11  there's a differential, and we're going to add up those

12  differentials and say this is billing by the plan of care fraud.

13  That's what they did here.

14           Look at what they did.  Now, these Counts 2 through --

15  this is the indictment.  What they did here was they said, well,

16  for Joseph Dickerson, Elsie Johnson, we've got a personal care

17  overpayment.  And they're blowing right past this and they want

18  it to blow right past you.  They want you to say, oh, yeah,

19  there's $7,000, $13,000, that's all from plan of care billing,

20  the plan of care billing fraud.

21           Well, look at Elizabeth Mullen, for instance.  There's

22  whole months of time sheets that are not in the file now, but

23  that Elizabeth Mullen surely got care for this those months,

24  this woman, that they have added up here and said oh, yeah,

25  there's $13,000 of fraud.  But what they're not telling you --

1    because they don't even think you're going to look -- what

2    they're not telling you is for month after month after month we

3    just racked all of that up as plan-of-care billing and they

4    don't do anything more systemic than that.

5             They do, really, the same thing with respite care.

6    They just say every single penny in this chart about respite

7    care, every single penny -- because we've decided that Michael

8    Mullen had to have made the request for the respite care

9    hours -- because we've decided that, every penny that Elizabeth,

10   Mullen ever received in respite care hours is fraud.  That is

11   where these numbers come from.  They don't want you to look at

12   this stuff.  They just want you, oh, yeah, this is fraud.

13            But getting back to billing by the plan of care, if

14   there is a plan of care fraud here, the government has to show

15   you systemically, with a real audit, with a real comparison of

16   the databases in payroll and in billing.  And they need to show

17   you, yeah, Wayne Perry, he had a double set of books going on.

18   That's exactly what he was doing.  He must have intended that.

19            They didn't do that.  They didn't even bother.

20   There's no evidence of that.  You didn't even hear from Deborah

21   Scoggins, who worked every Tuesday of her life with Artincy

22   Hobbs.

23            Ladies and gentlemen, there's a lot of mess in these

24   billings, but they have to show that Mr. Perry specifically

25   intended this fraud.  And there's all kinds of reasonable doubts

 1   about that.

 2           Now let's go on to the altering records and the

 3   Clifton Gunderson plan audit.  The second major prong of the

 4   government's case is that Wayne Perry knowingly impeded and

 5   obstructed Clifton Gunderson by altering and forging patient

 6   records.  The government would have you decide -- I'm sorry

 7   about this, I can't see you all -- Mr. Wayne Perry, fresh off

 8   his shoulder surgery and physical therapy sessions and with a

 9   belief his office and his procedures were running on all

10   cylinders without him, and after coming in and getting pizza for

11   everyone that Friday night, right then he left the office with a

12   dastardly plan in mind that a very large group of his staff,

13   basically everyone working together all weekend and without any

14   specific direction and in the constant presence of a full-time

15   employee of the Commonwealth of Virginia, and without tipping

16   off any of the registered nurses who were also present and who

17   never would have forged anything, without tipping them off about

18   what they were doing, they were going to write comments and

19   forge signatures and sign as RNs and make up hours and otherwise

20   trash his company's patient charts on the weekend before the

21   Clifton Gunderson audit?  That was Wayne Perry's deliberate,

22   intentional scheme.

23           Now, Mr. Perry doesn't dispute that several of his

24   employees altered patient files on the weekend *en masse*.  And no

25   one denies that the forgeries and alterations are obvious

1    crimes.  What Mr. Perry does contest, though, is that he had any

2    involvement in his employees' conduct that weekend; that he had

3    any knowledge of what they did, or that he intended that their

4    crimes be committed.  There's no evidence to show any of those

5    things, and there are lots of reasonable doubts.

6         Let's look at the evidence.  There's nothing wrong

7    with conducting internal audits.  Every responsible healthcare

8    in America does it all the time.  CPC did internal chart audits

9    every 90 days.  They were constantly reviewing the records.

10   Nurse's notes had to be complete and accurate.  Why do you

11   conduct an internal audit?  Find the time sheets, make sure

12   they're there.  They're not always there.  They weren't in this

13   case.  Put them in the proper order.  Make sure they're

14   complete.  Fill in obvious omissions.  Correct stupid mistakes

15   like, well, you put 4/1, but you didn't put 4/1/09, and if you

16   don't have that '09, they're going to retract that amount.  Know

17   what's coming.  Troubleshoot and improve.  This is what they did

18   at Community Personal Care.

19        The government makes a lot about Jessica Smith, the

20   intern and whatever was being done with that piece of paper, and

21   the Everest interns who were there for a week, I think, who were

22   billing people from some college who were working with Dee

23   Lindsey.  That's all they got.  What they completely ignore and

24   hope you'll ignore is say, Exhibit 40.  Exhibit 40 is one year

25   of chart audits in 2008.  Take a look the this.  It involves

1    almost every employee in the company.  And all these nurses and

2    all these patients and all these questions and all of these

3    checkmarks.  And this is what is going on.  There's nothing

4    fraudulent about this.  Take a look at that.  This is a

5    "criminal enterprise".  Well, that's 2008 in the internal audit

6    business.  See if you can find some fraud there.  So there's

7    nothing wrong with audits.

8            There's also nothing wrong with correcting records if

9    you do it properly.  Correction is permitted -- it has to be,

10   unless this whole thing is ridiculous -- but falsity and forgery

11   isn't.  Linda Hanson told you it would not be fraud if a nurse

12   forgot to put something on a time sheet.  Georgianna Wright said

13   when she received Allison's notes in her patient charts, she

14   went back to see the errors, and if they were hers, she would

15   correct them.

16           Christine Elliott said there's nothing illegal about a

17   pre-audit review for quality assurance.  And even JoAnn Hicks

18   from Clifton Gunderson said corrections are permitted.

19   Corrections can be done.  Let's not say there are no

20   corrections.  But they have to be done right.

21           Well the next thing is, there's nothing wrong

22   employing Allison Hunter-Evans to conduct special audits.  All

23   the company knew she was there, and none of them thought there

24   was anything wrong with it.  They didn't feel that she was doing

25   anything wrong.  She always expected that Allison, being a

1   Medicaid auditor, knew what could be fixed, how it could be

2   fixed, what could and could not be fixed, as Mr. Perry said it.

3   He never thought that Allison would do something that wasn't

4   Medicaid policy or procedure.  Why would you be paying her if

5   you can just make all this stuff up and blow it off?

6          Louis Wilson said Allison Hunter was looking for

7   errors in the chart that we would look for in any audit.  What

8   was missing, where a date had been left out, where a particular

9   item hadn't been filled in or a signature was missing.  All

10  those items.  Look, Allison Hunter never asked Louis Wilson to

11  falsify records or do anything anybody thought was illegal.  No

12  one ever suspected that Allison Hunter's role at the company was

13  somehow illegal.

14         And then the company did an amazing thing.  It had

15  Allison Hunter-Evans month after month, get her notes typed up

16  and circulated.  They were left for Jean Watson, typed up by

17  Deborah Scoggins.  Deedra would use those notes to correct

18  obvious errors properly.  She saw nothing wrong with that.  Jean

19  Watson would write up these sticky notes on a ledger, would

20  record who was responsible for the deficit, both nurses and

21  aides.  Jean Watson said the aide records are only to be

22  corrected by the personal care who completed form, but she

23  didn't think there was anything wrong with what Allison

24  Hunter-Evans was doing.  And Allison Hunter kept working for CPC

25  for almost two years after this audit.  She was still working

 1    there at the end.  Now, this is not an ongoing fraud.  It's a

 2    basic, routine, lawful, expected endeavor of a healthcare

 3    business.

 4            So what's the next point?  If Mr. Perry intended a

 5    major forgery and alteration crime on that weekend, nothing

 6    about that weekend makes any sense.  Why, if you're going to

 7    forge and defraud, why do you have all of your employees come?

 8    Why all hands on deck?  Why invite the PCAs?  It's only 10

 9    files.  All you need is your few trusted, skilled artisans who

10    can do the forgery and fabrication needed, have those

11    specialists come in, get the job done.  Let's keep it quiet,

12    otherwise -- but Mr. Perry is wide open.  He's transparent.  Get

13    them in here.  All hands on deck.  Let's get ready.  Now, why do

14    you do that if you think you're about to engage in massive fraud

15    together?  Why place so many of them -- or why place all of them

16    under the supervision of someone who currently works for the

17    Commonwealth and presumably might decide, boy, if I see a big

18    fraud, I'm going to have to report you?  Why bring in the

19    nurses?  Deedra was there, Jean Watson was there.  If Wayne

20    Perry intended to commit fraud, he wouldn't have those nurses

21    involved at all.  They would be as far from there as he could

22    get.  They wouldn't falsify records or condone it for anyone.

23            This is my favorite:  Why would you have a sign-up

24    sheet, Exhibit 79?  Why would you document and record and make

25    sure, and preserve forever, the record of your intended,

1  deliberate, fraud?  Make a sign-up sheet that shows everyone who

2  was there?  And why, after years of well-documented and

3  legitimate internal audits that you paid good money for, after

4  employing Allison Hunter-Evans to give you that guidance, why

5  would you change course so abruptly and so radically and go from

6  Exhibit 40, that notebook of 2008, to this cheap fraud?

7              And why, too, are the alterations so clumsy

8  and pointless?

9              MR. DAVIS:  Agent Wright, could I ask you to call up

10 Exhibit 80, please, just briefly?  Just the first document?

11             Wayne Perry had a bunch of Community Personal Care

12 records -- I'm sorry, I didn't give you notice.

13             These time sheets that are perfectly good time sheets

14 except they don't say "family" -- Exhibit 80, please.

15             That's okay, Agent Wright.  Thank you.

16             This is really stupid stuff.  This is a time sheet,

17 doesn't seem to have anything else wrong with it.  This is

18 Ethelene Williams.  Long-time patient.  This is her personal

19 care.  But someone wrote "family is supportive and patient

20 responded well to care" in a totally different handwriting.  And

21 someone signed Sarina Freeman's name in the RN block.  RN's

22 signature is not mandatory.  And maybe that was Vernice who

23 forged it, I don't know.  Somebody really got confused and

24 really didn't know what they were doing that night.  But the

25 government's asking you to believe that Wayne Perry intended

1  that these people trash his perfectly good documents -- or

2  almost perfectly good, they didn't say family supported well to

3  care or whatever that phrase is -- this is stupid stuff.  And

4  these altered documents, they scream "Alteration".  "Forgery".

5  And they're saying, well, this is what Wayne Perry wanted.  This

6  is what he meant to have happen.  It's clear, ladies and

7  gentlemen, Wayne Perry had nothing to do with this.

8          And then, and this is really important, the testimony

9  of the forgerers and alterers about critical facts was all over

10 the map.  Did you hear it?  Allison Hunter-Evans told the FBI

11 that Angela Perry was there all day Saturday.  That's what she

12 said.  But then she got caught and it turned out that, in fact,

13 Angela wasn't there all day Saturday because of the birthday

14 party for her mother, she didn't come in until 7:00 or 7:30.

15 Oh, but she was there... that's an amazing lie.  That's an

16 amazing effort to pin something on an innocent person.  And oh,

17 yeah, we'll just blow right past that.  Maybe it wasn't all day.

18 It sure wasn't all day, was it, ladies and gentlemen?

19         What about Vernice Spain?  Vernice Spain said that in

20 preparation for the audit, every chart was reviewed from A to Z

21 from 2009 to 2011, even though the upcoming audit involved only

22 10 charts.  Well, how did Wayne Perry benefit?  Why would he

23 ever want people working on anything but the 10 charts that

24 weekend?  And if Vernice Spain is doing an A to Z audit and

25 other people working with her and someone spent a whole lot of

1  time there that weekend, what are the reasons they might have to

2  be doing that?  Wayne Perry doesn't have any reason to do that.

3          And then best of all is Renee Neighbors.  Renee

4  Neighbors says all of my instructions came directly from Wayne

5  Perry.  Wayne Perry told her, he ordered her to sign the charts.

6  In his office, Sunday at 8:00 p.m., there he was, Mr. Wayne

7  Perry in the flesh, directing alteration of documents.  Well, no

8  one else said that.  Do you think Renee Neighbors maybe got the

9  signals crossed a little bit?  Do you think she might have an

10  axe to grind?  Do you think her evidence is in the slightest bit

11  reliable?  But the government threw her up there with everyone

12  else:  We're just gonna blow right past it.

13          We don't know what other crimes were being perpetrated

14  or covered up that weekend, because we don't know what happened.

15  And the government, of course, doesn't investigate embezzlement.

16  But we do know one of the most -- you learn things every day in

17  this case.  One of things that I learned was Dee Lindsey, who

18  left in March of 2010 -- Dee Lindsey was out of there early,

19  March of 2010 she's gone -- she testified that she had received

20  respite hours on her time sheets and got paid for them.  And Dee

21  Lindsey received kickbacks from aides going way back.  Ladies

22  and gentlemen, this has been going on under Wayne Perry's nose

23  for a while.  Respite fraud, stuff just made up, more hours, and

24  submit the check with the aide, we all pocket a little cash, and

25  maybe a lot of cash.

```
 1                We also know that who is running this?  Who is there?

 2    Vernice Spain, Sarina Freeman, Artincy Hobbs, all three of those

 3    people were heavily involved in billing fraud and kickbacks.

 4    What were they doing with Community Personal Care's records that

 5    weekend, and what crimes of their own -- because there surely

 6    were those crimes -- what crimes of their own were they trying

 7    to hide?

 8                The last thing about the audit and then we'll go to

 9    respite.

10                MR. DAVIS:  And Your Honor, I'm trying to meet my time

11    deadline.

12                Allison Hunter-Evans claimed that she informed,

13    specifically informed Wayne Perry afterwards that the staffing

14    coordinators had signed and back-dated documents.  But that's

15    incredible on its face.  It's really the only specific evidence

16    from her that even implicates Wayne Perry.  She said that she

17    told Wayne about signing the actual documents and back-dating

18    them and the staffing coordinators were not providing the

19    service.  She says that Wayne Perry assured her that staffing

20    coordinators contacted the patients daily to check on their

21    status and the individual and make documentation, and that was

22    the reason the staffing coordinators could sign the documents.

23    So she tells you about this, and ah, the government puts her up

24    there, you have evidence that Wayne Perry, he knew about this,

25    he directed it.  That conversation's uncorroborated, there's no
```

1  time or context, there's no witnesses, there's no details.  But

2  it also doesn't make any sense.  Why?  Because one thing we know

3  about Wayne Perry, he really doesn't know when staffing

4  coordinators can or can't sign documents, and he wouldn't ever

5  tell Allison Hunter-Evans that he did know.  That's why he hired

6  her.  He doesn't know this stuff.  And she's saying, well, he

7  told me that the staffing coordinators could do that if they did

8  Roll Call.  That doesn't make any sense, and you know that's not

9  true.

10         But the other thing, why would Angela -- think what

11  she's saying.  She pled guilty to altering records.  She said in

12  her plea agreement "I saw them forging.  I saw them making up

13  hours."  She saw the big stuff, not just the cheap comments

14  being added.  Now, why would you decide, well, I really need to

15  talk to Wayne Perry about a bad thing I saw this weekend, and so

16  I'm going to pull him aside and have this specific conversation

17  I'm going to tell you about, but not talk to him about the

18  person who was forging signatures, about the people who were

19  making up hours right under her nose, that she had seen, that

20  she had admitted in her plea agreement she knew about?  Why does

21  that make any sense at all?  If you really had this critical

22  conversation with the CEO of the company, wouldn't you tell him

23  about the really bad stuff that happened?

24         Ms. Allison Hunter-Evans is an opportunist from the

25  word Go.  When it's her time to be sentenced, she's counting on

1  the government to tell the judge what a good job she did and how

2  she helped the government obtain convictions in the case.  But

3  how far would you trust her uncorroborated word about a

4  conversation with Wayne Perry?

5          Let's go to respite fraud.  That's the third prong.

6  The third and final prong has kind of two parts.  They say,

7  well, Wayne Perry executed a scheme to defraud Medicaid by

8  fraudulently billing for respite care.  And the argument says,

9  well, first, Wayne Perry deliberately committed respite fraud

10  because his employees worked respite hours for particular

11  patients who weren't eligible for respite hours or who didn't do

12  it the right way.  That's argument No. 1 from the government.

13          And argument No. 2 is, he separately knew about and

14  participated in his employees' scheme to just make up respite

15  hours that no one ever worked and put 100 hours or 80 hours in a

16  week on a time sheet that no one signed and no one even pretends

17  was real.  And he was, he was doing that too.  That's also his

18  intentional, deliberate crime.  Well, let's look at those.

19          The first argument is, well, it's all respite fraud.

20  That's how they did their indictment.  Remember how they did

21  that indictment?  All those hours, they're not saying, you know,

22  the aide wasn't there actually working.  What they're saying is,

23  well, Michael Mullen lived in Maryland and he wasn't really the

24  kind of personal -- primary caregiver -- you know I always get

25  that wrong -- who actually could get respite hours, and he

1  didn't call to ask for the respite hours and therefore all

2  $35,000 is fraud.  That's the government, that's what the

3  government's saying:  It doesn't matter if it was worked or not,

4  and every penny for respite under this theory is a fraud scheme

5  by Wayne Perry against the Medicaid.

6          But Wayne Perry had nothing to do with this process.

7  Look at Elsie Johnson.  The government says in Count 3, $13,000,

8  almost $14,000 of respite care billed for Elsie Johnson was

9  fraud.  They don't even care about or look at the nurses' notes.

10  They didn't even talk to the nurses about these patients.  But

11  what did Linda Hanson say?  She says, well, respite was approved

12  for Elsie Johnson in March 2010 when she visited her.  Wayne

13  Perry had nothing to do with that.

14          In April of 2010, Ms. Johnson was still in chronic

15  pain, according to Linda Hanson's notes.  Ms. Johnson was

16  pleased with the aide and the services.

17          In May of 2010 the personal caregiver was -- the

18  primary caregiver was Wanda McNair, and client reports being

19  pleased with the services and the aide.

20          In June of 2010 the client was very pleased with the

21  aide and service.

22          In July of 2010, patient continues to need personal

23  care and respite care services.

24          In August of 2010, the client continues to need

25  personal care and respite services.  The aide is wonderful, and

 1   the client is pleased with the services.

 2          That's what Linda Hanson, going out there dutifully

 3   every month, actually checking in with Elsie Johnson, that's

 4   what she's experiencing.  That's the reality here.  It's not the

 5   $35,000 they have thrown on an indictment.  And they're saying,

 6   well, that's all fraud.

 7          And then look at Elizabeth Mullen.  She's actually the

 8   $35,000, that's the largest amount charged.  That's over four

 9   years.  Deedra Davis-Hussein actually lived that relationship.

10   She identified a primary caregiver in every case, including this

11   one.  She encouraged the use of respite, especially to clients

12   who were sick or very ill.  She encouraged some clients to get

13   service twice daily because they needed it.  Deedra found

14   nothing wrong with encouraging respite hours.  For Elizabeth

15   Mullen getting 41 personal care hours a week, she said Michael

16   Mullen was very involved in Elizabeth Mullen's care.  She would

17   talk to him about the care, including the respite care.  She

18   said Elizabeth Mullen would call her and ask her how much time

19   she had left, and Deedra even discussed respite care with

20   Michael Mullen on visits.  But the government's just going to

21   tell you this whole thing was fraud, and rack it up.

22          What did the evidence show about respite?  It's really

23   pretty simple:  Only an RN could decide to seek authorization to

24   receive respite hours.  Only Medicaid could authorize respite

25   hours based on the information the nurse provided.  No law says

 1   that only the primary caregiver can request respite.  No law

 2   says that only a registered nurse can approve a particular

 3   respite request.  Respite care can be episodic and it can be

 4   routine.  The government's whole respite case rests on a premise

 5   they didn't really explain to you, but that is, if the patient

 6   and not the primary caregiver ask for the respite, that's fraud.

 7   They're going to put on a primary caregiver, "While I didn't ask

 8   for respite."  Well, maybe your 97-year-old mother did.  But

 9   that's fraud.  Convict Wayne Perry.  Take away his liberty.

10          The nurses and the staffing coordinators encouraged

11   patients and families to use respite hours.  Respite hours and

12   the amount of respite hours remaining were continually inquired

13   about by the patients and families.  Louis Wilson would take

14   reports with her.  Linda Hanson said respite care was scheduled

15   on a consistent basis where the patient didn't want to be left

16   alone.

17          Now, there was a fair amount of confusion about how

18   and when the regulations changed that allowed respite hours for

19   primary caregivers who do not live in the house.  Louis Wilson

20   said Medicaid changed the respite requirements and opened the

21   door wide.  Linda Hanson recalled Medicaid meetings where they

22   said the primary caregiver didn't have to live in the home

23   anymore.  She said she did not know when the provision changed

24   and when the primary caregiver had to live in the home, she

25   remembers being strict about it, and she wouldn't have violated

1  it if it was still a rule.

2        Respite was, as Linda Hanson testified, one of the

3  looser Medicaid rules.  None of the nurses believed that

4  Community Personal Care's use of respite was fraudulent.  Those

5  are the facts.  The nurses and the patients interpreted the

6  respite benefit loosely.  The government now applies the

7  strictest possible construction in the rules as the basis for

8  these fraud charges, which are really most of the money alleged

9  in the indictment.  But this is a regulatory argument about a

10 loose, new government benefit that is not well-defined.  That's

11 all it is.  It's not a fraud crime.  And there's plenty of

12 reasonable doubt about it whether Wayne Perry, for four years,

13 executed a scheme to defraud Medicaid.

14       Well, that leaves the government's remarkable

15 alternative claim that Mr. Perry was also in on his employee's

16 scheme to manufacture and bill for respite hours that were never

17 worked, often using time sheets that sometimes weren't even

18 signed.

19       Well, the most important thing here is that the

20 government's own witnesses, the perpetrators of the respite

21 fraud scheme, said that Wayne Perry didn't know about and didn't

22 direct their scheme.  Tamika Nichols said she never heard Wayne

23 Perry say make up hours.  Dee Lindsey said Wayne Perry never

24 said to bill respite hours not worked.  Artincy Hobbs billed for

25 fabricated respite time sheets, but she never made a claim that

1   Wayne Perry ordered it.  Sarina Freeman said she had about seven

2   or eight personal care aides paying her kickbacks, she doesn't

3   remember, but those were all secret and hidden.

4          And then there's the remarkable Vernice Spain, and she

5   said we took it upon ourselves to create time sheets on our own.

6   Sarina, Vernice, Tamika and Artincy came up with the idea of how

7   to increase respite hours on their own.  Wayne Perry said "run

8   the respite", but he didn't say falsify aide records.

9          Vernice Spain said the Perrys were not aware of the

10  money Vernice Spain received.  She hid it from them.  Vernice

11  Spain said that Artincy took the time sheet and she placed it on

12  the side in a folder, or told the staffing coordinators to hide

13  them and take them later to get the patients to sign.  No one

14  ever did that.  All those time sheets were just hidden.

15         Vernice Spain said that the nurses never saw those

16  sheets, since they weren't in the charts.  Vernice didn't want

17  the nurse to see the records because they were altered.

18         There's no information on all the additional

19  information from aides and kickback patients -- kickback

20  payments.  We don't know how much money was stolen from Medicaid

21  because no one investigated it.  We have no idea how many

22  respite sheets weren't even in the patient files.  No efforts

23  was made to list a roster of aides who were falsifying time

24  sheets and paying kickbacks.

25         Vernice Spain back-billed respite.  Artincy Hobbs said

1  that it was only so far they could go back, then she would let

2  them know when they had to stop.

3          Vernice Spain was almost infinitely resourceful.  She

4  even forged checks the just pocketed.  She wasn't even going to

5  share with the aide the embezzled amount.  She was infinitely

6  resourceful, but she never said that Wayne Perry was in on this

7  or ordered it.

8          The government's case can't rise above its own

9  witness, its own chief accuser.

10         Well, the time sheets are critical.

11         MR. DAVIS:  Your Honor, if I could have five more

12 minutes?

13         THE COURT:  Two.

14         MR. DAVIS:  I'm going to try, Your Honor.

15         THE COURT:  I'm confident you can do it, Mr. Davis.

16         MR. DAVIS:  Ladies and gentlemen, the evidence of

17 employee respite fraud and deceit and kickbacks destroys the

18 government's claim of conspiracy.  The government says that

19 Wayne Perry conspired with his wife and others to defraud

20 Medicaid; that they were all in league together.  But think

21 about it.  This is the strangest conspiracy ever imagined.

22 Because the other supposed conspirators were stealing money from

23 Wayne Perry.  Because the other supposed conspirators actively

24 concealed their fraud from Mr. Perry.  Because employees

25 committing misconduct were regularly being fired.

1          Ladies and gentlemen, this was a rush to judgment by

2   the FBI.  Look what they did.  They interviewed four

3   confidential sources, one of whom was Anthony White, who was

4   fired as a forger and embezzler in 2010.  They executed a search

5   warrant, they didn't even interview the target.  They didn't

6   investigate embezzlement.  They wouldn't be bothered to do

7   surveillance on the Dana Welch deal.  And to this day they have

8   no idea how much money employees stole from Medicaid and from

9   Wayne Perry.

10          Louis Wilson told you, on the day of the search

11  warrant they were interested in Wayne Perry and no one else.

12          And so the government throws everything up.  It talks

13  about copays.  It talks about a post-search warrant decline in

14  revenue, even though after the search warrant there was an

15  immediate decline.  CPC had no paperwork to bill.  They lost

16  four to five patients a day.  Vernice Spain and Sarina Freeman

17  were immediately sabotaging the business.  But we're going to

18  show you a little chart, and without any other analysis, without

19  anything else, oh, yes, you can see how this is billing by the

20  plan of care fraud.  That's what they did.

21          They never verified Sabrena Tabron's audit.  Think how

22  easy it would have been to find the audit that she talked about

23  that supposedly occurred, and these respite sheets that she

24  said -- it would have been easy to do that.  But they didn't do

25  that.

```
 1              The same is true with Dee Lindsey and the $40,000 that

 2   Mr. Wayne Perry needed.  Think how simple it would have been to

 3   find the one week in 2009 where $40,000 in respite hours

 4   instantly and magically appeared?  But they're not going to do

 5   that.  They don't care about that.  They just want Dee Lindsey

 6   to go up and to throw more mud at Wayne Perry, ah, oh, yeah, you

 7   guys will just -- oh, yeah, reasonable doubt.

 8              MR. DAVIS:  I'm wrapping up, Your Honor.

 9              The last thing I'll say about the government's

10   investigation is to remind you of what Mr. Broughton said at the

11   start:  The wrong people are on trial.  By ignoring the

12   embezzlement, by closing their eyes to a long-running kickback

13   scheme between staffing coordinators and personal care aides,

14   and by immunizing everyone in sight, the government allowed a

15   very serious crime, much larger in scope than the charges

16   against Wayne Perry, to go unexamined and unpunished.  Even

17   using these outlier files, the personal care overpayment charged

18   in Count 5 against the Perrys is $1,600.  Meanwhile, in the

19   summer of 2012 alone, the fake respite time sheets were flying

20   into Artincy Hobbs's office with tens of thousands in obvious,

21   provable fraud against Medicaid.  And the cash kickbacks from

22   the personal care aides were piling up in the pockets of Vernice

23   Spain and her ilk.  In this case, the real money, the real money

24   was in those embezzlements.  But the government only wanted the

25   fat cat, and so they ignored all of that.  They didn't
```

1    investigate that, because their sole target from the beginning,

2    Wayne Perry, had nothing to do with them.

3              Wayne Perry --

4              MR. DAVIS:  Last page, Your Honor.

5              -- Wayne Perry had a lucrative and Joint

6    Commission-accredited business.  He had a loving family and

7    friends, he had vital positions in the community, and he had a

8    half-century of life behind them in which he played by the

9    rules.  The government has now asked you to accept its theory

10   that one day, for no good reason that anyone can think of, Wayne

11   Perry deliberately threw it all away and committed this act of

12   suicide by executing a scheme to defraud Medicaid through his

13   employees that had no hope of escaping detection.

14             Wayne Perry is not the most effective CEO you've ever

15   met.  But he is a good and decent man and he acted in good

16   faith.  You heard from the people who know him.  Michael

17   Hargrave, Yvonne Allmond, his next-door neighbor, Felix Strater,

18   Louis Wilson, who worked with him for eight and a half years,

19   Mr. James Sears.  All the employees who have known Mr. Wayne

20   Perry forever, they know that man, and even long after he was

21   disgraced and crushed by this federal indictment, they came

22   before you to say about Wayne Perry what they know to be true.

23             Ladies and gentlemen, Wayne Perry is innocent of these

24   crimes.  The reasonable doubts are staring all of us in the

25   face.  Wayne Perry did not do these things and he did not intend

 1   these things.  He didn't conspire with anyone, and he didn't

 2   execute a scheme to defraud.

 3          On behalf of Mr. Wayne Perry, I ask you to look

 4   carefully at the evidence, to hold the government to its heavy

 5   burden of proof, and to end this long nightmare by returning the

 6   only verdict that the facts and the law permit:  Not guilty on

 7   all counts.

 8          Thank you.

 9          THE COURT:  Ladies and gentlemen of the jury, I think

10   that we have to make another technical switch-out, so we're

11   going to take a five-minute recess, and we'll be back at that

12   point.  Thank you.

13          (Jury left the courtroom.)

14          (Recess taken from 2:18 p.m. to 2:27 p.m.)

15          THE COURT:  Bring the jury in.

16          (Jury entered the courtroom.)

17          THE COURT:  Everyone can be seated.

18          Mr. Sacks, your argument, please?

19          MR. SACKS:  May it please the court.

20          Good afternoon, ladies and gentlemen of the jury.

21          The prosecution told you in their opening and closing

22   argument that this is a case about dishonesty, deception and

23   fraud, and we don't disagree with that.  The problem is, that

24   the dishonesty, deception and fraud is on the part of the

25   witnesses that have been brought here by the government to try

1   to put a case together against Angela Perry.

2          Now, the government also mentioned four witnesses when

3   they were talking about the plan of care and relying upon

4   certain witnesses to prove those particular matters:  Linda

5   Hanson, Christina Brown, Renee Everson, Renee Neighbors-Everson,

6   and Sherrice Ford.  According to my recollection and notes,

7   Linda Hanson testified as to Angela Perry that she had no

8   personal knowledge Angela Perry ever falsified, forged or

9   fraudulently treated any documents or instructed anybody to do

10  that.

11         Christina Brown testified that Angela Perry never

12  instructed anyone to her knowledge to add, correct or falsify

13  any documents.

14         Renee Neighbors-Everson testified about the audit and

15  merely mentioned Angela Perry in passing.  She didn't say

16  anything about any instructions that Angela Perry supposedly

17  gave to persons to falsify records.

18         Sherrice Ford testified Angela Perry never asked her

19  directly to fix charts herself.

20         So if the government to going to rely on those

21  witnesses for certain propositions, then we have to take the

22  rest of their testimony too.  And the very witnesses I've

23  mentioned all create reasonable doubt about Angela Perry's

24  involvement at all.

25         Now, let me thank all of you for your patience, for

1   your attention.  It's been a long -- I guess we're going on

2   three weeks.  I know you all have been concentrating, it's been

3   an imposition on your lives, and we sincerely appreciate that.

4          Your work is not over yet.  The most important part is

5   yet to come, and I ask you to be patient with me, as I'm the

6   last one up before Mr. Salsbury will give a rebuttal argument.

7   I know it's getting late in the day, but if you'll bear with me

8   and keep your minds open and keep the attention that you've had,

9   we thank you again and we would appreciate it.

10         Now, I remind you it's never a question of the

11  government winning or losing a case, because we always win --

12  the community, the jury, the court, all of us -- when justice is

13  done.  And there is no greater justice, ladies and gentlemen,

14  than finding not guilty a fellow citizen like Angela Perry,

15  whose guilt has not been proven to you beyond a reasonable

16  doubt.

17         I also remind you that the numbers of counts, the

18  number of charges -- there are 18 against Angela -- is not

19  controlling.  It's just as easy for your foreperson, whoever

20  that is, to check not guilty on each box 18 times as it is one

21  time.  So don't be stampeded or rushed or pressured by the

22  number of counts, because if she's not guilty of one, she's not

23  guilty of all.  And I submit to you she's not guilty, and that's

24  what you need to check on that form.

25         Now, when we started this case together about three

 1    weeks ago, I made certain promises to you in the opening

 2    statement.  I told you that the evidence would be that the

 3    government will not prove beyond a reasonable doubt that Angela

 4    Perry has done what she is accused of doing.

 5         I told you that the evidence would show that certain

 6    employees of Community Personal Care did commit dishonest acts,

 7    and that certain employees at Community Personal Care did

 8    violate certain rules and regulations.

 9         I also told you that I expected the evidence to show

10    that none of that was done at the direction of or at the

11    specific instruction of Angela Perry.  Rather, I told you that

12    the evidence would be that these employees acted on their own,

13    for their own financial benefit, in a scheme to enrich

14    themselves deceitfully under the nose of persons like Angela

15    Perry.

16         And I told you that I expected that, to further prove

17    these employees -- or to further show that these employees were

18    guilty of these matters, the evidence would be that the

19    government had to give some of them immunity from prosecution in

20    exchange for their ability to testify without incriminating

21    themselves criminally.

22         I told you, in other words, the evidence would show

23    that these employees were so guilty of fraud themselves that

24    they had to be given special treatment so they could testify

25    without causing themselves to be charged.

1          And I told you that we expected the government's case

2   against Angela Perry, essentially, to be based almost

3   exclusively upon the testimony of self-admitted liars, cheaters

4   and thieves, and that they have their own agenda for advancing

5   their own interests to avoid prosecution.

6          I told you that the evidence would be that they would

7   have their own agenda to curry favor for themselves with the

8   prosecution by offering this testimony against Angela Perry.

9          I told you that the evidence would reveal that their

10  testimony, upon which the case against Angela is built, would

11  not be worthy of belief beyond a reasonable doubt and is hardly

12  sufficient upon which to base a verdict of guilty.

13         I submit to you with all, with the greatest respect,

14  that I have made good on those promises; that what I predicted

15  to you in the opening statement would be the evidence in this

16  case is exactly what you have seen and heard.

17         Now, I would remind you that you all made promises

18  too, as you were selected as jurors.  You promised to base your

19  verdict solely on the law and the evidence.  Instruction No. 1

20  tells you that it is your duty as jurors to follow the law as

21  stated in all of the instructions of the court, and to apply

22  these rules of law to the facts as you find them from the

23  evidence received during the trial.  It would a violation of

24  your sworn duty to base any part of your verdict upon any other

25  view or opinion of the law than that given in these

1    instructions, and the court -- of the court, as it would be a

2    violation of your sworn duty as the judges of facts to base your

3    verdict upon anything but the evidence received in this case.

4    And if you stick to that, you stick to the law that His Honor

5    has given you, and you'll have that back in the jury room, and

6    you apply it to the evidence in this case, then I am confident

7    you will agree, just as I predicted, that there is not a case

8    beyond a reasonable doubt against Angela Perry on these

9    witnesses on this evidence.

10             Now, I briefly want to address a couple of legal

11   principles.  You've heard about presumption of innocence and

12   reasonable doubt.  Let me just briefly address those again.

13             Instruction No. 11, you'll get that again, in the

14   first paragraph, reads as follows.  And this is from the court.

15   "I instruct you that the law presumes a defendant to be innocent

16   of the crimes charged; thus a defendant, although accused of

17   crimes in the superseding indictment, begins the trial with a

18   clean slate, with no evidence against him or her."  And what I

19   submit to you that means, in effect, is that we are told that we

20   start out the case with Angela Perry as being innocent.  We are

21   told to start the case with the assumption that she did not

22   commit the crimes that she is charged with.  We are told to find

23   her not guilty unless and until the evidence proves beyond a

24   reasonable doubt that she is guilty.  If there's any reasonable

25   doubt, the presumption of innocence has not been overcome, and

*Closing - Defendant A. Perry*                                                    2544

 1   that is, alone, enough to require an acquittal.  A not-guilty

 2   verdict.

 3          Now, reasonable doubt.  What is that?  The instruction

 4   reads "The presumption of innocence alone, therefore, is

 5   sufficient to acquit a defendant unless the jurors are satisfied

 6   beyond a reasonable doubt of a defendant's guilt after careful

 7   and impartial consideration of all the evidence in the case.

 8   The burden of proof is upon the prosecution to prove guilt

 9   beyond a reasonable doubt."

10          And then reading down, "Unless the government proves

11   beyond a reasonable doubt that a defendant has committed each

12   and every element of the offense charged in the superseding

13   indictment, you must find that defendant not guilty of the

14   offense."

15          Now, what I submit to you that means is that, in this

16   case, if you have a doubt about the individual witnesses whose

17   testimony you heard that is reasonable; that is, is it

18   reasonable to doubt witnesses who testify under a grant of

19   immunity excusing all of their crimes, so long as they testify

20   against the defendant, does that person come with baggage about

21   their believability?  Is it reasonable to doubt them?  It

22   certainly is.

23          Is it reasonable to doubt that a witness who has

24   admitted to lying in documents, falsifying information, cheating

25   Medicaid for their own personal financial gain, is it reasonable

1    to suspect that testimony as not being the kind that you would

2    receive beyond a reasonable doubt?  It certainly is.

3            Is it reasonable to doubt a witness who has admitted

4    to stealing from their employer and from Medicaid to line their

5    own pockets?  It's certainly reasonable to question those

6    witnesses believability, their credibility.

7            And so I submit to you that a reasonable doubt exists

8    in this case about all of these witnesses who have motives to

9    fabricate; who have admitted to their own wrongdoing; who are

10   proven liars and cheaters.  We cannot base verdicts upon that

11   kind of testimony, or we would cheapen the standard and burden

12   of proof to where it wouldn't protect anybody.

13           Now, the instruction about reasonable doubt also says,

14   "If the jury views the evidence in the case as reasonably

15   permitting either of two conclusions, one of innocence, the

16   other of guilt, the jury must, of course, adopt the conclusion

17   of innocence."  And I submit to you what that is telling us is

18   that if you say to yourselves or in the jury room, well, you

19   know, these people, maybe they are telling the truth about some

20   things, but you know, they've got some serious, serious

21   questions, maybe they're not.  If you have that kind of

22   dichotomy in your discussions, then you always give the

23   defendant the benefit of the doubt.  We err on the side of

24   innocence.  We adopt the views consistent with innocence.  Only

25   if the evidence is so overwhelming that you have no such split

1   that it is beyond a reasonable doubt, can you convict someone.

2       Now let's talk about the evidence in this case.

3   Instruction No. 10 tells you -- and again, these numbers are not

4   necessarily important, you'll see them when you get the

5   instructions, but listen to what it says.  "A separate crime is

6   alleged against each defendant in each count of the superseding

7   indictment.  Each alleged offense and any evidence pertaining to

8   it should be considered separately by the jury.  You must give

9   separate and individual consideration to each charge against

10  each defendant."  That is important because we have two

11  defendants and we have two different people, and you have to

12  evaluate the evidence on each count against each one separately

13  and independently.  And that is even though there's a joint

14  trial.  That is your duty under this instruction.

15      Now, the government makes a lot about they, as they

16  argued the case, they keep say Wayne and Angela Perry this,

17  Wayne and Angela Perry that.  Well, the evidence shows a

18  complete imbalance between Wayne Perry and his role in the

19  company and Angela Perry and her role in the company.  And to

20  lump them together like that and to say, well, they were

21  married, so she had this motive to enrich herself, that's guilt

22  by association, ladies and gentlemen, and that's not permitted

23  in these courtrooms.  And the instructions tell you that.

24  Instruction No. 47.  "Merely associating with others and

25  discussing common goals is not a criminal offense."

1          Therefore, just because they are married doesn't mean

2     they engaged in a conspiracy.  Or that Angela Perry had the

3     authority or the power or the capacity in the company that her

4     husband did.  You have to give each separate consideration.

5          Instruction No. 51.  "You may not infer that the

6     defendant was guilty of participating in criminal conduct merely

7     from the fact that he or she associated with other people who

8     were guilty of wrongdoing."  So just being in the company, being

9     around these thieves and liars who did commit crimes, doesn't

10    make her guilty of an offense.

11         Now, I submit to you that the evidence in this case

12    shows that Angela Perry lacked the capacity, lacked the ability,

13    the position, the authority and the responsibility either to

14    conspire with Wayne Perry or to commit the substantive offenses

15    that have been charged against her.  Wayne Perry and Angela

16    Perry, on this evidence, were in such different positions of

17    authority and in their relationship to the company that I submit

18    to you on the government's theory of this case, they couldn't

19    conspire.  And at least there is a substantial reasonable doubt

20    about whether she could come together with him or anybody else

21    the way it has been alleged in a conspiracy.

22         Even the government's immunized witnesses, those who

23    had to be given that immunity so they could testify without

24    going to jail themselves and whose credibility falls far short

25    of beyond a reasonable doubt, even they acknowledge in their own

1    testimony that Angela was in a vastly different position than

2    Wayne.

3            First of all, Christina Elliott, who was in DMAS, a

4    DMAS registered nurse, administers the Virginia Medicaid

5    Program, she testified -- and we know this -- that Mr. Perry was

6    the owner and operator of the company, not Angela Perry; that

7    the participation agreement with Community Personal Care and

8    Medicaid was signed not by Angela Perry, but by Mr. Perry or by

9    Mr. Sears, the chief financial officer.

10           Ms. Lindsey, who was a staffing coordinator and an

11   employee, as a billing clerk, she reported to Mr. Perry, not

12   Angela Perry.  She reported every week to Mr. Perry about the

13   billing numbers, not to Angela Perry.  It was Mr. Perry's idea

14   to send her, Ms. Lindsey, to a billing course, not Angela Perry.

15   She informed Mr. Perry of the weekly respite care totals, not

16   Angela Perry.  And she said that Mr. Perry, like so many others,

17   made the decisions in the company, not Angela Perry.

18           Ms. Hobbs said in regard to the audit weekend

19   preparation that it was Mr. Perry who instructed the staff

20   initially to pull certain charts and audit them for review.  It

21   was Mr. Perry who authorized overtime, not Angela Perry.

22   Ms. Hanson, acting director of nursing, Mr. Perry was her

23   supervisor, not Angela Perry.  The nurses worked for Mr. Perry,

24   not for Angela Perry.  The provider aide record, that's what

25   you'll see on all these DMAS-90s, or many of them, the title

1  Provider Aide Record, the provider is Mr. Perry, not Angela

2  Perry.  Wayne Perry hired and fired the employees.  Not Angela

3  Perry.

4          Vernice Spain said that it was Mr. Perry who told her

5  initially of the staff meeting regarding the Clifton Gunderson

6  audit that was coming up.  Ms. Spain said that it was Mr. Perry

7  who said go through charts and make corrections in accordance

8  with the stickies from Allison Hunter-Evans.  It was Mr. Perry

9  who gave the termination letters to employees when they were

10 caught stealing, not Angela Perry.

11         The Roll Call was put into place by Mr. Perry, not

12 Angela Perry.

13         Ms. Freeman, the staffing coordinator, testified that

14 when the nursing staff complained about Sarina Freeman and

15 wanted her terminated, they went to Mr. Perry, not Angela Perry.

16 When Sarina Freeman did -- when she testified that she didn't

17 consider stealing money when she had inflated her respite care

18 hours, she said I was not stealing from Mr. Perry.  She didn't

19 say I wasn't stealing from Angela Perry, because that's not who

20 they looked at as the company.

21         And Detective Flengas from the Norfolk Police

22 Department, when the embezzlement of funds was discovered by the

23 company which was being perpetrated by Vernice Spain and Sarina

24 Freeman, it was Mr. Perry along with Mr. Sears who went to the

25 police to make the complaint, not Angela Perry.  When a status

```
1  report was sought from the Norfolk Police Department about that
2  investigation, it was requested by Mr. Perry, not Angela Perry.
3          Christina Brown, a nursing supervisor, in opening
4  cases, she said Mr. Perry was the one who wanted her to do the
5  chart audits, it wasn't Angela Perry.  She said Mr. Perry
6  instructed her to update the plans of care and make sure the
7  nurses were visiting patients in a timely fashion.  It was not
8  from Angela Perry.  If an aide did not mark something that
9  should have been marked, Mr. Perry directed that the aide be
10 brought in for counseling, not Angela Perry directing that.
11         Ms. Neighbors-Everson, she said that the instruction
12 to tell aides that they need to do respite hours because -- she
13 said that the need to do respite hours is because what they were
14 told by Mr. Perry, not by Angela Perry.  Mr. Perry would have
15 mandatory meetings, not Angela Perry.  Mr. Perry -- she said you
16 did what Mr. Perry told you to do.  She didn't specify Angela
17 Perry.
18         And I could go on, ladies and gentlemen, example by
19 example.
20         Allison Hunter-Evans, she was paid in cash by Mr.
21 Perry, not by Angela Perry.  When Angela -- excuse me, Allison
22 Hunter-Evans was hired, she met with Mr. Perry to see what
23 needed to be done, not Angela Perry.  This is the evidence in
24 the case.  We're not making this up.  This is what you heard.
25 You're not in the company, you weren't there, but you're
```

1  eyewitness to what happened in this courtroom, and what I'm

2  telling you is just repeating what you've heard already and

3  summarizing it for you.

4          Mr. Perry, according to Allison Hunter-Evans, had

5  records pulled by the staff and asked her what needed to be done

6  for Medicaid billing, it wasn't Angela Perry.

7          Ms. Hunter-Evans provided the initial technical

8  assistance plan to Wayne Perry, not to Angela Perry.

9          She then asked -- it was then Mr. Perry who asked for

10 more specificity, not Angela Perry.

11         It was Mr. Perry who spoke with her about the upcoming

12 Clifton Gunderson audit, not Angela Perry.

13         It was Mr. Perry who made hotel accommodations for

14 her, not Angela Perry.

15         It was Mr. Perry who wanted to know the bottom line

16 about how much money was owed to Medicaid, not Angela Perry.

17         So again, I could keep repeating.  You get the point.

18 The point is, that Angela Perry was in a totally different

19 position in this company, and the fact that she was married to

20 Wayne Perry does not make her guilty of anything.  Anything.

21 And to associate the two in a conspiracy because they were

22 married is impermissible guilt by association that is not

23 supported by the evidence in this case.

24         Now let me talk about the credibility of the

25 government's case, because that's so important in this, in what

*Closing - Defendant A. Perry*                                              2552

1    you're doing.

2           Instruction No. 12 says "You as jurors are the sole

3    and exclusive judges of the credibility of each of the witnesses

4    called to testify in this case.  After making your assessment

5    concerning the credibility of a witness, you may decide to

6    believe all of that witness's testimony, only a portion of it,

7    or none of it.  After making your own judgment on assessment --

8    or assessment concerning the believability of a witness, you can

9    then attach such important weight to that testimony, if any,

10   that you feel it deserves.  You will then be in a position to

11   decide whether the government has proven the charges beyond a

12   reasonable doubt."

13          In other words, evaluating the witness's credibility

14   will guide you in determining whether you can believe them

15   beyond a reasonable doubt; whether their testimony, their

16   circumstances, their situation, leaves you with a reasonable

17   doubt about whether you can trust that evidence to take away the

18   liberty of Angela Perry.

19          And the instruction also tells you, "You can consider

20   all of the other evidence which tends to show whether a witness,

21   in your opinion, is worthy of belief."

22          Now, one of the most important facets of a number of

23   these key witnesses for the government against Angela is, as I

24   have alluded to earlier, these immunity agreements.  You're

25   given an Instruction No. 17.  You'll see it.  It tells you this,

```
1    from the court:  "The testimony of an immunized witness, someone

2    who has been told either that his or her crimes will go

3    unpunished or that his or her testimony will not be used against

4    him or her in return for that cooperation with the government,

5    must be examined by the jury," that is you, "with greater care

6    than the testimony of someone who is appearing in court without

7    the need for such an agreement with the government.  The jury

8    must determine" -- now listen to this.  This is the law from the

9    ages, the experience that we as humans have had that we have put

10   into our laws, what we have learned about these kinds of

11   witnesses -- "The jury must determine whether the testimony of

12   an immunized witness has been affected by self-interest or by

13   the agreement he or she has with the government, or his or her

14   own interest in the outcome of the case, or by prejudice against

15   a defendant."

16          So we know from life's experience that people like

17   that, who get a pass for crimes they committed in order to get

18   them to testify, have reasons to lie, have reasons to fabricate,

19   to protect themselves.

20          You have an instruction that talk about the testimony

21   of an accomplice.  These people claim to be accomplices in

22   crimes.  "Such testimony is always to be received with caution

23   and considered with great care."  You have to look at those

24   witnesses with a very critical eye.  And I submit to you that

25   their testimony, which I'm going to review briefly, clearly
```

1    creates a reasonable doubt about whether you can rely on them to

2    convict Angela Perry.

3            Azuradee Lindsey, immunized witness.  She admitted she

4    falsified respite care time sheets, she got money kicked back

5    from personal care aides whose respite sheets were inflated.

6    She profited from the overbilling for herself, putting in hours

7    that she didn't work.  She committed crimes because she said she

8    didn't want to lose her job.  She would falsify information to

9    help herself.  And I would submit to you, if she would falsify

10   information to help herself in that respect financially, what

11   would she do to stay out of jail?  If it's mere money that she's

12   lying to get, what would she say on the witness stand to protect

13   herself from going to prison?  Being charged.  She would say, I

14   submit to you, anything.  And that's why there's a reasonable

15   doubt about these kinds of witness's testimony.

16           And listen to what she said.  The question was "And

17   this agreement is signed by you, is it not?"  The immunity

18   agreement with the prosecution.  She said "Yes."

19           "And it's also signed by Ms. O'Boyle, the prosecutor

20   who asked you questions?

21           "Yes.

22           "And it was witnessed by Special Agent Wright, who is

23   sitting at this table?

24           "Yes.

25           "You know that, in order for you to avoid prosecution,

1    you have to cooperate with them?

2              "Yes.

3              "And 'cooperate' means tell the truth according to

4    this letter, correct?

5              "Yes.

6              "But the truth is what they say you have told them,

7    correct?

8              "Answer:  I would guess, yes.  It has to be according

9    to what I've told them up until this point.

10             "And it says should you -- should it be judged that

11   you have given false, incomplete or misleading testimony or

12   information, you shall thereafter be subject to prosecution?

13             "Yes.

14             "And when it says 'should it be judged,' the letter,

15   as you said, is signed by the prosecutor and the agent?

16             "Yes.

17             "So they are the ones to judge whether it's truthful

18   or not, correct?

19             "I guess so.

20             "So you have to please them?

21             "Yes."

22             Now, I'm not suggesting the prosecutors are doing

23   anything untoward.  What I'm suggesting is that the witnesses

24   have an absolute motive to say what they think they need to say

25   to please that table, because that table is the one that gave

1    them the pass in exchange for their testimony, in exchange for

2    what I submit to you is testimony rife with reasonable doubt.

3    How can we trust people like that who come in with that kind of

4    condition before they can testify?

5            Now, the Credibility of Witnesses Generally

6    instruction, Instruction No. 12, also tells you, "You should

7    consider each witness's motive to falsify; consider any relation

8    a witness may bear to either side of the case; the manner in

9    which each witness might be affected by your verdict."  In other

10   words, do these witnesses have an incentive to have Angela Perry

11   convicted?  Of course they do.  They want to uphold what they're

12   supposed to say and do; to say what they think this table wants

13   to hear.  That's a motive to falsify and a motive to want to

14   convict an individual.  The better -- the more conviction there

15   is, the better these people shine.  That is the kind of

16   witnesses that came in here against Angela Perry.  There is no

17   way that a citizen should be found guilty on that kind of

18   testimony.

19           Artincy Hobbs.  Immunized witness.  She testified she

20   fabricated information.  She billed for hours that were not

21   worked.  She said she would falsely -- falsely -- give false

22   information, excuse me, to advance her own interests in keeping

23   a job.  Now, I would submit to you, if she would falsify

24   information to advance her own interests to keep a job, she

25   would falsify information to advance her other interests.

1  Imagine what she would do to stay out of jail.  If she would

2  simply commit crimes to keep a job, what would she do to keep

3  herself out of prison?  And here's what she said -- excuse me.

4          Vernice Spain, another immunized witness.  She

5  falsified respite hours for her own financial gain and created

6  respite time sheets for her own financial gain.  Here's what she

7  said.  The question was:  "They are the ones who have the

8  control over this letter, aren't they?"

9          "Answer:  I guess so.  I do believe.

10          "You know that, don't you?

11          "I think so.

12          "And you don't want to displease the government, do

13  you?

14          "I don't want to displease anybody.

15          "But you certainly don't want to displease the

16  prosecution, do you?

17          "No.

18          "Was that a 'no' that you just said?  You don't want

19  to displease them, do you?

20          "No one.

21          "But them especially, right?

22          "I don't think so.

23          "They're the ones who say that if you testify and

24  cooperate, you won't be prosecuted, right?

25          "Yes.

1          "And if they say that you should be prosecuted because

2     you haven't said what is the truth, then you get prosecuted,

3     right?

4          "Yes.

5          "So you do have to please them, don't you?

6          "I guess so."

7          That's the same kind of distrustful evidence that you

8     heard from the previous witness, Ms. Lindsey.  These are people

9     who are testifying in a way they think they have to say.  How

10    could you trust that with a citizen's liberty, how could you

11    trust that in a matter this grave, this serious, this important,

12    when people are admitting "I'm testifying in a way that I think

13    I have to say to please somebody else"?  That's not beyond a

14    reasonable doubt, that creates tremendous doubt about whether

15    you can accept that or not and ground a verdict of guilty on.

16          Now, she said she committed a variety of dishonest

17    acts with respite care time sheets because she wanted to keep

18    her job.  She admitted she would lie to keep her job.  She

19    admitted she would fabricate information to keep her job.  And

20    here's what she had to say about that.  The question was:  "You

21    told us that we took it -- you told us that we" -- meaning

22    her -- "took it upon ourselves to create time sheets on our own

23    with respect to respite care for respite sheets?

24          "Yes.

25          "That was something not even you were saying Ms. Perry

1   told you to do?

2           "No, she didn't.

3           "And that was a scheme you did under her nose, isn't

4   it?

5           "Yes.

6           "So you would create false documents and lie in a way

7   to hide it from Ms. Perry, wouldn't you?

8           "Yes.

9           "And when the respite was low, you would create time

10  sheets to make it high?

11          "We did.

12          "And she never told you to do that?

13          "She didn't."

14          Now, if this witness would hide her own crimes in that

15  fashion from Mrs. Perry, what would she hide from you as a jury?

16  What would she hide and lie about on the stand in her own

17  testimony to further her own benefit, to keep herself from being

18  charged and going to jail?

19          Sarina Freeman.  Immunized witness.  These are -- all

20  the witnesses that I'm naming are the key ones the government is

21  asking you to convict Angela Perry on.

22          Sarina Freeman.  Immunized witness.  She inflated her

23  respite care hours -- excuse me, inflated personal care aide

24  hours so she could get certain monies kicked back to her.  She

25  admitted she would falsify information to benefit her own

1    financial interests.  She altered records, because she said if

2    she didn't, she probably would lose her job.  She admitted she

3    would commit crimes in order to retain her job.  She admitted

4    that she was another -- that this was another example of her

5    doing a dishonest thing to further her own personal interests.

6    And here were the questions to her, Sarina Freeman:

7             "So if you would do those things, then you would

8    certainly consider being dishonest to advance your own interests

9    as an immunized witness in this case, wouldn't you?"

10            And she said "Yes".  She said yes.  She would do

11   further dishonest things as an immunized witness to further her

12   own interests in this case.  Bingo.  That's exactly the problem

13   with these witnesses.  You don't know where the truth begins and

14   the lies end.  There's no way to know.  Reasonable doubt.

15            Now, we also asked her, she was asked on direct

16   examination, excuse me, by the government, What did Mr. Perry

17   tell her about respite care?  And initially she said "I don't

18   know what you want me to say."  And then she stopped herself and

19   said, "I know what you want me to say."  Now, that's a witness

20   telling the prosecutor "I know what you want me to say."  And I

21   questioned her about that.  I said "You said that because there

22   is certain information you're supposed to say, right?"  She said

23   "Yes".

24            "And that's because you signed this letter that

25   requires you to cooperate with the government, right?

1          "Yes.

2          "And you have to tell the testimony the way they

3    expect it, correct?

4          "Yes."

5          What greater evidence could you have than to mistrust

6    this kind of witness, who admits that they're saying what they

7    think they have to stay?  Not what the truth is, but what they

8    have to say to get their pass.

9          And I said to her, "The people who judge you are

10   sitting at that table because they signed this letter?"

11         She said "Yes".

12         Now I then said to her:  "You just told the ladies and

13   gentlemen of the jury you were taking money that wasn't yours

14   because you got paid so low?"

15         She said "Yes".

16         "You justified taking money from somebody else without

17   their permission, because you were getting paid so low and

18   thought that that makes it okay?

19         And she said "Yes".

20         Now ladies and gentlemen, if she concocts that

21   rationale to justify stealing, "I wasn't getting paid enough so

22   I can steal from somebody else," what would she do, what

23   rationale would she concoct to lie on the stand?  It's one right

24   after the other.  The same personality, the same character would

25   bring her to lie, would bring her to exaggerate, would bring her

1    to embellish.  How can we accept that kind of testimony?

2            Renita Jones, an immunized witness.  Another one.  The

3    question to her was, "The bargain that you reached with the

4    government in part includes if you do what letter says you need

5    to do, then you wouldn't be prosecuted, correct?"  And she said

6    "Yes".

7            "By your own testimony, you altered certain documents,

8    did you not?"

9            "Yes.

10           "That's a crime, isn't it?

11           "Yes.

12           "By your own testimony, you assisted aides in

13   prosecuting" -- excuse me -- "processing for respite care hours

14   they didn't work, correct?

15           "Yes.

16           "That's a crime, isn't it?

17           "Yes.

18           "So you committed crimes at Community Personal Care,

19   did you not?

20           "Yes.

21           "And in order for you to testify without being

22   prosecuted, this letter has to be in place?

23           "Correct.

24           "One of the understandings that you have with the

25   prosecution about avoiding prosecution for your crimes is in

1    Paragraph 2.  It says, 'Fully cooperate with agents of federal

2    law enforcement and investigative agencies', does it not?

3            "Yes.

4            "So that means that if they ask you to testify against

5    Angela Perry, you have to do that in order to get this bargain,

6    correct?"  And she said "Yes".

7            "And you understand the prosecutors here are trying to

8    convict Angela Perry?

9            "Yes.

10           "So you understand" -- this is to Renita Jones --

11   "that your cooperation with them has to be consistent with their

12   efforts to convict her?

13           "Yes.

14           "You've testified against Ms. Perry because you're

15   obligated to, correct?

16           "Yes."

17           Now listen to this:  "And if you don't say what you

18   understand the truth is supposed to be, supposed to be, you

19   could be prosecuted, correct?

20           "Right.

21           "And the persons who judge whether you have given

22   truthful information or not is the prosecution, correct?

23           "Yes.

24           "You have to satisfy them to get the benefit of this

25   letter, don't you?

1        "Yes."

2        Once again, the same theme:  A witness who is not

3    testifying because she's here to proffer the truth as an

4    ordinary witness, but somebody with baggage who's got to say

5    what she thinks needs to be said.  You cannot take the liberty

6    of another fellow citizen on the basis of that kind of evidence.

7        Allison Hunter-Evans.  She is in an even more

8    particular category, because she's not an immunized witness in

9    the same sense, she actually pled guilty and signed a plea

10   agreement.  She hasn't been sentenced yet.  So she's got all

11   kinds of incentives to say things against Angela Perry that are

12   exaggerated and embellished or just plain, flat, not true.

13       Instruction No. 19 will tell you about plea

14   agreements.  "In this case, there has been testimony from a

15   government witness who pled guilty after entering into an

16   agreement with the government to testify."  That's

17   Ms. Hunter-Evans.  "There is evidence that the government agreed

18   to dismiss some charges against the witness and agreed not to

19   prosecute her on other charges in exchange for the witness's

20   agreement to plead guilty and testify at this trial against the

21   defendant.  The government also promised to bring the witness's

22   cooperation to the attention of the sentencing court."

23       Now here's what the court says further about this kind

24   of witness:  "You should bear in mind that a witness who has

25   entered into such an agreement has an interest in this case

*Closing - Defendant A. Perry*                                    2565

1    different than any ordinary witness.  A witness who realizes

2    that they may be able to obtain their own freedom or receive a

3    lighter sentence by giving testimony favorable to the

4    prosecution has a motive to testify falsely.  Therefore, you

5    must examine her testimony with caution and weigh it with great

6    care."

7              Now, that's a warning flag.  Witnesses who testify

8    under plea agreements, who haven't been -- and haven't been

9    sentenced yet have motives to falsify.  She's looking at 20

10   years as a maximum penalty in her case.  That may not be what

11   she will get, but the range is from zero to 20.  And she knows

12   that the more she satisfies this table, the greater the chance

13   that at her sentencing they will speak favorably about her and

14   she will get a light sentence, or a lighter sentence.  That

15   gives her every reason to fudge; every reason to say things that

16   are not true in order to protect herself and satisfy what she

17   thinks she's supposed to say.

18             Now, she admitted that she engaged in a substantial

19   amount of dishonesty, and she admitted that he committed this

20   dishonesty, again, for financial reasons.  45 dollars an hour.

21   She admitted she engaged in this dishonesty to further her own

22   financial interests.  And I would submit to you, if she would do

23   what she did there for $45 an hour, what kinds of lies or false

24   information would she give from the witness stand when she's

25   looking at 20 years?  Can you trust that witness?  Absolutely

1    not.

2            She admitted that she would be dishonest to help

3    herself.

4            Now, she has gotten certain things in exchange for her

5    testimony already:  Charges dismissed, she's been immunized from

6    further prosecution, but she's still hoping for the big one,

7    which is help with her sentencing.

8            Now before I talk about that, briefly I want to remind

9    you too she has been convicted of a felony.  And that's an

10   important matter, because the court has told you in Instruction

11   20 that "The testimony of a witness may be discredited or

12   impeached by evidence showing that the witness has been

13   convicted of a felony; a crime for which a person may receive a

14   prison sentence of more than one year.  Prior conviction of a

15   crime that is a felony is one of the circumstances that you may

16   consider in determining the credibility of that witness."

17           So what that means is that not only is she testifying

18   under a plea agreement where you're warned that she may have a

19   motive to falsify, but she's a convicted felon, and that makes

20   her credibility something that you have to take into account

21   when you weigh what she has to say.

22           Now, she testified as follows:  "In order to get the

23   benefit of the things you've gotten, you have to testify in

24   accordance with this agreement, correct?

25           "That is correct.

```
 1            "And the people who determine whether you're

 2   testifying in accordance with this agreement are the

 3   prosecution, correct?

 4            "That's correct.

 5            "They are the ones you have to satisfy, correct?

 6            "Those are the ones I entered into this agreement

 7   with, yes, sir.

 8            "The ones trying to convict Mrs. Perry, correct?

 9            "That's correct.

10            "The prosecutors decide whether you violate this

11   agreement or not; is that correct?

12            "That's correct."

13            Now, her sentence is, as I told you, is authorized up

14   to 20 years.  She hasn't been sentenced yet.  Here's what she

15   had to say about that:  "And you hope, by saying the things

16   you've said today, you will help yourself at sentencing,

17   correct?  By testifying?

18            "Yes, sir.

19            "So you understand the plea agreement that, if you do

20   what you're doing, they're going to help you?

21            "Yes, sir."

22            Now, we also asked her, "You also understand that one

23   of the factors in your sentencing will be what's called the

24   sentencing guidelines?

25            "Yes, sir.
```

1            "You understand that the guidelines are a range from a

2    low end to a high end in terms of a recommendation of the actual

3    time of confinement?

4            "Yes, sir.

5            "And you understand that, under certain circumstances,

6    the government can ask a judge to go below the guidelines?

7            "Correct.  Yes, sir.

8            "And a downward departure" -- which is what that's

9    called, going below the bottom end of the sentencing guideline

10   -- "is going below the low end of the sentencing guidelines,

11   correct?

12           "Yes, sir.

13           "And this says" -- the plea agreement, and I'm

14   quoting -- 'the parties agree that the United States reserves

15   the right to seek any departure from the applicable sentencing

16   guidelines', correct?

17           "Yes, sir.

18           "If, in its sole discretion, the United States

19   determines that such a departure or reduction of sentence is

20   appropriate?

21           "Yes, sir.

22           "So you understand" -- this is Ms. Hunter-Evans --

23   "that the only party that can ask for a downward departure from

24   the sentencing guidelines bottom end is the prosecution?

25           "Yes, sir.

1           "And you hope to get that reduction?

2           "Yes, sir.

3           "And they're the only ones that can ask for it,

4    correct?

5           "That's correct."

6           Now, ladies and gentlemen, I just outlined for you

7    five witnesses or so whose testimony is crucial to the

8    government's case against Angela Perry.  Crucial.  You cannot

9    accept that testimony beyond a reasonable doubt.  And what it

10   does further, it infects and affects the rest of the case

11   against Angela.  Because if these witnesses would say these

12   things, we really don't know who else might be fudging and lying

13   and saying what they think they need to say even without an

14   immunity agreement.

15          An analogy I'll use from our daily lives, if we order

16   a bowl of soup in a restaurant, and it shows up and there's a

17   fly in the soup, we look at that and we don't take the fly out

18   and pour the little part out where the fly was and then eat the

19   rest.  If the fly is in the soup, we don't know whether the

20   whole bowl has been affected.  That is the same problem with

21   this evidence.  This soup of evidence the government has served

22   up has a fly in it, these witnesses we've talked about.  And we

23   don't know how deep and how wide and how far this type of

24   embellished testimony goes.  You cannot trust the government's

25   case with these kinds of witnesses embedded in it any more than

1   you can trust the rest of that soup that you found the fly in.

2           We've talked about the immunized witnesses and their

3   motives to falsify and who they want to please and why they

4   would say what they say.  But let's look at another facet of

5   credibility:  What's called prior inconsistent statements.  We

6   know from living life, if you talk to somebody and they tell you

7   one thing on one occasion about a certain matter, and then the

8   next day they tell you something totally different about the

9   same matter, you're going to kind of scratch your head and

10  wonder, is this person really somebody I can rely on?  They're

11  telling me two different things about the same thing.  That's

12  just common sense.  Well, when it happens in the courtroom, it

13  affects the witness's believability.  It's something you can

14  consider in determining whether a witness is telling the truth

15  or not.

16          Instruction No. 13 will tell you, "The testimony of a

17  witness may be discredited, or what we sometimes say impeached,

18  by showing that he or she previously made statements which are

19  different than or inconsistent with his or her testimony here in

20  court.  If a person is shown to have knowingly testified falsely

21  concerning any important or material matter, you obviously have

22  a right to distrust the testimony of such an individual

23  concerning other matters."

24          Now, that means that if we can show you witnesses who

25  said different things about the same subject on different

1    occasions, that's another facet of their credibility that causes

2    us to distrust them and find that there's not proof beyond a

3    reasonable doubt with those kinds of witnesses.

4              Now, Mrs. Lindsey, it was interesting.  She told us

5    that she left the company because she was afraid that she might

6    get caught up in some questions.  And she said I did know there

7    were things that I was doing I was not supposed to and I knew

8    that it was time to get away from that.  So she's leaving the

9    company because she doesn't like it, she doesn't want to be

10   there, she doesn't want to do these things.  But then she writes

11   a letter.  This is what she said in court under oath, but then

12   she writes a letter to Mr. Perry and it says "It has truly been

13   a pleasure meeting all of the wonderful people I have

14   encountered, as well as having a wonderful place to work for the

15   past eight years.  I feel I have grown, matured and achieved all

16   I can with Community Personal Care."  And then she says as a PS,

17   "I am available for continued billing on a part-time basis

18   should you be interested."

19             Now, she's told you under oath that she left that

20   company because she was doing things she didn't think she should

21   do and she was worried she was going to get caught, but then she

22   sends a letter praising the company and Mr. Perry, and saying

23   I'm ready to come back if you want me.  Now, which one is it?

24   Is it that she really was worried about being there and didn't

25   want to work, or does she really want to go back and work?  You

1  don't know.  That's an inconsistent series of statements.

2  That's the kind of witness you can't trust.

3        And here's what I asked her:  "So you would have taken

4  that up, that part-time job, if he had offered it, wouldn't you?

5        "Depending on what the offer was, possibly.

6        "So then what you told this jury just a few minutes

7  ago that you left the company because you know things were wrong

8  is not true?

9        And she said, "That's not what I told -- I said I left

10 the company because there was no more room for advancement, and

11 I was not going to be able to make any more money than I was

12 there, so I was leaving the company."

13       Then she adds in, "And I said I had a feeling

14 something bad was coming that I did not want to have to answer

15 questions for."

16       All over the board about it.  We don't know why she

17 left.  We don't have any idea from what she said which one it

18 is.  If she'd lie about that, something that important in her

19 own personal life, she would lie about other things.  You cannot

20 trust these witnesses.

21       Sarina Freeman.  During the audit preparation weekend

22 she testified that she claimed to have raised a concern with

23 Mrs. Perry that there were too many different handwritings and

24 that supposedly Ms. Perry said to her to try to use the same

25 colored ink or get the handwriting as good as you could.  But

1    then we brought to her attention -- she's been interviewed prior

2    to this trial five times by law enforcement; four by the FBI,

3    October 24, March of 2013, December of 2012, and November of

4    2012, and by Mr. Pelletier of the Medicaid Fraud Control Unit in

5    December of 2012.  Five times she had an opportunity to tell

6    those investigators what she just said to you in court about

7    supposedly Mrs. Perry having this conversation.  And here's what

8    we found.

9           "Question:  Isn't it a fact, Ms. Freeman, that in none

10   of those interviews did you ever tell the story you told in this

11   courtroom yesterday that Ms. Perry was told there were too many

12   different handwritings and she said use the same colors of ink

13   and get the handwriting good?

14          "Answer:  They didn't ask me."

15          Now ladies and gentlemen, that's stated by a true

16   liar.  "They didn't ask me."  There are five interviews, all

17   about this very subject.  That's the first thing that would come

18   out of your mouth.  "Well, Ms. Perry came to me and she saw

19   these handwritings and they were different."  But she never told

20   anybody that.  Five times.  Now she's telling you.  She's trying

21   to sell us a bill of goods.  She's embellishing.  She's adding.

22   She's trying too hard to say what she thinks she has to say.

23          And we also caught her in a bald-face lie.  She said

24   that Mrs. Perry signed a man named Christopher Leach's name to a

25   time sheet.  He was a patient.  And I asked her, "And you're

1    sure about that?

2              "Yes, I am.

3              "You saw that with your own two eyes that day, that

4    audit weekend?

5              "Yes, I saw that.

6              "You're as sure about that as everything else you've

7    told us?

8              "Yes, I am."

9              Absolutely sure that she saw Ms. Perry sign

10   Christopher Leach's name.  And then I asked her -- excuse me,

11   she testified -- then I brought to her attention March 11th,

12   2013 interview to Investigator Pelletier with Agent Wright

13   present, she said something different about that.  She said she

14   saw Mrs. Perry forge the name of Christopher Leach's mother.

15   Totally different story.  Not Christopher Leach, but his mother.

16   And she said, when we caught her in that, she said "You're

17   right.  I did tell them that is not Christopher Leach, because

18   he can't sign."

19             And the question I asked her was:  "You just told us

20   about two minutes ago the same thing.  I asked you if you saw

21   with your own two eyes that she signed the name Christopher

22   Leach and you said yes, remember?"

23             She said "Yes".

24             "You swore to that, didn't you?

25             "Yes.

1           "Now you're saying you were wrong, correct?

2           "Yes."

3           How can you trust these witnesses?  They're all over

4    the board.

5           Vernice Spain.  "Question:  You did not tell the FBI

6    when you were first interviewed that Ms. Perry instructed you to

7    do these things that you've told us about today?"

8           Her answer:  "No.  Not when I was first interviewed,

9    no.

10          "And that story changed later, didn't it?

11          "Yes.

12          "So we have to believe that your story -- we have to

13   believe that your story, when it changed, is the real story?

14          "It is."

15          What story is it?  She's tells the FBI one thing,

16   doesn't mention -- the whole case is about Ms. Perry allegedly

17   directing and instructing these things.  She doesn't say that to

18   the FBI.  Then she comes into court and conveniently says it.

19   How can you accept that kind of witness beyond a reasonable

20   doubt?  It can't be done.  Nobody should be judged on that kind

21   of testimony.

22          And then Sabrena Tabron.  They proffer her as a

23   witness against Ms. Perry.  Question to her was:  "You told us

24   with respect to this conversation that you say today you heard

25   Ms. Perry talking to Mr. Perry, you do acknowledge that you

1  didn't actually say that when you first talked with the FBI,

2  correct?

3          "Answer:  Correct.

4          "So that's something that's different today than what

5  you told them initially, correct?

6          "Correct."

7          She admits she testified about a conversation she

8  claims she saw Ms. Perry have on the phone with Mr. Perry, and

9  certain instructions given after, but she never told the FBI

10  about that and admits that her testimony in this trial is

11  different than what she told them.  It's just stacking up.  I

12  could go on and on.  There was so much of this in this case, it

13  is unfair to ask a jury to convict a fellow citizen on that kind

14  of evidence.  It's simply not -- it's not appropriate.

15          And she's the one, Ms. Tabron, who said at trial she

16  looked at 20 to 30 charts -- bless you --

17          JUROR:  Thank you.

18          MR. SACKS:  -- even though there were only 10 that

19  were supposed to be audited.  Looked at 20 to 30.  But then she

20  told the FBI, I looked at two to five charts.  Which one is IT

21  Ms. Tabron?  Why do we have to guess at that?

22          The government has the burden of proving this case,

23  and if they leave it open with all these questions and

24  inconsistencies, they can't expect the jury to find somebody

25  guilty on that.

1            Allison Hunter-Evans.  At trial she said she spoke to

2   Ms. Perry on Saturday, but she didn't know what time, but she

3   told the FBI that it was Saturday morning.  And we know that's

4   not possible.  Witness after witness has come in,

5   uncontradicted, basically, testifying about Ms. Perry's mother's

6   birthday.  I know that may seem trivial, but we brought the

7   hairdresser in, we brought the party planner in.  We want you to

8   know it really happened just the way Angela said.  And she

9   wasn't at that office on Saturday until the evening.  She wasn't

10  there.  If this grand scheme is going on, wouldn't she be posted

11  like a hawk, watching everything, making sure those charts get

12  right?  She was off at a birthday.  She wasn't concerned,

13  because she didn't know.  She hadn't instructed anybody to do

14  what some of these people were doing.

15            Ms. Hunter-Evans is flat either wrong or lying.  She

16  said she saw her Saturday morning and had a conversation with

17  her.  That couldn't be possible.  And if that isn't possible,

18  what else has Ms. Hunter-Evans said that can't be true?

19            THE COURT:  Mr. Sacks?

20            MR. SACKS:  Yes, Your Honor?

21            THE COURT:  I just want to help you keep track.  You

22  have five minutes left.

23            MR. SACKS:  All right, your Honor.  Thank you.

24            Now ladies and gentlemen, I would also offer to you

25  the instruction about character evidence, because in this case

1  the defendant -- the instruction says "The defendants have

2  offered evidence of their good general reputation for honesty,

3  integrity and being law-abiding persons.  The jury should

4  consider this evidence, along with all the other evidence in

5  this case, in reaching its verdict.  Evidence of a defendant's

6  reputation inconsistent with those traits of character

7  ordinarily involved in the commission of the crimes charged may

8  give rise to a reasonable doubt, since the jury may find it

9  improbable or unlikely that a person of good character for

10  honesty, integrity and being a law-abiding person would commit

11  such crimes."  That's a reasonable doubt about Angela Perry.  We

12  brought you five people, Reverend Anthony Copeland, 32-year

13  pastor, known Angela for 18 years, testified she has a

14  reputation for honesty and integrity.

15          Hattie Williams, a 26-year Navy Exchange employee has

16  known Angela Perry more than 50 years.  Honest and truthful is

17  her reputation.

18          Horace Savage with Portsmouth Schools for 37 years,

19  and assistant superintendent, a principal in two schools, has

20  known Ms. Perry for 46 years, impeccable reputation.

21          Kathy Bell, a Verizon employee for 29 years, has known

22  Angela for 51 years, holds her in high regard.  "Go to Angie if

23  you want to know the truth."

24          And Reverend Warren Amlet, a pastor for 24 years, has

25  known Angela 35 years, and has testified her reputation is

 1   honest, a person of integrity.

 2          People like Angela Perry, good and decent people, do

 3   not do these kinds of things.  There is a reasonable doubt based

 4   on that alone, that alone, that she would do anything like this.

 5   And her character is not of that type.

 6          Now, she testified -- she didn't have to, but she

 7   did -- and I submit to you her testimony was frank, sincere,

 8   truthful.  These character witnesses said they would have no

 9   hesitation believing her under oath, and you should have no

10   hesitation either.  I submit to you her denials that she

11   instructed anybody or directed anybody ring loud and true in

12   this case.

13          Now ladies and gentlemen, in wrapping up, I want to

14   bring to your attention one last matter.  The court has

15   instructed you that the good faith of an individual is a

16   complete defense to the charges contained in the superseding

17   indictment, because good faith on the part of a defendant is

18   simply inconsistent with the intent to defraud or to obtain

19   money by false or fraudulent pretenses, representations or

20   promises alleged in these charges.  "A person who acts on belief

21   or an opinion honestly held is not punishable under this statute

22   merely because the belief or opinion turns out to be inaccurate,

23   incorrect, or wrong.  An honest mistake in judgment or an honest

24   error in management does not rise to the level of criminal

25   conduct."

```
 1              Allison Hunter-Evans was the point person at that

 2   audit weekend, not Angela Perry.  Here is Allison Hunter-Evans

 3   testimony:

 4              "This is an email that you identified from you to Mrs.

 5   Perry about the audit weekend?

 6              "Yes, sir.

 7              "And in the third line of that memo you say 'Sorry I

 8   took so long to put a proposed game plan in place, but here it

 9   is'?

10              "Yes, sir.

11              "You're the one who came up with the proposed game

12   plan, were you not?

13              "Yes, sir.

14              "Mrs. Perry didn't come up with it, did she?

15              "No, sir, she did not."

16              Now listen to this:  "In reading this memorandum, this

17   email, there isn't anything in this email that specifically says

18   or sets out or instructs someone to do something that is a

19   crime, is there?

20              "No, sir."

21              And then she said, "Isn't it true that, as far as you

22   know, Ms. Perry had no specific employment with Medicaid like

23   you had?

24              "As far as I know, no, sir.

25              "But you did work for Medicaid, didn't you?
```

1           "Yes, sir.

2           "How many years?

3           "Three years.

4           "So you had a wealth of knowledge about the rules and

5    regulations, didn't you?

6           "Yes, sir.

7           "And Mrs. Perry was relying on you to tell her what

8    was right and what was wrong, wasn't she?

9           "She was relying on me, yes."

10          Good faith.  Angela Perry relied on Allison

11   Hunter-Evans to do the right thing, and she didn't do it.  And

12   that's not Angela's fault.  Angela relied in good faith, and

13   that's a defense to these charges, and that itself raises a

14   reasonable doubt about any criminal intent.

15          Now in conclusion, ladies and gentlemen, I would tell

16   you this:  I'm told the word "verdict", comes from Latin, means

17   "To speak the truth."  And the truth, ladies and gentlemen, in

18   this case, is that the charges against Angela Perry have not

19   been proven beyond a reasonable doubt.  Far from it.  I have

20   attempted to bring to your attention the highlights of that.

21   You will have your own reasonable doubts as you go in the jury

22   room.  But if you speak the truth through your verdict, the

23   truth is that the government has failed its burden in this case

24   against Angela.

25          Now, when I sit down in about one minute, the

1  government is going to get up to this podium and have a rebuttal

2  argument.  They get the last word because they have the burden

3  of proof, and they're given that opportunity to persuade you one

4  last time.  When Mr. Salsbury stands up here and I sit down, you

5  should think right there this is the physical embodiment of the

6  burden of proof that the government has.  And try as they may --

7  they will try to respond to what I have said by Angela Perry --

8  but try as they may, they will not be able to overcome it,

9  because the evidence and the law will not allow it.

10              THE COURT:  Thank you, Mr. Sacks.

11              MR. SACKS:  This is a case with reasonable doubt, and

12  I would ask you to return a verdict of not guilty on all charges

13  against Ms. Angela Perry.

14              THE COURT:  Thank you, Mr. Sacks.

15              MR. SACKS:  Thank you, Your Honor.

16              Mr. Salsbury?

17              MR. SALSBURY:  Thank you, Your Honor.

18              I've never been called a physical embodiment of

19  anything, so I found that interesting.

20              Ladies and gentlemen, this is my opportunity to rebut,

21  or to counter, the things you've heard from the defense

22  attorneys, to show you what they have said is absolutely wrong,

23  and I intend to do just that.  And I have a time limit, so I'm

24  going to talk rather fast.  So let's get right to it, and I'll

25  break this down into categories.

1          Quickly, on the reasonable doubt instruction, it's

2    interesting how Mr. Davis and Mr. Sacks quote selected portions

3    of the reasonable doubt instruction.  The one thing they don't

4    quote from that instruction is the following:  "It is not

5    required that the government prove guilt beyond all possible

6    doubt; the test is one of reasonable doubt."  That's the test.

7          All right.  Next category, the contention by the

8    defense that the real criminals are the employees.  Defense

9    would have you believe that Wayne Perry and Angela Perry are

10   just as innocent as can be, and that the real bad guys are their

11   employees.  Now think about that.  A number of these employees

12   that have come before you, they have admitted their wrongdoing.

13   And what did they get out of the billing scheme that was put in

14   place by Wayne Perry and Angela Perry?  A carton of cigarettes.

15   A Coach handbag.  Some money, yes, but in amounts that pale in

16   comparison to the enormous amount of money that Wayne Perry and

17   Angela Perry got as a result of cheating the Medicaid program.

18         Yes, several of these employees have been granted

19   immunity.  And the defense would have you believe that means you

20   can't trust what they say.  But the exact opposite is true.

21   Their immunity is conditioned on telling the truth.  Not the

22   truth as I see it or Ms. O'Boyle sees it, but the truth.  And

23   Mr. Sacks went through all the questions he asked these

24   immunized witnesses, but he never reviewed the last question he

25   asked every one of them, "And that means because of the

1    wrongdoing you've agreed you've committed, you would not tell

2    the truth today, or you would falsely testify today."  And every

3    single one of them said "I'm telling the truth.  I'm not telling

4    the truth as anyone wants me to or as anyone sees it, I'm

5    telling the truth."

6              And remember, there's not just one witness who has

7    immunity.  There are several.  They have all implicated Wayne

8    Perry and Angela Perry.  The judge has never told you that you

9    should not believe an immunized witness.  He has never told you

10   that.

11             And remember this:  There have been a number of former

12   employees who have not been given immunity but have said the

13   same thing, the same thing as the ones who were given immunity.

14   Betty Banks and Sabrena Tabron, for example.  They don't have

15   immunity, but they said the same thing the others said:  That

16   they fixed the time sheets at the direction of Wayne Perry and

17   Angela Perry.  And we'll talk more about that in a few minutes.

18             Sherrice Ford testified she was directed to falsify

19   time sheets, but she refused to do it.

20             Now, when Sarina Freeman tells you she didn't regard

21   herself as stealing from Mr. Perry, it really does make some

22   sense.  Because how do you steal from the very person who put

23   the fraudulent billing scheme into place?  Wayne Perry was that

24   person.  How do you steal from a cheater?  It's why Tamika

25   Nichols said she thought the termination letter she received

1    from Wayne Perry was unfair.  He accused her in that letter of

2    taking money she was not entitled to.  But as she said, it

3    wasn't my idea, and it wasn't her idea.  It wasn't her idea to

4    run the respite by preparing and submitting false respite time

5    sheets to Medicaid, it was Wayne Perry's idea.

6             We're all familiar with the concept of a scapegoat.

7    What is a scapegoat?  It's a person who is blamed for the

8    wrongdoing of others in order to distract attention from the

9    real perpetrators.  In this case, the defense has made

10   scapegoats out of the former employees in order to blame them

11   for the crimes of Wayne Perry and Angela Perry.  It is an

12   attempt to divert your attention from the crimes that they

13   committed.  Using the former employees as scapegoats is an

14   effort by Wayne Perry and Angela Perry to evade responsibility

15   for their own crimes.  They have been made scapegoats by the

16   Perrys.

17            Now let's talk about consciousness of guilt; actions

18   taken by Wayne Perry that show he was fully aware of his own

19   guilt.

20            One:  Immediately after the search warrant when he

21   knew that an investigation was taking place, he told Artincy

22   Hobbs to stop billing for personal care services by the plan of

23   care and to bill by the actual time worked by the personal care

24   aides.  That absolutely shows he knew what he had been doing was

25   fraudulent.  And remember, before the search warrant, he had

```
 1   always directed that personal care services be billed by the

 2   plan of care, even though he had been told by numerous persons

 3   it was wrong.

 4          And also recall that for one week he agreed to bill by

 5   the actual time worked instead of the plan of care, but then

 6   went right back to the plan of care because he saw it brought in

 7   much more money.  But after the search warrant, and only after

 8   the search warrant, did he switch the billing for actual hours

 9   worked, which, as you saw from one of the summary charts, caused

10   the bills to go way down.  That's consciousness of guilt.

11          Two:  Firing his employees right after the search

12   warrant as if he then knew for the first time they had submitted

13   false time sheets.  He knew on an ongoing basis that those false

14   time sheets were being billed to Medicaid and was bringing him

15   hundreds of thousands of dollars.  He didn't care until the

16   search warrant was conducted and he knew that an investigation

17   was taking place, so then and only then did he quickly fire a

18   few employees for doing what he had known for years had been

19   going on.  Consciousness of guilt.

20          Three:  The effort by Wayne Perry to take up state

21   embezzlement charges against Vernice Spain, Sarina Freeman and

22   Sarina's daughter Shavonne.  You heard from Detective Flengas of

23   the Norfolk Police Department.  In April of this year, just a

24   few months ago, Wayne Perry went to the Detective Flengas and

25   tried to take out those charges.  Conveniently, conveniently, he
```

1  failed to mention that he himself was under indictment,

2  something the detective said he would like to have known.  But

3  also consider this:  Wayne Perry terminated Vernice Spain and

4  Sarina Freeman in December, 2012.  He could have tried to take

5  out state charges against them way back then, at that time.  But

6  he didn't go to see the detective until just a few short months

7  ago, shortly before this trial was to begin.

8          As the detective said, had he elected to investigate,

9  he would have questioned Vernice Spain and Sarina Freeman as

10  suspects.  Wayne Perry knew this, and this was nothing more than

11  an effort on his part to intimidate Vernice Spain and Sarina

12  Freeman and perhaps discourage them from testifying against him.

13  Consciousness of guilt.

14          Four:  Using Allison Hunter-Evans and her contacts in

15  an underhanded way to find out when the Clifton Gunderson audit

16  was going to take place.  Information he was not entitled to.

17  You saw those emails.  He knew there would be plenty of work to

18  do to alter records before that audit took place, so it was

19  important for Wayne Perry to know when Clifton Gunderson would

20  be coming, because he knew a lot of record alteration had to

21  take place, and he had to prepare for it.  Consciousness of

22  guilty.

23          Let's talk more about Wayne Perry.  And what I'm

24  referring to now are some things he said in his testimony that

25  are clearly false that nearly defy belief.

1      Mr. Perry denies billing by the plan of care, even

2  though witness after witness has testified he did it, even after

3  being cautioned against it.  He seems to have been very fond of

4  Nurse Linda Hanson.  Well, she said she knew that Wayne Perry

5  billed by the plan of care and that she discussed it with him

6  several times, to no avail.

7      And another he said to you that is clearly untrue:  He

8  said he never knew that Allison Hunter-Evans was working on

9  DMAS-90s and putting sticky notes on them for the employees to

10  alter records.  Do you really believe that, ladies and

11  gentlemen?  All the weekends before and after the March 2011

12  weekend that Ms. Ms. Hunter-Evans was on the premises, and

13  especially that long weekend in March, and he tells you he had

14  no idea she was working on DMAS-90s?  He's not being truthful

15  when he says that.  This comes from someone who ran around the

16  office and said "fix my records", and everyone knew what he

17  meant by that, which was to alter them as dictated by

18  Ms. Hunter-Evans Post-It Notes.  He wasn't paying her $45 an

19  hour for nothing.  He was doing it to alter the DMAS-90s in

20  order to conceal his fraudulent billing practices from Medicaid

21  so he wouldn't have to pay money back.  It wasn't just to work

22  on nurses' notes.

23      And if not billing by the plan of care, why did he

24  direct employees to alter records to match the plan of care?

25      And let's talk about why Sarina Freeman wasn't fired

1   by Wayne Perry until after the other search warrant, even though

2   other employees had complained to him about her.  He said it was

3   because she was really good at making the personal care aides

4   show up for work, and that was more important than the many

5   complaints against her.  Does that even make sense?  No, it

6   doesn't.  She wasn't fired until after the search warrant

7   because Wayne Perry knew she was doing exactly what he wanted:

8   Submitting false respite time sheets that were being billed to

9   Medicaid and bringing huge amounts of money to him.  It was only

10  after the search warrant when Wayne Perry knew he might really

11  be in trouble that he fired her.

12          Ms. Freeman said herself when she was asked on

13  cross-examination by Mr. Perry's attorney, "I only did what your

14  client instructed me to do."  And that's the truth.

15          The DMAS-90 time sheets.  You heard Artincy Hobbs, one

16  of the billers, tell you that the half-baked measures like the

17  inter-office communications were completely insufficient to bill

18  for actual hours worked.  There was no way she could keep up

19  with the discrepancies.  Not even close.

20          What's more, she told you that the Generations program

21  could have been used before the search warrant to show the

22  actual time worked by the aides according to the DMAS-90s, and

23  that it could have been more accurate than billing by the plan

24  of care, but Wayne Perry refused to allow that until the search

25  warrant, when he knew that an investigation was taking place.

1          Primary caregivers.  Mr. Davis did everything he could

2     to spin it and to twist the facts that there was no fraud here

3     with respect to several of the cases involving primary

4     caregivers, but he cannot get away from the facts.  For example,

5     Michael Mullen has lived in Maryland for decades while his

6     mother, Elizabeth Mullen, lived here in Norfolk.  Mr. Mullen,

7     you will recall, testified he never told anyone at Community

8     Personal Care that he was his mother's primary caregiver; that

9     in fact he was not his mother's primary caregiver; that no one

10    at Community Personal Care ever spoke with him about respite

11    care; that he never requested respite care; that he didn't even

12    know what respite care was.  And you might remember that he

13    certainly -- he said this with a chuckle -- he certainly needed

14    no relief from caring for his mother, because he lived in

15    Maryland while she lived in Norfolk.  And yet, as you've seen,

16    respite care services were billed to Medicaid.  That's fraud.

17          Likewise, William Hatton, the son of Lucille Hatton,

18    testified that he never told anyone that he was his mother's

19    primary caregiver; that he has never been his mother's primary

20    caregiver; that no one at Community Personal Care ever spoke

21    with him about respite care; that he never requested it, didn't

22    even know what it was.  And yet, as you've seen, respite care

23    services were billed to Medicaid.  That's fraud.

24          And then there was Renee Faulkner, the aunt of Casey

25    McCook, the shooting victim.  She told you that when Mr. McCook

1  was released from rehabilitation in Richmond, he moved back to

2  his own residence here locally.  She said she was not his

3  primary caregiver, and she knows what one is, because she's a

4  Medicaid provider herself.  She said she never advised anyone at

5  Community Personal Care that she was Mr. McCook's primary

6  caregiver; that she never requested respite care services; that,

7  in fact, she never had any contact whatsoever with anyone at

8  Community Personal Care, and that to her knowledge, Mr. McCook

9  lived alone in his own residence and did not have a primary

10  caregiver.  And yet, as you've seen, respite care services were

11  billed to Medicaid.  That's called fraud.

12          Let's talk semantics.  The defense likes to say that

13  Wayne Perry never used the exact phrase "falsify the respite

14  time sheets."  He didn't have to.  It was more than enough to

15  say "run the respite", "burn the respite", "get my numbers up",

16  "fix my records", "do what I say or you'll be fired".  Everyone

17  knew what this meant.  When Angela Perry said that Wayne needed

18  an additional $40,000, everyone knew what that meant.  The only

19  way to get it was to falsify respite time sheets.  And Renee

20  Neighbors noted that, at a staff meeting, Wayne Perry referred

21  to respite as "his respite".  And the only way to "fix" records,

22  ladies and gentlemen, to "fix" them, is to alter them.

23          And Renee Neighbors also said Wayne Perry told her and

24  others to sign and back date-time sheets.

25          And another employee, Betty Banks, I believe,

1   testified that Wayne Perry said at a staff meeting that respite

2   was nothing more than quote, unquote "dollars sitting there."

3            The defense says that Wayne and Angela Perry never

4   used the exact word "falsify", and therefore they're not guilty.

5   When you direct false billing, when you direct the alteration of

6   records, that conduct speaks for itself.  Your careful use of

7   words cannot insulate you from your crimes.

8            Common sense.  The judge has told you, you can use

9   your common sense.  Well, common sense tells you a lot in this

10  case.  Common sense tells you that the Perrys knew full well

11  about the false billings and alteration of records that they

12  themselves put into place.  In fact, remember the testimony of

13  Tamika Nichols, who said that, when she asked Wayne Perry how he

14  knew she had come in to work one weekend, he said that he knew

15  everything that went on in his company; that nothing got past

16  him.  And yet now Mr. Perry says he was blissfully unaware of

17  all the fraud that was going on all around him.  That defies

18  common sense.

19           Let's talk Angela Perry.  She was heavily involved in

20  this fraud.  It doesn't matter if she wasn't the owner.  It

21  doesn't matter if she wasn't the named provider.  That doesn't

22  mean she can't commit fraud, just like the defense has been fond

23  of saying about the other employees.  She was the one who

24  supervised the staffing coordinators, and she was the one who

25  said Wayne Perry needed a certain amount of dollars on his

```
 1  respite billing, $40,000 to be exact.  She even tried to

 2  carefully conceal the alteration of records that she directed.

 3  Remember that testimony of Sabrena Tabron, who did not receive

 4  immunity.  She said that Angela Perry even told her when she

 5  altered records she use a pen with the same color as the color

 6  already written on the time sheet.  Mr. Sacks says, well, she

 7  only looked at five charts or so when they pulled 10.  Mr. Sacks

 8  was mistaken.  This audit Sabrena Tabron did was in 2008.  2008,

 9  well-ahead of the 2011 audit by Clifton Gunderson.

10            As Renita Jones told you, Angela Perry told her not

11  just to add comments, but to back-date times sheets to make it

12  appear that the comments had been written down on the actual

13  date of the visit to the patient.  And this included time sheets

14  for Mary Jenkins, who was not even Renita Jones' patient.

15            Angela Perry told Sarina Freeman to do her best when

16  Sarina pointed out there were too many different handwritings on

17  one of the time sheets that she had been instructed by Ms. Perry

18  to "alter".

19            Vernice Spain testified that it was Angela who

20  directed her to change the times on personal care time sheets to

21  match the billing based on plan of care, and even to create new

22  time sheets when necessary.

23            And there are other witnesses who implicate Angela

24  Perry.  There's Lillie Bryant, who was artistic and forged

25  signatures.  Angela Perry told Artincy Hobbs to make sure to
```

1  give time sheets to Lillie to forge signature, because she was

2  artistic.  As Lillie said in her testimony, she didn't think she

3  needed to tell Angela Perry she was forging signatures.  And why

4  would that be, ladies and gentlemen?  Because Angela Perry was

5  there that weekend, in charge and observing what was going on.

6  She gave her instructions to the staff on Friday and she dropped

7  by on Friday night, Saturday night, and again on Sunday to make

8  sure her instructions were being carried out.  It doesn't matter

9  that she attended her mother's birthday party on Saturday.

10         Remember, among other witnesses, Sherrice Ford,

11  another person with no immunity, said that Angela Perry was in

12  charge that weekend.  And what happened that weekend was the

13  fraudulent alteration of DMAS-90 time sheets.

14         You've heard numerous former employees, and of course

15  Allison Hunter-Evans, say that Angela Perry directed the

16  alteration of records, even before the March 2011 weekend,

17  during that weekend, and even continuing after that weekend.

18  You would have to disbelieve all of these witnesses to conclude

19  that Angela Perry did not direct the alteration of records.

20         And remember, Angela Perry admitted when she was

21  cross-examined that the 10 charts identified by Clifton

22  Gunderson could have been pulled out and put in a cart in 10

23  minutes.  That's what should have been done, because alterations

24  are not permitted before an audit, as JoAnn Hicks from Clifton

25  Gunderson told you.  Instead, Angela Perry directed the

1   alteration of records by employees that began on a Friday and

2   didn't end until Sunday.  And it was Angela Perry who admitted

3   that billing by the plan of care is a fraud on Medicaid.

4          And they talk about how Allison Hunter-Evans wasn't

5   telling the truth.  Well, she was, and Angela Perry even

6   admitted to an extent about that conversation with Allison

7   Hunter-Evans talking about billing by the plan of care would be

8   the death of Wayne Perry.

9          And I don't want you to forget one of the instructions

10  that the court gave you.  The title of it is Conspirator's

11  Liability for Substantive Counts.  Conspirator's Liability for

12  Substantive Counts.  "A conspirator is liable for the crimes

13  committed by another co-conspirator if those crimes were

14  committed during a conspiracy and in furtherance of the

15  conspiracy."  The evidence shows that Angela Perry and Wayne

16  Perry were co-conspirators, and that makes Angela Perry not only

17  criminally responsible for the conspiracy count and the

18  alteration of records count, which the evidence clearly shows,

19  but also for all the billing offenses committed by Wayne Perry

20  as charged in those counts.  She is as guilty as he is.

21         Let me conclude, ladies and gentlemen, by again

22  reminding you, Angela Perry and Wayne Perry are not charged in

23  the superseding indictment with violating Medicaid regulations.

24  They're charged with violations of federal criminal law

25  including, as you have heard, conspiracy, healthcare fraud,

1   false statements relating to a healthcare matter, alteration of

2   records and aggravated identity theft.  The evidence shows they

3   committed these offenses.  And when Wayne Perry and Angela Perry

4   testified, ladies and gentlemen, they did so in an effort to

5   deceive you.  To con you.  Just like they deceived and conned

6   the Virginia Medicaid Program.  Don't let them deceive you.

7   Don't let them con you.

8           Allison Hunter-Evans accepted responsibility for her

9   crimes by pleading guilty, and now you can hold Wayne Perry and

10  Angela Perry accountable for their crimes by finding them guilty

11  as charged.

12          Contrary to what Mr. Davis told you, Ms. O'Boyle and I

13  do not think you're superficial.

14          I resented that comment.

15          We have the greatest respect for you.  And we believe

16  that when you review the evidence and the facts, you will find

17  the defendants guilty as charged, and on behalf of the United

18  States, I urge you to do so.

19          Thank you.

20          (Excerpt concluded.)

21                            - - -

22

23

24

25

2597

*CERTIFICATION*

*I certify that the foregoing is a true, complete and correct excerpted transcript of Volume 13 of the proceedings held in the above-entitled matter.*

_____

Paul L. McManus, RMR, FCRR

_____

Date

Paul L. McManus, RMR, FCRR Official Court Reporter